## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEW MEXICO DEPARTMENT OF INFORMATION TECHNOLOGY, 715 Alta Vista Santa Fe, NM 87502-0110 )))))) *Plaintiff*, )) v. ) U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, 200 Independence Avenue, S.W. Washington, D.C. 20201-0004 and MICHAEL O. LEAVITT Secretary of the Department of Health and Human Services, 200 Independence Avenue, S.W. Washington, D.C. 20201-0004 *Defendants*. | Civ. No. _____ |

NEW MEXICO
DEPARTMENT OF INFORMATION
TECHNOLOGY,
715 Alta Vista
Santa Fe, NM 87502-0110

       *Plaintiff*,

   v.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, D.C. 20201-0004

   and

MICHAEL O. LEAVITT
Secretary of the Department of Health
  and Human Services,
200 Independence Avenue, S.W.
Washington, D.C. 20201-0004

       *Defendants*.

Civ. No. _____

## COMPLAINT

### PRELIMINARY STATEMENT

1.      This is a complaint for declaratory and injunctive relief brought by the

New Mexico Department of Information Technology ("New Mexico" or "the State"), seeking

relief from the decision of the Secretary of Health and Human Services ("HHS"), acting through

delegated officials, to recover approximately $4,000,000 from the State for "overcharges" to

federal programs. The actual overcharges (including the interest preceding the date of the penalty) were $1.85 million. The attempt to recover more than twice the actual amount of overcharges is unauthorized by law, and constitutes arbitrary and capricious agency action for which the State seeks relief from this Court.

2.    On June 22, 2006, defendant Division of Cost Allocation ("DCA"), an agency within HHS, informed the State that DCA was imposing a disallowance of $4,011,031. The disallowance was based on the assertion that in State Fiscal Year ("SFY") 2004, the State charged rates in excess of the cost of providing certain information services. Federal programs bore some of the costs of these services.

3.    The State appealed the disallowance to HHS's Departmental Appeals Board ("DAB"). The DAB was created by HHS to resolve matters including disputes related to cost allocation plans. 45 C.F.R. Part 16, Appendix A, ¶ D. The decisions of the DAB are the final administrative action of HHS. Department of Health & Human Services, Final Rule, Grant Appeals Board, 46 Fed. Reg. 43816, 43817 (Aug. 31, 1981).

4.    In a decision dated May 17, 2007, the DAB upheld the full disallowance against the State. DAB No. 2083 (attached as Exhibit A).

5.    Because of DCA's illegal and improper imposition of an excessive disallowance and the DAB decision upholding it, Plaintiff seeks a declaration from this Court that the Defendants' action was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. New Mexico also seeks an injunction restraining HHS from enforcing any disallowance amount in excess of $1,852,193.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, which provide for original jurisdiction in suits involving questions arising under federal law and suits to compel action by federal agencies.

7.    New Mexico's request for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.  There presently exists an actual controversy between the parties.

8.    Judicial review is authorized by the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.  The May 17, 2007 DAB decision upholding the disallowance constitutes "final agency action" within the meaning of 5 U.S.C. § 704.

9.    Venue in this Court is proper under 28 U.S.C. § 1391(e)(1), inasmuch as Defendants reside in this district.

## PARTIES

10.    Plaintiff New Mexico Department of Information Technology, formerly part of the New Mexico General Services Department, is a New Mexico State agency responsible for administering the information services at issue in this action.

11.    Defendant HHS is a federal agency that administers a number of joint federal-state  programs.  DCA is the cognizant agency responsible for reviewing and approving statewide cost allocation plans ("SWCAPs") for states that administer federal-state programs.

12.    Defendant Michael O. Leavitt is the Secretary of HHS.  In that capacity he is responsible for the overall administration of HHS.  Secretary Leavitt is sued in his official capacity.

## BACKGROUND

A.     <u>Factual and Legal Background</u>

13.     Office of Management and Budget ("OMB") Circular A-87 controls the process by which States charge the federal government for administrative services benefiting federal programs. The provisions of OMB Circular A-87 apply to all federal agencies responsible for administering programs that involve grants to and contracts with state and local governments. Office of Management and Budget, Final Revisions to OMB Circular A-87, Attachment A, ¶ A.1, 60 Fed. Reg. 26,484, 26,490 (May 17, 1995) ("Circular A-87").

14.     OMB Circular A-87 provides that each state that receives federal program grants must submit for approval a SWCAP identifying its central service costs and describing the method by which these costs will be distributed among benefiting programs.

15.     The "central services" referred to in Circular A-87 are administrative services provided by a state on a centralized basis to its various departments and agencies ("customer agencies"). Central services include computer and information services. Customer agencies may pass on to the federally-funded programs that they administer an appropriate portion of the state central service costs that are allocated or billed to them in accordance with the state's approved SWCAP.

16.     The information services at issue in this action include hardware, software, and email services, as well as technical support, provided to customer agencies. The services are provided through an internal service fund ("ISF"), which is one mechanism for providing central services. The services are "billed central services," which means that they are charged to customer state agencies on a fee-for-service basis.

17.    The State's information services ISF provided more than two dozen categories of information services in SFY 2004.  A rate for each service was established prior to the beginning of each fiscal year reflecting the estimated cost of providing the service.  Circular A-87 approves of the practice of subdividing services within an ISF in this fashion, because it ensures that "central service costs can be identified and assigned to benefitted activities on a reasonable and consistent basis."  Circular A-87, Attachment C, ¶ A.1.

18.    The primary customer agency of the ISF in SFY 2004 was the state Human Services Department ("HSD"), which administers Medicaid and other federal benefit programs in partnership with HHS.

19.    The ISF's costs include the direct costs of providing services, depreciation costs, and overhead costs.  The State uses an allocation method to assign per-unit costs to each of the service functions included in the ISF.  Usage units differ based on the function.  For example, central processing unit services are provided per hour, and printing is provided per page.

20.    Each year, States submit information about ISFs in their SWCAPs to a cognizant agency responsible for reviewing central service costs.  DCA is the cognizant agency for New Mexico's SWCAP, and is responsible for negotiating and approving the SWCAP. DCA may demand a refund when it concludes retrospectively that the federal government has borne excessive costs for central services.

21.    Circular A-87 states that its principles, including the SWCAP approval process, are "designed to provide that Federal awards bear their fair share of cost recognized under these principles except where restricted or prohibited by law."  Circular A-87, Attachment A, ¶ A.1.

22.     Under Circular A-87, billing rates in ISFs must be based on the cost of services. However, the ISF may maintain a working capital reserve sufficient to cover sixty days' cash expenses for normal operating purposes.

23.     Because the projected costs used to establish billing rates in an ISF inevitably differ from actual costs retrospectively determined, Circular A-87 provides for a two-step cost reconciliation process. First, the State must make, at least annually, "[a] comparison of the revenue generated by each billed service . . . to the actual allowable costs of the service . . . ." Circular A-87, Attachment C, ¶ G.4. Second, "an adjustment will be made for the difference between the revenue and the allowable costs." *Id.* In mandating this adjustment, Circular A-87 does not distinguish situations of ISF profit, where revenues generated exceed the cost of providing services, from situations of ISF loss, where revenues fall short of cost.

24.     New Mexico's SWCAP governing expenditures in fiscal year 2004 provided that adjustments for cost-revenue variances in billed central services "will be made in accordance with procedures agreed to between the State/locality and the Cognizant Agency."

25.     After each fiscal year, New Mexico analyzes actual costs for that year attributable to each service category of the information services ISF. The State then compares these costs with revenues. The State then takes into account the 60-day reserve for operating revenues permitted by Circular A-87, in order to obtain a final profit or loss for each service category.

26.     New Mexico submitted to DCA its SWCAP containing actual ISF costs and a reconciliation of profits and losses for fiscal year 2004 on October 15, 2005. New Mexico made amendments to the submission in subsequent correspondence. For the information services ISF, the State determined the federal participation in the overcharges and undercharges

to each state agency for each service category. The State then computed a total federal

overcharge for each state agency, which took into consideration all cost-revenue variances,

whether overcharges or undercharges, in all service categories.

27.    The State's calculation disclosed that in total, the ISF overcharged federal

programs by $1.78 million in SFY 2004. Of this amount, $1,716,068 was attributable to federal

programs administered by the primary fund customer agency, HSD.

B.    The DCA Disallowance

28.    DCA issued a disallowance letter against the State on June 22, 2006, in the

amount of $4,011,031. DCA accepted the calculations that the State had provided in its SWCAP

and subsequent correspondence, but based its disallowance on only five of the numerous service

categories in the ISF. These five categories each had excess balances totaling more than

$500,000.

29.    DCA computed the base disallowance amount of $3,790,567 by totaling

the federal share of overcharges in those five service categories to three state customer agencies:

HSD; the Department of Health ("DOH"); and the Children, Youth and Families Department

("CYF"). DCA disregarded the federal share of the difference between revenues and allowable

costs in other service categories, including all of those in which the ISF sustained a loss (i.e.,

charged insufficient rates).

30.    The base disallowance amount incorporated pre-disallowance interest

during fiscal year 2004, and DCA imposed an additional $220,464 in interest for the period from

June 30, 2004 through June 22, 2006.

31. Of the base disallowance amount, $3,723,891 was attributable to overcharges to HSD. The remaining $66,676 of the base amount was attributable to overcharges to DOH and CYF.

32. The disallowance letter stated that if payment were not received within thirty days, post-disallowance interest would be assessed from June 22, 2006 forward, at a rate of 12 1/8%, in accordance with 45 C.F.R. Part 30.

C.     The State's Appeal to the DAB

33. The State appealed the disallowance to the DAB to correct the excessive refund assessed by DCA, which occurred because DCA considered only ISF service categories in which the ISF realized a profit (i.e., overcharged customer agencies) in excess of $500,000, and disregarded categories in which the ISF sustained a loss (i.e., undercharged customer agencies) or a profit less than $500,000. The State conceded that it should repay the federal government $1.85 million, the net amount of ISF overcharges to Federal programs administered by HSD, DOH, and CYF during SFY 2004, including pre-disallowance interest.

34. Circular A-87 provides that the retrospective reconciliation of central service charges should cover "the difference between [ISF] revenue and the allowable costs." Circular A-87, Attachment C, ¶ G.4. The provision encompasses any cost-revenue variance and does not distinguish profit and loss situations. HHS's manual interpreting Circular A-87 states as the chief goal of the cost reconciliation "that the Federal programs charged in a given year receive an equitable and appropriate adjustment for *over/under billings*." HHS, *Implementation Guide for Office of Management and Budget Circular A-87 (ASMB C-10)* (1997)*, 4.8, 4-14 (emphasis added).

D.    The DAB Decision

35.    In its May 17, 2007 decision on appeal, the DAB sustained the full amount of the disallowance, holding that DCA could consider only service-category overcharges when computing the disallowance amount, without offsetting the undercharges.

## COUNT I

(Defendants' Refusal To Consider Undercharges in Calculating Disallowance Was Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Not in Accordance with the Law)

36.    Plaintiff repeats and re-alleges every allegation in paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37.    Defendants' action in imposing a disallowance that took into consideration only certain ISF service categories with overcharges, and disregarded service categories with undercharges, was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). Defendants' action, and the DAB decision upholding it, should be reversed.

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiff prays that this Honorable Court:

A.    Enter judgment declaring that HHS DAB Decision No. 2083 was arbitrary and capricious, an abuse of discretion, and contrary to the requirements of federal law, and unlawful, null, void, and of no legal effect;

B.    Issue a permanent injunction requiring Defendants to modify the amount of the disallowance against Plaintiff from $4,011,031 to $1,852,193; and

C.    Award Plaintiff such other relief as may be just and proper.

Respectfully submitted,

Charles A. Miller (D.C. Bar No. 8904)
Susannah Vance (D.C. Bar No. 496163)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-5410

Attorneys for the State of New Mexico
Department of Information Technology

September 10, 2007

- 10 -

**EXHIBIT A**

Department of Health and Human Services

# DEPARTMENTAL APPEALS BOARD

Appellate Division

SUBJECT:  New Mexico General              DATE:  May 17, 2007
          Services Department
          Docket No. A-06-105
          Decision No. 2083

## DECISION

The New Mexico General Services Department (New Mexico) appealed
a determination made by the Division of Cost Allocation (DCA) of
the Department of Health and Human Services (HHS).  The
determination related to computer services New Mexico provided to
various State agencies in State Fiscal Year (SFY) 2004 and
charged to federal funds using billing rates.  DCA determined
that New Mexico had not been following the requirements for using
billing rates to allocate costs to federal programs.  DCA asked
for a cash refund of $4,011,031 (including interest) for
overcharges to federal funds for five categories of computer
services.

On appeal, New Mexico concedes that it must refund $1,852,193 in
federal funds (including interest), but argues that the
overcharges for some types of computer services billed to
specific federal programs operated by the New Mexico Human
Services Department should be offset by undercharges for other
types of services billed to those programs.  New Mexico argues
that, because it has identified the overcharges and undercharges
to specific federal programs, the Board's decision in Arkansas
Department of Information Systems, DAB No. 2010 (2006) (Arkansas
I) does not control here.  New Mexico also requests that the
Board revisit its holding in New Mexico General Services Dept.,
DAB No. 1876 (2003) (New Mexico I), to the extent it rests on the
conclusion that DCA need not take undercharged amounts into
consideration in the cost settlement process because those
amounts were not claimed to individual federal programs and were
not substantiated.  In response, DCA asks that we issue a summary
decision upholding the disallowance here, based on our past
decisions.

2

Since New Mexico's presentation here seeks to address some of the concerns about offsetting that led to our past decisions and raises some new issues, we decline to issue a summary decision based on our analysis in those decisions. Based on our analysis in those decisions and below, however, we conclude that New Mexico has not adequately addressed the concerns that led us to uphold DCA in those decisions and that DCA used a method to calculate a refund due for overcharges that was reasonable under the circumstances here. New Mexico has failed to meet federal requirements for billing its computer services over a period of many years and, specifically, failed to follow the adjustment methodology adopted in its cost allocation plan for SFY 2004. Despite characterizing its analysis of the amount due as merely offsetting overcharges and undercharges for SFY 2004 at the individual federal program level, New Mexico is effectively seeking to offset overcharges in SFY 2004 against undercharges during a prior period, without the required approval for carrying those undercharges forward into SFY 2004. If we permitted this offset, it would put New Mexico in a better position with respect to federal funding than if it had met federal requirements and made adjustments according to its approved methodology. Contrary to what New Mexico argues, the flexibility permitted states in choosing a cost allocation methodology does not mean that a state may adopt one methodology in its cost allocation plan, fail to apply that methodology in a timely manner, and then seek to have the benefit of an alternative type of adjustment, with consequences that include circumventing federal program requirements. The goal of the federal cost allocation principles, as New Mexico points out, is to provide assurance of appropriate and equitable allocation of costs, but that does not help New Mexico here. New Mexico has not shown that the adjustments it seeks to make here are appropriately made at this point in time nor has New Mexico adequately supported its assertion that requiring it to repay the amount DCA calculated was owed would result in a significant inequity to New Mexico, especially since DCA used the overcharge amounts from a worksheet provided by New Mexico.

## Applicable Law, Regulations, and Cost Principles

The allowability of costs claimed by state governments under federal grants is governed by Office of Management and Budget (OMB) Circular A-87. 45 C.F.R. §§ 74.27(a) and 92.22(b).[1] To be

---

[1]    OMB Circular A-87 was most recently revised in 2004, and, in 2005, its provisions were relocated to the Code of Federal Regulations at 2 C.F.R. Chapter II. 70 Fed. Reg. 51,910 (Aug.
(continued...)

3

allowable, a cost must, among other things, be necessary and
reasonable for proper and efficient performance and
administration of a federal award, conform to any limitations or
exclusions in governing regulations as to types or amounts of
costs, and be allocable to the award.  OMB Circular (Cir.) A-87,
Attachment (Att.) A, ¶ C.1.  A cost is allocable to a particular
cost objective if the goods or services involved are chargeable
or assignable to such cost objective in accordance with relative
benefits received.  OMB Cir. A-87, Att. A, ¶ C.3.a.

This dispute concerns the disposition of federal funds that New
Mexico claimed for central service costs.  Central service costs
are the costs of services provided by a state on a centralized
basis to its various departments and agencies, which in turn may
receive federal funding in those costs, to the extent they
administer federally-funded programs.

To ensure that central service costs are identified and assigned
to benefitting federal programs and activities on a reasonable
and consistent basis, OMB Circular A-87 establishes a process for
submission and approval of a central service cost allocation plan
(CAP).  OMB Cir. A-87, Att. C, ¶ A.1.  A CAP is the documentation
identifying, accumulating, and allocating (or developing billing
rates based on) the allowable costs of services provided by a
governmental unit on a centralized basis to its departments and
agencies.  OMB Cir. A-87, Att. A., ¶ B.4.  "In essence, the CAP
identifies the central support services that qualify for federal
financial participation and describes how central support
agencies allocate the costs."  Alabama v. Shalala, 124 F. Supp.
2d 1250, at 1253 (M.D. Ala. 2000).  The requirements for CAPs are
listed in OMB Circular A-87, and in an HHS implementation guide
issued pursuant to OMB Circular A-87, "A Guide for State and
Local Government Agencies:  Cost Principles and Procedures for
Establishing Cost Allocation Plans and Indirect Cost Rates for
Agreements with the Federal Government" (ASMB C-10).  OMB Cir. A-
87, Att. C, ¶ A.2.[2]

For each year that a state claims central service costs under
federal awards, it must submit a CAP for review, negotiation, and
approval by the cognizant federal agency.  OMB Cir. A-87, Att.
C., ¶¶ D.1, F.1.  HHS is the cognizant federal agency for New

---

[1](...continued)
31, 2005).  The relevant provisions for this appeal have been in
effect since 1995.  60 Fed. Reg. 26,484 (May 17, 1995).

[2]  ASMB C-10 replaced "A Guide for State and Local
Government Agencies," OASC-10 (Dec. 1976).

4

Mexico, and DCA is the HHS component responsible for CAPs. The CAP must include a projection of the next year's costs and a "reconciliation of actual allocated costs to the estimated costs used for either the most recently completed year or the year immediately preceding the most recently completed year." Id., Att. C, ¶ D.

Costs of central services omitted from the plan will not be reimbursed. Id., Att. C, ¶ C. All cost and other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the propriety of the costs assigned to federal awards. Id., Att. C, ¶ A.1. All central service CAPS "will be prepared and, when required, submitted within six months prior to the beginning of each of the governmental unit's fiscal years in which it proposes to claim central service costs" although the cognizant agency may grant an extension. Id., Att. C, ¶ D.4.

Costs of central services that are allocated to benefitted agencies on some reasonable basis (but are not billed to those agencies) are included in Section I of a CAP and are called "allocated central services" or "Section I" costs. Services that are billed to benefitted agencies and/or programs on an individual fee-for-service or similar basis are included in Section II of a CAP and are called "billed central services" or "Section II" costs. Id., Att. C, ¶¶ B.1, B.2.

The revenues that a state agency receives from other state agencies for billed central services may be accounted for through an "internal service fund" (ISF), which the state uses to finance those services. Because ISFs are typically funded through periodic billing cycles, charges by an ISF activity to provide for the establishment and maintenance of a reasonable level of working capital reserve are allowable since this enables the ISF to pay expenses as they arise. Except in exceptional cases, a working capital reserve as part of retained earnings is considered reasonable if it does not exceed 60 days cash expenses for normal operating purposes. Id., Att. C, ¶ G.2. The allowance for a working capital reserve is an exception to the general policy that federal grantees may not make a profit by charging a federal award more than the cost of the services. ASMB C-10, ¶ 1.6, Question 1-4; OMB Cir. A-87, Att. A, ¶ A.1.

As part of a statewide CAP, a state government must provide specific documentation about ISFs, including a fiscal year-end reconciliation schedule showing the revenues, costs, and year-end balance. OMB Cir. A-87, Att. C, ¶¶ E.3.b(1), G.4; ASMB C-10, ¶ 4.8, Question 4-7. The cognizant agency has flexibility to request additional documentation on a case-by-case basis. OMB

5

Cir. A-87, Att. C, § E.  An ISF may cover more than one category
of service provided by a central services agency, but "[e]ach
billed central service activity must separately account for all
revenues (including imputed revenues) generated by the service,
expenses incurred to furnish the service, and profit/loss."  Id.,
Att. C, ¶ G.1.

With respect to revenues, OMB Circular A-87 provides:

> Revenues shall consist of all revenues generated by the
> service, including unbilled and uncollected revenues.
> If some users were not billed for the services (or were
> not billed at the full rate for that class of users), a
> schedule showing the full imputed revenues associated
> with these users shall be provided.

Id., Att. C., ¶ E.3.b(2).  With respect to billing rates, OMB
Circular A-87 provides:

> Adjustments of billed central services.  Billing rates
> used to charge Federal awards shall be based on the
> estimated costs of providing the services, including an
> estimate of the allocable central service costs.  A
> comparison of the revenue generated by each billed
> service (including total revenues whether or not billed
> or collected) to the actual allowable costs of the
> service will be made at least annually, and an
> adjustment will be made for the difference between the
> revenue and the allowable costs.

Id., Att. C, ¶ G.4 (emphasis added).  Adjustments are to be made
be made through one of four specified methods (set out and
discussed below).

Proposed CAPs must be accompanied by a certification that the
costs included in the proposal are allowable and properly
allocable to federal awards in accordance with federal
requirements, and that similar types of costs have been accounted
for consistently.  OMB Cir. A-87, Att. C, ¶ E.4., see also ¶ E.1.
This reflects basic guidelines for allowability of costs under
federal awards, including that costs must be consistent with
procedures that apply uniformly to both federal awards and other
governmental activities and be accorded consistent treatment.
Id., Att. A, ¶ C.1.

Negotiation of central service CAPs generally results in an
agreement that will be accepted and used by all federal agencies.
A negotiated agreement may be reopened in some circumstances
(including if the information on which the plan was negotiated is

6

later found to be materially incomplete or inaccurate) or may be
subject to adjustments or refunds for costs that are unallowable
or clearly not allocable to federal awards. Id., Att. C, ¶¶
F.2., F.3. If a dispute arises in the negotiation of a plan, the
dispute is resolved using the appeals procedures of the cognizant
agency. Id., Att. C, ¶ G.6.

Revisions to OMB Circular A-87 in 1995 clarified some
requirements for ISFs. After the revision, DCA issued ASMB C-10,
pursuant to the specific provision in the Circular providing for
HHS guidance. ASMB C-10 says it applies to costs claimed through
statewide CAPs for new agreements due after October 1, 1997.

While having and following an approved CAP is a prerequisite for
allocating central service costs to federal programs, not all
allocated costs are allowable costs for purposes of the federal
grants to which they are allocated. Federal funding may not be
available for costs allocated to a particular federal grant if
federal funding for a particular type of cost is subject to a
cap, if requirements for timely filing of claims are not met, or
if other restrictions on costs apply and are not met. Indeed,
OMB Circular A-87 specifically notes that, in addition to the
restrictions contained in the Circular, "there may be laws that
further limit the amount of administrative or indirect costs
allowed." OMB Cir. A-87, Att. A, ¶ F.3.; see also ¶ C.1.

Board cases, based on applicable law and regulations, hold that
the burden of demonstrating the allowability and allocability of
costs for which funding was received under a grant rests with the
grantee. See, e.g., Maryland Dept. of Human Resources, DAB No.
1886 (2003); New Jersey Dept. of Human Services, DAB No. 1797
(2001); Texas Migrant Council, Inc., DAB No. 1743 (2000) and
cases cited therein; see also 45 C.F.R. §§ 74.50- 74.53 (general
grant documentation and record-keeping requirements) and 45
C.F.R. Part 92 (administrative requirements for state grants).
This fundamental principle of grant law ultimately derives from
the requirement that federal funds may be expended only for the
purposes for which they were appropriated, and no other, absent
specific legal authority otherwise. U.S.C.A. Const. Art. I § 9,
cl. 7 (Appropriations Clause); 31 U.S.C.A. § 1301(a).

## Background

New Mexico has an ISF that provides computer services - hardware,
software, email services, and technical support - to New Mexico
State agencies (customer agencies). In SFY 2004 (ending June 30,
2004), the ISF included over 30 categories of services. NM Exs.
8.a. and 8.b. The costs of the services include the direct costs

7

of providing the services and allowable indirect costs. New Mexico issued monthly invoices to State agencies using billing accounts that were established to reflect distinct activities. New Mexico billed for all of the ISF services since the ISF relies entirely on customer agency payments (and interest earned on those payments) in order to operate. The computer services are provided by the New Mexico General Services Department (GSD), specifically, the Information Systems Division (ISD).

New Mexico originally set its rates for computer services by reference to the rates that a private provider of information services would charge. In 2001, DCA issued determinations for FY 1995 through FY 1999, disallowing more than $8,000,000 in federal funds for billings in excess of costs for the services. New Mexico did not deny it was not following the OMB Circular A-87 process of adjusting rates to costs at least annually, but challenged DCA's methodology for determining the amount to be refunded. New Mexico contended that it should be permitted to offset or "net" undercharges against overcharges in determining the amount owed to the federal government. The Board upheld DCA's determination in <u>New Mexico I</u>, for reasons we explain below.

After DCA had advised New Mexico that it needed to use a cost-based system for establishing rates, New Mexico began calculating rates based on costs for SFY 2000 through SFY 2004, using a cost allocation methodology it worked out with DCA. Rather than implementing new cost-based rates each fiscal year, however, New Mexico continued to use the rate calculated for SFY 1999 through the period at issue here. NM Ex. 5 (Peters Affidavit), ¶ 7.

In August 2003, after the Board issued its decision, DCA field office staff met with officials of the New Mexico General Services Department to discuss how to bring the required reporting back into compliance with OMB Circular A-87. In June 2004, DCA field office staff again met with New Mexico officials to discuss New Mexico's rate restructuring process.

On February 4, 2005, DCA issued a determination for SFY 2000 through SFY 2003 seeking a refund of over $3,000,000 in overcharges for computer services in three billing rate categories, plus interest, for a total refund of $3,274,624. DCA Ex. 5. This determination, like the earlier one, was based on New Mexico's failure to adjust its billing rates in order to eliminate reserves in excess of the amount permitted by OMB Circular A-87. New Mexico did not appeal this determination, instead electing to reimburse the federal government in full.

8

New Mexico's applicable statewide CAP (SWCAP) describes its
billing methodology as follows:

>The State's department/agencies are requested to provide
>information on the billing accounts they want
>established to accumulate the cost of the services
>provided by ISD related to these accounts.  As services
>are requested by the departments/agencies throughout the
>year, they also identify the billing account to be
>billed that is associated with the request.  As ISD
>generates the data in response to each request, all
>resources used by service (units of service by billing
>rate) are identified and charged to the specific account
>identified on the request.

>In March/April of each year, a "mid-year realignment" is
>performed to adjust the billed costs to the actual,
>allowable costs as defined by OMB Circular A-87.  The
>billing rates are adjusted to reflect actual usage and
>costs to that point in time plus the expected usage and
>costs to the end of the year.  Based on the new billing
>rates by service, any over/under recovery associated
>with each account is adjusted to reflect the new billing
>rates and the actual usage by that account.  An adjusted
>bill by account is sent to the respective
>departments/agencies.  In this manner, each account
>receives an adjustment proportional to its actual usage.
>This same process is also performed at the end of the
>year.

9

DCA Ex. 2.[3] New Mexico admits, however, that it did not perform the mid-year realignment in SFY 2004. NM Br. at 12, n. 8. The deadline for New Mexico to submit its SWCAP for FY 2004, including the cost reconciliation for its ISF, was December 31, 2004, six months after the end of the state fiscal year. New Mexico did not submit the plan until October 15, 2005, almost 10 months late, and after the end of SFY 2005. The SWCAP submission included a profit/loss analysis by service and identified both the "Published Service Rates" and the "Service Rates Based on Actual Service Costs." NM Ex. 4. New Mexico does not, however, claim to have ever sent adjusted bills for SFY 2004 by account to the departments/agencies for the variance between the two rates, pursuant to the SWCAP methodology.

On February 22, 2006, DCA issued a determination for SFY 2004 requesting refund of the amount DCA had determined was the federal share of excess reserve balances in the ISF as of June 30, 2004. See NM Ex. 2. After New Mexico submitted some additional information, DCA issued a revised determination on June 22, 2006, reducing the amount of the refund owed to $4,011,031, including interest. Id. The revised determination calculated the refund due for five service categories in which the excess reserve balances exceeded $500,000. Sixteen (16) categories of service had undercharges to HSD for the fiscal year

---

[3] New Mexico cites to its Exhibit 4.a. as the "SWCAP governing expenditures in fiscal year 2004." NM Br. at 11. This exhibit is a cost allocation agreement dated February 22, 2005, after the end of SFY 2004. Normally, the billing rate methodology that applies to a given year is established prior to that year, however, and the actual costs for the year are reported in the SWCAP due within six months of the end of the year. Both parties' exhibits, in any event, include the excerpt quoted above regarding the allocation methodology, on pages dated April 11, 2004. Since this document includes a methodology for adjusting for billed costs to actual allowable costs twice a year and for also adjusting the billings to the program accounts, we cannot agree with New Mexico's assertion that the "SWCAP does not set forth the specific method for implementing the cost reconciliation." NM Br. at 11. In support, New Mexico cites language in the agreement that "[a]djustments for variances between billed costs and the actual allowable costs of providing the services, as defined by OMB Circular A-87, will be made in accordance with the procedures agreed to between the State/locality and the Cognizant Agency." Id. citing NM Ex. 4.a. This boilerplate language cannot reasonably be read as meaning that a state could disregard the adjustment procedures set out in a document attached to the agreement, as New Mexico did.

10

because the actual cost per unit of service was greater than the per unit rate charged.[4]

On appeal, New Mexico does not challenge DCA's revised determination that New Mexico owes a refund of $66,676 in federal funds claimed for computer services provided to two State departments that receive federal funds – the Department of Health and the Children, Youth and Families Department.  NM Br. at 3. New Mexico does, however, challenge DCA's determination of an amount owed for the federal share of overcharges to the New Mexico Human Services Department (HSD).  HSD administers a number of federal assistance programs, including Medicaid, Child Support Enforcement, Food Stamps, the Low Income Home Energy Assistance Program, Refugee Cash and Medical Assistance, and Temporary Assistance for Needy Families, as well as a State-only General Assistance program.  New Mexico requests that the Board either "correct the amount of DCA's disallowance" based on the information New Mexico provides with its appeal concerning computer services charged to HSD programs in FY 2004, or "remand the matter to DCA to compute the disallowance in a manner conforming with federal law."  NM Br. at 3.  New Mexico asserts that DCA's determination here is in conflict with HHS' own policy guidance on OMB Circular A-87 and with OMB's stated intent to accord flexibility to states.  New Mexico argues that past Board decisions were wrongly decided and, in any event, distinguishable.  New Mexico provides an analysis that New Mexico says shows that the federal share of the amount it should repay for services provided to HSD programs is $1,683,715, including imputed interest.  Since, as noted above, New Mexico does not seek to reduce the refund amount for non-HSD programs of $66,676, New Mexico is conceding its owes $1,852,193 in federal funds.

_____

[4]  New Mexico says that, of the 32 service categories it lists in Exhibit 8.a., "six had neither undercharges nor overcharges to HSD, because HSD had no charges in fiscal year 2004 in these categories."  NM Br. at 12, n. 9, citing NM Ex. 2, Att. 1.  Yet, the analysis New Mexico submitted titled "Totals, All HSD Billing Accounts" lists 39 accounts, seven of which have either a zero or no amount in Column H ("Actual ISD Billable Revenues") and two of which have an "N/A" in that column (I/O General and Print General).  NM Ex. 9.b., unnumbered page 12. The other 30 service categories show some billable revenues in Column H.  This analysis also shows that, for one category (Tape Storage), the actual billable revenues were the same as the actual service cost for SFY 2004.

11

## Discussion

At the outset, we note that meeting federal requirements is a prerequisite for billing central services to federal funds. New Mexico had been failing for many years to comply with federal ISF requirements for billing central services and failed to make adjustments to the billed amounts using the methodology in its approved SWCAP for SFY 2004. New Mexico concedes that its failures resulted in substantial overcharges to federal funds for certain categories of computer services. Yet, DCA seeks a refund only for the overcharges in excess of permissible reserves for five service categories (and related interest). The reasonableness of DCA's determination of the refund amount, and New Mexico's arguments, must be considered in this context.

### 1. DCA's determination and past Board decisions are consistent with ASMB C-10 and the intent of the OMB requirements.

New Mexico first raises a legal argument, based on the policy guidance in ASMB C-10 and the intent of the OMB requirements. This argument refers to the part of OMB Circular specifying four different methods for adjusting for the variance between the revenues for a service and the actual, allowable costs of the service. OMB Circular A-87 states:

> A comparison of the revenue <u>generated by each billed service</u> . . . to the actual allowable cost <u>of the service</u> will be made <u>at least annually</u>, and an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central services costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal Share and non-Federal [Share]) exceeds $500,000.

OMB Circular A-87, ¶ G.4.

New Mexico focuses only on the listing of the adjustment methods and contends:

> At issue in this case is DCA's assertion – in tension with HHS' own policy guidance, and with OMB's stated

12

> intent to accord flexibility to States - that an
> adjustment under method (a)(refund to the federal
> government), as distinguished from all of the other
> adjustment methods listed in Paragraph G.4, does not
> permit any consideration of functional categories in
> which the State undercharged federal programs.  The
> policy guidance conflicting with DCA's stance, the ASMB
> C-10, states that in choosing a method of adjustment,
> "[t]he primary concern would be the assurance that
> Federal programs charged in a given year receive an
> *equitable and appropriate* adjustment of the *over/under
> billings*."  Ex. 1, ASMB C-10, Pt. 4, 4.8, 4-14 (emphasis
> added).

NM Br. at 5.  According to New Mexico, "the overcharges and the
undercharges were established in the same manner, using
approaches approved" by DCA.  Id. at 15.  New Mexico argues that
the "refund is an adjustment intended to correct *any* difference
between revenue and allowable costs in an internal service fund"
and that "DCA's contention that the 'refund' option may properly
include only overcharges, because it is intended to function as a
penalty where a State fails timely to pursue other adjustment
options, is entirely unsupported in Circular A-87 and its
regulatory history."  Id.  New Mexico also asserts that "[n]o
authority sets forth DCA's alleged deadlines for the other
adjustment options."  Id.

These arguments have no merit.  First, New Mexico's argument
ignores the fact that the adjustment options in Attachment C,
Paragraph G.4., considered in context, are options for cost
allocation plan methodologies to adjust for any variance between
a billing rate and the actual costs of a service <u>for a fiscal
year</u> and that the methodology New Mexico adopted in its approved
SWCAP for SFY 2004 was alternative (b).

In ASMB C-10, DCA discussed the adjustment methods in a question-
and-answer format, at Question 4-12:

> **Attachment C, paragraph G.4 establishes four methods for
> adjusting internal service funds (billed central
> services) for profits or losses realized from
> operations.  Alternative (b) allows credits to amounts
> charged to the individual programs.  This method would
> only cover profits.  If losses occur, why can't
> individual programs be debited? [Att. C, ¶ G.4]**

Effectively, alternative (b) is correcting billed costs
in the <u>current</u> year, whereas alternative (c) is carrying

13

> forward the profit/loss into the <u>next open fiscal period</u>.
>
> The failure of the Circular to note how losses are to be treated in alternative (b) is an editing error.  For consistency purposes, both alternative (b) and (c) cover profit and loss situations.  However, only one method can be used in a given fiscal year.

ASMB C-10, Part 4, § 4.8, Question 4-12 at page 4-27 (bold in original, underlining added).  This response does indicate that, under alternative (b), a state may either credit an individual federal program for a profit resulting from an overcharge for a service or debit the program for a loss resulting from an undercharge for the service.  As the Board pointed out in <u>New Mexico I</u>, however, ASMB C-10 highlights the time-sensitive nature of alternatives (b) and (c) (current credits or debits or future rate changes).[5]  In <u>Arkansas I</u>, the Board held that the ASMB C-10 interpretation of Paragraph G.4. is reasonable since the adjustment methods follow the requirement for a comparison of revenue to actual costs for each service "at least annually."  Thus, New Mexico is mistaken in arguing that there is no authority for DCA to consider certain alternatives as no longer available if a state delays too long in implementing them.  As we also noted in <u>Arkansas I</u>, Paragraph G.4. addresses ways for a state to correct for a variance between a billing rate and actual costs to <u>avoid</u> accruing overcharges or undercharges.  It does not permit a state to adopt one methodology in its SWCAP, fail to apply that methodology in a timely manner, and then seek to have the benefit of an alternative type of adjustment, no matter what the consequences of the delay.

Moreover, New Mexico cites no specific authority for its position that the refund option – alternative (a) in Paragraph G.4. – must take into account both profits <u>and</u> losses across all service categories within an ISF, other than by implication from the treatment of the other alternatives.  Arguably, the fact that

---

[5]  The Board also pointed out that, while the carry-forward option permits offsets of a profit in one year for a service against a loss in another year <u>for that same service</u> (and vice versa) through adjustment of the rate amount, DCA may disapprove this method if it is inequitable in particular circumstances.  For example, if federal programs will be substantially reducing the number of units of a particular service they use in the later year due to a program change, a carry-forward adjustment to the per unit rate for that service would not fairly compensate the federal programs for overcharges from the prior year.

14

ASMB C-10 clarifies with respect to the "credit" alternative that either a profit or a loss could lead to an adjustment to the billing for an individual program but does not do so with respect to the refund option implies that the refund option applies only to profits.

Even if one infers that the same clarification could apply to the refund alternative, however, that would not necessarily mean that New Mexico should prevail here or that DCA's position is unreasonable.  New Mexico ignores the fact that its SWCAP opted for the <u>credit</u> method, with adjustments to billings be made mid-year and at the end of the year, but that New Mexico admittedly failed to make timely adjustments for any credits or debits to individual programs using that method.[6]  Thus, we are not dealing with the issue of whether offset is permitted if the adjustment method selected in a CAP is the refund alternative in subparagraph (a).  Instead, we are dealing with a situation where a state has failed to follow the ISF billing requirements in OMB Circular A-87 and its SWCAP.  New Mexico admits that it "had not yet taken steps to adjust future billing rates to reflect the cost reconciliation for SFY 2004 when DCA, on February 22, 2006, issued a disallowance letter seeking a refund of the federal share of certain ISF overcharges in SFY 2004."  NM Ex. 5 (Peters Affidavit) at ¶ 23.  Moreover, New Mexico does not claim that it ever took steps to adjust the bills for the various billing accounts for SFY 2004 "to reflect the new billing rates and the actual usage by that account," pursuant to the methodology in the applicable SWCAP.

Following ISF requirements and submitting claims consistent with an approved cost allocation methodology are prerequisites for charging ISF services to federal programs.  As we indicated in <u>Arkansas I</u>, a refund request by DCA where a state has failed to meet federal requirements must be evaluated in this context, where it is an alternative to a more severe determination that none of the billed services is an allowable charge to federal programs.  <u>Arkansas I</u>, at 17.  The Circular specifically provides that DCA may request a refund from a state if it determines that

---

[6]    We recognize that there is merit to New Mexico's argument that it takes some time after the end of a year to make the calculations, but that does not explain why New Mexico never made the mid-year "realignment" pursuant to its SWCAP or seek to credit/debit the billing accounts (and then the individual programs) once it had the information to compare the revenues to expenses for each service category.  Nor does New Mexico explain why it continued to bill at the 1999 rates, which could no longer be considered to be a reasonable estimate of 2004 costs.

15

the state has charged unallowable costs to federal programs.  OMB
Cir. A-87, Att. C, ¶ F.3.

New Mexico suggests (and its declarants assert) that the same
data as DCA used to calculate overcharges was used to calculate
the undercharges and that its analysis includes only costs that
are allowable and allocable.  As discussed below, however, New
Mexico's analysis goes beyond data used by DCA.  Also, New Mexico
is confusing the issue of whether the underlying data New Mexico
used to calculate the actual costs of providing each category of
computer service included only allowable and allocable costs of
that service with the issue here – whether undercharges not
timely billed or adjusted pursuant to the approved methodology
(and consequently never claimed from federal programs) should be
considered allowable and allocable charges to federal funds that
may be offset against admitted overcharges.  At most, DCA's use
of the amounts calculated by New Mexico as showing the amount of
overcharges to federal funds for five categories means that DCA
is not challenging New Mexico's data regarding the actual,
underlying costs of providing those services.  But, given the
history of DCA's position, it clearly is <u>not</u> a concession that
the undercharges New Mexico's analysis seeks belatedly to charge
to federal awards are allowable and allocable costs of those
awards.  As we have pointed out in our past decisions, there are
requirements in particular programs, such as requirements for
timely submission of claims or caps on administrative costs, that
affect allowability of such charges at the program level.
Moreover, while the Circular permits carry forward of some losses
into the next open fiscal period where approved by DCA as part of
a cost allocation methodology, generally costs incurred in one
year are not allocable to an award for a later year.

Contrary to what New Mexico argues, DCA's position is consistent
with the statement in the Circular that it provides some
flexibility to states and with the ASMB C-10 statement that, in
choosing a method of adjustment, "[t]he primary concern would be
the assurance that Federal programs charged in a given year
receive an *equitable and appropriate* adjustment of the *over/under
billings*." NM Br. at 1-2.  As we discussed above, the methods of
adjustment in the Circular presume timely calculation of billing
rates and timely adjustments to billing, consistent with the
approved methodology in the SWCAP.  Following the approved
methodology provides an assurance that the adjustment of any over
or under billing will be equitable and appropriate.  That
assurance simply  is not there when a state deviates from that
methodology, as New Mexico has done over a period of many years.

16

As we discuss below, the post-hoc analysis New Mexico provides on appeal does not provide adequate assurance that the adjustments it seeks here are appropriate. Although that analysis addresses some of the concerns DCA has previously raised about offsetting, it does not address all of those concerns. Because of flaws in New Mexico's analysis and in the supporting documentation provided, moreover, we cannot accept it as adequate to show that DCA's calculation method is inequitable to New Mexico.

Finally, we reject New Mexico's suggestion that DCA is seeking to impose a "penalty" on New Mexico for its failure to meet Circular requirements. To determine that a state has lost an opportunity to recover federal funds that it could have recovered had it timely followed federal requirements is not tantamount to imposing a penalty. New Mexico has had ample notice of what was required in order to comply with OMB Circular A-87 and to establish its entitlement to federal funds for computer services billed through its ISF. The disallowance here is a consequence of New Mexico's repeated failure over a number of years to comply with those requirements, and the fact that New Mexico thereby lost an opportunity to make timely rate adjustments that would have permitted it to recover its full cost of services is not fairly characterized as a "penalty."

### 2. New Mexico is correct that this case is distinguishable from our past cases in some respects, but misconstrues statements in the Board's Arkansas decisions.

In New Mexico I, New Mexico advocated offsetting overcharges for computer services by amounts that New Mexico said that it had spent providing other types of computer services in the period 1995 to 1999. The Board concluded that the "netting" sought by New Mexico was not permissible under the circumstances there and that New Mexico's position would improperly permit costs that were never billed to state agencies or claimed from federal programs to be used to offset the debt incurred as a result of admitted overbilling of costs. The Board concluded that such an approach "would result in costs being charged against funds due to the federal government while evading required tests for reasonableness, allowability, allocability and timeliness which would normally apply during the claims process." New Mexico I, at 1. The Board explained this conclusion as follows:

> The difference between offsetting unbilled costs in different internal services rate categories against overcharges actually billed to federal programs in prior fiscal years, as opposed to filing timely claims for

17

> federal grant funds in the first instance, is clearly
> not one of mere form.  To allow the former maneuver
> would be to open a back door to claims evading timely
> filing requirements which would leave federal budget
> outlays uncertain indefinitely.  What is more, to use
> the unbilled undercharges to offset repayment of
> improperly claimed federal funds would mean the
> additional charges would never pass through the normal
> claiming process at all.  The normal claiming processes
> at the grantor federal agencies are critical mechanisms
> that assure that expenditures are proper under the
> particular federal grants involved.

New Mexico I, at 9.

We do not agree with New Mexico that we should revisit the
Board's characterization in New Mexico I of undercharges that
have not been claimed from federal programs as "unsubstantiated."
As discussed above, substantiating through underlying data what
the actual costs of the services were in SFY 2004 compared to the
amounts billed is not the same as substantiating that offsetting
undercharges against overcharges in determining a refund due
provides adequate assurance that only allowable and allocable
costs will be charged to federal funds.

In Arkansas I, the Board concluded that DCA did not act in an
arbitrary and capricious manner by refusing to permit Arkansas to
offset total overcharges for services provided by its Division of
Information Services (DIS) against total undercharges for other
DIS services in calculating the amount due.  Our key reasons for
this conclusion were that –

●    Arkansas did not dispute that it was not reconciling DIS
     billing rates for data processing and telecommunications
     services to the actual costs of providing the services
     annually, as required.  Arkansas was thus not submitting
     claims for federal funding for DIS services in
     accordance with an approved cost allocation methodology,
     as required.  Rather than disallowing the entire amount
     charged to federal funds for DIS services, however, DCA
     in effect permitted some amounts to be allocated to
     federal funds, after estimating the federal share of
     overcharges resulting from billing rates that exceeded
     the actual cost of providing the services.

●    The alternative methods in the Circular for adjusting
     for variances between a billing rate and actual costs
     generally apply only when the adjustments are being made
     on an ongoing basis and when approved by DCA, and DCA

18

may require a state to account for each category of
service separately, even if the services are funded
through the same internal service fund.

- DCA reasonably determined that permitting retrospective
  offsets of total overcharges for some DIS services
  against total undercharges for other DIS services could
  result in impermissibly shifting costs from State to
  federal funds or from one federal program to another or
  in avoiding conditions on federal funding such as caps
  on program administrative costs or requirements for
  timely claims for program funds.

- Arkansas had notice of DCA's rationale for its
  calculations and ample opportunity to provide further
  information and to dispute the rationale before the
  Board.

The Board further concluded:

> While Arkansas is correct that it would be more accurate
> to determine a disallowance amount by examining the
> actual charges to federal programs (rather than applying
> an average federal financial participation rate to the
> charges to State agencies), Arkansas has had numerous
> opportunities to come forward with documentation of the
> actual charges, but failed to do so.  Absent such
> documentation, DCA reasonably relied on evidence (either
> provided by or not rebutted by Arkansas) about charges
> to State agencies, and about the average federal
> financial participation rates for each agency, to
> estimate the total excess charges to federal funds for
> DIS services.

DAB No. 2010, at 3.[7]

We agree with New Mexico that, unlike Arkansas, it is not seeking
here to offset over- and undercharges at the bottom line.  Also,
some of the concerns present in Arkansas, such as the potential
for shifting of costs from non-federal to federal programs, are
not present here to the same degree.  Recognizing that there are
some distinctions, however, does not mean that factual
similarities are not significant or that the concerns are fully

---

[7]  In Arkansas Department of Information Systems, DAB No.
2047 (2006) (Arkansas II), the Board concluded that there was no
factual distinction between the two cases that required a
different result on the issues raised.

19

addressed. Like Arkansas, New Mexico here created the need to
calculate an amount due to the federal government because New
Mexico was not following federal ISF requirements. Like
Arkansas, New Mexico seeks to charge to federal funds amounts
which it has never billed to federal programs and which therefore
have not been subject to review against conditions on funding in
those programs.[8] As discussed below, moreover, New Mexico's
analysis does not avoid the potential for shifting costs among
federal programs or from federal to state programs.

New Mexico argues that in Arkansas I, the Board "appears to have
acknowledged that a refund might appropriately take undercharges
into account, if a state's methodology treats all federal
programs equitably." NM Br. at 5, citing Arkansas I, at 8, 13.
New Mexico asserts that "the Board has twice clearly signaled
that evidence of the sort the State has presented in this appeal
could be sufficient to demonstrate that a refund amount should
take undercharges into consideration." NM Reply Br. at 2, citing
Arkansas I, DAB No. 2010, at 3, 40, and Arkansas II (no page cite
given).

The Board's acknowledgment in Arkansas I that it would be more
accurate to determine a disallowance amount by examining the
actual charges to federal programs (rather than applying an
average federal financial participation (FFP) rate to the charges
to State agencies) referred, however, to Arkansas' complaint that
use of an average FFP rate to compute the federal share of
overcharges may have skewed the calculation of the refund amount.
We agreed that it might be more accurate in determining a refund
amount to trace the overcharges to individual programs to

---

[8] New Mexico provides evidence that ISF costs allocated to
HSD programs in SFY 2004 were included on federal claims forms in
cumulative amounts on a line for administrative costs. New
Mexico seems to suggest through this that it has already
submitted claims that cover the undercharges, since the amounts
claimed on the expenditure report included overcharges to federal
funds greater than the undercharges, for a net overcharge. This
might address some of the concerns expressed in our earlier
decisions (such as the concern about exceeding a cap on
administrative costs). We do not think that it addresses the
concern about timeliness of claims, however, since amounts
included on a line on a report form must be traceable to state
accounting records showing the specific expenditures being
claimed, and since, as we discuss below, some of the undercharges
that New Mexico's analysis offsets against overcharges in SFY
2004 were from earlier years.

20

determine the actual FFP rates at which the overcharges were claimed.

The Board also had questioned DCA about whether it might accept some offset if Arkansas did provide information about the specific amounts of over- and undercharges to specific programs for specific years.  But, the Board ultimately did not need to evaluate the effect of such information because Arkansas did not provide it, despite many opportunities to do so.  In this case, New Mexico provided information that it presented as an analysis of the variances between billing rates and actual costs for SFY 2004 for services billed to HSD accounts showing the actual FFP rates for the services.  As we discuss next, however, we find that New Mexico's analysis is insufficient to fully address the concerns raised by offsetting, in part since the analysis does not in fact offset only overcharges and undercharges for services provided in SFY 2004 at the individual program level but also takes into account over- or undercharges for the period SFY 2000 through SFY 2003.

### 3.  New Mexico's calculations seek to offset undercharges from FY 2000-FY 2003 against overcharges for FY 2004 and are otherwise flawed.

The calculations on which New Mexico relies to support its view that this case is distinguishable from earlier Board cases and that the adjustments it wants to make are equitable and appropriate are in its Exhibit 9.  Exhibit 9.b. is an analysis of HSD billing accounts, by service type.  Exhibit 9.c. is a summary of the total net charges for services for each account allocated to individual HSD programs.  New Mexico submitted two affidavits to support these analyses and also attached documents summarizing the analysis and providing descriptions of the computer billing accounts, the HSD accounts to which they relate, the allocation methods used to allocate costs in the accounts among HSD programs (for accounts that benefit more than one program), and the federal participation rates for the services for each of the programs charged.[9]

_____

[9]  While these documents describe the costs as "indirect costs," New Mexico does not claim that it used an indirect cost rate to allocate them among benefitted programs.  Instead, the record indicates that New Mexico used percentages derived from a random moment sample (RMS) or division employee count and then the RMS results to allocate charges to billing accounts that benefitted more than one HSD program.  NM Ex. 6.a.

21

The first striking thing revealed by a careful analysis of Exhibit 9 is that, while New Mexico seeks to characterize it as an analysis of profit/loss to individual HSD programs for SFY 2004 for computer services at the federal program level, it in fact takes into account over- and undercharges for prior years. The accumulated total amounts in the last column (headed "A-87 Adjusted Fund Balance") are calculated for each billing account not just by offsetting undercharges for some categories of computer services against overcharges for other services within a program account, but also by taking into account amounts that are identified on the worksheets as "FY 2004 Beginning Fund Balance." The accumulated total of this amount is a negative $1,189,223.80, which the worksheets then offset against the total actual accumulated profit/loss for the fiscal year for all accounts of $4,954,399.99 to get $3,765,176.18, the total of the column New Mexico labels as the "FY 2004 Ending Fund Balance." NM Ex. 9.c., last unnumbered page.

New Mexico's declarations provide no explanation of the column for beginning fund balances. In his declaration, the DCA negotiator describes New Mexico's worksheets as showing that the "cumulative effect of prior fiscal years 2000-2003 was that [HSD] was undercharged $1,189,224." DCA Ex. 1 (Hill Declaration) at ¶ 19. This amount is the total "FY 2004 Beginning Fund Balance" figure (rounded up) for all of the HSD accounts. While New Mexico's reply brief disputes some statements made in the negotiator's declaration, it does not dispute the description of this figure as the net undercharge for these prior fiscal years.

Thus, it is apparent that the effect of accepting New Mexico's calculation of the refund due would be to permit New Mexico to carry forward into SFY 2004 the undercharges from the period 2000 through 2003 and to offset them against overcharges in SFY 2004. Permitting such a carry forward at this point in time, however, would raise the same concerns about circumventing timely claims provisions and the possibility of cost-shifting (if there are any significant changes in federal usage of services from the earlier period to 2004) that we found in our earlier decisions were valid concerns justifying DCA's determination not to permit an offset. Some of these charges were to HHS programs such as Medicaid and Child Support Enforcement, which are subject to two-year timely claims provisions. 45 C.F.R. Part 95, subpart A. Moreover, New Mexico used allocation methods, such as a random moment sample, to allocate the costs billed to HSD accounts among HSD programs, and it is possible that these allocation percentages changed over the years. It is also possible that FFP rates changed. Yet, New Mexico does not specifically address the timely claims and cost shifting concerns with respect to the offset of undercharges from

22

prior years, and does not provide us with the information we would need to evaluate this issue ourselves.[10]

As noted above, moreover, in arguing that its undercharges are allowable and allocable since they are based on the same data as the overcharges, New Mexico ignores the fact that the concept of allocability of costs to a particular award generally means not only that costs must be of benefit to the program to which they are charged, but also means that costs may not be shifted from one award period to another. The provision permitting carry forward when it is part of an approved allocation methodology is an exception to this, and thus should be read narrowly.

More important, accepting New Mexico's calculations would in effect permit New Mexico to reopen settled cost allocation issues from the period SFY 2000 through SFY 2003. As mentioned above, after DCA had issued a determination for that period requiring refund of overcharges for certain service categories, calculated without any offset for undercharges, New Mexico had acquiesced in that determination, without appealing it. Yet, New Mexico does not allege that DCA's determination for that period permitted it to carry forward any undercharges from earlier periods into SFY 2004, nor even acknowledge that its analysis includes undercharges from the earlier periods.

The only reference in the materials New Mexico submitted to us describing Column A (titled "FY2004 Beginning Fund Balance") on the worksheet in Exhibit 9.b. appears in a document titled "Detail of Calculations in Exhibit 9.b.," which states:

> GSD used the same beginning fund balance data as were used in the DCA calculation of overcharges. The beginning fund balance has been allocated to each account on the basis of account service utilization to total service utilization.

---

[10] The Peters Affidavit states that New Mexico's analysis "guarantees against cost-shifting among federal programs" because "[t]his concern could arise only if one federal program were, on the whole, undercharged for ISF services in FY 2004" whereas New Mexico found that each federal program, as a whole, was overcharged in SFY 2004. NM Ex. 5, at ¶ 29. The concern arose, however, once New Mexico sought to shift charging of costs from earlier years into later years. Moreover, the concern is not just about shifting costs among federal programs, but also about shifting costs from state to federal programs.

23

This statement is misleading, however. DCA calculated refund
amounts for SFY 2004 using only five categories of service "which
had excess reserve balances in excess of $500,000 as of June 30,
2004." NM Ex. 2 (revised determination). DCA's worksheets that
are attached to the revised determination do have a column either
for "2003 Ending Balance" (Attachment 1) or "Beginning 2004 Fund
Balance" (Attachment 2), but in all of the five categories of
service DCA used to calculate the refund requested, this is a
positive amount. The revised determination also indicates that
Attachment 1 was provided to DCA by New Mexico in support of its
proposed reduction in the debt amount, and that DCA rejected that
proposal because it was "developed based on netting billing rate
categories for only" HSD. Id. at 1. Thus, contrary to what New
Mexico suggests, DCA clearly did not use any negative beginning
fund balances in calculating the refund due, nor can DCA
reasonably be viewed as having approved the offsetting of
undercharges from prior years against overcharges in SFY 2004.[11]

In its reply brief, New Mexico tries to characterize its
beginning fund balances as "undisputed." In some cases, a
party's failure to dispute an assertion by another party would
lead us to accept the assertion as true. We reject that approach
here, for several reasons. First, New Mexico's submission to
which DCA was responding did not clearly explain the source of
the beginning fund balances or assert that New Mexico should be

---

[11]  We also note that Column A in the worksheet originally
submitted with New Mexico's SWCAP as the profit/loss analysis by
service for SFY 2004 was the "Total Actual Cost by Billing
Service," rather than a beginning fund balance. NM Ex. 4.b. at
page 6 (unnumbered). This indicates that New Mexico understood
that the profit or loss for a service for a particular year does
not take into account profits or losses from prior years. It is
not clear that DCA was aware when it issued its revised
determination that, unlike the original calculations of the
profit or loss by billing service (which clearly relate only to
SFY 2004), the profit/loss analysis New Mexico submitted to
support a reduced refund (for the services charged only to HSD)
took into account losses from prior periods. DCA's revised
calculation focused on the service categories with the largest
overcharges, for which the beginning fund balance was a positive
amount that DCA may have assumed was a working capital reserve.
Such an assumption would have been reasonable since New Mexico's
SWCAP methodology called for adjustments to be made to the
billings based on reconciling the rates to actual costs mid-year
and at the end of the year, not for any carry forward of excess
reserves or negative fund balances from one year to another.

24

permitted to carry forward undercharges in prior years to offset overcharges in SFY 2004. Second, the Circular permits such carry forward only if it is affirmatively approved by DCA. Third, since DCA's policy limits the carry forward option to the next open fiscal period, even when a state is meeting the Circular requirements, and since DCA did generally dispute New Mexico's position here, we do not think that DCA's failure to specifically challenge New Mexico's use of these negative fund balances can reasonably be viewed as DCA acquiescing in their carryover.

We recognize that some of the offsetting New Mexico seeks to do in its proposed calculation is for overcharges and undercharges for different categories of services provided <u>during SFY 2004</u> to HSD and charged through HSD accounts to individual federal programs. Arguably, this is closer to the type of offsetting of profits and losses permitted when making a current year adjustment under OMB Circular A-87 (credit to individual federal programs). Yet, the Circular does not require DCA to approve such an offset among service categories even when it is proposed in a timely submitted SWCAP, and whether this type of offset should be permitted to retrospectively correct for a state's failure to make ongoing, timely adjustments to its billing rates and amounts raises additional questions about its appropriateness, as we discussed above.

Even if we determined that this type of offset was permitted in some circumstances, moreover, we would not consider it appropriate to simply recalculate a new refund amount by adding the $1,189,223.80 in cumulative undercharges from prior years back into New Mexico's calculations (which would give a total refund amount of $2,872,939). New Mexico's calculations have other flaws.

First, New Mexico's worksheets for its analysis indicate that it calculated imputed interest based on the "FY 2004 Ending Fund Balance" amounts, which were understated as a result of offsetting the cumulative undercharges from the prior years. Thus, New Mexico's calculations understate the pre-disallowance interest owed on the federal share of the overcharges for SFY 2004.

New Mexico's worksheets also indicate that its calculations included a negative adjustment for a "60 Days Working Capital" reserve for each category of service before calculating the over- or undercharge. Yet, DCA described its determination for the earlier period as a determination of the "excess reserve balances as of June 30, 2003." DCA Ex. 5, at 1. From this, we infer that DCA's calculations for the earlier period permitted New Mexico to

25

retain the federal share of a working capital reserve amount (at least for each service where there was an overcharge) and to carry that amount forward into SFY 2004. That would have been consistent with what DCA has done in other cases and may explain why DCA's revised calculations of the overcharges for the five categories of service did not back out the beginning fund balance amount. While it may be that the service categories for which New Mexico's worksheets show a negative beginning fund balance amount had no working capital reserve, New Mexico provided no information from which we could determine this.

We also note that the beginning fund balance amounts on the worksheets appear to represent only the cumulative profits and losses for each service category over the four-year period 2000-2003. These amounts do not necessarily represent the appropriate fund balance amounts, even if New Mexico had shown (which it did not) that it had approval to carry forward into SFY 2004 profits and losses from the period SFY 2000 through SFY 2003. DCA's letter of February 4, 2005 informing New Mexico of DCA's determination for that period indicates that the parties had an agreement about beginning fund balances for SFY 2000. Those amounts - presumably retained as working capital reserves - would have to be taken into account in order to appropriately determine fund balances at the beginning of SFY 2004.[12]

The information New Mexico provided also raises some other questions. For example, as discussed in footnote 4 above, the information on the underlying documents regarding the service categories for which services were billed to HSD program accounts does not track with the numbers in New Mexico's brief. Also, some categories have notations on the worksheets, such as N/A (presumably for "not applicable"), which New Mexico does not explain.

---

[12] The record does not contain DCA's calculations for the period SFY 2000 through SFY 2003, so we do not know how the beginning fund balance amounts in the Attachments to the revised determination compare with the amounts DCA allowed as working capital reserve in its earlier determination. We note, however, that none of the beginning fund balance amounts included in DCA's calculation of the refund owed is significantly different from the working capital reserve amounts calculated based on SFY 2004 costs for the five service categories DCA used in its calculations. We also note that New Mexico does not argue that DCA should have used different amounts as the SFY 2004 beginning fund balance amounts than the figures New Mexico itself provided.

26

Overall, adjustments would have to be made to New Mexico's calculations to back out the prior years' profits or losses and to correct for the other identified flaws and any further problems that more complete information might reveal. Since these adjustments could bring the refund amount calculated for individual programs fairly close to the amount calculated by DCA, we are not convinced that the refund DCA seeks is significantly different from the amount New Mexico would owe, even if undercharges to those programs for SFY 2004 were reasonably taken into account.

In sum, part of New Mexico's calculations include adjustments of the type that are not appropriate at this point in time, and, overall, we cannot accept New Mexico's flawed analysis as sufficient to demonstrate that DCA's calculation method is inequitable.

Given the history of New Mexico's failures and our past decisions, New Mexico should have known that its use of the undercharges from prior years was questionable, unless it had specific approval from DCA to carry these amounts forward into SFY 2004, and that it could not include these amounts in its analysis without documenting that it was appropriate. Indeed, the record suggests that New Mexico understood this and deliberately sought to obfuscate exactly what its analysis did.

Conclusion

For the reasons stated above, we affirm the DCA determination that New Mexico should refund $4,011,031 in federal cash claimed for computer services in excess of the amounts permitted for those services.


Donald F. Garrett


Leslie A. Sussan


Judith A. Ballard
Presiding Board Member

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

NEW MEXICO DEPARTMENT OF INFORMATION TECHNOLOGY

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___88888___
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Charles A. Miller
Susannah Vance
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
(202) 662-5410

## DEFENDANTS

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; MICHAEL O. LEAVITT, Secretary of the Department of Health & Human Services

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ● C. Administrative Agency Review
☐ 151 Medicare Act

Social Security:
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ○ E. General Civil (Other)   OR   ○ F. Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Administrative Procedure Act, 5 U.S.C. s 701 (challenge of agency action as arbitrary and capricious)

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  DEMAND $ n/a  Check YES only if demanded in complaint  JURY DEMAND:  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE September 10, 2007  SIGNATURE OF ATTORNEY OF RECORD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.