UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| New Mexico Department of Information ) | |
| Technology, ) | |
| ) | |
| Plaintiff, ) | Civ. Action No. 07-01603 (CKK) |
| ) | ECF |
| v. ) | |
| ) | |
| U.S. Department of Health and ) | |
| Human Services, and ) | |
| Michael O. Leavitt, Secretary of ) | |
| the Department of Health and ) | |
| Human Services, ) | |
| Defendants. ) | |
| _____ ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, U.S. Department of Health and Human Services ("HHS") and Michael O.

Leavitt, in his official capacity as the United States Secretary of the Department of Health and

Human Services (collectively "Defendants"), through and by undersigned counsel, respectfully

move for summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

Plaintiff seeks review and reversal of the decision of HHS' Departmental Appeals Board

("DAB"), finding that Plaintiff overcharged the federal government approximately $4,000,000.

Plaintiff seeks a declaration from the Court that the Defendants' determination was arbitrary,

capricious, an abuse of discretion, and otherwise contrary to law, as well as an injunction

restraining HHS from enforcing the portion of the disallowance in excess of $1,852,193.

Summary judgment should be granted to the Secretary and HHS pursuant to Fed. R. Civ.

P. 56(c), because the DAB's decision was not arbitrary or capricious, but rather rational and fully

supported by the administrative record and there is no material fact in genuine dispute.  The

grounds for this motion are set forth in the accompanying Memorandum in Support and the

Statement of Material Facts Not In Genuine Dispute.  A proposed Order is herewith attached.

Dated December 11, 2007.

Respectfully submitted,

/s/

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/

_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/

_____
MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, D.C.  20530

*Of Counsel*:
Katherine Brown
Assistant Regional Counsel
Office of the General Counsel, Region VI
U.S. Department of Health and Human Services
1301 Young St., Ste. 1138
Dallas, TX  75202

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
New Mexico Department of Information      )
Technology,                               )
                                          )
                    Plaintiff,            ) Civ. Action No. 07-01603 (CKK)
                                          ) ECF
        v.                                )
                                          )
U.S. Department of Health and            )
Human Services, and                       )
Michael O. Leavitt, Secretary of          )
the Department of Health and              )
Human Services,                           )
                    Defendants.           )
_____)


**STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to LCvR 7(h), Defendants hereby submit the following statement.

1.    Central service costs are the costs of services provided by a state on a centralized basis to its various departments and agencies, which in turn may be reimbursed by federally funded programs on an allocated or billed basis.  (OMB Circular A-87 and AR 3, 214, 224-26).

2.    OMB Circular A-87 establishes a process for submission and approval of a central service cost allocation plan ("CAP") to ensure that central service costs are identified and assigned to benefitting federal programs and activities on a reasonable and consistent basis.  (Comp. ¶ 13 and AR 3, 224).

3.    At all times relevant to this appeal, New Mexico had an internal service fund ("ISF") that provided funding for computer services, including hardware, software, email services, and technical support, to New Mexico state agencies.  (Comp. ¶ 16 and AR 6).

4.    On February 22, 2006, the Division of Cost Allocation ("DCA") of the U.S. Department of Health and Human Services issued a determination for New Mexico fiscal year ("SFY")

1

2004 seeking a refund of the amount DCA had determined was the federal share of excess reserve balances in New Mexico's ISF for computer services as of fiscal year end date June 30, 2004. (Comp. ¶ 28 and AR 9, 29).

5. After New Mexico submitted additional information, DCA issued a revised determination on June 22, 2006, reducing the amount owed to $4,022,031, including interest. (AR 9, 29).

6. The revised determination calculated the refund due for five service categories in which the excess reserve balances exceeded $500,000. Sixteen (16) categories of services had undercharges for the fiscal year because the actual cost per unit of service was greater than the per unit rate charged. (AR 9-10, 29-43).

7. Although its State Wide Cost Allocation Program ("SWCAP") provides for a mid-year "realignment" of rates, New Mexico did not perform a mid-year "realignment" or year end adjustment of its billing rates for computer services for FY 2004. (AR 14 n. 6, 256).

8. In FY 2004, New Mexico used the same billing rates for computer services as it had used every fiscal year since 1999. (AR 14, 254-55).

9. Robert Peters, Executive Budget Analyst in the New Mexico Department of Finance and Administration, admitted that New Mexico has not been timely in submitting its SWCAP to DCA for years. (AR 310).

10. Before the Departmental Appeals Board ("DAB"), New Mexico did not challenge DCA's revised determination that New Mexico owed a refund of $66,676 in federal funds claimed for computer services provided to two State departments that receive federal funds - the Department of Health and the Children, Youth and Families Department. (AR 10, 66).

11. New Mexico challenged the revised determination finding of the amount owed for the federal share of overcharges to the New Mexico Human Services Department ("HSD"), asserting that DCA's determination was in conflict with HHS' policy guidance on OMB Circular A-87 and with OMB's intent to accord flexibility to the states. Additionally, New Mexico argued that past DAB decisions on related issues were wrongly decided and distinguishable. (Comp. ¶¶ 33-34 and AR 10, 66, 90).

12.    In its appeal before the DAB, New Mexico propounded an alternative analysis of the reserve balances. New Mexico contended that this analysis provided a basis for concluding that the federal share it should repay for services provided to HSD programs was $1,683,715, including imputed interest. Therefore, New Mexico conceded owing $1,852,193 excluding debt interest owed. (AR 10, 87-90). The DAB concluded that "New Mexico's calculations sought to offset undercharges from FYs 2000 - 2003 against overcharges for FY 2004 and [were] otherwise flawed." (AR 20-26).

13.    The DAB noted that "New Mexico had been failing for many years to comply with federal ISF requirements for billing central services and failed to make adjustments to the billed amounts using the methodology in its approved SWCAP [statewide cost allocation plan] for SFY 2004." (AR 11).

14.    The DAB concluded that DCA's determination as well as prior DAB decisions challenged in New Mexico's administrative appeal were consistent with "A Guide for State and Local Government Agencies: Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government" (ASMB C-10), and the intent of the OMB requirements. (AR 11-16).

15.    OMB Circular A-87 does not list offsetting over or under-charges as an adjustment method. OMB Circular A-87, Att. C ¶ 4 (provides a list of adjustment methods).

Respectfully submitted,

/s/
_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/
_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/
_____
MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, D.C.  20530
(202) 305-4851

*Of Counsel*:
Katherine Brown
Assistant Regional Counsel
Office of the General Counsel, Region VI
U.S. Department of Health and Human Services
1301 Young St., Ste. 1138
Dallas, TX  75202

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ | ) |
| New Mexico Department of Information | ) |
| Technology, | ) |
| | ) |
| Plaintiff, | ) Civ. Action No. 07-01603(CKK) |
| | ) ECF |
| v. | ) |
| | ) |
| U.S. Department of Health and | ) |
| Human Services, and | ) |
| Michael O. Leavitt, Secretary of | ) |
| the Department of Health and | ) |
| Human Services, | ) |
| Defendants. | ) |
| _____) | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF ITS MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this case, Plaintiff, New Mexico Department of Information Technology ("New

Mexico")[1] filed a one-count complaint, alleging that HHS's Division of Cost Allocation

("DCA") violated of the Administrative Procedures Act ("APA") in its June 22, 2006

determination finding that Plaintiff had overcharged the federal government by approximately

$4,000,000.  See generally, Complaint ("Comp.")  DCA's determination was upheld by HHS's

Departmental Appeals Board ("DAB" or "the Board") on May 17, 2007.  Plaintiff seeks a ruling

---

[1]  New Mexico Department of Information Technology was formerly part of the New
Mexico General Services Department and it was created after DCA issued the disallowance at
issue here.  Comp. ¶ 10.  While this case is brought by the New Mexico Department of
Information Technology, at all times relevant to this appeal, New Mexico General Services
Department was responsible for the cost allocation program and billing of the computer-related
services to the state organizations using such services.

1

by this Court, finding the DAB's decision to be arbitrary and capricious, and injunctive relief requiring the Defendants to modify the amount of the disallowance to $1,852,193. (Comp., Request for Relief, p. 9).

Defendants are entitled to judgment as a matter of law because Plaintiff's claims are without merit and there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56. There is clearly a reasonable basis for the agency's actions in the record, and therefore, the DAB's final decision must be upheld.

## REGULATORY BACKGROUND

**I.      Cost Allocation Principles**

This case concerns the disposition of federal funds that New Mexico received for central service costs relating to computer services that were incurred in the administration of federal programs. (AR 3). Central service costs are the costs of services provided by a state on a centralized basis to its various departments and agencies, which in turn may receive federal funding for those costs to the extent that the agencies administer federally-funded programs. OMB Circular A-87, Att. C, A.1. Central services typically include insurance, computer services, transportation services, fringe benefits, general accounting, personnel administration, and purchasing. OMB Circular A-87, Att. C, B.1 and B.2. Central service costs are either billed to benefitting agencies and programs on an individual fee-for-service or similar basis (billed central service costs), or allocated to the agencies and programs on some other reasonable basis (allocated central service costs). Id.

The allowability of costs claimed for reimbursement by New Mexico is governed by Office of Management and Budget ("OMB") Circular A-87.[2] 45 C.F.R. §§ 74.27(a) and 92.22(b). To be allowable generally, costs must "be necessary and reasonable for the proper and efficient administration of Federal awards," and must be "allocable" to the award. OMB Circular A-87, Att. A, ¶ C.1.a and b. "A cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objective in accordance with relative benefits received[,]" id., ¶ C.3.a, and is "consistent with policies, regulations and procedures that apply uniformly to both Federal awards and other activities of the governmental unit." Id., ¶ C.1.e.    For each year that a state government claims indirect central service costs for federally funded programs, it must submit a central service cost allocation plan (known as a Statewide cost allocation plan ("SWCAP")) to the cognizant federal agency. A-87, Att. C, ¶¶ A.1, D.1, F.1.[3] As part of the cost allocation plan, a state must provide specific documentation, including, but not limited to, the fund balance sheet; a statement of revenue and expenses with revenues broken out by source; a listing of all non-operating transfers into and out of the fund, a description of the procedures or methodology used to charge the costs of each service to users,

---

[2] The provisions of OMB Circular A-87 apply to all federal agencies responsible for administering programs that involve grants and contracts with state and local governments. 46 Fed. Reg. 9548 (1981). Regulations at 45 C.F.R. § 74.27(a) make the cost principles of OMB Circular A-87 applicable to programs administered by HHS. See also 60 Fed. Reg. 26,484 (May 17, 1995) (revised A-87 applies to cost allocation plans submitted for State fiscal years beginning after September 1, 1995).

[3] ASMB C-10 ("Cost Principles and Procedures for Developing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government") embodies HHS's interpretation of OMB's 1995 version of A-87. OMB has delegated responsibility to HHS to issue such implementing material for the federal government.   45 C.F.R. §§ 74.27(a) and 92.22(b).

including how billing rates are determined; a schedule of current rates; "and a schedule comparing total revenues (including imputed revenues) generated by the service to the allowable costs of the service, as determined under circular A-87 with an explanation of how all variances will be handled." A-87, Att. C, ¶ E.3.b.2.

Circular A-87 provides that the state organizations overseeing central service funds may compensate for fluctuations in revenue and cost by one of the four actions specified in the circular for doing so. In order to address these fluctuations in cost and revenue, Circular A-87 requires that the state organization make a comparison of the revenue generated by each billed service–including total revenues whether or not billed or collected–to the actual allowable costs of the service on at least an annual basis, and that the state organization make an adjustment in billing rates based on this comparison in order to address the difference between the revenue and the allowable costs. Circular A-87 sets forth that these adjustments will be made through one of the following adjustment methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central service costs. Circular A-87, Att. C, ¶ G.4. Adjustment to allocated central service costs is not permitted if the total amount of the adjustment for a particular service exceeds $500,000. Id.

Offsetting over or under-charges is not an adjustment method under A-87. OMB Circular 87, Att. C ¶ G and OMB Circular A-87, Att. C, F.3 (If a state's cost allocation plan includes costs later determined to be unallowable, the federal cognizant agency may require a

refund.).  If an overcharge is assessed for unallowable[4] costs, the decision as to the methodology

for repayment is vested in DCA.  See 45 C.F.R. § 92.52 ("funds paid to a grantee in excess of the

amount to which the grantee is finally determined to be entitled under the terms of the award

constitute a debt to the Federal Government. If not paid within a reasonable period after demand,

the Federal agency may reduce the debt by: (1) Making an administrative offset against other

requests for reimbursements, (2) Withholding advance payments otherwise due to the grantee, or

(3) Other action permitted by law"); see also Circular A-87, Att. C, ¶ F.3 (cost allocation plans

based on costs later determined to be unallowable, shall be adjusted or refund made at the federal

agency's option).  This position is consistent with the payment of claims by the federal

government; the offset of an undercharge equates to the payment of an undercharge.  "[A]ny

claim by a State for payment with respect to an expenditure made . . . shall be filed (in such form

and manner as the Secretary shall by regulations prescribe) within [a] two-year period[.]" 42

U.S.C. § 1320b-2(a).  Otherwise, payment of the claim will not be made.  Id.

## II.    Cost Disallowance Procedure

DCA may initiate a disallowance action if costs are not claimed in accordance with the

approved cost allocation plan.  45 C.F.R. § 92.51.  The State may request reconsideration of a

disallowance and, ultimately pursue an appeal before the DAB. 45 C.F.R. Part 16 and Appendix

A, ¶ D (Cost allocation and rate disputes).  A final disallowance is subject to judicial review as

final agency action under 5 U.S.C. § 704.

---

[4]  Unallowable costs are costs that do not meet the requirements for reimbursement set forth in OMB Circular A-87, Att. A, ¶ C.  One example of an unallowable cost is a claim for payment that is not adequately documented.  Id. at  C.1.j.

5

### III.    Overview of the Grantor-Grantee Relationship

Federal grantors fund state grantee departments to operate federally-funded programs. Grantors review cost claims submitted by the grantee organizations to determine if costs are timely claimed and are necessary and reasonable for the effective and efficient administration of the relevant programs.  New Mexico General Services Department provided computer services and billed user state grantee departments for services that may be included in their claims to the federal government if federally-funded programs benefit.  (Comp. ¶ 10 and AR 6-8).

DCA provides federal financial oversight of state central services, but does not issue grants or accept claims from any organization. DCA's role in this dispute is limited to oversight of the process by which the central service sets billing rates, assigns costs to the billing rate categories, bills user agencies and adjusts for the differences between revenue and cost for each billing rate.

### FACTUAL BACKGROUND[5]

New Mexico provided computer services to various state agencies in State Fiscal Year ("SFY") 2004 and charged federal funds using billing rates.  (AR 1).  DCA determined, in February 2006, that "New Mexico had not been following the requirements for using billing rates to allocate costs to federal programs" run by the state, and asked for a cash refund of over four million dollars for New Mexico's overcharges to federal funds for five categories of computer services.  Id.  In making its determination, DCA "used overcharge amounts from a worksheet provided by New Mexico."  (AR 2.)  While New Mexico conceded that it must refund

---

[5]  The undisputed material facts are set forth separately.  However, a brief recitation of pertinent factual background is provided for ease of reference.

over one million eight hundred thousand dollars, it argues that "the overcharges for some of its computer services billed to specific federal programs operated by the New Mexico Department of Human Services should be offset by undercharges for other types of services billed in those programs." (AR 1). However, New Mexico has consistently failed to follow procedures and to meet requirements, as provided in the applicable regulations, as discussed fully in the Argument section below, thereby leaving the DAB with no choice, but to uphold DCA's finding that a refund is necessary. (AR 2, 26).

Preliminarily, it should be noted that New Mexico has demonstrated a lengthy history of inaction with regard to adjusting its billing rates and of delay in submitting its annual cost reconciliations. Specifically, in March and April 2001, DCA issued determinations for fiscal years ending 1995 through 1999, disallowing more than $8,000,000 in federal funds for billings in excess of costs for central computer services, billed by New Mexico. (AR 7). New Mexico challenged the amount of the disallowances, contending that it should be permitted to offset or "net" undercharges against overcharges in determining the amount owed to the federal government. Id. The Board upheld these determinations in New Mexico General Services Dept., DAB No. 1876 (2003);[6] the Board ruled that New Mexico could not use undercharges that represent costs that were never billed to state agencies or claimed from federal programs in an effort to offset the debt incurred as a result of admitted over-billing of costs. (AR 1, 6-7).

In fiscal years ending 2000 through 2004, New Mexico claims to have calculated rates based on estimated costs taking into consideration historical usage. (AR 254). Despite

---

[6] DAB decisions are available on Westlaw or via the internet at http:// www. hhs.gov/ dab/search.html.

undertaking these calculations, New Mexico admits that it did not implement the adjusted rates at any time during that time period.  Id.  On August 8, 2003, members of the Central States Field Office of DCA met with Edward J. Lopez, Jr., Cabinet Secretary for New Mexico General Services Department; Wanda J. Carrillo, Deputy Cabinet Secretary for New Mexico General Services Department; and James C. Jimenez, Cabinet Secretary for New Mexico Department of Finance and Administration.  (AR 299).  At this meeting, DCA and the New Mexico representatives discussed how to bring the required reporting back into compliance with the terms of OMB Circular A-87 in response to the 2003 New Mexico General Services Dept. decision.  Id.

On June 22, 2004, members of the Central States Field Office of DCA met with Wanda J. Carillon, Deputy Cabinet Secretary of New Mexico General Services Department and Michael S. Fried, the Budget Director of the New Mexico General Services Department.  (AR 300).  The topic for the meeting was a briefing and discussion relating to New Mexico's rate restructuring project.  (AR 2, 299).

On February 4, 2005, DCA issued a determination for fiscal years ending 2000 through 2003, disallowing approximately $3,000,000 in costs for computer services.  (AR 313).  Including imputed interest, the total owed to the federal government reached $3,274,624.  (AR 314).  This disallowance resulted from New Mexico's failure to adjust its billing rates in order to eliminate reserves in excess of the amount permitted by OMB Circular A-87.  (AR 313-315).  New Mexico did not appeal the decision; instead, it elected to reimburse the federal government in full.

8

New Mexico's state-wide cost allocation plan ("SWCAP") for FY 2004 states that it will perform a "mid-year rate realignment" as well as a year end cost reconciliation. (AR 309).  New Mexico admits that it did not perform the mid-year rate realignment for FY 2004.  (AR 256).  New Mexico also concedes that it did not implement adjusted rates for 2000 through 2004 as noted above.  (AR 254).

The deadline for submitting the SWCAP, including the cost reconciliation for FY 2004 was December 31, 2004.  (AR 256).  New Mexico did not submit the plan until October 15, 2005, approximately 10 months late.  (AR 256-57).  Robert Peters, Executive Budget Analyst in the New Mexico Department of Finance and Administration admits that "the state has been delinquent in submitting the plan on a timely basis since the Stone Age."  (AR 310).

On February 22, 2006, DCA issued a determination for fiscal year ending 2004, disallowing $4,620,948 in costs for computer services.  This amount represented the federal share of excess reserve balances as of June 30, 2004 (the fiscal year end date).  (AR 29).  New Mexico submitted additional information seeking to correct the amount of the disallowance.  On June 22, 2006, DCA revised the February 22, 2006 determination.  Id.  DCA accepted New Mexico's contention that it used an incorrect allocation methodology to prepare the expenditures by billing category, and therefore, reduced the amount of the disallowance to $3,790,567, excluding interest.  Id.  Including imputed interest, the debt owed to the federal government, as of June 22, 2006, totaled $4,011,031.  Id.  On July 24, 2006, New Mexico filed its notice of appeal with the Board, asserting that DCA used an unreasonable method to compute the amount of the disallowance.  (AR 27-28).

9

## ARGUMENT

### Standard of Review

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court should grant summary judgment when the non-moving party fails to make a sufficient showing concerning an element of the case for which that party will have the burden of proof at trial.  Chelates v. Citrate, 477 U.S. 317 (1986).  Moreover, summary judgment is especially appropriate in cases where the court is called upon to review a decision of an administrative agency and the record supporting that decision.  In such cases, the issues are most frequently not issues of fact, but concern whether the agency erred in its application of the law or ignored the record evidence.  See, e.g., C. Wright, A. Miller & M. Kane, Federal Practice & Procedure 2733 at 366-67 (2d ed. 1983).  The Rule 56 requirements are met here.

Plaintiff seeks review of the Department's decision under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).  See Compl. at 37.  Upon APA review, the Court must uphold agency determinations unless they are shown to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  This standard of review is highly deferential.  See Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 43 (1983) ("the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency"); National Trust for Historic Preservation v. Dole, 828 F.2d 776, 782 (D.C. Cir. 1987);

<u>Belch Petroleum Corp. v. Federal Energy Regulation Commission</u>, 589 F.2d 680, 685 (D.C. Cir. 1978).

It is also well settled that de novo judicial review of agency decisions is inappropriate. Rather, "the focal point for judicial review should be the administrative record and not some new record made initially in the reviewing court." <u>Camp v. Pints</u>, 411 U.S. 138, 142 (1973); <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 416 (1971)(establishing that courts must review agency adjudications under 5 U.S.C. § 706(2)(A) on the basis of the complete administrative record that was before the agency at the time of the decision). Thus, this Court's task is to determine whether the agency's decision was reasonable, that is, "whether it considered relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record." <u>National Treasury Employees Union v. Horner</u>, 854 F.2d 490, 498 (D.C. Cir. 1987) (citation omitted).

Additionally, courts have long recognized that an agency's interpretation of its own regulations is subject to substantial deference, <u>Aver v. Robbins</u>, 519 U.S. 452, 461 (1997); <u>Lyng v. Payne</u>, 476 U.S. 926, 939 (1986); <u>United States v. Larionoff</u>, 431 U.S. 864, 872 (1977); <u>Puerto Rico Elec. Power Auth. v. Federal Energy Regulation Commission</u>, 848 F.2d 243, 249 (D.C. Cir. 1988), and must be accepted "unless [the interpretation] is manifestly unreasonable." <u>Liberty Maritime Corp. v. United States</u>, 928 F.2d 413, 419 (D.C. Cir. 1991) (<u>quoting</u> <u>National Wildlife Federation v. Gorsuch</u>, 693 F.2d 156, 174 (D.C. Cir. 1982)).

However, if the Court holds the agency decision to be unlawful, the only remedy is a remand to the agency to reconsider the matter. "If the record before the agency does not support

the agency action . . . the proper course, except in rare circumstances, is to remand to the agency

for additional investigation or explanation. The reviewing court is not generally

empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own

conclusions based on such an inquiry." <u>Florida Power & Light v. NRC</u>, 470 U.S. 729, 744

(1985).

Here, the Secretary's decision, clearly implicating substantial agency expertise, based on

a consideration of the relevant factors, was plainly rational and must be upheld.  Plaintiff's one-

count Complaint alleges that DCA's disallowance and the DAB's decision upholding the

disallowance were arbitrary, capricious, an abuse of discretion and otherwise not in accordance

with the law because it took into consideration only certain internal service fund service

categories with overcharges and did not take into account service categories with undercharges.

Comp. ¶ 37.  The record and pertinent laws prove Plaintiff's position to be without merit, which

entitles Defendants to judgment as a matter of law.

**II.    <u>The DAB's Decision Upholding DCA's Disallowance is not Arbitrary,
Capricious, or Contrary to Law and is Supported by the Record.</u>**

Plaintiff alleges that the DAB's decision in this case is arbitrary and capricious because

the DAB did not allow Plaintiff to offset unclaimed costs[7] against overcharges identified by

DCA.  Comp. ¶ 37.  A review of OMB Circular A-87, ASMB C-10, other pertinent regulations,

prior decisions by the DAB and the evidence of record in this case, reflects that the decision in

---

[7]  New Mexico uses the term "undercharge" instead of "costs", which may leave the
reader with the incorrect impression that the forgoing were legitimate charges.  However, these
are costs for which New Mexico has never submitted for payment.

this case was not arbitrary, capricious or contrary to law.  The decision is well-supported by the

record and is rational.

      (A)    **The DAB's Decision is Consistent with the Requirements Set Forth in OMB Circular A-87.**

According to OMB Circular A-87, states are required to undertake, on at least an annual

basis, a comparison of the revenue generated by each billed service to the actual allowable cost

of the service.  OMB Circular A-87, Att. C, ¶ G.4.  Based on this comparison, states are required

to make an adjustment for the difference between the revenue and the allowable costs.  Id.  The

adjustment must be made through one of the following methods:  (a) a cash refund to the federal

government for the federal share of the adjustment, (b) credits to the amounts charged to the

individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated

central services costs.  Id.  OMB Circular A-87 restricts option (d) only to situations where the

total amount of the adjustment for a particular service does not exceed $500,000.  Id.  The DAB

correctly noted that the adjustment options in Attachment C, ¶ G.4 are options for adjusting for

variances in a given fiscal year, and that New Mexico, in its approved SWCAP for SFY 2004,

adopted alternative (b).  AR 12.  A state may either credit an individual federal program for a

profit resulting from an overcharge for a service or it may debit the program for a loss resulting

from an undercharge for the service; however, there are time restrictions for doing so.  ASMB C-

10, Part 4, § 4.8, Question 4-12 at page 4-27 (AR 13, 191-92).  Specifically, ASMB C-10

amplifies the time sensitive nature of these particular types of adjustments, noting that alternative

(b) or credits must be given in the current year, and alternative (c) or adjustments to future

billing rates must be performed in the next open fiscal period.  Id.

13

Here, New Mexico took neither action at any time leading up to the date of the disallowance. In this case, New Mexico has missed its window of opportunity to make adjustments and credits pursuant to Attachment C, ¶ G.4. New Mexico should have made any adjustments to its future billing rates within SFY 2005, which ended June 30, 2005. DCA issued its disallowance on February 22, 2006 and then revised it on June 22, 2006. New Mexico admits that it had not adjusted its billing rates during that time period. (AR 254, 256, 258).

New Mexico has held the position that it should be permitted to offset undercharges or unclaimed costs, but the DAB correctly noted that Circular A-87 does not set forth any basis for doing so. (AR 13). In fact, following internal service fund requirements and submitting claims consistent with an approved cost allocation methodology are prerequisites for charging internal service fund services to federal programs. (AR 6). See also OMB Circular A-87, Att. C, para. A.1, E.3. Here, New Mexico did not submit claims for the undercharges it seeks to offset against its overcharges. However, Circular A-87 specifically permits DCA to request a refund from a state if DCA determines that the state has charged unallowable costs to federal programs. OMB Circular A-87, Att. C, ¶ F.3.

New Mexico suggested that the undercharges should be permitted, but the DAB disagreed. Specifically, the Board found that undercharges not timely billed or adjusted pursuant to the approved methodology (and consequently never claimed from federal programs) are not properly considered allowable and allocable charges to federal funds, and as such, may not be offset against admitted overcharges. AR 15. The DAB supported this finding by noting that "there are requirements in particular programs, such as requirements for timely submission of claims or caps on administrative costs, that affect allowability of such charges at the program

14

level." Id.  Furthermore, the Board noted that generally costs incurred in one year are not allocable to an award for a later year.  Id.

The concepts of allowability and allocability are fundamental to processing costs under internal service funds.  To be an allowable cost, the cost must, among other things, be allocable to a federal award.  "A cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objective in accordance with relative benefits received."  OMB Circular A-87, Attach. A, ¶ C.3.a.  Costs are allocable pursuant to the cost allocation plan in effect at the time that the cost was incurred.  OMB Circular A-87, Attach. A, ¶ C.3.d.  It follows that costs are not allocable outside of the year in which they were incurred. Once a cost has been determined to be allocable, the cost must then be determined to be allowable.  Allowability is assessed through a number of criteria which includes conforming to the claiming requirements of the particular federal award and being adequately documented. OMB Circular A-87, Attach. A, ¶ C.1.

The claims that New Mexico seeks to offset here have not been submitted for claims processing to allow a determination that they may be allocable and allowable pursuant to the terms of Circular A-87.  More specifically, New Mexico has failed to submit the charges for payment from any federal awards; it did not submit the related documentation for review; and, there is no evidence that such a claim would meet the timeliness of claims requirements per each federal award.

It is well-established in DAB case law that the burden of proof for allowability and allocability rests on the state.  See, e.g., Maryland Dept of Human Resources, DAB No. 1875 (2003); Idaho Division of Financial Management, DAB No. 1822 (2002); New York State Dept.

of Health, DAB No. 1827 (2002) ("the State carries the burden of proof with respect to documentation of its claims").  Therefore, it is New Mexico's burden to establish the allowability and allocability of its claims.  Here, New Mexico has not met this burden.

In contrast, the DAB found that Plaintiff's failure to follow the terms of its SWCAP for the adjustment of rates provided important context for evaluating Plaintiff's arguments in favor of offsetting unclaimed costs against the overcharges.  (AR 11).  In considering Plaintiff's failures, the DAB found that DCA's disallowance was consistent with OMB Circular A-87 intent for flexibility in adjustments.  (AR 15).  Specifically, the Board recognized the importance of following the approved methodology for adjustment that is established in the state's SWCAP. Id.  Additionally, the DAB noted that "[f]ollowing the approved methodology provides an assurance that the adjustment of any over or under billing will be equitable and appropriate. That assurance simply is not there when a state deviates from that methodology, as New Mexico has done over a period of many years."  Id.

Plaintiff had every opportunity to adjust it rates in accordance with the terms of its SWCAP.   Once the time period for making those adjustments has closed, DCA acted properly in issuing a disallowance for the amounts that New Mexico overcharged federal programs. Plaintiff's failure to claim the costs or adjust its rates has resulted in a lost opportunity to establish the allocability and allowability of these costs.  In light of this failure, these costs are no longer potentially allocable to a federal award.  Because these costs are not allocable, the DAB concluded, consistent with the requirements of OMB Circular A-87 that offset of these unclaimed costs against the overcharges to the federal government would be improper.  (AR 26).

16

Accordingly, Defendants have not violated the APA and are entitled to judgment as a matter of law.

### (B)    The DAB's Decision is Consistent with Applicable Case Law and Prior Board Decisions.

Plaintiff  had no reasonable expectation that its undercharges, resulting from unclaimed costs, would be accepted by DCA for any purpose.  In a number of contexts, the courts have consistently rejected the use of undercharges for either payment or for the offset of known overcharges.  See e.g. Maine v. Shalala, 81 F.Supp.2d 91 (D. Maine 1999).  Many of these cases have also rejected the type of "fairness" argument presented by Plaintiff.  See e.g., Delta Foundation, Inc. v. U.S., 303 F.3d 551, 570 (5th Cir. 2002)("It is not enough for a cost to be allowable, records must establish that the cost is also allocable to the grant project.  The Board's refusal to accept Delta's 'good word' in place of the required documentation is certainly not arbitrary and capricious."); Colorado v. Shalala, 29 F.3d 519 (10th Cir. 1994)(an agency is entitled to require rather strict proof when considering a state's retroactive claims under federal entitlement programs.); Colvin v. Sullivan, 939 F.2d 153 (4th Cir. 1991)("Congress gave HHS the authority to require that all claims meet reasonable verification standards."); State of Kansas v. Shalala, 859 F. Supp. 484, (D. Kan. 1994)(state's own inaction causing under-claims did not result in inequity); State of Kan. ex rel. Secretary of Social and Rehabilitation Services v. Shalala, 884 F.Supp. 413, 416 (D. Kan. 1995) (the State of Kansas' own choices and decisions resulted in the underclaims);  Maine v. Shalala, 81 F.Supp.2d 91 (D. Maine 1999)(Maine failed to affirmatively show that under-payments resulted in allowable charges to federal grant programs at issue, and federal government's overpayments involved different programs.).

17

Likewise, the DAB itself has addressed a number of cases in which states have sought to utilize unclaimed costs in manners that the Board deemed inconsistent with OMB Circular A-87 requirements.  See, e.g., Arkansas Dept. of Information Systems, DAB 2010 (2006) (where a state does not comply with Circular A-87's requirements for annual reconciliation and adjustment of billing rates, it cannot later seek to offset undercharges);  Maryland Dept. of Health and Hygiene, DAB 1909 (2004)(Exceptions to the timely claims filing requirements are intended only to cover extreme circumstances and do not apply to the routine situation where a state simply did not get around to getting its data together in time to file a claim); Idaho Division of Financial Management, DAB No. 1822 (2002)(the State must adequately document undercharges for the federal government to take any action with respect to such); West Virginia Dept. of Administration, DAB. No. 1465 (1994)(adjustment of the disallowance in question for unclaimed and unproven costs was inappropriate.); South Carolina Dept. of Social Services, DAB No. 614 (1984)(it is not inequitable for the agency to recover overpayments, while denying claims for under-payments); Illinois Dept. of Administrative Services, DAB 271 (1982) (over-billing users of one computer service to offset under-billed users of another computer service is not permitted).  As noted, many of these cases were decided long before the state fiscal year at issue here; as such, New Mexico had no reason to believe that undercharges could be used in the manner suggested in this case.

The strongest reason for rejecting New Mexico's claim that the DAB was arbitrary and capricious is the fact that New Mexico has gone through this process with the DAB previously. See New Mexico General Services Dept., DAB No. 1876 (2003) ("New Mexico I").  In the 2003 New Mexico case, New Mexico sought to offset overcharges from certain computer services by

18

amounts that New Mexico contended it had spent providing other types of computer services.

Id.  Importantly, the DAB concluded that allowing such an approach "would result in costs being charged against funds due to the federal government while evading required tests for reasonableness, allowability, allocability and timeliness which would normally apply during the claims process."  New Mexico I and AR 16.  The DAB noted that allowing this sort of informal process with regard to unclaimed costs would undermine the filing requirements for federal grants:

> To allow the former maneuver would be to open a back door to claims evading timely filing requirements which would leave federal budget outlays uncertain indefinitely.  What is more, to use the unbilled undercharges to offset repayment of improperly claimed federal funds would mean the additional charges would never pass through the normal claiming process at all.  The normal claiming processes at the grantor federal agencies are critical mechanisms that assure that expenditures are proper under the particular federal grants involved.

New Mexico I at 9; AR 17.

Plaintiff is, or should have been, intimately familiar with the 2003 New Mexico decision rendered against it, and hence, is aware of the consistency of the DAB's approach to questions involving unclaimed costs.  Based on the Board's prior decisions and the relevant case law, it is clear that the DAB did not act arbitrarily or capriciously, but instead provided consistent analysis grounded in the principles set forth in OMB Circular A-87.

> **(C)    The DAB Properly Took Into Consideration Plaintiff's Past Failures to Comply with the Terms of its SWCAP.**

The DAB's decision properly took into consideration New Mexico's actions and/or inactions that led to the disallowance. It is important to bear in mind that had New Mexico followed the terms of its SWCAP, timely filed its claims for costs, and performed mid-year

"realignments" and annual adjustments of billing rates, there would have been no need to

consider the issues New Mexico presents regarding offsetting of claims.  The DAB specifically

points this out in introduction to its discussion of its findings:

> At the outset we note that meeting federal requirements is a prerequisite
> for billing central services to federal funds.  New Mexico had been failing
> for many years to comply with federal ISF requirements for billing central
> services and failed to make adjustments to the billed amounts using the
> methodology in its approved SWCAP for SFY 2004.  New Mexico
> concedes that its failures resulted in substantial overcharges to federal
> funds for certain categories of computer services.  Yet, DCA seeks a
> refund only for the overcharges in excess of permissible reserves for five
> service categories (and related interest).  The reasonableness of DCA's
> determination of the refund amount, and New Mexico's arguments, must
> be considered in this context.

(AR 11.)  The record reflects New Mexico's failures to comply with the ISF requirements and

the failure to make adjustments to the billing rates as set forth in its SWCAP.  (See, e.g., AR 254,

256).

The record includes several examples of New Mexico's failure to comply with the terms

of OMB Circular A-87 and New Mexico's SWCAP.  For example, according to Robert Peters,

then Executive Budget Analyst in the New Mexico Department of Finance and Administration,

New Mexico failed repeatedly to make required adjustments to its rates.  (AR 254)("In fiscal

year 2004 and the four fiscal years preceding it, GSD calculated rates as set forth above, but did

not implement them.").  This adjustment of rates is mandated on an annual basis at OMB

Circular A-87, Attach. C, ¶ G.4.  Nor has New Mexico timely submitted its report to DCA for

years.  (AR 310) ("As you know, the state has been delinquent in submitting the plan on a timely

basis since the Stone Age.").

Likewise, Mr. Peters further reports that "The SWCAP description of this internal service fund contemplates that, as well as a year-end cost reconciliation, a 'mid-year rate realignment' may be performed. This realignment was not performed in fiscal year 2004." (AR 256). The relevant portion of the State of New Mexico SWCAP reflects, contrary to Mr. Peters assertions, that this "mid-year rate realignment" was not an optional undertaking per the terms of the plan. (AR 309). New Mexico provided no information or indication to DCA that it did not undertake this mid-year rate realignment, and DCA had been led to believe that the mid-year rate realignment had been performed as stated. (AR 304). Mr. Peters' affidavit represents the first time that DCA was made fully aware that New Mexico was not performing the mid-year adjustment, contrary to the terms of the SWCAP it submitted to DCA. Id.

In a previous DAB determination relating to cost allocation matters, the DAB concluded that a state's success or failure at complying with the federal requirements is relevant to how unclaimed costs should be processed. If a party does not comply with the federal requirements, such as the terms of OMB Circular A-87, it may be considered to have "unclean hands," which the DAB has concluded is an appropriate consideration in determining an equitable result. Arkansas Dept. of Information Systems, DAB No. 2010 (2006).

In light of the repeated failures by New Mexico to comply with the terms of OMB Circular A-87, the DAB properly took into account New Mexico's history of compliance when affirming DCA's disallowance.

## **CONCLUSION**

For the forgoing reasons, Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

/s/
_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/
_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/
_____
MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, D.C.  20530

*Of Counsel*:
Katherine Brown
Assistant Regional Counsel
Office of the General Counsel, Region VI
U.S. Department of Health and Human Services
1301 Young St., Ste. 1138
Dallas, TX 75202

22

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of December 2007, I caused to be served, by the Court's Electronic Case Filing System, a true and correct copy of the above *Defendants' Motion for Summary Judgment* and all attachments upon parties of record.

                                                /s/

                                          MERCEDEH MOMENI
                                          Assistant United States Attorney
                                          555 4th Street, NW
                                          Civil Division
                                          Washington, D.C.  20530
                                          (202) 305-4851
                                          (202) 514-8780 (facsimile)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NEW MEXICO DEPARTMENT | ) | |
| OF INFORMATION TECHNOLOGY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action No. 07-1603 (CKK) |
| | ) | (ECF) |
| U.S. DEPARTMENT OF HEALTH | ) | |
| AND HUMAN SERVICES, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>ORDER</u>

Upon consideration of Defendants' Motion for Summary Judgment, all oppositions and replies, and the entire record herein, it is hereby ORDERED that the Motion is GRANTED.

Defendants' are entitled to judgment as a matter of law and Plaintiff's Complaint is hereby dismissed with prejudice.

SO ORDERED on this _____ day of _____ 2008.


_____
UNITED STATES DISTRICT JUDGE

ADMINISTRATIVE RECORD BEFORE THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEAL BOARD

NEW MEXICO DEPARTMENT OF INFORMATION
TECHNOLOGY

Case No. 1:07-cv-01603

INDEX

# UNITED STATES OF AMERICA

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## CERTIFICATION OF TRUE COPY

Pursuant to the provisions of 42 U.S.C. 3505 and the authority vested in me by delegation from the Secretary (see attached memo), I hereby certify that the annexed is a true copy of the document on file in the Department of Health and Human Services.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Department of Health and Human Services to be affixed, on this_____12th_____day of _____October_____20__07__

*Constance B. Tobias*
Constance B. Tobias
Chair
Departmental Appeals Board

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

MAR - 5 1992

Washington, D.C. 20201

TO:        Chair, Departmental
           Appeals Board

FROM:      Terrence J. Tychan
           Acting Deputy Assistant Secretary for
           Management and Acquisition

SUBJECT:   Authority to Certify True Copies and Affix the
           Department Seal

Under the authority vested in the Deputy Assistant Secretary for
Management and Acquisition on November 14, 1991 (attached) to
certify true copies and affix the Department Seal for the Office
of the Secretary, I hereby redelegate to the Chair of the
Departmental Appeals Board:

1.    The authority to certify true copies of any books, records,
      papers, or other documents on file within the Department, or
      extracts from such, to certify that true copies are true
      copies of the entire file of the Department, to certify the
      complete original record, or to certify the nonexistence of
      records on file within the Department, and to cause the Seal
      of the Department to be affixed to such certifications.

2.    The authority to cause the Seal to be Affixed to agreements,
      awards, citations, diplomas, and similar documents.

3.    These authorities may be redelegated.

4.    This redelegation supersedes all previous redelegations of
      authorities to the Chair of the Departmental Appeals Board
      relating to this subject.  Further redelegations made under
      previous redelegations of authority shall remain in effect
      until appropriate new redelegations are made.

Attachment

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEW MEXICO DEPARTMENT OF<br>INFORMATION TECHNOLOGY<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HEALTH & HUMAN SERVICES,<br><br>and<br><br>MICHAEL O. LEAVITT, SECRETARY<br>OF THE DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES<br><br>Defendants. | DATE:  October 12, 2007<br><br>Case No. 1:07-cv-01603 |

ADMINISTRATIVE RECORD BEFORE THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
REGARDING DAB DECISION NO. 2083

**INDEX**

LIST OF MATERIALS IN THE RECORD

| Item No. | Document Description | Page Number |
|---|---|---|

**DECISION**

1.    Decision of the Departmental Appeals Board Presiding Board        1-26
      Member Judith A. Ballard and Board Members Donald F. Garrett and
      Leslie A. Sussan, Decision No. 2083 dated May 17, 2007.

2

## CORRESPONDENCE AND BRIEFS

| 2. | New Mexico General Services Department's (Appellant) Notice of Appeal dated July 24, 2006. | 27-44 |

3.    Departmental Appeals Board's (DAB) Acknowledgment of Appellant's Notice of Appeal dated July 31, 2006.    45-48

4.    Division of Cost Allocation's (DCA) Notice of Appearance of Counsel dated August 7, 2006.    49-50

5.    Appellant's Case Status Report and Request for Sixty-Day Extension dated September 29, 2006.    51

6.    DAB's Continuance of Stay dated October 5, 2006.    52-53

7.    DAB's Request for Case Status Update dated November 28, 2006.    54

8.    Parties' Joint Case Status Report and Proposed Briefing Schedule dated November 28, 2005.    55-56

9.    DAB's Approved Briefing Schedule dated November 29, 2006.    57

10.   Appellant's Opening Brief and Appeal File dated January 16, 2006. Appellant's Exhibits (A. Ex.) 1-11 were included with this submission and are listed under Appendix A of the Index.    58-106

11.   Appellant's submission of the original Affidavits of Robert G. Peters and Donna Sandoval dated February 9, 2007. See Appendix A, Appellant's Exhibits 5 and 7 of the Index.    107-108

12.   DCA's Request for an Extension of Time to File its Reply Brief dated February 23, 2007.    109

13.   DAB's Confirmation of DCA's Request for an Extension of Time dated February 23, 2007.    110

14.   DCA's Brief and Exhibits dated March 8, 2007. DCA's Exhibits (DCA Ex.) 1-5 are listed under Appendix B of the Index.    111-145

15.   Appellant's Reply Brief dated March 30, 2007.    146-164

3

16.    Transmittal of DAB Decision No. 2083 dated May 18, 2007.  The          165
       Decision is listed under "Decision" of the index.

## APPENDIX A

Appellant's Exhibits 1-11

17.    Appellant's Exhibit List                                              166-167

18.    A. Ex. 1                                                              168-192

19.    A. Ex. 2                                                              193-206

20.    A. Ex. 3.a                                                            207-230

21.    A. Ex. 3.b                                                            231-237

22.    A. Ex. 4.a                                                            238-240

23.    A. Ex. 4.b                                                            241-252

24.    A. Ex. 5                                                              253-261

25.    A. Ex. 6.a                                                            262-264

26.    A. Ex. 6.b                                                            265-267

27.    A. Ex. 7                                                              268-272

28.    A. Ex. 8.a                                                            273

29.    A. Ex. 8.b                                                            274-276

30.    A. Ex. 9.a                                                            277

31.    A. Ex. 9.b                                                            278-289

32.    A. Ex. 9.c                                                            290-293

33.    A. Ex. 10.a                                                           294

34.    A. Ex. 10.b                                                           295

4

| 35. | A. Ex. 10.c | 296 |
| 36. | A. Ex. 11 | 297 |

## APPENDIX B

DCA's Exhibits 1-5

| 37. | DCA's Exhibit Index | 298 |
| 38. | DCA Ex. 1 | 299-308 |
| 39. | DCA Ex. 2 | 309 |
| 40. | DCA Ex. 3 | 310-311 |
| 41. | DCA Ex. 4 | 312 |
| 42. | DCA Ex. 5 | 313-315 |

UNITED STATES OF AMERICA

DEPARTMENT OF HEALTH AND HUMAN SERVICES

*C E R T I F I C A T I O N   O F   T R U E   C O P Y*

Pursuant to the provisions of 42 U.S.C. 3505 and the authority vested in me by delegation from the Secretary (see attached memo), I hereby certify that the annexed is a true copy of the document on file in the Department of Health and Human Services.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Department of Health and Human Services to be affixed, on this_____12th_____day of _____October_____20__07__

Constance B. Tobias
Chair
Departmental Appeals Board

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

MAR - 5 1992

Washington, D.C. 20201

TO:      Chair, Departmental
         Appeals Board

FROM:    Terrence J. Tychan
         Acting Deputy Assistant Secretary for
         Management and Acquisition

SUBJECT: Authority to Certify True Copies and Affix the
         Department Seal

Under the authority vested in the Deputy Assistant Secretary for
Management and Acquisition on November 14, 1991 (attached) to
certify true copies and affix the Department Seal for the Office
of the Secretary, I hereby redelegate to the Chair of the
Departmental Appeals Board:

1.  The authority to certify true copies of any books, records,
    papers, or other documents on file within the Department, or
    extracts from such, to certify that true copies are true
    copies of the entire file of the Department, to certify the
    complete original record, or to certify the nonexistence of
    records on file within the Department, and to cause the Seal
    of the Department to be affixed to such certifications.

2.  The authority to cause the Seal to be Affixed to agreements,
    awards, citations, diplomas, and similar documents.

3.  These authorities may be redelegated.

4.  This redelegation supersedes all previous redelegations of
    authorities to the Chair of the Departmental Appeals Board
    relating to this subject.  Further redelegations made under
    previous redelegations of authority shall remain in effect
    until appropriate new redelegations are made.

Attachment

Department of Health and Human Services

# DEPARTMENTAL APPEALS BOARD

### Appellate Division

SUBJECT: New Mexico General
Services Department
Docket No. A-06-105
Decision No. 2083

DATE: May 17, 2007

## DECISION

The New Mexico General Services Department (New Mexico) appealed
a determination made by the Division of Cost Allocation (DCA) of
the Department of Health and Human Services (HHS). The
determination related to computer services New Mexico provided to
various State agencies in State Fiscal Year (SFY) 2004 and
charged to federal funds using billing rates. DCA determined
that New Mexico had not been following the requirements for using
billing rates to allocate costs to federal programs. DCA asked
for a cash refund of $4,011,031 (including interest) for
overcharges to federal funds for five categories of computer
services.

On appeal, New Mexico concedes that it must refund $1,852,193 in
federal funds (including interest), but argues that the
overcharges for some types of computer services billed to
specific federal programs operated by the New Mexico Human
Services Department should be offset by undercharges for other
types of services billed to those programs. New Mexico argues
that, because it has identified the overcharges and undercharges
to specific federal programs, the Board's decision in Arkansas
Department of Information Systems, DAB No. 2010 (2006) (Arkansas
I) does not control here. New Mexico also requests that the
Board revisit its holding in New Mexico General Services Dept.,
DAB No. 1876 (2003) (New Mexico I), to the extent it rests on the
conclusion that DCA need not take undercharged amounts into
consideration in the cost settlement process because those
amounts were not claimed to individual federal programs and were
not substantiated. In response, DCA asks that we issue a summary
decision upholding the disallowance here, based on our past
decisions.



2

Since New Mexico's presentation here seeks to address some of the concerns about offsetting that led to our past decisions and raises some new issues, we decline to issue a summary decision based on our analysis in those decisions. Based on our analysis in those decisions and below, however, we conclude that New Mexico has not adequately addressed the concerns that led us to uphold DCA in those decisions and that DCA used a method to calculate a refund due for overcharges that was reasonable under the circumstances here. New Mexico has failed to meet federal requirements for billing its computer services over a period of many years and, specifically, failed to follow the adjustment methodology adopted in its cost allocation plan for SFY 2004. Despite characterizing its analysis of the amount due as merely offsetting overcharges and undercharges for SFY 2004 at the individual federal program level, New Mexico is effectively seeking to offset overcharges in SFY 2004 against undercharges during a prior period, without the required approval for carrying those undercharges forward into SFY 2004. If we permitted this offset, it would put New Mexico in a better position with respect to federal funding than if it had met federal requirements and made adjustments according to its approved methodology. Contrary to what New Mexico argues, the flexibility permitted states in choosing a cost allocation methodology does not mean that a state may adopt one methodology in its cost allocation plan, fail to apply that methodology in a timely manner, and then seek to have the benefit of an alternative type of adjustment, with consequences that include circumventing federal program requirements. The goal of the federal cost allocation principles, as New Mexico points out, is to provide assurance of appropriate and equitable allocation of costs, but that does not help New Mexico here. New Mexico has not shown that the adjustments it seeks to make here are appropriately made at this point in time nor has New Mexico adequately supported its assertion that requiring it to repay the amount DCA calculated was owed would result in a significant inequity to New Mexico, especially since DCA used the overcharge amounts from a worksheet provided by New Mexico.

## Applicable Law, Regulations, and Cost Principles

The allowability of costs claimed by state governments under federal grants is governed by Office of Management and Budget (OMB) Circular A-87. 45 C.F.R. §§ 74.27(a) and 92.22(b).[1] To be

---

[1] OMB Circular A-87 was most recently revised in 2004, and, in 2005, its provisions were relocated to the Code of Federal Regulations at 2 C.F.R. Chapter II. 70 Fed. Reg. 51,910 (Aug.
(continued...)

3

allowable, a cost must, among other things, be necessary and reasonable for proper and efficient performance and administration of a federal award, conform to any limitations or exclusions in governing regulations as to types or amounts of costs, and be allocable to the award.  OMB Circular (Cir.) A-87, Attachment (Att.) A, ¶ C.1.  A cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objective in accordance with relative benefits received.  OMB Cir. A-87, Att. A, ¶ C.3.a.

This dispute concerns the disposition of federal funds that New Mexico claimed for central service costs.  Central service costs are the costs of services provided by a state on a centralized basis to its various departments and agencies, which in turn may receive federal funding in those costs, to the extent they administer federally-funded programs.

To ensure that central service costs are identified and assigned to benefitting federal programs and activities on a reasonable and consistent basis, OMB Circular A-87 establishes a process for submission and approval of a central service cost allocation plan (CAP).  OMB Cir. A-87, Att. C, ¶ A.1.  A CAP is the documentation identifying, accumulating, and allocating (or developing billing rates based on) the allowable costs of services provided by a governmental unit on a centralized basis to its departments and agencies.  OMB Cir. A-87, Att. A., ¶ B.4.  "In essence, the CAP identifies the central support services that qualify for federal financial participation and describes how central support agencies allocate the costs." <u>Alabama v. Shalala</u>, 124 F. Supp. 2d 1250, at 1253 (M.D. Ala. 2000).  The requirements for CAPs are listed in OMB Circular A-87, and in an HHS implementation guide issued pursuant to OMB Circular A-87, "A Guide for State and Local Government Agencies:  Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government" (ASMB C-10).  OMB Cir. A-87, Att. C, ¶ A.2.[2]

For each year that a state claims central service costs under federal awards, it must submit a CAP for review, negotiation, and approval by the cognizant federal agency.  OMB Cir. A-87, Att. C., ¶¶ D.1, F.1.  HHS is the cognizant federal agency for New

---

[1](...continued)
31, 2005).  The relevant provisions for this appeal have been in effect since 1995.  60 Fed. Reg. 26,484 (May 17, 1995).

[2] ASMB C-10 replaced "A Guide for State and Local Government Agencies," OASC-10 (Dec. 1976).

4

Mexico, and DCA is the HHS component responsible for CAPs. The CAP must include a projection of the next year's costs and a "reconciliation of actual allocated costs to the estimated costs used for either the most recently completed year or the year immediately preceding the most recently completed year." Id., Att. C, ¶ D.

Costs of central services omitted from the plan will not be reimbursed. Id., Att. C, ¶ C. All cost and other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the propriety of the costs assigned to federal awards. Id., Att. C, ¶ A.1. All central service CAPS "will be prepared and, when required, submitted within six months prior to the beginning of each of the governmental unit's fiscal years in which it proposes to claim central service costs" although the cognizant agency may grant an extension. Id., Att. C, ¶ D.4.

Costs of central services that are allocated to benefitted agencies on some reasonable basis (but are not billed to those agencies) are included in Section I of a CAP and are called "allocated central services" or "Section I" costs. Services that are billed to benefitted agencies and/or programs on an individual fee-for-service or similar basis are included in Section II of a CAP and are called "billed central services" or "Section II" costs. Id., Att. C, ¶¶ B.1, B.2.

The revenues that a state agency receives from other state agencies for billed central services may be accounted for through an "internal service fund" (ISF), which the state uses to finance those services. Because ISFs are typically funded through periodic billing cycles, charges by an ISF activity to provide for the establishment and maintenance of a reasonable level of working capital reserve are allowable since this enables the ISF to pay expenses as they arise. Except in exceptional cases, a working capital reserve as part of retained earnings is considered reasonable if it does not exceed 60 days cash expenses for normal operating purposes. Id., Att. C, ¶ G.2. The allowance for a working capital reserve is an exception to the general policy that federal grantees may not make a profit by charging a federal award more than the cost of the services. ASMB C-10, ¶ 1.6, Question 1-4; OMB Cir. A-87, Att. A, ¶ A.1.

As part of a statewide CAP, a state government must provide specific documentation about ISFs, including a fiscal year-end reconciliation schedule showing the revenues, costs, and year-end balance. OMB Cir. A-87, Att. C, ¶¶ E.3.b(1), G.4; ASMB C-10, ¶ 4.8, Question 4-7. The cognizant agency has flexibility to request additional documentation on a case-by-case basis. OMB

5

Cir. A-87, Att. C, § E.  An ISF may cover more than one category of service provided by a central services agency, but "[e]ach billed central service activity must separately account for all revenues (including imputed revenues) generated by the service, expenses incurred to furnish the service, and profit/loss." <u>Id.</u>, Att. C, ¶ G.1.

With respect to revenues, OMB Circular A-87 provides:

> Revenues shall consist of all revenues generated by the service, including unbilled and uncollected revenues. If some users were not billed for the services (or were not billed at the full rate for that class of users), a schedule showing the full imputed revenues associated with these users shall be provided.

<u>Id.</u>, Att. C., ¶ E.3.b(2).  With respect to billing rates, OMB Circular A-87 provides:

> Adjustments of billed central services.  Billing rates used to charge Federal awards <u>shall be based on the estimated costs of providing the services</u>, including an estimate of the allocable central service costs.  A comparison of the revenue <u>generated by each billed service</u> (including total revenues whether or not billed or collected) to the actual allowable costs of the service will be <u>made at least annually</u>, and an adjustment will be made for the difference between the revenue and the allowable costs.

<u>Id.</u>, Att. C, ¶ G.4 (emphasis added).  Adjustments are to be made be made through one of four specified methods (set out and discussed below).

Proposed CAPs must be accompanied by a certification that the costs included in the proposal are allowable and properly allocable to federal awards in accordance with federal requirements, and that similar types of costs have been accounted for consistently.  OMB Cir. A-87, Att. C, ¶ E.4., <u>see also</u> ¶ E.1. This reflects basic guidelines for allowability of costs under federal awards, including that costs must be consistent with procedures that apply uniformly to both federal awards and other governmental activities and be accorded consistent treatment. <u>Id.</u>, Att. A, ¶ C.1.

Negotiation of central service CAPs generally results in an agreement that will be accepted and used by all federal agencies. A negotiated agreement may be reopened in some circumstances (including if the information on which the plan was negotiated is

6

later found to be materially incomplete or inaccurate) or may be subject to adjustments or refunds for costs that are unallowable or clearly not allocable to federal awards. Id., Att. C, ¶¶ F.2., F.3. If a dispute arises in the negotiation of a plan, the dispute is resolved using the appeals procedures of the cognizant agency. Id., Att. C, ¶ G.6.

Revisions to OMB Circular A-87 in 1995 clarified some requirements for ISFs. After the revision, DCA issued ASMB C-10, pursuant to the specific provision in the Circular providing for HHS guidance. ASMB C-10 says it applies to costs claimed through statewide CAPs for new agreements due after October 1, 1997.

While having and following an approved CAP is a prerequisite for allocating central service costs to federal programs, not all allocated costs are allowable costs for purposes of the federal grants to which they are allocated. Federal funding may not be available for costs allocated to a particular federal grant if federal funding for a particular type of cost is subject to a cap, if requirements for timely filing of claims are not met, or if other restrictions on costs apply and are not met. Indeed, OMB Circular A-87 specifically notes that, in addition to the restrictions contained in the Circular, "there may be laws that further limit the amount of administrative or indirect costs allowed." OMB Cir. A-87, Att. A, ¶ F.3.; see also ¶ C.1.

Board cases, based on applicable law and regulations, hold that the burden of demonstrating the allowability and allocability of costs for which funding was received under a grant rests with the grantee. See, e.g., Maryland Dept. of Human Resources, DAB No. 1886 (2003); New Jersey Dept. of Human Services, DAB No. 1797 (2001); Texas Migrant Council, Inc., DAB No. 1743 (2000) and cases cited therein; see also 45 C.F.R. §§ 74.50- 74.53 (general grant documentation and record-keeping requirements) and 45 C.F.R. Part 92 (administrative requirements for state grants). This fundamental principle of grant law ultimately derives from the requirement that federal funds may be expended only for the purposes for which they were appropriated, and no other, absent specific legal authority otherwise. U.S.C.A. Const. Art. I § 9, cl. 7 (Appropriations Clause); 31 U.S.C.A. § 1301(a).

**Background**

New Mexico has an ISF that provides computer services - hardware, software, email services, and technical support - to New Mexico State agencies (customer agencies). In SFY 2004 (ending June 30, 2004), the ISF included over 30 categories of services. NM Exs. 8.a. and 8.b. The costs of the services include the direct costs

7

of providing the services and allowable indirect costs. New Mexico issued monthly invoices to State agencies using billing accounts that were established to reflect distinct activities. New Mexico billed for all of the ISF services since the ISF relies entirely on customer agency payments (and interest earned on those payments) in order to operate. The computer services are provided by the New Mexico General Services Department (GSD), specifically, the Information Systems Division (ISD).

New Mexico originally set its rates for computer services by reference to the rates that a private provider of information services would charge. In 2001, DCA issued determinations for FY 1995 through FY 1999, disallowing more than $8,000,000 in federal funds for billings in excess of costs for the services. New Mexico did not deny it was not following the OMB Circular A-87 process of adjusting rates to costs at least annually, but challenged DCA's methodology for determining the amount to be refunded. New Mexico contended that it should be permitted to offset or "net" undercharges against overcharges in determining the amount owed to the federal government. The Board upheld DCA's determination in <u>New Mexico I</u>, for reasons we explain below.

After DCA had advised New Mexico that it needed to use a cost-based system for establishing rates, New Mexico began calculating rates based on costs for SFY 2000 through SFY 2004, using a cost allocation methodology it worked out with DCA. Rather than implementing new cost-based rates each fiscal year, however, New Mexico continued to use the rate calculated for SFY 1999 through the period at issue here. NM Ex. 5 (Peters Affidavit), ¶ 7.

In August 2003, after the Board issued its decision, DCA field office staff met with officials of the New Mexico General Services Department to discuss how to bring the required reporting back into compliance with OMB Circular A-87. In June 2004, DCA field office staff again met with New Mexico officials to discuss New Mexico's rate restructuring process.

On February 4, 2005, DCA issued a determination for SFY 2000 through SFY 2003 seeking a refund of over $3,000,000 in overcharges for computer services in three billing rate categories, plus interest, for a total refund of $3,274,624. DCA Ex. 5. This determination, like the earlier one, was based on New Mexico's failure to adjust its billing rates in order to eliminate reserves in excess of the amount permitted by OMB Circular A-87. New Mexico did not appeal this determination, instead electing to reimburse the federal government in full.

8

New Mexico's applicable statewide CAP (SWCAP) describes its billing methodology as follows:

> The State's department/agencies are requested to provide information on the billing accounts they want established to accumulate the cost of the services provided by ISD related to these accounts. As services are requested by the departments/agencies throughout the year, they also identify the billing account to be billed that is associated with the request. As ISD generates the data in response to each request, all resources used by service (units of service by billing rate) are identified and charged to the specific account identified on the request.
>
> In March/April of each year, a "mid-year realignment" is performed to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87. The billing rates are adjusted to reflect actual usage and costs to that point in time plus the expected usage and costs to the end of the year. Based on the new billing rates by service, any over/under recovery associated with each account is adjusted to reflect the new billing rates and the actual usage by that account. An adjusted bill by account is sent to the respective departments/agencies. In this manner, each account receives an adjustment proportional to its actual usage. This same process is also performed at the end of the year.

9

DCA Ex. 2.[3] New Mexico admits, however, that it did not perform the mid-year realignment in SFY 2004. NM Br. at 12, n. 8. The deadline for New Mexico to submit its SWCAP for FY 2004, including the cost reconciliation for its ISF, was December 31, 2004, six months after the end of the state fiscal year. New Mexico did not submit the plan until October 15, 2005, almost 10 months late, and after the end of SFY 2005. The SWCAP submission included a profit/loss analysis by service and identified both the "Published Service Rates" and the "Service Rates Based on Actual Service Costs." NM Ex. 4. New Mexico does not, however, claim to have ever sent adjusted bills for SFY 2004 by account to the departments/agencies for the variance between the two rates, pursuant to the SWCAP methodology.

On February 22, 2006, DCA issued a determination for SFY 2004 requesting refund of the amount DCA had determined was the federal share of excess reserve balances in the ISF as of June 30, 2004. See NM Ex. 2. After New Mexico submitted some additional information, DCA issued a revised determination on June 22, 2006, reducing the amount of the refund owed to $4,011,031, including interest. Id. The revised determination calculated the refund due for five service categories in which the excess reserve balances exceeded $500,000. Sixteen (16) categories of service had undercharges to HSD for the fiscal year

_____

[3] New Mexico cites to its Exhibit 4.a. as the "SWCAP governing expenditures in fiscal year 2004." NM Br. at 11. This exhibit is a cost allocation agreement dated February 22, 2005, after the end of SFY 2004. Normally, the billing rate methodology that applies to a given year is established prior to that year, however, and the actual costs for the year are reported in the SWCAP due within six months of the end of the year. Both parties' exhibits, in any event, include the excerpt quoted above regarding the allocation methodology, on pages dated April 11, 2004. Since this document includes a methodology for adjusting for billed costs to actual allowable costs twice a year and for also adjusting the billings to the program accounts, we cannot agree with New Mexico's assertion that the "SWCAP does not set forth the specific method for implementing the cost reconciliation." NM Br. at 11. In support, New Mexico cites language in the agreement that "[a]djustments for variances between billed costs and the actual allowable costs of providing the services, as defined by OMB Circular A-87, will be made in accordance with the procedures agreed to between the State/locality and the Cognizant Agency." Id. citing NM Ex. 4.a. This boilerplate language cannot reasonably be read as meaning that a state could disregard the adjustment procedures set out in a document attached to the agreement, as New Mexico did.

10

because the actual cost per unit of service was greater than the per unit rate charged.[4]

On appeal, New Mexico does not challenge DCA's revised determination that New Mexico owes a refund of $66,676 in federal funds claimed for computer services provided to two State departments that receive federal funds - the Department of Health and the Children, Youth and Families Department. NM Br. at 3. New Mexico does, however, challenge DCA's determination of an amount owed for the federal share of overcharges to the New Mexico Human Services Department (HSD). HSD administers a number of federal assistance programs, including Medicaid, Child Support Enforcement, Food Stamps, the Low Income Home Energy Assistance Program, Refugee Cash and Medical Assistance, and Temporary Assistance for Needy Families, as well as a State-only General Assistance program. New Mexico requests that the Board either "correct the amount of DCA's disallowance" based on the information New Mexico provides with its appeal concerning computer services charged to HSD programs in FY 2004, or "remand the matter to DCA to compute the disallowance in a manner conforming with federal law." NM Br. at 3. New Mexico asserts that DCA's determination here is in conflict with HHS' own policy guidance on OMB Circular A-87 and with OMB's stated intent to accord flexibility to states. New Mexico argues that past Board decisions were wrongly decided and, in any event, distinguishable. New Mexico provides an analysis that New Mexico says shows that the federal share of the amount it should repay for services provided to HSD programs is $1,683,715, including imputed interest. Since, as noted above, New Mexico does not seek to reduce the refund amount for non-HSD programs of $66,676, New Mexico is conceding its owes $1,852,193 in federal funds.

---

[4]    New Mexico says that, of the 32 service categories it lists in Exhibit 8.a., "six had neither undercharges nor overcharges to HSD, because HSD had no charges in fiscal year 2004 in these categories." NM Br. at 12, n. 9, citing NM Ex. 2, Att. 1. Yet, the analysis New Mexico submitted titled "Totals, All HSD Billing Accounts" lists 39 accounts, seven of which have either a zero or no amount in Column H ("Actual ISD Billable Revenues") and two of which have an "N/A" in that column (I/O General and Print General). NM Ex. 9.b., unnumbered page 12. The other 30 service categories show some billable revenues in Column H. This analysis also shows that, for one category (Tape Storage), the actual billable revenues were the same as the actual service cost for SFY 2004.

11

## Discussion

At the outset, we note that meeting federal requirements is a prerequisite for billing central services to federal funds. New Mexico had been failing for many years to comply with federal ISF requirements for billing central services and failed to make adjustments to the billed amounts using the methodology in its approved SWCAP for SFY 2004. New Mexico concedes that its failures resulted in substantial overcharges to federal funds for certain categories of computer services. Yet, DCA seeks a refund only for the overcharges in excess of permissible reserves for five service categories (and related interest). The reasonableness of DCA's determination of the refund amount, and New Mexico's arguments, must be considered in this context.

### 1. DCA's determination and past Board decisions are consistent with ASMB C-10 and the intent of the OMB requirements.

New Mexico first raises a legal argument, based on the policy guidance in ASMB C-10 and the intent of the OMB requirements. This argument refers to the part of OMB Circular specifying four different methods for adjusting for the variance between the revenues for a service and the actual, allowable costs of the service. OMB Circular A-87 states:

> A comparison of the revenue <u>generated by each billed service</u> . . . to the actual allowable cost <u>of the service</u> will be made <u>at least annually</u>, and an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central services costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal Share and non-Federal [Share)] exceeds $500,000.

OMB Circular A-87, ¶ G.4.

New Mexico focuses only on the listing of the adjustment methods and contends:

> At issue in this case is DCA's assertion – in tension with HHS' own policy guidance, and with OMB's stated

12

intent to accord flexibility to States - that an adjustment under method (a)(refund to the federal government), as distinguished from all of the other adjustment methods listed in Paragraph G.4, does not permit any consideration of functional categories in which the State undercharged federal programs. The policy guidance conflicting with DCA's stance, the ASMB C-10, states that in choosing a method of adjustment, "[t]he primary concern would be the assurance that Federal programs charged in a given year receive an *equitable and appropriate* adjustment of the *over/under billings.*" Ex. 1, ASMB C-10, Pt. 4, 4.8, 4-14 (emphasis added).

NM Br. at 5. According to New Mexico, "the overcharges and the undercharges were established in the same manner, using approaches approved" by DCA. <u>Id.</u> at 15. New Mexico argues that the "refund is an adjustment intended to correct *any* difference between revenue and allowable costs in an internal service fund" and that "DCA's contention that the 'refund' option may properly include only overcharges, because it is intended to function as a penalty where a State fails timely to pursue other adjustment options, is entirely unsupported in Circular A-87 and its regulatory history." <u>Id.</u> New Mexico also asserts that "[n]o authority sets forth DCA's alleged deadlines for the other adjustment options." <u>Id.</u>

These arguments have no merit. First, New Mexico's argument ignores the fact that the adjustment options in Attachment C, Paragraph G.4., considered in context, are options for cost allocation plan methodologies to adjust for any variance between a billing rate and the actual costs of a service <u>for a fiscal year</u> and that the methodology New Mexico adopted in its approved SWCAP for SFY 2004 was alternative (b).

In ASMB C-10, DCA discussed the adjustment methods in a question-and-answer format, at Question 4-12:

> **Attachment C, paragraph G.4 establishes four methods for adjusting internal service funds (billed central services) for profits or losses realized from operations. Alternative (b) allows credits to amounts charged to the individual programs. This method would only cover profits. If losses occur, why can't individual programs be debited? [Att. C, ¶ G.4]**

> Effectively, alternative (b) is correcting billed costs in the <u>current</u> year, whereas alternative (c) is carrying

13

forward the profit/loss into the <u>next open fiscal period</u>.

The failure of the Circular to note how losses are to be treated in alternative (b) is an editing error. For consistency purposes, both alternative (b) and (c) cover profit and loss situations. However, only one method can be used in a given fiscal year.

ASMB C-10, Part 4, § 4.8, Question 4-12 at page 4-27 (bold in original, underlining added). This response does indicate that, under alternative (b), a state may either credit an individual federal program for a profit resulting from an overcharge for a service or debit the program for a loss resulting from an undercharge for the service. As the Board pointed out in <u>New Mexico I</u>, however, ASMB C-10 highlights the time-sensitive nature of alternatives (b) and (c) (current credits or debits or future rate changes).[5] In <u>Arkansas I</u>, the Board held that the ASMB C-10 interpretation of Paragraph G.4. is reasonable since the adjustment methods follow the requirement for a comparison of revenue to actual costs for each service "at least annually." Thus, New Mexico is mistaken in arguing that there is no authority for DCA to consider certain alternatives as no longer available if a state delays too long in implementing them. As we also noted in <u>Arkansas I</u>, Paragraph G.4. addresses ways for a state to correct for a variance between a billing rate and actual costs to <u>avoid</u> accruing overcharges or undercharges. It does not permit a state to adopt one methodology in its SWCAP, fail to apply that methodology in a timely manner, and then seek to have the benefit of an alternative type of adjustment, no matter what the consequences of the delay.

Moreover, New Mexico cites no specific authority for its position that the refund option – alternative (a) in Paragraph G.4. – must take into account both profits <u>and</u> losses across all service categories within an ISF, other than by implication from the treatment of the other alternatives. Arguably, the fact that

---

[5]  The Board also pointed out that, while the carry-forward option permits offsets of a profit in one year for a service against a loss in another year <u>for that same service</u> (and vice versa) through adjustment of the rate amount, DCA may disapprove this method if it is inequitable in particular circumstances. For example, if federal programs will be substantially reducing the number of units of a particular service they use in the later year due to a program change, a carry-forward adjustment to the per unit rate for that service would not fairly compensate the federal programs for overcharges from the prior year.

14

ASMB C-10 clarifies with respect to the "credit" alternative that either a profit or a loss could lead to an adjustment to the billing for an individual program but does not do so with respect to the refund option implies that the refund option applies only to profits.

Even if one infers that the same clarification could apply to the refund alternative, however, that would not necessarily mean that New Mexico should prevail here or that DCA's position is unreasonable. New Mexico ignores the fact that its SWCAP opted for the <u>credit</u> method, with adjustments to billings be made mid-year and at the end of the year, but that New Mexico admittedly failed to make timely adjustments for any credits or debits to individual programs using that method.[6] Thus, we are not dealing with the issue of whether offset is permitted if the adjustment method selected in a CAP is the refund alternative in subparagraph (a). Instead, we are dealing with a situation where a state has failed to follow the ISF billing requirements in OMB Circular A-87 and its SWCAP. New Mexico admits that it "had not yet taken steps to adjust future billing rates to reflect the cost reconciliation for SFY 2004 when DCA, on February 22, 2006, issued a disallowance letter seeking a refund of the federal share of certain ISF overcharges in SFY 2004." NM Ex. 5 (Peters Affidavit) at ¶ 23. Moreover, New Mexico does not claim that it ever took steps to adjust the bills for the various billing accounts for SFY 2004 "to reflect the new billing rates and the actual usage by that account," pursuant to the methodology in the applicable SWCAP.

Following ISF requirements and submitting claims consistent with an approved cost allocation methodology are prerequisites for charging ISF services to federal programs. As we indicated in <u>Arkansas I</u>, a refund request by DCA where a state has failed to meet federal requirements must be evaluated in this context, where it is an alternative to a more severe determination that none of the billed services is an allowable charge to federal programs. <u>Arkansas I</u>, at 17. The Circular specifically provides that DCA may request a refund from a state if it determines that

---

[6] We recognize that there is merit to New Mexico's argument that it takes some time after the end of a year to make the calculations, but that does not explain why New Mexico never made the mid-year "realignment" pursuant to its SWCAP or seek to credit/debit the billing accounts (and then the individual programs) once it had the information to compare the revenues to expenses for each service category. Nor does New Mexico explain why it continued to bill at the 1999 rates, which could no longer be considered to be a reasonable estimate of 2004 costs.

15

the state has charged unallowable costs to federal programs.   OMB
Cir. A-87, Att. C, ¶ F.3.

New Mexico suggests (and its declarants assert) that the same
data as DCA used to calculate overcharges was used to calculate
the undercharges and that its analysis includes only costs that
are allowable and allocable.  As discussed below, however, New
Mexico's analysis goes beyond data used by DCA.  Also, New Mexico
is confusing the issue of whether the underlying data New Mexico
used to calculate the actual costs of providing each category of
computer service included only allowable and allocable costs of
that service with the issue here – whether undercharges not
timely billed or adjusted pursuant to the approved methodology
(and consequently never claimed from federal programs) should be
considered allowable and allocable charges to federal funds that
may be offset against admitted overcharges.  At most, DCA's use
of the amounts calculated by New Mexico as showing the amount of
overcharges to federal funds for five categories means that DCA
is not challenging New Mexico's data regarding the actual,
underlying costs of providing those services.  But, given the
history of DCA's position, it clearly is _not_ a concession that
the undercharges New Mexico's analysis seeks belatedly to charge
to federal awards are allowable and allocable costs of those
awards.  As we have pointed out in our past decisions, there are
requirements in particular programs, such as requirements for
timely submission of claims or caps on administrative costs, that
affect allowability of such charges at the program level.
Moreover, while the Circular permits carry forward of some losses
into the next open fiscal period where approved by DCA as part of
a cost allocation methodology, generally costs incurred in one
year are not allocable to an award for a later year.

Contrary to what New Mexico argues, DCA's position is consistent
with the statement in the Circular that it provides some
flexibility to states and with the ASMB C-10 statement that, in
choosing a method of adjustment, "[t]he primary concern would be
the assurance that Federal programs charged in a given year
receive an _equitable and appropriate_ adjustment of the _over/under
billings._"  NM Br. at 1-2.  As we discussed above, the methods of
adjustment in the Circular presume timely calculation of billing
rates and timely adjustments to billing, consistent with the
approved methodology in the SWCAP.  Following the approved
methodology provides an assurance that the adjustment of any over
or under billing will be equitable and appropriate.  That
assurance simply  is not there when a state deviates from that
methodology, as New Mexico has done over a period of many years.

16

As we discuss below, the post-hoc analysis New Mexico provides on appeal does not provide adequate assurance that the adjustments it seeks here are appropriate. Although that analysis addresses some of the concerns DCA has previously raised about offsetting, it does not address all of those concerns. Because of flaws in New Mexico's analysis and in the supporting documentation provided, moreover, we cannot accept it as adequate to show that DCA's calculation method is inequitable to New Mexico.

Finally, we reject New Mexico's suggestion that DCA is seeking to impose a "penalty" on New Mexico for its failure to meet Circular requirements. To determine that a state has lost an opportunity to recover federal funds that it could have recovered had it timely followed federal requirements is not tantamount to imposing a penalty. New Mexico has had ample notice of what was required in order to comply with OMB Circular A-87 and to establish its entitlement to federal funds for computer services billed through its ISF. The disallowance here is a consequence of New Mexico's repeated failure over a number of years to comply with those requirements, and the fact that New Mexico thereby lost an opportunity to make timely rate adjustments that would have permitted it to recover its full cost of services is not fairly characterized as a "penalty."

### 2. *New Mexico is correct that this case is distinguishable from our past cases in some respects, but misconstrues statements in the Board's* Arkansas *decisions.*

In New Mexico I, New Mexico advocated offsetting overcharges for computer services by amounts that New Mexico said that it had spent providing other types of computer services in the period 1995 to 1999. The Board concluded that the "netting" sought by New Mexico was not permissible under the circumstances there and that New Mexico's position would improperly permit costs that were never billed to state agencies or claimed from federal programs to be used to offset the debt incurred as a result of admitted overbilling of costs. The Board concluded that such an approach "would result in costs being charged against funds due to the federal government while evading required tests for reasonableness, allowability, allocability and timeliness which would normally apply during the claims process." New Mexico I, at 1. The Board explained this conclusion as follows:

> The difference between offsetting unbilled costs in different internal services rate categories against overcharges actually billed to federal programs in prior fiscal years, as opposed to filing timely claims for

17

federal grant funds in the first instance, is clearly not one of mere form.  To allow the former maneuver would be to open a back door to claims evading timely filing requirements which would leave federal budget outlays uncertain indefinitely.  What is more, to use the unbilled undercharges to offset repayment of improperly claimed federal funds would mean the additional charges would never pass through the normal claiming process at all.  The normal claiming processes at the grantor federal agencies are critical mechanisms that assure that expenditures are proper under the particular federal grants involved.

New Mexico I, at 9.

We do not agree with New Mexico that we should revisit the Board's characterization in New Mexico I of undercharges that have not been claimed from federal programs as "unsubstantiated." As discussed above, substantiating through underlying data what the actual costs of the services were in SFY 2004 compared to the amounts billed is not the same as substantiating that offsetting undercharges against overcharges in determining a refund due provides adequate assurance that only allowable and allocable costs will be charged to federal funds.

In Arkansas I, the Board concluded that DCA did not act in an arbitrary and capricious manner by refusing to permit Arkansas to offset total overcharges for services provided by its Division of Information Services (DIS) against total undercharges for other DIS services in calculating the amount due.  Our key reasons for this conclusion were that –

- Arkansas did not dispute that it was not reconciling DIS billing rates for data processing and telecommunications services to the actual costs of providing the services annually, as required.  Arkansas was thus not submitting claims for federal funding for DIS services in accordance with an approved cost allocation methodology, as required.  Rather than disallowing the entire amount charged to federal funds for DIS services, however, DCA in effect permitted some amounts to be allocated to federal funds, after estimating the federal share of overcharges resulting from billing rates that exceeded the actual cost of providing the services.

- The alternative methods in the Circular for adjusting for variances between a billing rate and actual costs generally apply only when the adjustments are being made on an ongoing basis and when approved by DCA, and DCA

000017

18

- may require a state to account for each category of service separately, even if the services are funded through the same internal service fund.

- DCA reasonably determined that permitting retrospective offsets of total overcharges for some DIS services against total undercharges for other DIS services could result in impermissibly shifting costs from State to federal funds or from one federal program to another or in avoiding conditions on federal funding such as caps on program administrative costs or requirements for timely claims for program funds.

- Arkansas had notice of DCA's rationale for its calculations and ample opportunity to provide further information and to dispute the rationale before the Board.

The Board further concluded:

> While Arkansas is correct that it would be more accurate to determine a disallowance amount by examining the actual charges to federal programs (rather than applying an average federal financial participation rate to the charges to State agencies), Arkansas has had numerous opportunities to come forward with documentation of the actual charges, but failed to do so. Absent such documentation, DCA reasonably relied on evidence (either provided by or not rebutted by Arkansas) about charges to State agencies, and about the average federal financial participation rates for each agency, to estimate the total excess charges to federal funds for DIS services.

DAB No. 2010, at 3.[7]

We agree with New Mexico that, unlike Arkansas, it is not seeking here to offset over- and undercharges at the bottom line. Also, some of the concerns present in Arkansas, such as the potential for shifting of costs from non-federal to federal programs, are not present here to the same degree. Recognizing that there are some distinctions, however, does not mean that factual similarities are not significant or that the concerns are fully

---

[7]   In Arkansas Department of Information Systems, DAB No. 2047 (2006) (Arkansas II), the Board concluded that there was no factual distinction between the two cases that required a different result on the issues raised.

19

addressed.  Like Arkansas, New Mexico here created the need to
calculate an amount due to the federal government because New
Mexico was not following federal ISF requirements.  Like
Arkansas, New Mexico seeks to charge to federal funds amounts
which it has never billed to federal programs and which therefore
have not been subject to review against conditions on funding in
those programs.[8]  As discussed below, moreover, New Mexico's
analysis does not avoid the potential for shifting costs among
federal programs or from federal to state programs.

New Mexico argues that in Arkansas I, the Board "appears to have
acknowledged that a refund might appropriately take undercharges
into account, if a state's methodology treats all federal
programs equitably."  NM Br. at 5, citing Arkansas I, at 8, 13.
New Mexico asserts that "the Board has twice clearly signaled
that evidence of the sort the State has presented in this appeal
could be sufficient to demonstrate that a refund amount should
take undercharges into consideration."  NM Reply Br. at 2, citing
Arkansas I, DAB No. 2010, at 3, 40, and Arkansas II (no page cite
given).

The Board's acknowledgment in Arkansas I that it would be more
accurate to determine a disallowance amount by examining the
actual charges to federal programs (rather than applying an
average federal financial participation (FFP) rate to the charges
to State agencies) referred, however, to Arkansas' complaint that
use of an average FFP rate to compute the federal share of
overcharges may have skewed the calculation of the refund amount.
We agreed that it might be more accurate in determining a refund
amount to trace the overcharges to individual programs to

---

[8]  New Mexico provides evidence that ISF costs allocated to
HSD programs in SFY 2004 were included on federal claims forms in
cumulative amounts on a line for administrative costs.  New
Mexico seems to suggest through this that it has already
submitted claims that cover the undercharges, since the amounts
claimed on the expenditure report included overcharges to federal
funds greater than the undercharges, for a net overcharge.  This
might address some of the concerns expressed in our earlier
decisions (such as the concern about exceeding a cap on
administrative costs).  We do not think that it addresses the
concern about timeliness of claims, however, since amounts
included on a line on a report form must be traceable to state
accounting records showing the specific expenditures being
claimed, and since, as we discuss below, some of the undercharges
that New Mexico's analysis offsets against overcharges in SFY
2004 were from earlier years.

20

determine the actual FFP rates at which the overcharges were claimed.

The Board also had questioned DCA about whether it might accept some offset if Arkansas did provide information about the specific amounts of over- and undercharges to specific programs for specific years. But, the Board ultimately did not need to evaluate the effect of such information because Arkansas did not provide it, despite many opportunities to do so. In this case, New Mexico provided information that it presented as an analysis of the variances between billing rates and actual costs for SFY 2004 for services billed to HSD accounts showing the actual FFP rates for the services. As we discuss next, however, we find that New Mexico's analysis is insufficient to fully address the concerns raised by offsetting, in part since the analysis does not in fact offset only overcharges and undercharges for services provided in SFY 2004 at the individual program level but also takes into account over- or undercharges for the period SFY 2000 through SFY 2003.

### 3. New Mexico's calculations seek to offset undercharges from FY 2000-FY 2003 against overcharges for FY 2004 and are otherwise flawed.

The calculations on which New Mexico relies to support its view that this case is distinguishable from earlier Board cases and that the adjustments it wants to make are equitable and appropriate are in its Exhibit 9. Exhibit 9.b. is an analysis of HSD billing accounts, by service type. Exhibit 9.c. is a summary of the total net charges for services for each account allocated to individual HSD programs. New Mexico submitted two affidavits to support these analyses and also attached documents summarizing the analysis and providing descriptions of the computer billing accounts, the HSD accounts to which they relate, the allocation methods used to allocate costs in the accounts among HSD programs (for accounts that benefit more than one program), and the federal participation rates for the services for each of the programs charged.[9]

---

[9]  While these documents describe the costs as "indirect costs," New Mexico does not claim that it used an indirect cost rate to allocate them among benefitted programs. Instead, the record indicates that New Mexico used percentages derived from a random moment sample (RMS) or division employee count and then the RMS results to allocate charges to billing accounts that benefitted more than one HSD program. NM Ex. 6.a.

21

The first striking thing revealed by a careful analysis of Exhibit 9 is that, while New Mexico seeks to characterize it as an analysis of profit/loss to individual HSD programs for SFY 2004 for computer services at the federal program level, it in fact takes into account over- and undercharges for prior years. The accumulated total amounts in the last column (headed "A-87 Adjusted Fund Balance") are calculated for each billing account not just by offsetting undercharges for some categories of computer services against overcharges for other services within a program account, but also by taking into account amounts that are identified on the worksheets as "FY 2004 Beginning Fund Balance." The accumulated total of this amount is a negative $1,189,223.80, which the worksheets then offset against the total actual accumulated profit/loss for the fiscal year for all accounts of $4,954,399.99 to get $3,765,176.18, the total of the column New Mexico labels as the "FY 2004 Ending Fund Balance." NM Ex. 9.c., last unnumbered page.

New Mexico's declarations provide no explanation of the column for beginning fund balances. In his declaration, the DCA negotiator describes New Mexico's worksheets as showing that the "cumulative effect of prior fiscal years 2000-2003 was that [HSD] was undercharged $1,189,224." DCA Ex. 1 (Hill Declaration) at ¶ 19. This amount is the total "FY 2004 Beginning Fund Balance" figure (rounded up) for all of the HSD accounts. While New Mexico's reply brief disputes some statements made in the negotiator's declaration, it does not dispute the description of this figure as the net undercharge for these prior fiscal years.

Thus, it is apparent that the effect of accepting New Mexico's calculation of the refund due would be to permit New Mexico to carry forward into SFY 2004 the undercharges from the period 2000 through 2003 and to offset them against overcharges in SFY 2004. Permitting such a carry forward at this point in time, however, would raise the same concerns about circumventing timely claims provisions and the possibility of cost-shifting (if there are any significant changes in federal usage of services from the earlier period to 2004) that we found in our earlier decisions were valid concerns justifying DCA's determination not to permit an offset. Some of these charges were to HHS programs such as Medicaid and Child Support Enforcement, which are subject to two-year timely claims provisions. 45 C.F.R. Part 95, subpart A. Moreover, New Mexico used allocation methods, such as a random moment sample, to allocate the costs billed to HSD accounts among HSD programs, and it is possible that these allocation percentages changed over the years. It is also possible that FFP rates changed. Yet, New Mexico does not specifically address the timely claims and cost shifting concerns with respect to the offset of undercharges from

22

prior years, and does not provide us with the information we would need to evaluate this issue ourselves.[10] .

As noted above, moreover, in arguing that its undercharges are allowable and allocable since they are based on the same data as the overcharges, New Mexico ignores the fact that the concept of allocability of costs to a particular award generally means not only that costs must be of benefit to the program to which they are charged, but also means that costs may not be shifted from one award period to another. The provision permitting carry forward when it is part of an approved allocation methodology is an exception to this, and thus should be read narrowly.

More important, accepting New Mexico's calculations would in effect permit New Mexico to reopen settled cost allocation issues from the period SFY 2000 through SFY 2003. As mentioned above, after DCA had issued a determination for that period requiring refund of overcharges for certain service categories, calculated without any offset for undercharges, New Mexico had acquiesced in that determination, without appealing it. Yet, New Mexico does not allege that DCA's determination for that period permitted it to carry forward any undercharges from earlier periods into SFY 2004, nor even acknowledge that its analysis includes undercharges from the earlier periods.

The only reference in the materials New Mexico submitted to us describing Column A (titled "FY2004 Beginning Fund Balance") on the worksheet in Exhibit 9.b. appears in a document titled "Detail of Calculations in Exhibit 9.b.," which states:

> GSD used the same beginning fund balance data as were used in the DCA calculation of overcharges. The beginning fund balance has been allocated to each account on the basis of account service utilization to total service utilization.

---

[10] The Peters Affidavit states that New Mexico's analysis "guarantees against cost-shifting among federal programs" because "[t]his concern could arise only if one federal program were, on the whole, undercharged for ISF services in FY 2004" whereas New Mexico found that each federal program, as a whole, was overcharged in SFY 2004. NM Ex. 5, at ¶ 29. The concern arose, however, once New Mexico sought to shift charging of costs from earlier years into later years. Moreover, the concern is not just about shifting costs among federal programs, but also about shifting costs from state to federal programs.

23

This statement is misleading, however. DCA calculated refund amounts for SFY 2004 using only five categories of service "which had excess reserve balances in excess of $500,000 as of June 30, 2004." NM Ex. 2 (revised determination). DCA's worksheets that are attached to the revised determination do have a column either for "2003 Ending Balance" (Attachment 1) or "Beginning 2004 Fund Balance" (Attachment 2), but in all of the five categories of service DCA used to calculate the refund requested, this is a positive amount. The revised determination also indicates that Attachment 1 was provided to DCA by New Mexico in support of its proposed reduction in the debt amount, and that DCA rejected that proposal because it was "developed based on netting billing rate categories for only" HSD. Id. at 1. Thus, contrary to what New Mexico suggests, DCA clearly did not use any <u>negative</u> beginning fund balances in calculating the refund due, nor can DCA reasonably be viewed as having approved the offsetting of undercharges from prior years against overcharges in SFY 2004.[11]

In its reply brief, New Mexico tries to characterize its beginning fund balances as "undisputed." In some cases, a party's failure to dispute an assertion by another party would lead us to accept the assertion as true. We reject that approach here, for several reasons. First, New Mexico's submission to which DCA was responding did not clearly explain the source of the beginning fund balances or assert that New Mexico should be

---

[11] We also note that Column A in the worksheet originally submitted with New Mexico's SWCAP as the profit/loss analysis by service for SFY 2004 was the "Total Actual Cost by Billing Service," rather than a beginning fund balance. NM Ex. 4.b. at page 6 (unnumbered). This indicates that New Mexico understood that the profit or loss for a service for a particular year does not take into account profits or losses from prior years. It is not clear that DCA was aware when it issued its revised determination that, unlike the original calculations of the profit or loss by billing service (which clearly relate only to SFY 2004), the profit/loss analysis New Mexico submitted to support a reduced refund (for the services charged only to HSD) took into account losses from prior periods. DCA's revised calculation focused on the service categories with the largest overcharges, for which the beginning fund balance was a positive amount that DCA may have assumed was a working capital reserve. Such an assumption would have been reasonable since New Mexico's SWCAP methodology called for adjustments to be made to the billings based on reconciling the rates to actual costs mid-year and at the end of the year, not for any carry forward of excess reserves or negative fund balances from one year to another.

24

permitted to carry forward undercharges in prior years to offset overcharges in SFY 2004. Second, the Circular permits such carry forward only if it is affirmatively approved by DCA. Third, since DCA's policy limits the carry forward option to the next open fiscal period, even when a state is meeting the Circular requirements, and since DCA did generally dispute New Mexico's position here, we do not think that DCA's failure to specifically challenge New Mexico's use of these negative fund balances can reasonably be viewed as DCA acquiescing in their carryover.

We recognize that some of the offsetting New Mexico seeks to do in its proposed calculation is for overcharges and undercharges for different categories of services provided during SFY 2004 to HSD and charged through HSD accounts to individual federal programs. Arguably, this is closer to the type of offsetting of profits and losses permitted when making a current year adjustment under OMB Circular A-87 (credit to individual federal programs). Yet, the Circular does not require DCA to approve such an offset among service categories even when it is proposed in a timely submitted SWCAP, and whether this type of offset should be permitted to retrospectively correct for a state's failure to make ongoing, timely adjustments to its billing rates and amounts raises additional questions about its appropriateness, as we discussed above.

Even if we determined that this type of offset was permitted in some circumstances, moreover, we would not consider it appropriate to simply recalculate a new refund amount by adding the $1,189,223.80 in cumulative undercharges from prior years back into New Mexico's calculations (which would give a total refund amount of $2,872,939). New Mexico's calculations have other flaws.

First, New Mexico's worksheets for its analysis indicate that it calculated imputed interest based on the "FY 2004 Ending Fund Balance" amounts, which were understated as a result of offsetting the cumulative undercharges from the prior years. Thus, New Mexico's calculations understate the pre-disallowance interest owed on the federal share of the overcharges for SFY 2004.

New Mexico's worksheets also indicate that its calculations included a negative adjustment for a "60 Days Working Capital" reserve for each category of service before calculating the over- or undercharge. Yet, DCA described its determination for the earlier period as a determination of the "excess reserve balances as of June 30, 2003." DCA Ex. 5, at 1. From this, we infer that DCA's calculations for the earlier period permitted New Mexico to

25

retain the federal share of a working capital reserve amount (at least for each service where there was an overcharge) and to carry that amount forward into SFY 2004. That would have been consistent with what DCA has done in other cases and may explain why DCA's revised calculations of the overcharges for the five categories of service did not back out the beginning fund balance amount. While it may be that the service categories for which New Mexico's worksheets show a negative beginning fund balance amount had no working capital reserve, New Mexico provided no information from which we could determine this.

We also note that the beginning fund balance amounts on the worksheets appear to represent only the cumulative profits and losses for each service category over the four-year period 2000-2003. These amounts do not necessarily represent the appropriate fund balance amounts, even if New Mexico had shown (which it did not) that it had approval to carry forward into SFY 2004 profits and losses from the period SFY 2000 through SFY 2003. DCA's letter of February 4, 2005 informing New Mexico of DCA's determination for that period indicates that the parties had an agreement about beginning fund balances for SFY 2000. Those amounts – presumably retained as working capital reserves – would have to be taken into account in order to appropriately determine fund balances at the beginning of SFY 2004.[12]

The information New Mexico provided also raises some other questions. For example, as discussed in footnote 4 above, the information on the underlying documents regarding the service categories for which services were billed to HSD program accounts does not track with the numbers in New Mexico's brief. Also, some categories have notations on the worksheets, such as N/A (presumably for "not applicable"), which New Mexico does not explain.

---

[12] The record does not contain DCA's calculations for the period SFY 2000 through SFY 2003, so we do not know how the beginning fund balance amounts in the Attachments to the revised determination compare with the amounts DCA allowed as working capital reserve in its earlier determination. We note, however, that none of the beginning fund balance amounts included in DCA's calculation of the refund owed is significantly different from the working capital reserve amounts calculated based on SFY 2004 costs for the five service categories DCA used in its calculations. We also note that New Mexico does not argue that DCA should have used different amounts as the SFY 2004 beginning fund balance amounts than the figures New Mexico itself provided.

26

Overall, adjustments would have to be made to New Mexico's calculations to back out the prior years' profits or losses and to correct for the other identified flaws and any further problems that more complete information might reveal. Since these adjustments could bring the refund amount calculated for individual programs fairly close to the amount calculated by DCA, we are not convinced that the refund DCA seeks is significantly different from the amount New Mexico would owe, even if undercharges to those programs for SFY 2004 were reasonably taken into account.

In sum, part of New Mexico's calculations include adjustments of the type that are not appropriate at this point in time, and, overall, we cannot accept New Mexico's flawed analysis as sufficient to demonstrate that DCA's calculation method is inequitable.

Given the history of New Mexico's failures and our past decisions, New Mexico should have known that its use of the undercharges from prior years was questionable, unless it had specific approval from DCA to carry these amounts forward into SFY 2004, and that it could not include these amounts in its analysis without documenting that it was appropriate. Indeed, the record suggests that New Mexico understood this and deliberately sought to obfuscate exactly what its analysis did.

Conclusion

For the reasons stated above, we affirm the DCA determination that New Mexico should refund $4,011,031 in federal cash claimed for computer services in excess of the amounts permitted for those services.


Donald F. Garrett


Leslie A. Sussan


Judith A. Ballard
Presiding Board Member

000026

UNITED STATES OF AMERICA

DEPARTMENT OF HEALTH AND HUMAN SERVICES

*C E R T I F I C A T I O N   O F   T R U E   C O P Y*

Pursuant to the provisions of 42 U.S.C. 3505 and the authority vested in me by delegation from the Secretary (see attached memo), I hereby certify that the annexed is a true copy of the document on file in the Department of Health and Human Services.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Department of Health and Human Services to be affixed, on this_____12th_____day of _____October_____20__07_____

Constance B. Tobias
Chair
Departmental Appeals Board

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

MAR - 5 1992

Washington, D.C. 20201

TO:        Chair, Departmental
           Appeals Board

FROM:      Terrence J. Tychan
           Acting Deputy Assistant Secretary for
           Management and Acquisition

SUBJECT:   Authority to Certify True Copies and Affix the
           Department Seal

Under the authority vested in the Deputy Assistant Secretary for
Management and Acquisition on November 14, 1991 (attached) to
certify true copies and affix the Department Seal for the Office
of the Secretary, I hereby redelegate to the Chair of the
Departmental Appeals Board:

1.   The authority to certify true copies of any books, records,
     papers, or other documents on file within the Department, or
     extracts from such, to certify that true copies are true
     copies of the entire file of the Department, to certify the
     complete original record, or to certify the nonexistence of
     records on file within the Department, and to cause the Seal
     of the Department to be affixed to such certifications.

2.   The authority to cause the Seal to be Affixed to agreements,
     awards, citations, diplomas, and similar documents.

3.   These authorities may be redelegated.

4.   This redelegation supersedes all previous redelegations of
     authorities to the Chair of the Departmental Appeals Board
     relating to this subject.  Further redelegations made under
     previous redelegations of authority shall remain in effect
     until appropriate new redelegations are made.

Attachment

# COVINGTON & BURLING LLP

1201 PENNSYLVANIA AVENUE NW   WASHINGTON
WASHINGTON, DC 20004-2401   NEW YORK
TEL 202.662.6000   SAN FRANCISCO
FAX 202.662.6291   LONDON
WWW.COV.COM   BRUSSELS

July 24, 2006

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED

Department of Health & Human Services
Departmental Appeals Board, MS 6127
Appellate Division
Cohen Building, Room G-644
330 Independence Avenue, S.W.
Washington, D.C. 20201

**RECEIVED**

**JUL 2 8 2006**

**DAB**

> Re:   New Mexico General Services Department
> Notice of Appeal

Dear Sir or Madam:

Pursuant to 45 C.F.R. Part 16, the State of New Mexico General Services Department ("the Department") hereby appeals a disallowance of $4,011,031 by the Division of Cost Allocation ("DCA"). The disallowance was taken by Henry Williams, Director, DCA Central States Field Office, by letter to Secretary Arturo Jaramillo, dated June 22, 2006. A copy of the disallowance letter is enclosed.

The disallowance letter asserts that the Department's Information Services Division internal service fund overcharged federal programs in the fiscal year ending June 30, 2004. DCA concluded that of numerous categories of central services provided, five had excess balances that each totaled more than $500,000. DCA computed the base disallowance amount, $3,790,567, by totaling the federal share of overcharges in these five categories to three State agencies: the Human Services Department; the Children, Youth and Families Department; and the Department of Health. DCA calculated that the State also owed $220,464 in interest for the period from June 30, 2004 to June 22, 2006. The asserted legal basis for the disallowance is OMB Circular A-87, Attachment C, ¶ G.4 ("Paragraph G.4"). Paragraph G.4 requires States to conduct a comparison between revenue generated by each billed central service and the actual allowable costs of the service. As one remedy among four, Paragraph G.4 provides that the State may provide a "cash refund to the Federal Government for the Federal share of the adjustment."

The Department believes that DCA has used an unreasonable method to compute the amount of the disallowance, which does not reflect the amount of actual overcharges to federal programs. Relying on the Department's profit / loss statements for fiscal year 2004,



COVINGTON & BURLING LLP

Department of Health & Human Services
Departmental Appeals Board
July 24, 2006
Page 2

DCA totaled excess reserve balances in certain service categories in which revenues exceeded
the costs of providing central services. However, the disallowance methodology failed to take
into account other service categories in which costs exceeded revenues. Federal programs were
undercharged for those services. This methodology represents an unreasonable interpretation of
Paragraph G.4's "refund" remedy. The Department of Health & Human Services has interpreted
other remedies in Paragraph G.4 to allow States to balance central service fund losses against
profits when adjusting for overcharges. The "refund" remedy should be similarly construed.
The Department also asserts that it should have opportunity to resolve the overcharges by
"credit[ing] the amounts charged to the individual programs," another remedy provided in
Paragraph G.4.

        The Department believes it may be possible to resolve this dispute with DCA
informally, and intends to approach DCA and propose approaches that may lead to an amicable
resolution. To that end, the Department requests that the Board stay further proceedings in this
appeal for sixty days. Within that time period, the Department will report to the Board on the
status of its discussions with DCA and the prospects for a negotiated resolution.

        The undersigned will represent the appellant in this appeal.

                                Sincerely,

                                *Charles A. Miller\ sv*

                                Charles A. Miller
                                Susannah Vance
                                Covington & Burling LLP
                                1201 Pennsylvania Avenue, N.W.
                                Washington, D.C. 20004-2401

                                *Attorneys for Appellant*

Enclosure

cc:  Henry Williams, Director
DCA Central States Field Office

Gayla Fuller, Regional Counsel
Department of Health & Human Services, Region VI



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Program Support Center
Financial Management Service
Division of Cost Allocation
Central States Field Office

1301 Young Street
Room 732
Dallas, Texas 75202
(214)-767-3261
FAX: (214)-767-3264

**CERTIFIED – RETURN RECEIPT REQUESTED**

June 22, 2006



Mr. Art Jaramillo
Cabinet Secretary
New Mexico General Services Department
P.O. Drawer 26110
Santa Fe, New Mexico 87502-0110

Dear Mr. Jaramillo:

The purpose of this letter is to replace our letter of February 22, 2006 to Mr. James C. Jimenez, Cabinet Secretary of the New Mexico Department of Finance Administration, concerning a determination involving the General Services Department – Information Systems Division (ISD) excess reserve balances as of June 30, 2004. This letter changes the amount of the determination and the date from which your deadline for appealing this determination will be determined. It also changes the date from which debt interest will be computed if you elect to not pay the debt by the due date.

To recalculate the amount of the debt we used the attached materials provided to this office subsequent to our determination letter of February 22nd. It is our understanding that you proposed that the debt be reduced from $4,620,948 to $1,716,068 (Attachment Number 1), in part, because incorrect allocation methodology was used by ISD to prepare the expenditures by billing category on which the February 22, 2006 determination was based. Your proposed debt amount of $1,716,068 was also developed based on netting billing rate categories for only the New Mexico Human Services Department. This methodology, as was explained in our telephone conference of June 20, 2006, is not acceptable.

We have recalculated the debt to be $3,790,567 as of June 30, 2004. On Attachment Number 1, we used five billing rate categories which had excess reserve balances in excess of $500,000 as of June 30, 2004. The Federal share of these five categories totaled $3,723,891 for the Human Services Department. We used Attachment Number 2 to obtain the Federal share of the excess reserve for the Children Youth and Families Department and the Department of Health. These amounts totaling $66,676 have been added to Attachment Number 1 resulting in a total debt as of June 30, 2004 of $3,790,567. Interest at the State Treasurer's Office General Fund rate of 2.9%, calculated on Attachment Number 3, from June 30, 2004 to June 22, 2006 is $220,464 (Attachment Number 4) resulting in a total debt as of June 22, 2006 of $4,011,031.

It is the responsibility of the State to operate the ISD internal service fund in compliance with *Office of Management and Budget Circular A-87 Cost Principles for State, Local and Indian Tribal Governments* (A- 87), Attachment C, Section G. 4, Adjustments of billed central services which states "Billing rates used to charge Federal Awards shall be based on the estimated cost of providing the services, including an estimate of the allocable central service cost. A comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable cost of the service will be made at least annually and an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following adjustments methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central service costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and Non-Federal) share exceeds $500,000."

This is the final decision of the Director, Division of Cost Allocation- Central States Field Office. It shall be the final decision of the Department unless, within 30 days after receiving this decision, you deliver or mail (you should use registered or certified mail to establish the date) a written notice of appeal to the Department of Health and Human Services, Departmental Appeals Board, MS 6127, Appellate Division, 330 Independence Avenue S.W., Cohen Building, - Room G-644, Washington, D.C. 20201. You should attach to the notice a copy of this decision, note that you intend to appeal, state the amount in dispute, and briefly state why you think that this decision is wrong. You will be notified of further procedures.

If you elect not to appeal this decision, please refund $4,011,031 by check made payable to the U. S. Department of Health and Human Services and send it along with a copy of this letter within 30 days of the date of this letter to the following address:

> U. S. Department of Health and Human Services
> Program Support Center – Fin. Mgmt. Svcs.
> Division of Financial Operations
> Debt Management Branch
> 5600 Fishers lane
> Parklawn Building, Room 16A-12
> Rockville, MD 20857

In addition, please submit to my office copies of your transmittal letter and check. If you have any questions concerning the computation of the payment amount, please call Terry Hill at (214) 767-3263.

This letter constitutes the initial notification of a claim by the United States as required by the Federal Claims Collection Standards (4 CFR 102.2). If payment is not received within 30 days from the date of this notification, interest at the current Private Consumer rate as of the date of this Notice (approximately 12 1/8%), will be assessed in accordance with Department regulations at 45 CFR Part 30.13 and calculated with the Treasury Financial Manual, 1 TFM Part 6, Section 8025. If your organization elects to appeal, we will suspend collection action. However, if the final decision of the appeals process is determined in favor of the Federal

Government (fully or partially), interest will be assessed on the upheld amount from the date of this notification. Questions concerning payment may be addressed to the Debt Management Branch or by calling (301) 443-3083.

Sincerely,

Henry Williams
Director
Division of Cost Allocation
Central States Field Office

Attachments

cc: Mr. James C. Jimenez
Cabinet Secretary
New Mexico Department of Finance Administration
Bataan Memorial Building, Room 180
407 Galisteo
Santa Fe, New Mexico 87501

ATTACHMENT NUMBER 1

*(handwritten annotations: "① OTHER", "4,507", "8,546", "28,232", "14,973", "6/22/06", "1~1")*

| Billable Service | 2003 Ending Balance | 2004 Actual Cost by Billable Service | 2004 Actual Billed Revenue | Cost % | Rev % | 2004 Profit/Loss By Billable Service | 2004 Ending Balance | Imputed Interest | Less 2004 Final Allowed Working Cap Without Dept. | Final 2004 Adjusted Billing Service Balances | FFP | FED $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VM HBD | -38,163 | 6,176 | 2,227 | 0.03% | 0.01% | -3,949 | -39,112 | 0 | 980 | -40,092 | 62.89% | -25,214 |
| VM CPU | -2,147,528 | 377,200 | 205,169 | 2.13% | 1.01% | -171,041 | -2,319,567 | 0 | 59,938 | -2,376,405 | 62.89% |  |
| HBD ALL OTHER | 0 | 3 | 0 | 0.00% | 0.00% | 0 | 6 | 0 | 0 | 0 | 62.89% | 0 |
| VM Start I/O | 0 | 0 | 0 | 0.00% | 0.00% | 0 | 0 | 0 | 0 | 0 | 62.89% | 0 |
| HBD OTHER | 12,419 | 9,029 | -10,615 | 0.03% | 0.05% | 4,556 | 16,899 | 447 | 966 | 16,190 | 62.89% | 0 |
| VM CPU | -11,082 | 8,339 | 4,763 | 0.05% | 0.02% | -3,586 | -14,710 | 0 | 1,331 | -16,040 | 62.89% | -10,049 |
| MVS CPU |  |  |  |  |  |  |  |  |  |  |  |  |
| HBD ALL OTHER | 370,125 | 5,884,719 | 3,692,644 | 10.65% | 17.65% | 1,717,895 | 2,088,020 | 12,391 | 295,821 | 1,804,490 | 62.89% | 1,134,844 |
|  | 197,785 | 896,233 | 1,919,172 | 5.64% | 9.37% | 922,549 | 1,120,444 | 9,591 | 168,057 | 935,949 | 62.89% |  |
| MVS Disk I/O | 162,027 | 162,866 | 289,727 | 0.92% | 1.40% | 123,671 | 315,699 | 2,640 | 25,835 | 292,602 | 62.89% | 184,018 |
| HBD OTHER | 341,419 | 280,854 | 509,792 | 1.64% | 2.46% | 220,238 | 561,657 | 4,576 | 45,594 | 520,228 | 62.89% |  |
| MVS Tape I/O | 4,917 | 294,212 | 416,545 | 1.66% | 2.04% | 124,333 | 129,250 | 671 | 46,673 | 83,248 | 62.89% | 52,352 |
| HBD ALL OTHER | 4,676 | 276,707 | 385,024 | 1.57% | 1.84% | 118,237 | 122,912 | 838 | 44,385 | 78,165 | 62.89% |  |
| MVS Print Local | -112,718 | 85,183 | 49,876 | 0.32% | 0.24% | -38,223 | -150,937 | 0 | 12,492 | -160,837 | 62.89% | -103,724 |
| HBD OTHER | -345,289 | 665,774 | 376,122 | 3.76% | 1.84% | -287,652 | -1,135,941 | 0 | 105,500 | -1,241,261 | 62.89% |  |
| MVS Print Remote | 0 | 0 | 0 | 0.00% | 0.00% | 0 | 0 | 0 | 0 | 0 | 62.89% | 0 |
| HBD ALL OTHER | -59,780 | 118,985 | 330 | 0.67% | 0.00% | -1,898 | -2,082 | 0 | 338 | -3,289 | 62.89% | -2,068 |
| CICS CPU | 0 | 2,516 | 12,840 | 0.01% | 0.06% | -106,045 | -165,825 | 0 | 16,675 | -184,701 | 62.89% |  |
| HBD OTHER | 327,450 | 1,365,957 | 3,279,121 | 7.90% | 15.37% | 1,873,164 | 2,200,594 | 12,849 | 221,611 | 1,991,832 | 62.89% | 1,252,832 |
| ALL OTHER | 454,528 | 454,528 | 1,007,046 | 2.57% | 4.92% | 552,517 | 686,724 | 3,429 | 72,189 | 590,404 | 62.89% |  |
| CICS EXCP | 385,845 | 321,321 | 565,722 | 1.82% | 2.78% | 244,491 | 533,240 | 5,110 | 50,974 | 587,393 | 62.89% | 369,408 |
| HBD OTHER | 139,137 | 114,974 | 202,429 | 0.65% | 0.99% | 87,452 | 226,589 | 1,829 | 13,239 | 210,178 | 62.89% |  |
| DB2 CPU | -846,770 | 942,128 | 374,419 | 5.33% | 1.83% | -567,707 | -1,413,686 | 0 | 149,457 | -1,533,442 | 62.89% | -963,249 |
| HBD OTHER | -389,098 | 825,120 | 371,835 | 4.66% | 1.82% | -455,465 | -2,449,095 | 0 | 146,948 | -1,551,816 | 62.89% |  |
| IDMS EXCP | -469,406 | -444,567 | 16,674 | 7.64% | -0.26% | 461,041 | 437,865 | 0 | -20,625 | -367,340 | 62.89% | -231,920 |
| HBD OTHER | -1,340,662 | 1,359,683 | -51,570 | 7.64% | -0.25% | -1,460,253 | -2,748,995 | 0 | 214,267 | -2,963,362 | 62.89% |  |
| AD80 CPU | -1,226,082 | 165,710 | 0 | 0.84% | 0.00% | -165,719 | -1,392,291 | 0 | 26,289 | -1,418,570 | 62.89% |  |
| HBD OTHER | -4,869 | 2,919 | 86 | 0.02% | 0.00% | -2,823 | -11,792 | 0 | 463 | -12,244 | 62.89% | -7,707 |
| ADSO EXCP | -196,863 | 64,738 | 2,180 | 0.37% | 0.01% | -62,603 | -251,466 | 0 | 10,270 | -271,756 | 62.89% |  |
| HBD OTHER | 1,040 | 161 | 284 | 0.00% | 0.00% | 125 | 1,169 | 11 | 26 | 1,195 | 62.89% | 728 |
| OTHER | 2,996 | 483 | 815 | 0.00% | 0.00% | 382 | 3,350 | 32 | 73 | 3,308 | 62.89% |  |
| TS0 MVS CPU | 102,747 | 26,346 | 48,247 | 0.11% | 0.23% | 22,899 | 127,846 | 1,153 | 3,196 | 125,803 | 62.89% | 76,177 |
| HBD OTHER | 70,184 | 13,762 | 30,827 | 0.08% | 0.15% | 17,145 | 67,329 | 788 | 2,183 | 65,933 | 62.89% |  |
| TS0 Connect | -57,904 | 60,215 | 33,529 | 0.34% | 0.16% | -26,686 | -84,590 | 0 | 9,442 | -104,142 | 62.89% | -65,490 |
| HBD OTHER | -73,693 | 68,590 | 37,079 | 0.38% | 0.18% | -29,311 | -104,604 | 0 | 10,664 | -115,198 | 62.89% |  |
| TS0 HSD | 85,481 | 24,785 | 43,837 | 0.14% | 0.21% | 18,892 | 74,733 | 663 | 5,932 | 74,454 | 62.89% | 44,920 |
| OTHER | 27,155 | 12,044 | 21,205 | 0.07% | 0.10% | 9,161 | 36,316 | 317 | 1,911 | 34,722 | 62.89% |  |
| HBD | -6,319 | 1,777 | 1,007 | 0.01% | 0.01% | -770 | -6,088 | 683 | 282 | -5,370 | 62.89% | -4,066 |
| OTHER | -5,563 | 2,127 | 1,205 | 0.01% | 0.01% | -922 | -7,285 | 317 | 337 | -7,622 | 62.89% |  |

000032



ATTACHMENT NUMBER 2

Published Rate: $1,276.00 /CPU Hr (A)

Service: MVS CPU - Prime

Cost-Based Rate: $465.983 /CPU Hr (B)

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serv. Util (D / M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Exiting Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation | Federal Over/(Under)-Recovery (J * K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $1,700 | 17.8470 | 1.46% | $22,800 | $8,928 | $13,924 | | | | $82,724 | | | |
| | | | | | | | | $15,654 | | $1,350 | $14,382 | | $0 |
| | | | | | | | | | | $5,142 | $14,351 | | $0 |
| GSD | $8,434 | 68.7604 | 5.59% | $355,145 | $32,414 | $62,731 | | | | $4,042 | $54,351 | | $0 |
| HSD | $73,620 | 753.7628 | 63.07% | $961,973 | $385,073 | $595,199 | | $437,820 | | | | 82.83% | $395,818 |
| PRO | $0 | | | | | | | $3,467 | | $304 | $3,243 | | $0 |
| STR | $380 | 3.9474 | 0.33% | $5,035 | $1,818 | $3,117 | | $0 | | $0 | $0 | | $0 |
| Other | 65,057 | 52.4571 | 4.39% | $65,921 | $25,470 | $41,475 | | $40,501 | | | $42,718 | | |
| **Totals** | **$115,138** | 1,195 (M) | 100.00% | 1,523,771 (N) | 580,060 (O) | 943,884 | 3.28% | 1,055,823 | 9,970 | 82,704 | $972,696 | | $386,220 |

C:\WORK\DETERMINATION\Srpv revised 2004 individual billing rate analysis

000034

**Service:** MVS CPU - Standard

| | Published Rate: | Cost-Based Rate: |
|---|---|---|
| | $650.00 /CPU Hr (A) | $496.383 /CPU Hr (B) |

| Client | Beginning 2004 Fund Balance (D) | Service Utilization (M) | Client Util vs Total Servc Util (D/M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under) Recovery (J * K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | *Client Revenue Analysis* | | | | | | | | | *Federal Participation* | |
| DFA | $9,251 | 103 | 2.25% | $67,206 | $49,834 | $17,435 | | $47,329 | | $7,906 | | | |
| | | | 2.01% | | | | | | | $0 | | | |
| GSD | $13,651 | 140 | 3.04% | $91,267 | $68,086 | $51,182 | | $4,843 | | $20,798 | | | $749,220 |
| | | | | | | | | | | | | | $0 |
| HSD | $208,763 | 3,080 | 86.10% | $2,516,921 | $1,406,184 | $1,123,167 | | $1,419,926 | | $207,190 | | 82.60% | $0 |
| PRD | $325 | 8 | 0.14% | $5,198 | $3,965 | $2,385 | | $2,891 | | $5 | | | $0 |
| RTR | $2,074 | 28 | 0.63% | $20,942 | $11,909 | $8,943 | | $11,567 | | $500 | | | $0 |
| Other | $12,917 | 184 | 2.95% | $113,988 | $95,060 | $45,098 | | $61,805 | | $1,987 | | | $0 |
| **Totals** | **$448,994** | **4,580** | **100.00%** | **$2,954,290** | **$2,992,056** | **$1,696,200** | **12.90%** | **$2,148,226** | **$12,098** | **$339,848** | **$1,802,392** | | **$783,841** |

6/22/06

2-2

000035

Service:  MV8 CPU - Non-Prime

| Published Rate: | $425.00 /CPU Hr (A) | | | Cost-Based Rate: | $865.385 /CPU Hr (B) | | | | | | | | | Federal Participation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D / M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Participation (I) | Federal Over/(Under)-Recovery (J * K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $194 | 2.0174 | 5.12% | $857 | $979 | ($122) | | $73 | $21 | $155 | ($81) | | ($212) |
| GSD | $1.10 | 11.6203 | 29.5% | | $5,503 | ($689) | | ($89) | | $387 | ($509) | 62.0% | |
| HSD | $137 | 7.6482 | 19.41% | | $3,172 | ($802) | | $199 | | $589 | ($460) | | |
| PRD | $41 | 0.4302 | 1.09% | $183 | $209 | ($26) | | $15 | | $329 | ($17) | | |
| STR | $2 | 0.4564 | 1.15% | $195 | $314 | ($30) | | $23 | | $63 | ($29) | | |
| Other | $549 | 5.7027 | 14.47% | $2,424 | $2,768 | ($344) | | $205 | | $4,539 | ($4,150) | | |

| Totals | $3,798 | 39 (M) | 100.00% | $16,747 (N) | $19,127 (O) | ($2,378) | 0.41% | $1,497 | $28 | $3,834 | ($1,591) | | ($212) |

C:\WORK\ADETERMINATIONS\vm revised 2004 individual billing rate analysis

000036

Published Rate: $0.10 /1000 (A)

Service: MVS Disk I/O

Cost-Based Rate: $0.067 /1000 (B)

| Client | Beginning 2004 Fund Balance (D) | Service Utilization (E) | Client Util vs Total Service Util Rates (D / Aö) (F) | Revenue: Published Rates (A × D) (G) | Revenue: Cost-Based Rates (B × D) (H) | Client Over/(Under)- Recovery (F - G) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Participation (J) | Federal Over/(Under) Recovery (J - B) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $50,333 | 764,530 | 9.44% | $76,153 | | $32,407 | | $62,739 | | | | | |
| GSO | | 617,678 | 8.38% | $68,768 | $37,617 | $28,540 | | | 30,772 | | $78,603 | 82.99% | $184,018 |
| HSD | $102,027 | 2,967,209 | 36.00% | $268,727 | $182,806 | $123,971 | | | | | $305,128 | | |
| PRC | $1,460 | 27,608 | 0.35% | $2,690 | | | | | | | | | |
| STR | $9,030 | 90,030 | 1.13% | $9,003 | | | | $5,019 | | $311 | $0,188 | | |
| Other | $15,459 | 330,528 | 2.00% | $33,043 | $13,111 | $9,972 | | $25,431 | | $2,080 | $23,559 | | $0 |

| Totales | $535,443 | 7,898,181 | 100.00% | $790,516 | $492,410 | $344,109 | 2.56% | $869,883 | $5,881 | $49,905 | $792,739 | | $192,563 |

C:\WORK\DETERMINATIONS\Sum revised 2004 individual billing rate analysis

6-22-06
2-4

**Service:** CICS CPU - Standard

Published Rate: $3,000.00 /CPU Hr (A)   Cost-Based Rate: $1,254,222 /CPU Hr (B)

| Client | Beginning 2004 Fund Balance | Service Utilization (C) | (D) | Client U08 vs Total Serve Unit (D / M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)- Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation | Federal Over/(Under)- Recovery (J - I) (K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 24 | 1.77% | $73,022 | $30,829 | $42,193 | | | | | | | |
| | | | 14 | 0.96% | $40,921 | $17,069 | $23,765 | | $7,765 | | $2,707 | $8,205 | | $0 |
| HSD | $313,465 | | 1.00% | $44,483 | $1,837,348 | $1,801,463 | | $2,124,640 | | $212,164 | $1,975,227 | 82.83% | $1,242,231 | |
| PRC | $4,357 | | 16 | 1.00% | $44,483 | $18,809 | $25,674 | | $30,281 | | $3,028 | $27,485 | | $0 |
| SFD | $1,024 | | 3 | 0.25% | $10,484 | $4,371 | $6,093 | | $7,105 | | $709 | $6,455 | | $0 |
| STR | | | | | | | | | | | | | | |
| Other | $28,133 | | 98 | 6.99% | $287,100 | $120,028 | $167,074 | | $196,204 | | $19,041 | $177,290 | | $0 |
| Totals | $494,192 | | 1,376 (M) | 100.00% | $4,124,785 (N) | $1,724,485 (O) | $3,400,500 | 9.78% | $3,728,830 | $16,511 | $205,166 | $3,479,376 | | $1,270,212 |

Published Rate: $1,500.00 /CPU Hr (A)

Service: CICS CPU - NonPrime

Cost-Based Rate: $1,254,232 /CPU Hr (B)

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serv Util (D / td) (E) | Revenue: Published Rates (A • D) (F) | Revenue: Cost-Based Rates (B • D) (G) | Client Over/(Under) Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (J - K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOC | $589 | 2.0033 | 1.97% | $3,005 | $2,513 | $492 | | $1,001 | | | | | |
| DFA | | 0.0855 | 0.88% | $1,043 | $872 | $171 | | $350 | | | | | |
| HSD | $816 | 0.8955 | 48.76% | $71,221 | $59,610 | $11,861 | | $18,845 | | | | | |
| PRC | $13,972 | 47.9274 | 6.43% | $8,974 | $1,872 | | | | | | | | |
| STN | $1,641 | 6.5808 | 0.09% | $134 | $112 | $22 | | $46 | | | | | |
| Other | $10,204 | 0.0892 | 34.36% | $50,371 | $63,700 | $6,581 | | $3,013 | | | | | |
| Totals | $28,867 | 102 (M) | 100.00% | $163,388 | $127,427 | $24,077 | 0.72% | $54,014 | $417 | $19,941 | $34,520 | | $10,851 |

C:\WORK\DETERMINATIONS\rm revised 2004 Individual billing rate analysis

Published Rate:    $0.10 /1000 (A)

Service:    CICS EXCP

Cost-Based Rate:    $0.057 /1000 (B)

| | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Servc Util (D/ΣD) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)- Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)- Recovery (J - K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Client Revenue Analysis

Federal Participation

Totals:   $827,982   7,851,479 (M)   100.00%   $785,148 (N)   $454,205 (O)   $331,892   2.47%   $813,924   36,581   $65,445   $754,140     $384,378

C:\WORK\DETERMINATIONS\am revised 2004 individual billing rate analysis

6-22-06

2-7

859,835

14073

**Service: Disk Occupancy**

| Published Rate: | $0.000009 /KB-Day | (A) | | Cost-Based Rate: | $0.00000351 /KB-Day (B) |
|---|---|---|---|---|---|

| Client | Beginning 2004 Fund Balance | Service Utilization | Client Util vs Total Serv. Util (D / M) | Revenue: Published Rates (A · D) | Revenue: Cost-Based Rates (B · D) | Client Over/(Under) Recovery (F - G) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation | Federal Over/(Under) Recovery (J - K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (D) | (M) | (E) | (F) | (G) | (H) | | | | | | (J) | (L) |
| DFA | $9,296 | 19,579,646,105 | 4.47% | $176,405 | $50,704 | $118,764 | | $127,040 | | $240,164 | $210,267 | | |
| GSD | $5,618 | 13,476,507,596 | 3.08% | $127,799 | $67,283 | $60,532 | | $86,141 | | | | | |
| HSD | $8,437 | 212,151,781,804 | 47.75% | $2,011,540 | $743,905 | $1,267,645 | | | | | | 82.99% | $768,050 |
| PHD | | 1,711 (46,145) | 0.39% | $16,127 | $5,085 | $10,102 | | $10,871 | | $118,026 | $1,245,179 | 82.99% | |
| STR | $1,389 | 3,805,429,264 | 0.86% | $35,079 | $13,349 | $22,732 | | $24,519 | | $7,403 | $0 | | $0 |
| Other | $14,935 | 36,634,470,477 | 8.06% | $399,741 | $123,647 | $216,094 | | $228,000 | | $18,632 | | | |
| **Totals** | **$188,219** | **444,389,397,944** | **100.00%** | **$4,212,878** | **$1,556,189** | **$2,654,658** | 9.83% | **$3,929,928** | **$15,062** | **$240,164** | **$2,595,834** | | **$793,811** |
| | | | | | (N) | (C) | | | | | | | $0 |

6-22-06

8-8

| ATTACHMENT NUMBER 3 |

# New Mexico
## state treasury interest earning rates
### July 1, 2004 - February 2006

**AVERAGE YIELD**

| Quarter | Avg. Yield Rate | weighted | | |
|---|---|---|---|---|
| June-04 | 1.998% | July - Sept | | |
| September-04 | 2.180% | 2.180% | | |
| December-04 | 2.030% | 2.030% | | |
| March-05 | 2.570% | 2.570% | | |
| June-05 | 3.020% | 3.020% | | |
| September-05 | 3.613% | 3.613% | | |
| December-05 | 3.330% | 3.330% | | |
| Subtotal Average | 2.677% | six quarters avg  2.790%  18 months  0.502275 | | |

| Month | | | | |
|---|---|---|---|---|
| January-06 | 3.800% | | | |
| February-06 | 3.900% | 2 months | 0.078 | |
| Subtotal Average | 3.900% | total | 0.580275 | |

| Average Yield | 3.2866% | average 20 months | 2.90% |
|---|---|---|---|

Source: www.stonm.org/level%201/L1-treasuryreports.htm

ATTACHMENT NUMBER 4

New Mexico GSD - ISD
Determination - 6/30/2004

| | | |
|---|---|---|
| revised debt as of : | 6/30/2004 | $3,790,567 |
| interest rate | 2.90% | |
| determination letter date: | 8/22/2006 | |
| interest from 6/30/2004 to 6/22/2008 | | $220,464 |
| debt as of 6/22/2008 | | $4,011,031 |



**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Office of the Secretary

Departmental Appeals Board
Appellate Division, MS 6127
Room G-644, Cohen Building
330 Independence Avenue, SW
Washington, D.C. 20201

CERTIFIED MAIL -- RETURN RECEIPT REQUESTED

Charles A. Miller, Esq.
Susannah Vance, Esq.                    **JUL 3 1 2006**
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004-2401

              and

INTER-OFFICE MAIL -- RETURN RECEIPT REQUESTED

Paul Nacon, Director
Division of Cost Allocation
Financial Management Service
Program Support Center
Room 1067, Cohen Building
330 Independence Avenue, S.W.
Washington, D.C.  20201

Board Docket No. A-06-105

### ACKNOWLEDGMENT OF NOTICE OF APPEAL

Appellant                      : New Mexico General Services
                                 Department
Notice filed by                : Charles Miller and Susannah Vance
Dated                          : July 24, 2006
Amount appealed                : $4,011,031
Appeal from decision of        : Director, Division of Cost
                                 Allocation, Central States
                                 Field Office
Date of appealed decision      : June 22, 2006
Presiding Board Member         : Judith A. Ballard
Board contact                  : June K. Julien
                                 (202) 565-0191 (phone)
                                 (202) 565-0238 (FAX)
                                 june.julien@hhs.gov (e-mail)

The notice of appeal described above has been received by the
Departmental Appeals Board.



000045

This letter summarizes the next procedural steps in this case. For further details, please see the regulations at 45 C.F.R. Part 16. More detailed information is also provided in the Appellate Division Practice Manual at http://www.hhs.gov/dab.

When it receives this letter, the Division of Cost Allocation (respondent) should send a notice to the New Mexico General Services Department (appellant) and the Board stating the name, address and telephone number of its representative.

In its notice of appeal, the appellant states that it believes it may be possible to resolve this dispute with the respondent and requests a 60-day stay of proceedings to pursue this matter with the respondent. The Presiding Board Member has determined that such a stay is appropriate. The parties should report to the Board on the status of the case no later than 60 days from the date of this letter and may request a continuation of the stay at that time.

The parties should note that the Board can provide alternative dispute resolution services such as mediation or early neutral evaluation. For information on these services, see www.hhs.gov/DAB/ADR or call the Director of Mediation Services at (202) 565-0118.

**If the stay of proceedings ends without resolution of the dispute, within 30 days of the end of the stay the appellant should submit** a written statement of its arguments concerning why the appealed decision is wrong (appellant's brief). The appellant should also submit copies of the documents on which its arguments are based (appellant's appeal file). See section 16.8(a) and the instructions below for preparing appeal files.

**Within 30 days after receiving the appellant's brief and appeal file,** the respondent should submit its brief and supplement the appeal file. Section 16.8(b).

**Within 15 days after receiving the respondent's submission,** the appellant may submit a reply brief. Section 16.8(c). The appellant should notify the Board if it does not intend to file a reply brief.

All future submissions should refer to the Board's docket number.

Whenever you submit anything to the Board, provide an original and two copies to the Board and a copy to the other party. Include in your submission to the Board a statement that you have sent a copy to the other party. The date of a submission to the Board is established by the postmark date, the date on a registered or certified mail receipt, the date deposited with a commercial delivery service, or the date a fax is sent. If you fax documents to the Board, two copies should also be submitted by mail. Please do not fax documents in excess of 10 pages. If

000046

feasible, please send a courtesy copy of any brief to the Board
staff attorney assigned to the case as an e-mail attachment.
(This is not a substitute for submitting an original (or fax) and
two copies as specified above, however.)

Before contacting the Board to request an extension of time to
make a required submission, you should ask the other party's
representative if there is an objection.

Prior Departmental Appeals Board decisions are accessible  at
http://www.hhs.gov/dab.  DAB decisions are also available by
subscription from WESTLAW (in the Federal Health Law database,
identifier FHTH-HHS), LEXIS-NEXIS (in the Health library, file
HHSDAB), and other on-line sources.  DAB decisions appearing in
these sources may be paginated differently from the original,
signed decision or have no page numbers.  If you cite a decision
by page number, please put the source in parentheses, or note the
relevant section or subsection of the decision if no page number
is available.

In preparing your appeal files, please note the following:

  o  The Board may decide the case based solely on the
     submissions described above.  The appeal files should
     therefore include all documents which would assist the
     Board in making findings of fact on disputed issues, as
     well as documents which provide necessary background
     information.

  o  The parties need not provide documents to establish any
     material facts that they stipulate are undisputed.

  o  All exhibits or attachments in the appeal file should be
     tabbed and indexed.  A party should continue the same
     numbering or lettering sequence for any documents
     submitted later.  Exhibit pages should also be numbered.

  o  Copies of materials such as the legislative history of a
     statute, preamble to the regulation, or statements of
     Agency policy should be included where relevant.

  o  Do not include duplicative material such as copies of
     documents the Board has issued or documents which you or
     the other party have already provided to the Board.

  o  All documents submitted as part of an appeal are public
     records.  **Before submitting documents to the Board,** you
     should delete information the disclosure of which might
     violate state or other confidentiality or privacy
     requirements.  If this information is needed in order to
     resolve disputed issues, please leave some information
     intact (such as initials or Medicaid numbers instead of
     the full names of recipients or patients).

o   The Board's procedures do not provide for a formal
    discovery step.  However, parties sometimes need
    additional information to fairly present their cases.
    The parties should cooperate in sharing information.
    You should first request any information you need from
    the other party.  If this fails, you should seek a
    discovery order from the Board as early as possible.

By direction of the Presiding
Board Member.

Carolyn Reines-Graubard
Chief, Appellate Division

Enclosure:  Notice of Appeal (for respondent)

cc:  Deputy Assistant IG for Auditing
     Office of the Inspector General

     Chief Counsel
     DHHS - Region VI

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

RECEIVED

AUG 1 4 2006

DAB

| | |
|---|---|
| NEW MEXICO GENERAL SERVICES DEPARTMENT, | ) ) ) |
| Appellant, | ) ) |
| v. | ) ) |
| DIVISION OF COST ALLOCATION, | ) ) |
| Appellee. | ) ) |

Docket No. A-06-105

## NOTICE OF APPEARANCE OF COUNSEL

I hereby enter my appearance of counsel for the Division of Cost Allocation in the above-entitled and numbered cause. My mailing address, telephone number, and facsimile number are listed below. A copy of this Notice has been sent to Appellant, Louisiana Division of Administration, by and through its attorney of record, Charles Miller, Covington and Burling, 1201 Pennsylvania Avenue, N.W., Washington DC 20004-2401.

August 7, 2006.

Respectfully submitted,

Gayla Fuller
Chief Counsel

Katherine W. Brown
Assistant Regional Counsel
1301 Young Street, Suite 1138
Dallas, Texas 75202
Telephone: (214) 767-3524
Fax: (214) 767-4663
katherine.brown@hhs.gov

K. Brown, AKC

**DEPARTMENT OF**
**HEALTH & HUMAN SERVICES**
Office of the General Counsel
Regional Office VI
1301 Young Street, Suite 1138
Dallas, TX 75202
**OFFICIAL BUSINESS**
**PENALTY FOR PRIVATE USE $300**

DALLAS TX 752

08 AUG 2006 P

$ 00.39°
02 1A
0004613785    AUG 08 2006
MAILED FROM ZIPCODE 75202

June Julien
Departmental Appeals Board
Appellate Division, MS 6127
Room G-644, Cohen Building
330 Independence Ave., SW
Washington DC, 20201



000050

**Julien, June (HHS/OS)**

| | |
|---|---|
| **From:** | Vance, Susannah [svance@cov.com] |
| **nt:** | Friday, September 29, 2006 3:57 PM |
| **ro:** | Julien, June (HHS/OS) |
| **Cc:** | Miller, Charles; Brown, Katherine W. (HHS/OGC) |
| **Subject:** | New Mexico General Services Department, Board Docket No. A-06-105 |

Dear Ms. Julien:

We are writing to present a status report about the above-referenced matter.

The New Mexico General Services Department (GSD) filed its notice of appeal in this matter on July 24, and requested a sixty-day stay of briefing in order to pursue settlement discussions with the Division of Cost Allocation (DCA). The Board granted this request and instructed the parties to submit a status report when the stay expires, on September 29.

GSD has been working diligently to develop a settlement proposal in this matter and, yesterday, submitted to DCA documents describing GSD's proposed methodology for computing the amount owed to the federal government. GSD has also begun analyzing data to compute a proposed repayment amount, and anticipates completing this work within the next three weeks. Because of October scheduling conflicts, however, it will be impossible for the parties to meet to discuss a final settlement proposal until early November.

The parties are hopeful that this matter can be amicably resolved, and agree that a further sixty-day extension of the stay is desirable. Accordingly, we respectfully request a further extension of the stay until Tuesday, November 28, at which time we will provide the Board with an updated status report.

Counsel for DCA has authorized us to say that she consents to the request for further stay of the proceedings.

Si~~erely,
es Miller
Susannah Vance


**Susannah Vance**
Covington & Burling LLP
1201 Pennsylvania Ave. NW
Washington, DC  20004
Tel. (202) 662-5354
Fax (202) 778-5354
svance@cov.com

*This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.*



FILE COPY

000051

10/3/2006

### Julien, June (HHS/OS)

| | |
|---|---|
| **From:** | Julien, June (HHS/OS) |
| **It:** | Thursday, October 05, 2006 11:35 AM |
| **To:** | 'Vance, Susannah' |
| **Cc:** | Miller, Charles; Brown, Katherine W. (HHS/OGC) |

**Subject:** RE: New Mexico General Services Department, Board Docket No. A-06-105

CONTINUANCE OF STAY

Counsel:

By email transmission on September 29, 2006, Ms. Vance on behalf of both parties requested a 60-day continuance of the stay in the above-docketed case.

The Presiding Board Member determined that good cause for the stay has been shown. Accordingly, the Appellant should file a status report to the Board by November 28, 2006.

By direction of the Presiding Board Member.


June Julien
Paralegal Specialist

---

**From:** Vance, Susannah [mailto:svance@cov.com]
**:** Friday, September 29, 2006 3:57 PM
**To:** Julien, June (HHS/OS)
**Cc:** Miller, Charles; Brown, Katherine W. (HHS/OGC)
**Subject:** New Mexico General Services Department, Board Docket No. A-06-105

Dear Ms. Julien:

We are writing to present a status report about the above-referenced matter.

The New Mexico General Services Department (GSD) filed its notice of appeal in this matter on July 24, and requested a sixty-day stay of briefing in order to pursue settlement discussions with the Division of Cost Allocation (DCA). The Board granted this request and instructed the parties to submit a status report when the stay expires, on September 29.

GSD has been working diligently to develop a settlement proposal in this matter and, yesterday, submitted to DCA documents describing GSD's proposed methodology for computing the amount owed to the federal government. GSD has also begun analyzing data to compute a proposed repayment amount, and anticipates completing this work within the next three weeks. Because of October scheduling conflicts, however, it will be impossible for the parties to meet to discuss a final settlement proposal until early November.

The parties are hopeful that this matter can be amicably resolved, and agree that a further sixty-day extension of the stay is desirable. Accordingly, we respectfully request a further extension of the stay until Tuesday, November 28, at which time we will provide the Board with an updated status report.

Counsel for DCA has authorized us to say that she consents to the request for further stay of the proceedings.

Sincerely,
Charles Miller
annah Vance


**Susannah Vance**                     **FILE COPY**                    000052

10/5/2006

Covington & Burling LLP
1201 Pennsylvania Ave. NW
Washington, DC  20004
Tel. (202) 662-5354
F    202) 778-5354
sv... .ce@cov.com

*This message is from a law firm and may contain information that is confidential or legally privileged.  If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system.  Thank you for your cooperation.*

10/5/2006

**Julien, June (HHS/OS)**

| | |
|---|---|
| **From:** | Julien, June (HHS/OS) |
| **Sent:** | Tuesday, November 28, 2006 2:09 PM |
| **To:** | 'Vance, Susannah' |
| **Cc:** | Miller, Charles; Brown, Katherine W. (HHS/OGC) |
| **Subject:** | Status update re: New Mexico General Services Department |

Dear Ms. Vance:

Please provide the Board a current status update of the following Board case:

New Mexico General Services Department, Docket No. A-06-105

Thank you.

June Julien

FILE COPY

000054

### Julien, June (HHS/OS)

**From:** Brown, Katherine W. (HHS/OGC)

**It:** Tuesday, November 28, 2006 5:18 PM

**To:** 'Vance, Susannah'; Julien, June (HHS/OS); Sacks, Jeffrey (HHS/OS)

**Cc:** Miller, Charles

**Subject:** RE: New Mexico General Services Department, Board Docket No. A-06-105

DCA has no objection to any of the dates proposed by Counsel for NM's with regard to the briefing schedule.

Katherine Brown
Assistant Regional Counsel
Region VI
(214) 767-3524
katherine.brown@hhs.gov

---

**From:** Vance, Susannah [mailto:svance@cov.com]
**Sent:** Tuesday, November 28, 2006 4:06 PM
**To:** Julien, June (HHS/OS); Sacks, Jeffrey (HHS/OS)
**Cc:** Miller, Charles; Brown, Katherine W. (HHS/OGC)
**Subject:** New Mexico General Services Department, Board Docket No. A-06-105

D--r Ms. Julien:

    We are writing to present the parties' joint status report about the above-referenced matter.

    The New Mexico General Services Department (GSD) filed its notice of appeal in this matter on July 24. The Board has granted two stays of briefing, the second expiring today, to allow GSD to pursue settlement discussions with the Division of Cost Allocation (DCA).

    Although the parties have had discussions concerning possible settlement, no agreement has yet been reached. Since the prospects for amicable resolution of this matter are uncertain, the parties jointly request that a briefing schedule be set. The parties respectfully request (1) that GSD's appeal brief be due on January 15, 2007; and (2) that DCA's brief in response be due on March 1, 2007. GSD requests that its reply brief be due on March 22, 2007. (Counsel for DCA has neither consented nor objected to the latter request.)

    Thank you for your consideration of this request.

Sincerely,

Charles Miller (202-662-5410)
Susannah Vance (202-662-5354)
Covington & Burling LLP

---

        **From:** Julien, June (HHS/OS) [mailto:June.Julien@HHS.GOV]
        **Sent:** Tuesday, November 28, 2006 2:09 PM
        **To:** Vance, Susannah
        **Cc:** Miller, Charles; Brown, Katherine W. (HHS/OGC)
        **Subject:** Status update re: New Mexico General Services Department



11/29/2006

Dear Ms. Vance:

Please provide the Board a current status update of the following Board case:

New Mexico General Services Department, Docket No. A-06-105

Thank you.

June Julien

11/29/2006

## ReinesGraubard, Carolyn (HHS/OS)

**From:** ReinesGraubard, Carolyn (HHS/OS)

**Sent:** Wednesday, November 29, 2006 10:24 AM

**To:** 'svance@cov.com'; Brown, Katherine W. (HHS/OGC)

**Subject:** Board Docket No. A-06-105

Counsel:

The Presiding Board Member, Judith A. Ballard, has approved the briefing schedule proposed by the parties by e-mail on November 28, 2006. Please notify the Board promptly if a settlement agreement is reached before the appellant's initial brief is due to be filed.

By direction of the Presiding Board Member.

Carolyn Reines-Graubard
Chief, Appellate Division
DAB

000057

11/29/2006

# COVINGTON & BURLING LLP

1201 PENNSYLVANIA AVENUE NW WASHINGTON
WASHINGTON, DC 20004-2401 NEW YORK
TEL 202.662.6000 SAN FRANCISCO
FAX 202.662.6291 LONDON
WWW.COV.COM BRUSSELS

SUSANNAH C. VANCE
TEL 202.662.5354
FAX 202.778.5354
SVANCE@COV.COM

January 16, 2006

<u>VIA CERTIFIED MAIL</u>

June Julien
Departmental Appeals Board
Appellate Division, MS 6127
Room G-644, Cohen Building
330 Independence Avenue, SW
Washington, DC 20201

**RECEIVED**

**JAN 1 9 2007**

**DAB**

   Re: <u>New Mexico General Services Department, Departmental Appeals</u>
     <u>Board Docket No. A-06-105</u>

Dear Ms. Julien:

   Enclosed for filing in the above-captioned Appeal please find one original and two copies of Appellant's Opening Brief and Appeal File, filed on behalf of Appellant New Mexico General Services Department.

           Respectfully submitted,

           Susannah C. Vance

Enclosures

cc: Katherine W. Brown, Esq.

FILE COPY

RECEIVED

JAN 1 9 2007

DAB

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

NEW MEXICO GENERAL SERVICES
DEPARTMENT,                                )
                   Appellant,                )
                          )
          v.                  )
                          )    DOCKET NO. A-06-105
DIVISION OF COST ALLOCATION,                )
                  Appellee.                 )
                          )

---

## OPENING BRIEF OF APPELLANT
## NEW MEXICO GENERAL SERVICES DEPARTMENT

---

Charles A. Miller
Susannah Vance
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-6000

*Counsel for Appellant*

January 16, 2007



# TABLE OF CONTENTS

**PAGE**

INTRODUCTION .................................................................................................1

BACKGROUND .................................................................................................3

I.    LEGAL FRAMEWORK ................................................................................3

II.   FACTUAL BACKGROUND..........................................................................6

    A.    The Information Services ISF............................................................6

    B.    How the Human Services Department's ISF Costs Reach Federal
         Programs....................................................................................8

    C.    The Adjustment Reconciling GSD Revenues With Allowable Costs..................11

    D.    The Present Disallowance ................................................................12

ARGUMENT.....................................................................................................15

I.    BY DISREGARDING UNDERCHARGES, DCA'S DISALLOWANCE
     VASTLY OVERSTATES THE AMOUNT OWED TO FEDERAL PROGRAMS.
     ........................................................................................................17

    A.    A Refund Including Both Service Category Overcharges and
         Undercharges Accurately Measures the Impact on Federal Programs..................17

    B.    Only a Refund Including Both Service Category Overcharges and
         Undercharges Gives Full Effect to the Language and Intent of Circular A-
         87. ...........................................................................................18

    C.    The Overcharges and Undercharges Were Determined Through the Same
         Process and Are Equally Reliable. ......................................................20

    D.    GSD Is Not Time-Barred From Pursuing an Equitable Cost Settlement. ............21

    E.    GSD's Total Obligation to the Federal Government Equals $1.85 Million.........24

II.   THE *ARKANSAS* DECISIONS DO NOT GOVERN THIS CASE.....................27

    A.    GSD Has Treated All Users Equitably in Billing for ISF Services and in
         the Cost Settlement Process................................................................28

    B.    GSD Has Furnished Assurances Against Cost-Shifting, As Arkansas
         Could Not. ................................................................................29

000060

III.    THE BOARD SHOULD NOT FOLLOW ITS HOLDING IN *NEW MEXICO I* IN THIS CASE. .................................................................................................31

     A.    The *New Mexico I* Decision Rests on Invalid Premises. ........................................32

          1.    Appropriate Claims Have Been Submitted to the Federal Grantor Agencies. ........................................................................................32

          2.    The Undercharge Amounts Have Been Substantiated In the Manner Contemplated by the Governing Federal Requirements. ...............................................................................................35

     B.    The *New Mexico I* Decision Is Not Supported By Prior Board Precedent. ...........38

CONCLUSION ..........................................................................................................................40

000061

# TABLE OF AUTHORITIES

**PAGE**

### FEDERAL CASES

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989)........................................................................18

*Glover v. West*, 185 F.3d 1328 (Fed. Cir. 1999)............................................................................18

### DEPARTMENTAL APPEALS BOARD CASES

*Arkansas Department of Information Systems*, DAB No. 2047, 2006 WL 3030763
    (Oct. 6, 2006)..................................................................................2, 6, 28-30

*Arkansas Department of Information Systems*, DAB No. 2010, 2006 WL 321179
    (Jan. 26, 2006) .......................................................2, 3, 5, 16, 24-26, 28-30

*New Mexico General Services Department*, DAB No. 1876, 2003 WL 21043171
    (Apr. 30, 2003) ...........................................................2, 4, 31, 32, 35, 37

*Idaho Division of Financial Management*, DAB No. 1822, 2002 WL 464464
    (Mar. 21, 2002).........................................................................38-39

### FEDERAL STATUTES

42 U.S.C. § 1320b-2(a)...................................................................................23

### FEDERAL REGISTER

Office of Management and Budget, Proposed Revisions to OMB Circular No. A-87,
    58 Fed. Reg. 44,212, 44,230 (Aug. 19, 1993) ...............................................4,22

Office of Management and Budget, Final Revision to OMB Circular A-87, 60 Fed.
    Reg. 26,484, 26,489 (May 17, 1995)...........................4, 5, 11-13, 15, 18-23, 37

Office of Management and Budget, Relocation of Policy Guidance to 2 C.F.R.
    Chapter II, 70 Fed. Reg. 51,910 (Aug. 31, 2005) ...............................................4

Office of Management and Budget, Final Revision of OMB Circulars A-21, A-87, A-102, A-110
    and A-122 and Interim Final Revision of OMB Circular A-110, 62 Fed. Reg. 45,934
    (Aug. 29, 1997)...................................................................................4

000062

FEDERAL POLICY GUIDANCE

UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, A GUIDE FOR STATE, LOCAL AND
INDIAN TRIBAL GOVERNMENTS (April 8, 1997) ("ASMB C-10")
................................................................................................2, 5, 11, 18, 19, 22-25, 34

iv

# INTRODUCTION

In this case involving charges to federal programs for information services provided to state agencies pursuant to a cost allocation plan, an after-the-fact review for fiscal year 2004 disclosed an overcharge to the federal government of $1.78 million. In order to correct this overcharge, the Division of Cost Allocation ("DCA") imposed a disallowance of $3,790,567, plus interest. DCA contends that it may ignore certain aspects of the cost settlement analysis performed by the New Mexico General Services Department ("GSD," or "the State"), in order to obtain a "refund" amount that is more than double the amount by which federal programs were overcharged. The State does not believe that this action is valid; nor that the federal government should ever seek to exact such a forfeiture from a State simply because the State drew federal funds under an interim rate that exceeded the amount to which it was entitled based on an after-the-fact cost audit.

DCA obtained this result by ignoring the fact that the State undercharged federal programs by more than $2 million, in the same internal service fund ("ISF") and in the same fiscal year, 2004, as the overcharges to federal programs that form the basis for this disallowance. DCA defends its action on the ground that the State failed to compute actual costs in time to meet deadlines for pursuing certain cost reconciliation mechanisms set forth in Office of Management & Budget ("OMB") Circular A-87. But while the mechanisms in Circular A-87 that DCA cites are intended to correct the federal portion of cost-revenue variances in an ISF by considering all aspects of the State's retrospective cost settlement for the ISF, no federal authority sets forth deadlines for pursuing an equitable adjustment. According to the Department of Health & Human Services' ("HHS") own guidance, a federal programs should receive "an *equitable and appropriate* adjustment for the *over / under billings*" pursuant to the year-end cost

reconciliation in an ISF.[1]  DCA's strained interpretation uses Circular A-87 for a punitive purpose clearly unintended by the Office of Management and Budget.

In three prior decisions, the Board has sustained applications of DCA's policy of exacting a "refund" which the States claimed exceeded  the amount by which an internal service fund overcharged federal programs. *See Arkansas Dep't of Info. Sys.*, DAB No. 2010, 2006 WL 321179 (Jan. 26, 2006) ("*Arkansas I*"); *Arkansas Dep't of Info. Sys.*, DAB No. 2047, 2006 WL 3030763 (Oct. 6, 2006) ("*Arkansas II*"); *New Mexico Gen. Servs. Dep't*, DAB No. 1876, 2003 WL 21043171 (Apr. 30, 2003) ("*New Mexico I*").[2] The *Arkansas* decisions ought not control this case, because Arkansas was unable in those cases to provide the Board with a method of ensuring that a refund considering all aspects of the cost settlement process provided a fair remedy for each federal program to which the costs were allocated.  In the present matter, the State has met this concern by calculating overcharges at the federal program level, using federal program-specific federal financial participation ("FFP") information, to demonstrate that a refund of $1.78 million (before pre-disallowance interest is computed through the date of the disallowance letter) more than adequately reimburses the federal government.

To the extent that the Board's holding in its previous decision concerning this fund, *New Mexico I*, rests on the conclusion that DCA need not take into consideration any undercharged amounts in the cost settlement process because those amounts were not claimed to individual federal programs and were not "substantiated," the State requests that the Board

---

[1] Ex. 1, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, A GUIDE FOR STATE, LOCAL AND INDIAN TRIBAL GOVERNMENTS (April 8, 1997) ("ASMB C-10") (Excerpt - Part 4), Pt. 4, 4.8, 4-14 (emphasis added).

[2] Departmental Appeals Board cases are cited using a Westlaw reference.

2

revisit that conclusion. As we show below, that position is not sustainable. In this disallowance, DCA accepted the accuracy of the State's cost settlement analysis, which yielded findings of overcharges for some information services functions, and undercharges for others. Treating the functions disparately by accepting the overcharge calculations while regarding the undercharge calculations as "unsubstantiated," even though all cost settlement findings resulted from the same audit process, is an arbitrary action that cannot be justified.

DCA's disallowance of $4,011,031 (including pre-disallowance interest through the date of the disallowance letter) reflects the alleged federal share of overcharges to the Human Services Department, $3,723,891; and the federal share of overcharges to the Department of Health and the Children, Youth and Families Department, $66,676. *See* Ex. 2, Disallowance Letter and Attachments. The State is not contesting DCA's findings with respect to the latter two departments,[3] and will pay those portions of the disallowance. With respect to the Human Services Department, the State requests that the Board either correct the amount of DCA's disallowance as described below, or remand this matter to DCA to compute the disallowance in a manner conforming with federal law.

# BACKGROUND

## I.    LEGAL FRAMEWORK

Through ISFs, States account for the financing of administrative services provided to their own agencies. Customer state agencies in turn seek reimbursement from federal programs that benefit from the services. *Arkansas I*, DAB No. 2010, at \*3. Under Office

---

[3] While there were undoubtedly some undercharges to the other two state agencies, and a equitably computed total overcharge for those agencies therefore would be considerably less than $66,676, the cost and burden of determining, on a federal program-specific basis, the federal participation in undercharges was too onerous to warrant the benefit of the adjustment.

000066

of Management and Budget Circular A-87 ("Circular A-87" or "the Circular"), States may not earn a profit in operating an ISF, *id.*; however, they may maintain a working capital reserve sufficient to cover sixty days' cash expenses for normal operating purposes. Ex. 3.a, Cir. A-87, Att. C, ¶ G.2.[4] For a "billed central service"—one offered on a fee-for-service basis—rates charged to state agencies in a fiscal year must be based on the estimated costs of providing services. *Id.* ¶ G.4. For each year, States submit information about internal service funds in their statewide cost allocation plans ("SWCAPs") to a cognizant agency (here, DCA) responsible for reviewing central service costs. *Id.* ¶ F.1. SWCAPs must be submitted six months in advance of the next fiscal year in which the State plans to claim central service costs. *Id.* ¶ D.4. Because projected costs inevitably differ, to some degree, from actual costs as retrospectively determined, the Circular provides for a two-step reconciliation process, comprised of an annual cost / revenue comparison and a routine adjustment ("the Paragraph G.4 adjustment"):

> A *comparison* of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable costs of the service will be made at least annually, and an *adjustment* will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central service costs.

*Id.* ¶ G.4 (emphasis added).

---

[4] OMB Circular A-87 was most recently revised in 2004, and in 2005, its provisions were relocated to the Code of Federal Regulations. *See* OMB, Relocation of Policy Guidance to 2 C.F.R. Chapter II, 70 Fed. Reg. 51,910 (Aug. 31, 2005). Since this disallowance concerns fiscal year 2004, all citations to the Circular in this brief refer not to the current version but to the 1995 version. *See* Ex. 3.a, OMB, Final Revisions to OMB Circular A-87, 60 Fed. Reg. 26,484 (May 17, 1995); *see also* Ex. 3.b, Proposed Revisions to OMB Circular A-87, 58 Fed. Reg. 44,212 (Aug. 19, 1993). Certain limited revisions to the Circular in 1997, *see* 62 Fed. Reg. 45,934 (Aug. 29, 1997), did not affect the provisions at issue in this appeal.

4

Internal service funds frequently provide multiple service functions; a per-unit rate for each service or function reflects the estimated cost of providing it. While nothing in Circular A-87 requires that internal service funds be subdivided by function, the practice ensures that "central service costs can be identified and assigned to benefitted activities on a reasonable and consistent basis." *Id.* ¶ A.1. New Mexico has followed this practice, and its information services ISF divides costs among thirty-two functions. Its annual SWCAP includes a year-end cost reconciliation for each functional category in the ISF.

At issue in this case is DCA's assertion—in tension with HHS' own policy guidance, and with OMB's stated intent to accord flexibility to States—that an adjustment under method (a) (refund to the federal government), as distinguished from all of the other adjustment methods listed in Paragraph G.4, does not permit any consideration of functional categories in which the State undercharged federal programs. The policy guidance conflicting with DCA's stance, the ASMB C-10, states that in choosing a method of adjustment, "[t]he primary concern would be the assurance that Federal programs charged in a given year receive an *equitable and appropriate* adjustment of the *over/under billings*." Ex. 1, ASMB C-10, Pt. 4, 4.8, 4-14 (emphasis added).

In keeping with this HHS guidance, the Board appears to have acknowledged that a refund might appropriately take undercharges into account, if a state's methodology treats all federal programs equitably. *Arkansas I*, DAB No. 2010, at *8, *13. Nonetheless, in several decisions, the Board has upheld DCA refund computations that ignored functional category undercharges, because of concerns of cost-shifting, and because of the Board's conclusion that undercharges were not properly documented or substantiated. *Arkansas I*, DAB No. 2010, at

*13-*14; *Arkansas II*, DAB No. 2047, at *4; *New Mexico I*, DAB No. 1876, at *4. The State

addresses these holdings in Sections II and III of its Argument.

## II.     FACTUAL BACKGROUND

### A.     The Information Services ISF

The internal service fund at issue in this case ("the information services ISF"),

administered by the Information Systems Division of GSD, provides computer services—

hardware, software, email services, and technical support—to New Mexico state agencies

("customer agencies"). *See* Ex. 5, Affidavit of Robert G. Peters, ¶ 3 ("Peters Affidavit"). In

fiscal year 2004, the fund included thirty-two categories of information services.[5] *See* Ex. 8.a,

GSD Information Services ISF Categories - Fiscal Year 2004.

The fund's costs, incurred by GSD, include the direct costs of providing services,

such as salary and wage costs, hardware, and software; depreciation of assets; overhead costs,

such as building maintenance; and allowable indirect costs. Ex. 5, Peters Affidavit, ¶ 4. GSD

uses allocation methods to assign all costs, including direct and indirect costs, to the thirty-two

service categories. The allocation methods were developed in the mid-1990s in consultation

with DCA. *Id.* ¶ 5.

---

[5] The thirty-two service categories are listed in DCA's computation of the disallowance. Ex. 2, Disallowance Letter, Att. 1. The State's cost reconciliation analysis in its SWCAP contains thirty-seven categories, because this analysis divides several service categories among "Standard," "Non-Prime," and "Prime," according to the time in the day when the service is used. *See* Ex. 4.b, New Mexico Proposed 2006 Cost Allocation Plan (Based on Costs for Fiscal Year 2004), Excerpt - Description of Billed Central Services - Office of Information Processing / Information Systems Division ("2006 SWCAP Excerpt"), pp. 5-6, 9-10. Since 2004, GSD has streamlined the categories. As of fiscal year 2008, the fund will contain 24 categories, grouped into three clusters of services. Ex. 5, Peters Affidavit, ¶ 3.

GSD calculates billing rates for each service category using estimated costs, which are based on historical usage, taking into account routine increases in fixed costs and anticipated changes in variable costs. *Id.* ¶ 6. Then, estimated cost is divided by anticipated per-unit usage in the rate year to achieve unit rates. Usage units differ based on the function. For example, central processing unit services are provided per hour, printing is provided per page, and technical support services are provided per hour. Ex. 4.b, New Mexico Proposed 2006 Cost Allocation Plan (Based on Costs for Fiscal Year 2004), Excerpt: Description of Billed Central Services - Office of Information Processing / Information Systems Division ("2006 SWCAP Excerpt"), p. 5. The calculated rates are then applied to actual reported service units provided to obtain the amounts billed to the customer agencies.

In fiscal year 2004 and the four fiscal years preceding it, GSD calculated rates as set forth above, but did not implement them. During this period, the cost-based rates originally calculated for fiscal year 1999 continued in use. Ex. 5, Peters Affidavit, ¶ 7. From fiscal year 2005 forward, however, GSD has implemented new updated cost-based rates. *Id.* ¶¶ 7, 14.

GSD issues monthly invoices to state agencies. State customer agencies request that billing accounts be established to reflect distinct activities. Ex. 4.b, New Mexico 2006 SWCAP Excerpt - Description of Billed Central Services, p. 2. For example, the Human Services Department has accounts that correspond to its three major program divisions: Medical Assistance, Child Support Enforcement, and Income Support. Ex. 6.a, Summary of Human Services Department Billing Accounts ("Billing Accounts Summary"). GSD monitors and reflects in each account's monthly bill the services consumed by the account. Ex. 5, Peters Affidavit, ¶ 8; Ex. 11, Example of GSD Invoice to Human Services Department Account. The billing account is the most specific level at which GSD's invoices measure actual consumption

7

of services. Ex. 5, Peters Affidavit, ¶ 10. The state customer agency's payment reflects one total amount for consumption of all service categories by that agency. GSD does not use "imputed" or "memo" billings: each invoice is a request for payment, and the ISF relies entirely on state customer agency payments (and interest earned on those payments) in order to operate. *Id.* ¶ 8.

B.    How the Human Services Department's ISF Costs Reach Federal Programs

The Human Services Department ("HSD"), which administers Medicaid and other federal assistance programs, is the dominant customer of the ISF. It purchases approximately half of the information services that GSD provided through the fund in fiscal year 2004. Approximately 95% of the federal funds that support the ISF's operations derive from HSD-administered programs. Ex. 7, Affidavit of Donna Sandoval ("Sandoval Affidavit"), ¶ 3. HSD is also the customer agency with the most significant federal financial participation; in state fiscal year 2004, federal programs contributed in the aggregate approximately 63% of the total ISF costs paid by HSD. *Id.*

ISF charges billed by GSD to the Human Services Department for information technology services reach the federal programs that HSD administers through a two-tiered process, approved by DCA and fully conforming with OMB Circular A-87: GSD bills each HSD account for services used each month; then, HSD charges expenses from each account to federal programs as part of the administrative expenses for each program. A flowchart, attached to the Brief as Exhibit 6.b, summarizes the path by which charges to the billing accounts reach federal programs.

HSD's three program divisions—Medical Assistance ("MA"), Child Support Enforcement ("CSE"), and Income Support ("ISD")—coincide with three principal billing account areas. *Id.* ¶ 6. Two billing accounts, MA and CSE, include charges to only one federal

program each: Medicaid, for MA; and Child Support, for CSE. Therefore, any over- or underbilling by the ISF to that account is clearly traceable to one federal program. Each account's charges are then assigned directly to the Medicaid or Child Support Enforcement claim as administrative expenses. *Id.* ¶ 7.

The third program division, ISD, is comprised of six GSD billing accounts.[6] ISD encompasses services that benefit seven federal programs,[7] as well as state-funded general assistance. *Id.* ¶ 8. The charges to the six ISD accounts reflect the information technology costs that eligibility workers incur while administering the various programs. HSD pools the ISF charges to the six Income Support Division accounts with other administrative expenses, and then allocates these costs among benefiting federal programs and the state general assistance program using a random moment sample ("RMS"). *Id.* ¶ 9. The allocations are based on the percentage of surveyed eligibility workers' time spent administering each program. *Id.*; Ex. 6.a, Billing Accounts Summary. This is in conformance with HSD's DCA-approved cost allocation methodologies.

Because the billing account is the most specific level at which GSD bills information services usage, each of the federal programs administered through ISD participates in a specified percentage of the costs of all functional services covered by each bill. The percentages derive from the RMS results. Therefore, within a billing account, the level of

---

[6] Although ISD's bills are broken down into six separate accounts, one (Account 626) covers the majority of the information service costs billed to ISD. *See* Ex. 9.b, Overcharge Analysis - HSD Billing Accounts.

[7] These programs are Temporary Aid for Needy Families ("TANF"), Medicaid (Administration), Food Stamps, Food Stamps Employment and Training, the Low Income Home Energy Assistance Program ("LIHEAP"), the Refugee Cash and Medical Grant, and Systematic Alien Verification for Entitlements ("SAVE"). Ex. 6.a, Billing Accounts Summary.

federal participation from one functional category to the next is identical. Ex. 7, Sandoval Affidavit, ¶¶ 5, 10. Likewise, because the same RMS results dictate the allocation of costs to federal programs in all six ISD accounts, each program bears costs in all six accounts according to a single allocation.   For example, for each quarter of fiscal year 2004, Food Stamps was allocated approximately 52% of all ISF charges in all six ISD accounts. *Id.* ¶ 10; *see also* Ex. 6.a, Billing Accounts Summary.

Finally, two billing accounts serve the Administrative Services Division ("ASD") of HSD.  ASD administratively supports the three program divisions.  ISF charges to this division are allocated among the three HSD program divisions (ISD, CSE, and MA) according to the number of employees in each division.  In fiscal year 2004, Child Support received approximately 25% of the allocation, Medical Assistance 10%, and Income Support 65%.  The ISF costs allocated to CSE and MA are claimed in turn under the Medicaid and Child Support federal programs as administrative costs.  The charges allocated to ISD are charged as administrative costs to various federal programs, as well as state general assistance, through the RMS allocation methodology described above.  *See* Ex. 7, Sandoval Affidavit, ¶ 11; *see also* Ex. 6.a, Billing Accounts Summary.

For each of the HSD-administered federal programs contributing to ISF payments, HSD seeks reimbursement of ISF payments as administrative costs.  HSD's quarterly claims for reimbursement from the various federal programs contain one line item for administrative expenses; HSD payments to GSD for ISF services are grouped with other administrative expenses on this line. Ex. 7, Sandoval Affidavit, ¶ 12.

10

000073

C.     The Adjustment Reconciling GSD Revenues With Allowable Costs

After each fiscal year, GSD analyzes actual costs for that year attributable to each service category of the fund as described in Part I.A above. *See supra* at 6-7. GSD then compares these costs with revenues: payment rates received for the service category, plus imputed interest (interest at the state treasury earning rate) on payments. *See* Ex. 1, ASMB C-10, Pt. 4, Illus. 4-7, 4. GSD then takes into account the 60-day reserve for operating revenues permitted by Circular A-87, *see* Ex. 3.a, Cir. A-87, Att. C, ¶ G.2, in order to obtain a final profit or loss for each service category. A variety of factors may cause actual costs as determined in the retrospective audit to fall short of the anticipated costs on which rates were based, resulting in an overcharge: for example, staffing levels might drop; or usage levels for a service may be higher than anticipated, increasing efficiency of service delivery and creating a lower per-unit cost. Ex. 5, Peters Affidavit, ¶ 12. Conversely, an increase in staffing or unexpectedly low usage levels might result in an undercharge for a service.

GSD audits the cost settlement information before it is finalized and submitted to DCA as part of the SWCAP. The SWCAP governing expenditures in fiscal year 2004 provides that adjustments for cost-revenue variances in Section II billed central services "will be made in accordance with procedures agreed to between the State/locality and the Cognizant Agency." Ex. 4.a, New Mexico 2004 Cost Allocation Plan Based on Costs for Fiscal Year 2002, Excerpt: Cost Allocation Agreement, February 22, 2005. The SWCAP does not set forth the specific method for implementing the cost reconciliation. In practice, GSD has developed new cost-based rates from fiscal year 2005 forward, and has for that year implemented a year-end cost reconciliation that reflects an adjustment to the fiscal year 2007 billing rates based on deficit or

excess positive balance in the previous fiscal years.[8]  *Id.* ¶ 14.  This method corresponds closely to adjustment method (c) in Paragraph G.4, "adjustments to future billing rates."  *See* Ex. 3.a, Cir. A-87, Att. C, ¶ G.4.  The reconciliation of costs at year end is an accepted practice by DCA, since the numbers can be reconciled to the organization's audited financial statements.

In fiscal year 2004, GSD was delayed in completing the audit that determined actual costs for the year, and had not taken any steps to adjust future billing rates to reflect the cost reconciliation at the time that DCA imposed the refund of overcharges in five service categories that constitutes the disallowance under review. Ex. 5, Peters Affidavit, ¶¶ 16, 23.

D.    The Present Disallowance

New Mexico submitted to DCA its statewide cost allocation plan containing actual costs for fiscal year 2004 on October 15, 2005. *Id.* ¶ 17.  GSD compiled cost settlement information for the entire ISF in its SWCAP, and through subsequent submissions to DCA provided cost reconciliations for the three state customer agencies of the ISF with more than negligible federal funding: the Human Services Department; the Children, Youth and Families Department; and the Department of Health.  *Id.* ¶ 18.  The analysis, which allocated all information services-related costs (*e.g.*, labor, equipment, overhead, etc.) among the thirty-two functional categories, revealed that in categories representing ten functions, revenues exceeded allowable costs; in sixteen categories, allowable costs exceeded revenues.[9]  GSD determined the

---

[8] The description of this internal service fund in the proposed SWCAP containing cost information for fiscal year 2004 notes that, as well as a year-end cost reconciliation, a "mid-year rate realignment" may be performed. Ex. 4.b, 2006 SWCAP Excerpt - Description of Billed Central Services, p. 2.  This realignment was not performed in fiscal year 2004.

[9] Of the thirty-two service categories, six had neither undercharges nor overcharges to HSD, because HSD had no charges in fiscal year 2004 in these categories. *See* Ex. 2, Disallowance Letter, Att. 1.

federal participation in each state agency's service category overcharges and undercharges by applying a weighted average of federal participation in the agency's fiscal year 2004 payments for ISF services. For HSD, this FFP was computed at 62.89%.[10] *Id.* ¶ 20.

These amounts were aggregated to compute a total overcharge for each state agency, which took into consideration all cost-revenue variances, whether overcharges or undercharges, in the thirty-two service categories. This calculation (after reflecting corrections that GSD made through dialogue with DCA in 2006) disclosed that within the Human Services Department, federal programs were overcharged by $1,716,068. *Id.* ¶ 21. *See* Ex. 10.b, State's Refund Calculation (Average FFP).

DCA issued its disallowance letter on June 22, 2006, in the amount of $4,011,031.[11] Ex. 2, Disallowance Letter. DCA concluded that of the thirty-two service categories in the fund, five had excess balances totaling more than $500,000.[12] DCA computed the base disallowance amount of $3,790,567, by totaling the federal share of overcharges in these five service categories to the three state customer agencies using the weighted average FFP rate

---

[10] In reviewing its data on charges to federal programs in preparation for this appeal, the State detected a minor error in the calculation that yielded 62.89% average rate of federal participation in HSD's payments to the ISF. The correct average is 63.02%. GSD has used the corrected charge data in the computation of federal-program specific overcharges, at Exhibit 9.c (Overcharge Analysis - Federal Programs).

[11] DCA issued its original disallowance on February 22, 2006. After GSD identified a flaw in the State's cost allocation methodology and offered data more accurately reflecting a reconciliation of revenues with allowable costs, DCA issued an amended disallowance letter on June 22. Ex. 2, Disallowance Letter.

[12] DCA apparently limited its disallowance only to service categories with excess balances exceeding $500,000 because Paragraph G.4 of Circular A-87 allows for one adjustment mechanism (adjustments to allocated central service costs) only for services with excess balances below $500,000. Ex. 3.a, Cir. A-87, Att. C, ¶ G.4. In this matter, the federal portion of the excess balances in the overcharge categories that DCA did not factor into the disallowance totals $177,140. Ex. 2, Disallowance Letter, Att. 1.

000076

for each state agency (62.89% for HSD). Of this amount, $3,723,891 (or 98.3%) was attributable to the Human Services Department; $66,676 was attributable to the other two state agencies. *Id.* With respect to HSD, the disallowance methodology disregarded sixteen service categories in which the costs of providing service exceeded revenues collected, totaling a federal share of $2.18 million. *See id.* Att. 1. The base disallowance amount incorporates pre-disallowance interest at 2.9%, from the end of the disallowance period until the date of the disallowance letter, at $220,464. *See id.* Att. 3.

Between June and December 2006, in connection with unsuccessful efforts to resolve the dispute through negotiation, the State analyzed all monthly ISF invoices to Human Services Department billing accounts for fiscal year 2004. In order to alleviate any potential concern on the part of DCA staff that consideration of cost-revenue variances in all service categories could result in cost-shifting, GSD refined its previous analysis of cost-revenue variances. Ex. 5, Peters Affidavit, ¶¶ 25, 26. GSD determined the ISF charges claimed under each federal program in each HSD billing account in fiscal year 2004, and applied the FFP rate for each federal program to its share of the overcharge or undercharge for that account. The new analysis reveals that the federal share of GSD's total overcharge to HSD was $1,683,715. *See* Ex. 9.c, Overcharge Analysis - Federal Programs; Ex. 10.a, State's Refund Calculation (Federal Program FFP). This amount is $ 32,353 *less* than the total overcharge to HSD-administered federal programs obtained using a weighted average FFP for 2004. *Compare* Ex. 10.a *with* Ex. 10.b, State's Refund Calculation (Average FFP). The State has attached this analysis to the brief as Exhibit 9.a through 9.c, and discusses it further below. The analysis demonstrates that while minor cost-shifting did result from the use of an average FFP in the Human Services Department (the method used by DCA in calculating the disallowance), this cost-shifting actually *benefited*

14

federal programs, because billing accounts with a higher level of federal participation tended to have lower-than-average overcharges.

# ARGUMENT

Neither party disputes in this case that a neutral, after-the-fact cost settlement analysis performed by GSD disclosed an overall overcharge of approximately $1.7 million to the federal programs administered by HSD. GSD accepts that it must repay the federal government for overcharged amounts, and it accepts the imposition of pre-disallowance interest.[13] The only dispute is whether federal law permits DCA, in computing a refund due to the federal government, to consider only service categories in which revenues exceeded costs, and not service categories in which costs exceeded revenues, causing in this case a forfeiture of over $2 million, to which the State is entitled.

Under controlling federal law, and under the facts of this case, this dispute should be resolved in favor of the State. The overcharges and the undercharges were established in the exact same manner, using approaches approved by HHS. The refund is an adjustment intended to correct *any* difference between revenue and allowable costs in an internal service fund. *See* Ex. 3.a, Cir. A-87, Att. C, ¶ G.4. DCA's contention that the "refund" option may properly include only overcharges, because it is intended to function as a penalty where a State fails timely to pursue other adjustment options, is entirely unsupported in Circular A-87 and its regulatory history. No authority sets forth DCA's alleged deadlines for the other adjustment options.

---

[13] Under the federal-program overcharge analysis that the State proposes in this appeal, the amount owing to correct all overcharges, include pre-disallowance interest through the date of the disallowance letter, is $1,852,193. *See* Ex. 10.a, State's Refund Calculation - Federal Program FFP.

15

Board precedent treating "cost-shifting" does not require the Board to sustain DCA's inequitable computation of this disallowance. In earlier decisions, the Board has declined to allow "netting" of overcharges and undercharges in computing a refund where the Board had reasonable concerns that a State's proposed refund methodologies could result in federal programs' being inadequately compensated for the impact of overcharges. *See Arkansas I*, DAB No. 2010, at \*9. That concern is inapplicable here, for GSD has eliminated any possibility of cost-shifting by determining the actual overcharge attributable to each federal program participating in ISF costs, using that program's rate of federal participation. *See* Ex. 9.c, Overcharge Analysis - Federal Programs. That recalculation reveals that the use of an average FFP resulted in cost-shifting on a minor scale, but in a way that advantaged, rather than disadvantaged, federal programs.

GSD respectfully requests that the Board revisit its holding, in *New Mexico I*, that undercharges disclosed by a neutral cost settlement analysis, because they were not separately claimed from grantor agencies, are "unsubstantiated," and therefore cannot be considered in the Paragraph G.4 cost settlement. The undercharges are for documented, allowable costs under the SWCAP. The governing federal guidelines permit consideration of these undercharges in making adjustments to align payments with actual costs. The process of identifying the undercharges was identical to that which identified the overcharges, and there was appropriate opportunity for full federal review of both sides of the reconciliation. No federal program is being charged more as a result of the reconciliation than it was initially charged in fiscal year 2004. Thus, the undercharges are as fully claimed and substantiated as the overcharges.

16

I.    BY DISREGARDING UNDERCHARGES, DCA'S DISALLOWANCE VASTLY
      OVERSTATES THE AMOUNT OWED TO FEDERAL PROGRAMS.

      A.    A Refund Including Both Service Category Overcharges and Undercharges
            Accurately Measures the Impact on Federal Programs.

            Considering all cost-revenue variances in an internal service fund, including both

overcharges and undercharges, is the most precise way of correcting federal participation in

internal service fund costs.  According to GSD's approved billing methodology, usage of

individual services functions is monitored at the billing account level.  Ex. 4.b, 2006 SWCAP

Excerpt - Description of Billed Central Services, p. 2.  Each account receives a monthly invoice

detailing all service usage, and pays one bill encompassing the cost of all functions received.  *Id.*

According to HSD's approved cost allocation methodology, each federal program participates in

a fixed portion of each billing account's costs.  Ex. 7, Sandoval Affidavit, ¶ 5.  In each billing

account, one dollar of service category undercharge benefits a federal program to the same extent

as that federal program is harmed by one dollar of overcharge in another service category.

Therefore, the total cost-revenue variance attributable to federal programs is the sum of all

programs' shares in the total over- or undercharge to each account.[14]

            DCA has disallowed the estimated impact on federal programs of overcharges to

HSD for the five information service categories with excess balances exceeding $500,000.  This

methodology disregards over $2 million in undercharges that benefited the same federal

programs in sixteen other categories of information services.  In addition, by focusing on certain

service categories, rather than on the overcharge to each federal program as a whole, DCA has

---

[14] The precise impact of a billing account cost reconciliation on a federal program is measured as
follows.  First, the total billing account overcharge or undercharge is multiplied by the percent of
that account's costs attributable to the federal program.  Next, that amount is multiplied by the
FFP rate applicable to the federal program.  *See* Ex. 9.a, Summary of Overcharge Computation.

000080

forgone any attempt to measure precisely the impact of cost-revenue variances on the federal

government, as HHS' own policy guidance requires it to do.[15]  *See* Ex. 1, ASMB C-10,  Pt. 4,

4.8, 4-14.

          **B.**    <u>Only a Refund Including Both Service Category Overcharges and Undercharges</u>
                <u>Gives Full Effect to the Language and Intent of Circular A-87.</u>

          Circular A-87 directs that an "adjustment" to central service charges to federal

programs must cover "the difference between [ISF] revenue and the allowable costs." Ex. 3.a,

Cir. A-87, Att. C, ¶ G.4. The "refund . . . for the federal share of the adjustment" must serve this

purpose, as must the other three listed methods of adjustment: credits to individual federal

programs, adjustments to future billing rates, and adjustments to allocated central service costs.

In construing a statute or regulation, a reviewing body must, if possible, give full effect to every

word used by Congress or by the promulgating agency. *See Hallstrom v. Tillamook County*, 493

U.S. 20, 29 (1989); *Glover v. West*, 185 F.3d 1328, 1332 (Fed. Cir. 1999).  Only a refund

considering *all* ISF service categories can give full effect to the command to make an adjustment

for the difference between revenue and allowable costs.[16]  DCA's insistence on including only

---

[15] The State agrees with DCA that service categories within an internal service fund are an
important mechanism for measuring ISF costs precisely and for ensuring cost-based rates.
Moreover, where the Paragraph G.4 adjustment is conducted through an "adjustment to future
billing rates" (option (c) in Paragraph G.4), computing a state-agency-wide overcharge or
undercharge for each service category is the appropriate way to adjust the rate in that category in
a future year. But option (c), which recognizes and adjusts both overcharges and undercharges,
in no way justifies *ignoring* undercharges when the refund option is employed.

[16] In proposing a refund methodology, GSD has adhered to this logic in an evenhanded way.  In
order for the cost reconciliation to be effective, federal programs should receive a refund that
takes into account all undercharges that benefited the programs, and all overcharges that harmed
them. DCA's disallowance disregarded a $177,140 federal share in overcharges in five service
categories, because the total excess balances in those categories fell below $500,000. *See* Ex. 2,
Disallowance Letter, Att. 1. GSD's proposed refund amount takes into account federal
participation in those overcharges.

000081

service category overcharges in its refund computation ignores the difference between revenue and allowable cost where the latter exceeds the former. Nothing in the Circular authorizes this interpretation,[17] and many factors weigh against it.

Construing the refund method to require consideration of all cost-revenue variances conforms with HHS guidance. The ASMB C-10 instructs that, when selecting a method of adjustment under Paragraph G.4, "[t]he primary concern would be that the Federal programs charged in a given year receive an *equitable and appropriate adjustment for the over/under billings.*" Ex. 1, ASMB C-10, Pt. 4, 4.8, 4-14 (emphasis added). Further, the ASMB C-10 explicitly states, in a response that focused on two other adjustment options under Paragraph G.4, credits to individual federal programs and adjustments to future billing rates, that they cover both "profit and loss situations."[18] *Id.*, Pt. 4, 4.8, 4-12.

---

[17] DCA has asserted in argument in past disallowances that Paragraph G.4, by requiring a comparison of revenues with allowable costs for "each billed service," contemplates that adjustments be conducted at the service-category level. *See* Ex. 3.a, Cir. A-87, Att. C, ¶ G.4. But the terms of the Circular do not support this conclusion. They require a *comparison* of costs to revenues for "each billed service," but these words are not included in the requirement of an *adjustment.* Thus, even if the phrase "each billed service" is meant to refer to each service category of an ISF, rather than the ISF as a whole (a doubtful proposition, given the reference elsewhere in Attachment C of the Circular to "all billed services, including internal service funds," *see* Ex. 3.a, Cir. A-87, Att. C, ¶ E.3.a), the terms of the Circular do not justify the patently inequitable adjustment approach that considers only overcharges and ignores undercharges.

[18] Answer 4-12 does not suggest that *only* methods (b) and (c) under Paragraph G.4 permit consideration of both overcharges and undercharges. HHS made this statement in the context of explaining that the word "credit" in adjustment method (b) was an "editing error"; method (b), like method (c) ("adjustments to future billing rates") should have been worded neutrally so as to permit the correction of undercharges as well as overcharges. *See* Ex. 1, ASMB C-10, Pt. 4, 4.8, 4-12. The question to which HHS was responding noted that Paragraph G.4 "establishes four methods for adjusting internal service funds . . . for *profits or losses* realized from operations." *Id.* (emphasis added). HHS' response did not indicate that the questioner was incorrect in assuming that methods (a) and (d), like (b) and (c), permitted consideration of undercharges.

000082

Further, the broader intent of Circular A-87 is to ensure that federal programs participate in allowable costs according to the benefit they receive. *See* Ex. 3.a, Cir. A-87, Att. A, ¶ C.1.b (cost is allowable if "necessary and reasonable for proper and efficient performance and administration of Federal awards."); *id.* ¶ A.1 (the principles in the Circular are "designed to provide that Federal awards bear their fair share of cost recognized under these principles except where restricted or prohibited by law"); *id.*, Att. C, ¶ A.1 (CAP process is intended to ensure that "central service costs can be identified and assigned to benefitted activities on a reasonable and consistent basis"). An objective, undisputed cost settlement analysis revealed that federal programs administered by HSD paid less than their share of cost for some service categories. Only by considering these aspects of the cost settlement may DCA calculate a refund that is consistent with the intent of the Circular.

C.    The Overcharges and Undercharges Were Determined Through the Same Process and Are Equally Reliable.

The over $2 million in service category undercharges that DCA refused to consider in its refund methodology constitute documented, allowable costs for Section II billed services provided in accordance with the SWCAP. *See infra* at 35-37. The State followed the same methodology, fully consistent with federal guidance, in computing all overcharges and undercharges. For example, the State included imputed interest in the calculations, and incorporated into year-end balances a 60-day reserve of working capital. *See* Cir. A-87, Att. C, ¶ G.2. DCA's disallowance letter neither questioned nor furnished any reason to doubt the accuracy of the computations.

Circular A-87 draws no legal distinction between "undercharges" and "overcharges." As DCA acknowledged in *New Mexico I*, under the State's cost reconciliation methods, undercharges "were included in the same worksheets and calculated in the same way as

20                                                            000083

the overcharges." *New Mexico I*, DAB No. 1876, at *4. No legal authority supports DCA's one-sided position that, simply because a neutral, retrospective cost analysis reveals that rates fell below rather than above cost for a service category in an ISF, this category may be ignored in the cost settlement process.

D.    GSD Is Not Time-Barred From Pursuing an Equitable Cost Settlement.

DCA has asserted in past disallowances that in computing a refund, it is entitled to disregard undercharges because States failed timely to pursue the other remedies afforded by Circular A-87, such as adjusting future billing rates or crediting federal programs, which would allow consideration of undercharges. The State vigorously contests this view. The Circular does not impose the purported deadline on conducting an adjustment under Paragraph G.4. Moreover, even assuming that the State missed a deadline for pursuing other adjustment methods, the Circular does not authorize the forfeiture of the undercharged amounts.

For internal service funds, the Circular requires that "[a] comparison of the revenue generated by each billed service . . . to the actual allowable costs of the service will be made at least annually." Ex. 3.a, Cir. A-87, Att. C, ¶ G.4. New Mexico satisfies this requirement by submitting a SWCAP for each fiscal year containing cost reconciliation data for the information services ISF.[19]

In contrast to the cost-revenue comparison in Paragraph G.4, the subsequent adjustment is not subject to any rigid deadline under the Circular. At one time, OMB contemplated a more restrictive time frame for making these adjustments. The proposed version

---

[19] The State concedes that its SWCAP containing 2004 costs, filed on October 15, 2005, was untimely. The Circular imposes no penalty for this error of administrative organization. *See* Ex. 3.a, Cir. A-87, Att. C, ¶ D.4. Moreover, as noted below, *see infra* at 24, even without a formal penalty, States have a clear incentive to reconcile promptly costs and revenues and implement an adjustment, because interest accrues on excess funds held in an ISF.

of Paragraph G.4 stated, in part, "Individual billing rates will be reviewed and *adjusted to actual costs at least annually.*" Ex. 3.b, OMB, Proposed Revisions to OMB Circular No. A-87, 58 Fed. Reg. 44,212, 44,230 (Aug. 19, 1993) (emphasis added). In promulgating the final version of the Circular, OMB noted that it had revised the section in order "to provide [State] governmental units more options and flexibility in making adjustments to Federal awards." Ex. 3.a, OMB, Final Revision to OMB Circular A-87, 60 Fed. Reg. 26,484, 26,489 (May 17, 1995). The promulgated version read, "A comparison of the revenue generated by each billed service . . . to the actual allowable costs of the service will be made at least annually, and an adjustment will be made for the difference between the revenue and the allowable costs." *Id.*, 60 Fed. Reg. at 26,503. The final version retained the requirement of an annual cost-revenue comparison, but removed any reference to an annual adjustment. The Board should reject DCA's effort to enforce a version of Circular A-87 that was not in fact promulgated.

Nor does the ASMB C-10 independently impose any deadlines on conducting the Paragraph G.4 adjustments. That policy guidance notes that "alternative (b) is correcting billed costs in the current year, whereas alternative (c) is carrying forward the profit/loss into the next open fiscal period." Ex. 1, ASMB C-10, Pt. 4, 4.8, 4-12. This sentence simply explains which fiscal year's costs each adjustment affects. Method (b) is a retrospective adjustment that amends a prior quarter's claim for FFP; the adjustment is *effective* in the current fiscal year, even if it is made in a future fiscal year.[20] To assert that such a retrospective adjustment must be *implemented* in the same fiscal year as the cost-revenue discrepancy occurred flies in the face of

---

[20] The Board has acknowledged as much. *See New Mexico I*, DAB No. 1876, at *6 (emphasis added) ("[Method (b)] would have had to be taken *effective* the fiscal year in which the revenues exceeded costs . . . .").

22

000085

the concept of retrospective cost settlement, for only after a year is completed may final costs be determined. In addition, such an assumption disregards the Social Security Act provision allowing States eight quarters (and even longer in the case of "adjustments to prior year costs") to adjust retrospectively a claim under a program created by the Act. *See* 42 U.S.C. § 1320b-2(a).

Similarly, the ASMB C-10 places no firm deadline on adjusting future billing rates, method (c) of Paragraph G.4. Acknowledging that the determination of actual costs following a fiscal year takes time, the ASMB C-10 provides that under method (c), billing rates may be adjusted in "the *next open* fiscal period." Ex. 1, ASMB C-10, Pt. 4, 4.8, 4-12 (emphasis added). "Next open" is not defined, but presumably refers to the next fiscal year for which rates are to be set. For example, where cost data for fiscal year 2004 are finalized in October 2005, the "next open" fiscal year for a rate adjustment would be fiscal year 2007, since 2006 rates had already gone into effect on July 1, 2005.

Assuming, for the sake of argument, that the State here missed clear deadlines for pursuing adjustment methods (b) and (c) in Paragraph G.4, there is no reason, and nothing in Circular A-87 or in the ASMB C-10 to require, that the State must forfeit its entitlement to an equitable adjustment encompassing the total federal portion of cost-revenue variances in the internal service fund. The provisions of the Circular on central services are intended to ensure that federal contributions to ISF rates neither exceed nor fall short of appropriate federal participation in the cost of ISF services. *See* Ex. 3.a, Cir. A-87, Att. A, ¶ C.1.b (cost is allowable if "necessary and reasonable for proper and efficient performance and administration of Federal

23

000086

awards."). Nothing in Paragraph G.4 calls for an adjustment grounded in a punitive rationale, rather than a cost-based adjustment.

Moreover, it is unnecessary for DCA to adopt this strained and inequitable reading of the Paragraph G.4 adjustments in order for States to have a disincentive to accumulate excess balances. States do not stand to gain from delay. On the contrary, for each month that GSD retains balances in excess of the allowable sixty-day reserve, its refund amount increases, because it must pay the federal government interest at the state treasury earning rate for the federal share of excess balances. *See* Ex. 1, ASMB C-10, Pt. 4, Instructions on Illus. 4-7, 4. As the Board has noted, this framework "remove[s] any incentive to states to accumulate and retain excess federal funds." *Arkansas I*, DAB No. 2010, at *29 n.27.

E.    GSD's Total Obligation to the Federal Government Equals $1.85 Million.

In its SWCAP and in documentation that it provided to DCA leading to this disallowance, GSD reconciled costs and revenues in the internal service fund by identifying a total overcharge or undercharge to the Human Services Department for each service category, and applied an HSD-wide average FFP to obtain the federal share of each service-category overcharge or undercharge. This method complies with the ASMB C-10, which advises States to use one "ratio of federal activity" for each user agency when reporting federal participation in fund revenues. *See* Ex. 1, ASMB C-10, Pt. 4, Illus. 4-6. GSD obtained a total federal participation in HSD overcharges of $1,716,068 by summing the federal shares of service-category overcharges and undercharges. Because the State complied with federal principles in conducting the adjustment, and because the Circular calls for a reconciliation of all cost-revenue variances, DCA should have accepted the State's total overcharge calculation in seeking a refund.

24

DCA, however, refused to take into account over $2 million in service-category undercharges in computing the refund. *See* Ex. 2, Disallowance Letter. The State, therefore, has recomputed the refund with the aim of addressing any concerns on the part of DCA or the Board that undercharges are improperly documented, or that considering them results in inequitable treatment of federal programs.

As an initial matter, the State notes that the concern about cost-shifting cited by the Board in past decisions discussing the treatment of ISF undercharges, *see Arkansas I*, DAB No. 2010, at *12, derives chiefly from HHS' own advice to States to use an average FFP in the cost reconciliation process. *See* Ex. 1, ASMB C-10, Pt. 4, Illus. 4-6. The use of an average FFP may render inaccurate *any* cost-revenue variance, including the service category overcharges on which DCA relied in computing its disallowance.

To guard against cost-shifting, GSD, using its monthly invoices to the Human Services Department, conducted a two-part analysis, supported by Exhibits 9.a, 9.b, and 9.c to this Brief. First, GSD analyzed the services actually used by each billing account during fiscal year 2004 in order to identify the overcharge or undercharge to the billing account for each service category. Summing the service category overcharges and undercharges, GSD obtained a total overcharge or undercharge for each billing account (including both federal and state shares). *See* Ex. 9.b, Overcharge Analysis - HSD Billing Accounts.

Next, within each billing account, GSD identified the overcharge or undercharge attributable to each federal program. *See* Ex. 9.c, Overcharge Analysis - Federal Programs. Using information supplied by HSD, GSD identified the federal programs participating in the account. (See Exhibit 6.a, Billing Accounts Summary, for a list of program participation in each account.) GSD then multiplied this percentage by the FFP applicable to the program's

000088

reimbursement of ISF expenditures.[21]  For the two billing accounts corresponding to only one

federal program each (Accounts 628 and 629), GSD applied the program's FFP rate to the billing

account total ISF overcharge or undercharge for fiscal year 2004.  For accounts including more

than one federal program, GSD determined the overcharge or undercharge attributable to each

federal program, using each program's FFP rate, and summed these amounts to obtain the total

federal share in the overcharge or undercharge for the account.  *See* Ex. 9.a, Summary of

Overcharge Computation; Ex. 9.c, Overcharge Analysis - Federal Programs.  Finally, GSD

summed the participation of each federal program in cost-revenues variances in all accounts, to

obtain an overall overcharge for the program.  All federal programs were overcharged.  *See id.*

GSD's improved analysis revealed a total overall overcharge to the federal

government of $1,683,715 for HSD-administered programs.  *See id.*; *see also* Ex. 10.a, State's

Refund Calculation (Federal Program FFP).  The new methodology eliminates any risk of cost-

shifting, because it determines each program's stake in overcharges and undercharges, rather

than applying an aggregate, HSD-wide federal participation rate.  When the analysis targets

federal programs in this manner, considering both service-category overcharges and

undercharges is not "net[ting] at the bottom line" or "net[ting] one rate against another across

programs," *Arkansas I*, DAB No. 2010, at *13, but rather the sensible, equitable, and precise way

of determining the margin by which amounts claimed under federal programs exceeded cost.

---

[21] For example, in 2004, 18.4% of all ISF costs billed to Income Support Division accounts
within the Human Services Department were allocated to the TANF program. (*See* Ex. 6.a,
Billing Accounts Summary.)  Within the ISD billing accounts, the makeup of federal program
users is identical for each service category.  TANF reimburses administrative expenses at 100%.
TANF thus bore 18.4% of all service category overcharges to the Income Support accounts, and
benefited from 18.4% of all service category undercharges to ISD.  GSD therefore applied a
100% FFP to 18.4% of the overall overcharge for each ISD account to reflect the participation of
TANF in these cost-revenue variances.

000089

GSD's analysis revealed that the minor cost-shifting caused by the use of the weighted average FFP actually resulted in shifting of costs from federal to state programs, rather than in a refund that undercompensated federal programs. Using the agency-wide average FFP, and considering both overcharges and undercharges, the federal share in overall overcharge to HSD (including pre-disallowance interest through June 30, 2004) was calculated to be $1,716,068. *See* Ex. 10.b, State's Refund Calculation (Average FFP). Using the program-specific analysis, the total overall overcharge to these federal programs is $32,353 less, or $1,683,715. *See* Ex. 10.a, State's Refund Calculation (Federal Program FFP). This demonstrates that by a slim but non-trivial margin, billing accounts with higher rates of federal participation bore a lighter proportion of overcharges than their overall participation in the ISF. The federal share in overcharges was 61.7%, whereas the federal share in all ISF costs was about 63%. Ex. 5, Peters Affidavit, ¶ 28. After the amounts for the Department of Health and the Children, Youth and Families Department ($66,676) are added to the refund, and pre-disallowance interest through the date of DCA's disallowance letter is incorporated, the total to be repaid to satisfy GSD's total obligation, under a federal program-specific analysis, is $1,852,193.[22] Ex. 10.a, State's Refund Calculation (Federal Program FFP).

II.    THE *ARKANSAS* DECISIONS DO NOT GOVERN THIS CASE.

The present matter is entirely distinguishable from two recent decisions involving the Arkansas Department of Information Systems internal service fund. In those two cases, DCA disallowed the federal share of certain ISF overcharges to state agencies during fiscal years

---

[22] The hypothetical concern that there could be cost-shifting *between* federal programs if one program had an overall undercharge does not arise in this case, for every HSD-administered federal program had an overall overcharge. *See* Ex. 9.c, Overcharge Analysis - Federal Programs, p. 4.

000090

1997-2000 and 2001. *Arkansas I*, DAB No. 2010; *Arkansas II*, DAB No. 2047. As in the present case, DCA computed its disallowance amount by considering only service categories with overcharges, and not undercharges. The Board sustained the disallowances. Yet the facts in the *Arkansas* cases are in each key respect opposite to those here. There, it was found that state policies overtly discriminated against federal programs; that Arkansas had failed to account accurately for the actual costs of administering each service; that Arkansas was unable to provide data to support an average FFP level based on federal participation in ISF costs; and that Arkansas failed to provide a sound alternative methodology guaranteeing against cost-shifting. None of these perceived deficiencies is present in this case.

A.    GSD Has Treated All Users Equitably in Billing for ISF Services and in the Cost Settlement Process.

In the *Arkansas* cases, DCA justified its disallowance on two grounds: the ISF held excess reserves, which must be refunded under Paragraph G.4; and Arkansas had given preferential treatment to State-funded State agencies, in violation of Circular provisions requiring equal treatment. The latter condition is not present here.

In *Arkansas II*, the Board found that state policies "resulted in inconsistent treatment between federally funded state agencies and other state agencies." *Arkansas II*, DAB No. 2047, at *3. Overcharges in Arkansas' ISF disproportionately impacted state agencies administering federal programs. Moreover, Arkansas, after conducting the cost reconciliation analysis, had distributed rebates such that state-funded state agencies more than recovered amounts by which they were overcharged, while federally funded State agencies recovered only 43% of overcharged amounts. *See Arkansas I*, DAB No. 2010, at *8. The Board also noted, in *Arkansas II*, that Arkansas had entered into an agreement with one federally-funded State agency whereby the ISF charged it discounted billing rates; on the other hand, the ISF charged

28

full billing rates to other state agencies administering federally funded programs. The Board

noted that this could result in cost-shifting among federal programs. *See Arkansas II*, DAB No.

2047, at *4. These factors combined to convince the Board that Arkansas had not demonstrated

an appropriate treatment of undercharges.

In the present matter, GSD has treated all state agencies equally in setting rates,

billing for ISF services, and conducting the retrospective cost settlement. As noted in Section I.E

above, the overcharges to the Human Services Department in 2004 actually disproportionately

impacted billing accounts with *lower* federal participation, rather than the contrary, as in the

*Arkansas* cases. *See* Ex. 5, Peters Affidavit, ¶ 28. The State acted entirely in good faith, and

there is no contention that the State treated customer agencies disparately based on whether they

did or did not administer federally-funded programs (or on any other basis).

B.    GSD Has Furnished Assurances Against Cost-Shifting, As Arkansas Could Not.

GSD has scrupulously addressed the concerns about cost-shifting expressed in the

*Arkansas* cases. *See* Section I.E *supra*. In those cases, "Arkansas did not establish that

permitting offset at the user agency level would not result in shifting costs between federal

programs or from State to federal funds." *Arkansas I*, DAB No. 2010, at *14. By contrast, New

Mexico has provided DCA with reliable, detailed information about service category costs and

about the level of participation by federal programs in the ISF. New Mexico has also

demonstrated that inclusion of the undercharges, using federal program-specific FFP rates,

would not result in any cost-shifting, either between state and federal programs, or among federal

programs.

In the *Arkansas* cases, Arkansas was not monitoring actual per-unit service usage

for each service in the ISF. Arkansas could not determine overcharges or undercharges to state

agencies with accuracy, because it had failed to implement a cost reporting system identifying ISF costs to specific service categories. *Arkansas I*, DAB No. 2010, at *7. By contrast, GSD's cost reporting system monitors the costs of providing each component service within the ISF. *See* Ex. 5, Peters Affidavit, ¶ 4. Each year's cost-revenue comparison, including the one for fiscal year 2004, was based on an accurate identification of actual costs for each service category.

Further, in the *Arkansas* cases, Arkansas complained that DCA's disallowance improperly relied on a proxy FFP (the participation of federal funds in state agencies' total costs), rather than taking into account federal participation in state customer agencies' actual ISF expenditures. However, Arkansas was unable to provide data to identify actual ISF expenditures claimed under federal programs, or the relevant FFP levels for those programs. *Arkansas I*, DAB No. 2010, at *20; *Arkansas II*, DAB No. 2047, at *5. New Mexico, by contrast, has obtained an overall FFP for the Human Services Department using a targeted method: a weighted average of the federal participation that HSD actually claimed for ISF payments during fiscal year 2004. *See* Ex. 7, Sandoval Affidavit, ¶ 13. Moreover, recognizing that even this targeted average could result in cost-shifting, since each billing account reflects a different composition of federal programs, GSD undertook the more accurate analysis described above in Section I.E, to assess the exact impact of overcharges on federal programs.

The Board understood the Arkansas approach as an effort (1) to "'net[] at the bottom line,'" *see Arkansas I*, DAB No. 2010, at *13, by offsetting total undercharges to all state agencies in some service categories, against total overcharges to all state agencies in other categories, even though some of the agencies under consideration handled no federal funds at all; and (2) to consider in one calculation all overcharges and all undercharges for a four-year

period—in effect, to "net" across four years, *see id.* at *10. The New Mexico approach is the polar opposite. It is based on a precise calculation of actual overcharges and undercharges to each federal program for a single year. This approach conforms completely with the terms and the purpose of the governing federal guidance.

III.    THE BOARD SHOULD NOT FOLLOW ITS HOLDING IN *NEW MEXICO I* IN THIS CASE.

In *New Mexico I*, the Board upheld a disallowance in which DCA sought a refund for overcharges in certain information service ISF categories without taking into consideration the undercharges in other categories revealed by the same audit. The basis for the Board's ruling was that the undercharge amounts had never been claimed as expenditures in the federal programs to which they related, and thus there had been no opportunity for the amounts to be "substantiated" as eligible for FFP. *New Mexico I*, DAB No. 1876, at *3-*4.

That case is not identical to the present case; the earlier case involved several years of claims, and the State there did not demonstrate as precisely as in this case how the undercharges (and overcharges) would individually impact each federal program. Moreover, the Board in the earlier case was at pains to explain it was not resolving any "generalized conceptual question of when 'netting' is permissible," but was only deciding the case before it. See *New Mexico I*, DAB No. 1876, at *8 n.5. Nonetheless, to the extent that the Board believes that the issue decided in the prior case is essentially the same as that presented in this case, the State asks that the Board look anew at that issue, for it believes that the earlier decision was not correct, was grounded in premises that were not sustainable, and would not be upheld if presented to a reviewing court.

31                                                              000094

A.    The *New Mexico 1* Decision Rests on Invalid Premises.

The core error in the earlier decision was its reliance on two premises: that the undercharge amounts had never been claimed for reimbursement; and that they had not been subjected to the normal review that is available for substantiation of all claims for FFP in federal programs. Neither of these premises is valid.

1.    Appropriate Claims Have Been Submitted to the Federal Grantor Agencies.

The undercharge amounts were claimed for reimbursement. That is at least true to the extent that the undercharges did not exceed the overcharges claimed against particular federal programs. In the present case there were no undercharges that exceeded the overcharges for information service ISF costs (either in the aggregate or at the federal program level) in fiscal year 2004, the year in question. *See* Ex. 9.c, Overcharge Analysis - Federal Programs.

The Board's earlier analysis made the mistake of treating each separate service category in the information services ISF bills as if it were a separate activity unrelated to the other service categories in that particular internal service fund. *See New Mexico I*, DAB No. 1876, at *1. This separate treatment is not required by any law, regulation or published guidance of DCA or of any component agency of HHS, and it is inconsistent with the nature of the ISF fund claiming process that has been developed over many years.

It is not as if the costs associated with the particular service categories within the information services ISF are separately identifiable. Basically, even the direct costs assigned to each of the categories, both in developing the estimated rate and in making the final audit reconciliation, are derived by an allocation process, for the employees whose wages, salaries and benefits make up the bulk of the costs of the fund, and the equipment and intellectual property that is utilized and for which costs are incurred, are attributable to all of the operations covered

000095

by the fund and are not differentiated by the thirty-two service functions into which these labor and equipment costs are divided.

The nature of the thirty-two service categories further demonstrates that functional categories in the information services ISF are not appropriately treated as separate activities for claiming purposes. For the most part, they are simply a breakdown of the functions that are performed by computer systems, or the technical components of the computer systems used for particular functions. For example, several of the categories are labeled "MVS" (MVS stands for Multiple Virtual Storage). *See* Ex. 8.a, List of ISF Categories - 2004; Ex. 8.b, ISF Service Rate Terminology - 2004. MVS refers to a family of operating systems that manage the resources of system servers to provide various application services. The several categories cover different commands performed by the systems (*e.g.*, printing locally, printing to a different location, and transferring data to or from a disk). There are several "I/O" (Input/Output) categories, all of which refer to different ways that data can be transferred from a processor. As can be seen, these so-called service categories are really ways of subdividing the operations of a computer system in technical ways that bear little or no relationship to the way in which costs are incurred. They are no more separate service activities than the various steps in a hospital inpatient procedure are separate services.

Thus, when GSD bills its customer state agencies for their share of the ISF costs, although the bills are broken down by service category, the total bill represents the share of the total labor and equipment costs of the fund allocable to the particular state agencies. And when HSD in turn allocates those bills among the federal programs that participate in the cost of its operations, the federal program is being billed for a share of the overall labor and equipment costs of the information services ISF. *See supra* at 8-10. It is entirely artificial to view this

33

process as constituting separate and isolated bills to the state agencies and claims to the federal programs for each of thirty-two separate information service functions.

This is not to say that the breakdown of ISF costs into service categories serves no purpose. The use of the categories helps to assure a more precise division of the costs among the user state agencies based on their particular usage of the ISF functions. But that benefit can be attained without the need to regard the service categories as completely separate activities for which separate billings to federal programs are demanded,[23] particularly when the only consequence of such separate treatment is to justify the patently inequitable result pursued by DCA in this case of recognizing elements of overcharges to federal programs while ignoring the corresponding undercharges.

The State appreciates that separate services provided by state agencies need to be claimed separately on expenditure reports to federal funding programs. Repayment of an overclaim in expenditures for Medicaid-covered inpatient hospital services, for example, cannot be avoided by pointing to unclaimed undercharges in reimbursement of nursing homes, or physicians. But there is no valid analogy from these different Medicaid services, or from comparable activities claimed against other federal programs, to the claiming of the administrative costs of information service systems, which are predicated on an entirely different

---

[23] It is true that the ASMB C-10 provides that DCA may require "a reconciliation schedule . . . for *each* billing rate" for "those funds which utilize multiple billing rates." Ex. 1, ASMB C-10, Illus. 4-7 (emphasis in original). The guidance notes that an "overall / average fund balance" may not be appropriate where "excess charges may occur in one billed service but undercharges may occur in other billed services," or where "various users do not utilize each/all billed services to the same extent." *Id.* The concerns reflected by these comments relate to cost-shifting and are inapplicable here, where New Mexico has determined the participation of each federal program in cost-revenue variances. Moreover, New Mexico does not provide an "overall" fund balance; the State uses categories in order to measure precisely the services rendered to each account, and now seeks only to consider all category balances in computing a refund.

000097

system of cost identification and claiming. Rather, the closer analogy in the Medicaid setting is to the allocation of costs on a hospital cost report. The allocations may be adjusted up or down as a result of audits, but it is the overall resultant costs that (in a cost reimbursement system) are compared to the interim payments (which may have been set on the basis of different allocations) and that form the basis for a cost settlement.

2.    The Undercharge Amounts Have Been Substantiated in the Manner Contemplated by the Governing Federal Requirements.

This leads to the second erroneous premise of the *New Mexico I* ruling -- that the undercharge amounts revealed by the audit of ISF activities have not been "substantiated." *See New Mexico I*, DAB No. 1876, at *3-4. The Board in the earlier case asserted that without submission of new claims to federal grantor agencies there would be no opportunity to "verify whether the bills reflect necessary costs for services actually ordered and delivered," *id.* at *4, and to assure that the state had "allocate[d] the correct amounts to any participating federal programs in accordance with the CAP and the rules applicable to those program grants." *Id.* Further, "the federal programs would then be in a position to review the claims for allocability and allowability, including timeliness and grant-specific requirements." *Id.* Yet the process established for dealing with claims for ISF costs covers every one of these elements of claim review, and results in complete substantiation of the undercharge amounts taken into consideration in determining the proper refund to the federal government.

The end-of-year audit conducted pursuant to the requirements of Circular A-87 is the means for verifying that the bills for ISF services "reflect necessary costs for services actually ordered and delivered." *Id.* DCA, the cognizant agency for statewide cost allocation

35

plans, has the authority and responsibility to review the state cost reconciliation[24] to ensure that the costs have been properly substantiated, and it does perform that function. DCA reviewed the methodologies that GSD used to generate charges to HSD accounts, and the methodologies that HSD used to allocate those charges to federal programs, and those methods were consistently applied to determine overcharges and undercharges. It is fair to say that particular grantor agencies have neither expertise nor capacity to ascertain whether states have faithfully adhered to the CAPs that govern ISF services. That is why the oversight function for these kinds of activities has been assigned to DCA.[25]

As for the issue of timeliness and grant-specific requirements, allowing consideration of undercharges in determining amounts to be repaid to the federal government in no way impairs the federal programs' ability to enforce their requirements. Each federal program has processed and accepted the claims made by New Mexico for 2004 that included allocated information services ISF costs. None has questioned either the timeliness of those claims or their compliance with limits on administrative claiming. The results of GSD's recent analysis show that *each* HSD-administered federal program experienced an overcharge, taking all service categories into account. *See* Ex. 9.c, Overcharge Analysis - Federal Programs. No requests for federal funds beyond those already submitted and accepted have been made, and

---

[24] As previously indicated, the reconciliation is submitted to DCA as part of the State's annual SWCAP submission.

[25] And if a state were to submit a new claim for previously undercharged costs for certain service categories, it is a certainty that the grantor agency, if it would pay any attention at all to the claim, would ask DCA to determine its validity, for the grantor agency would have utterly no basis for ascertaining the validity of the claim.

000099

thus no issue is presented either of timeliness or of exceeding applicable limits on administrative costs.[26]

The federal rules governing the cost reconciliation for internal service funds confirm that the substantiation of the retrospective cost adjustments does not typically involve the grantor agency, but instead is handled through the cognizant agency's oversight, most often DCA in the public assistance area. This is manifested by the Circular A-87 provision governing adjustments of ISF claims to reflect allowable costs (Attachment C, Paragraph G.4). The cost reconciliation process mandated by that provision is handled at the cognizant agency level. Most of the options for implementing the reconciliation results, including recognition of undercharges, do not require separate claiming, and none contemplates any oversight role for the grantor agencies.

Thus, under adjustment method (c), the State may correct for an undercharge in the base year by an increase in a future year's billing rate. Ex. 3.a, Cir. A-87, Att. C, ¶ G.4. Only DCA, as the cognizant agency, would have sufficient information to determine what portion of the future year's rate change resulted from the Paragraph G.4 adjustment, or whether that adjustment accurately compensated for the undercharges in the past year. Once a future billing rate is adjusted, claims based on it are routinely processed by federal grantor agencies without further review for allocability and allowability. *Cf. New Mexico I*, DAB No. 1876, at *4.

Likewise, option (d), "adjustments to allocated central service costs," Ex. 3.a, Cir. A-87, Att. C, ¶ G.4, when applicable, is entirely a DCA-level responsibility. Grantor agencies

---

[26] If, hypothetically, the audit resulted in an overall undercharge to a federal program, there would be a need for a supplemental claim to the program to make up the difference, which the grantor agency would be in a position to review as it would any claim for timeliness and applicable limits.

0000100

play no role in that process.

Even under option (b), which adjusts claims to federal programs for the year to which the reconciliation relates, *id.,* the grantor agency would have no competence in determining the propriety of the amended claims and their allocation among programs administered by different federal agencies.

And it bears mentioning that federal grantor agencies play no role in the determination of refund amounts under option (a). As in this case, the cognizant agency, here DCA, takes sole responsibility for determining the amount of the refund to be sought.

It is entirely inconsistent with the long-established process for adjusting ISF claims to reflect the results of cost reconciliations to assert that in the determination of undercharges the grantor agencies have any meaningful role to play.

B.     The *New Mexico I* Decision Is Not Supported By Prior Board Precedent.

No precedent prior to *New Mexico I* required the conclusion reached by the Board in that case. The chief decision on which the Board relied in support of its holding *New Mexico I* stands for a principle unrelated to this case: States cannot obtain federal reimbursement for expenditures that are arguably consistent with the purpose of an ISF, but which fall outside the State's SWCAP. In the relied-upon case, *Idaho Division of Financial Management*, DAB No. 1822, 2002 WL 464464 (Mar. 21, 2002), the State had transferred funds out of an ISF into a separate "permanent building fund." The Board found that the State had failed to record any transfers out of the fund in its SWCAP documentation, as HHS rules required. The permanent building fund did not fall within Idaho's SWCAP.

DCA disallowed the federal portion of the transferred amount. In its arguments before the Board, Idaho conceded that it had transferred the funds out of the ISF. Idaho argued, however, that it had spent most of the money on projects that were consistent with the purposes

38

of the ISF. *Id.* at \*3. Idaho asserted that the portion of these expenditures benefiting federal programs should be deducted from the disallowance. The Board held that these expenditures were unsubstantiated because they were not contemplated in the SWCAP. The SWCAP is designed to assure the federal government that states will use federal funds for "specific, known functions," *id.* at \*5, and Idaho had vitiated that assurance, the Board held, by transferring funds out of the ISF without reporting a transfer. *Id.* at \*6.

The principles set forth in *Idaho* make clear that in this matter, any adjustment intended to correct undercharged amounts in an ISF service category is not "unsubstantiated" or an improper "offset," but instead is an integral part of the cost settlement process. All sixteen ISF service categories with undercharges were listed in the ISF rate schedule in New Mexico's SWCAP covering costs for 2004. New Mexico's SWCAP included analysis showing that rates for these service categories did not fully cover costs in fiscal year 2004. Ex. 4.b, 2006 SWCAP Excerpt - Description of Billed Central Services, p. 4. GSD billed state customer agencies including HSD for these sixteen services, and HSD sought federal reimbursement for the expenditures. The purpose of the CAP process is for States to provide federal agencies with clear notice of the categories of expenditures for which they intend to seek federal participation. *See Idaho*, DAB No. 1822, at \*5. GSD diligently accomplished this goal through its documentation of ISF costs and revenues in all thirty-two service categories.

In contrast with *Idaho*, the allegedly "unsubstantiated" undercharges in this matter relate to documented, allowable costs of a Section II billed service. An adjustment is necessary in order to provide appropriate federal participation in these allowable costs, just as an adjustment is necessary in order to reimburse federal programs for amounts contributed in excess of cost in other service categories.

39

0000102

# CONCLUSION

In sum, the refusal to permit consideration of undercharges that are determined in exactly the same manner as the overcharges are determined, for the same time period and in the same internal service fund, covering the activities of the same employees and the use of the same equipment and property, simply because the before-the-fact allocation of the costs of those employees and that equipment and property among categories of information service functions was not precisely equal to the allocation that was made after-the-fact, is about as stark a case of elevating form over substance as could be imagined. It reflects no disrespect for requirements of federal programs designed to assure proper expenditures of federal funds, to conclude that the refusal to take account of the downs while recovering the ups revealed by ISF fund audits cannot be justified by any consideration of program integrity or administrative convenience, but instead represents arbitrary reliance on artificial barriers to a fair and proper determination of what is in fact owed to the federal government.

For all of the reasons stated above, New Mexico respectfully requests that the Board correct the disallowance amount with respect to overcharges to the Human Services Department to reflect that the total amount owed to correct internal service fund overcharges in fiscal 2004 for all three state agencies, including pre-disallowance interest through June 22, 2006, equals $1,852,193.

0000103

Respectfully submitted,

Charles A. Miller
Susannah Vance
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
(202) 662-6000

*Counsel for Appellant*

0000104

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

|  |  |  |
|---|---|---|
| NEW MEXICO GENERAL SERVICES DEPARTMENT, | ) ) | |
| Appellant, | ) ) | |
|  | ) | |
| v. | ) ) | **DOCKET NO. A-06-105** |
| DIVISION OF COST ALLOCATION, | ) ) | |
| Appellee. | ) ) | |

## CERTIFICATE OF SERVICE

I, Susannah Vance, hereby certify that on this 16th of January, 2007, I caused to be filed, by certified mail, return receipt requested, the original and two true copies of the Appellant's Brief and Appeal File.  Copies of Appellant's Brief and Appeal File were served by certified mail and electronic mail on Katherine W. Brown, Acting Principal Regional Counsel, United States Department of Health & Human Services, Region VI, 1301 Young Street, Suite 1138, Dallas, TX, 75202.


Susannah Vance
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 662-6000



# COVINGTON & BURLING LLP

1201 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20004-2401
TEL 202.662.6000
FAX 202.662.6291
WWW.COV.COM

WASHINGTON
NEW YORK
SAN FRANCISCO
LONDON
BRUSSELS

SUSANNAH C. VANCE

TEL 202.662.5354
FAX 202.778.5354
SVANCE @ COV.COM

February 9, 2007

By Certified Mail

June Julien
Departmental Appeals Board
Appellate Division, MS 6127
Room G-644, Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201

**RECEIVED**

FEB 15 2007

**DAB**

Re:    *New Mexico General Services Department*, Board Docket No. A-06-105

Dear Ms. Julien:

In the above-referenced matter, enclosed please find the original affidavits of Robert G. Peters and Donna Sandoval. A facsimile was included in the State's Appeal File submitted January 16, 2007. The State respectfully requests that the original documents be added to the file.

Sincerely,

Susannah Vance

Enclosures

cc:    Charles A. Miller

Katherine W. Brown
Assistant Regional Counsel
U.S. Department of Health &
        Human Services
Region VI
1301 Young Street, Suite 1138
Dallas, TX  75202



0000107



CERTIFIED MAIL

7006 2150 0005 7259 5226

Susannah C. Vance, Esq.

**COVINGTON & BURLING** LLP
1201 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20004-2401

June Julien
Departmental Appeals Board
Appellate Division, MS 6127
Room G-644, Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201

RETURN RECEIPT REQUESTED

## Sacks, Jeffrey (HHS/OS)

**From:**     Brown, Katherine W. (HHS/OGC)
**Sent:**     Friday, February 23, 2007 12:46 PM
**To:**       Sacks, Jeffrey (HHS/OS)
**Cc:**       svance@cov.com; cmiller@cov.com
**Subject:** New Mexico General Services Department, A-06-105

Mr. Sacks,

The Division of Cost Allocation respectfully requests an extension of time to file its reply brief in the above-captioned matter. An extension is necessary due to family illness and medical appointments that will make it difficult for DCA to meet the previously ordered deadline of March 1 for filing its reply brief. DCA proposes that it be permitted to file its reply brief on March 9, 2007, and that the deadline for New Mexico General Services Department's response be likewise extended to March 30, 2007. We have consulted with counsel for New Mexico General Services Department, and they have indicated their consent to the proposed extended deadlines.

We look forward to hearing back from you at your earliest convenience.

Sincerely,

Katherine Brown
Assistant Regional Counsel
U.S. Department of Health and Human Services
Office of the General Counsel, Region VI
(214) 767-3524
katherine.brown@hhs.gov

Counsel for Division of Cost Allocation

0000109

2/23/2007

## Sacks, Jeffrey (HHS/OS)

| | |
|---|---|
| **From:** | Sacks, Jeffrey (HHS/OS) |
| **Sent:** | Friday, February 23, 2007 4:37 PM |
| **To:** | Brown, Katherine W. (HHS/OGC) |
| **Cc:** | svance@cov.com; cmiller@cov.com |
| **Subject:** | RE: New Mexico General Services Department, A-06-105 |

Re:    New Mexico General Services Department, Board Docket No. A-06-105
       Extension of time

Counsel,

The Presiding Board Member has granted DCA's request for an extension of time.  DCA's brief is now due March 9, 2007, and New Mexico may submit a reply brief by March 30, 2007.

By Direction of the Presiding Board Member,

Jeffrey Sacks
Board Staff Attorney

---

**From:** Brown, Katherine W. (HHS/OGC)
**Sent:** Friday, February 23, 2007 12:46 PM
**To:** Sacks, Jeffrey (HHS/OS)
**Cc:** svance@cov.com; cmiller@cov.com
**Subject:** New Mexico General Services Department, A-06-105

Mr. Sacks,

The Division of Cost Allocation respectfully requests an extension of time to file its reply brief in the above-captioned matter.  An extension is necessary due to family illness and medical appointments that will make it difficult for DCA to meet the previously ordered deadline of March 1 for filing its reply brief.  DCA proposes that it be permitted to file its reply brief on March 9, 2007, and that the deadline for New Mexico General Services Department's response be likewise extended to March 30, 2007.  We have consulted with counsel for New Mexico General Services Department, and they have indicated their consent to the proposed extended deadlines.

We look forward to hearing back from you at your earliest convenience.

Sincerely,

Katherine Brown
Assistant Regional Counsel
U.S. Department of Health and Human Services
Office of the General Counsel, Region VI
(214) 767-3524
katherine.brown@hhs.gov

Counsel for Division of Cost Allocation

0000110

2/23/2007

DEPARTMENT OF HEALTH & HUMAN SERVICES

Office of the
General Counsel
Region VI

1301 Young Street, Suite 1138
Dallas, Texas 75202

March 8, 2007

**RECEIVED**

MAR 1 2 2007

DAB

Ms. June Julien, Staff Attorney
Departmental Appeals Board, MS 6132
330 Independence Avenue, SW
Cohen Building, Room G-644
Washington, D.C. 20201

Re:    *New Mexico General Services Department V. DCA, Docket No. A-06-105*

Dear Ms Julien.:

Enclosed please find of the original and (2) copies of the DCA's Brief and Exhibits for
the above referenced matter. If you have any questions or concerns, please do not hesitate to call
me at (214) 767-3524. Thank you for your assistance in this matter.

Sincerely,

Daniel Meron
General Counsel

Kermit R. Williams, III
Acting Chief Counsel

Katherine Brown
Assistant Regional Counsel

cc:    Charles Miller & Susannah Vance
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401



0000111

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

| | | |
|---|---|---|
| **NEW MEXICO GENERAL SERVICES DEPARTMENT,** <br> **Appellant,** | §<br>§<br>§<br>§<br>§<br>§ | MAR 1 . 2007 |
| **vs.** | §<br>§ | **Docket No.    A-06-105** |
| **DIVISION OF COST ALLOCATION,** <br> **Appellee.** | §<br>§<br>§ | |

## APPELLEE DIVISION OF COST ALLOCATION'S MOTION FOR SUMMARY DECISION AND IN THE ALTERNATIVE, APPELLEE'S BRIEF ON THE MERITS

Submitted on March 8, 2007

By:

DANIEL MERON
General Counsel

KERMIT R. WILLIAMS, III
Acting Chief Counsel

KATHERINE W. BROWN
Assistant Regional Counsel
Office of the General Counsel
U.S. Dept. of Health and Human Services
1301 Young Street, Suite 1138
Dallas, TX 75202
Tel.: (214) 767-3524
Fax: (214) 767-4663

Attorney for the Division of Cost Allocation

FILE COPY

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
APPELLATE DIVISION

NEW MEXICO GENERAL SERVICES
DEPARTMENT,
     Appellant,

vs.

DIVISION OF COST ALLOCATION,
    Appellee.

§
§
§
§
§
§
§
§
§
§

Docket No.    A-06-105

## APPELLEE DIVISION OF COST ALLOCATION'S MOTION FOR SUMMARY DECISION AND IN THE ALTERNATIVE, APPELLEE'S BRIEF ON THE MERITS

COMES NOW Appellee, Division of Cost Allocation ("DCA"), by and through its attorney of record, and files a motion for summary decision based on the prior New Mexico General Services Department, DAB No. 1876 (2003). This case involves the same parties and the same issues as the prior New Mexico decision. In light of the absence of new issues, DCA submits that summary decision is appropriate. Alternatively, DCA files this Brief in support of DCA's determination dated June 22, 2006. DCA respectfully submits that the determination in question was proper, and as such, an overpayment and interest are owed to the Department of Health and Human Services.

## I. INTRODUCTION

On July 24, 2006, Appellant New Mexico General Services Department (hereinafter referred to as "Appellant," "New Mexico," or "NMGSD"), appealed the Division of Cost Allocation's determination that a cash repayment in the amount of $4,011,031 is due the federal

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

0000113

government for excess reserve balances as of June 30, 2004. Despite having fully litigated the issue previously before the Departmental Appeals Board (see Dec. 1876 (2003)), NMGSD seeks again to establish that it may "net" or offset costs by customer state agency in order to reduce the overpayment amount. DCA respectfully submits that OMB Circular A-87 does not authorize netting to reduce overpayments as a method of adjusting overpayments.

## II. ISSUES PRESENTED

The following issues are presented for decision or review:

1.    Whether the Board should issue a summary decision in this case.

2.    In the alternative, whether the undercharges identified by NMGSD are allowable and allocable.

3.    Whether the method used by DCA to compute the amount of the disallowance is reasonable and in accord with OMB Circular A-87.

## III. FACTUAL BACKGROUND

NMGSD demonstrates a lengthy history of inaction with regard to adjusting its billing rates and of delay in submitting its annual cost reconciliation.

In March and April 2001, DCA issued determinations for fiscal years ending 1995 through 1999, disallowing more than $8,000,000 in federal funds for billings in excess of costs for central computer services. New Mexico challenged the amount of the disallowances, contending that it should be permitted to offset or "net" undercharges against overcharges in determining the amount owed to the federal government. The Board upheld these determinations in New Mexico General Services Department, DAB No. 1876 (2003); the Board ruled that New Mexico could not use undercharges that represent costs that were never billed to state agencies or claimed from federal programs in an effort to offset the debt incurred as a result of admitted

New Mexico General Services Department (A-06-105) ........................................... 2

overbilling of costs.

In fiscal years ending 2000 through 2004, NMGSD claims to have calculated rates based on estimated costs taking into consideration historical usage. NMGSD Ex. 5, p.2. Despite undertaking these calculations, NMGSD admits that it did not implement the adjusted rates at any time during this time period. Id.

On August 8, 2003, members of the Central States Field Office of DCA met with Edward J. Lopez, Jr., Cabinet Secretary for New Mexico General Services Department; Wanda J. Carrillo, Deputy Cabinet Secretary for New Mexico General Services Department; and James C. Jimenez, Cabinet Secretary for New Mexico Department of Finance and Administration. DCA Ex. 1. At this meeting, DCA and the New Mexico representatives discussed how to bring the required reporting back into compliance with the terms of OMB Circular A-87 in response to the New Mexico General Services Department decision from 2003. Id.

On June 22, 2004, members of the Central States Field Office of DCA met with Wanda J. Carrillo, Deputy Cabinet Secretary of New Mexico General Services Department and Michael S. Friel, the Budget Director of the New Mexico General Services Department. Id. The topic for the meeting was a briefing and discussion relating to New Mexico's rate restructuring project. Id.

On February 4, 2005, DCA issued a determination for fiscal years ending 2000 through 2003, disallowing approximately $3,000,000 in costs for computer services. Including imputed interest, the total owed to the federal government reached $3,274,624. This disallowance resulted from New Mexico's failure to adjust its billing rates in order to eliminate reserves in excess of the amount permitted by OMB Circular A-87. DCA Ex. 5. New Mexico did not

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

appeal the decision; instead, it elected to reimburse the federal government in full.

New Mexico's state-wide cost allocation plan (SWCAP) states that it will perform a "mid-year rate realignment" as well as a year end cost reconciliation. DCA Ex. 2. NMGSD admits that it did not perform the mid-year rate realignment for fiscal year ending (FYE) 2004. NMGSD Ex. 5, p. 4. NMGSD also admits that it did not implement adjusted rates for 2000 through 2004 as noted above. NMGSD Ex. 5, p. 2.

The deadline for submitting the SWCAP, including the cost reconciliation for FYE 2004 was December 31, 2004. NMGSD did not submit the plan until October 15, 2005, approximately 10 months late. DCA Ex. 1. Robert Peters, Executive Budget Analyst in the New Mexico Department of Finance and Administration admits that "the state has been delinquent in submitting the plan on a timely basis since the Stone Age." DCA Ex. 3, p.1.

On February 22, 2006, DCA issued a determination for fiscal year ending 2004, disallowing $4,620,948 in costs for computer services. DCA contended that this represented the federal share of excess reserve balances as of June 30, 2004 (the fiscal year end date). NMGSD Ex. 2. NMGSD submitted additional information seeking to correct the amount of the disallowance. On June 22, 2006, DCA revised the February 22 determination. Id. DCA accepted NMGSD's contention that it used an incorrect allocation methodology to prepare the expenditures by billing category, and therefore, reduced the amount of the disallowance to $3,790,567. Id. Including imputed interest, the total owed to the federal government, as of June 22, 2006, totaled $4,011,031. Id.

On July 24, 2006, NMGSD filed its notice of appeal with the Departmental Appeals Board ("DAB" or "the Board"), asserting that DCA used an unreasonable method to compute the

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

amount of the disallowance.

## IV. APPLICABLE LAW

### A. Allowability and Allocability.

The allowability of costs claimed for reimbursement by NMGSD in its administration of

federal programs is governed by Office of Management and Budget (OMB) Circular A-87.[1] 45

C.F.R. §§74.27(a) and 92.22(b).  To be allowable, costs must be necessary and reasonable for the

proper and efficient administration of a federal award, and must be "allocable" to the award.

OMB Circular A-87, Attachment A, para. C.1.a. OMB Circular A-87, Attachment A, section C

lays out the following criteria for allowability, providing that the cost must be:

> a. Be necessary and reasonable for proper and efficient performance and administration of Federal awards.
>
> b. Be allocable to Federal awards under the provisions of this Circular.
>
> c. Be authorized or not prohibited under State or local laws or regulations.
>
> d. Conform to any limitations or exclusions set forth in these principles, Federal laws, terms and conditions of the Federal award, or other governing regulations as to types or amounts of cost items.
>
> e. Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the

---

[1] The provisions of OMB Circular A-87 apply to all federal agencies responsible for administering programs that involve grants and contracts with state and local governments. 46 Fed. Reg. 9548 (1981). Regulations at 45 C.F.R. §74.27(a) make the cost principles of OMB Circular A-87 applicable to programs administered by HHS; other federal agencies have similar regulations. See 45 C.F.R. §74.27, 59 Fed. Reg. 43,760 (August 25, 1994)). A revised version of OMB Circular A-87 was published in the Federal Register on May 17, 1995 (60 Fed. Reg. 26,484). Citations in this brief are to the revised 1995 version.

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

governmental unit.

.....

i. Be the net of all applicable credits.

j. Be adequately documented.

OMB Circular A-87, Attach. A., para. C.1.a.

The question of reasonableness is particularly important when governmental units or components are predominately federally-funded. In determining the reasonableness of a given cost, consideration is given to market prices for comparable goods or services and whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the governmental unit, its employees, the public at large, and the Federal Government. OMB Circular A-87, Attach. A, paras. C. 2.c, C.2.d.

A cost is *allocable* to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objective in accordance with relative benefits received. OMB Circular A-87, Attach. A, para. C.3.a. Furthermore,

> Any cost allocable to a particular grant or cost objective under the principles provided for in this Circular may not be shifted to other federal grant programs to overcome fund deficiencies, avoid restrictions imposed by law, or grant agreements, or for other reasons.

OMB Circular A-87, Attach. A, para C.3.e.

This case concerns the disposition of federal funds that New Mexico received for central service costs incurred in the administration of federal programs. Central service costs are the costs of services provided by a state on a centralized basis to its various departments

New Mexico General Services Department (A-06-105) .............................................. 6

and agencies, which in turn may receive federal funding for those costs to the extent that they benefit federally-funded programs.  Central services typically include computer services, transportation services, insurance, fringe benefits, general accounting, personnel administration, and purchasing.  Central service costs are either billed to benefitting agencies and programs on an individual fee-for-service or similar basis (billed central service costs), or allocated to the agencies and programs on some other reasonable basis (allocated central service costs).  OMB Circular A-87, Attach. C, paras. A.1, B.1, B.2.  In order to account for the financing of the goods or services it provides to the user departments, the governmental unit supplying the billed central service normally establishes an  "internal service fund."  HHS' Implementation Guide for State, Local and Indian Tribe Governments   ("ASMB C-10"), Pt. 4,  4.8, 4-6.  In this case, the central services in question involve computer services provided by the New Mexico General Services Department.

For each year that a state government claims indirect central service costs for federally funded programs, it must submit a cost allocation plan to the cognizant federal agency.  OMB Circular A-87, Attach. C, para. D.1.  As part of the cost allocation plan, a state government must provide specific documentation about internal service funds, including a fiscal year-end reconciliation schedule showing the revenues, costs, and year-end balance.   Id. at paras. E.3.b.(1), G.4.

Directly funded agencies must include costs incurred for specific periods, including the billed costs of internal service funds.  Because internal service funds are a step removed from the directly funded agencies and because they are required to bill for costs only, OMB Circular

A-87 accommodates these funds ' particular needs by allowing for a working capital reserve and the ability to adjust billing rates as needed to compensate for fluctuations in usage and cost. In return for these accommodations, the state organization overseeing the internal service funds is expected to adjust billing rates as provided in OMB Circular A-87, and if needed, take one of the four actions specified in the circular without requiring prompting from DCA to do so. If action is not taken independently by the state, the responsibility for deciding which of the four authorized actions will be taken shifts to DCA, as specified in the Circular.

Because internal service funds typically operate pursuant to periodic billing cycles, the cost principles provide for a working capital reserve for such funds. Id. at para. G.2. Thus, the reasonable cost of operating an internal service fund includes charges in excess of the full recovery of the costs of the services. However, such charges are limited to those which will establish and maintain a working capital reserve of up to 60 days of cash expenses for normal operating purposes.

Without this allowance for a working capital reserve, the fiscal year-end balance on the A-87 reconciliation for an internal service fund must be zero because federal grantees are not permitted to make a profit by charging the federal grant or program more than the cost of the services. Id. at para. G.4; ASMB C-10, Pt. 1, 1.6, 1-4. Further, while the fiscal year-end balance (determined through the reconciliation process under OMB Circular A-87) can include as much as 60 days of cash expenses for normal operating expenses, such cash expenses may not include depreciation, principal payments, or capital expenditures. ASMB C-10, Pt. 4, 4., 4.7, Ill. 4-7, Pt. I.5.

0000120

As noted above, OMB Circular A-87 provides for "[a] comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable costs of the service . . . [to] be made at least annually . . . " OMB Circular A-87, Attach. C, para. G.4. If the fiscal year-end balance of an internal service fund exceeds the permissible working capital reserve, an adjustment must be made for the difference between the revenue generated by the fund and the allowable costs. OMB Circular A-87, Attach. C, para. G.4; ASMB C-10, Pt. 4, 4.7, Ill. 4-7, Pt. I.6. The adjustment "will be made" by one of the following methods:

> (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustment to future billing rates, or (d) adjustments to allocated central services costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and non-Federal share) exceeds $500,000.

OMB Circular A-87, Attach. C, para. G.4. ASMB C-10 provides guidance as to the timing for issuing the credits or making the adjustments contemplated in OMB Circular A-87. ASMB C-10, 4.8 (Questions and Answers on Part C), 4-12. Specifically, ASMB C-10 states that credits are to be issued in the current year while adjustments are to be made in the "next open fiscal period." Id. Neither OMB Circular A-87 nor ASMB C-10 makes reference to "netting" or offsetting overcharges and undercharges as an acceptable method of adjusting the federal share in the event of an overpayment.

## IV. ARGUMENT & AUTHORITIES

### A. A Summary Decision Should Be Issued in This Case.

In its brief, NMGSD repeatedly asks the Board to "revisit" its prior decision. DCA

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

0000121

contends that to "revisit" is tantamount to "relitigate." In 2003, NMGSD appealed a determination by DCA, contending that it should be permitted to offset undercharges against the determined overcharges. New Mexico General Services Department, DAB No. 1876 (2003). NMGSD raised the same arguments in that case as it has here: that the undercharges are calculated in the same manner as the overcharges and that greater precision can be reached by basing the determination on the results of "netting" or offsetting at the customer level. Id. The Board in 2003 rejected these arguments and provided a lengthy analysis in support of its decision. Id. Specifically, the Board concluded: "we find it impermissible for New Mexico to use the amounts it describes as undercharges in the manner it suggested. First, we have concluded that the undercharges are unsubstantiated, were never charged to any federal programs, and cannot now be claimed through contesting the DCA disallowance. Second, we find that all alternatives to cash repayment of the overcharges have become unavailable, either due to the amount at issue, the passage of time, and/or the present status of the undercharges." Id., Analysis, section 3.    DCA respectfully submits that the current appeal by NMGSD is merely an attempt to relitigate the prior decision, and as such, issuance of a summary decision is the appropriate action for the Board to take.

The Board has been very clear that it does not permit relitigation of identical issues by the same parties. In Louisiana Health and Hospitals, DAB No. 1176 (1990), the Board spoke at length with regard the limitations on the opportunity to relitigate issues:

> .... the Board has a long history of applying informally a practice much like collateral estoppel, in that we frequently charge a party with the burden to show cause why a summary decision should not issue when an earlier decision controls a similar case arising later. This practice arises from a characteristic of many HHS assistance programs: they typically involve an on-going relationship producing

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

0000122

quarterly claims (and disallowances), so issues may arise again and again. Because our process is designed to be relatively fast and informal, because we must be concerned about economy of public resources, and because of the utility of promoting finality of what is, after all, an administrative process, it is appropriate for us to avoid reopening these issues. Thus, generally, we will not do so notwithstanding that there might be new facets or additional arguments, or better presentations by more sophisticated counsel. There is all the more reason for applying this approach where, as here, the parties in the later case are the same as in the earlier one, the issues are the same, and the facts are the same (except that the disallowance is for a later period in a different amount).

Id. See also Montana v. United States, 440 U.S. 147, 153 (1979) (A party may not relitigate any issue "actually and necessarily determined by a court of competent jurisdiction.") The case law supports enforcing finality as to issues that the parties have previously litigated before the Board.. United States v. Utah Construction and Mining Co., 384 U.S. 394, 422 (1966) ("When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose . . . .") See also University of Tennessee v. Elliott, 478 U.S. 788, 797 (1986); K. C. Davis, Administrative Law, section 21:2, "Res Judicata Applies to Administrative Adjudication," and Restatement (Second) of Judgments, section 83 (1982).

The Board is clear on the criteria to be applied in deciding questions of issue preclusion: "(1) the issue to be precluded was the same one involved in the prior litigation; (2) that issue was actually litigated; (3) it was determined by a final judgment; and (4) that determination was essential to the prior judgment." Louisiana Department of Health and Hospitals, DAB No. 1176 (1990);  Virgin Islands Dept. of Human Services, DAB No. 980 at 5 (1988), citing Haize v. Hanover Insurance Co., 536 F.2d 576, 579 (3d Cir. 1976); see also New York State Dept. of

Social Services, DAB No. 828 at 3 (1987). After application of the foregoing criteria, the Board then issues a summary decision to the relevant issues and proceeds to decide any remaining issues. Louisiana Department of Health and Hospitals, DAB No. 1176 (1990).

Here, NMGSD's position is founded on an attempt to relitigate the issues presented in New Mexico General Services Department, DAB No. 1876 (2003). In its hearing request, NMGSD presents only the issue of whether "DCA has used an unreasonable method to compute the amount of the disallowance, which does not reflect the amount of actual overcharges to the federal programs." NMGSD Hearing Request Dated July 24, 2006. NMGSD elaborates on this issue as follows: "Relying on [NMGSD's] profit/loss statement for fiscal year 2004, DCA totaled excess reserves in certain service categories in which revenues exceeded the costs of providing central services. However, the disallowance methodology failed to take into account other service categories in which costs exceeded revenues. Federal programs were undercharged for those services. This methodology represents an unreasonable interpretation of Paragraph G.4's 'refund' remedy." Id. As can readily be seen, NMGSD is asking the Board to find unreasonable the methodology for determining overcharges that the Board expressly found reasonable in DAB No. 1876.

In NMGSD's opening brief, it again presents the same arguments as it did in DAB No. 1876. NMGSD contends that it should be permitted to offset service category overcharges against undercharges. NMGSD Opening Brief pp.17-18, addressed in DAB No. 1876, Analysis, sections 3 and 4. NMGSD argues that the overcharges and undercharges were determined through the same process and are equally reliable. NMGSD Opening Brief, pp. 21-22, addressed in DAB No. 1876, Analysis, section 2 ("According to New Mexico, the same data and methods

DCA used to calculate the overcharges would also provide the amount of the undercharges...").

Additionally, NMGSD makes equitable arguments in favor of allowing it to offset its

unsubstantiated undercharges. NMGSD Brief, pp. 21-24, addressed in DAB No. 1876, Analysis,

section 5 ("5. New Mexico's equitable arguments cannot entitle it to federal funds.").

NMGSD also spends three pages of its brief attempting to distinguish the <u>Arkansas

Department of Information Systems</u> decisions (DAB Nos. 2010 and 2047) from the instant case.

NMGSD Brief, pp. 27-31. This piece of argument does not provide a basis for allowing this case

to go forward administratively, since this issue is one that was generated by NMGSD and not

reflected as a consideration in DCA's determination. See NMGSD Ex. 2. However, to the

extent that NMGSD felt it was necessary to preemptively distinguish its situation from Arkansas,

we will discuss the applicability of the <u>Arkansas</u> decisions later in this brief.

Finally, NMGSD openly argues that the Board should not follow its decision from <u>New

Mexico General Services Department</u>, DAB No. 1876 (2003). NMGSD Brief, pp. 31-39. This

portion of NMGSD's brief simply recognizes that there are little differences between this case

and DAB No. 1876. As noted above, the Board has previously stated that it will not review its

prior determinations "notwithstanding that there might be new facets or additional arguments, or

better presentations by more sophisticated counsel." <u>Louisiana Department of Health and

Hospitals</u>, DAB No. 1176 (1990).

DCA respectfully submits that this case meets the criteria established by the Board for

issuance of a summary decision. The issues to be precluded are the same as in the prior <u>New

Mexico General Services Department</u> decision. The issues were actually litigated, as evidenced

by the lengthy <u>New Mexico General Services Department</u> (DAB No. 1876) decision. The Board

0000125

issued a final decision in the prior case on April 30, 2003, and the Board's decision was not appealed, providing finality to the decision. Finally, the reasonableness of DCA's calculation of the amount owed to the federal government formed the core of DAB No. 1876, and thus, was essential to the prior judgment. See <u>Louisiana Department of Health and Hospitals</u>, DAB No. 1176 (1990); <u>Virgin Islands Dept. of Human Services</u>, DAB No. 980 at 5 (1988), citing <u>Haize v. Hanover Insurance Co.</u>, 536 F.2d 576, 579 (3d Cir. 1976); see also <u>New York State Dept. of Social Services</u>, DAB No. 828 at 3 (1987).

Because NMGSD has merely reiterated the positions it raised in DAB No. 1876, DCA respectfully submits that the Board should not expend further time or resources dealing with relitigation of issues that have been previously decided. Instead, DCA moves the Board to issue a summary decision affirming DCA's methodology and dismissing the case on the basis of issue preclusion.

**B.    NMGSD Failed to Establish that the Undercharges are Allowable and Allocable.**

**1.   The Burden of Proof Under 45 C.F.R. Part 16**

The Board has consistently held that it is a fundamental principle of grants management that the state is required to document its costs, and that the burden of demonstrating the allowability and allocability of costs for which funding was received by the state rests with the state. See, e.g., <u>Maryland Dept of Human Resources</u>, DAB No. 1875 (2003); <u>Idaho Division of Financial Management</u>, DAB No. 1822 (2002); <u>New York State Dept. of Health</u>, DAB No. 1827 (2002) ("the State carries the burden of proof with respect to documentation of its claims"). Therefore, NMGSD bears the burden of demonstrating that it documented its costs and that such costs were allowable and allocable.

## 2. NMGSD's Undercharges are Not Allowable in the Manner Presented.

OMB Circular A-87 clearly provides that the burden is on NMGSD to prove that the undercharges it seeks to utilize in offset are allowable charges. OMB Circular A-87, Attach. A, para. C.1.j. In <u>New Mexico General Services Department</u>, DAB No. 1876 (2003), the Board has ruled that New Mexico cannot rely on costs that *could* have been billed (but were not, in fact, billed) in an effort to reduce an overcharge. <u>Id</u>., Analysis, section 2.

DCA agrees with the Board's analysis in the prior <u>New Mexico</u> decision and submits that offsetting of undercharges against overcharges is not contemplated nor authorized by OMB Circular A-87 or any other competent authority. New Mexico has not taken any steps to claim any of the said undercharges through the accepted procedures for claiming costs. DAB case law has clearly established that DCA is under no obligation to accept undercharges if the state has not taken all appropriate steps to claim the undercharge timely and as prescribed by specific federal program requirements.

In <u>West Virginia Department of Administration</u>, Dec. No. 1465 (1994), the DAB clearly found that adjustment of the disallowance in question for unclaimed and unproven costs was inappropriate. In that case, West Virginia never filed a proper claim for the undercharges; therefore, the federal government did not have the opportunity to determine the allocability or allowability of the costs under any federal program. <u>Id</u>.

Similarly, in <u>Maine Department of Administrative and Financial Services</u>, Dec. No. 1659 (1998), the DAB found that Maine was not entitled to offset the disallowance because Maine had failed to establish that it was entitled to federal reimbursement for any of the supplemental contributions it sought to claim. The DAB found that Maine had failed to claim federal

reimbursement for the supplemental contributions under the appropriate programs and failed to demonstrate that federal funding would have been available under those programs. Id. Furthermore, the Board concluded that, without a showing that Maine's demand for an offset is a proper claim based on statutes and regulations authorizing payment, the Board is without power to grant an offset. Id.

As in the West Virginia, Maine, and New Mexico decisions, the onus is on NMGSD to establish and substantiate the undercharges that it seeks to offset. Since it has failed to do so, any offset or netting against the overcharges here would be inherently improper. In all likelihood, any opportunity for NMGSD to seek reimbursement of an undercharge has been foreclosed due to the passage of time and the timeliness requirements for filing claims for underpayments. NMGSD's failure to timely seek reimbursement for costs is yet another reason why NMGSD should not be permitted to offset the unsubstantiated underpayments against the established overpayments. It would be improper for NMGSD to benefit by an unjustified waiver of the timeliness requirements for filing claims for underpayments based on this appeal. New Mexico General Services Department, DAB Decision No. 1876, Analysis, section 2 (2003)("To allow the [offset of unbilled costs] would be to open a back door to claims evading timely filing requirements which would leave federal budget outlays uncertain indefinitely.").

NMGSD has failed to meet its burden of establishing the allowability and allocability of the undercharges it seeks to use in offsetting the overcharges at issue here. Therefore, NMGSD's argument that it should be permitted to offset undercharges against the acknowledged overpayment cannot be permitted.

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C.    **DCA's Determination is Reasonable.**

1.    **The Board's Authority and Role in Reviewing the Agency's Interpretations and Policy Guidance.**

By regulation, the Board is bound by all applicable laws and regulations. 45 C.F.R. §16.14. OMB Circular A-87 is specifically made applicable to the programs at issue here by 45 C.F.R. §§ 74.27(a) and 92.22(b). See New York State Dept. of Social Services, DAB No. 1601, n. 3 (1996)(concluding that the Board is bound by OMB Circular A-87). Moreover, the Board has previously held that the Circular was properly adopted by HHS under the Administrative Procedure Act and consequently was binding on the states in their administration of federal grant programs. See New York State Dept. of Social Services, DAB No. 1537 (1995) at 2-5. HHS, and specifically DCA, is the cognizant federal agency for purposes of approving the state's cost allocation plans and determining whether costs are properly charged in accordance with that Plan. OMB Circular A-87, Attach. C, para. D.1; see also New York State Department of Social Services, DAB No. 1601, n.1 (1996).

The Board recently summarized its role in evaluating the level of deference to be afforded to the HHS operating divisions' interpretations of statutes and regulations. Alaska Department of Social Services, DAB No. 1919 (2004). In general, the Board has held that, where a statute or regulation is subject to more than one interpretation, the HHS operating division's interpretation is entitled to deference as long as the interpretation is reasonable and the grantee had adequate notice of that interpretation or, in the absence of notice, did not reasonably rely on its own contrary interpretation. Louisiana Department of Health and Hospitals, DAB No. 1772 (2001); see also Community Action Agency of Franklin County, DAB No. 1581 (1996), and decisions cited therein. The degree of deference that the Board accords to a particular operating division's

interpretation depends on a number of factors, such as whether it has been published and in what form, how widely and at what level it has been distributed, what authority the source within the operating division has, whether the interpretation is consistent with other issuances, and whether the interpretation is a long-standing one or appears to be a position adopted in litigation which the agency seeks to enforce retroactively. This approach is similar to that taken by courts when dealing with asserted agency interpretations not embodied in regulations promulgated through notice and comment rulemaking.

Accordingly, the Board has applied any reasonable and permissible interpretation by the operating divisions of ambiguous statutory language if the operating divisions interpretation was timely published in the Federal Register or, failing that, if the state had actual and timely notice of the interpretation. See, e.g. South Dakota Department of Social Services, DAB No. 1847, at 7 (2002); New Jersey Dept. of Human Services, DAB No. 1773 (2001); Louisiana Dept. of Health and Hospitals, DAB No. 1772 (2001).  As such, it is well-settled that an agency's interpretation of its own regulations, of which a party has notice, is entitled to substantial deference unless it is plainly erroneous or inconsistent with the regulation.  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  This deference is at its apex when, as in this instance, a regulation concerns "a complex and highly technical regulatory program in which the identification and classification of relevant criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns." Id.  The interpretation of OMB Circular A-87 lies uniquely within the compass of DCA's expertise.

The Board may not require DCA to show that its reading of the regulation is the only permissible reading, nor may the Board simply adopt an alternative interpretation, as suggested

by NMGSD. New York State Dept. of Social Services, DAB No. 1429 (1994). The burden is on the party challenging the Secretary's reasoning to show that it fails to pass muster under the reasonableness standard. See South Shore Hospital Inc. v Thompson, 308 F.3d 91, 101 (1st Cir. 2002). The burden on NMGSD is even heavier, given that DCA issued similar disallowances in 2001, and the Board ruled that the method of calculating the overpayment used by DCA is reasonable. See New Mexico General Services Department, Decision No. 1876 (2003).

**2.     DCA's Determination is Consistent with the Terms of OMB Circular A-87.**

The foregoing clearly establishes that it is not enough for NMGSD to propose an alternative methodology to the manner in which DCA calculated the overcharge in this case. Instead, in order to prevail, NMGSD must show that DCA was unreasonable in its methodology of calculating the overcharge. There is no dispute that OMB Circular A-87 presents the standard by which the reasonableness of DCA's actions is to be measured. See 45 C.F.R. §74.27.

In reality, NMGSD spends little time in its brief explaining the basis for its contention that DCA's determination is unreasonable. Instead, NMGSD submits an alternative methodology for determining the amount of any overcharges, which includes review of all monthly ISF invoices to the New Mexico Human Services Department (HSD) billing accounts. NMGSD Brief, p. 14. NMGSD proposes that the overcharge be calculated at the customer level (i.e., state agency, such as HSD), in which undercharges are offset against the overcharges. If DCA adopted the methodology proposed by NMGSD, NMGSD argues that it would owe only $1.85 million. NMGSD Brief, p. 40. As noted above, NMGSD's methodology is contingent upon a finding that the undercharges are allowable and allocable. See supra, pages 14-16.

NMGSD's contention that DCA has acted unreasonably here by electing not to adopt

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

NMGSD's proposed methodology is strained.  As noted above, DCA does not consider NMGSD as having established that the undercharges in question are allowable and allocable.  Furthermore, NMGSD's track record of compliance with the requirements of its own SWCAP and the terms of OMB Circular A-87 is far from sterling.  Based on NMGSD's multiple failures in adhering to the requirements of OMB Circular A-87, it strains credulity that DCA's A-87-based methodology of calculating the overcharge should be rejected in favor of NMGSD's *post-hoc* methodology that is not based on the terms of OMB Circular A-87 and contradicts the method in its SWCAP.

The record includes several examples of NMGSD's failure to comply with the terms of OMB Circular A-87 and New Mexico's SWCAP.  For example, according to Robert Peters, the Executive Budget Analyst in the New Mexico Department of Finance and Administration, NMGSD has failed repeatedly to make required adjustments to its rates.  See NMGSD Ex. 5, pp. 2-3, para. 7 ("In fiscal year and the four fiscal years preceding it, GSD calculated rates as set forth above, but did not implement them.").  This adjustment of rates is mandated on an annual basis at OMB Circular A-87, Attach. C, para. G.4.  Nor has New Mexico timely submitted its report to DCA for years.  See DCA Ex. 3 ("As you know, the state has been delinquent in submitting the plan on a timely basis since the Stone Age.").

Likewise, Mr. Peters further reports that "The SWCAP description of this internal service fund contemplates that, as well as a year-end cost reconciliation, a 'mid-year rate realignment' may be performed.  This realignment was not performed in fiscal year 2004."  NMGSD Ex. 5, p. 4, para. 15.  Mr. Peters' admission reflects that NMGSD has actually misrepresented to DCA its efforts to adjust its rates.  The relevant portion of the State of New Mexico SWCAP reflects that

**New Mexico General Services Department (A-06-105)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

contrary to Mr. Peters assertions, this "mid-year rate realignment" was not optional. DCA Ex. 2. NMGSD provided no information or indication that it did not undertake this mid-year rate realignment, and DCA had been led to believe that the mid-year rate realignment had been performed as stated. DCA Ex. 1. Mr. Peters' affidavit represents the first time that DCA was made fully aware that New Mexico was not performing the mid-year adjustment, contrary to the terms of the SWCAP it submitted to DCA.[2] Id.

Such inaction and failure to correct the SWCAP is hardly a surprise, however, in light of the disarray in which NMGSD has found itself over the past several years. According to a recent communication between DCA and Mr. Peters about the status of other reports that have not been timely submitted, Mr. Peters has responded: "The previous management of the General Services Department was removed by the Governor and new management has been in place for about nine month (sic). What the new management found was a financial nightmare, and they are working hard to clean it up.... It's an embarrassing situation for the state, but it is not the fault of the current management at GSD." DCA Ex. 3.

Perhaps most compelling are the Board's own words rejecting a virtually identical proposed methodology in the 2003 case:

> New Mexico argued that the options set out at OMB Circular A-87, Attachment C, para G.4.a-d, address only ways to "handle" billing rates when over- or undercharges have occurred but that the Circular does not deal with "how to calculate" such over- or undercharges in the first place... On this point, according to New Mexico, OMB Circular A-87 is silent. *This argument misses the point.* The provision addresses ways for the grantee to correct billing rates to avoid

---

[2] If a party does not comply with the federal requirements, such as the terms of OMB Circular A-87, it may be considered to have "unclean hands," which the Board has concluded is a relevant consideration in determining an equitable result. Arkansas Department of Information Systems, DAB No. 2010 (2006).

accruing overcharges and undercharges as New Mexico did here. *Had the overcharges come to light earlier, New Mexico might have had additional alternatives to make the needed corrections.* But there is no question of calculation before us. The amounts involved are settled by agreement of the parties. The undercharge amounts are not part of "calculating" the overcharges... neither can they serve the role of retrospectively reducing the overcharges.

New Mexico General Services Department, DAB No. 1876, Analysis, section 4 (2003)(emphasis added).

NMGSD has failed to demonstrate that DCA acted unreasonably in issuing the subject disallowance. In fact, the DAB has previously ruled that DCA's methodology is reasonable. As noted by the DAB in the previous New Mexico General Services Department decision, had NMGSD monitored its rates and undertaken adjustments at the proper time, it would have had choices in how to make the necessary adjustments to eliminate the possibility of the overpayment. Id. However, since NMGSD failed to undertake the needed rate adjustments and/or to issue the appropriate credits, it has become mired in the unenviable position of being subject to the sort of determination that one finds here. The methodology envisioned by OMB Circular A-87 requires that the states comply with the rate adjustment process in a proactive manner.

### 3.    NMGSD Has Failed to Set Forth or Comprehend the Timing Requirements Established in OMB Circular A-87 and in Interpretive Guide C-10.

NMGSD's brief is remarkably silent as to the timing requirements for making adjustments. However, OMB Circular A-87 and ASMB C-10 provide significant guidance as to how long a state has to make adjustments, whether credits or rate adjustments. OMB Circular A-87 provides that states are required to make an *annual* comparison "of the revenue generated by each billed service (whether or not billed or collected) to the actual allowable costs... and an

0000134

adjustment will be made for the difference between the revenue and the allowable costs." OMB Circular A-87, Attach C, para. G.4. The Circular then provides the four mechanisms for putting in place the said adjustment: "(a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments for future billing rates, or (d) adjustments to allocated central services costs." Id. The Circular contains an additional requirement that "[a]djustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and non-Federal) share exceeds $500,000." Id.

Thus, OMB Circular A-87 allows certain actions to be taken to reconcile overcharges and/or undercharges, so long as they are taken as a result of a timely-conducted annual revenue review. This provision does not permit the states to take these sorts of actions at their leisure, but mandates timely adjustments.

It should be noted that OMB Circular A-87 is written in terms of assessing overcharges. However, ASMB C-10 provides clarification on adjustment for undercharges as well as overcharges. ASMB C-10 provides that if the review of a billed service results in the finding of an undercharge, the state may take appropriate action to recover the amount owed it either through an adjustment in the billing rate for the current fiscal year or by carrying forward the loss into the next open fiscal period. ASMB C-10, p. 4-27, para. 4-12. This guidance applies equally to situations of profit or loss. Id.

It should be noted that the Board has previously indicated that these time constraints for making adjustments and reconciliations are not mere window-dressing. The Board has recognized the "time-sensitive nature of the alternatives" for making adjustments. New Mexico

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

General Services Department, No. 1876 (2003).   In the Arkansas Department of Information Systems case (DAB No. 2010 (2006)), the Board addressed similar deficiencies in making billing rate adjustments, stating  "DCA also could also have taken the position that no amounts in excess of the billing rates actually charged were reimbursable because the proper reconciliations and adjustments were not made in a timely manner."

Here, where NMGSD's SWCAP provided for a "mid-year rate realignment" as well as the normal end of year review, realigning the billing rates to eliminate the possibility of an overcharge or undercharge should have been readily achieved.  See DCA Ex. 2.  However, NMGSD admits that it did not comply with the terms of its SWCAP since it did not perform the "mid-year rate realignment." NMGSD Ex. 5, p. 4, para. 15.  Likewise, the annual rate calculation should have allowed NMGSD to adjust its rates to eliminate the possibility of overcharges and undercharges.  However, NMGSD also admits that while it recalculated its rates on an annual basis, it did not implement the new rates.  Id. at 2, para. 7.  "During this period, the cost-based rates originally calculated for fiscal year 1999 continued in use."  Id. at 2-3, para. 7.  These failures have led NMGSD to be in the difficult financial corner that it finds itself in, not unreasonable action by DCA.

NMGSD contends that the "next open fiscal period" referred to in ASMB C-10 for carrying forward the loss "presumably refers to the next fiscal year for which rates are to be set.  For example, where cost data for fiscal year 2004 are finalized in October 2005, the 'next open' fiscal year for a rate adjustment would be fiscal year 2007, since 2006 rates had already gone into effect on July 1, 2005."  NMGSD Opening Brief, p. 23.  DCA disagrees with NMGSD's interpretation.  Application of these rate adjustment provisions in the manner presented by

0000136

NMGSD would merely reward those who unduly delay setting rates, by allowing those states to carry those adjustments into the future to the point where the state gets around to making the rate adjustment.

For example, here, NMGSD admits that it did not put into place revised rates for a five year period. DCA does not agree with NMGSD's apparent belief that an adjustment that should have been made in 1999 could be put into place in 2005 without repercussion simply because NMGSD decided to delay the implementation of revised rates. Clearly, such an interpretation of OMB Circular A-87 and ASMB C-10 is illogical.[3]

ASMB C-10 states that "alternative (b) is correcting billed costs in the *current* year whereas alternative (c) is carrying forward the profit/loss into the *next open* fiscal period." ASMB C-10, 4-12 (emphasis added). The use of the terms "current year" and "next open fiscal period" convey a sense of urgency to completing the needed adjustments. In fact, the Board in the prior New Mexico General Services Department case pointed out just that fact. In discussing this language in the prior decision, the Board noted

> While this response does show that a state could make timely adjustments in either direction in billing rates, it also highlights the time-sensitive nature of the alternatives. Thus, had New Mexico been reconciling each billing rate category annually as required, the alternatives open to it for making adjustments to reflect excess profits and losses in each would have been the same. It did not do so. The alternatives available to correct the over-billed amounts have been narrowed now,

---

[3] Such delay in making adjustments increases the risk of the shifting of costs to programs not responsible for those costs. Cost-shifting is clearly prohibited by OMB Circular A-87. See OMB Circular A-87, Attach. A, para. C.3.c. Allowing adjustments to be made several fiscal years after the costs were incurred "would result in those costs being borne by a set or mix of programs that did not exist when the costs arose. Prompt adjustments ensure that the programs benefitted by the costs actually pay for them." Louisiana Division of Administration, DAB No. 1893 (2003); citing Michigan Dept. of Management and Budget, DAB No. 1811 (2002).

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

0000137

because alternatives (b) and (c) (current credits or future rate changes) are time-limited. The first action would have had to be taken effect the fiscal year in which the revenues exceeded costs and the second would have had to be taken the next fiscal period.

New Mexico General Services Department, DAB No. 1876 (2003). See also Arkansas Department of Information Systems, DAB No. 2010 (2006) ("In New Mexico, the Board pointed out that ASMB C-10 highlights the time-sensitive nature of alternatives (b) and (c) (current credits or future rate changes)."). The Board makes clear in these passages that it recognizes the urgency that OMB and HHS denote in the requirements. Therefore, the Board should reject NMGSD's self-serving reading that would allow, or even reward, states, such as New Mexico, that have been delinquent in their reporting and rate responsibilities "since the Stone Age." DCA Ex. 3.

### 4.    NMGSD's Documents Reflect Inconsistent Treatment of Costs.

Despite NMGSD's protestations that it is not acting in similar manner to Arkansas in the two Arkansas Department of Information Systems cases (see NMGSD Opening Brief, pp. 27-31), DCA's review of NMGSD documents reflects, similar to that uncovered in Arkansas, an inconsistency in the treatment of state -funded programs as opposed to federally-funded programs. While DCA agrees that there appears to be no evidence of *intentional* inconsistent treatment, intent is irrelevant to this DAB review. See Arkansas Department of Information Systems, DAB No. 2047 (2006).[4]

---

[4] NMGSD improperly suggests that DCA "intended [this determination] to function as a penalty." NMGSD Opening Brief, p. 15; see also, NMGSD Opening Brief, p. 24. DCA has not suggested that this determination was in *any way* punitive, and NMGSD points to nothing in the record to support its baseless allegation. However, such allegations from NMGSD are nothing new. Apparently, NMGSD considers recovery of overcharges to be some sort of punitive effort on the part of the federal government. The Board, however, has previously disagreed with

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

"'Inconsistent treatment of costs' generally refers to a grantee's treating federal funds in a manner inconsistent with the grantee's treatment of its own or other funding." Florida Department of Health and Rehabilitative Services, DAB No. 821 (1987); see OMB Circular A-87, Attach. A, para. C.1.e. OMB Circular A-87's prohibition on the inconsistent treatment of costs is clear, making consistent treatment a requirement for the costs to be allowable. OMB Circular A-87, Attach. A, para. C.1.e.

Here, the possibility of inconsistent treatment of costs was not DCA's immediate concern, but was raised by NMGSD in its brief. NMGSD stated "GSD has treated all state agencies equally in setting rates, billing for ISF services, and conducting the retrospective cost settlement." NMGSD Opening Brief, p. 29. Having raised this possibility of inconsistent treatment, DCA decided to examine the documents submitted along with NMGSD's opening brief to determine whether or not costs were treated consistently between state-funded and federally-funded programs. See DCA Ex. 1.[5]

In its analysis, DCA computed various percentages based on information provided by NMGSD to evaluate the relative treatment of New Mexico Human Services Department (HSD) as compared to "All Other" state agencies (as designated in NMGSD Ex. 2, attach. 1).[6] The

_____

NMGSD on this point: "Nor does it appear that DCA is seeking to impose any penalty on New Mexico. New Mexico is simply required to repay what it overcharged. This obligation implies no misconduct." New Mexico General Services Department, DAB No. 1876, section 5 (2003).

[5] It is not DCA's custom to reach the customer level in its assessment of overpayments and underpayments since it is not within the scope of DCA's responsibilities per OMB Circular A-87. DCA Ex. 1. However, given that NMGSD's Exhibit 2, attach 1, set out the necessary information, DCA decided to examine this particular contention raised in NMGSD's brief. Id.

[6] According to the documentation provided by NMGSD, the federal financial participation (FFP) of HSD is 62.89%, while the FFP for "All Others" includes agencies that have FFP as little as

New Mexico General Services Department (A-06-105)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

0000139

results show that, contrary to NMGSD's assertions, during FYE 2004, HSD was overcharged in total for services while all others were undercharged in total. DCA Ex. 1. In addition, DCA's analysis reflects that the cumulative effect of prior FYEs 2000-2003 is that the HSD was undercharged $1,189,224 while "All Others" were undercharged $9,152,175. Id. This lack of balance is the cumulative result for Fiscal Years 2000 – 2003 after NMGSD refunded overcharges totaling $3,016,928 to the federal government. Id.

DCA's analysis of the consistency of the treatment of costs uncovered that, in 2004, HSD was allocated 38% of NMGSD's costs but charged 173% of costs while "All Others" were charged only 80% of costs. Id. HSD was charged 64% of the overcharges while "All Others" were charged only 36% of the overcharges. Id. HSD was charged only 14% of the undercharges ($902,427) while "All Others" received 86% of the undercharges ($5,473,307). Id. See DCA Illustration 1. Of the total profit of $2,800,173 calculated by NMGSD, HSD was the source of $4,954,399 while "All Others" provided $2,154,226 less revenue than the cost of services provided to them. Id. The 2003 Ending Balance of a negative $10.3 million, after adjustments for a refund to the federal government as of June 30, 2003, was caused by undercharges to HSD of $1,189,224 and $9,152,175 for "All Other." Id.

It becomes readily apparent that the methods proposed by NMGSD have resulted in the inconsistent treatment of costs among customer departments and subsequently state and federally funded programs operated by those departments. This inconsistent treatment violates OMB

---

0% (state-funded only programs) to 33% (Department of Children, Youth and Families). DCA Ex.4; NMGSD Ex. 2. Therefore, HSD receives significantly more federal funds than any of the other state agencies, according to the documentation provided by NMGSD in this case.

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28



Docket No. A-96-105
DCA Illustration 1    0000141

Circular A-87, Attachment A, section C 1 which states: "[t]o be allowable under Federal awards, costs must meet the following general criteria: e. Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit."

Therefore, the evidence of record reflects that NMGSD's failure to adjust the billing rates on an annual basis has resulted in a prolonged period of inconsistent treatment of costs. This inconsistency is reflected in the fact that the predominantly state-funded agencies have paid proportionately less of the internal service fund costs than did HSD, the one state agency that was largely federally funded. This case clearly illustrates that an internal service fund with multiple rates such as the one managed by NMGSD cannot meet the requirement of consistent treatment unless it consistently uses the methods described in OMB Circular A-87, Attachment C, section G.4 and ASMB C-10.

The above analysis illustrates why offsetting or "netting" as prohibited in the prior New Mexico General Services Department decision was sound. To have achieved true "consistent treatment" in 2004 and prior years, NMGSD would have had to (1) adjusted individual rates to have eliminated over/under recoveries for 2000 in 2001, for 2001 in 2002 and so forth, or (2) provided rebates or additional charges to customer agencies during 2000 through 2004, in each of those years. Until NMGSD undertakes a systematic approach of adjusting its rates or issuing rebates as provided in OMB Circular A-87, it is foreseeable that NMGSD will continue on this cycle of disallowances issued by the Division of Cost Allocation.

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## VI. CONCLUSION

For the above reasons, DCA respectfully requests that the Board issue a summary decision affirming DCA's determination. In the alternative, should the Board conclude that this appeal does not merely seek to relitigate the issues presented in DAB Decision No. 1876, DCA respectfully submits that NMGSD has not met its burden of showing that the methodology used by DCA is unreasonable. As such, DCA submits that NMGSD should be ordered to pay the overpayment in the amount of $4,011,031 plus accrued interest.

Finally, DCA seeks any further relief to which it may be entitled.

Respectfully submitted,

DANIEL MERON
General Counsel

KERMIT R. WILLIAMS, III
Acting Chief Counsel

KATHERINE W. BROWN
Assistant Regional Counsel
Office of the General Counsel
U.S. Department of Health and Human Services
1301 Young Street, Suite 1138
Dallas, TX 75202
Tel.: (214) 767-3524
Fax: (214) 767-4663

Attorney for the Division of Cost Allocation

New Mexico General Services Department (A-06-105) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

0000143

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appellee Division of Cost Allocation's Motion for Summary Decision and in the Alternative, Appellee's Brief on the Merits was served on Charles Miller and Susannah Vance, attorneys for New Mexico General Services Department, Covington & Burling LLP, 1201 Pennsylvania Avenue, N.W., Washington, DC 20004-2401 by Federal Express, on this 8th day of March, 2007.

Katherine W. Brown

Assistant Regional Counsel

0000144



FROM: DALLAS, TX 75202
CARR: FDX
TRK#: 799600461493
RCVD: 03/09/2007  11:00

TO: BALLARD, JUDITH A
PH: 202-565-0119
MSC: 6127
PCS: 1

FLR: 6TH  MSC: 6127
BALLARD, JUDITH A
PSC/ABS/OTS/CSB

FedEx | Ship Manager | Label 7996 0046 1493

From:  Origin ID: RBDA  (214)767-2506
DANIEL WOLFE
US DHHS OFFICE OF GENERAL COUNSEL
1301 YOUNG STREET
SUITE 1130
DALLAS, TX 75202

**FedEx**

Page 1 of 1

Ship Date: 08MAR07
ActWgt: 1 LB
System#: 5221362/INET7011
Account #: S

SHIP TO: (202)565-0119          BILL SENDER
**Judith Ballard**
DAB/Appellate Division
Cohen Bldg., Rm. G-644
330 Independence Ave., SW
**Washington, DC 20201**

Delivery Address Bar Code

Ref #  GOM/WOLFE
Invoice #
PO #
Dept #

**PRIORITY OVERNIGHT**

TRK#  7996 0046 1493

20201      -DC-US

**FRI**
Deliver by:
09MAR07

IAD      A1

**ND WASA**

This pouch is reusable

**FedEx** Pak

FedEx Express® Shipments Only

Align top of FedEx Express Shipping Label here.

Press Here. Press Here. Press Here. Press Here. Press Here.

Align bottom of Peel and Stick Airbill or Pouch here.

# COVINGTON & BURLING LLP

| | | |
|---|---|---|
| 1201 PENNSYLVANIA AVENUE NW | WASHINGTON | SUSANNAH C. VANCE |
| WASHINGTON, DC 20004-2401 | NEW YORK | TEL 202.662.5354 |
| TEL 202.662.6000 | SAN FRANCISCO | FAX 202.778.5354 |
| FAX 202.662.6291 | LONDON | SVANCE@COV.COM |
| WWW.COV.COM | BRUSSELS | |

March 30, 2007

## VIA FEDERAL EXPRESS

June Julien
Departmental Appeals Board
Appellate Division, MS 6127
Room G-644, Cohen Building
330 Independence Avenue, SW
Washington, DC 20201

**RECEIVED**

APR - 3 2007

**DAB**

*email transmission*
*rec'd 3/30/07*

Re:     New Mexico General Services Department, Departmental
Appeals Board Docket No. A-06-105

Dear Ms. Julien:

Enclosed for filing in the above-captioned appeal please find one original and two copies of Appellant's Reply Brief, filed on behalf of Appellant New Mexico General Services Department.

Sincerely,

Susannah Vance

Susannah C. Vance

Enclosures

cc:     Katherine W. Brown, Esq.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
APPELLATE DIVISION

NEW MEXICO GENERAL SERVICES
DEPARTMENT,

              Appellant,

    v.

DIVISION OF COST ALLOCATION,

              Appellee.

)
)
)
)
)
)
)
)
)
)
)

DOCKET NO. A-06-105

---

REPLY BRIEF OF APPELLANT
NEW MEXICO GENERAL SERVICES DEPARTMENT

---

Charles A. Miller
Susannah Vance
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004-2401
(202) 662-6000

*Counsel for Appellant*

March 30, 2007



## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ....................................................................................................................1

ARGUMENT........................................................................................................................2

I.  SUMMARY DECISION IS INAPPROPRIATE. ..............................................2

II.  THE STATE HAS PROVEN THAT THE UNDERCHARGES ARE
ALLOWABLE AND ALLOCABLE. ..............................................................3

III.  NO FEDERAL POLICY GUIDANCE JUSTIFIES DCA'S DISALLOWANCE..............7

IV.  THE STATE'S PROPOSED REFUND RESOLVES ANY INCONSISTENT
TREATMENT OF FEDERAL AND STATE FUNDS IN THE ISF. ................................9

CONCLUSION ....................................................................................................................12

0000148

## **TABLE OF AUTHORITIES**

**PAGE**

### DEPARTMENTAL APPEALS BOARD CASES

*Alaska Department of Health & Social Services*, DAB No. 1919 (Apr. 22, 2004)..................8

*Arkansas Department of Information Systems*, DAB No. 2047 (Oct. 6, 2006)......................2, 6, 9

*Arkansas Department of Information Systems*, DAB No. 2010 (Jan. 26, 2006)...........2, 5, 7, 9, 12

*Idaho Division of Financial Management*, DAB No. 1822 (Mar. 21, 2002) ..................................4

*Louisiana Department of Health & Hospitals*, DAB No. 1176 (Jul. 13, 1990)...........................2

*Maine Department of Administration and Financial Services*, DAB No. 1659 (May 4, 1998).....4

*Nebraska Department of Social Services*, DAB No. 1449 (Nov. 22, 1993)...........................2

*New Mexico General Services Department*, DAB No. 1876 (Apr. 30, 2003)..............................2, 3

*New York State Department of Social Services*, DAB No. 1115 (Nov. 20, 1989)....................2

*Pennsylvania Department of Public Welfare*, DAB No. 1523 (Jul. 25, 1995)...........................3

*Texas Office of the Governor*, DAB No. 1608 (Jan. 30, 1997)...................................10, 11

*Virgin Islands Department of Social Services*, DAB No. 980 (Aug. 30, 1988)........................2

*West Virginia Department of Administration*, DAB No. 1465 (Feb. 25, 1994).......................4

### FEDERAL REGISTER

Office of Management and Budget, Final Revision to OMB Circular A-87, 60 Fed.
    Reg. 26,484, 26,489 (May 17, 1995).......................................................... 6-8, 10

### FEDERAL POLICY GUIDANCE

UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, A GUIDE FOR STATE, LOCAL AND
    INDIAN TRIBAL GOVERNMENTS (April 8, 1997) ("ASMB C-10").......................................6-8

0000149

## INTRODUCTION

The New Mexico General Services Department ("GSD" or "the State") files this brief in reply to the Division of Cost Allocation's ("DCA") response brief in support of the instant disallowance.

In its opening brief, the State showed that a refund of $1.85 million (including all pre-disallowance interest, and covering overcharges to the three state agencies included in the disallowance) would restore to federal programs the federal share of overcharges for information services in fiscal year 2004. DCA nonetheless persists in claiming that it is entitled to recover more than twice the correct refund. DCA does not even attempt to argue in its brief that its disallowance of $4,011,031 is necessary to ensure that federal programs pay a rate equaling the allowable cost of services. Instead, DCA has simply repeated its mantra that undercharged amounts are unallowable. DCA assumes as givens assertions that the State has disproven, and ignores the evidence that the State presented with its opening brief showing that each undercharged amount is, in fact, allowable and allocable to federal programs.

While ignoring the State's showing, DCA attempts to justify its disallowance on the newly-advanced ground of unequal treatment of state-funded and federally-funded agencies, but this argument turns out to be a red herring. The appropriate remedy for any unequal treatment is not DCA's disallowance, which creates a windfall for the federal government, but the refund that the State has proposed, which restores overcharged amounts to the federal government.

The State renews its request that the Board modify the amount of the disallowance, or remand this matter to DCA to recompute the disallowance to conform with the requirements of Circular A-87.

## ARGUMENT

I.    SUMMARY DECISION IS INAPPROPRIATE.

The Board should consider this appeal on its merits because (1) the State has provided specific evidence, not presented in the prior case, that all undercharged amounts in dispute are allocable to individual federal programs without causing a net undercharge to any program; and (2) the Board declined in the prior case to adopt a general rule precluding consideration of undercharges in determining the proper refund amount.

In fact, since the Board's previous *New Mexico* decision, DAB No. 1876 (Apr. 30, 2003) ("*New Mexico I*"), the Board has twice clearly signaled that evidence of the sort the State has presented in this appeal could be sufficient to demonstrate that a refund amount should take undercharges into consideration. *See Ark. Dep't of Info. Sys.*, DAB No. 2010, at 3, 40 (Jan. 26, 2006) ("*Arkansas I*"); *Ark. Dep't of Info. Sys.*, DAB No. 2047 (Oct. 6, 2006) ("*Arkansas II*").

The Board has informally applied a concept similar to issue preclusion, *see Louisiana Dep't of Health & Hosps.*, DAB No. 1176 (Jul. 13, 1990), chiefly where parties failed to present any new evidence that could lead the Board to a different conclusion than the one reached in a previous disallowance involving the same parties. *See Nebraska Dep't of Soc. Servs.*, DAB No. 1449 (Nov. 22, 1993) (rejecting state's arguments where its briefs repeated same arguments as in previous disallowance and did not supply any new evidence for Board consideration); *New York State Dep't of Soc. Servs.*, DAB No. 1115 (Nov. 20, 1989) (same). On the other hand, where a state presents an "entirely new factual question" relevant to whether funds were allowable, the informal policy of issue preclusion does not apply. *See Virgin Islands Dep't of Human Servs.*, DAB No. 980 (Aug. 30, 1988).

Here, the State has not simply added a new line of argument or new rhetorical flourishes to the same case that it presented in a previous appeal. Instead, it has built its appeal

2

on a new factual foundation: analysis tying service-category undercharges and overcharges to federal programs. DCA misstates the State's proof when it asserts that the State "proposes that the overcharge be calculated at the customer level (i.e., state agency, such as HSD)." Brief of the Division of Cost Allocation ("DCA Br.") at 19. The State has instead calculated overcharges at the federal program level within the Human Services Department ("HSD"). *See* State's Ex. 9.c, Overcharge Analysis - Federal Programs.

The Board's cautious wording in *New Mexico I*, refusing to "resolve some more generalized conceptual question of when 'netting' is permissible," *New Mexico I*, DAB No. 1876, at n.5, is reason alone for the Board to not to issue a summary decision here. But even if the Board views its previous decision as one of general application, it should consider the issues raised here because aspects of *New Mexico I* appear in retrospect to have been wrongly decided. *See* Opening Brief of New Mexico General Services Department ("State's Br.") at 31-39. The Board is not strictly bound by its prior rulings, but can revisit issues and rule differently in light of new legal or factual developments, such as the State's showing, in this matter, of overcharges at the federal program level. *See Penn. Dep't of Pub. Welfare*, DAB No. 1523 (Jul. 25, 1995).

II.    THE STATE HAS PROVEN THAT THE UNDERCHARGES ARE ALLOWABLE AND ALLOCABLE.

DCA does not even attempt to justify its action, which grants the federal government a windfall of $2 million, *see infra* p. 10, as consistent with the principle of equitable distribution of costs between federal and state programs. Instead, it repeats the conclusory assertion that the undercharged amounts at issue are unallowable because they were not billed.

3

DCA Br. at 15. In fact, the State has proved that the undercharged amounts were properly billed and were allocable to federal programs.[1]

DCA's argument consists of asking the Board to adhere blindly to its ruling in *New Mexico I*. While it avoids rather than confronts the State's evidence tying each undercharge to a federal program, its own factual analysis actually supports the State's showing. Both the chart in DCA's brief (DCA Illustration 1) and Terry Hill's quantitative analysis attached as Exhibit 1 to the DCA brief take the undercharged amounts fully into account, considering them as reliably documented as the overcharges.

The State has met its burden of proving that the amounts undercharged to HSD in sixteen service categories are allowable. The costs were established pursuant to relevant federal rules. New Mexico's statewide cost allocation plan ("SWCAP") identifies the sixteen service areas as allowable, and DCA approved the State's year-end cost reconciliation disclosing the undercharges for these sixteen functions. This case is therefore different from the cases, *W. Va. Dep't of Admin.*, DAB No. 1465 (Feb. 25, 1994); *Me. Dep't of Admin. & Fin. Servs.*, DAB No. 1659 (May 4, 1998), that DCA cites in support of its assertion that the undercharges at issue here are unallowable. In those cases, states sought to offset against overcharges the alleged federal share of categories of costs for which the state had never claimed federal reimbursement. *Id.*; *see* State's Br. at 38-39 (discussing *Idaho Div. of Fin. Mgmt.*, DAB No. 1822 (Mar. 21, 2002)).

---

[1] The State wishes to clarify that this appeal concerns only internal service fund ("ISF") charges to HSD. DCA asserts that it "is not DCA's custom to reach the customer level in its assessment of overpayments and underpayments." DCA Br. at 27 n.5. However, DCA's determination letter contradicts this, imposing a penalty of $3,723,891 for HSD, and $66,676 for the Department of Health ("DOH") and the Children Youth and Families Department ("CYF"). *See* State's Ex. 2 (Disallowance Letter). Because the State has agreed to pay the refund associated with overcharges to DOH and CYF, only charges to HSD are at issue here.

No federal authority supports the view (implied, but not asserted, in the DCA brief) that undercharged amounts can be allowable only if GSD issues new bills to State agencies for the cost shortfall in each undercharged service category. The internal service fund billed HSD for all service units with undercharges, *see Arkansas I*, DAB No. 2010, at 35, and, equally importantly, considering the undercharges would not result in augmenting any federal claim.

The Board has recently counseled that to substantiate undercharges, a state must show whether "*increasing* the amount charged for services (billed [to state agencies] at a lower rate)" would cause the amounts not to be allocable to federal programs under grant-specific rules. *Id.* (emphasis in original). The Board cautioned that unless a state could trace overcharges and undercharges to federal programs, considering undercharges in computing a refund amount (1) could result in exceeding a federal program's cap on administrative expenses, (2) could violate federal programs' rules on timely claims, or (3) could result in cost-shifting among federal programs, where one has a net overcharge and another a net undercharge. *Id.* at 35-36. The State has definitively resolved all three of those concerns in this case by showing that each HSD-administered federal program had a net overcharge, so that no new claim is needed. *See* State's Br. at 36-37; State's Ex. 9.c, Overcharge Analysis - Federal Programs, p.4.

In developing this proof, the State scrupulously followed the Board's guidance in *Arkansas I and II*, in order to provide an alternative to DCA's imprecise disallowance method. *See Arkansas I*, DAB No. 2010, at 40 ("Trac[ing] the billings to the different State agencies through to the federal grants to which they were charged . . . . might lead to a more accurate determination of the amount of overcharges to federal funds."); *id.* at 3 (same); *id.* at 38 (noting that this method would determine "how those undercharges, if combined with the admitted overcharges, did or did not result in any excess claim for federal funds from any grant

program"); *Arkansas II*, DAB No. 2047 (noting that the state was "correct that it would be more accurate to determine a disallowance amount by examining the actual charges to federal programs, rather than by applying an average federal financial participation (FFP) rate to charges to State agencies"). The method adheres to the Department of Health & Human Services' ("HHS") command to assess the impact of both over- and undercharges on individual federal programs when conducting the cost adjustment required by Circular A-87. *See* State's Ex. 1, ASMB C-10, Ch. 4, Pt. 4, 4.8, 4-14 (emphasis added). DCA's method, by contrast, lacks any principled justification.

DCA cites administrative ease as a reason to disregard the user-specific overcharge calculations the State has submitted in the past. *See* DCA Ex. 1, Hill Decl. ¶ 15 ("While we have received information at the department level from [GSD], in the past it was generally too voluminous to analyze for inconsistent cost treatment and cost shifting."); DCA Br. at 26-27 n.4 (same). If DCA views information at the state agency level as too detailed, it is likely even more averse to considering the *more* detailed federal program-specific overcharge data that the Board has exhorted states to provide in previous decisions, and which the State has supplied here. DCA places the State in a Catch 22 by refusing to acknowledge the very information that meets the State's burden of proving undercharges allocable to federal programs.

DCA has instead pursued a cruder (if less cumbersome) disallowance method which creates a large windfall for the federal government in this case and in every instance. It is not difficult to see the advantages to the federal government of this method, but pursuing those advantages subverts the central premise of Circular A-87's cost reconciliation: federal programs must bear their fair share of allowable costs. *See* State's Ex. 1, ASMB C-10, Ch. 4, Pt. 4, 4.8, 4-12; State's Ex. 3.a, Cir. A-87, Att. A, Para. A.1.

6

III.    NO FEDERAL POLICY GUIDANCE JUSTIFIES DCA'S DISALLOWANCE.

The State agrees with DCA's summary of the Board standard for deference to HHS policy guidances, *see* DCA Br. at 17-18, and ASMB C-10, HHS's manual interpreting Circular A-87, clearly warrants deference. That manual interprets the "primary concern" of the Circular A-87 provisions at issue here as "the assurance that the *Federal programs* charged in a given year receive an equitable and appropriate adjustment for the over/*under* billings." State's Ex. 1, ASMB C-10, Ch. 4, Pt. 4, 4.8, 4-14 (emphasis added). What is *not* entitled to deference is DCA's *application* of Circular A-87 in this case, which systematically ignores service-category undercharges and is inconsistent with the interpretation reflected in ASMB C-10.

DCA asserts that it is too late for the State to seek an adjustment that considers both overcharges and undercharges,[2] and claims that the State's brief is silent on the "timing requirements" in the Circular and in ASMB C-10. DCA Br. at 22. In fact, the State, in a four-page section of its brief, demonstrated that (1) ASMB C-10 does not contain the time requirements that DCA asserts, and (2) the Office of Management and Budget ("OMB") decided to reject a proposed version of Paragraph G.4 of Circular A-87, Attachment C, which would have required States to implement cost-revenue adjustments annually. State's Br. at 21-24 (citing OMB, Final Revisions to OMB Circular A-87, 60 Fed. Reg. 26,484, 26,489 (May 17, 1995)). OMB instead revised the paragraph to give States "more options and flexibility in making adjustments to Federal awards." *Id.*

---

[2] The State's failure to submit its SWCAP timely should be irrelevant to the computation of the disallowance amount. *See* State's Br. at 21, 24. It would take the strongest showing to support the contention that a federal agency had adopted a policy of imposing such a harsh penalty for untimely filing of a report. Furthermore, the Board should reject the unsupported assertion that a cost-based refund calculation would "reward" States for delay. DCA Br. at 26. The imposition of imputed interest on overcharges documented in the SWCAP means that States already have a disincentive to delay the adjustment process. *See Arkansas I*, DAB No. 2010, at n.27.

0000156

DCA's emphasis on the "timing requirements" masks the fact that the Circular and ASMB C-10 refute DCA's application of the refund provision which is actually at issue in this appeal. Circular A-87, Attachment C, Paragraph G.4 provides in part,

> an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following adjustment methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment. . . .

State's Ex. 3.a. DCA incorrectly asserts that the Circular "is written in terms of assessing overcharges." DCA Br. at 23. The Circular refers nowhere to overcharges, and the phrase describing the amount to be adjusted—"the difference between the revenue and the allowable costs"—on its face encompasses any cost-revenue variance. *See* State's Br. at 18-19.

ASMB C-10 contains two provisions on the role of undercharges in the Paragraph G.4 adjustment, each supporting the State's view. DCA entirely ignores the chief provision on point: in choosing an adjustment method, "[t]he primary concern would be the assurance that the Federal programs charged in a given year receive an *equitable and appropriate* adjustment of the *over/under* billings." State's Ex. 1, ASMB C-10 Ch. 4, Pt. 4, 4.8 4-14 (emphasis added). Further, in responding to a question about two of the "*four methods* for adjusting internal service funds . . . for *profits or losses* realized from operations," HHS advises that both of the methods focused on in the question include both profits and losses. *Id.* 4-12 (emphasis added).

HHS has not issued any written, prospective guidance stating that the refund provision of Paragraph G.4 excludes undercharges. To the extent that DCA, by citing standards of deference without identifying any applicable policy guidance, implies that the Board must defer to the assertions in DCA's brief in *this* appeal, the Board has made clear its reticence to defer to agency litigation positions. *Alaska Dep't of Health & Soc. Servs.*, DAB No. 1919 (Apr. 22, 2004). If DCA is implying that the Board must defer to DCA's assertion in briefs in *previous*

8

disallowances that the refund mechanism in Paragraph G.4 cannot consider undercharges, that view is also unavailing, since the Board has not fully embraced DCA's interpretation, but has instead noted the inaccuracy of DCA's calculation method. *See Arkansas I*, DAB No. 2010, at 3, 40; *Arkansas II*, DAB No. 2047.

DCA's brief aptly summarizes the standard for Board deference to agency policy guidances such as ASMB C-10. The State urges the Board to adhere to these standards by acknowledging that, under ASMB C-10, the adjustment options in Paragraph G.4 are intended to consider the impact of both overcharges and undercharges on federal programs.

## IV. THE STATE'S PROPOSED REFUND RESOLVES ANY INCONSISTENT TREATMENT OF FEDERAL AND STATE FUNDS IN THE ISF.

In asserting that the State has treated federally-funded and state-funded agencies inconsistently,[3] DCA draws a false analogy between this case and the *Arkansas* decisions. In the *Arkansas* decisions, the state proposed to offset undercharges to solely state-funded agencies against overcharges to federally funded agencies. *Arkansas I*, DAB No. 2010, at 29. Here, only overcharges and undercharges to HSD are disputed, and the $1.85 million refund that the State has proposed adequately corrects any inconsistent treatment within HSD, CYF, and DOH, the three state agencies included in the disallowance.

The State's proposed refund amount restores to the federal government amounts paid in excess of the cost of services. DCA's disallowance rocks the boat in the opposite direction, causing a significant *undercharge* to HSD-administered federal programs—a

---

[3] DCA raises this issue for the first time in its brief, implying that it discovered the alleged inconsistent treatment by reviewing the worksheet attached to Exhibit 2 in the State's appeal file. *See* Hill Decl. ¶ 16. Mr. Hill's assertion that he "do[es] not recall receiving a worksheet that was so easy to analyze" is surprising, since this spreadsheet was included as an attachment to DCA's own determination letter. *See* State's Ex. 2.

0000158

deficiency that the State would be forced to subsidize. Thus, DCA's "remedy results in the same sort of shifting of costs and benefits that led DCA to take the disallowance in the first place." *Texas Office of the Governor*, DAB No. 1608 (Jan. 30, 1997).

DCA's own appeal file illustrates usefully the windfall effect of the DCA disallowance on the federal government. According to the calculations accompanying Terry Hill's declaration, the ISF earned a profit of $4,954,399 from providing services to HSD in fiscal year 2004. DCA Ex. 1, p. 10. Under a disallowance method compliant with Circular A-87, the refund calculation would be based on this gross profit. After making adjustments (which neither party disputes) for fiscal year 2003 ending balances, for allowable working capital reserves, and for imputed interest, DCA would obtain an adjusted fund balance for HSD of $2,728,683. *See* DCA Br. Ex. 1, p. 7; State's Ex. 9.c, p. 4. The federal share of the undisputed adjusted fund balance amount equals $1.68 million, the amount that the State asserts it owes with respect to HSD. State's Ex. 9.c, p. 4. DCA's disallowance of $3.72 million for HSD thus gives the federal government a $2 million windfall. Mr. Hill's quantitative analysis buttresses the State's appeal.

Since its own quantitative analysis would belie the assertion, DCA does not venture to claim that the disallowance under appeal achieves an equitable division of costs between federal and state programs. Instead, DCA relies on the requirement in Circular A-87 of consistent treatment of costs, *see* State's Ex. 3.a, Cir. A-87, Att. A, Para. C.1.e, to assert that in order to treat all state agencies equally, "[GSD] would have to refund charges to the Federal government to the point that Federally funded state departments such as NMHSD are undercharged to the same degree that 'All Others' are. . . ." Hill Decl. ¶ 24.

The fallacy in this formalistic argument is clear. When the ISF undercharges *either* state-only agencies *or* federally funded agencies for a service, it is the State that absorbs

10

0000159

the costs that the ISF failed to recover. Thus, an undercharge to a state-only agency causes no cost-shifting, but an undercharge to a federally-funded state agency causes the state government to bear costs allocable to federal programs. Because ISFs providing information services operate at cost, rather than absorbing risk (as a self-insurance or employee pension fund does) and therefore do not rely on the accumulation of reserves, undercharges to state-only agencies do not adversely impact the quality of ISF services benefiting the federal government. In order to achieve "consistency" under DCA's argument, a state would have to bear a disproportionate share of costs, simply in order to show that state-only and federally-funded agencies were both consistently undercharged.

The Board has rejected DCA's past efforts to use the "consistent treatment" requirement of Circular A-87 to permit the federal government to bear less than its fair share of allowable costs. In *Texas Office of the Governor*, DAB No. 1608, federal programs participated in a Texas state employee health insurance fund to the extent that the employees' work involved federal programs. The state transferred into the plan a group of state university employees with little or no federal participation in their premiums. The Board held that the state had treated state and federal programs inconsistently because the university employees improperly benefited from accrued reserves contributed by the federal government, and a disallowance was warranted. Nonetheless, the Board held that DCA had improperly disallowed *all* federal participation in the fund. DCA could disallow only the amount necessary to ensure that federal programs did not fund the state-only costs of the newly enrolled employees. In this case, similarly, the requirement of consistent treatment of federal and state funds in Circular A-87 cannot justify a disallowance that permits the federal government to pay a rate below cost in sixteen ISF service categories.

11

The Board should dismiss DCA's misguided comparison of this case with the *Arkansas* decisions. In those cases, the Board perceived that the state sought to "net at the bottom line," *Arkansas I*, DAB No. 2010, at 26; that is, to compute a refund amount by subtracting all undercharges to all state agencies, from all overcharges to all state agencies. Because the Arkansas method would use undercharges to state-only agencies to reduce the refund of the federal share of overcharges to federally-funded agencies, the Board understandably concluded that the maneuver would "result in inequity to the Federal Government." *Id.* at 22. The present appeal, by contrast, concerns only one state agency: HSD. Undercharges to solely state-funded agencies, or to CYF and DOH, are not at issue, and the State does not seek to limit its payment to the federal government on this basis. Therefore, the information on the righthand side of DCA's Illustration 1, while it would show the failings of the netting proposed in the *Arkansas* cases, has no bearing here.

DCA offers the issue of inconsistent treatment as a red herring, to distract from the reality that neither the Circular, nor ASMB C-10, nor common-sense principles of federal-state cost-sharing, support DCA's policy of ignoring service-category undercharges.

## CONCLUSION

New Mexico has vigilantly sought to compute federal participation in overcharges so as to guard against cost-shifting. Drawing on the Board's recent guidance in *Arkansas I* and *II,* GSD has determined overcharges with the greatest possible precision. Because federal programs participate to different extents in different HSD billing accounts, and because each account consumes a different mix of services, GSD computed each federal program's participation in overcharges to each HSD billing account. *See* State's Br. at 27; State's Ex. 9.c, Overcharge Analysis - Federal Programs. GSD's method faithfully implements the Circular's directive that federal programs bear their fair share of costs.

12

DCA's attempt to draw a parallel between this case and the *Arkansas* decisions does not withstand scrutiny, and the Board should reject it. The refund that the State has proposed fully corrects any variance in distribution of costs between federal and state programs. DCA's disallowance, on the other hand, simply creates a different inequity, only this time benefiting the federal rather than the state government.

For these reasons and those set forth in its opening brief, the New Mexico General Services Department respectfully requests that the Board modify the disallowance as the State has proposed, or remand this matter to the Division of Cost Allocation with instructions to calculate the disallowance in conformance with federal law.

Respectfully submitted,

Charles A. Miller
Susannah Vance
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
(202) 662-6000

*Counsel for Appellant*

13

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

|  |  |
|---|---|
| **NEW MEXICO GENERAL SERVICES DEPARTMENT,** | ) |
| Appellant, | ) |
|  | ) |
| v. | ) |
|  | ) **DOCKET NO. A-06-105** |
| **DIVISION OF COST ALLOCATION,** | ) |
| Appellee. | ) |
|  | ) |

## CERTIFICATE OF SERVICE

I, Susannah Vance, hereby certify that on this 30th of March, 2007, I caused to be filed, by Federal Express, the original and two true copies of the Appellant's Reply Brief. Copies of Appellant's Reply Brief were served by Federal Express and electronic mail on Katherine W. Brown, Assistant Regional Counsel, United States Department of Health & Human Services, Region VI, 1301 Young Street, Suite 1138, Dallas, TX, 75202.


Susannah Vance
Covington & Burling LLP
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000

0000163



FedEx Express

ORIGIN ID:BVCA 15364
Susannah C. Vance
Covington & Burling LLP
1201 Pennsylvania Ave NW

Washington, DC 20004

System 8610033/FXRU00685
SHIP DATE: 30MAR2007
WEIGHT: 1 LBS

FedEx

FedEx Revenue Barcode
(202) 662 5906

TO: June Julian
Departmental Appeals Board
330 Independence Avenue, SW
Room G-644, Cohen Bldg
Washington, DC 20201

REF: 838278.99901.84441

Delivery Address Barcode (FedEx EDR)

PRIORITY OVERNIGHT
System # 610033 30MAR2007

MON
Deliver by
02APR07

TRK # 9379 9678 9533 FORM 0201

20201 -DC-US

IAD
19 WASA

A1



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Office of the Secretary

Departmental Appeals Board
Appellate Division, MS-6127
Room G-644, Cohen Building
330 Independence Avenue, SW
Washington, D.C. 20201

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Charles Miller
Susannah Vance
Covington & Burling                                    **MAY 1 8 2007**
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401

      and

Katherine Brown
Assistant Regional Counsel
Office of the General Counsel
HHS - Region VI
1301 Young Street, Suite 1138
Dallas, Texas 75202

               Re:  Decision in the Appeal of New
                       Mexico General Services
                       Department
                       Docket No. A-06-105
                       Decision No. 2083
                       Dated: May 17, 2007

Counsel:

Enclosed is a copy of the decision of the Departmental
Appeals Board in the appeal identified above. The
decision constitutes the final administrative action
on this matter.

               Sincerely yours,

               *Carolyn Reines-Graubard*

               Carolyn Reines-Graubard
               Chief, Appellate Division

Enclosure

cc:  Darryl Mayes, Director
      Division of Cost Allocation


FILE COPY

0000165

UNITED STATES OF AMERICA

DEPARTMENT OF HEALTH AND HUMAN SERVICES

*CERTIFICATION OF TRUE COPY*

Pursuant to the provisions of 42 U.S.C. 3505 and the authority vested in me by delegation from the Secretary (see attached memo), I hereby certify that the annexed is a true copy of the document on file in the Department of Health and Human Services.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Department of Health and Human Services to be affixed, on this_____12th_____day of _____October_____20__07____

Constance B. Tobias
Chair
Departmental Appeals Board



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

MAR - 5 1992

Washington, D.C. 20201

TO:      Chair, Departmental
         Appeals Board

FROM:    Terrence J. Tychan
         Acting Deputy Assistant Secretary for
         Management and Acquisition

SUBJECT: Authority to Certify True Copies and Affix the
         Department Seal

Under the authority vested in the Deputy Assistant Secretary for
Management and Acquisition on November 14, 1991 (attached) to
certify true copies and affix the Department Seal for the Office
of the Secretary, I hereby redelegate to the Chair of the
Departmental Appeals Board:

1.  The authority to certify true copies of any books, records,
    papers, or other documents on file within the Department, or
    extracts from such, to certify that true copies are true
    copies of the entire file of the Department, to certify the
    complete original record, or to certify the nonexistence of
    records on file within the Department, and to cause the Seal
    of the Department to be affixed to such certifications.

2.  The authority to cause the Seal to be Affixed to agreements,
    awards, citations; diplomas, and similar documents.

3.  These authorities may be redelegated.

4.  This redelegation supersedes all previous redelegations of
    authorities to the Chair of the Departmental Appeals Board
    relating to this subject.  Further redelegations made under
    previous redelegations of authority shall remain in effect
    until appropriate new redelegations are made.

Attachment

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
APPELLATE DIVISION

RECEIVED

JAN 1 2 2007

DAB

NEW MEXICO GENERAL SERVICES )
DEPARTMENT, )
               Appellant, )
                           )
           v. )
                           )
DIVISION OF COST ALLOCATION, )
               Appellee. )
                           )

DOCKET NO. A-06-105

APPELLANT'S APPEAL FILE

EXHIBIT LIST

1.    UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, A GUIDE FOR STATE,
      LOCAL AND INDIAN TRIBAL GOVERNMENTS (April 8, 1997) ("ASMB C-10") (Excerpt:
      Part 4, "Attachment C - Requirements for Cost Allocation Plans")

2.    June 22, 2006 Disallowance Letter from Henry Williams, Director, Central States Field
      Office, DCA, to Arturo Jaramillo, Secretary, New Mexico General Services Department

3a.   Office of Management & Budget, Final Revision to OMB Circular A-87, 60 Fed. Reg.
      26,484 (May 17, 1995)

3b.   Office of Management & Budget, Proposed Revisions to OMB Circular A-87, 58 Fed.
      Reg. 44,212 (Aug. 19, 1993) (Excerpt: Attachment C)

4a.   New Mexico 2004 Cost Allocation Plan, Based on Costs for Fiscal Year 2002 (Excerpt:
      February 22, 2005 Cost Allocation Agreement)

4b.   New Mexico Proposed 2006 Cost Allocation Plan, Based on Costs for Fiscal Year 2004
      (Excerpt: Description of Billed Central Services - Office of Information Processing /
      Information Systems Division)

5.    Affidavit of Robert G. Peters

6a.   Summary of Human Services Department Billing Accounts

6b.   Flowchart - How ISF Charges Reach HSD-Administered Federal Programs

7.    Affidavit of Donna Sandoval



0000166

8a.    GSD Information Services ISF - Categories (Fiscal Year 2004)

8b.    ISF Service Rate Terminology - Fiscal Year 2004

9a.    Summary of Overcharge Computation at Federal Program Level

9b.    Spreadsheet: Overcharge Analysis - HSD Billing Accounts

9c.    Spreadsheet: Overcharge Analysis - Federal Programs

10.a.   State's Refund Calculation - Federal Program FFP

10.b   State's Refund Calculation - HSD Average FFP

10.c   DCA Refund Calculation - HSD Average FFP

11.    April 30, 2004 GSD Invoice to HSD Billing Account 628

0000167

# EXHIBIT 1

# A GUIDE FOR

## STATE, LOCAL AND INDIAN TRIBAL

## GOVERNMENTS

## COST PRINCIPLES AND PROCEDURES FOR

## DEVELOPING COST ALLOCATION PLANS AND

## INDIRECT COST RATES FOR AGREEMENTS

## WITH THE FEDERAL GOVERNMENT

## IMPLEMENTATION GUIDE FOR

## OFFICE OF MANAGEMENT AND BUDGET

## CIRCULAR A-87

**ASMB C-10**

0000168

Cost Principles and Procedures for

Establishing Cost Allocation Plans and Indirect Cost Rates

for Agreements with the Federal Government

## A GUIDE FOR STATE, LOCAL AND INDIAN TRIBAL GOVERNMENTS

This guide is intended to assist state, local, and Indian tribal governments in applying Office of Management and Budget Circular A-87, which provides principles and standards for determining costs applicable to Federal grants and contracts performed by state, local, and Indian tribal governments.

The procedures in this guide are applicable to grants and contracts awarded by all Federal agencies and have been developed in coordination with the Office of Management and Budget.

This document replaces "A Guide for State and Local Government Agencies" (OASC-10), published December 1976

8 April 1997

U.S. Department of Health and Human Services

This document can be ordered from the U.S. Government Printing Office, Superintendent of Documents, Mail Stop:  SSOP, Washington, DC 20402-9328, 202-512-1800.

0000169

April 8, 1997


**TO USERS OF OMB CIRCULAR A-87 - COST PRINCIPLES FOR STATE, LOCAL AND INDIAN TRIBAL GOVERNMENTS**


Dear Colleague:

The Office of Management and Budget, in Circular A-87, mandates that the Department of Health and Human Services issue implementing material for that document on behalf of the Federal Government. The accompanying *Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government* reflects our efforts to satisfy that mandate. This brochure, last issued in 1976 under the reference OASC-10, is being assigned the new reference number ASMB C-10.

I want to acknowledge the efforts of the Office of Audit Resolution and Cost Policy, in the Office of Grants and Acquisition Management, who had the responsibility for developing this brochure. I also wish to thank the HHS staff, those of other Federal agencies, and OMB who provided much appreciated assistance on this project. Lastly, I would like to acknowledge Management Concepts, Inc., of Vienna, Virginia, who provided advice, layout, and editorial support.

As will be noted, the C-10 is issued in loose-leaf form. Users are encouraged to maintain a subscription with the Government Printing Office in order that they can receive up-dates and changes in the future. This document can also be accessed on HHS's GrantsNet: http://www.os.dhhs.gov/progorg/GrantsNet/index.html. This document may be reproduced without permission.

We welcome your comments and inquiries. Please address them to:

> Director, Office of Audit Resolution and
> Cost Policy
> Rm. 1067 - Cohen Building
> 300 Independence Ave. S.W.
> Washington, D.C. 20201


> Sincerely,


> Terrence Tychan
> Deputy Assistant Secretary for
>    Grants and Acquisition Management

0000170

# PART 4

# Attachment C — Requirements for Cost Allocation Plans

---

**4.1     Highlights of New Section, Attachment C**

A new attachment C has been added addressing Central Service Cost Allocation Plans (commonly referred to as the state-wide cost allocation plan or SWCAP and for local governments, LOCAP). The new Attachment generally has incorporated longstanding practices and procedures contained in internal HHS implementing material as well as historical convention.

**4.2     What is a Central Service Cost Allocation Plan?**

Most governmental units provide certain services, such as motor pools, computer centers, purchasing, accounting, etc., to operating agencies on a centralized basis. Because Federally supported awards are performed within the individual operating agencies, there needs to be a process through which these central service costs can be identified and assigned to benefitted activities on a reasonable and consistent basis. The central service cost allocation plan (CSCAP) provides that process.

**4.3     Content of CSCAPs**

CSCAPs must include all central service costs that will be claimed, whether as a billed or an allocated cost, under Federal awards. Costs of central services omitted from the plan **will not** be reimbursed. Documentation requirements are discussed in section 4.5 below.

Plans must include a projection of the next year's allocated central services cost. This projection should be based on either actual costs for the most recently completed year or the budget projection for the coming year. Plans must also include a reconciliation of actual allocated central services costs to the estimated costs used for either the most recently completed year or the year preceding the most recently completed year.

**4.4     Requirements for Submission of Cost Allocation Plans**

**4.4.1     Role of Cognizant Agencies**

Circular A-87 provides that, for certain larger governmental units and their subdivisions, Federal cognizant agencies will be appointed to review and approve cost allocation plans on behalf of other Federal agencies. The Circular further explains these assignments and the approval process that these agencies will use.

**4.4.2     State Governments and "Major" Local Governments**

All state governments must submit statewide cost allocation plans to the Department of Health and Human Services. All local governments that OMB designates as "major" are also required to submit their plans to a designated cognizant agency unless the

cognizant agency determines otherwise. Note: Indian tribal governments should use guidelines applicable to local governments and local education agencies (LEAs) should follow the procedures established by the U.S. Department of Education.

OMB periodically publishes a listing of major local governments in the *Federal Register.* The most recently published listing is contained in Appendix 2 of this guide. In general, cognizant agencies for local governments are assigned according to the predominance of Federal funding, although other factors such as availability of resources and past history may also be considered.

### 4.4.3    Local Governments Not Considered "Major"

Local governments that are not designated as "major" are not required to submit their cost allocation plans for Federal review and approval unless specifically instructed to do so by a Federal agency. Local governments that only receive funds as a subrecipient of another government should follow instructions from their pass-through grantors concerning submission and review. However, they are expected to prepare and retain their plans for audit by independent auditors and Federal auditors. Pass-through grantors (primary recipients) are expected to review and monitor subrecipient plans to provide reasonable assurance that provisions of Circular A-87 are being followed.

### 4.5    What Are the Documentation Requirements for a CSCAP?

All costs and other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the appropriateness of the costs assigned to Federal awards.

### 4.5.1    Allocated Central Services

The allocated costs of the CSCAP are commonly referred to as "Section I" costs and are categorized as such in both the plan submission and the negotiated agreement. For each allocated central service, the proposed cost allocation plan must:

- briefly describe the service;

- identify the unit rendering the service and the operating agencies receiving the service;

- list the items of expense included in the cost of the service;

- identify the method used to distribute the cost of the service to benefitted agencies; and

- provide a summary schedule showing the allocation of each service to benefitted agencies.

In addition, all proposed cost allocation plans must be accompanied by:

- an organization chart which is sufficiently detailed to show operations, including the central service activities of the governmental unit, regardless of whether they are shown as benefitting from central service functions;

- a copy of the comprehensive annual financial report (CAFR) (or executive budget, if budgeted costs are being proposed) to support the allowable costs of each central service activity included in the plan; and

- a certification that the plan:

  — was prepared in accordance with A-87;

  — contains only allowable costs; and

  — was prepared in a manner that treated similar costs consistently among the various Federal awards and between Federal and nonfederal awards/activities.

### 4.5.2  Internal Service Funds

The internal service funds (ISFs) and other billed services in the CSCAP are commonly referred to as "Section II" costs in both the plan submission and the negotiated agreement. For each internal service fund or similar activity with an operating budget of $5 million or more, the proposed cost allocation plan must include:

- a brief description of each service;

- a balance sheet for each fund based on individual accounts contained in the governmental unit's accounting system;

- a revenue/expenses statement with revenues broken out by source;

- a list of nonoperating transfers (as defined by generally accepted accounting principles) into and out of the fund;

- a description of the methodology used to charge the costs of each service to users, including how billing rates are determined;

- a schedule of current rates; and

- a schedule comparing total revenues (including imputed revenues) generated by the service to the allowable costs of the service under Circular A-87, with an explanation of how variances will be handled.

### 4.5.3  Self-Insurance Funds

For each self-insurance fund, the proposed cost allocation plan must include:

- the fund balance sheet;

- a statement of revenue and expenses, including a summary of billings and claims paid by the agency;

- a listing of all nonoperating transfers into and out of the fund;

- the type(s) of risk(s) covered by the fund;

- an explanation of how the level of fund contributions are determined;

- a description of the procedures used to charge or allocate fund contributions to benefitted activities;

- an identification and explanation of reserve levels in excess of claims:

  — submitted and adjudicated, but not paid;

  — submitted but not adjudicated; or

  — incurred but not submitted; and

- an insurance report.

### 4.5.4  Fringe Benefits Costs

For fringe benefit costs, the proposed cost allocation plan must:

- list fringe benefits provided to covered employees and the overall annual cost of each type of benefit;

- identify current fringe benefit policies; and

- describe procedures used to charge or allocate the costs of the benefits to benefitted activities.

### 4.5.5  Pension and Postretirement Health Insurance Plans

For pension and postretirement health insurance plans, the proposed cost allocation plan must provide:

- the governmental unit's funding policies, if different from actuarially determined rates;

- the pension plan's costs accrued for the year;

- the amount funded and date(s) of funding;

- a copy of the current actuarial report, including the actuarial assumptions;

- the plan trustee's report; and

- a schedule from the activity showing the value of the interest cost associated with late funding.

### 4.5.6  Certification

CSCAPs must be accompanied by a certification, shown in Attachment C, ¶ D.4. (See also 2.9, Government Certification)

**4.6      How Should Allocated Costs Be Presented in a CSCAP?**

**4.6.1    Sample Formats for Central Service Cost Allocation Plans**

The following pages illustrate a central service cost allocation plan. They consist of:

Illustration 4-1 - Statement of Function and Benefit, Personnel Department. The personnel department has been selected as an example of a central service. This schedule is a narrative description of the activities conducted by the personnel department, their necessity (benefits) to the successful performance of Federally supported programs, a description of the base(s) selected to distribute the costs of those activities to the organizations to which services are rendered, and the rationale for the base(s) selected.

Illustration 4-2 - Costs to be Allocated, Personnel Department. This illustration shows the composition of the costs of the personnel department as contained in official financial or budget statements and a reconciliation of those costs with the amount allocated in Illustration 4-1.

Illustration 4-3 - Allocation of Costs, Personnel Department. This illustration shows those state organizations to which the personnel department provides services and the allocation of its costs to those organizations. This illustration is supported by Illustrations 4-1 and 4-2.

Illustration 4-4 - Summary of Allocated Central Service Costs. This illustration shows each central service, and the attendant costs, which benefit Federal grants and contracts and for which a state or local government wishes to make a claim. This summary must be supported by detailed schedules comparable to Illustrations 4-1 — 4-3 for each included central service. (For purposes of preparing Attachment A of the Negotiation Agreement, only those state agencies receiving Federal funds are to be individually listed. The remaining agencies are to be grouped under "other.")

Illustration 4-5 - Summary of Central Services Billed. It is common practice for central service departments to bill those organizations to which they render services for the cost of those services. This summary illustrates the services billed to organizations conducting Federal grants and contracts, the costs included in the billing, the methodology for computing the billing rate, etc.

Amounts allocated to the operating departments from the central service cost allocation plan in Illustrations 4-4 and 4-5 are carried forward to Illustrations 6-1 — 6-4, which provide various sample formats for an indirect cost rate proposal.

Only a few of the many possible central services have been shown in Illustration 4-4 and only one central service department is shown in the accompanying Illustrations 4-1 through 4-3. A central service cost allocation plan may include any other services and their attendant costs which are allowable under OMB Circular A-87 and for which documentation can be provided. Each type of cost claimed should be supported by appropriate schedules and other documentation sufficient to provide a reasonable basis for evaluation and acceptance.

0000175

**Illustration 4-1**

**Sample Central Service Cost Allocation Plan**
**Statement of Function & Benefit, Personnel Department**
**For the Fiscal Year Ended June 30, XXXX**

The personnel department is responsible for overall administration of the Civil Service program. This includes recruiting, interviewing, testing, and referring potential candidates for the more than 2,000 municipal positions.

The personnel department administers the classifications and salary programs and is responsible for recommending personnel policies and procedures to the Civil Service Commission for approval.

The department is involved in the design of the various employee benefit programs. After installation, the department reviews and maintains the records of these programs.

Active and inactive personnel records are maintained on all municipal employees.

The personnel department is responsible for maintaining the safety program (including workmen's compensation and injury level) and the city training programs.

All functions and services performed by the personnel department benefit all departments of the city. Federal programs are benefitted because city employees are hired to work in these programs. Therefore, the costs of the personnel department have been distributed to all departments of the city.

The basis for allocation is the number of employees per department. The base data is readily available and verifiable. All employees receive essentially the same type and level of services. Therefore, this base reflects that condition by distributing the total cost of providing these services to each department in proportion to its relative number of employees.

> This is a sample. In practice, this schedule should be sufficiently detailed to provide narrative explanations of the functions and benefits associated with the costs being allocated.

**Illustration 4-2**

**Sample Central Service Cost Allocation Plan**
**Costs to be Allocated, Personnel Department**
**For the Fiscal Year Ended June 30, XXXX**

| | |
|---|---:|
| Salaries and Wages | $1,088,380 |
| Fringe Benefits (19.8%) | 215,499 |
| Supplies | 113,600 |
| Travel | 26,200 |
| Equipment/Capital Outlay | 41,560 |
| Maintenance and Janitorial Services | 26,040 |
| Miscellaneous | 35,880 |
| Total Cost | $1,547,159 |

Adjustments

| | | | |
|---|---|---|---:|
| Less: | Unallowable Costs | | <40,979> |
| | Capital Outlay | | <41,560> |
| | Costs Chargeable to Federal Grant *(a)* | | <24,000> |
| | | | |
| Add: | Use Allowance | | 15,236 |

Subtotal Adjustments <91,303>

Total Allowable, Allocable Costs $1,455,856 *(b)*

**Notes:**

*(a)*   Represents charges to a Federal grant awarded to assist the state or local government in improving its efforts to hire and train disabled workers. If a supporting agency received an award from the Federal Government, all costs incurred in connection with the award (including any costs that are required for matching or cost sharing) must be eliminated prior to distributing the supporting agency's costs to the user departments or agencies.

*(b)*   The costs allocated must be reconciled to appropriate financial documents, either financial statements, budgets, or a combination of both. In this example, the government's base data was cost incurred for its most recent fiscal year.

> This is a sample. In practice, this schedule should be sufficiently detailed to show the costs of major activities, branches, etc. of the personnel departments in a manner permitting a reasonable assessment of the costs claimed against Federal programs.

0000177

Illustration 4-3

**Sample Central Service Cost Allocation Plan**
**Allocation of Costs, Personnel Department**
**For the Fiscal Year Ended June 30, XXXX**

| Department/Unit | Number of Employees (b) | Percent | Allocation (c) |
|---|---|---|---|
| Health | 188 | 6.61 | 96,232 |
| Environmental Services | 170 | 5.98 | 87,060 |
| Social Services | 61 | 2.14 | 31,155 |
| Highway and Public Transportation | 289 | 10.16 | 147,915 |
| Police | 570 | 20.04 | 291,754 |
| Corrections | 475 | 16.70 | 243,128 |
| Other Departments (a) | 1,091 | 38.37 | 558,612 |
| Total | 2,844 | 100.00 | $1,455,856 |

**Notes:**

*(a)*   Those departments that do not perform Federal programs may be grouped together. However, a one-time schedule is required, listing all agencies or functions listed under "other."

*(b)*   Allocation base must include all full- and part-time employees of all operating departments that are serviced by the personnel department.

*(c)*   Allocated amounts are carried forward to the summary schedule in Illustration 4-4. The total of $1,455,856 comes from Illustration 4-2.

> This is a sample. In practice, the type and level of service provided by the personnel department to the various organizations served may require a separate allocation for each service or to different organizations served.

0000178

Illustration 4-4

## Sample Central Service Cost Allocation Plan
## Summary of Allocated Central Service Costs
## For the Fiscal Year Ended June 30, XXXX

| Department/Operating Unit | Central Service Organizations *(c)* | | | | Total Allocated Costs *(b)* |
|---|---|---|---|---|---|
| | Personnel *(a)* | Accounting/ Cmptr Svcs. | Purchasing | Audit | |
| Health | 96,232 | 201,450 | 34,123 | 16,753 | 348,558 |
| Environmental Services | 87,060 | 216,220 | 22,211 | 12,210 | 337,701 |
| Social Services | 31,155 | 79,841 | 8,960 | 6,452 | 126,408 |
| Highway and Public Transportation | 147,915 | 428,550 | 67,512 | 62,271 | 706,248 |
| Police | 291,754 | 519,605 | 94,751 | 114,211 | 1,020,321 |
| Corrections | 243,128 | 497,431 | 99,970 | 145,260 | 985,789 |
| Other Departments | 558,612 | 1,876,082 | 214,311 | 186,542 | 2,835,547 |
| TOTALS | $1,455,856 | $3,819,179 | $541,838 | $543,699 | $6,360,572 |

**Notes:**

*(a)* Allocated amounts shown are from Illustration 4-3. In an actual plan, the remaining service departments would also need to be supported by separate schedules showing the computation of the allocated amounts.

*(b)* These amounts are includable in the indirect cost proposals of the individual operating departments/units. See Illustrations 6-1 — 6-4.

*(c)* Suggested allocation bases can be found in Section 4.6.2.

> This is a sample. In practice, a state or local government may wish to claim more or fewer activities as charges to Federally supported programs. If so, this Illustration and its supporting schedules (Illustrations 4-1 — 4-3) would need to be modified accordingly.

Illustration 4-5

**Sample Central Service Cost Allocation Plan
Summary of Central Services Billed to User Organizations**

Motor Pool            The state (or local government) operates a central motor pool
                      which makes cars, trucks, and buses available to the user
                      departments. User departments are billed for each mile driven:
                      cars - 40 cents per mile; trucks - 55 cents per mile; and buses -
                      75 cents per mile. The basis for the charge is the most recent
                      study of cost per mile driven, performed by the internal audit
                      staff. Any over- or under recovery is applied to the next year's
                      expected expenditures and is included in that year's billing rate.
                      The costs included are salaries and wages and fringe benefits of
                      motor pool personnel; their travel; supplies and parts; and use
                      charges for equipment, buildings, and vehicles determined in
                      accordance with OMB Circular A-87.

Data Processing       The state (or local government) operates a central data service
                      center (DSC) consisting of a mainframe computer and an area
                      network. The center provides both regular, continuing, and
                      special job computer support to most operating and staff
                      departments. Billings for services are made to user organizations
                      based on a standard price schedule. The price schedule is related
                      to, and designed to recover, the costs of various types of jobs on
                      each system. It is revised quarterly and audited annually by the
                      internal audit department. Profits or losses are carried forward
                      and used to adjust price schedules of ensuing quarterly billing
                      rates. Costs consist of salaries and wages and fringe benefits of
                      center personnel, supplies, maintenance and utilities, and
                      straight-line depreciation of equipment based on a fifteen-year
                      life.

| This is a sample. In actual practice, a complete listing of all billed components of the DSC would be required: e.g., CPU, programming, microfiche, etc. |
| --- |

Long Distance         All long distance telephone calls are placed through a central
Telephone             switchboard and are billed to the organizations making the call.

0000180

**Notes:**

If a direct billing mechanism is used by the government, then all users must be billed, either through actual, memo, or imputed billings. Billing of selected departments and allocation of residual amounts through the cost allocation plan to remaining departments results in inequitable costing and is not acceptable. However, if all users are billed, residual amounts may be allocated through the allocation plan, provided they are not material and the allocation base is equitable.

A detailed breakdown of costs is not normally required as a part of this summary. However, the submitting state or local government must have and make available to the Federal cognizant agency such cost and revenue breakdowns, utilization records, and other information necessary to permit a reasonable assessment of the costs incurred and changes made.

---

This is a sample. In practice, the number and types of services billed may be greater than shown here and may require more extensive description and explanation.

---

### 4.6.2  Suggested Bases for Cost Distribution

Listed below are suggested bases for distributing joint costs of central-type services to local government departments or agencies and to projects and programs utilizing these services. The bases are suggestions only, and should not be used if they are not suitable for the particular services involved. Any method of distribution can be used which will produce an equitable distribution of cost. In selecting one method over another, consideration should be given to the additional effort required to achieve a greater degree of accuracy.

| Type of Service | Suggested Bases for Allocation |
|---|---|
| Accounting | Number of transactions processed |
| Auditing | Direct audit hours |
| Budgeting | Direct hours of identifiable services of employees of central budget |
| Buildings lease management | Number of leases |
| Data processing | System usage |
| Disbursing service | Number of checks or warrants issued |
| Employees retirement system administration | Number of employees contributing |
| Insurance management service | Dollar value of insurance premiums |
| Legal services | Direct hours |
| Mail and messenger service | Number of documents handled or employees served |
| Motor pool costs, including automotive management | Miles driven and/or days used |
| Office machines and equipment maintenance repairs | Direct hours |
| Office space use and related costs (heat, light, janitorial services, etc.) | Square feet of space occupied |
| Organization and management services | Direct hours; Square feet |
| Payroll services | Number of employees |
| Personnel administration | Number of employees |
| Printing and reproduction | Direct hours, job basis, pages printed, etc. |
| Procurement service | Number of transactions processed |
| Local telephone | Number of telephone instruments |
| Health services | Number of employees |
| Fidelity bonding program | Employees subject to bond or penalty amounts |

### 4.7    How Should Billed Costs Be Presented in a CSCAP?

"Billed costs" include internal service funds (ISFs), self-insurance funds (SIFs), and fringe benefits funds (FBFs). Illustrations 4-6 and 4-7 show suggested formats for presenting these costs in the CSCAP proposal. While these formats are not mandated, the information they contain is required, unless the cognizant agency waives the requirement.

Specifically, for all funds, including those under $5 million, a schedule of retained earnings (see e.g., Illustration 4-7) must be submitted which shows:

- the beginning balance for the fiscal year;

- actual and imputed revenues;

- A-87 allowable costs, adjusted for:

    — capital expenditures,

    — depreciation or use allowance,

    — nonrecognized transfers,

    — bad debts,

    — CSCAP allocations,

    — actual or imputed earnings on monthly cash balances and replacement reserves;

- working capital reserve; and

- contributed capital.

Contributed capital consists of unallowable A-87 costs, such as reserves for future asset replacement and capital expenditures, and are funded by nonfederal funds.

For those funds which have operating budgets over $5 million, a schedule of billed services must be submitted. Illustration 4-6 is a suggested format for presenting billings. Again, this format is only for illustration purposes, and is not required. However, the schedule must provide, for each fund:

- billings by user;

- revenues, both actual and imputed; and

- adjustments for the pro rata share of the rate representing bad debts, reserves for replacement costs, capital expenditures, etc.

STATE OF _____ FUND

SUMMARY OF ACTUAL AND IMPUTED REVENUES
FOR THE YEAR ENDING JUNE 30, 19___

Illustration 4-6
Summary of Actual and Imputed Revenues by Fund

ATTACHMENT

| USER AGENCY/DEPARTMENT | RATIO OF FEDERAL ACTIVITY* | TOTAL BILLING | | | IMPUTED REVENUES | | | SUBTOTAL (A-87 REVENUES) | SURCHARGE*** | | TOTAL REVENUES |
| | | COLLECTED BILLINGS@ | | | | | | | | | |
| | | BILLED AT FULL RATE(S) | BILLED AT LESS THAN FULL RATE(S) | UNCOLLECTED BILLINGS** | DIFF BETWEEN (FULL-BILLED RATES) | MEMO BILLING | UNBILLED | | (COLLECTED) | (IMPUTED) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| TOTALS | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

* FOR EXAMPLE, BASED ON EXPENDITURES EXCLUDING FLOW-THROUGH FUNDS.
** ACCOUNTS RECEIVABLE/BAD DEBT EXPENSE
*** FOR EXAMPLE, INCREMENT FOR UNALLOWABLE COSTS SUCH AS INTEREST, RESERVES FOR REPLACEMENT, PROJECTED COST INCREASES, ETC. BILLED TO STATE FUNDS
**** SHOW THIS FIGURE AS "ACTUAL & IMPUTED REVENUES" ON RECONCILIATION OF FUND TO FEDERAL GUIDELINES (ATTACHMENT 6).
***** MUST RECONCILE TO TOTAL ACTUAL COSTS PER STATE FINANCIAL REPORT.
@ MUST RECONCILE TO BILLED REVENUE PER STATE FINANCIAL REPORT.

4-18

0000184

**Illustration 4-7**
**Reconciliation of Retained Earnings**

STATE OF _____
                                FUND                                              ATTACHMENT B
RECONCILIATION OF RETAINED EARNINGS BALANCE TO FEDERAL GUIDELINES
FOR YEAR ENDING JUNE 30, 19 __

PART I    A-87 R.E. BALANCE                                                        (000s)

A-87 R.E. BALANCE JULY 1, 19__
    Balance Per Prior Year's Reconciliation of Fund to A-87                    $0
    (Initial Year, Use CAFR RE Balance at Beginning of Year Less
    Adjustments - e.g., Contrib, Capital)

FY 19 __   RETAINED EARNINGS INCREASE (DECREASE) Per CAFR
    A-87 Revenue (Actual and Imputed)
        From Attachment A                                      $0
        Other-                                                  0
                    Total Revenues                                             $0

    Expenditures (Actual Costs):
        Per State's Financial Report                          $0
        Less A-87 Unallowable Costs (e.g.)-
            Capital Outlay                                    (0)
            Projected Cost Increases/Replacement Reserve      (0)
            Bad Debt                                          (0)
            Other - (e.g., Gain on Disposal of Assets)        (0)

        Plus A-87 Allowable Costs (e.g.)-
            Indirect Costs from SWCAP                           0
            (If Not Allocated in Section I Of SWCAP To User Depts/Programs)
            Depreciation or Use Allowance                      0
            (If Not Included in Actual Costs Above)
            Other-                                             0
                    OMB A-87 Allowable Expenditures                           $0
    Adjustments:
        Imputed Interest Earnings on Monthly Average Cash Balance
        at State Treasury Avg. Rate of Return                  0
        Other-                                                 0
                    Total Adjustments                                         $0

A-87 R.E. BALANCE June 30, 19__                    (A)                        $0                      $0

Allowable Reserve                                  (B)                        $0

Excess Balance (A)-(B)                                                        $0
(If less than zero, the amount on (A) is the beginning A-87 R.E. balance for the next year's reconciliation.
If there is an excess balance, than the federal share should be returned to the federal gov't and the amount
on (B) will be the beginning A-87 R.E. balance for the next year.)

PART II    A-87 CONTRIBUTED CAPITAL BALANCE

A-87 CONTRIBUTED CAPITAL BALANCE JULY 1, 19__                                 $0

TRANSFERS Per CAFR (Supported By Official Accounting Records)
    Plus: Transfers in     (e.g., Contrib, Capital)           $0
    Less: Transfers Out   (e.g., Payback of Contrib, Capital, Other Users of Fund R.E.)   (0)
                Net Transfers                                                 $0
A-87 CONTRIBUTED CAPITAL BALANCE JUNE 30, 19__     (C)                        $0                      $0

PART III    A-87 ADJUSTMENTS BALANCE

A-87 ADJUSTMENTS BALANCE JULY 1, 19__

ADJUSTMENTS:
    Less: A-87 Unallowable Costs                             ($0)
    Plus: A-87 Allowable Costs                                0
    Other-                                                    0
                Total Adjustments                                            $0

A-87 ADJUSTMENTS BALANCE JUNE 30, 19__             (D)                        $0                      $0

PART IV    RECONCILIATION OF A-87 R.E., CONTRIBUTED CAPITAL AND ADJUSTMENTS BALANCES TO CAFR BALANCE

RECONCILIATION OF A-87 R.E., CONTR. CAPITAL & ADJUST. BALANCES TO CAFR (A) + (C) + (D)                $0
(Should Tie to the Fund Balance in the CAFR)

## Instructions for Preparing the Reconciliation of Retained Earnings (R.E.) Balance to Federal Guidelines (Illustration 4-7)

**General.** A reconciliation schedule must be completed for all billed central services, including internal service funds (ISFs), self-insurance funds (SIFs), and fringe benefit funds (FBFs).

For those funds which utilize multiple billing rates (e.g., ADP funds), a reconciliation schedule may be required for **each** billing rate. An overall/average fund balance may not be appropriate, because excess charges may occur in one billed service but undercharges may occur in other billed services. In addition, various users do not utilize each/all billed services to the same extent.

### Part I A-87 R.E. Balance

1. **Beginning A-87 R.E. Balance.** If this is the first time the reconciliation schedule is being prepared, the beginning A-87 R.E. balance should be the R.E. balance on the state's CAFR, including allowable adjustments (e.g., transfers in/transfers out, A-87 unallowable/allowable costs, imputed interest). If the fund has been reviewed in prior years, the beginning balance will be the ending balance from the previous year's reconciliation schedule. However, if adjustments for excess reserve balances have been made, then a zero balance may be the appropriate starting balance.

2. **A-87 Revenues.** Revenues shall consist of all revenues generated by the service, including unbilled and uncollected revenues. If some users were not billed for services (or were not billed at a full rate), a schedule showing the full imputed revenues associated with these users shall be provided (see Summary of Actual and Imputed Revenues - Illustration 4-6). Revenues should also include (i) all other revenues the fund earned from its operation, and (ii) interest earned on reserves. If imputed interest/investment earnings are shown at the bottom of the schedule, these amounts should not be included in this section.

3. **A-87 Expenditures.** The initial expenditure balance should reconcile to the CAFR (or other financial records). Adjustments in accordance with A-87 are made, for example, the exclusion of bad debts and the inclusion of allocated central service costs (SWCAP Section I costs).

4. **Imputed Interest.** There are different methods to compute imputed interest earnings. Currently, one acceptable method is the application of the state's Treasury Average Rate of Return to the monthly average cash balance for the year. If actual interest earned is computed incorrectly, then additional interest may be imputed.

5. **Allowable Reserves.**

   A. **Internal Service Funds.** The allowable reserve for ISFs, which are identified in the CAFR, is equal to the ISF's billing cycle up to 60 days allowable operating expenditures. The reserve is determined by applying a percentage to the allowable operating expenditures (excludes depreciation/use allowance, start-up capital, and any reserves to fund

long-term assets). The percentage is the number of days in the billing cycle days divided by 360.

Reserves for other billed central services that are not identified as ISFs in the CAFR are unallowable.

B.  **Self-Insurance Funds.** The allowable reserve for self-insurance funds is defined in Circular A-87, Attachment B, paragraph 25. d. It is normally limited to the discounted present value of claims (i) submitted and adjudicated but not paid; (ii) submitted but not adjudicated; and (iii) incurred but not submitted.

C.  **Fringe Benefit Funds.**

   (i)  *Medical, Unemployment, and Workers' Compensation Insurance.* See self-insurance funds above.

   (ii)  *Pension Plan.* Actuarial determined, but limited to the amount funded in accordance with Circular A-87, Attachment B, Paragraph 11.e.

   (iii)  *Post-retirement Health Benefits.* Actuarial determined, but limited to the amount funded in accordance with Circular A-87, Attachment B, paragraph 11.f.

   (iv)  *Accrued Leave.* Accrued leave is the amount required to pay leave earned but not taken. The reserve must be a valid liability as defined by GAAP and is limited to the amount funded. It must be supported by the state's payroll records.

   Note: To be considered funded, a reserve must be paid to a trustee (or insurer) who maintains a trust fund or reserve for the sole purpose of paying the specific fringe benefit for which the reserve is established. If there is no funding, costs are recognized when paid.

6.  **Excess Balance.** The Federal share of the excess must be returned to the Federal Government. Exceptions are based on negotiator judgment. For example, the state could credit the appropriate Federal and state programs/agencies for the overcharged amount, or the future billing rates could be reduced.

Interest may be assessed, taking into consideration the time period required to affect the payback.

**Part II A-87 Contributed Capital Balance**

1.  **Transfers In/Transfers Out.** Contributed capital represents contributions by the state to the fund to cover expenditures not allowable under A-87, capital expenditures, reserves for the acquisition of future assets, etc. Transfers in/transfers out are identified in the CAFR and are in compliance with GAAP. Examples include contributed capital to the fund by the state or the transfer out of earned capital/cash to a fund that is having cash flow problems.

**Part III A-87 Adjustments Balance**

1.  **A-87 Adjustments.** Adjustments specific to A-87 must be identified and recorded. The figures should be the same as those identified in Part I above.

**Part IV Reconciliation of R.E., Contr. Capital & Adjustments Balances to CAFR Balance**

1.  The ending balances for Parts I, II, and III are totaled. The total figure should reconcile to the CAFR fund balance.

    Note: If this schedule is for a billed central service that is general funded (and not identified as an ISF in the CAFR), there will be no reconciliation.

**4.8    Questions and Answers on Attachment C**

**4-1    Under what, if any, circumstances can an approved cost allocation plan be reopened by either party? [Att. C]**

With respect to the governmental unit or component, the only circumstance whereby a negotiated plan can be re-opened is noted in Question 4-2 below. The basis for the cognizant agency to reopen the approved plan is stated in Attachment C, paragraph F.2, e.g., if there is a violation of a statute or if submitted information was materially incomplete or inaccurate. Inclusion of unallowable or unallocable costs under Circular A-87 will not be grounds for reopening. In such cases, a roll-forward adjustment or refund will be made at the cognizant agency's option.

**4-2    If a central service activity, either allocated (Section I) or billed (Section II), is omitted when the state/local-wide cost allocation plan (SWCAP/LOCAP) is approved, can the carry forward procedure be used to recover the cost of the omitted activity in a future plan? [Att. C, § C]**

Attachment C, Section C specifically states that costs of central services omitted from the plan will not be reimbursed. However, OMB clarifies in the preamble to the May 17, 1995 *Federal Register* notice of the Circular's issuance that if a service **did not exist** (as opposed to being overlooked) when the plan was prepared, the approved plan can be reopened to include the new activity. In such cases, the plan will be amended to include the nonexistent activity. The definition of "nonexistent" does not include central services that existed when the plan was finally approved, nor those that the state should have known would exist in the future, based on budgets approved by the state legislature.

**4-3    Does Circular A-87 require primary recipients to prospectively review cost allocation plans and negotiate indirect cost rates with all organizations to which it makes cost reimbursement subawards? OMB does not impose a similar requirement on Federal agencies. [Att. C, ¶ D.3]**

Circular A-87 does not specifically prescribe procedures to be used by primary recipients in accepting claims for indirect costs made by organizations to which they make subawards. The Circular states: "Where a local government only

receives funds as a sub-recipient, the primary recipient will be responsible for negotiating indirect cost rates and/or monitoring the sub-recipient's plan. " (Att. C, ¶ D.3.) This would permit a primary recipient to actually engage in prospective review and negotiation. Alternatively, the primary recipient could require subrecipients to develop the necessary documentation concerning indirect charges and retain the documentation for audit and could then review audit reports to determine whether proper cost charging occurred. It would also be acceptable for primary recipients to use a combination of these methods, depending upon the relative size of the subrecipient. As accountability for the Federal funds ultimately rests with the primary recipient, the level of risk and exposure should be the determining factors in what oversight will be required.

**4-4    Attachment C, Section E provides the cognizant agency with flexibility in the types of information and documentation it can require when approving central service cost allocation plans (SWCAPs/LOCAPs). Are there limits on this authority? [Att. C, § E]**

The data and information that a cognizant agency can require is subject to reasonableness. Factors to be considered when assessing documentation needs are: (1) the overall size of the government unit; (2) the timing of previous reviews and the results of such reviews; (3) the appearance of systemic problems; (4) the reoccurrence of problems/issues; (5) the veracity of information provided in the past; and (6) the level of "good faith" exercised in the past by the government or its consultants, if applicable.

**4-5    Attachment C, paragraph E.2 requires that a summary schedule be provided showing the allocation of each service to the specific benefitted agencies. Can the allocations to small or inconsequential agencies be included in a grouping, such as "other"? [Att. C, ¶ E.2]**

Such a practice is permissible where, in fact, the agencies/activities are inconsequential and they receive no Federal awards. However, a narrative description must be provided listing all agencies/activities that have been included in the grouping, so that it can be verified that all operations of the government have been included in the base.

**4-6    Attachment C, paragraph E.3.b. identifies the requirements for the submission of information to the cognizant agency concerning internal service funds (ISFs). What is the definition of an ISF? [Att. C, ¶ E.3.b(1)]**

The definition is provided in generally accepted accounting principles, i.e., a fund used "to account for the financing of goods or services provided by one department or agency to other departments or agencies of a government or to other governments, on a cost-reimbursement basis." *(Codification of Standards of Governmental Accounting,* 1300.104. Governmental Accounting Standards Board.) Internal Service Funds (ISFs) would be separately recognized in the financial statements using the accrual basis of accounting. However, this section of A-87 covers more than ISFs for central service activities of a state or local government. It covers the submission requirements of all central service activities for which the state or local government uses a billing mechanism (formal or memo billing) to assign or allocate costs to other components of the respective government. This requirement applies whether or not the "billed" activity is established in the unit's financial statements as a true ISF under

generally accepted accounting principles.

**4-7    Under a central service cost allocation plan (SWCAP/LOCAP), is the government required to submit documentation for internal service funds (ISFs) with operating budgets under $5 million? [Att. C, ¶ E.3.b(1)]**

Attachment C, paragraph E.3.b(1) specifies documentation requirements for internal services funds (ISFs) with operating budgets of $5 million or more. It also states that the requirements may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis. At a minimum, the government or component must submit a schedule for ISFs under $5 million that reconciles the ISF Retained Earnings. Illustration 4-7 provides a sample schedule format for making such presentations. This schedule provides information that is essential for Federal review and approval of the ISFs and which is not included in the comprehensive annual financial report (CAFR) or other financial statements. In addition, the reconciliation determines an A-87 allowable balance on an on-going basis. Additional documentation may be requested on a case-by-case basis, depending, in part, on the dollar impact on Federal awards and when a detailed review of the ISF was last performed by the cognizant Federal agency.

**4-8    Attachment C, paragraph E.3.b(1) requires the governmental unit to provide a description of the procedures (methodology) used to charge the costs of each service to the user, including how the billing rates are determined. How much detail is required on how billing rates are determined? [Att. C, ¶ E.3.b(1)]**

Like any other aspect of the submission requirements, the governmental unit is required to submit sufficient documentation for the reviewer to make an informed judgement as to the acceptability of the basis used by the unit of government. Such documentation would include: (1) the items of expense making up the billed activity; (2) the specific data used to develop the billing rate(s) and how often they are updated; (3) justification as to why the method used is the most appropriate for the activity; (4) an identification of any users that are not billed, with assurance that their share of services are reflected in the base; (5) how often billings are compared to actual costs and usage; (6) how variances will be adjusted; and (7) any other information the cognizant agency requires to evaluate the reasonableness of the billing system.

**4-9    Attachment C, paragraph E.3.b(2) of the May 4, 1995 revision to Circular A-87 requires that the expenses of the billed function be broken out by object cost categories. In the past, submissions were permitted where a break-out of salaries and wages was made, but a roll-up of all other costs was presented as one amount. Can this practice continue, supported with detailed, on-site accounting records, or must the plans be modified to include the detail? [Att. C, ¶ E.3.b(2)]**

A listing of the items of expenses is required for each central service activity whether it is a billed or unbilled activity. In addition, as noted in the beginning of Attachment C, Section E, the documentation requirements can be reduced by the cognizant agency. For example, reduced documentation might be appropriate for a central service function which has little or no impact on Federal awards. Therefore, the initial plan should address the A-87 documentation requirement, unless the cognizant agency approves otherwise based on the

Federal effort, significance of "roll-up amount," and other factors.

**4-10  Under what circumstances are working capital reserves permitted for internal service funds (ISFs) and how are they to be determined? [Att. C, ¶ G.2]**

Attachment C, paragraph G.2 permits working capital reserves to allow ISFs sufficient cash to sustain operations between billing cycles. While the Circular authorizes reserves of up to 60-day cash needs, their allowability is not automatic. The following factors are to be considered when establishing reserves and determining whether they will be allowable.

(1)  Reserves are only allowable for enterprise funds and bona fide ISFs recognized in the government's comprehensive annual financial report (CAFR). Reserves are not allowable for activities funded through general revenue appropriations.

(2)  For each fund for which a reserve is determined necessary, the number of days of cash needs, up to 60 days, must be fully supported by a cash flow analysis reflecting billing cycles, revenue receipts, and allowable disbursements.

(3)  Semi-annual or annual payments are to be amortized in billing rates.

(4)  Reserves, for purposes of Federal recognition, may only include allowable cash disbursements. Depreciation, principal payments, and capital expenditures are not allowable. However, interest payments are allowable.

(5)  Self-insurance funds, including fringe benefits operating as such, are further subject to the provisions of Circular A-87, Attachment B, paragraph 25.

(6)  Pension funds are subject to Circular A-87, Attachment B, paragraph 11.

(7)  Allowability of reserves covering longer periods can be granted by the cognizant agency in extraordinary circumstances where such needs are fully documented and justified.

**4-11  Earnings on ISF cash balances are to be treated as applicable credits. If a state co-mingles its funds, how is the amount of earnings for a single fund to be determined? [Att. C, G]**

When known, actual earnings should be used. In the circumstances described above, earnings may be imputed by applying the government's, e.g., State Treasurer, Average Rate of Return on the average monthly balance for a given fund.

**4-12  Attachment C, paragraph G.4 establishes four methods for adjusting internal service funds (billed central services) for profits or losses realized from operations. Alternative (b) allows credits to amounts charged to the individual programs. This method would only cover profits. If losses occur, why can't individual programs be debited? [Att. C, ¶ G.4]**

Effectively, alternative (b) is correcting billed costs in the current year, whereas alternative (c) is carrying forward the profit/loss into the next open fiscal period. The failure of the Circular to note how losses are to be treated in alternative (b) is an editing error. For consistency purposes, both alternative (b) and (c) cover profit and loss situations. However, only one method can be used in a given fiscal year.

4-13  **Attachment C, paragraph G.4 allows adjustments to allocated, unbilled central service costs ("Section I costs") as an option for adjusting a particular billed service ("Section II costs") if the amount of the adjustment does not exceed $500,000. May this adjustment be made in the normal course of plan preparation or is prior Federal approval required? [Att. C, ¶ G.4]**

Prior Federal approval is not required by Circular A-87. It should be noted, however, that the $500,000 threshold applies to the entire billing function and not to components of that function.

> **EXAMPLE:** A data service facility typically has numerous cost centers for which it develops individual billing rates. The allocation method for adjusting over/under billings can only be used if the net, total adjustment for the data facility is less than $500,000.

4-14  **For adjustments exceeding $500,000, Attachment C, paragraph G.4 presents three options. What criteria will be used to select the method of recovery? [Att. C, ¶ G.4]**

The primary concern would be the assurance that the Federal programs charged in a given year receive an equitable and appropriate adjustment for the over/under billings. Consideration must also be given to the makeup of the user community in future periods as well as the level of support they will require.

**EXHIBIT 2**



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Program Support Center
Financial Management Service
Division of Cost Allocation
Central States Field Office

1301 Young Street
Room 732
Dallas, Texas 75202
(214)-767-3261
FAX: (214)-767-3264

**CERTIFIED – RETURN RECEIPT REQUESTED**

June 22, 2006



Mr. Art Jaramillo
Cabinet Secretary
New Mexico General Services Department
P.O. Drawer 26110
Santa Fe, New Mexico 87502-0110

Dear Mr. Jaramillo:

The purpose of this letter is to replace our letter of February 22, 2006 to Mr. James C. Jimenez, Cabinet Secretary of the New Mexico Department of Finance Administration, concerning a determination involving the General Services Department – Information Systems Division (ISD) excess reserve balances as of June 30, 2004. This letter changes the amount of the determination and the date from which your deadline for appealing this determination will be determined. It also changes the date from which debt interest will be computed if you elect to not pay the debt by the due date.

To recalculate the amount of the debt we used the attached materials provided to this office subsequent to our determination letter of February 22nd. It is our understanding that you proposed that the debt be reduced from $4,620,948 to $1,716,068 (Attachment Number 1), in part, because incorrect allocation methodology was used by ISD to prepare the expenditures by billing category on which the February 22, 2006 determination was based. Your proposed debt amount of $1,716,068 was also developed based on netting billing rate categories for only the New Mexico Human Services Department. This methodology, as was explained in our telephone conference of June 20, 2006, is not acceptable.

We have recalculated the debt to be $3,790,567 as of June 30, 2004. On Attachment Number 1, we used five billing rate categories which had excess reserve balances in excess of $500,000 as of June 30, 2004. The Federal share of these five categories totaled $3,723,891 for the Human Services Department. We used Attachment Number 2 to obtain the Federal share of the excess reserve for the Children Youth and Families Department and the Department of Health. These amounts totaling $66,676 have been added to Attachment Number 1 resulting in a total debt as of June 30, 2004 of $3,790,567. Interest at the State Treasurer's Office General Fund rate of 2.9%, calculated on Attachment Number 3, from June 30, 2004 to June 22, 2006 is $220,464 (Attachment Number 4) resulting in a total debt as of June 22, 2006 of $4,011,031.

It is the responsibility of the State to operate the ISD internal service fund in compliance with *Office of Management and Budget Circular A-87 Cost Principles for State, Local and Indian Tribal Governments* (A-87), Attachment C, Section G. 4, Adjustments of billed central services which states "Billing rates used to charge Federal Awards shall be based on the estimated cost of providing the services, including an estimate of the allocable central service cost. A comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable cost of the service will be made at least annually and an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following adjustments methods:
(a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central service costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and Non-Federal) share exceeds $500,000."

This is the final decision of the Director, Division of Cost Allocation- Central States Field Office. It shall be the final decision of the Department unless, within 30 days after receiving this decision, you deliver or mail (you should use registered or certified mail to establish the date) a written notice of appeal to the Department of Health and Human Services, Departmental Appeals Board, MS 6127, Appellate Division, 330 Independence Avenue S.W., Cohen Building, - Room G-644, Washington, D.C. 20201. You should attach to the notice a copy of this decision, note that you intend to appeal, state the amount in dispute, and briefly state why you think that this decision is wrong. You will be notified of further procedures.

If you elect not to appeal this decision, please refund $4,011,031 by check made payable to the U. S. Department of Health and Human Services and send it along with a copy of this letter within 30 days of the date of this letter to the following address:

U. S. Department of Health and Human Services
Program Support Center – Fin. Mgmt. Svcs.
Division of Financial Operations
Debt Management Branch
5600 Fishers lane
Parklawn Building, Room 16A-12
Rockville, MD 20857

In addition, please submit to my office copies of your transmittal letter and check. If you have any questions concerning the computation of the payment amount, please call Terry Hill at (214) 767-3263.

This letter constitutes the initial notification of a claim by the United States as required by the Federal Claims Collection Standards (4 CFR 102.2). If payment is not received within 30 days from the date of this notification, interest at the current Private Consumer rate as of the date of this Notice (approximately 12 1/8%), will be assessed in accordance with Department regulations at 45 CFR Part 30.13 and calculated with the Treasury Financial Manual, 1 TFM Part 6, Section 8025. If your organization elects to appeal, we will suspend collection action. However, if the final decision of the appeals process is determined in favor of the Federal

Government (fully or partially), interest will be assessed on the upheld amount from the date of this notification. Questions concerning payment may be addressed to the Debt Management Branch or by calling (301) 443-3083.

Sincerely,

Henry Williams
Director
Division of Cost Allocation
Central States Field Office

Attachments

cc:    Mr. James C. Jimenez
       Cabinet Secretary
       New Mexico Department of Finance Administration
       Bataan Memorial Building, Room 180
       407 Galisteo
       Santa Fe, New Mexico 87501

0000195

JUN. 26. 2006  4:17PM    GENERAL SERVICES         NO. 4070   P. 5





① Source "PINK" WPS by rate

Totals "✓"

10,418

3,723,891    66,676
3,790,567

6/22/06
1-2

**Service:  MVS CPU - Prime**

| Published Rate: | $1,276.00 /CPU Hr (A) | | Cost-Based Rate: | $485.383 /CPU Hr (B) |
|---|---|---|---|---|

**ATTACHMENT NUMBER 2**

*8 pages*

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D / M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)- Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)- Recovery (J - K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | $0 |
| | $1,700 | 7,470 | 7.46% | $22,300 | $9,569 | $13,984 | | $16,934 | | $1,380 | $14,382 | | $0 |
| OSD | $5,434 | 66,7604 | 5.59% | $85,146 | $32,414 | $5,751 | | $55,183 | | $5,142 | $54,351 | | $0 |
| HSD | $72,620 | 763,7626 | 93.07% | $991,073 | $355,173 | $595,199 | | $637,820 | | $50,042 | $118,488 | | $385,618 |
| | $0 | | | | | | | $0 | | $0 | $0 | | $0 |
| | $890 | 3,9474 | 0.33% | $5,031 | $1,813 | $3,117 | | $3,417 | | $304 | 3,219 | | $0 |
| Other | $5,057 | 62,4571 | 4.30% | $59,921 | $20,478 | $41,445 | | $46,501 | | $4,042 | $42,716 | | $0 |
| **Totals** | **$116,138** | **1,195 (M)** | **100.00%** | **1,822,774 (N)** | **880,080 (O)** | **943,894** | **3.23%** | **1,068,823** | **5,470** | **92,024** | **972,689** | | **$496,220** |

(Handwritten annotations:)

*All 3 Total*

*All other 4507*

*#3) $*

*6/22/06 2-1*

C:\WORK\GETERMINATIONS\wm revised 2004 individual billing rate analysis

Service:   MVS CPU - Standard

| Published Rate: | $860.00 /CPU Hr (A) |
| Cost-Based Rate: | $456.333 /CPU Hr (B) |

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Svc Util (D/M) (E) | Revenue: Published Rates (A*D) (F) | Revenue: Cost-Based Rates (B*D) (G) | Client Over/(Under)-Recovery (F-G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (J) | Federal Over/(Under)-Recovery (J-K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $1,891 | 103 | 2.20% | $57,285 | $46,834 | $37,636 | | $47,324 | | $7,808 | $39,707 | | $0 |
| GSD | $153,511 | 140 | 3.01% | $119,201 | $68,088 | $51,132 | | $84,343 | | $10,795 | $34,235 | | $0 |
| HSD | $205,750 | 3,050 | 65.10% | $2,618,921 | $1,485,164 | $1,123,157 | | $1,410,225 | | $237,190 | $1,191,318 | 82.59% | $746,220 |
| PRC | $825 | 8 | 0.14% | | $6,513 | $3,150 | $2,386 | $2,991 | | $590 | $2,519 | | $0 |
| STR | $2,374 | 25 | 0.63% | $20,142 | $11,959 | | | $11,957 | | $1,697 | $9,529 | | $0 |
| Other | $12,917 | 184 | 2.85% | $113,988 | $65,080 | $48,808 | | $61,605 | | $10,324 | $51,605 | | $0 |
| **Totals** | **$445,994** | **4,860 (M)** | **100.00%** | **$3,865,290 (N)** | **$2,292,045 (O)** | **$1,894,240** | **13.80%** | **$2,149,225** | **$12,986** | **$356,849** | **$1,992,962** | | **$753,341** |

C:\WORK\DETERMINATIONS\firm revised 2004 individual billing rate analysis

6/22/06   2-2

0000691

Service:  MVS CPU - NonPrime

| Published Rate: | $425.00 /CPU Hr (A) | | Cost-Based Rate: | $485.383 /CPU Hz (B) | | | | | | | | | |

**Client Revenue Analysis**

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serv Util (D / M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (I · X) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $194 | 2.0174 | 6.12% | $857 | $979 | ($122) | | $73 | | $155 | ($61) | | $0 |
| | | | | | | | | | | | ($101) | | |
| GSD | $1,110 | 11.5833 | 29.24% | $4,897 | $5,593 | ($696) | | $114 | | $687 | ($495) | | $0 |
| HSD | $737 | 7.4462 | 19.41% | $3,250 | $3,712 | ($462) | | $273 | | $589 | ($300) | 62.59% | ($194) |
| PRC | $41 | 0.4802 | 1.06% | $183 | $209 | ($26) | | $13 | | $23 | ($17) | | $0 |
| STR | $62 | 0.5464 | 1.41% | $276 | $314 | ($29) | | $18 | | $50 | ($20) | | $0 |
| Other | $549 | 6.7027 | 14.47% | $2,424 | $2,768 | ($344) | | $205 | | $439 | ($198) | | $0 |
| **Totals** | **$3,706** | **39 (M)** | **100.00%** | **$16,747 (N)** | **$19,127 (O)** | **($2,378)** | **0.41%** | **$1,477** | **$20** | **$3,034** | **($1,581)** | | **($212)** |

C:\WORD\DETERMINATIONS\rom revised 2004 individual billing rate analysis

**Service:** MVS Disk I/O

| Published Rate: | $0.10 /1000 (A) | | Cost-Based Rate: | $0.087 /1000 (B) | | | | | | | | |

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D / M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (J - 16) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $60,333 | 751,530 | 9.44% | $75,153 | $64,848 | $32,487 | | $92,799 | | $8,772 | $76,683 | | $0 |
| GSD | $44,700 | 687,678 | 8.33% | $65,768 | $57,917 | $29,840 | | $79,560 | | $6,015 | $85,120 | | $0 |
| HSD | $192,027 | 2,807,288 | 38.00% | $286,727 | $282,856 | $123,871 | | $318,816 | | $23,606 | $292,602 | | 62.00% | $184,016 |
| PRC | $1,860 | 21,626 | 0.35% | $2,703 | $1,589 | $1,109 | | $3,044 | | $240 | $2,810 | | $0 |
| STR | $9,030 | 90,030 | 1.13% | $9,003 | $8,160 | $9,158 | | $9,919 | | $811 | $9,195 | | $0 |
| Char | $15,450 | 230,628 | 2.00% | $23,083 | $13,111 | $4,972 | | $23,431 | | $2,080 | $23,556 | | $0 |
| **Totals** | **$533,448** | **7,934,191 (M)** | **100.00%** | **$793,419 (N)** | **$469,410** | **$344,109** | **2.86%** | **$986,853** | **$3,881** | **849,965** | **$792,739** | | **$192,893** |

C:\WORK\DETERMINATIONS\m revised 2004 individual billing rate analysis

Service:  CICS CPU - Standard

| Published Rates: | $3,000.00 /CPU Hr (A) | Cost-Based Rate: | $1,264,222 /CPU Hr (B) |

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D/M) (E) | Revenue: Published Rates (A*D) (F) | Revenue: Cost-Based Rates (B*D) (G) | Client Over/(Under)-Recovery (F-G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (I*K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $7,156 | 24 | 1.77% | $73,022 | $30,529 | $42,494 | | $49,849 | | $4,043 | $45,806 | | $0 |
| GTO | $4,000 | 14 | 0.99% | $40,621 | $17,086 | $23,705 | | $27,753 | | $2,707 | $25,205 | | $0 |
| HBD | $513,438 | 1,006 | 77.65% | $3,195,830 | $1,317,348 | $1,081,453 | | $2,474,840 | | $312,104 | $1,975,227 | 92.59% | $1,242,221 |
| PRC | $4,357 | 15 | 1.04% | $44,451 | $18,680 | $25,874 | | $30,231 | | $12,849 | | | $0 |
| BTR | $1,024 | 3 | 0.25% | $10,484 | $4,371 | $5,364 | | $7,108 | | $903 | $6,455 | | $0 |
| Other | $26,133 | 0 | 0.99% | $287,100 | $120,020 | $167,071 | | $105,304 | | $19,041 | $177,280 | | $0 |
| **Totals** | **$404,992** | **1,375 (M)** | **100.00%** | **$4,424,488 (N)** | **$1,724,488 (C)** | **$2,400,509** | 9.76% | **$2,728,650** | $16,911 | **$266,166** | **$2,478,275** | | **$1,270,212** |

C:\WORK\DETERMINATION\tm revised 2004 individual billing rate analysis

GENERAL SERVICES    JUN. 26. 2006  4:19PM    NO. 4070    P. 11

6-22-06

2-5

Published Rate: $1,500.00 /CPU Hr (A)

Service: CICS CPU - NonPrime

Cost-Based Rate: $1,254.222 /CPU Hr (B)

| Client | Beginning 2004 Fund Balance | (D) Service Utilization | (E) Client Util as Total Serve Utln (D/M) | (F) Revenue: Published Rates (A*D) | (G) Revenue: Cost-Based Rates (B*D) | (H) Client Over/(Under) Recovery (F-G) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | (I) % Federal Financial Participation | (L) Federal Over/(Under) Recovery (J-K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $599 | 2.0033 | 4.97% | $3,005 | $2,513 | $492 | | $1,081 | | $501 | $580 | | $0 |
| | | | | | | | | | | | $290 | | $0 |
| GSD | $204 | 0.0065 | 0.65% | $1,043 | $872 | $171 | | $375 | | $138 | $991 | | $0 |
| HSD | $13,972 | 47.5274 | 45.75% | $71,291 | $59,610 | $11,681 | | $82,003 | | $3,450 | $18,306 | 62.95% | $10,315 |
| PRC | $1,041 | 5.528 | 5.46% | $8,874 | $7,002 | $1,872 | | $3,013 | | $1,111 | $1,029 | | $0 |
| STR | $20 | 0.0092 | 0.09% | $184 | $154 | $22 | | $46 | | $16 | $31 | | $0 |
| Other | $10,254 | 34.8137 | 34.39% | $52,371 | $43,790 | $8,581 | | $16,845 | | $6,947 | $12,044 | | $0 |
| **Totals** | **$29,867** | **102 (M)** | **100.00%** | **$183,588 (N)** | **$427,427 (O)** | **$24,974** | **0.73%** | **$54,044** | **$417** | **$19,811** | **$34,620** | | **$10,681** |

C:\WORK\DETERMINATIONS\own revised 2004 individual billing rate analysis

*(handwritten: All other / 6-22-06 / 2-6 / 457)*

Published Rate: $0.10 /1000 (A)

Service: CICS EXCP

Cost-Based Rate: $0.057 /1000 (B)

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D*/M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (J - K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $16,682 | 271,798 | 3.54% | $27,180 | $15,458 | $11,742 | | $30,424 | $2,449 | $28,220 | | $0 |
| OSD | $8,970 | 85,316 | 1.15% | $8,531 | $5,016 | $3,515 | | $8,088 | $799 | $9,110 | | $0 |
| HBD | $388,945 | 6,657,216 | 73.65% | $665,722 | $321,321 | $344,401 | | $633,210 | $18,974 | $4,597,383 | 62.89% | $380,405 |
| FRC | $2,780 | 40,579 | 0.53% | $4,058 | $2,305 | $1,783 | | $4,842 | $395 | | | $0 |
| STR | $2,729 | 39,703 | 0.52% | $3,970 | $2,255 | $1,715 | | $4,144 | $399 | $4,119 | | $0 |
| Other | $39,900 | 600,931 | 7.65% | $58,093 | $32,879 | $25,004 | | $54,904 | $4,212 | $4,122 / $60,288 | | $0 |
| **Totals** | **$527,882** | **7,891,419 (M)** | **100.0%** | **$788,148 (N)** | **$439,295 (C)** | **$331,853** | **2.47%** | **$813,054** | **$38,661** | **$865,445** | | **$384,578** |

Service:    Disk Occupancy

Published Rate: $0.000009 /KB-Day (A)    Cost-Based Rate: $0.00000351 /KB-Day (B)

| Client | Beginning 2004 Fund Balance | (D) Service Utilization | Client Revenue Analysis | | | | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | Federal Participation | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | (E) Client Util vs Data Serve Util (D/Σd) | (F) Revenue: Published Rates (A·D) | (G) Revenue: Cost-Based Rates (B·D) | (H) Client Over/(Under)-Recovery (F-G) | | | | | | (J) % Federal Financial Participation | (L) Federal Over/(Under)-Recovery (J·K) |
| DFA | | | | | | | | | | | | | $0 |
| GSD | $8,090 | 18,879,548,108 | 4.47% | $169,460 | $69,704 | $119,764 | | $127,940 | | $11,058 | $116,059 | | $0 |
| HSD | $5,818 | 13,479,507,850 | 3.03% | $121,708 | $47,283 | $80,522 | | $20,141 | | $7,464 | $179,102 | 82.99% | $0 |
| | $38,437 | 212,497,781,904 | 47.70% | $2,011,540 | $743,946 | $1,267,144 | | $1,355,022 | | $118,028 | $1,204,179 | 82.99% | $783,063 |
| | $109 | 1,601,155,746 | 0.35% | $10,127 | $5,986 | $10,102 | | $10,921 | | $940 | $9,983 | | $0 |
| STR | $1,688 | 8,605,428,384 | | $39,075 | $13,349 | $22,733 | | $24,310 | | $2,117 | $22,331 | | $0 |
| Other | $14,935 | 35,834,470,477 | 8.09% | $380,711 | $126,047 | $214,064 | | $229,000 | | $19,852 | $210,297 | | $0 |
| Totals | $185,210 | 441,349,271,544 (N) | 100.00% | $4,213,378 (N) | $1,806,188 (C) | $2,094,689 | 8.83% | $2,528,020 | $15,082 | $249,164 | $2,595,924 | | $732,511 |

ATTACHMENT NUMBER 3

# New Mexico
## state treasury interest earning rates
## July 1, 2004 - February 2006

### AVERAGE YIELD

| Quarter | Avg. Yield Rate | | weighted |
|---|---|---|---|
| June-04 | 1.988% | | |
| September-04 | 2.180% | | |
| December-04 | 2.030% | July - Sept | 2.180% |
| March-05 | 2.570% | | 2.030% |
| June-05 | 3.020% | | 2.570% |
| September-05 | 3.613% | | 3.020% |
| December-05 | 3.330% | | 3.613% |
| Subtotal Average | 2.677% | | 3.330% |
| | | six quarters avg | 2.790%  18 months  0.502275 |

| Month | | | |
|---|---|---|---|
| January-06 | 3.800% | | |
| February-06 | 3.900% | | 2 months  0.078 |
| Subtotal Average | 3.900% | | |
| | | | total  0.580275 |
| Average Yield | 3.2866% | | average |
| | | | 20 months  2.90% |

Source: www.sstonm.org/level%201/L1-treasuryreports.htm

C:\WORK\123NM\NEW MEXICO state treasury interest rates

**EXHIBIT 3.a**

# OFFICE OF MANAGEMENT AND BUDGET

## Cost Principles for State, Local and Indian Tribal Governments

**AGENCY:** Office of Management and Budget.

**ACTION:** Final Revision to OMB Circular A–87, "Cost Principles for State, Local and Indian Tribal Governments".

**SUMMARY:** An interagency task force was established to review existing cost principles for Federal awards to State and local governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from State and local governments, and compared for consistency the provisions of other Office of Management and Budget cost principles covering non-profit organizations and universities. Proposed revisions reflecting the results of those efforts were published on October 12, 1988 (53 FR 40352–40367) and August 19, 1993 (58 FR 44212–44234). The extensive comments received on these proposed revisions, discussions with interested groups, and other related developments were considered in developing this final revision.

**DATES:** Agencies shall issue codified regulations to implement the provisions of this Circular by September 1, 1995.

**ADDRESSES:** Office of Management and Budget, Office of Federal Financial Management, Financial Standards and Reporting Branch, Room 6025, New Executive Office Building, Washington, DC 20503. For a copy of the revised Circular, contact Office of Administration, Publications Office, Room 2200, New Executive Office Building, Washington, DC 20503, or telephone (202)395–7332.

**FOR FURTHER INFORMATION CONTACT:** Non-Federal organizations should contact the organization's cognizant Federal funding agency. Federal agencies should contact Gilbert H. Tran, Financial Standards and Reporting Branch, Office of Federal Financial Management, Office of Management and Budget, telephone: (202)395–3993.

**SUPPLEMENTARY INFORMATION:**

## A. Background

The Office of Management and Budget (OMB) received about 200 comments from governmental units, Federal agencies, professional organizations and others in response to the Federal Register notice of August 19, 1993 (58 FR 44212). All comments were considered in developing this final revision.

OMB also considered the National Performance Review's recommendations to reduce paperwork and red tape. Changes were made to the Circular to streamline the cost negotiation process and defer to State and local accounting procedures whenever possible. Also, the policy guides in the Circular were amended to provide that Federal agencies which work with States or localities which wish to test alternative mechanisms for paying costs for administering Federal programs.

Section B presents a summary of the major public comments grouped by subject and a response to each comment. Other changes have been made to increase clarity and readability. Section C addresses procurement issues. Section D discusses the Federal Acquisition Streamlining Act of 1994.

## B. Public Comments and Responses

### Basic Circular

*Comment:* The policy subsection states that "no provision for profit or increment above allowable cost is intended." This statement is currently contained in the Circular, but it is different from that contained in other OMB cost principles circulars and is literally incorrect. This seems to say no profit or increment above cost is permitted.

*Response:* This sentence was changed to conform with the other OMB cost principles circulars. There is no policy change intended by this change.

### General Principles for Determining Allowable Costs—Attachment A

*Comment:* The requirement in the basic guidelines that "a cost may not be assigned to a Federal award as a direct cost if any other cost incurred for the same purpose in like circumstances has been allocated to a Federal award as an indirect cost" appears to be too expansive and should be clarified.

*Response:* There is no policy change intended from that in the existing Circular. The wording in the consistency provision was changed to make it clear that all costs incurred for the same purpose in like circumstances are either direct costs only or indirect costs only with respect to final cost objectives (e.g., grants). No final cost objective shall have allocated to it as an indirect cost any cost if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective. For example, a grantee normally allocates all travel as an indirect cost. For purposes of a new grant proposal, the grantee intends to allocate the travel costs of personnel

whose time is accounted for as direct labor directly to the grant. Since travel costs of personnel whose time is accounted for as direct labor working on other grants are costs which are incurred for the same purpose, these costs may no longer be included within indirect cost pools for purposes of allocation to any other grant.

*Comment:* The Circular lists the market price of comparable goods or services as one test of reasonableness. This statement may cause problems for State agencies that are required to make purchases from State-wide contracts.

*Response:* OMB recognizes that market fluctuations may result in a State paying higher prices on State-wide contracts. However, significant differences between State prices and market prices should be analyzed. For example, Federal awards should not be paying higher prices for State awards based on geographical preferences.

*Comment:* The prohibition against shifting costs allocable to a particular Federal award or other cost objective to other Federal awards needs to be clarified. Governmental units should not be precluded from shifting allowable cost in accordance with program agreements.

*Response:* This section was expanded to recognize that there are instances when it may be appropriate for governmental units to transfer costs from one cost objective to another cost objective.

*Comment:* It is not logical to require governmental units to allocate indirect costs to all activities including donated services.

*Response:* The Circular is designed to provide that Federal awards bear their fair share of costs. If non-Federal activities use donated services that require a substantial amount of support costs, it would be inequitable to charge these costs to Federal awards.

*Comment:* The section on applicable credits needs to be clarified.

*Response:* The language in this section has been revised to remove inappropriate examples of applicable credits and references to program income which are covered by the grants management common rule.

### Selected Items of Cost—Attachment B

#### Advertising and Public Relations Costs

*Comment:* Clarify the allowability of certain public relations type costs, such as job fairs and activities to promote ridership on public transportation.

*Response:* The allowability of these types of costs depends upon the circumstances surrounding the individual case. In determining whether

Federal awards should participate in these types of costs, the recipient should consider how similar types of costs are charged, and whether there is a direct benefit to Federal awards resulting from these costs.

Audit Services

*Comment:* The Circular limits the allowability of audit costs to single audits and does not provide reimbursement for audits of a less comprehensive nature.

*Response:* This section was revised to allow the costs of other audits.

Automatic Electronic Data Processing

*Comment:* The requirement for governmental units to amortize the costs associated with the development and testing of automated systems would impose an unreasonable financial and administrative burden on the governmental units.

*Response:* OMB eliminated the requirement for governmental units to amortize the costs of developing and testing automated systems until a uniform Federal policy covering all types-of recipients of Federal awards can be developed.

Compensation for Personnel Services

*Comment:* The potential paperwork burdens associated with accounting for employee leave payments and accruals could be substantial.

*Response:* This section was simplified by modifying many of the prescriptive accounting rules for leave.

*Comment:* Interest cost associated with pension contributions should be allowed if the governmental unit's contributions are delayed.

*Response:* References to interest payments were deleted. However, language was inserted into the Circular to make it clear that Federal reimbursement of pension cost must be adjusted when the governmental unit's payments to the fund are late. The adjustment should compensate for the additional cost because of the timing of the charges to the Federal Government and the governmental unit's contribution to the pension fund.

*Comment:* Governmental units should not be required to use separate cost allocation procedures for classes of employees that experience different actuarial gains and losses (e.g., police and fire departments).

*Response:* This requirement was deleted from the Circular.

*Comment:* The requirement that a governmental unit obtain Federal approval for changing its method for determining pension and post-

retirement health benefit costs should be deleted.

*Response:* This requirement was deleted. Pension costs and post-retirement health benefit costs determined in accordance with Generally Accepted Accounting Principles (GAAP) and the provisions of the Circular will be allowable. For contracts covered under Cost Accounting Standards (CAS), CAS 412 and 413 promulgated by the Cost Accounting Standards Board shall establish the allocability of pension costs.

*Comment:* The current principles applicable to support of personnel costs have worked well and require no change.

*Response:* OMB believes additional guidance is necessary. Federal agencies have found that the absence of sufficient guidance on documentation to support salaries charged to Federal awards has caused numerous audit findings and resulted in endless wasted hours of negotiation between Federal agencies and governmental units. Based on the comments received, OMB made a number of changes to the requirements in this section of the Circular to clarify and simplify Federal requirements for documenting salaries charged to Federal awards.

Defense and Prosecution of Criminal and Civil Proceedings, and Claims

*Comment:* OMB proposed to substantially amend the provisions on the allowability of legal and related expenses. In the 1981 version of the Circular, this provision is found at Attachment B, section 16 (46 FR 9552). In the latest proposal, the proposed revisions were at Attachment B, section 14 (58 FR 44222).

State and local governments contended that the proposed revisions on the allowability of legal and related expenses would be unfair and would deny them due process.

State and local governments also objected to the specific proposed revisions dealing with legal proceedings based on the Major Fraud Act and the Federal Acquisition Regulation (48 CFR 31.205—47) in Attachment B, sections 14.a. through f. State and local governments contended that those provisions are ambiguous, inconsistent and overly broad. In addition, these commenters argued that the provisions were designed for commercial contractors and should not be applied to grants.

*Response:* After reviewing the comments on the proposed revisions, OMB decided not to amend the current provision on the allowability of legal

and related expenses. In the revised Circular, this provision is now found at section 14.b.

In this revision, OMB has added a provision at section 14.a. This provision, which was in the proposal, simply restates the currently-applicable, statutory restrictions in 10 U.S.C. 2324(k).

Depreciation and Use Allowances

*Comment:* It is unclear if a use charge can be charged while an asset is in service.

*Response:* The Circular now provides that a reasonable use allowance may be negotiated for fully depreciated assets; therefore, OMB believes a reasonable use allowance could be negotiated for an asset for as long as the asset is in service.

*Comment:* It is not clear whether accelerated depreciation is allowed.

*Response:* The preferred method of depreciation is the straight line method. However, other methods may be used when there is evidence that an asset will be used up faster in the earlier portion of its useful life.

*Comment:* The estimated useful lives of equipment and buildings used to compute use allowances should be shortened.

*Response:* No changes were made. Governmental units have the option of claiming depreciation which is usually based on the actual life of the asset.

*Comment:* It is not clear why classes of assets needed to be determined on a State-wide, local-wide, or Tribal-wide basis.

*Response:* This section was amended to say classes of assets shall be determined on the same bases used for the governmental unit's financial statements.

Equipment and Other Capital Expenditures

*Comment:* The capitalization level for equipment seems to be arbitrarily low. The criterion of $25,000, which is recognized by the Department of Health and Human Services (HHS), might be more appropriate.

*Response:* The $5000 criterion is in line with capitalization levels used by government contractors and others. The HHS criterion is limited to equipment used on a few very large programs where equipment purchases are a very small percentage of total program costs. For CAS-covered contracts subject to "full coverage", the threshold for equipment is $1500 as established under CAS 404.

*Comment:* Clarify the term "article" as used in the definition of equipment. The Circular defines equipment "as

0000208

being an article of nonexpendable property."

*Response:* The definition of "capital expenditure" was added to further define the term "equipment." However, if further guidance is needed in this area, governmental units should follow their own accounting practices when defining equipment.

*Comment:* It is not clear what is meant by "The total acquisition costs are not allowable as indirect costs during the period acquired."

*Response:* This section was clarified. It now says that capital expenditures which are not authorized to be charged directly to an award may be recovered through use allowances or depreciation.

*Comment:* The impact of depreciation as proposed in the Circular would shift costs to the governmental unit, not make any provision for the time value of money, increase administrative costs to track resulting depreciation schedules, and erode the partner relationship between Federal agencies and governmental units.

*Response:* The accounting treatment for depreciation as prescribed by the Circular is based on GAAP. Further, the provisions ensure that the Federal Government pays its fair share of costs, including interest on financing.

## Fund Raising and Investment Management Costs

*Comment:* It is not clear whether costs related to raising funds from employees within an organization for charitable activities, such as the United Way, would be allowable since the Circular disallows fund raising costs.

*Response:* Generally, the prohibition on fund raising activities covered by the Circular is for those activities where the governmental unit raises funds for its own use. Incidental fund raising from an organization's own employees for charitable organizations, such as the United Way, is considered part of normal operating expenses and, therefore, allowable.

## Gains and Losses on Disposition of Depreciable Property and Other Capital Assets and Substantial Relocation of Federal Programs

*Comment:* The provisions which would require governmental units to reimburse the Federal Government when Federal awards were relocated from facilities where the Federal Government participated in the financing is inappropriate.

*Response:* This section was amended. It now requires governmental units to obtain prior approval from the cognizant agency for substantial relocations of Federal awards from buildings for

which the Federal Government participated in the financing.

## Insurance and Indemnification

*Comment:* It is not apparent why provisions for liabilities, which do not become payable for more than one year after a self insurance provision is made, are limited to the discounted value of the liability.

*Response:* This requirement is designed to cover only those cases where the amount of the liability is firm or reasonably certain. This provision helps to avoid excessive reserve balances for the current fiscal year. It limits current year premiums to the present value of the future (known or reasonably certain) liability. When that future liability becomes due, prior years premiums plus earnings (i.e., interest or investment income) from those premiums will be available to satisfy that debt.

*Comment:* The Circular states that self-insurance reserves must be based on sound actuarial principles using the most likely assumptions. This seems to be an attempt to limit sound actuarial principles.

*Response:* This language was not intended to restrict sound actuarial principles. The language was changed to clarify that sound actuarial assumptions should recognize actual past, as well as probable future, events when determining premiums and reserve levels.

## Interest

*Comment:* Interest expense should be allowable not only for building modifications, as provided in the 1981 revision of Circular A-87, but also for acquisitions of equipment made prior to the issuance date of the revised Circular. The proposed provision is objectionable because it would require dual records and impose an unreasonable and unnecessary administrative burden on State and local governments.

*Response:* The provision was rewritten to allow interest expense paid or incurred on or after the revised Circular's effective date to be charged to Federal awards for existing as well as newly-acquired equipment.

Historically, OMB has not allowed interest on debt issued prior to the effective date of an interest policy revision (pre-revision debt). In 1980, OMB allowed State and local governments interest on debt issued to acquire buildings, but not on pre-revision debt (45 FR 27363). In 1982, in a revision to Circular A-21, "Cost Principles for Educational Institutions," OMB allowed interest on debt issued to acquire buildings and equipment, but

not on pre-revision debt (47 FR 33658). In 1994, in a proposed revision to Circular A-122, "Cost Principles for Non-Profit Organizations," OMB proposed to allow interest debt issued to acquire buildings and equipment, but not on pre-revision debt (59 FR 49091).

In view of the fact that pre-revision debt was incurred with full knowledge of the cost policy that was in effect at that time, OMB does not believe that grantees should expect the Federal Government to allow interest on this debt without such a decision being cost-justified from the Federal Government's perspective. OMB believes the Federal Government should only allow interest on pre-revision debt when the cost of maintaining dual records on pre-revision and post-revision assets and related debt (all or a portion of these recordkeeping costs are chargeable to the Federal programs as administrative costs) is less than the interest cost on pre-revision debt.

With respect to debt incurred to purchase buildings, OMB believes that the cost of maintaining dual records is cost-justified in view of the limited number of buildings and debt issues for which separate records would have to be maintained, and the substantial interest cost associated with long term debt used to finance buildings. Thus, as OMB has previously explained, "[a]pplying the new rules to old buildings would appear to provide a windfall recovery, and might drive up overhead costs of federally assisted programs" (47 FR 33658, also see 45 FR 27363).

Equipment acquired by State and local governments (except computers), while substantial in terms of the number of pieces, is relatively nominal in cost and has a relatively short life span. As a result, the outstanding interest on debt issued to finance this equipment is relatively nominal. Moreover, State and local governments would still bear the major share of the financing costs, even if pre-revision debt were allowable. By contrast, the cost of maintaining dual records for a large number of items and related debt would likely be substantial. Given the different balance between administrative and interest costs, OMB has decided that, in this instance, the administrative costs associated with maintaining separate records to track pre-revision and post-revision debt is not cost-justifiable from the Federal Government's perspective.

The basis for the allowance of pre-revision debt for equipment of State and local governments is consistent with the basis for OMB's treatment of such debt for educational institutions (in 1982) and OMB's proposed treatment of such

0000209

debt for non-profit organizations (in 1994). The cost of equipment acquired by educational institutions and non-profit organizations through debt financing can be significant (e.g., over $650,000 for x-ray crystallography equipment, $348,000 for a vantage flow cytometer for high speed cell analysis, and $265,000 for an electron microscope). Equipment of this type and related debt has a longer life, and in turn, significantly higher interest cost. Moreover, as with buildings, there are only a limited number of pieces of such equipment, which reduces the administrative costs of dual records. Given the amount of interest involved in the financing of these assets compared with the relatively nominal administrative burden associated with maintaining dual records, OMB believes the cost of maintaining dual records is justifiable.

*Comment:* The requirement for a governmental unit to document, as part of its decisionmaking process, that capital leasing is the most economical option does not belong in Circular A-87.

*Response:* The requirement for lease analysis as part of the governmental unit's decisionmaking process and its proper documentation is addressed in the Grants Management Common Rule under Section ____.36(b)(4). This requirement is not addressed in Circular A-87.

*Comment:* Governmental units would not recover their full costs because of provisions in the Circular which provide that a credit is due the Federal Government when Federal payments for interest, depreciation, use charges and other contributions for building use exceed the interest and principal payments made by the government (positive cash flow).

*Response:* OMB deleted the provisions in the Circular which would require credits under the conditions described above. However, governmental units will be required to negotiate the amount of allowable interest whenever cash payments (interest, use allowances, depreciation and contributions) exceed governmental unit cash payments and other governmental unit contributions. OMB will study this matter further to ensure fair and equitable policies are established for the States and the Federal Government.

Memberships, Subscriptions, and Professional Activities

*Comment:* Membership costs in some civic and community organizations should be allowable when the purpose

is to promote services provided by the Federal award.

*Response:* The language has been revised to allow memberships in civic and community organizations as a direct cost with the prior approval of the Federal awarding agency.

Professional Service Costs

*Comment:* Simplify the section on professional service costs by eliminating the factors to consider in determining the allowability of professional service costs.

*Response:* Eight subsections listing the factors were deleted.

Proposal Costs

*Comment:* It is not clear why proposal costs should normally be treated as indirect costs and allocated to all activities. Such costs should be treated as direct costs if they can be identified with a specific award.

*Response:* OMB added a provision to allow governmental units to charge proposal costs directly to a Federal award with the prior approval of the Federal awarding agency.

Taxes

*Comment:* If OMB adopts the proposed revision affecting sales tax reimbursement, the revision should become effective at some later date to allow time to change State and local laws.

*Response:* OMB agrees that there should be a phase-in period. The Circular allows governmental units three years to phase-in the change.

*Comment:* If the sales tax proposal were adopted, it would become a burden to separately account for State sales taxes paid on Federal grant purchases.

*Response:* The Circular allows reasonable approximations to be used where the identification of the actual amount of unallowed taxes would require an inordinate amount of effort.

*Comment:* State sales taxes should be allowable when a governmental unit is in a position that makes exclusion administratively impossible, i.e., when employees in travel status must pay sales taxes upon receipt of goods and services.

*Response:* States should attempt a reasonable approximation.

*Comment:* Some State and local governments and Indian Tribal governments would lose substantial amounts of revenue if sales taxes were not chargeable to purchases made in connection with federally-funded programs.

*Response:* The intention of the tax provision is to address State or local

government taxes, or changes in tax policy, that disproportionately affect a federally-funded program. Under the Circular, such taxes are unallowable. (As explained in the next comment-and-response, where a Federal statute prescribes a different treatment for taxes, that statute controls.)

For example, a tax would disproportionately affect a Federal program if the tax were defined or applied so that it was imposed only in connection with that program, or only in connection with Federal programs generally. Another example would be if a sales tax were imposed on a good or service that in practice is used solely or disproportionately in connection with Federal programs. These examples are for illustration, and are not meant to be exclusive. Whether a particular tax, or change in tax policy, would disproportionately affect a Federal program will have to be determined based on a review of the tax and the Federal programs in question.

When a governmental unit pays a tax to itself, that self-assessed tax is not a true cost to the governmental unit. Especially where a self-assessed tax disproportionately affects a Federal program, it is not appropriate for the governmental unit to be able to characterize that tax as a "cost" of its participation in the Federal program. If such disproportionate, self-assessed taxes were treated as allowable, even though they disproportionately affect Federal programs, governmental units could define or apply taxes in such a way that their net impact would largely be to increase the Federal Government's contribution, rather than to raise revenues from the taxpayer. To the extent that making such taxes unallowable would result in a loss of Federal assistance awards, the Circular allows three years for governmental units to phase-out any existing taxes that disproportionately affect Federal programs. (For the larger formula grant programs, the disallowance of such taxes would not result in any loss of Federal assistance awards; the funds which are now used to pay self-assessed taxes could be used to further the objectives of the Federal assistance.)

*Comment:* The proposed revision on sales taxes is directly contrary to the legislative intent of Public Law 102-234, "Medicaid Voluntary Contributions and Provider Specific Tax Amendments of 1991." The proposal should be revised to preclude its application to broad-based health care related taxes paid by public entities.

*Response:* The Circular would not take precedence over a statute. If any statute specifically prescribes policies

0000210

and specific requirements that differ from the Circular, the statute will govern.

*Comment:* State sales taxes collected by another level of government should be exempt from the provisions of the Circular.

*Response:* As noted above, the Circular's disallowance is directed at self-assessed taxes. Thus, if a local government receives an award directly from the Federal Government, and pays a State sales tax on purchases made in connection with that award, the tax is an allowable cost. (However, as previously noted, the Circular does not restrict the authority of Federal agencies to identify taxes where Federal participation is inappropriate.)

However, if the local government does not receive the award directly from the Federal Government, but instead receives the award indirectly by virtue of a State pass-through, then the sales tax that the local government pays the State is in reality a self-assessed tax, which would be unallowable if the tax disproportionately affects a Federal program.

*Comment:* It is not clear whether the prohibition on payment of sales taxes applies to out-of-state sales tax.

*Response:* Since they are not self-assessed, taxes assessed by other States, or political subdivisions of other States, are not unallowable under the Circular. (However, as previously noted, the Circular does not restrict the authority of Federal agencies to identify taxes where Federal participation is inappropriate.)

Travel Costs

*Comment:* Airfare costs in excess of the lowest available commercial discount fare are unallowable. With today's confusing array of super savers and fare wars, the burden involved in proving the lowest airfare would be considerable.

*Response:* The travel provisions were changed to say travel costs in excess of the customary standard (coach or equivalent) airfare are unallowable.

State/Local-Wide Central Service Cost Allocation Plans—Attachment C

*Comment:* Working capital reserves in many cases should not be limited to 60 days cash expenses. Time consuming collections, uneven usage levels, and unanticipated demand for services are some of the reasons for authorizing a larger reserve.

*Response:* OMB believes the 60 day reserve should provide the flexibility required by most funds to operate from one billing cycle to the next. However, the Circular was amended to provide for a larger reserve in exceptional cases when approved by the cognizant Federal agency.

*Comment:* The Circular should not restrict governmental units from engaging an accounting firm to prepare an indirect cost proposal and then engaging the same firm to make subsequent audits.

*Response:* This provision was deleted from the Circular. This issue will be addressed as part of OMB policy changes to other OMB grants management circulars.

*Comment:* What are the criteria OMB uses for making cognizant assignments and for defining "major governments"?

*Response:* OMB is in the process of reviewing the cognizant assignments for governmental units. Only governmental units receiving substantial amounts of direct Federal assistance will be assigned a Federal cognizant agency and be required to submit plans to those cognizant agencies. Because the mix of Federal awards has changed so much since the last list was issued, OMB needs to develop a new dollar criteria for defining "major."

*Comment:* States and other prime grantees should not be required to monitor subrecipient cost allocation plans and/or negotiate sub-recipient indirect costs.

*Response:* The grants management common rule requires governmental units to monitor subawards to assure compliance with applicable Federal requirements. These requirements include compliance with the cost principles. In those cases where the subrecipient does not receive any Federal awards directly from the Federal Government, Federal agencies would not have any direct responsibility for negotiating indirect costs.

*Comment:* Attachment C, Section E states that "The documentation requirements in this section may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis." This specific sentence might allow a Federal cognizant agency to unreasonably and unilaterally expand the documentation requirements.

*Response:* Federal agencies should have the flexibility to obtain additional data, when necessary. However, OMB agrees that this type of request should be the exception rather than the rule.

*Comment:* Documentation for internal service funds seems excessive since these areas are audited. This documentation is more appropriately included in a State or local government's financial statements and work papers for the fiscal year rather than in the entity's cost allocation plan.

*Response:* OMB amended this section to require only the largest funds to submit data. If the required data are included in the governmental unit's financial statements, submission of the financial statements to the Federal cognizant agency will meet the requirements of the Circular.

*Comment:* OMB proposed to add provisions requiring the certification of cost allocation plans and of indirect cost rates (see preamble (58 FR 44218); Attachment C, Section E.4 (58 FR 44229); Attachment D, Section D.3 (58 FR 44230–31); and Attachment E, Section D.3 (58 FR 44233)). States objected to the inclusion of the phrase "under penalty of perjury" in the proposed certification. They contended that the phrase is unnecessary.

*Response:* OMB has decided to amend the Circular to add the proposed certifications, but OMB has accepted the commenters' suggestion that the phrase "under penalty of perjury" not be included in the certifications. OMB believes that, when the Federal Government is dealing with State and local governments, it is unnecessary to require that the certifying government official sign a certification stating that it is made "under penalty of perjury." State and local officials should not conclude, however, that the omission of the phrase "under penalty of perjury" means that no potential legal liability is associated with a certification's submission. In this regard, note the provision in Federal law imposing criminal penalties for "false, fictitious or fraudulent statements or representations" (18 U.S.C. 1001). The Department of Justice is responsible for enforcing this provision (and other laws regarding false statements and claims). OMB expresses no opinion concerning the potential legal liabilities that are associated with making the certifications in the revised Circular.

*Comment:* Restricting the authority to reopen Central Service Plans to the Federal cognizant agency is inequitable.

*Response:* This section was changed to state that agreements may be subject to reopening only if the agreement is subsequently found to violate a statute or the information upon which the plan was negotiated is later found to be materially incomplete or inaccurate.

*Comment:* GAAP for State and local governments do not require internal service activities to be accounted for and reported in proprietary accounts.

*Response:* The requirement for internal service activities to be accounted for in proprietary accounts was deleted.

*Comment:* Remove the requirement that a carry forward adjustment is not

0000211

permitted for a central service activity that was not included in the approved plan.

*Response:* The carry forward technique was intended to permit adjustments for differences between actual and estimated costs of services included in a cost allocation plan. It was not intended to shift the entire cost of an activity excluded from the year of the plan to a future year. There may be circumstances where a change to the plan should be considered (e.g., the service did not exist when the plan was established and was initiated during the year covered by the plan). This type of amendment should modify the plan itself and would not be handled through a carry forward adjustment.

*Comment:* Adjustments of billed services do not provide a workable solution for the larger central services of the States. The dollar limitation of $50,000 for making adjustments through allocated central services is too low.

*Response:* This section was rewritten to provide governmental units more options and flexibility in making adjustments to Federal awards.

*Public Assistance Cost Allocation Plans—Attachment D*

*Comment:* The public assistance cost allocation plans are narrative descriptions of cost allocation procedures rather than allocations of actual costs. The provisions dealing with refunds or adjustments related to unallowable costs and the certification of cost allowability do not appear appropriate.

*Response:* The certification and the provisions dealing with refunds and adjustments were deleted.

*State and Local Indirect Cost Rate Proposals—Attachment E*

*Comment:* The Circular is silent on the time period for use of predetermined rates.

*Response:* The Circular was amended to encourage the use of indirect cost rates for a period of two to four years.

*Comment:* Governmental units should notify the Federal Government of any accounting changes that might make it necessary to renegotiate the predetermined rate.

*Response:* A provision was added to the certification which requires the governmental unit to notify the Federal Government of any accounting changes that would effect the application of the predetermined rate.

## C. Procurement Issues

Several procurement issues arose during the Federal Government's internal review process. This section clarifies the procurement issues.

*Effective Date for Governmental Units With Predetermined Rates Beyond September 1, 1995*

For a governmental unit that already has established indirect cost rates beyond September 1, 1995, the effective date of the revised Circular shall be at the start of the next accounting period beginning on or after September 1, 1995, for which the governmental unit has not yet established a predetermined indirect cost rate.

*Depreciation Method(s) for CAS-Covered Contracts*

CAS-covered contracts subject to "full coverage" under CASB shall follow the standards promulgated by CASB in the computation of depreciation.

*Allowability of Interest Expenses for CAS-Covered Contracts*

For contracts subject to CAS 414 (48 CFR 9903.414, cost of money as an element of the cost of capital), and CAS 417 (48 CFR 9903.417, cost of money as an element of the cost of capital assets under construction), the imputed cost of money determined allocable in accordance with CAS 414 and 417 may be claimed as an allowable cost. When cost of money is claimed, interest shall not be an allowable direct or indirect cost under such contracts.

## D. Federal Acquisition Streamline Act

The Federal Acquisition Streamlining Act (FASA) of 1994, enacted on October 13, 1994, amended Section 306(e) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 256, Public Law 103–355, Section 2151, 108 Stat. 3309–12), to specify certain items of costs as not allowable under Federal covered contracts. OMB is undertaking a review of these FASA provisions, for the purpose of determining whether the unallowable cost provisions of Circular A–87, and of OMB's other cost principles circulars, should be amended in light of the FASA provisions on unallowable costs. If OMB ultimately concludes that amendments may be appropriate, OMB will issue a proposal

seeking public comment on the proposed revisions.
John B. Arthur,
*Associate Director for Administration.*

**Executive Office of The President**

*Office of Management and Budget*
Washington, DC 20503

May 4, 1995.

Circular No. A–87 Revised

To the Heads of Executive Departments and Establishments

From: Alice M. Rivlin, Director

Subject: Cost Principles for State, Local, and Indian Tribal Governments

1. *Purpose.* This Circular establishes principles and standards for determining costs for Federal awards carried out through grants, cost reimbursement contracts, and other agreements with State and local governments and federally-recognized Indian tribal governments (governmental units).

2. *Authority.* This Circular is issued under the authority of the Budget and Accounting Act of 1921, as amended; the Budget and Accounting Procedures Act of 1950, as amended; the Chief Financial Officers Act of 1990; Reorganization Plan No. 2 of 1970; and Executive Order No. 11541 ("Prescribing the Duties of the Office of Management and Budget and the Domestic Policy Council in the Executive Office of the President").

3. *Background.* An interagency task force was established in 1987 to review existing cost principles for Federal awards to State, local, and Indian tribal governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from governmental units, and compared for consistency the provisions of other OMB cost principles circulars covering non-profit organizations and universities. A proposed revised Circular reflecting the results of those efforts was issued on October 12, 1988, and August 19, 1993. Extensive comments on the proposed revisions, discussions with interest groups, and related developments were considered in developing this revision.

4. *Rescissions.* This Circular rescinds and supersedes Circular A–87, issued January 15, 1981.

5. *Policy.* This Circular establishes principles and standards to provide a uniform approach for determining costs and to promote effective program delivery, efficiency, and better relationships between governmental units and the Federal Government. The principles are for determining allowable costs only. They are not intended to identify the circumstances or to dictate the extent of Federal and governmental unit participation in the financing of a particular Federal award. Provision for profit or other increment above cost is outside the scope of this Circular.

6. *Definitions.* Definitions of key terms used in this Circular are contained in Attachment A, Section B.

7. *Required Action.* Agencies responsible for administering programs that involve cost reimbursement contracts, grants, and other agreements with governmental units shall

0000212

26490    Federal Register / Vol. 60, No. 95 / Wednesday, May 17, 1995 / Notices

Issue codified regulations to implement the provisions of this Circular and its Attachments by September 1, 1995.

8. *OMB Responsibilities.* The Office of Management and Budget (OMB) will review agency regulations and implementation of this Circular, and will provide policy interpretations and assistance to insure effective and efficient implementation. Any exceptions will be subject to approval by OMB. Exceptions will only be made in particular cases where adequate justification is presented.

9. *Information Contact.* Further information concerning this Circular may be obtained by contacting the Office of Federal Financial Management, Financial Standards and Reporting Branch, Office of Management and Budget, Washington, DC 20503, telephone 202–395–3993.

10. *Policy Review Date.* OMB Circular A–87 will have a policy review three years from the date of issuance.

11. *Effective Date.* This Circular is effective as follows:

—For costs charged indirectly or otherwise covered by the cost allocation plans described in Attachments C, D and E, this revision shall be applied to cost allocation plans and indirect cost proposals submitted or prepared for a governmental unit's fiscal year that begins on or after September 1, 1995.

—For other costs, this revision shall be applied to all awards or amendments, including continuation or renewal awards, made on or after September 1, 1995.

**OMB Circular No. A–87—Cost Principles for State, Local and Indian Tribal Governments**

**Table of Contents**

Attachment A—General Principles for Determining Allowable Costs
Attachment B—Selected Items of Cost
Attachment C—State/Local-Wide Central Service Cost Allocation Plans
Attachment D—Public Assistance Cost Allocation Plans
Attachment E—State and Local Indirect Cost Rate Proposals

**Attachment A—General Principles for Determining Allowable Costs**

**Table of Contents**

A. Purpose and Scope
  1. Objectives
  2. Policy guides
  3. Application
B. Definitions
  1. Approval or authorization of the awarding or cognizant Federal agency
  2. Award
  3. Awarding agency
  4. Central service cost allocation plan
  5. Claim
  6. Cognizant agency
  7. Common rule
  8. Contract
  9. Cost
  10. Cost allocation plan
  11. Cost objective
  12. Federally-recognized Indian tribal government
  13. Governmental unit
  14. Grantee department or agency
  15. Indirect cost rate proposal
  16. Local government
  17. Public assistance cost allocation plan
  18. State
C. Basic Guidelines
  1. Factors affecting allowability of costs
  2. Reasonable costs
  3. Allocable costs
  4. Applicable credits
D. Composition of Cost
  1. Total cost
  2. Classification of costs
E. Direct Costs
  1. General
  2. Application
  3. Minor items
F. Indirect Costs
  1. General
  2. Cost allocation plans and indirect cost proposals
  3. Limitation on indirect or administrative costs
G. Interagency Services
H. Required Certifications

**A. Purpose and Scope**

1. *Objectives.* This Attachment establishes principles for determining the allowable costs incurred by State, local, and federally-recognized Indian tribal governments (governmental units) under grants, cost reimbursement contracts, and other agreements with the Federal Government (collectively referred to in this Circular as "Federal awards"). The principles are for the purpose of cost determination and are not intended to identify the circumstances or dictate the extent of Federal or governmental unit participation in the financing of a particular program or project. The principles are designed to provide that Federal awards bear their fair share of cost recognized under these principles except where restricted or prohibited by law. Provision for profit or other increment above cost is outside the scope of this Circular.

2. *Policy guides.*

a. The application of these principles is based on the fundamental premises that:

(1) Governmental units are responsible for the efficient and effective administration of Federal awards through the application of sound management practices.

(2) Governmental units assume responsibility for administering Federal funds in a manner consistent with underlying agreements, program objectives, and the terms and conditions of the Federal award.

(3) Each governmental unit, in recognition of its own unique combination of staff, facilities, and experience, will have the primary responsibility for employing whatever form of organization and management

techniques may be necessary to assure proper and efficient administration of Federal awards.

b. Federal agencies should work with States or localities which wish to test alternative mechanisms for paying costs for administering Federal programs. The Office of Management and Budget (OMB) encourages Federal agencies to test fee-for-service alternatives as a replacement for current cost-reimbursement payment methods in response to the National Performance Review's (NPR) recommendation. The NPR recommended the fee-for-service approach to reduce the burden associated with maintaining systems for charging administrative costs to Federal programs and preparing and approving cost allocation plans. This approach should also increase incentives for administrative efficiencies and improve outcomes.

3. *Application.*

a. These principles will be applied by all Federal agencies in determining costs incurred by governmental units under Federal awards (including subawards) except those with (1) Publicly-financed educational institutions subject to OMB Circular A–21, "Cost Principles for Educational Institutions," and (2) programs administered by publicly-owned hospitals and other providers of medical care that are subject to requirements promulgated by the sponsoring Federal agencies. However, this Circular does apply to all central service and department/agency costs that are allocated or billed to those educational institutions, hospitals, and other providers of medical care or services by other State and local government departments and agencies.

b. All subawards are subject to those Federal cost principles applicable to the particular organization concerned. Thus, if a subaward is to a governmental unit (other than a college, university or hospital), this Circular shall apply; if a subaward is to a commercial organization, the cost principles applicable to commercial organizations shall apply; if a subaward is to a college or university, Circular A–21 shall apply; if a subaward is to a hospital, the cost principles used by the Federal awarding agency for awards to hospitals shall apply, subject to the provisions of subsection A.3.a. of this Attachment; if a subaward is to some other non-profit organization, Circular A–122, "Cost Principles for Non-Profit Organizations," shall apply.

c. These principles shall be used as a guide in the pricing of fixed price arrangements where costs are used in determining the appropriate price.

0000213

Federal Register / Vol. 60, No. 95 / Wednesday, May 17, 1995 / Notices    26491

d. Where a Federal contract awarded to a governmental unit incorporates a Cost Accounting Standards (CAS) clause, the requirements of that clause shall apply. In such cases, the governmental unit and the cognizant Federal agency shall establish an appropriate advance agreement on how the governmental unit will comply with applicable CAS requirements when estimating, accumulating and reporting costs under CAS-covered contracts. The agreement shall indicate that OMB Circular A-87 requirements will be applied to other Federal awards. In all cases, only one set of records needs to be maintained by the governmental unit.

**B. Definitions**

1. "Approval or authorization of the awarding or cognizant Federal agency" means documentation evidencing consent prior to incurring a specific cost. If such costs are specifically identified in a Federal award document, approval of the document constitutes approval of the costs. If the costs are covered by a State/local-wide cost allocation plan or an indirect cost proposal, approval of the plan constitutes the approval.

2. "Award" means grants, cost reimbursement contracts and other agreements between a State, local and Indian tribal government and the Federal Government.

3. "Awarding agency" means (a) with respect to a grant, cooperative agreement, or cost reimbursement contract, the Federal agency, and (b) with respect to a subaward, the party that awarded the subaward.

4. "Central service cost allocation plan" means the documentation identifying, accumulating, and allocating or developing billing rates based on the allowable costs of services provided by a governmental unit on a centralized basis to its departments and agencies. The costs of these services may be allocated or billed to users.

5. "Claim" means a written demand or written assertion by the governmental unit or grantor seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of award terms, or other relief arising under or relating to the award. A voucher, invoice or other routine request for payment that is not a dispute when submitted is not a claim. Appeals, such as those filed by a governmental unit in response to questioned audit costs, are not considered claims until a final management decision is made by the Federal awarding agency.

6. "Cognizant agency" means the Federal agency responsible for reviewing, negotiating, and approving

cost allocation plans or indirect cost proposals developed under this Circular on behalf of all Federal agencies. OMB publishes a listing of cognizant agencies.

7. "Common Rule" means the "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments; Final Rule" originally issued at 53 FR 8034-8103 (March 11, 1988). Other common rules will be referred to by their specific titles.

8. "Contract" means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. In addition to bilateral instruments, contracts include (but are not limited to): awards and notices of awards; job orders or task orders issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and, bilateral contract modifications. Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301 et seq.

9. "Cost" means an amount as determined on a cash, accrual, or other basis acceptable to the Federal awarding or cognizant agency. It does not include transfers to a general or similar fund.

10. "Cost allocation plan" means central service cost allocation plan, public assistance cost allocation plan, and indirect cost rate proposal. Each of these terms are further defined in this section.

11. "Cost objective" means a function, organizational subdivision, contract, grant, or other activity for which cost data are needed and for which costs are incurred.

12. "Federally-recognized Indian tribal government" means the governing body or a governmental agency of any Indian tribe, band, nation, or other organized group or community (including any native village as defined in Section 3 of the Alaska Native Claims Settlement Act, 85 Stat. 688) certified by the Secretary of the Interior as eligible for the special programs and services provided through the Bureau of Indian Affairs.

13. "Governmental unit" means the entire State, local, or federally-recognized Indian tribal government, including any component thereof. Components of governmental units may function independently of the

governmental unit in accordance with the term of the award.

14. "Grantee department or agency" means the component of a State, local, or federally-recognized Indian tribal government which is responsible for the performance or administration of all or some part of a Federal award.

15. "Indirect cost rate proposal" means the documentation prepared by a governmental unit or component thereof to substantiate its request for the establishment of an indirect cost rate as described in Attachment E of this Circular.

16. "Local government" means a county, municipality, city, town, township, local public authority, school district, special district, intrastate district, council of governments (whether or not incorporated as a non-profit corporation under State law), any other regional or interstate government entity, or any agency or instrumentality of a local government.

17. "Public assistance cost allocation plan" means a narrative description of the procedures that will be used in identifying, measuring and allocating all administrative costs to all of the programs administered or supervised by State public assistance agencies as described in Attachment D of this Circular.

18. "State" means any of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any agency or instrumentality of a State exclusive of local governments.

**C. Basic Guidelines**

1. *Factors affecting allowability of costs.* To be allowable under Federal awards, costs must meet the following general criteria:

a. Be necessary and reasonable for proper and efficient performance and administration of Federal awards.

b. Be allocable to Federal awards under the provisions of this Circular.

c. Be authorized or not prohibited under State or local laws or regulations.

d. Conform to any limitations or exclusions set forth in these principles, Federal laws, terms and conditions of the Federal award, or other governing regulations as to types or amounts of cost items.

e. Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit.

f. Be accorded consistent treatment. A cost may not be assigned to a Federal award as a direct cost if any other cost incurred for the same purpose in like

circumstances has been allocated to the Federal award as an indirect cost.

g. Except as otherwise provided for in this Circular, be determined in accordance with generally accepted accounting principles.

h. Not be included as a cost or used to meet cost sharing or matching requirements of any other Federal award in either the current or a prior period, except as specifically provided by Federal law or regulation.

i. Be the net of all applicable credits.

j. Be adequately documented.

2. *Reasonable costs.* A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when governmental units or components are predominately federally-funded. In determining reasonableness of a given cost, consideration shall be given to:

a. Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the governmental unit or the performance of the Federal award.

b. The restraints or requirements imposed by such factors as: sound business practices; arms length bargaining; Federal, State and other laws and regulations; and, terms and conditions of the Federal award.

c. Market prices for comparable goods or services.

d. Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the governmental unit, its employees, the public at large, and the Federal Government.

e. Significant deviations from the established practices of the governmental unit which may unjustifiably increase the Federal award's cost.

3. *Allocable costs.*

a. A cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objective in accordance with relative benefits received.

b. All activities which benefit from the governmental unit's indirect cost, including unallowable activities and services donated to the governmental unit by third parties, will receive an appropriate allocation of indirect costs.

c. Any cost allocable to a particular Federal award or cost objective under the principles provided for in this Circular may not be charged to other Federal awards to overcome fund deficiencies, to avoid restrictions imposed by law or terms of the Federal

awards, or for other reasons. However, this prohibition would not preclude governmental units from shifting costs that are allowable under two or more awards in accordance with existing program agreements.

d. Where an accumulation of indirect costs will ultimately result in charges to a Federal award, a cost allocation plan will be required as described in Attachments C, D, and E.

4. *Applicable credits.*

a. Applicable credits refer to those receipts or reduction of expenditure-type transactions that offset or reduce expense items allocable to Federal awards as direct or indirect costs. Examples of such transactions are: purchase discounts, rebates or allowances, recoveries or indemnities on losses, insurance refunds or rebates, and adjustments of overpayments or erroneous charges. To the extent that such credits accruing to or received by the governmental unit relate to allowable costs, they shall be credited to the Federal award either as a cost reduction or cash refund, as appropriate.

b. In some instances, the amounts received from the Federal Government to finance activities or service operations of the governmental unit should be treated as applicable credits. Specifically, the concept of netting such credit items (including any amounts used to meet cost sharing or matching requirements) should be recognized in determining the rates or amounts to be charged to Federal awards. (See Attachment B, item 15, "Depreciation and use allowances," for areas of potential application in the matter of Federal financing of activities.)

### D. Composition of Cost

1. *Total cost.* The total cost of Federal awards is comprised of the allowable direct cost of the program, plus its allocable portion of allowable indirect costs, less applicable credits.

2. *Classification of costs.* There is no universal rule for classifying certain costs as either direct or indirect under every accounting system. A cost may be direct with respect to some specific service or function, but indirect with respect to the Federal award or other final cost objective. Therefore, it is essential that each item of cost be treated consistently in like circumstances either as a direct or an indirect cost. Guidelines for determining direct and indirect costs charged to Federal awards are provided in the sections that follow.

### E. Direct Costs

1. *General.* Direct costs are those that can be identified specifically with a particular final cost objective.

2. *Application.* Typical direct costs chargeable to Federal awards are:

a. Compensation of employees for the time devoted and identified specifically to the performance of those awards.

b. Cost of materials acquired, consumed, or expended specifically for the purpose of those awards.

c. Equipment and other approved capital expenditures.

d. Travel expenses incurred specifically to carry out the award.

3. *Minor items.* Any direct cost of a minor amount may be treated as an indirect cost for reasons of practicality where such accounting treatment for that item of cost is consistently applied to all cost objectives.

### F. Indirect Costs

1. *General.* Indirect costs are those: (a) incurred for a common or joint purpose benefiting more than one cost objective, and (b) not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved. The term "indirect costs," as used herein, applies to costs of this type originating in the grantee department, as well as those incurred by other departments in supplying goods, services, and facilities. To facilitate equitable distribution of indirect expenses to the cost objectives served, it may be necessary to establish a number of pools of indirect costs within a governmental unit department or in other agencies providing services to a governmental unit department. Indirect cost pools should be distributed to benefitted cost objectives on bases that will produce an equitable result in consideration of relative benefits derived.

2. *Cost allocation plans and indirect cost proposals.* Requirements for development and submission of cost allocation plans and indirect cost rate proposals are contained in Attachments C, D, and E.

3. *Limitation on indirect or administrative costs.*

a. In addition to restrictions contained in this Circular, there may be laws that further limit the amount of administrative or indirect cost allowed.

b. Amounts not recoverable as indirect costs or administrative costs under one Federal award may not be shifted to another Federal award, unless specifically authorized by Federal legislation or regulation.

## G. Interagency Services

The cost of services provided by one agency to another within the governmental unit may include allowable direct costs of the service plus a pro rata share of indirect costs. A standard indirect cost allowance equal to ten percent of the direct salary and wage cost of providing the service (excluding overtime, shift premiums, and fringe benefits) may be used in lieu of determining the actual indirect costs of the service. These services do not include centralized services included in central service cost allocation plans as described in Attachment C.

## H. Required Certifications

Each cost allocation plan or indirect cost rate proposal required by Attachments C and E must comply with the following:

1. No proposal to establish a cost allocation plan or an indirect cost rate, whether submitted to a Federal cognizant agency or maintained on file by the governmental unit, shall be acceptable unless such costs have been certified by the governmental unit using the Certificate of Cost Allocation Plan or Certificate of Indirect Costs as set forth in Attachments C and E. The certificate must be signed on behalf of the governmental unit by an individual at a level no lower than chief financial officer of the governmental unit that submits the proposal or component covered by the proposal.

2. No cost allocation plan or indirect cost rate shall be approved by the Federal Government unless the plan or rate proposal has been certified. Where it is necessary to establish a cost allocation plan or an indirect cost rate and the governmental unit has not submitted a certified proposal for establishing such a plan or rate in accordance with the requirements, the Federal Government may either disallow all indirect costs or unilaterally establish such a plan or rate. Such a plan or rate may be based upon audited historical data or such other data that have been furnished to the cognizant Federal agency and for which it can be demonstrated that all unallowable costs have been excluded. When a cost allocation plan or indirect cost rate is unilaterally established by the Federal Government because of failure of the governmental unit to submit a certified proposal, the plan or rate established will be set to ensure that potentially unallowable costs will not be reimbursed.

## Attachment B—Selected Items of Cost

### Table of Contents

1. Accounting
2. Advertising and public relations costs
3. Advisory councils
4. Alcoholic beverages
5. Audit services
6. Automatic electronic data processing
7. Bad debts
8. Bonding costs
9. Budgeting
10. Communications
11. Compensation for personnel services
   a. General
   b. Reasonableness
   c. Unallowable costs
   d. Fringe benefits
   e. Pension plan costs
   f. Post-retirement health benefits
   g. Severance pay
   h. Support of salaries and wages
   i. Donated services
12. Contingencies
13. Contributions and donations
14. Defense and prosecution of criminal and civil proceedings, and claims
15. Depreciation and use allowances
16. Disbursing service
17. Employee morale, health, and welfare costs
18. Entertainment
19. Equipment and other capital expenditures
20. Fines and penalties
21. Fund raising and investment management costs
22. Gains and losses on disposition of depreciable property and other capital assets and substantial relocation of Federal programs
23. General government expenses
24. Idle facilities and idle capacity
25. Insurance and indemnification
26. Interest
27. Lobbying
28. Maintenance, operations, and repairs
29. Materials and supplies
30. Memberships, subscriptions, and professional activities
31. Motor pools
32. Pre-award costs
33. Professional service costs
34. Proposal costs
35. Publication and printing costs
36. Rearrangements and alterations
37. Reconversion costs
38. Rental costs
39. Taxes
40. Training
41. Travel costs
42. Underrecovery of costs under Federal agreements

Sections 1 through 42 provide principles to be applied in establishing the allowability or unallowability of certain items of cost. These principles apply whether a cost is treated as direct or indirect. A cost is allowable for Federal reimbursement only to the extent of benefits received by Federal awards and its conformance with the general policies and principles stated in Attachment A to this Circular. Failure to mention a particular item of cost in

these sections is not intended to imply that it is either allowable or unallowable; rather, determination of allowability in each case should be based on the treatment or standards provided for similar or related items of cost.

1. *Accounting.* The cost of establishing and maintaining accounting and other information systems is allowable.

2. *Advertising and public relations costs.*

a. The term "advertising costs" means the costs of advertising media and corollary administrative costs. Advertising media include magazines, newspapers, radio and television programs, direct mail, exhibits, and the like.

b. The term "public relations" includes community relations and means those activities dedicated to maintaining the image of the governmental unit or maintaining or promoting understanding and favorable relations with the community or public at large or any segment of the public.

c. Advertising costs are allowable only when incurred for the recruitment of personnel, the procurement of goods and services, the disposal of surplus materials, and any other specific purposes necessary to meet the requirements of the Federal award. Advertising costs associated with the disposal of surplus materials are not allowable where all disposal costs are reimbursed based on a standard rate as specified in the grants management common rule.

d. Public relations costs are allowable when:

(1) Specifically required by the Federal award and then only as a direct cost;

(2) Incurred to communicate with the public and press pertaining to specific activities or accomplishments that result from performance of the Federal award and then only as a direct cost; or

(3) Necessary to conduct general liaison with news media and government public relations officers, to the extent that such activities are limited to communication and liaison necessary to keep the public informed on matters of public concern, such as notices of Federal contract/grant awards, financial matters, etc.

e. Unallowable advertising and public relations costs include the following:

(1) All advertising and public relations costs other than as specified in subsections c. and d.;

(2) Except as otherwise permitted by these cost principles, costs of conventions, meetings, or other events

0000216

**26494**    Federal Register / Vol. 60, No. 95 / Wednesday, May 17, 1995 / Notices

related to other activities of the governmental unit including:

(a) Costs of displays, demonstrations, and exhibits;

(b) Costs of meeting rooms, hospitality suites, and other special facilities used in conjunction with shows and other special events; and

(c) Salaries and wages of employees engaged in setting up and displaying exhibits, making demonstrations, and providing briefings;

(3) Costs of promotional items and memorabilia, including models, gifts, and souvenirs; and

(4) Costs of advertising and public relations designed solely to promote the governmental unit.

3. *Advisory councils.* Costs incurred by advisory councils or committees are allowable as a direct cost where authorized by the Federal awarding agency or as an indirect cost where allocable to Federal awards.

4. *Alcoholic beverages.* Costs of alcoholic beverages are unallowable.

5. *Audit services.* The costs of audits are allowable provided that the audits were performed in accordance with the Single Audit Act, as implemented by Circular A–128, "Audits of State and Local Governments." Generally, the percentage of costs charged to Federal awards for a single audit shall not exceed the percentage derived from dividing Federal funds expended by the total funds expended by the recipient or subrecipient (including program matching funds) during the fiscal year. The percentage may be exceeded only if appropriate documentation demonstrates higher actual costs.

Other audit costs are allowable if specifically approved by the awarding or cognizant agency as a direct cost to an award or included as an indirect cost in a cost allocation plan or rate.

6. *Automatic electronic data processing.* The cost of data processing services is allowable (but see section 19, Equipment and other capital expenditures).

7. *Bad debts.* Any losses arising from uncollectible accounts and other claims, and related costs, are unallowable unless provided for in Federal program award regulations.

8. *Bonding costs.* Costs of bonding employees and officials are allowable to the extent that such bonding is in accordance with sound business practice.

9. *Budgeting.* Costs incurred in the development, preparation, presentation, and execution of budgets are allowable.

10. *Communications.* Costs of telephone, mail, messenger, and similar communication services are allowable.

11. *Compensation for personnel services.*

a. *General.* Compensation for personnel services includes all remuneration, paid currently or accrued, for services rendered during the period of performance under Federal awards, including but not necessarily limited to wages, salaries, and fringe benefits. The costs of such compensation are allowable to the extent that they satisfy the specific requirements of this Circular, and that the total compensation for individual employees:

(1) Is reasonable for the services rendered and conforms to the established policy of the governmental unit consistently applied to both Federal and non-Federal activities;

(2) Follows an appointment made in accordance with a governmental unit's laws and rules and meets merit system or other requirements required by Federal law, where applicable; and

(3) Is determined and supported as provided in subsection h.

b. *Reasonableness.* Compensation for employees engaged in work on Federal awards will be considered reasonable to the extent that it is consistent with that paid for similar work in other activities of the governmental unit. In cases where the kinds of employees required for Federal awards are not found in the other activities of the governmental unit, compensation will be considered reasonable to the extent that it is comparable to that paid for similar work in the labor market in which the employing government competes for the kind of employees involved. Compensation surveys providing data representative of the labor market involved will be an acceptable basis for evaluating reasonableness.

c. *Unallowable costs.* Costs which are unallowable under other sections of these principles shall not be allowable under this section solely on the basis that they constitute personnel compensation.

d. *Fringe benefits.*

(1) Fringe benefits are allowances and services provided by employers to their employees as compensation in addition to regular salaries and wages. Fringe benefits include, but are not limited to, the costs of leave, employee insurance, pensions, and unemployment benefit plans. Except as provided elsewhere in these principles, the costs of fringe benefits are allowable to the extent that the benefits are reasonable and are required by law, governmental unit-employee agreement, or an established policy of the governmental unit.

(2) The cost of fringe benefits in the form of regular compensation paid to

employees during periods of authorized absences from the job, such as for annual leave, sick leave, holidays, court leave, military leave, and other similar benefits, are allowable if: (a) they are provided under established written leave policies; (b) the costs are equitably allocated to all related activities, including Federal awards; and, (c) the accounting basis (cash or accrual) selected for costing each type of leave is consistently followed by the governmental unit.

(3) When a governmental unit uses the cash basis of accounting, the cost of leave is recognized in the period that the leave is taken and paid for. Payments for unused leave when an employee retires or terminates employment are allowable in the year of payment provided they are allocated as a general administrative expense to all activities of the governmental unit or component.

(4) The accrual basis may be only used for those types of leave for which a liability as defined by Generally Accepted Accounting Principles (GAAP) exists when the leave is earned. When a governmental unit uses the accrual basis of accounting, in accordance with GAAP, allowable leave costs are the lesser of the amount accrued or funded.

(5) The cost of fringe benefits in the form of employer contributions or expenses for social security; employee life, health, unemployment, and worker's compensation insurance (except as indicated in section 25, Insurance and indemnification); pension plan costs (see subsection e.); and other similar benefits are allowable, provided such benefits are granted under established written policies. Such benefits, whether treated as indirect costs or as direct costs, shall be allocated to Federal awards and all other activities in a manner consistent with the pattern of benefits attributable to the individuals or group(s) of employees whose salaries and wages are chargeable to such Federal awards and other activities.

e. *Pension plan costs.* Pension plan costs may be computed using a pay-as-you-go method or an acceptable actuarial cost method in accordance with established written policies of the governmental unit.

(1) For pension plans financed on a pay-as-you-go method, allowable costs will be limited to those representing actual payments to retirees or their beneficiaries.

(2) Pension costs calculated using an actuarial cost-based method recognized by GAAP are allowable for a given fiscal year if they are funded for that year

0000217

within six months after the end of that year. Costs funded after the six month period (or a later period agreed to by the cognizant agency) are allowable in the year funded. The cognizant agency may agree to an extension of the six month period if an appropriate adjustment is made to compensate for the timing of the charges to the Federal Government and related Federal reimbursement and the governmental unit's contribution to the pension fund. Adjustments may be made by cash refund or other equitable procedures to compensate the Federal Government for the time value of Federal reimbursements in excess of contributions to the pension fund.

(3) Amounts funded by the governmental unit in excess of the actuarially determined amount for a fiscal year may be used as the governmental unit's contribution in future periods.

(4) When a governmental unit converts to an acceptable actuarial cost method, as defined by GAAP, and funds pension costs in accordance with this method, the unfunded liability at the time of conversion shall be allowable if amortized over a period of years in accordance with GAAP.

(5) The Federal Government shall receive an equitable share of any previously allowed pension costs (including earnings thereon) which revert to or inure to the governmental unit in the form of a refund, withdrawal, or other credit.

f. Post-retirement health benefits. Post-retirement health benefits (PRHB) refers to costs of health insurance or health services not included in a pension plan covered by subsection e. for retirees and their spouses, dependents, and survivors. PRHB costs may be computed using a pay-as-you-go method or an acceptable actuarial cost method in accordance with established written polices of the governmental unit.

(1) For PRHB financed on a pay as-you-go method, allowable costs will be limited to those representing actual payments to retirees or their beneficiaries.

(2) PRHB costs calculated using an actuarial cost method recognized by GAAP are allowable if they are funded for that year within six months after the end of that year. Costs funded after the six month period (or a later period agreed to by the cognizant agency) are allowable in the year funded. The cognizant agency may agree to an extension of the six month period if an appropriate adjustment is made to compensate for the timing of the charges to the Federal Government and related Federal reimbursements and the

governmental unit's contributions to the PRHB fund. Adjustments may be made by cash refund, reduction in current year's PRHB costs, or other equitable procedures to compensate the Federal Government for the time value of Federal reimbursements in excess of contributions to the PRHB fund.

(3) Amounts funded in excess of the actuarially determined amount for a fiscal year may be used as the government's contribution in a future period.

(4) When a governmental unit converts to an acceptable actuarial cost method and funds PRHB costs in accordance with this method, the initial unfunded liability attributable to prior years shall be allowable if amortized over a period of years in accordance with GAAP, or, if no such GAAP period exists, over a period negotiated with the cognizant agency.

(5) To be allowable in the current year, the PRHB costs must be paid either to:

(a) An insurer or other benefit provider as current year costs or premiums, or

(b) An insurer or trustee to maintain a trust fund or reserve for the sole purpose of providing post-retirement benefits to retirees and other beneficiaries.

(6) The Federal Government shall receive an equitable share of any amounts of previously allowed post-retirement benefit costs (including earnings thereon) which revert or inure to the governmental unit in the form of a refund, withdrawal, or other credit.

g. Severance pay.

(1) Payments in addition to regular salaries and wages made to workers whose employment is being terminated are allowable to the extent that, in each case, they are required by (a) law, (b) employer-employee agreement, or (c) established written policy.

(2) Severance payments (but not accruals) associated with normal turnover are allowable. Such payments shall be allocated to all activities of the governmental unit as an indirect cost.

(3) Abnormal or mass severance pay will be considered on a case-by-case basis and is allowable only if approved by the cognizant Federal agency.

h. Support of salaries and wages. These standards regarding time distribution are in addition to the standards for payroll documentation.

(1) Charges to Federal awards for salaries and wages, whether treated as direct or indirect costs, will be based on payrolls documented in accordance with generally accepted practice of the governmental unit and approved by a

responsible official(s) of the governmental unit.

(2) No further documentation is required for the salaries and wages of employees who work in a single indirect cost activity.

(3) Where employees are expected to work solely on a single Federal award or cost objective, charges for their salaries and wages will be supported by periodic certifications that the employees worked solely on that program for the period covered by the certification. These certifications will be prepared at least semi-annually and will be signed by the employee or supervisory official having first hand knowledge of the work performed by the employee.

(4) Where employees work on multiple activities or cost objectives, a distribution of their salaries or wages will be supported by personnel activity reports or equivalent documentation which meets the standards in subsection (5) unless a statistical sampling system (see subsection (6)) or other substitute system has been approved by the cognizant Federal agency. Such documentary support will be required where employees work on:

(a) More than one Federal award,

(b) A Federal award and a non-Federal award,

(c) An indirect cost activity and a direct cost activity,

(d) Two or more indirect activities which are allocated using different allocation bases, or

(e) An unallowable activity and a direct or indirect cost activity.

(5) Personnel activity reports or equivalent documentation must meet the following standards:

(a) They must reflect an after-the-fact distribution of the actual activity of each employee,

(b) They must account for the total activity for which each employee is compensated,

(c) They must be prepared at least monthly and must coincide with one or more pay periods, and

(d) They must be signed by the employee.

(e) Budget estimates or other distribution percentages determined before the services are performed do not qualify as support for charges to Federal awards but may be used for interim accounting purposes, provided that:

(i) The governmental unit's system for establishing the estimates produces reasonable approximations of the activity actually performed;

(ii) At least quarterly, comparisons of actual costs to budgeted distributions based on the monthly activity reports are made. Costs charged to Federal

0000218

awards to reflect adjustments made as a result of the activity actually performed may be recorded annually if the quarterly comparisons show the differences between budgeted and actual costs are less than ten percent; and

(iii) The budget estimates or other distribution percentages are revised at least quarterly, if necessary, to reflect changed circumstances.

(6) Substitute systems for allocating salaries and wages to Federal awards may be used in place of activity reports. These systems are subject to approval if required by the cognizant agency. Such systems may include, but are not limited to, random moment sampling, case counts, or other quantifiable measures of employee effort.

(a) Substitute systems which use sampling methods (primarily for Aid to Families with Dependent Children (AFDC), Medicaid, and other public assistance programs) must meet acceptable statistical sampling standards including:

(i) The sampling universe must include all of the employees whose salaries and wages are to be allocated based on sample results except as provided in subsection (c);

(ii) The entire time period involved must be covered by the sample; and

(iii) The results must be statistically valid and applied to the period being sampled.

(b) Allocating charges for the sampled employees' supervisors, clerical and support staffs, based on the results of the sampled employees, will be acceptable.

(c) Less than full compliance with the statistical sampling standards noted in subsection (a) may be accepted by the cognizant agency if it concludes that the amounts to be allocated to Federal awards will be minimal, or if it concludes that the system proposed by the governmental unit will result in lower costs to Federal awards than a system which complies with the standards.

(7) Salaries and wages of employees used in meeting cost sharing or matching requirements of Federal awards must be supported in the same manner as those claimed as allowable costs under Federal awards.

i. Donated services.

(1) Donated or volunteer services may be furnished to a governmental unit by professional and technical personnel, consultants, and other skilled and unskilled labor. The value of these services is not reimbursable either as a direct or indirect cost. However, the value of donated services may be used to meet cost sharing or matching

requirements in accordance with the provisions of the Common Rule.

(2) The value of donated services utilized in the performance of a direct cost activity shall, when material in amount, be considered in the determination of the governmental unit's indirect costs or rate(s) and, accordingly, shall be allocated a proportionate share of applicable indirect costs.

(3) To the extent feasible, donated services will be supported by the same methods used by the governmental unit to support the allocability of regular personnel services.

12. *Contingencies.* Contributions to a contingency reserve or any similar provision made for events the occurrence of which cannot be foretold with certainty as to time, or intensity, or with an assurance of their happening, are unallowable. The term "contingency reserve" excludes self-insurance reserves (see subsection 25.c.), pension plan reserves (see subsection 11.a.), and post-retirement health and other benefit reserves (see subsection 11.f.) computed using acceptable actuarial cost methods.

13. *Contributions and donations.* Contributions and donations, including cash, property, and services, by governmental units to others, regardless of the recipient, are unallowable.

14. *Defense and prosecution of criminal and civil proceedings, and claims.*

a. The following costs are unallowable for contracts covered by 10 U.S.C. 2324(k). "Allowable costs under defense · contracts."

(1) Costs incurred in defense of any civil or criminal fraud proceeding or similar proceeding (including filing of false certification brought by the United States where the contractor is found liable or has pleaded nolo contendere to a charge of fraud or similar proceeding (including filing of a false certification).

(2) Costs incurred by a contractor in connection with any criminal, civil or administrative proceedings commenced by the United States or a State to the extent provided in 10 U.S.C. 2324(k).

b. Legal expenses required in the administration of Federal programs are allowable. Legal expenses for prosecution of claims against the Federal Government are unallowable.

15. *Depreciation and use allowances.*

a. Depreciation and use allowances are means of allocating the cost of fixed assets to periods benefitting from asset use. Compensation for the use of fixed assets on hand may be made through depreciation or use allowances. A combination of the two methods may not be used in connection with a single class of fixed assets (e.g., buildings,

office equipment, computer equipment, etc.) except as provided in subsection g. Except for enterprise funds and internal service funds that are included as part of a State/local cost allocation plan, classes of assets shall be determined on the same basis used for the government-wide financial statements.

b. The computation of depreciation or use allowances shall be based on the acquisition cost of the assets involved. Where actual cost records have not been maintained, a reasonable estimate of the original acquisition cost may be used. The value of an asset donated to the governmental unit by an unrelated third party shall be its fair market value at the time of donation. Governmental or quasi-governmental organizations located within the same State shall not be considered unrelated third parties for this purpose.

c. The computation of depreciation or use allowances will exclude:

(1) The cost of land;

(2) Any portion of the cost of buildings and equipment borne by or donated by the Federal Government irrespective of where title was originally vested or where it presently resides; and

(3) Any portion of the cost of buildings and equipment contributed by or for the governmental unit, or a related donor organization, in satisfaction of a matching requirement.

d. Where the use allowance method is followed, the use allowance for buildings and improvements (including land improvements, such as paved parking areas, fences, and sidewalks) will be computed at an annual rate not exceeding two percent of acquisition costs. The use allowance for equipment will be computed at an annual rate not exceeding 6⅔ percent of acquisition cost. When the use allowance method is used for buildings, the entire building must be treated as a single asset; the building's components (e.g., plumbing system, heating and air condition, etc.) cannot be segregated from the building's shell. The two percent limitation, however, need not be applied to equipment which is merely attached or fastened to the building but not permanently fixed to it and which is used as furnishings or decorations or for specialized purposes (e.g., dentist chairs and dental treatment units, counters, laboratory benches bolted to the floor, dishwashers, modular furniture, carpeting, etc.). Such equipment will be considered as not being permanently fixed to the building if it can be removed without the destruction of, or need for costly or extensive alterations or repairs, to the building or the equipment. Equipment that meets these

criteria will be subject to the 6⅔ percent equipment use allowance limitation.

e. Where the depreciation method is followed, the period of useful service (useful life) established in each case for usable capital assets must take into consideration such factors as type of construction, nature of the equipment used, historical usage patterns, technological developments, and the renewal and replacement policies of the governmental unit followed for the individual items or classes of assets involved. In the absence of clear evidence indicating that the expected consumption of the asset will be significantly greater in the early portions than in the later portions of its useful life, the straight line method of depreciation shall be used. Depreciation methods once used shall not be changed unless approved by the Federal cognizant or awarding agency. When the depreciation method is introduced for application to an asset previously subject to a use allowance, the annual depreciation charge thereon may not exceed the amount that would have resulted had the depreciation method been in effect from the date of acquisition of the asset. The combination of use allowances and depreciation applicable to the asset shall not exceed the total acquisition cost of the asset or fair market value at time of donation.

f. When the depreciation method is used for buildings, a building's shell may be segregated from the major component of the building (e.g., plumbing system, heating, and air conditioning system, etc.) and each major component depreciated over its estimated useful life, or the entire building (i.e., the shell and all components) may be treated as a single asset and depreciated over a single useful life.

g. A reasonable use allowance may be negotiated for any assets that are considered to be fully depreciated, after taking into consideration the amount of depreciation previously charged to the government, the estimated useful life remaining at the time of negotiation, the effect of any increased maintenance charges, decreased efficiency due to age, and any other factors pertinent to the utilization of the asset for the purpose contemplated.

h. Charges for use allowances or depreciation must be supported by adequate property records. Physical inventories must be taken at least once every two years (a statistical sampling approach is acceptable) to ensure that assets exist, and are in use. Governmental units will manage equipment in accordance with State

laws and procedures. When the depreciation method is followed, depreciation records indicating the amount of depreciation taken each period must also be maintained.

16. *Disbursing service.* The cost of disbursing funds by the Treasurer or other designated officer is allowable.

17. *Employee morale, health, and welfare costs.* The costs of health or first-aid clinics and/or infirmaries, recreational facilities, employee counseling services, employee information publications, and any related expenses incurred in accordance with a governmental unit's policy are allowable. Income generated from any of these activities will be offset against expenses.

18. *Entertainment.* Costs of entertainment, including amusement, diversion, and social activities and any costs directly associated with such costs (such as tickets to shows or sports events, meals, lodging, rentals, transportation, and gratuities) are unallowable.

19. Equipment and other capital expenditures.

a. As used in this section the following terms have the meanings as set forth below:

(1) "Capital expenditure" means the cost of the asset including the cost to put it in place. Capital expenditure for equipment means the net invoice price of the equipment, including the cost of any modifications, attachments, accessories, or auxiliary apparatus necessary to make it usable for the purpose for which it is acquired. Ancillary charges, such as taxes, duty, protective in transit insurance, freight, and installation may be included in, or excluded from, capital expenditure cost in accordance with the governmental unit's regular accounting practices.

(2) "Equipment" means an article of nonexpendable, tangible personal property having a useful life of more than one year and an acquisition cost which equals the lesser of (a) the capitalization level established by the governmental unit for financial statement purposes, or (b) $5000.

(3) "Other capital assets" mean buildings, land, and improvements to buildings or land that materially increase their value or useful life.

b. Capital expenditures which are not charged directly to a Federal award may be recovered through use allowances or depreciation on buildings, capital improvements, and equipment (see section 15). See also section 38 for allowability of rental costs for buildings and equipment.

c. Capital expenditures for equipment, including replacement equipment, other

capital assets, and improvements which materially increase the value or useful life of equipment or other capital assets are allowable as a direct cost when approved by the awarding agency. Federal awarding agencies are authorized at their option to waive or delegate this approval requirement.

d. Items of equipment with an acquisition cost of less than $5000 are considered to be supplies and are allowable as direct costs of Federal awards without specific awarding agency approval.

e. The unamortized portion of any equipment written off as a result of a change in capitalization levels may be recovered by (1) continuing to claim the otherwise allowable use allowances or depreciation charges on the equipment or by (2) amortizing the amount to be written off over a period of years negotiated with the cognizant agency.

f. When replacing equipment purchased in whole or in part with Federal funds, the governmental unit may use the equipment to be replaced as a trade-in or sell the property and use the proceeds to offset the cost of the replacement property.

20. *Fines and penalties.* Fines, penalties, damages, and other settlements resulting from violations (or alleged violations) of, or failure of the governmental unit to comply with, Federal, State, local, or Indian tribal laws and regulations are unallowable except when incurred as a result of compliance with specific provisions of the Federal award or written instructions by the awarding agency authorizing in advance such payments.

21. *Fund raising and investment management costs.*

a. Costs of organized fund raising, including financial campaigns, solicitation of gifts and bequests, and similar expenses incurred to raise capital or obtain contributions are unallowable, regardless of the purpose for which the funds will be used.

b. Costs of investment counsel and staff and similar expenses incurred to enhance income from investments are unallowable. However, such costs associated with investments covering pension, self-insurance, or other funds which include Federal participation allowed by this Circular are allowable.

c. Fund raising and investment activities shall be allocated an appropriate share of indirect costs under the conditions described in subsection C.3.b. of Attachment A.

22. *Gains and losses on disposition of depreciable property and other capital assets and substantial relocation of Federal programs.*

0000220

a. (1) Gains and losses on the sale, retirement, or other disposition of depreciable property shall be included in the year in which they occur as credits or charges to the asset cost grouping(s) in which the property was included. The amount of the gain or loss to be included as a credit or charge to the appropriate asset cost grouping(s) shall be the difference between the amount realized on the property and the undepreciated basis of the property.

(2) Gains and losses on the disposition of depreciable property shall not be recognized as a separate credit or charge under the following conditions:

(a) The gain or loss is processed through a depreciation account and is reflected in the depreciation allowable under sections 15 and 19.

(b) The property is given in exchange as part of the purchase price of a similar item and the gain or loss is taken into account in determining the depreciation cost basis of the new item.

(c) A loss results from the failure to maintain permissible insurance, except as otherwise provided in subsection 25.d.

(d) Compensation for the use of the property was provided through use allowances in lieu of depreciation.

b. Substantial relocation of Federal awards from a facility where the Federal Government participated in the financing to another facility prior to the expiration of the useful life of the financed facility requires Federal agency approval. The extent of the relocation, the amount of the Federal participation in the financing, and the depreciation charged to date may require negotiation of space charges for Federal awards.

c. Gains or losses of any nature arising from the sale or exchange of property other than the property covered in subsection a., e.g., land or included in the fair market value used in any adjustment resulting from a relocation of Federal awards covered in subsection b. shall be excluded in computing Federal award costs.

**23. General government expenses.**

a. The general costs of government are unallowable (except as provided in section 41). These include:

(1) Salaries and expenses of the Office of the Governor of a State or the chief executive of a political subdivision or the chief executives of federally-recognized Indian tribal governments;

(2) Salaries and other expenses of State legislatures, tribal councils, or similar local governmental bodies, such as county supervisors, city councils, school boards, etc., whether incurred for purposes of legislation or executive direction;

(3) Cost of the judiciary branch of a government;

(4) Cost of prosecutorial activities unless treated as a direct cost to a specific program when authorized by program regulations (however, this does not preclude the allowability of other legal activities of the Attorney General); and

(5) Other general types of government services normally provided to the general public, such as fire and police, unless provided for as a direct cost in program regulations.

b. For federally-recognized Indian tribal governments and Councils Of Governments (COGs), the portion of salaries and expenses directly attributable to managing and operating Federal programs by the chief executive and his staff is allowable.

**24. Idle facilities and idle capacity.**

a. As used in this section the following terms have the meanings set forth below:

(1) "Facilities" means land and buildings or any portion thereof, equipment individually or collectively, or any other tangible capital asset, wherever located, and whether owned or leased by the governmental unit.

(2) "Idle facilities" means completely unused facilities that are excess to the governmental unit's current needs.

(3) "Idle capacity" means the unused capacity of partially used facilities. It is the difference between (a) that which a facility could achieve under 100 percent operating time on a one-shift basis less operating interruptions resulting from time lost for repairs, setups, unsatisfactory materials, and other normal delays and (b) the extent to which the facility was actually used to meet demands during the accounting period. A multi-shift basis should be used if it can be shown that this amount of usage would normally be expected for the type of facility involved.

(4) "Cost of idle facilities or idle capacity" means costs such as maintenance, repair, housing, rent, and other related costs, e.g., insurance, interest, and depreciation or use allowances.

b. The costs of idle facilities are unallowable except to the extent that:

(1) They are necessary to meet fluctuations in workload; or

(2) Although not necessary to meet fluctuations in workload, they were necessary when acquired and are now idle because of changes in program requirements, efforts to achieve more economical operations, reorganization, termination, or other causes which could not have been reasonably foreseen. Under the exception stated in this subsection, costs of idle facilities

are allowable for a reasonable period of time, ordinarily not to exceed one year, depending on the initiative taken to use, lease, or dispose of such facilities.

c. The costs of idle capacity are normal costs of doing business and are a factor in the normal fluctuations of usage or indirect cost rates from period to period. Such costs are allowable, provided that the capacity is reasonably anticipated to be necessary or was originally reasonable and is not subject to reduction or elimination by use on other Federal awards, subletting, renting, or sale, in accordance with sound business, economic, or security practices. Widespread idle capacity throughout an entire facility or among a group of assets having substantially the same function may be considered idle facilities.

**25. Insurance and indemnification.**

a. Costs of insurance required or approved and maintained, pursuant to the Federal award, are allowable.

b. Costs of other insurance in connection with the general conduct of activities are allowable subject to the following limitations:

(1) Types and extent and cost of coverage are in accordance with the governmental unit's policy and sound business practice.

(2) Costs of insurance or of contributions to any reserve covering the risk of loss of, or damage to, Federal Government property are unallowable except to the extent that the awarding agency has specifically required or approved such costs.

c. Actual losses which could have been covered by permissible insurance (through a self-insurance program or otherwise) are unallowable, unless expressly provided for in the Federal award or as described below. However, the Federal Government will participate in actual losses of a self insurance fund that are in excess of reserves. Costs incurred because of losses not covered under nominal deductible insurance coverage provided in keeping with sound management practice, and minor losses not covered by insurance, such as spoilage, breakage, and disappearance of small hand tools, which occur in the ordinary course of operations, are allowable.

d. Contributions to a reserve for certain self-insurance programs including workers compensation, unemployment compensation, and severance pay are allowable subject to the following provisions:

(1) The type of coverage and the extent of coverage and the rates and premiums would have been allowed had insurance (including reinsurance) been purchased to cover the risks.

0000221

However, provision for known or reasonably estimated self-insured liabilities, which do not become payable for more than one year after the provision is made, shall not exceed the discounted present value of the liability. The rate used for discounting the liability must be determined by giving consideration to such factors as the governmental unit's settlement rate for those liabilities and its investment rate of return.

(2) Earnings or investment income on reserves must be credited to those reserves.

(3) Contributions to reserves must be based on sound actuarial principles using historical experience and reasonable assumptions. Reserve levels must be analyzed and updated at least biennially for each major risk being insured and take into account any reinsurance, coinsurance, etc. Reserve levels related to employee-related coverages will normally be limited to the value of claims (a) submitted and adjudicated but not paid, (b) submitted but not adjudicated, and (c) incurred but not submitted. Reserve levels in excess of the amounts based on the above must be identified and justified in the cost allocation plan or indirect cost rate proposal.

(4) Accounting records, actuarial studies, and cost allocations (or billings) must recognize any significant differences due to types of insured risk and losses generated by the various insured activities or agencies of the governmental unit. If individual departments or agencies of the governmental unit experience significantly different levels of claims for a particular risk, those differences are to be recognized by the use of separate allocations or other techniques resulting in an equitable allocation.

(5) Whenever funds are transferred from a self-insurance reserve to other accounts (e.g., general fund), refunds shall be made to the Federal Government for its share of funds transferred, including earned or imputed interest from the date of transfer.

e. Actual claims paid to or on behalf of employees or former employees for workers' compensation, unemployment compensation, severance pay, and similar employee benefits (e.g., subsection 11.f. for post retirement health benefits), are allowable in the year of payment provided (1) the governmental unit follows a consistent costing policy and (2) they are allocated as a general administrative expense to all activities of the governmental unit.

f. Insurance refunds shall be credited against insurance costs in the year the refund is received.

g. Indemnification includes securing the governmental unit against liabilities to third persons and other losses not compensated by insurance or otherwise. The Federal Government is obligated to indemnify the governmental unit only to the extent expressly provided for in the Federal award, except as provided in subsection d.

h. Costs of commercial insurance that protects against the costs of the contractor for correction of the contractor's own defects in materials or workmanship are unallowable.

26. *Interest.*

a. Costs incurred for interest on borrowed capital or the use of a governmental unit's own funds, however represented, are unallowable except as specifically provided in subsection b. or authorized by Federal legislation.

b. Financing costs (including interest) paid or incurred on or after the effective date of this Circular associated with the otherwise allowable costs of building acquisition, construction, or fabrication, reconstruction or remodeling completed on or after October 1, 1980 is allowable, subject to the conditions in (1)–(4). Financing costs (including interest) paid or incurred on or after the effective date of this Circular associated with otherwise allowable costs of equipment is allowable, subject to the conditions in (1)–(4).

(1) The financing is provided (from other than tax or user fee sources) by a bona fide third party external to the governmental unit;

(2) The assets are used in support of Federal awards;

(3) Earnings on debt service reserve funds or interest earned on borrowed funds pending payment of the construction or acquisition costs are used to offset the current period's cost or the capitalized interest, as appropriate. Earnings subject to being reported to the Federal Internal Revenue Service under arbitrage requirements are excludable.

(4) Governmental units will negotiate the amount of allowable interest whenever cash payments (interest, depreciation, use allowances, and contributions) exceed the governmental unit's cash payments and other contributions attributable to that portion of real property used for Federal awards.

27. *Lobbying.* The cost of certain influencing activities associated with obtaining grants, contracts, cooperative agreements, or loans is an unallowable cost. Lobbying with respect to certain grants, contracts, cooperative agreements, and loans shall be governed by the common rule, "New Restrictions on Lobbying" published at 55 FR 6736 (February 26, 1990), including definitions, and the Office of Management and Budget "Government-wide Guidance for New Restrictions on Lobbying" and notices published at 54 FR 52306 (December 20, 1989), 55 FR 24540 (June 15, 1990), and 57 FR 1772 (January 15, 1992), respectively.

28. *Maintenance, operations, and repairs.* Unless prohibited by law, the cost of utilities, insurance, security, janitorial services, elevator service, upkeep of grounds, necessary maintenance, normal repairs and alterations, and the like are allowable to the extent that they: (1) keep property (including Federal property, unless otherwise provided for) in an efficient operating condition, (2) do not add to the permanent value of property or appreciably prolong its intended life, and (3) are not otherwise included in rental or other charges for space. Costs which add to the permanent value of property or appreciably prolong its intended life shall be treated as capital expenditures (see sections 15 and 19).

29. *Materials and supplies.* The cost of materials and supplies is allowable. Purchases should be charged at their actual prices after deducting all cash discounts, trade discounts, rebates, and allowances received. Withdrawals from general stores or stockrooms should be charged at cost under any recognized method of pricing, consistently applied. Incoming transportation charges are a proper part of materials and supply costs.

30. *Memberships, subscriptions, and professional activities.*

a. Costs of the governmental unit's memberships in business, technical, and professional organizations are allowable.

b. Costs of the governmental unit's subscriptions to business, professional, and technical periodicals are allowable.

c. Costs of meetings and conferences where the primary purpose is the dissemination of technical information, including meals, transportation, rental of meeting facilities, and other incidental costs are allowable.

d. Costs of membership in civic and community, social organizations are allowable as a direct cost with the approval of the Federal awarding agency.

e. Costs of membership in organizations substantially engaged in lobbying are unallowable.

31. *Motor pools.* The costs of a service organization which provides automobiles to user governmental units at a mileage or fixed rate and/or

0000222

provides vehicle maintenance, inspection, and repair services are allowable.

32. *Pre-award costs.* Pre-award costs are those incurred prior to the effective date of the award directly pursuant to the negotiation and in anticipation of the award where such costs are necessary to comply with the proposed delivery schedule or period of performance. Such costs are allowable only to the extent that they would have been allowable if incurred after the date of the award and only with the written approval of the awarding agency.

33. *Professional service costs.*

a. Cost of professional and consultant services rendered by persons or organizations that are members of a particular profession or possess a special skill, whether or not officers or employees of the governmental unit, are allowable, subject to section 14 when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Federal Government.

b. Retainer fees supported by evidence of bona fide services available or rendered are allowable.

34. *Proposal costs.* Costs of preparing proposals for potential Federal awards are allowable. Proposal costs should normally be treated as indirect costs and should be allocated to all activities of the governmental unit utilizing the cost allocation plan and indirect cost rate proposal. However, proposal costs may be charged directly to Federal awards with the prior approval of the Federal awarding agency.

35. *Publication and printing costs.* Publication costs, including the costs of printing (including the processes of composition, plate-making, press work, and binding, and the end products produced by such processes), distribution, promotion, mailing, and general handling are allowable.

36. *Rearrangements and alterations.* Costs incurred for ordinary and normal rearrangement and alteration of facilities are allowable. Special arrangements and alterations costs incurred specifically for a Federal award are allowable with the prior approval of the Federal awarding agency.

37. *Reconversion costs.* Costs incurred in the restoration or rehabilitation of the governmental unit's facilities to approximately the same condition existing immediately prior to commencement of Federal awards, less costs related to normal wear and tear, are allowable.

38. *Rental costs.*

a. Subject to the limitations described in subsections b. through d. of this section, rental costs are allowable to the extent that the rates are reasonable in light of such factors as: rental costs of comparable property, if any; market conditions in the area; alternatives available; and, the type, life expectancy, condition, and value of the property leased.

b. Rental costs under sale and leaseback arrangements are allowable only up to the amount that would be allowed had the governmental unit continued to own the property.

c. Rental costs under less-than-arms-length leases are allowable only up to the amount that would be allowed had title to the property vested in the governmental unit. For this purpose, less-than-arms-length leases include, but are not limited to, those where:

(1) One party to the lease is able to control or substantially influence the actions of the other;

(2) Both parties are parts of the same governmental unit; or

(3) The governmental unit creates an authority or similar entity to acquire and lease the facilities to the governmental unit and other parties.

d. Rental costs under leases which are required to be treated as capital leases under GAAP are allowable only up to the amount that would be allowed had the governmental unit purchased the property on the date the lease agreement was executed. This amount would include expenses such as depreciation or use allowance, maintenance, and insurance. The provisions of Financial Accounting Standards Board Statement 13 shall be used to determine whether a lease is a capital lease. Interest costs related to capital leases are allowable to the extent they meet the criteria in section 26.

39. *Taxes.*

a. Taxes that a governmental unit is legally required to pay are allowable, except for self-assessed taxes that disproportionately affect Federal programs or changes in tax policies that disproportionately affect Federal programs. This provision becomes effective for taxes paid during the governmental unit's first fiscal year that begins on or after January 1, 1998, and applies thereafter.

b. Gasoline taxes, motor vehicle fees, and other taxes that are in effect user fees for benefits provided to the Federal Government are allowable.

c. This provision does not restrict the authority of Federal agencies to identify taxes where Federal participation is inappropriate. Where the identification of the amount of unallowable taxes would require an inordinate amount of effort, the cognizant agency may accept a reasonable approximation thereof.

40. *Training.* The cost of training provided for employee development is allowable.

41. *Travel costs.*

a. *General.* Travel costs are allowable for expenses for transportation, lodging, subsistence, and related items incurred by employees traveling on official business. Such costs may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip, and results in charges consistent with those normally allowed in like circumstances in non-federally-sponsored activities. Notwithstanding the provisions of section 23, travel costs of officials covered by that section, when specifically related to Federal awards, are allowable with the prior approval of a grantor agency.

b. *Lodging and subsistence.* Costs incurred by employees and officers for travel, including costs of lodging, other subsistence, and incidental expenses, shall be considered reasonable and allowable only to the extent such costs do not exceed charges normally allowed by the governmental unit in its regular operations as a result of the governmental unit's policy. In the absence of a written governmental unit policy regarding travel costs, the rates and amounts established under subchapter I of Chapter 57 of Title 5, United States Code "Travel and Subsistence Expenses; Mileage Allowances," or by the Administrator of General Services, or the President (or his designee) pursuant to any provisions of such subchapter shall be used as guidance for travel under Federal awards (41 U.S.C. 420, "Travel Expenses of Government Contractors").

c. *Commercial air travel.* Airfare costs in excess of the customary standard (coach or equivalent) airfare, are unallowable except when such accommodations would: require circuitous routing, require travel during unreasonable hours, excessively prolong travel, greatly increase the duration of the flight, result in increased cost that would offset transportation savings, or offer accommodations not reasonably adequate for the medical needs of the traveler. Where a governmental unit can reasonably demonstrate to the awarding agency either the nonavailability of customary standard airfare or Federal Government contract airfare for individual trips or, on an overall basis, that it is the governmental unit's practice to make routine use of such airfare, specific determinations of nonavailability will generally not be questioned by the Federal Government.

unless a pattern of avoidance is detected. However, in order for airfare costs in excess of the customary standard commercial airfare to be allowable, e.g., use of first-class airfare, the governmental unit must justify and document on a case-by-case basis the applicable condition(s) set forth above.

d. *Air travel by other than commercial carrier.* Cost of travel by governmental unit-owned, -leased, or -chartered aircraft, as used in this section, includes the cost of lease, charter, operation (including personnel costs), maintenance, depreciation, interest, insurance, and other related costs. Costs of travel via governmental unit-owned, -leased, or -chartered aircraft are unallowable to the extent they exceed the cost of allowable commercial air travel, as provided for in subsection c.

42. *Underrecovery of costs under Federal agreements.* Any excess costs over the Federal contribution under one award agreement are unallowable under other award agreements.

**Table of Contents**

A. General
B. Definitions
  1. Billed central services
  2. Allocated central services
  3. Agency or operating agency
C. Scope of the Central Service Cost Allocation Plans
D. Submission Requirements
E. Documentation Requirements for Submitted Plans
  1. General
  2. Allocated central services
  3. Billed services
  a. General
  b. Internal service funds
  c. Self-insurance funds
  d. Fringe benefits
  44. Required certification
F. Negotiation and Approval of Central Service Plans
G. Other Policies
  1. Billed central service activities
  2. Working capital reserves
  3. Carry-forward adjustments of allocated central service costs
  4. Adjustments of billed central services
  5. Records retention
  6. Appeals
  7. OMB assistance

**A. General**

1. Most governmental units provide certain services, such as motor pools, computer centers, purchasing, accounting, etc., to operating agencies on a centralized basis. Since federally-supported awards are performed within the individual operating agencies, there needs to be a process whereby these central service costs can be identified and assigned to benefitted activities on a reasonable and consistent basis. The central service cost allocation plan provides that process. All costs and

other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the propriety of the costs assigned to Federal awards.

2. Guidelines and illustrations of central service cost allocation plans are provided in a brochure published by the Department of Health and Human Services entitled "A Guide for State and Local Government Agencies: Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Grants and Contracts with the Federal Government." A copy of this brochure may be obtained from the Superintendent of Documents, U.S. Government Printing Office.

**B. Definitions**

1. "Billed central services" means central services that are billed to benefitted agencies and/or programs on an individual fee-for-service or similar basis. Typical examples of billed central services include computer services, transportation services, insurance, and fringe benefits.

2. "Allocated central services" means central services that benefit operating agencies but are not billed to the agencies on a fee-for-service or similar basis. These costs are allocated to benefitted agencies on some reasonable basis. Examples of such services might include general accounting, personnel administration, purchasing, etc.

3. "Agency or operating agency" means an organizational unit or sub-division within a governmental unit that is responsible for the performance or administration of awards or activities of the governmental unit.

**C. Scope of the Central Service Cost Allocation Plans**

The central service cost allocation plan will include all central service costs that will be claimed (either as a billed or an allocated cost) under Federal awards and will be documented as described in section E. Costs of central services omitted from the plan will not be reimbursed.

**D. Submission Requirements**

1. Each State will submit a plan to the Department of Health and Human Services for each year in which it claims central service costs under Federal awards. The plan should include (a) a projection of the next year's allocated central service cost (based either on actual costs for the most recently completed year or the budget projection for the coming year), and (b) a reconciliation of actual allocated central

service costs to the estimated costs used for either the most recently completed year or the year immediately preceding the most recently completed year.

2. Each local government that has been designated as a "major local government" by the Office of Management and Budget (OMB) is also required to submit a plan to its cognizant agency annually. OMB periodically lists major local governments in the Federal Register.

3. All other local governments claiming central service costs must develop a plan in accordance with the requirements described in this Circular and maintain the plan and related supporting documentation for audit. These local governments are not required to submit their plans for Federal approval unless they are specifically requested to do so by the cognizant agency. Where a local government only receives funds as a sub-recipient, the primary recipient will be responsible for negotiating indirect cost rates and/or monitoring the sub-recipient's plan.

4. All central service cost allocation plans will be prepared and, when required, submitted within six months prior to the beginning of each of the governmental unit's fiscal years in which it proposes to claim central service costs. Extensions may be granted by the cognizant agency on a case-by-case basis.

**E. Documentation Requirements for Submitted Plans**

The documentation requirements described in this section may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis. For example, the requirements may be reduced for those central services which have little or no impact on Federal awards. Conversely, if a review of a plan indicates that certain additional information is needed, and will likely be needed in future years, it may be routinely requested in future plan submissions. Items marked with an asterisk (*) should be submitted only once; subsequent plans should merely indicate any changes since the last plan.

1. *General.* All proposed plans must be accompanied by the following: an organization chart sufficiently detailed to show operations including the central service activities of the State/local government whether or not they are shown as benefiting from central service functions; a copy of the Comprehensive Annual Financial Report (or a copy of the Executive Budget if budgeted costs are being proposed) to support the allowable costs of each central service activity included in the plan; and, a

certification (see subsection 4.) that the plan was prepared in accordance with this Circular, contains only allowable costs, and was prepared in a manner that treated similar costs consistently among the various Federal awards and between Federal and non-Federal awards/activities.

2. *Allocated central services.* For each allocated central service, the plan must also include the following: a brief description of the service*, an identification of the unit rendering the service and the operating agencies receiving the service, the items of expense included in the cost of the service, the method used to distribute the cost of the service to benefitted agencies, and a summary schedule showing the allocation of each service to the specific benefitted agencies. If any self-insurance funds or fringe benefits costs are treated as allocated (rather than billed) central services, documentation discussed in subsections 3.b. and c. shall also be included.

3. *Billed services.*

a. *General.* The information described below shall be provided for all billed central services, including internal service funds, self-insurance funds, and fringe benefit funds.

b. *Internal service funds.*

(1) For each internal service fund or similar activity with an operating budget of $5 million or more, the plan shall include: a brief description of each service; a balance sheet for each fund based on individual accounts contained in the governmental unit's accounting system; a revenue/expenses statement, with revenues broken out by source, e.g., regular billings, interest earned, etc.; a listing of all non-operating transfers (as defined by Generally Accepted Accounting Principles (GAAP)) into and out of the fund; a description of the procedures (methodology) used to charge the costs of each service to users, including how billing rates are determined; and, a schedule comparing total revenues (including imputed revenues) generated by the service to the allowable costs of the service, as determined under this Circular, with an explanation of how variances will be handled.

(2) Revenues shall consist of all revenues generated by the service, including unbilled and uncollected revenues. If some users were not billed for the services (or were not billed at the full rate for that class of users), a schedule showing the full imputed revenues associated with these users shall be provided. Expenses shall be broken out by object cost categories (e.g., salaries, supplies, etc.).

c. *Self-insurance funds.* For each self-insurance fund, the plan shall include: the fund balance sheet; a statement of revenue and expenses including a summary of billings and claims paid by agency; a listing of all non-operating transfers into and out of the fund; the type(s) of risk(s) covered by the fund (e.g., automobile liability, workers' compensation, etc.); an explanation of how the level of fund contributions are determined, including a copy of the current actuarial report (with the actuarial assumptions used) if the contributions are determined on an actuarial basis; and, a description of the procedures used to charge or allocate fund contributions to benefitted activities. Reserve levels in excess of claims (1) submitted and adjudicated but not paid, (2) submitted but not adjudicated, and (3) incurred but not submitted must be identified and explained.

d. *Fringe benefits.* For fringe benefit costs, the plan shall include: a listing of fringe benefits provided to covered employees, and the overall annual cost of each type of benefit; current fringe benefit policies*; and procedures used to charge or allocate the costs of the benefits to benefitted activities. In addition, for pension and post-retirement health insurance plans, the following information shall be provided: the governmental unit's funding policies, e.g., legislative bills, trust agreements, or State-mandated contribution rules, if different from actuarially determined rates; the pension plan's costs accrued for the year; the amount funded, and date(s) of funding; a copy of the current actuarial report (including the actuarial assumptions); the plan trustee's report; and, a schedule from the activity showing the value of the interest cost associated with late funding.

4. *Required certification.* Each central service cost allocation plan will be accompanied by a certification in the following form:

**Certificate of Cost Allocation Plan**

This is to certify that I have reviewed the cost allocation plan submitted herewith and to the best of my knowledge and belief:

(1) All costs included in this proposal [identify date] to establish cost allocations or billings for [identify period covered by plan] are allowable in accordance with the requirements of OMB Circular A-87, "Cost Principles for State and Local Governments," and the Federal award(s) to which they apply. Unallowable costs have been adjusted for in allocating costs as indicated in the cost allocation plan.

(2) All costs included in this proposal are properly allocable to Federal awards on the basis of a beneficial or causal relationship between the expenses incurred and the awards to which they are allocated in accordance with applicable requirements. Further, the same costs that have been treated as indirect costs have not been claimed as direct costs. Similar types of costs have been accounted for consistently.

I declare that the foregoing is true and correct.

Governmental Unit _____

Signature _____

Name of Official _____

Title _____

Date of Execution _____

**F. Negotiation and Approval of Central Service Plans**

1. All proposed central service cost allocation plans that are required to be submitted will be reviewed, negotiated, and approved by the Federal cognizant agency on a timely basis. The cognizant agency will review the proposal within six months of receipt of the proposal and either negotiate/approve the proposal or advise the governmental unit of the additional documentation needed to support/evaluate the proposed plan or the changes required to make the proposal acceptable. Once an agreement with the governmental unit has been reached, the agreement will be accepted and used by all Federal agencies, unless prohibited or limited by statute. Where a Federal funding agency has reason to believe that special operating factors affecting its awards necessitate special consideration, the funding agency will, prior to the time the plans are negotiated, notify the cognizant agency.

2. The results of each negotiation shall be formalized in a written agreement between the cognizant agency and the governmental unit. This agreement will be subject to re-opening if the agreement is subsequently found to violate a statute or the information upon which the plan was negotiated is later found to be materially incomplete or inaccurate. The results of the negotiation shall be made available to all Federal agencies for their use.

3. Negotiated cost allocation plans based on a proposal later found to have included costs that: (a) are unallowable (i) as specified by law or regulation, (ii) as identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal awards, or (b) are unallowable because they are clearly not allocable to Federal awards, shall be adjusted, or a refund shall be made at the option of the Federal cognizant agency. These adjustments or refunds are designed to correct the plans and do not constitute a reopening of the negotiation.

0000225

## G. Other Policies

1. *Billed central service activities.* Each billed central service activity must separately account for all revenues (including imputed revenues) generated by the service, expenses incurred to furnish the service, and profit/loss.

2. *Working capital reserves.* Internal service funds are dependent upon a reasonable level of working capital reserve to operate from one billing cycle to the next. Charges by an internal service activity to provide for the establishment and maintenance of a reasonable level of working capital reserve, in addition to the full recovery of costs, are allowable. A working capital reserve as part of retained earnings of up to 60 days cash expenses for normal operating purposes is considered reasonable. A working capital reserve exceeding 60 days may be approved by the cognizant Federal agency in exceptional cases.

3. *Carry-forward adjustments of allocated central service costs.* Allocated central service costs are usually negotiated and approved for a future fiscal year on a "fixed with carry-forward" basis. Under this procedure, the fixed amounts for the future year covered by agreement are not subject to adjustment for that year. However, when the actual costs of the year involved become known, the differences between the fixed amounts previously approved and the actual costs will be carried forward and used as an adjustment to the fixed amounts established for a later year. This "carry-forward" procedure applies to all central services whose costs were fixed in the approved plan. However, a carry-forward adjustment is not permitted, for a central service activity that was not included in the approved plan, or for unallowable costs that must be reimbursed immediately.

4. *Adjustments of billed central services.* Billing rates used to charge Federal awards shall be based on the estimated costs of providing the services, including an estimate of the allocable central service costs. A comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable costs of the service will be made at least annually, and an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following adjustment methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c)

adjustments to future billing rates, or (d) adjustments to allocated central service costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and non-Federal share exceeds $500,000.

5. *Records retention.* All central service cost allocation plans and related documentation used as a basis for claiming costs under Federal awards must be retained for audit in accordance with the records retention requirements contained in the Common Rule.

6. *Appeals.* If a dispute arises in the negotiation of a plan between the cognizant agency and the governmental unit, the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency.

7. *OMB assistance.* To the extent that problems are encountered among the Federal agencies and/or governmental units in connection with the negotiation and approval process, OMB will lend assistance, as required, to resolve such problems in a timely manner.

## Attachment D—Public Assistance Cost Allocation Plans

Table of Contents

A. General
B. Definitions
   1. State public assistance agency
   2. State public assistance agency costs
C. Policy
D. Submission, Documentation, and Approval of Public Assistance Cost Allocation Plans
E. Review of Implementation of Approved Plans
F. Unallowable Costs

## A. General

Federally-financed programs administered by State public assistance agencies are funded predominately by the Department of Health and Human Services (HHS). In support of its stewardship requirements, HHS has published requirements for the development, documentation, submission, negotiation, and approval of public assistance cost allocation plans in Subpart E of 45 CFR Part 95. All administrative costs (direct and indirect) are normally charged to Federal awards by implementing the public assistance cost allocation plan. This Attachment extends these requirements to all Federal agencies whose programs are administered by a State public assistance agency. Major federally-financed programs typically administered by State public assistance agencies include: Aid to Families with Dependent Children, Medicaid, Food Stamps, Child Support Enforcement, Adoption Assistance and Foster Care, and Social Services Block Grant.

## B. Definitions

1. "State public assistance agency" means a State agency administering or supervising the administration of one or more public assistance programs operated by the State as identified in Subpart E of 45 CFR Part 95. For the purpose of this Attachment, these programs include all programs administered by the State public assistance agency.

2. "State public assistance agency costs" means all costs incurred by, or allocable to, the State public assistance agency, except expenditures for financial assistance, medical vendor payments, food stamps, and payments for services and goods provided directly to program recipients.

## C. Policy

State public assistance agencies will develop, document and implement, and the Federal Government will review, negotiate, and approve, public assistance cost allocation plans in accordance with Subpart E of 45 CFR Part 95. The plan will include all programs administered by the State public assistance agency. Where a letter of approval or disapproval is transmitted to a State public assistance agency in accordance with Subpart E, the letter will apply to all Federal agencies and programs. The remaining sections of this Attachment (except for the requirement for certification) summarize the provisions of Subpart E of 45 CFR Part 95.

## D. Submission, Documentation, and Approval of Public Assistance Cost Allocation Plans

1. State public assistance agencies are required to promptly submit amendments to the cost allocation plan to HHS for review and approval.

2. Under the coordination process outlined in subsection E, affected Federal agencies will review all new plans and plan amendments and provide comments, as appropriate, to HHS. The effective date of the plan or plan amendment will be the first day of the quarter following the submission of the plan or amendment, unless another date is specifically approved by HHS. HHS, as the cognizant agency acting on behalf of all affected Federal agencies, will, as necessary, conduct negotiations with the State public assistance agency and will inform the State agency of the action taken on the plan or plan amendment.

## E. Review of Implementation of Approved Plans

1. Since public assistance cost allocation plans are of a narrative

nature, the review during the plan approval process consists of evaluating the appropriateness of the proposed groupings of costs (cost centers) and the related allocation bases. As such, the Federal Government needs some assurance that the cost allocation plan has been implemented as approved. This is accomplished by reviews by the funding agencies, single audits, or audits conducted by the cognizant audit agency.

2. Where inappropriate charges affecting more than one funding agency are identified, the cognizant HHS cost negotiation office will be advised and will take the lead in resolving the issue(s) as provided for in Subpart E of 45 CFR Part 95.

3. If a dispute arises in the negotiation of a plan or from a disallowance involving two or more funding agencies, the dispute shall be resolved in accordance with the appeals procedures set out in 45 CFR Part 75. Disputes involving only one funding agency will be resolved in accordance with the funding agency's appeal process.

4. To the extent that problems are encountered among the Federal agencies and/or governmental units in connection with the negotiation and approval process, the Office of Management and Budget will lend assistance, as required, to resolve such problems in a timely manner.

**F. Unallowable Costs**

Claims developed under approved cost allocation plans will be based on allowable costs as identified in this Circular. Where unallowable costs have been claimed and reimbursed, they will be refunded to the program that reimbursed the unallowable cost using one of the following methods: (a) a cash refund, (b) offset to a subsequent claim, or (c) credits to the amounts charged to individual awards.

**Attachment E—State and Local Indirect Cost Rate Proposals**

Table of Contents

A. General
B. Definitions
    1. Indirect cost rate proposal
    2. Indirect cost rate
    3. Indirect cost pool
    4. Base
    5. Predetermined rate
    6. Fixed rate
    7. Provisional rate
    8. Final rate
    9. Base period
C. Allocation of Indirect Costs and Determination of Indirect Cost Rates
    1. General
    2. Simplified method
    3. Multiple allocation base method

    4. Special indirect cost rates
D. Submission and Documentation of Proposals
    1. Submission of indirect cost rate proposals
    2. Documentation of proposals
    3. Required certification
E. Negotiation and Approval of Rates
F. Other Policies
    1. Fringe benefit rates
    2. Billed services provided by the grantee agency
    3. Indirect cost allocations not using rates
    4. Appeals
    5. Collections of unallowable costs and erroneous payments
    6. OMB assistance

**A. General**

1. Indirect costs are those that have been incurred for common or joint purposes. These costs benefit more than one cost objective and cannot be readily identified with a particular final cost objective without effort disproportionate to the results achieved. After direct costs have been determined and assigned directly to Federal awards and other activities as appropriate, indirect costs are those remaining to be allocated to benefitted cost objectives. A cost may not be allocated to a Federal award as an indirect cost if any other cost incurred for the same purpose, in like circumstances, has been assigned to a Federal award as a direct cost.

2. Indirect costs include (a) the indirect costs originating in each department or agency of the governmental unit carrying out Federal awards and (b) the costs of central governmental services distributed through the central service cost allocation plan (as described in Attachment C) and not otherwise treated as direct costs.

3. Indirect costs are normally charged to Federal awards by the use of an indirect cost rate. A separate indirect cost rate(s) is usually necessary for each department or agency of the governmental unit claiming indirect costs under Federal awards. Guidelines and illustrations of indirect cost proposals are provided in a brochure published by the Department of Health and Human Services entitled "A Guide for State and Local Government Agencies: Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Grants and Contracts with the Federal Government." A copy of this brochure may be obtained from the Superintendent of Documents, U.S. Government Printing Office.

4. Because of the diverse characteristics and accounting practices of governmental units, the types of costs which may be classified as indirect

costs cannot be specified in all situations. However, typical examples of indirect costs may include certain State/local-wide central service costs, general administration of the grantee department or agency, accounting and personnel services performed within the grantee department or agency, depreciation or use allowances on buildings and equipment, the costs of operating and maintaining facilities, etc.

5. This Attachment does not apply to State public assistance agencies. These agencies should refer instead to Attachment D.

**B. Definitions**

1. "Indirect cost rate proposal" means the documentation prepared by a governmental unit or subdivision thereof to substantiate its request for the establishment of an indirect cost rate.

2. "Indirect cost rate" is a device for determining in a reasonable manner the proportion of indirect costs each program should bear. It is the ratio (expressed as a percentage) of the indirect costs to a direct cost base.

3. "Indirect cost pool" is the accumulated costs that jointly benefit two or more programs or other cost objectives.

4. "Base" means the accumulated direct costs (normally either total direct salaries and wages or total direct costs exclusive of any extraordinary or distorting expenditures) used to distribute indirect costs to individual Federal awards. The direct cost base selected should result in each award bearing a fair share of the indirect costs in reasonable relation to the benefits received from the costs.

5. "Predetermined rate" means an indirect cost rate, applicable to a specified current or future period, usually the governmental unit's fiscal year. This rate is based on an estimate of the costs to be incurred during the period. Except under very unusual circumstances, a predetermined rate is not subject to adjustment. (Because of legal constraints, predetermined rates are not permitted for Federal contracts; they may, however, be used for grants or cooperative agreements.) Predetermined rates may not be used by governmental units that have not submitted and negotiated the rate with the cognizant agency. In view of the potential advantages offered by this procedure, negotiation of predetermined rates for indirect costs for a period of two to four years should be the norm in those situations where the cost experience and other pertinent facts available are deemed sufficient to enable the parties involved to reach an informed judgment as to the probable

0000227

level of indirect costs during the ensuing accounting periods.

6. "Fixed rate" means an indirect cost rate which has the same characteristics as a predetermined rate, except that the difference between the estimated costs and the actual, allowable costs of the period covered by the rate is carried forward as an adjustment to the rate computation of a subsequent period.

7. "Provisional rate" means a temporary indirect cost rate applicable to a specified Federal which is used for funding, interim reimbursement, and reporting indirect costs on Federal awards pending the establishment of a "final" rate for that period.

8. "Final rate" means an indirect cost rate applicable to a specified past period which is based on the actual allowable costs of the period. A final audited rate is not subject to adjustment.

9. "Base period" for the allocation of indirect costs is the period in which such costs are incurred and accumulated for allocation to activities performed in that period. The base period normally should coincide with the governmental unit's fiscal year, but in any event, shall be so selected as to avoid inequities in the allocation of costs.

## C. Allocation of Indirect Costs and Determination of Indirect Cost Rates

1. *General.*

a. Where a governmental unit's department or agency has only one major function, or where all its major functions benefit from the indirect costs to approximately the same degree, the allocation of indirect costs and the computation of an indirect cost rate may be accomplished through simplified allocation procedures as described in subsection 2.

b. Where a governmental unit's department or agency has several major functions which benefit from its indirect costs in varying degrees, the allocation of indirect costs may require the accumulation of such costs into separate cost groupings which then are allocated individually to benefitted functions by means of a base which best measures the relative degree of benefit. The indirect costs allocated to each function are then distributed to individual awards and other activities included in that function by means of an indirect cost rate(s).

c. Specific methods for allocating indirect costs and computing indirect cost rates along with the conditions under which each method should be used are described in subsections 2, 3 and 4.

2. *Simplified method.*

a. Where a grantee agency's major functions benefit from its indirect costs to approximately the same degree, the allocation of indirect costs may be accomplished by (1) classifying the grantee agency's total costs for the base period as either direct or indirect, and (2) dividing the total allowable indirect costs (net of applicable credits) by an equitable distribution base. The result of this process is an indirect cost rate which is used to distribute indirect costs to individual Federal awards. The rate should be expressed as the percentage which the total amount of allowable indirect costs bears to the base selected. This method should also be used where a governmental unit's department or agency has only one major function encompassing a number of individual projects or activities, and may be used where the level of Federal awards to that department or agency is relatively small.

b. Both the direct costs and the indirect costs shall exclude capital expenditures and unallowable costs. However, unallowable costs must be included in the direct costs if they represent activities to which indirect costs are properly allocable.

c. The distribution base may be (1) total direct costs (excluding capital expenditures and other distorting items, such as pass-through funds, major subcontracts, etc.), (2) direct salaries and wages, or (3) another base which results in an equitable distribution.

3. *Multiple allocation base method.*

a. Where a grantee agency's indirect costs benefit its major functions in varying degrees, such costs shall be accumulated into separate cost groupings. Each grouping shall then be allocated individually to benefitted functions by means of a base which best measures the relative benefits.

b. The cost groupings should be established so as to permit the allocation of each grouping on the basis of benefits provided to the major functions. Each grouping should constitute a pool of expenses that are of like character in terms of the functions they benefit and in terms of the allocation base which best measures the relative benefits provided to each function. The number of separate groupings should be held within practical limits, taking into consideration the materiality of the amounts involved and the degree of precision needed.

c. Actual conditions must be taken into account in selecting the base to be used in allocating the expenses in each grouping to benefitted functions. When an allocation can be made by assignment of a cost grouping directly to the function benefitted, the allocation shall be made in that manner. When the expenses in a grouping are more general in nature, the allocation should be made through the use of a selected base which produces results that are equitable to both the Federal Government and the governmental unit. In general, any cost element or related factor associated with the governmental unit's activities is potentially adaptable for use as an allocation base provided that: (1) it can readily be expressed in terms of dollars or other quantitative measures (total direct costs, direct salaries and wages, staff hours applied, square feet used, hours of usage, number of documents processed, population served, and the like), and (2) it is common to the benefitted functions during the base period.

d. Except where a special indirect cost rate(s) is required in accordance with subsection 4, the separate groupings of indirect costs allocated to each major function shall be aggregated and treated as a common pool for that function. The costs in the common pool shall then be distributed to individual Federal awards included in that function by use of a single indirect cost rate.

e. The distribution base used in computing the indirect cost rate for each function may be (1) total direct costs (excluding capital expenditures and other distorting items such as pass-through funds, major subcontracts, etc.), (2) direct salaries and wages, or (3) another base which results in an equitable distribution. An indirect cost rate should be developed for each separate indirect cost pool developed. The rate in each case should be stated as the percentage relationship between the particular indirect cost pool and the distribution base identified with that pool.

4. *Special indirect cost rates.*

a. In some instances, a single indirect cost rate for all activities of a grantee department or agency or for each major function of the agency may not be appropriate. It may not take into account those different factors which may substantially affect the indirect costs applicable to a particular program or group of programs. The factors may include the physical location of the work, the level of administrative support required, the nature of the facilities or other resources employed, the organizational arrangements used, or any combination thereof. When a particular award is carried out in an environment which appears to generate a significantly different level of indirect costs, provisions should be made for a separate indirect cost pool applicable to that award. The separate indirect cost

0000228

pool should be developed during the course of the regular allocation process, and the separate indirect cost rate resulting therefrom should be used, provided that: (1) the rate differs significantly from the rate which would have been developed under subsections 2. and 3., and (2) the award to which the rate would apply is material in amount.

b. Although this Circular adopts the concept of the full allocation of indirect costs, there are some Federal statutes which restrict the reimbursement of certain indirect costs. Where such restrictions exist, it may be necessary to develop a special rate for the affected award. Where a "restricted rate" is required, the procedure for developing a non-restricted rate will be used except for the additional step of the elimination from the indirect cost pool those costs for which the law prohibits reimbursement.

**D. Submission and Documentation of Proposals**

1. *Submission of indirect cost rate proposals.*

a. All departments or agencies of the governmental unit desiring to claim indirect costs under Federal awards must prepare an indirect cost rate proposal and related documentation to support those costs. The proposal and related documentation must be retained for audit in accordance with the records retention requirements contained in the Common Rule.

b. A governmental unit for which a cognizant agency assignment has been specifically designated must submit its indirect cost rate proposal to its cognizant agency. The Office of Management and Budget (OMB) will periodically publish lists of governmental units identifying the appropriate Federal cognizant agencies. The cognizant agency for all governmental units or agencies not identified by OMB will be determined based on the Federal agency providing the largest amount of Federal funds. In these cases, a governmental unit must develop an indirect cost proposal in accordance with the requirements of this Circular and maintain the proposal and related supporting documentation for audit. These governmental units are not required to submit their proposals unless they are specifically requested to do so by the cognizant agency. Where a local government only receives funds as a sub-recipient, the primary recipient will be responsible for negotiating and/or monitoring the sub-recipient's plan.

c. Each Indian tribal government desiring reimbursement of indirect costs must submit its indirect cost proposal to the Department of the Interior (its cognizant Federal agency).

d. Indirect cost proposals must be developed (and, when required, submitted) within six months after the close of the governmental unit's fiscal year, unless an exception is approved by the cognizant Federal agency. If the proposed central service cost allocation plan for the same period has not been approved by that time, the indirect cost proposal may be prepared including an amount for central services that is based on the latest federally-approved central service cost allocation plan. The difference between these central service amounts and the amounts ultimately approved will be compensated for by an adjustment in a subsequent period.

2. *Documentation of proposals.* The following shall be included with each indirect cost proposal:

a. The rates proposed, including subsidiary work sheets and other relevant data, cross referenced and reconciled to the financial data noted in subsection b. Allocated central service costs will be supported by the summary table included in the approved central service cost allocation plan. This summary table is not required to be submitted with the indirect cost proposal if the central service cost allocation plan for the same fiscal year has been approved by the cognizant agency and is available to the funding agency.

b. A copy of the financial data (financial statements, comprehensive annual financial report, executive budgets, accounting reports, etc.) upon which the rate is based. Adjustments resulting from the use of unaudited data will be recognized, where appropriate, by the Federal cognizant agency in a subsequent proposal.

c. The approximate amount of direct base costs incurred under Federal awards. These costs should be broken out between salaries and wages and other direct costs.

d. A chart showing the organizational structure of the agency during the period for which this proposal applies, along with a functional statement(s) noting the duties and/or responsibilities of all units that comprise the agency. (Once this is submitted, only revisions need be submitted with subsequent proposals.)

3. *Required certification.* Each indirect cost rate proposal shall be accompanied by a certification in the following form:

*Certificate of Indirect Costs*

This is to certify that I have reviewed the indirect cost rate proposal submitted herewith and to the best of my knowledge and belief:

(1) All costs included in this proposal [identify date] to establish billing or final indirect costs rates for [identify period covered by rate] are allowable in accordance with the requirements of the Federal award(s) to which they apply and OMB Circular A–87, "Cost Principles for State and Local Governments." Unallowable costs have been adjusted for in allocating costs as indicated in the cost allocation plan.

(2) All costs included in this proposal are properly allocable to Federal awards on the basis of a beneficial or causal relationship between the expenses incurred and the agreements to which they are allocated in accordance with applicable requirements. Further, the same costs that have been treated as indirect costs have not been claimed as direct costs. Similar types of costs have been accounted for consistently and the Federal Government will be notified of any accounting changes that would affect the predetermined rate.

I declare that the foregoing is true and correct.

Governmental Unit _____
Signature _____
Name of Official _____
Title _____
Date of Execution: _____

**E. Negotiation and Approval of Rates**

1. Indirect cost rates will be reviewed, negotiated, and approved by the cognizant Federal agency on a timely basis. Once a rate has been agreed upon, it will be accepted and used by all Federal agencies unless prohibited or limited by statute. Where a Federal funding agency has reason to believe that special operating factors affecting its awards necessitate special indirect cost rates, the funding agency will, prior to the time the rates are negotiated, notify the cognizant Federal agency.

2. The use of predetermined rates, if allowed, is encouraged where the cognizant agency has reasonable assurance based on past experience and reliable projection of the grantee agency's costs, that the rate is not likely to exceed a rate based on actual costs. Long-term agreements utilizing predetermined rates extending over two or more years are encouraged, where appropriate.

3. The results of each negotiation shall be formalized in a written agreement between the cognizant agency and the governmental unit. This agreement will be subject to re-opening if the agreement is subsequently found to violate a statute, or the information upon which the plan was negotiated is later found to be materially incomplete or inaccurate. The agreed upon rates shall be made available to all Federal agencies for their use.

4. Refunds shall be made if proposals are later found to have included costs that (a) are unallowable (i) as specified

by law or regulation, (ii) as identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal awards, or (b) are unallowable because they are clearly not allocable to Federal awards. These adjustments or refunds will be made regardless of the type of rate negotiated (predetermined, final, fixed, or provisional).

### F. Other Policies

1. *Fringe benefit rates.* If overall fringe benefit rates are not approved for the governmental unit as part of the central service cost allocation plan, these rates will be reviewed, negotiated and approved for individual grantee agencies during the indirect cost negotiation process. In these cases, a proposed fringe benefit rate computation should accompany the indirect cost proposal. If fringe benefit rates are not used at the grantee agency level (i.e., the agency specifically identifies fringe benefit costs to individual employees), the governmental unit should so advise the cognizant agency.

2. *Billed services provided by the grantee agency.* In some cases, governmental units provide and bill for services similar to those covered by central service cost allocation plans (e.g., computer centers). Where this occurs, the governmental unit should be guided by the requirements in Attachment C relating to the development of billing rates and documentation requirements, and should advise the cognizant agency of any billed services. Reviews of these types of services (including reviews of costing/billing methodology, profits or losses, etc.) will be made on a case-by-case basis as warranted by the circumstances involved.

3. *Indirect cost allocations not using rates.* In certain situations, a governmental unit, because of the nature of its awards, may be required to develop a cost allocation plan that distributes indirect (and, in some cases, direct) costs to the specific funding sources. In these cases, a narrative cost allocation methodology should be developed, documented, maintained for audit, or submitted, as appropriate, to the cognizant agency for review, negotiation, and approval.

4. *Appeals.* If a dispute arises in a negotiation of an indirect cost rate (or other rate) between the cognizant agency and the governmental unit, the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency.

5. *Collection of unallowable costs and erroneous payments.* Costs specifically identified as unallowable and charged to Federal awards either directly or indirectly will be refunded (including interest chargeable in accordance with applicable Federal agency regulations).

6. *OMB assistance.* To the extent that problems are encountered among the Federal agencies and/or governmental units in connection with the negotiation and approval process, OMB will lend assistance, as required, to resolve such problems in a timely manner.

[FR Doc. 95–11656 Filed 5–16–95; 8:45 am]

BILLING CODE 3110-01-P

HeinOnline -- 60 Fed. Reg. 26507 1995

# EXHIBIT 3.b

44212    Federal Register / Vol. 58, No. 159 / Thursday, August 19, 1993 / Notices

## OFFICE OF MANAGEMENT AND BUDGET

### Cost Principles for State and Local Governments

**AGENCY:** Office of Management and Budget.

**ACTION:** Proposed Revisions to OMB Circular No. A-87.

**SUMMARY:** This Notice offers interested parties an opportunity to comment on proposed revisions to Office of Management and Budget (OMB) Circular No. A-87, "Cost Principles for State and Local Governments."

An interagency task force was established in 1987 to review existing cost principles for Federal awards to State and local governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from State and local governments, and compared for consistency the provisions of other OMB cost principles covering nonprofit organizations and universities. A proposed revised Circular reflecting the results of those efforts was published on October 12, 1988, at 53 FR 40352–67. The extensive comments received on the 1988 proposed revision, discussions with interest groups, recent legislation concerning lobbying, and other related developments were considered in developing this new proposed revision.

**DATES:** All comments on this proposal should be in writing and must be received by October 18, 1993. Late comments will be considered to the extent practicable.

**ADDRESSES:** Office of Management and Budget, Office of Federal Financial Management, Financial Standards and Reporting Branch, room 10235, New Executive Office Building, Washington, DC 20503. For a copy of the current Circular, contact Office of Administration, Publication Office, room 2200, New Executive Office Building, Washington, DC 20503, or telephone (202) 395–7332.

**FOR FURTHER INFORMATION CONTACT:** Palmer Marcantonio, Financial Standards and Reporting Branch, Office of Federal Financial Management, Office of Management and Budget (telephone: 202–395–3993).

**SUPPLEMENTARY INFORMATION:** The proposed changes were guided by the following criteria.

—*Fairness.* Federal cost principles will consistently guide State, local, and Indian tribal governments, within statutory limitations, in determining all the reasonable direct and indirect costs they incur in conducting Federal and the Federal portion of Federal/State programs. Federal, State, local, and Indian tribal governments will treat Federal, State, local and Indian tribal programs consistently. Due consideration will be given to public perceptions of certain costs, such as advertising, public relations, and travel. Negotiations on the extent of Federal participation will be based on consideration of all costs.

—*Effectiveness, efficiency, and accountability.* Policies, principles, and regulations will support effective, efficient delivery of program services and minimize opportunities for fraud, waste, and abuse. They will stimulate the use of efficient administrative practices and the economical use of resources. State, local and Indian tribal governments will be granted the maximum discretion for managing the activities for which reimbursable costs are incurred and the manner in which reimbursements are expended.

—*Feasibility and simplicity.* Policies, principles, and regulations will be as simple as possible to: (a) minimize time and effort required for determining reimbursable costs, consistent with the need for accountability; (b) minimize confusion and opportunity for disagreements; and, (c) minimize the need for involvement of technical and policy level officials. Changes to policies, principles, and regulations will only be made to achieve significant net benefits.

—*Conformance with generally accepted accounting principles.* Policies, principles, and regulations will be consistent with generally accepted accounting principles, subject to certain additional requirements, in order to encourage State, local, and Indian tribal governments to continue to adopt good financial management practices.

### Summary of Significant Changes

This proposal is based on the revisions proposed in 1988 but incorporates the comments, discussions, and other developments received or occurring since that time. The major areas of concern, all of which have been addressed in this proposal, are as follows:

A. Documentation and Procedures
B. Allowable Costs
C. Timing of Funding
D. Other Needed Changes

### A. Documentation and Procedures

Certain proposed revisions address the need to limit documentation and procedures to a necessary minimum, consistent with the Federal, State, local, and Indian tribal governments' need for accountability.

#### 1. Support for Salaries and Wages

The 1988 proposed Circular tightened documentation requirements consistent with audit recommendations to prevent abuses and improve auditability.

Some comments suggested simplification of documentation requirements. This proposal provides simplification by clarifying alternative systems for personnel activity distributions and allowing salary costs to be claimed based on estimates, so long as charges to Federal assistance programs based on such estimates are adjusted quarterly to reflect actual effort.

#### 2. Submission of Cost Allocation Plans

The 1988 proposal reorganized the text of the current Circular (January 15, 1981) and incorporated long-standing requirements for cost allocation plans (CAPs) in attachments. Requirements for CAPs were previously issued by the Department of Health and Human Services, at OMB's direction. This proposal responded to Federal, State, and local requests that the Circular be made easier to use.

Comments were generally supportive, indicating that the new format facilitated administration. However, some comments suggested elimination of CAPs and/or further simplification. In response to these comments, this proposal makes the following changes: (i) encourages use of multi-year predetermined rates to reduce workload, (ii) allows use of budget data as the basis for cost projections (with an after-the-fact adjustment to reflect actual costs), and (iii) allows a two year rather than one year lag for reconciliations.

#### 3. Documentation for CAPs

The 1988 proposal required additional documentation regarding the financial condition and operations of internal service funds and self insurance funds. This was in response to audit findings that the Federal Government was inappropriately charged when governmental units accumulated excessive retained earnings or transferred excess cash balances from internal service and self insurance funds to general funds.

In response to comments, this proposal reduces part of the 1988 documentation requirements. Listings of fund transfers are no longer required for all transfers, only for non-operating transfers.

0000231

## 4. Timely Approval of CAPs

The 1988 proposal provided for timely approval of CAPs by Federal agencies, but did not impose a deadline.

Some comments suggested that a deadline be imposed. This proposal does not provide a deadline because of the nature of the approval process. Approval requires negotiation between cognizant Federal agencies and governmental units. However, this proposal does call for increased use of multi-year predetermined rates, where authorized, to reduce workload and speed the review process. OMB is also committed to work with the Department of Health and Human Services and other agencies to accelerate the approval process.

### B. Allowable Costs

Certain proposed revisions focus on the need to reimburse necessary and reasonable costs of administering Federal financial assistance programs, consistent with fairness and public policy concerns.

## 5. Interest

The 1988 proposal liberalized interest allowability as requested by State and local governments. It allowed interest paid to second parties on capital equipment acquisitions and major building renovations, including lease purchase arrangements, completed on or after the effective date of the Circular.

Some comments suggested that interest allowability also be extended to acquisitions made prior to the issue date of the final regulation. This proposal does not allow such interest because the related capital costs have already been incurred and payment of interest would in effect be retroactive. The proposal also provides for interest offsets in certain cash flow situations.

## 6. Depreciation and Use Allowances

The 1988 proposal clarified requirements for determining the useful life of assets, accounting for the cost of capital assets, determining allowable depreciation, and providing for Federal recovery on property disposal. These changes responded to reported abuses.

In response to comments, this proposal makes approval of changes in depreciation methods a part of CAP negotiation, rather than a separate process. The proposal does not adopt suggestions that reimbursements be based on replacement cost or accelerated depreciation. These suggestions would violate the basic principle of cost reimbursement by using estimates of future prices, rather than actual costs, and accelerated, rather than actual, depreciation.

## 7. State/Local Taxes

The Federal Government funds many programs and activities with State and local governments. The rates of Federal financial participation vary between programs and are generally established in law or in the agreement between the Federal Government and the governmental unit.

In September 1988, the Inspector General for the Department of Health and Human Services issued a "Report on the Effects of State Sales Tax on Federal Programs" (No. 04-87-00040). A principal question was whether there was a "need for regulatory denial of Federal financial participation (FFP) for sales tax paid by a governmental entity to itself." The report studied the effects on FFP in six States that did not exempt State agencies from the obligation to pay State sales tax. In those States during one fiscal year, sales tax paid on Federal expenditures under Federal agreements totalled approximately $54 million. Thus the "Federal Government could have saved this $54 million if sales tax generated by those States was considered unallowable for FFP." The report also studied two States that exempted State departments from sales tax, and found that "significant increases in Federal expenditures, $74.5 million, would occur if those two States were to begin taxing themselves." Based on additional analysis contained in the report, the Inspector General reached the following conclusion: "We believe that State sales tax applied to expenditures under Federal agreements is unallowable because it does not constitute actual cost to the State," but instead represents monies "paid by a governmental entity to itself."

The 1988 proposal disallowed "taxes assessed by a Governmental unit upon itself, [and] its component parts * * *" 53 FR 40361 (10/14/88). The response to this proposal did not disagree that such taxes are self-payments. Nevertheless, some comments called for continued allowability of self-assessed taxes, contending that the proposed disallowance would be intrusive and administratively burdensome. Comments stated that user charges, such as gasoline taxes, provide benefits to Federal financial assistance programs.

During our analysis, we noted that one State had passed a law which would require each contractor involved in the highway program to pay an amount equal to five percent of the gross receipts derived from the performance of federally-funded highway contracts. Under the proposed provisions of this Circular such taxes will not be allowable.

In response to comments concerning implementation problems, this proposal allows most taxes but disallows, as a matter of government-wide policy, only sales taxes and equivalent broad-based taxes that a governmental unit assesses upon itself and/or Federal programs. The current proposal is therefore narrower than the 1988 proposal, which would have disallowed all self-assessed taxes, including user charges. Federal agencies may continue to disallow other taxes on a case by case basis, if the agency determines that the tax is an inappropriate charge to the Federal financial assistance program or if it inappropriately reduces the actual contribution by the governmental unit.

This proposal responds to other comments regarding implementation concerns by allowing alternatives to actual cost records, where identification of actual costs is not administratively feasible.

## 8. Lobbying

This proposal specifies restrictions against the reimbursement of lobbying costs consistent with recent legislation.

## 9. Costs Incurred in Appeals and Claims Against Federal Agencies

This proposal disallows costs of appeals, claims, and related actions consistent with the October 3, 1991, revision to Circular A-21, "Cost Principles for Educational Institutions."

## 10. Working Capital Reserves

The 1988 proposal liberalized current policy by allowing reimbursement for an amount equivalent of up to 60 days cash expenditures in order to provide for establishment of a working capital reserve in internal service funds. This proposed change responded to suggestions by governmental units that such reserves were a necessary cost of doing business.

Some comments suggested 90 days of working capital reserve. No change was made to the 60 day proposal, since comments did not provide adequate support for a longer period.

## 11. Capital Expenditures

The 1988 proposal liberalized treatment of capital expenditures by making such expenditures under $5,000 allowable as a current expense, if permitted by the accounting policies uniformly applied at the governmental unit. This responded to suggestions that the policy be changed to facilitate acquisition of equipment and allows use of existing systems rather than requiring two different capital accounting systems. It also was consistent with the capitalization requirements in the

0000232

Common Rule, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments; Final Rule," published at 53 FR 8034–8103 (3/11/88).

In response to comments, this proposal clarifies that only capital acquisitions of $5,000 or more treated as a direct cost to Federal programs are subject to Federal approval. This proposal provides that for indirect cost purposes the governmental unit shall use the capitalization level, up to $5,000, established by that unit. Some comments also suggested that the ceiling be raised above $5,000. This change was not made since $5,000 is consistent with other requirements, including the Common Rule.

12. *Mass Severance and Back Pay*

The 1988 proposal restricted the allowability of mass severance pay and back pay and provided for prior approval of deviations.

In response to comments, this proposal deletes pre-approval requirements regarding back pay. However, such back pay is still unallowable if it constitutes payment of fines and penalties.

C. *Timing of Funding*

Certain proposed revisions are made in recognition of the importance of cash flows and the time value of money as well as the need to follow generally accepted accounting principles.

13. *Pension Costs*

The 1988 proposal clarified current policy by limiting allowability of the Federal share of pension costs to the portion currently funded by governmental units. It also defined situations in which the interest component of pension cost was not reimbursable. It also required additional information on pension fund financial condition and operations.

In response to comments, this proposal provides for Federal sharing, on an amortized basis, of the costs of unfunded liabilities, net of the increased interest cost caused by late funding of the actuarially required pension plan contributions by the governmental unit.

14. *Retiree Health Benefits*

The 1988 proposal limited allowability of retiree health benefit costs to the amount actually paid.

In response to comments, this proposal also provides for payment on the basis of accrued costs to the extent such costs are funded.

15. *Employee Leave Earned But Not Taken*

The 1988 proposal limited reimbursements to actual payments for leave taken.

In response to comments, this proposal also provides for payment on the basis of accrued costs to the extent such costs are funded.

16. *Insurance and Indemnification Reserves*

The 1988 proposal tightened standards for self insurance programs to prevent abuses identified in Federal audits. It also limited reimbursements to actual cash payments for employee benefit related programs.

In response to comments, this proposal allows costs associated with employee benefit related programs, such as worker's compensation, to be treated either on an actual cash basis or on the basis of accrued cost to the extent such costs are funded and satisfy the other requirements governing insurance and indemnification reserves.

D. *Other Needed Changes*

Certain proposed changes were made to this Circular to reflect related changes in law, potential conflict of interest situations and to make it consistent with revisions in Circular A–21 "Cost Principles for Educational Institutions."

17. *Certification on CAPs and Indirect Cost Proposals*

This proposal adds a requirement for specific certification language in CAPs and indirect cost proposals (ICPs) to improve understanding by responsible governmental unit officials of the types of costs the Federal Government does not allow.

18. *Additional Changes*

This proposal explicitly restricts or prohibits reimbursement for alcohol, entertainment, advertising and public relations, and travel. This is consistent with law and the recent revisions in OMB Circular No. A–21, "Cost Principles for Educational Institutions."

19. *Refunds of Unallowable Cost*

This proposal requires unallowable costs to be refunded to the Federal Government.

20. *Accounting and Consulting Services*

This proposal restricts State and local governments from engaging an accounting firm to prepare indirect cost proposals and then engaging the same firm to make subsequent audits.

**Judicial Review**

This Circular is intended solely to improve the internal management of the Executive Branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its officers, or any person.

**Public Comment**

Suggestions received on the revisions proposed in 1988 to the Circular were accommodated to the extent appropriate. OMB encourages comments on the revisions being proposed here and on more efficient approaches to funding indirect cost. Other alternative proposals are also encouraged.

**National Performance Review**

Cost principles for State and local governments are under consideration by the National Performance Review. If changes are adopted as a result of that review, this proposal will be made compatible with those changes.

John B. Arthur,

*Assistant Director for Administration.*

To the Heads of Executive Departments and Establishments

Subject: Cost principles for Federal financial assistance programs conducted by State, local, and Indian tribal governments

1. *Purpose.* This Circular establishes principles and standards for determining costs for Federal financial assistance programs carried out through grants, contracts, and other agreements with State and local governments and federally-recognized Indian tribal governments (governmental units).

2. *Authority.* This Circular is issued under the authority of 31 U.S.C. 1111, 31 U.S.C. 503, Reorganization Plan No. 2 of 1970; and Executive Order No. 11541.

3. *Background.* An interagency task force was established in 1987 to review existing cost principles for Federal awards to State and local governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from State and local governments, and compared for consistency the provisions of other OMB cost principles covering nonprofit organizations and universities. A proposed revised Circular reflecting the results of those efforts was issued on October 12, 1988. Extensive comments on the proposed revision, discussions with interest groups, recent legislation concerning lobbying, and related developments have been considered in this new proposed revision.

0000233

expectancy, condition, and value of the property leased.

b. Rental costs under sale and leaseback arrangements are allowable only up to the amount that would be allowed had the governmental unit continued to own the property.

c. Rental costs under less-than-arms-length leases are allowable only up to the amount that would be allowed had title to the property vested in the governmental unit. For this purpose, less-than-arms-length leases include, but are not limited to, those where:

(1) One party to the lease is able to control or substantially influence the actions of the other;

(2) Both parties are parts of the same governmental unit; or

(3) The governmental unit creates an authority or similar entity to acquire and lease the facilities to the governmental unit and other parties.

d. Rental costs under leases which are required to be treated as capital leases under generally accepted accounting principles are allowable only up to the amount that would be allowed had the governmental unit purchased the property on the date the lease agreement was executed; e.g., depreciation or use allowance, maintenance, taxes, insurance but excluding any unallowable costs. Wherever GAAP does not apply, the provisions of Financial Accounting Standards Board Statement 13 shall be used to determine whether a lease is a capital lease. Interest costs related to capital leases are allowable to the extent they meet the criteria in Section 26.

39. *Taxes.* Taxes which the governmental unit is legally required to pay are allowable except for general sales taxes (and equivalent broad based taxes) assessed by a governmental unit upon itself, its component parts (including State colleges, universities, and hospitals) or other political subdivisions and/or Federal programs. Gasoline taxes, motor vehicle fees, and other taxes that are in effect user fees providing a benefit to the Federal Government are allowable. This does not restrict the authority of Federal agencies to identify other taxes where Federal participation is inappropriate. Where the identification of the amount of such taxes would require an inordinate amount of effort, the cognizant agency may accept a reasonable approximation thereof.

40. *Training.* The cost of training customarily provided for employee development is allowable.

41. *Travel costs.* a. *General.* Travel costs are allowable for expenses for transportation, lodging, subsistence, and related items incurred by employees who are in travel status on official business. Such costs may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip, and results in charges consistent with those normally allowed in like circumstances in non-federally sponsored activities. Notwithstanding the provisions of section 23, travel costs of officials covered by that section, when specifically related to Federal financial assistance programs, are allowable with the prior approval of a grantor agency.

b. *Lodging and subsistence.* Costs incurred by employees and officers for travel, including costs of lodging, other subsistence, and incidental expenses, shall be considered reasonable and allowable only to the extent such costs do not exceed charges normally allowed by the governmental unit in its regular operations as a result of a governmental unit policy and the amounts claimed under Federal awards represent reasonable and allocable costs. In the absence of a written governmental unit policy regarding travel costs, the rates and amounts established under subchapter I of Chapter 57 of Title 5, United States Code, or by the Administrator of General Services, or the President (or his designee) pursuant to any provisions of such subchapter shall be used as guidance for travel under Federal financial assistance programs (41 U.S.C. 420).

c. *Commercial air travel.* Airfare costs in excess of the lowest available commercial discount airfare, Federal Government contract airfare (where authorized and available), or customary standard (coach or equivalent) airfare, are unallowable except when such accommodations would: require circuitous routing; require travel during unreasonable hours; excessively prolong travel; greatly increase the duration of the flight; result in increased cost that would offset transportation savings; or offer accommodations not reasonably adequate for the medical needs of the traveler. Where a governmental unit can reasonably demonstrate to the awarding agency either the nonavailability of discount airfare or Federal Government contract airfare for individual trips or, on an overall basis, that it is the governmental unit's practice to make routine use of such airfare, specific determinations of nonavailability will generally not be questioned by the Federal Government, unless a pattern of avoidance is detected. However, in order for airfare costs in excess of the customary standard commercial airfare to be allowable, e.g., use of first-class airfare, the governmental unit must justify and document on a case-by-case basis the applicable condition(s) set forth above.

d. *Air travel by other than commercial carrier.* Cost of travel by governmental unit-owned, -leased, or -chartered aircraft, as used in this paragraph, includes the cost of lease, charter, operation (including personnel costs), maintenance, depreciation, interest, insurance, and other related costs. Costs of travel via governmental unit-owned, -leased, or -chartered aircraft are unallowable to the extent they exceed the cost of allowable commercial air travel, as provided for in section c. above.

42. *Underrecovery of costs under Federal agreements.* Any excess costs over the Federal contribution under one award agreement are unallowable under other award agreements.

Attachment C—State/Local-Wide Central Service Cost Allocation Plans

*Table of Contents*

A. General
B. Definitions
  1. Central Service Cost Allocation Plan
  2. Billed central services
  3. Allocated central services
  4. Agency or operating agency
C. Scope of the Central Service Cost Allocation Plans
D. Submission Requirements
E. Documentation Requirements for Submitted Plans
  1. General
  2. Allocated Central Services
  3. Billed Services
    a. General
    b. Internal service Funds
    c. Self-Insurance Funds
    d. Fringe benefits
  4. Required Certification
F. Negotiation and Approval of Central Service Plans
G. Other Policies
  1. Use of Proprietary Fund Accounts for Internal Services
  2. Working Capital Reserves
  3. Carry-forward Adjustments of Allocated Central Service Costs
  4. Adjustments of Billed Central Services
  5. Records Retention
  6. Appeals
  7. Accounting/Consulting Services
  8. OMB Assistance

A. *General.* 1. Most governmental units provide certain services, such as motor pools, computer centers, purchasing, accounting, etc., to operating agencies on a centralized basis. Since federally-supported programs are performed within the individual operating agencies, there needs to be a process whereby these central service costs can be identified and assigned to benefitted activities on

0000234

a reasonable and consistent basis. The Central Service Cost Allocation Plan provides that process. All costs and other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the propriety of the costs assigned to Federal financial assistance programs.

2. Guidelines and illustrations of central service cost allocation plans are provided in a brochure published by the Department of Health and Human Services entitled "A Guide for State and Local Government Agencies: Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Grants and Contracts with the Federal Government." A copy of this brochure may be obtained from the Superintendent of Documents, U.S. Government Printing Office.

B. *Definitions.* 1. "Central service cost allocation plan" means the documentation identifying, accumulating, and allocating, or developing billing rates based on, the allowable costs of services provided by a governmental unit on a centralized basis to its departments/agencies. The costs of these services may be either billed or allocated to users.

2. "Billed central services" means central services that are billed to benefitted agencies and/or programs on an individual fee for service or similar basis, and the billings are included in the accounting records of the benefitted agencies. Typical examples of billed central services include computer services, transportation services, insurance, and fringe benefits.

3. "Allocated central services" means central services that benefit operating agencies but are not billed to the agencies on a fee for service or similar basis. These costs are allocated to benefitted agencies on some reasonable basis. Examples of such services might include general accounting, personnel administration, purchasing, etc.

4. "Agency or operating agency" means an organizational unit or sub-division within a governmental unit that is responsible for the performance or administration of programs or activities of the governmental unit.

C. *Scope of the Central Service Cost Allocation Plans.* The central service cost allocation plan will include all central service costs that will be claimed (either as a billed or an allocated cost) under Federal financial assistance programs and will be documented as described in Section F below. Costs of central services omitted from the plan will not be reimbursed.

D. *Submission Requirements.* 1. All States will submit a plan to the Department of Health and Human Services for each year in which they claim central service costs under Federal financial assistance programs. The plan should include (i) a projection of the next year's cost (based either on actual costs for the most recently completed year or the executive budget for the coming year), and (ii) a reconciliation of actual costs to the estimated costs used for either the most recently completed year or the year immediately preceding the most recently completed year.

2. Local governments that have been designated as "major local governments" by the Office of Management and Budget are also required to submit a plan to their cognizant agency annually. OMB periodically lists major local governments in the Federal Register.

3. All other local governments claiming central service costs must develop a plan in accordance with the requirements described in this Circular and maintain the plan and related supporting documentation for audit. These local governments are not required to submit their plans for Federal approval unless they are specifically requested to do so by the cognizant agency. Where a local government only receives funds as a sub-recipient, the primary recipient will be responsible for negotiating and/or monitoring the sub-recipient's plan.

4. All central service cost allocation plans will be prepared (and when required, submitted) within six months prior to the beginning of each of the governmental unit's fiscal years in which it proposes to claim central service costs. Extensions may be granted by the cognizant agency on a case-by-case basis.

E. *Documentation Requirements for Submitted Plans.* The documentation requirements described in this section may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis. For example, the requirements may be reduced for those central services which have little or no impact on Federal programs. Conversely, if a review of a plan indicates that certain additional information is needed, and will likely be needed in future years, it may be routinely requested in future plan submissions. Items marked with an asterisk (*) should be submitted only once; subsequent plans should merely indicate any changes since the last plan.

1. General. All proposed plans must be accompanied by the following: An organization chart showing all operations including the central service activities of the State/local government whether or not they are shown as benefiting from central service functions; a copy of the Comprehensive Annual Financial Report (or a copy of the Executive Budget if budgeted costs are being proposed) to support the allowable costs of each central service activity included in the plan; and a certification (see subsection E. 4) that the plan was prepared in accordance with this Circular, contains only allowable costs, and was prepared in a manner that treated similar costs consistently among the various Federal financial assistance programs and between Federal and non-Federal programs.

2. Allocated central services. For each allocated central service, the plan must also include the following: a brief description of the service*; an identification of the unit rendering the service and the operating agencies receiving the service; the items of expense included in the cost of the service; the method used to distribute the cost of the service to benefitted agencies; and a summary schedule showing the allocation of each service to the specific benefitted agencies. If any self-insurance funds or fringe benefits are treated as allocated (rather than billed) central services, documentation discussed in paragraphs 3.b. and c. below shall also be included.

3. Billed services.

a. General. The information described below shall be provided for all billed central services, including internal service funds, self-insurance funds and fringe benefit funds.

b. Internal service funds.

(1) For each internal service fund, the plan shall include: A brief description of each service; a fund balance sheet for each fund based on individual accounts contained in the governmental unit's accounting system; revenues/expenditures statement, with revenues broken out by source, e.g., regular billings, interest earned, etc.; a listing of all non-operating transfers (that is cash transfers made for purposes other than normal purchases and sales) into and out of the fund; a description of the procedures (methodology) used to charge the costs of each service to users, including how billing rates are determined; a schedule of current rates; and a schedule comparing the full revenues (including imputed revenues) generated by the service to the allowable costs of the service, as determined under this Circular, with an explanation of how variances will be handled.

(2) Revenues shall consist of all revenues generated by the service,

including unbilled and uncollected revenues. If some users were not billed for the services (or were not billed at the full rates), a schedule showing the full "imputed" revenues associated with these users shall be provided. Expenditures shall be broken out by cost category (e.g., salaries, supplies, etc.).

c. Self-insurance funds. For each self-insurance fund, the plan shall include: The fund balance sheet; a statement/ schedule showing fund income (contributions, earnings, etc.) and fund outlays including a summary of billings and claims paid by agency; a listing of all transfers into and out of the fund; the type(s) of risk(s) covered by the fund (e.g., automobile liability, worker's compensation, etc.); an explanation of how the level of fund contributions are determined, including a copy of the current actuarial report (with the actuarial assumptions used) if the contributions are determined on an actuarial basis; and a description of the procedures used to charge or allocate fund contributions to benefiting activities. Reserve levels in excess of claims (i) submitted and adjudicated but not paid, (ii) submitted but not adjudicated, and (iii) incurred but not submitted must be identified and justified.

d. Fringe benefits. For fringe benefit costs, the plan shall include: a listing of fringe benefits provided to State/local employees, and the overall annual cost of each type of benefit; current fringe benefit policies"; and procedures used to charge or allocate the costs of the benefits to benefiting activities. In addition, for pension and post retirement health insurance plans, the following information shall be provided: The governmental unit's funding policies, e.g., legislative bills, trust agreements, state-mandated contribution rules if different from actuarially determined rates; the pension plan's costs accrued for the year; the amount funded, and date(s) of funding; a copy of the current actuarial report (including the actuarial assumptions); the plan trustee's report and a schedule from the activity showing the value of the interest cost associated with late funding (see Sections 11.e. and f.).

4. Required certification. Each central service cost allocation plan will be accompanied by a certification in the following form:

Certificate of Cost Allocation Plan

This is to certify that I have reviewed the cost allocation plan submitted herewith and to the best of my knowledge and belief:

(1) All costs included in this proposal [identify date] to establish allocations or billings for [identify period covered by plan]

are allowable in accordance with the requirements of the Federal agreement(s) to which they apply and the cost principles applicable to those agreements.

(2) This proposal does not include any costs which are unallowable under applicable cost principles, such as (without limitation): advertising and public relations costs, entertainment costs, fines and penalties, lobbying costs, and defense and prosecution of criminal and civil proceedings.

(3) All costs included in this proposal are properly allocable to Federal agreements on the basis of a beneficial or causal relationship between the expenses incurred and the agreements to which they are allocated in accordance with applicable requirements. Further, the same costs that have been treated as indirect costs have not been claimed as direct costs. Similar types of costs have been accounted for consistently.

I declare under penalty of perjury that the foregoing is true and correct.

Governmental Unit: _____
Signature: _____
Name of Official: _____
Title: _____
Date of Execution: _____

F. Negotiation and Approval of Central Service Plans. 1. All proposed Central Service Cost Allocation Plans that are required to be submitted will be reviewed, negotiated, and approved by the Federal cognizant agency on a timely basis. The cognizant agency will review the proposal within six months and either negotiate/approve the proposal or advise the governmental unit of the additional documentation needed to support/evaluate the proposed plan or the changes required to make the proposal acceptable. Once an agreement with the governmental unit has been reached, the agreement will be accepted and used by all Federal agencies unless prohibited or limited by statute. Where a Federal funding agency has reason to believe that special operating factors affecting its awards necessitate special consideration, the funding agency will, prior to the time the plans are negotiated, notify the cognizant agency.

2. The results of each negotiation shall be formalized in a written agreement between the cognizant agency and the governmental unit. This agreement will be subject to re-opening only at the option of the cognizant agency, and then only if: (a) The agreement is subsequently found to violate a statute; (b) the information provided by the governmental unit upon which the cognizant agency relied during the plan review and negotiation process is later found to be materially incomplete or inaccurate; or (c) the cognizant agency was not made aware that major changes in accounting practices occurred during the effective

period of the agreement. The results of the negotiation shall be made available to all Federal agencies for their use.

3. Negotiated cost allocation plans based on a proposal later found to have included costs which are unallowable as (i) specified by law or regulation, (ii) identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal awards; or (b) are unallowable because they are clearly not allocable to Federal awards, shall be adjusted, or a refund shall be made at the option of the Federal cognizant agency. These adjustments or refunds are designed to correct the plans and do not constitute a reopening of the negotiation.

G. Other Policies. 1. Use of proprietary fund accounts for internal services. Internal service activities must be accounted for and reported in individual proprietary fund accounts in order to properly account for revenues, expenses, and profit or loss.

2. Working capital reserves. Internal service funds are dependent upon a reasonable level of working capital reserve to operate from one billing cycle to the next. Charges by an internal service activity to provide for the establishment and maintenance of a reasonable level of working capital reserve, in addition to the full recovery of costs, are allowable. A working capital reserve as part of retained earnings of up to 60 days cash expenditures for normal operating purposes is considered reasonable.

3. Carry-forward adjustments of allocated central service costs. Allocated central service costs are usually negotiated and approved for a future fiscal year on a "fixed with carry-forward" basis. Under this procedure, the fixed amounts for the future year covered by agreement are not subject to adjustment for that year. However, when the actual costs of the year involved become known, the differences between the fixed amounts previously approved and the actual costs will be carried forward and used as an adjustment to the fixed amounts established for a later year. This "carry-forward" procedure applies to all central services whose costs were fixed in the approved plan. A carry-forward adjustment is not permitted, however, for a central service activity that was not included in the approved plan, or for unallowable costs that must be reimbursed immediately.

4. Adjustments of billed central services. Billing rates used to charge Federal programs should normally reflect only allowable costs as defined by the circular, including an estimate of the allocable central service costs.

0000236

Individual billing rates will be reviewed and adjusted to actual costs at least annually. Adjustments related to the elimination of unallowable costs will be made and returned to the Federal Government immediately. Other adjustments, at the option of the cognizant agency, will be made (1) for major differences. In these cases, the State or local government and the Federal Government may agree to an immediate cash recovery or an agreed to repayment plan that includes the payment of interest, (2) adjustments to future billing rates, or (3) an adjustment through allocated central services where the total adjustment is the lesser of either $50,000 or 5% of the annual operating cost of the billing rate involved. It is the governmental units responsibility to document the amount of the adjustment. If the governmental unit does not compute the Federal share of the adjustment a ratio of total Federal revenues to the total Federal/ Governmental unit revenues will be used for this purpose.

5. Records retention. All Central Service Cost Allocation Plans and related documentation used as a basis for claiming costs under Federal financial assistance programs must be retained for audit in accordance with the records retention requirements contained in the Common Rule.

6. Appeals. If a dispute arises in the negotiation of a plan between the cognizant agency and the governmental unit, the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency.

7. Accounting/consulting services. To avoid a potential conflict of interest State and local governments shall not engage the same accounting/consulting firm to prepare indirect cost proposals/ cost allocation plans and to make subsequent audits in accordance with the provisions of Circular A–128, "Audits of State and Local Governments."

8. OMB assistance. To the extent that problems are encountered among the Federal agencies in connection with the negotiation and approval process, the Office of Management and Budget will lend assistance as required to resolve such problems in a timely manner.

**Circular A–87 Attachment D—Public Assistance Cost Allocation Plans**

**Table of Contents**

A. General
B. Definitions
  1. State public assistance agency
  2. Public Assistance Cost Allocation Plan
  3. State public assistance agency costs
C. Policy
D. Submission, Documentation and Approval of Public Assistance Cost Allocation Plans
E. Review of Implementation of Approved Plans

A. General. 1. Federally-financed programs administered by State public assistance agencies are funded predominantly by the Department of Health and Human Services (HHS). In support of its stewardship requirements, HHS has published requirements for the development, documentation, submission, negotiation, and approval of public assistance cost allocation plans in subpart E of 45 CFR part 95. All administrative costs (direct and indirect) are normally charged to Federal awards by implementing the public assistance cost allocation plan. This Attachment extends these requirements to all Federal agencies whose programs are administered by a State public assistance agency. Major federally-financed programs typically administered by State public assistance agencies include: Aid for Families with Dependent Children, Medicaid, Food Stamps, Child Support Enforcement, Adoption Assistance and Foster Care, and Social Services.

2. An interim guide has also been developed by the Department of Health and Human Services entitled "A Guide for State and Local Government Public Assistance Agencies/Departments— Procedures for the Preparation and Submission of Cost Allocation Plans". A copy of this guide may be obtained from HHS.

3. Negotiated cost allocation plans based on a proposal later found to have included costs that (a) are unallowable as (i) specified by law or regulation, (ii) identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal financial assistance programs; or (b) are unallowable because they are clearly not allocable to Federal awards, shall be adjusted, or a refund shall be made at the option of the Federal cognizant agency. These adjustments or refunds are designed to correct the plans and do not constitute a reopening of the negotiation.

B. Definitions. 1. "State public assistance agency" means a State agency administering or supervising the administration of one or more public assistance programs operated by the State as identified by subpart E of 45 CFR part 95. For the purpose of this Attachment, these programs include all programs administered by that State public assistance agency.

2. "Public assistance cost allocation plan" means a narrative description of the procedures that will be used in identifying, measuring, and allocating all "State public assistance agency costs" (as defined in paragraph 3. below) to all of the programs administered or supervised by the State agency.

3. "State public assistance agency costs" mean all costs incurred by, or allocable to, the State public assistance agency, except expenditures for financial assistance, medical vendor payments, food stamps, and payments for services and goods provided directly to program recipients.

C. Policy. State public assistance agencies will develop, document and implement, and the Federal Government will review, negotiate and approve, public assistance cost allocation plans in accordance with subpart E of 45 CFR part 95. The plan will include all programs administered by the State public assistance agency. Where a letter of approval or disapproval is transmitted to a State public assistance agency in accordance with subpart E, the letter will apply to all Federal agencies and programs. The remaining sections of this Attachment (except for the requirement for certification) summarize the provisions of subpart E of 45 CFR part 95.

D. Submission, Documentation, and Approval of Public Assistance Cost Allocation Plans. 1. A currently approved public assistance cost allocation plan will continue in effect until the occurrence of an event that would make the current plan outdated. At that time, the State public assistance agency is required to promptly develop and submit an amendment to the cost allocation plan to HHS for review and approval.

2. Under the coordination process outlined in subpart E, affected Federal agencies will review all new plans and plan amendments and provide comments as appropriate to HHS. The effective date of the plan or plan amendment will be the first day of the quarter following the submission of the plan or amendment unless another date is specifically approved by HHS. HHS, as the cognizant agency acting on behalf of all affected Federal agencies, will, as necessary, conduct negotiations with the State public assistance agency and will inform the State agency of the action taken on the plan or plan amendment.

3. Each public assistance cost allocation plan or proposed amendment will be accompanied by a certification in the following form:

0000237

# EXHIBIT 4.a

# COST ALLOCATION AGREEMENT
## STATE AND LOCAL GOVERNMENTS

EIN # 1856000565A1

DATE: February 22, 2005

DEPT/AGENCY:
State of New Mexico
DFA - Budget Division
190 Bataan Memorial Building
Santa Fe, NM 87501

FILING REF: The preceding
Agreement was dated
June 30, 2003

---

## SECTION I: ALLOCATED COSTS

The central service costs listed in Exhibit A, attached, are approved on a Fixed basis and may be included as part of the costs of the State/local departments and agencies indicated during the fiscal year ending June 30, 2004 for further allocation to Federal grants, contracts, and other agreements performed at those departments and agencies.

---

## SECTION II: BILLED COSTS

In addition to Section I, which provides for services furnished but not billed, the services listed below are furnished and billed to departments and agencies:

1. State Auditor
2. Information System Division
        Human Resource System
        Office of Information Processing
        Office of Communications
        Radio Communications Bureau
3. Transportation Services Division
4. State Printing Office
5. Risk Management Division
        Group Health & Life Insurance
        Public Liability Insurance
        Surety Bonds
        Unemployment Compensation
        Workers' Compensation
6. PERA Building
7. Public Employees Retirement Association Contributions

1

DEPT/AGENCY: State of New Mexico
DATE: February 22, 2005

## SECTION III: CONDITIONS

The amounts approved in Section I and the billings for the services listed in Section II are subject to the following conditions:

A. LIMITATIONS: (1) Charges resulting from this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract, or other agreement only to the extent that funds are available. (2) Such charges represent costs incurred by the State/locality which are legal obligations of the State/locality and are allowable under OMB Circular A-87. (3) The same costs that are treated as indirect costs are not claimed as direct costs. (4) Similar type of costs are accorded consistent accounting treatment. (5) The information provided by the State/locality which was used to establish this Agreement is not later found to be materially incomplete or inaccurate.

B. ACCOUNTING CHANGES: This Agreement is based on the accounting system purported by the State/locality to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the Cognizant Agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from an allocated cost to a billed cost. Failure to obtain such approval may result in cost disallowances.

C. FIXED AMOUNTS: If fixed amounts are approved in Section I of this Agreement, they are based on an estimate of the costs for the period covered by the Agreement. When the actual costs for this period are determined, adjustments will be made to the amounts of a future year to compensate for the difference between the costs used to establish the fixed amounts and actual costs.

D. BILLED COSTS: Charges for the services listed in Section II will be billed in accordance with rates established by the State/locality. These rates will be based on the estimated costs of providing the services. Adjustments for variances between billed costs and the actual allowable costs of providing the services, as defined by OMB Circular A-87, will be made in accordance with procedures agreed to between the State/locality and the Cognizant Agency.

E. USE BY OTHER FEDERAL AGENCIES: This Agreement was executed in accordance with the authority in OMB Circular A-87, and should be applied to grants, contracts and other agreements covered by this Circular, subject to any limitations in Paragraph A above. The State/locality may provide copies of this Agreement to other Federal Agencies to give them early notification of the Agreement.

2

0000239

DEPT/AGENCY:
State of New Mexico
DATE: February 22, 2005

F. SPECIAL REMARKS:

Equipment Definition - Equipment means an article of nonexpendable, tangible personal property having a useful
life of more than one year and an acquisition cost of $500 or more unit.

## ACCEPTANCE

BY THE DEPT/AGENCY:
State of New Mexico

*State Budget Division*
(DEPT/AGENCY)

*Dannette K Burch*
(SIGNATURE)

*Dannette K Burch*
(NAME)

*Director, State Budget Division*
(TITLE)

*6/1/2005*
DATE)

BY THE COGNIZANT AGENCY ON
BEHALF OF THE FEDERAL GOVERNMENT
DEPARTMENT OF HEALTH AND HUMAN SERVICES
(AGENCY)

(SIGNATURE)

Henry Williams
(NAME)

Director, Division of Cost Allocation
(TITLE)

February 22, 2005
(DATE)0244

Pamela Page

HHS REPRESENTATIVE

(214) 767-6505
Telephone

3

**EXHIBIT 4.b**

# The State of New Mexico

## OMB A-87 Cost Allocation Plan
## Volume I



## Based on Fiscal Year Ending June 30, 2004

October 15, 2005



Innovative
Costing
Solutions LLC

# State of New Mexico

## Cost Allocation Plan based on FYE 2004

October 15, 2005

# State of New Mexico
## Description of Billed Central Services

**Central Service Function:** Office of Information Processing/Information Systems Division

1. Brief Description of Function:

   The Information Services Division (ISD) provides automated data processing services for State departments/agencies and other local and federal governmental units. In addition, ISD develops and promotes new technology applications and provides data processing training.

2. Financial Information – Reference is made to extracted pages from the CAFR - Attached

   A. Balance Sheet - Since this account (Office of Information Processing) also includes State Printing and the Equipment Replacement Fund a supplemental schedule is needed to be developed to identify the costs related to each component.

   B. Profit and Loss - Since this account (Office of Information Processing) also includes State Printing and the Equipment Replacement Fund a supplemental schedule is needed to be developed to identify the costs related to each component.

   C. OMB Reconciliation

3. Transfers

4. Billing Rate Methodology

   All costs, including an allocation from the State-wide cost allocation plan, an assessment from the GSD Office of the Secretary, the GSD Administrative Support Division and the Information Systems Division are initially identified and entered into a double step down cost allocation model. This model assigns costs of the various functions within ISD to the various billing centers (rates).

   ISD provides in excess of 30 different services, none of which exceed the $5M special data needs requirement contained in OMB Circular A-87, to the State's operating departments/agencies and other entities. At the beginning of the year, data from the cost allocation step down model is entered into another model that analyzes historical utilization

Innovative Costing Solutions LLC

April 11, 2004

0000243

## State of New Mexico
### Description of Billed Central Services

data by billing service and anticipated usage based on the customers needs and a billing rate by service is computed.

The State's departments/agencies are requested to provide information on the billing accounts they want established to accumulate the cost of the services provided by ISD related to these accounts. As services are requested by the departments/agencies throughout the year, they also identify the billing account to be billed that is associated with the request. As ISD generates the data in response to each request, all resources used by service (units of service by billing rate) are identified and charged to the specific account identified on the request.

In March/April of each year, a "mid-year realignment" is performed to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87. The billing rates are adjusted to reflect actual usage and costs to that point in time plus the expected usage and costs to the end of the year. Based on the new billing rates by service, any over/under recovery associated with each account is adjusted to reflect the new billing rates and the actual usage by that account. An adjusted bill by account is sent to the respective departments/agencies. In this manner, each account receives an adjustment proportional to its actual usage. This same process is also performed at the end of the year

5.  Schedule of Current Rates –

    Attached

6.  Treatment of variances

    See item 4 above.

7.  Actuarial Reports

    Not applicable

8.  Explanation of Insurance Fund Contributions Are Determined

    Not applicable

9.  Explanation of Pension Fund Contributions and Dates

    Not applicable

---

FISCAL YEAR 2004 OFFICE OF INFORMATION PROCESSING RECONCILIATION OF REVENUES AND EXPENDITURES

## REVENUE

| | Reference | Usage Base Internal Revenue | Audited Statements | General Ledger Trial Balance | Difference between Profit/Audit |
|---|---|---|---|---|---|
| | | 20,472,554 | 21,983,481 | 21,983,481 | |
| Pass Through Charges (S/W, Gartner, Xerox, Team Tack) | Model/Various | | | | |
| Balance Account Adj account for in prior year from Reconciliation | Revenue Recon | | (748,631) | (748,631) | |
| Add for Fulltime Threshold Policy from Reconciliation | Revenue Recon | | 213,247 | 213,247 | |
| Less Miscellaneous Revenue from Trial | Trial | | 339 | 339 | |
| Plus Financing Proceeds (by & Dep Dir Assessments) from Trial | Trial | | (186) | (186) | |
| Less Internal Service Utilization times rate versus Yvonne's caculation | Adj util sheet | | (972,824) | (972,824) | |
| INTERNAL REVENUE (only rev associated to rates) | | | (2,872) | (2,872) | |
| | | 20,472,554 | 20,472,554 | 20,472,554 | 0 |

## EXPENDITURES

| | Cost Centers | Usage Base Internal COSTS | Audited Statements | Trial Balance OIP/ERF | Difference between Profit/Audit |
|---|---|---|---|---|---|
| | | 17,166,091 | 17,164,928 | 20,114,129 | |
| State Printing | 8413001 | | | | |
| HRS | 8414010 | | 1,230,064 | | |
| Less on Disposal | Various | | 1,850,812 | | |
| Adj Entry (Audited Statement needs to reduce expense/excluded St.Printing) | 2061045 | | 1,919 | | |
| Adj Entry (Audited Statement needs to increase expense from HRS?) | | | (180,383) | | |
| | | | 46,769 | | |
| **SUB RECONCILIATION** | | | | | |
| | | | 20,114,129 | 20,114,129 | (0) |
| Capital Outlay ?(Non-budgeted) should have been reversed out of expense | Various | | (1,871) | (1,871) | |
| Loss on Disposal  (Non-budgeted) | 8420005 | | 2,653,870 | 2,653,870 | |
| Inline Finance uses (Non-budgeted) | Various | | (1,919) | (1,919) | |
| State Printing (Budgeted and Non-Budgeted) | 02060005/08420005 | | (16) | (16) | |
| HRS (Budgeted and Non-Budgeted) | 02061045/08413001 | | (1,230,064) | (1,230,064) | |
| Flow Through Charges (S/W, Gartner, Xerox, Team Tack) | Model/Various | | (1,850,812) | (1,850,812) | |
| Non Allocated/Management Computer Operation (Millie) 42% Printing | Model/8411005 | | (728,572) | (728,572) | |
| Non-Allocated/Management/Application Support Services (Dorenda)55% HRS | Model/8411005 | | (47,276) | (47,276) | |
| Non-Allocated/Administrative Support (Diana S.) 51% CD, HRS, Printing | Model/8414005 | | (88,322) | (88,322) | |
| Non-Allocated/Customer Serv Management (Karen B.) 51% CD,HRS, Printing | Model/8421005 | | (282,631) | (282,631) | |
| Non-Allocated/Account Manager (Karen B.) 51% CD,HRS, Printing | Model/8421030 | | (118,037) | (118,037) | |
| Non-Allocated/Despatch 100% | Model/8421040 | | (208,804) | (208,804) | |
| Non-Allocated In House Training | Model/8414030 | | (361,376) | (361,376) | |
| Other Financing Sources/(Division Assesments) | Model/Various | | (4,613) | (4,613) | |
| | | | (677,923) | (677,923) | |
| EXPENSE (only expense associated to rates) | | | | | |
| | | $17,166,091 | $17,165,743 | $17,165,743 | $349 |

State of New Mexico ISD/OP and ISD/CCS Profit / Loss Analysis by Billable Service — 2004 Expr

Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service

Model Assumptions:
- Cost files are extracted principally from a well-set document known as a Budget Status Report.
- Costs include only those elements allowable by Federal Circular OMB a-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of federal reporting and does not reflect actual State Division profit and loss.

| Billing Service | A Total Actual Cost by Billing Service | B Actual Billable Utilizations | C Billable Utilizations, Rated | D Service Rates Based On Actual Service Costs (A/C) | E Actual Service Costs Unrated (B*D) | F Actual Service Costs Rated (C*D) | G ISD Published Service Rates | H Actual ISD Billable Revenue (B*G) | I Actual ISD Profit/(Loss) Billable Revenue (H-E) | Profit/(Loss) Margin by Billable Service (I/E) | 60 Days Working Capital (60/365*B0) | Acc'l + "C" Prof't + "C" Billing Service Adj for Working Capital (H-E+K) | Acc'l + "C" Prof't + "C" Billing Service (I/E-K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | | | | | | | | | | | | | |
| VM CPU - NonPrime | | | | | | | | | | | | | |
| VM Start I/O | | | | | | | | | | | | | |
| 100 Print Local | | | | | | | | | | | | | |
| I/O General | | | | | | | | | | | | | |
| Print General | | | | | | | | | | | | | |
| MVS CPU - Standard | | | | | | | | | | | | | |
| MVS CPU - Prime | | | | | | | | | | | | | |
| MVS CPU - NonPrime | | | | | | | | | | | | | |
| MVS Disk I/O | | | | | | | | | | | | | |
| MVS Tape I/O | | | | | | | | | | | | | |
| MVS Print Remotes | | | | | | | | | | | | | |
| OCE CPU - Standard | | | | | | | | | | | | | |
| OCE CPU - NonPrime | | | | | | | | | | | | | |
| OCE EXCP | | | | | | | | | | | | | |
| DMS CPU | | | | | | | | | | | | | |
| DMS EXCP | | | | | | | | | | | | | |
| ADABAS CPU | | | | | | | | | | | | | |
| ADABAS EXCP | | | | | | | | | | | | | |
| ADRD CPU | | | | | | | | | | | | | |
| ADRD EXCP | | | | | | | | | | | | | |
| TSO MVS CPU | | | | | | | | | | | | | |
| TSO Occupancy | | | | | | | | | | | | | |
| ISD Disk I/O | | | | | | | | | | | | | |
| TSO Print Local | | | | | | | | | | | | | |
| Project Manager | | | | | | | | | | | | | |
| Systems Analyst | | | | | | | | | | | | | |
| Business Analyst | | | | | | | | | | | | | |
| Programmer Analyst | | | | | | | | | | | | | |
| Data Occupancy | | | | | | | | | | | | | |
| Tape Storage | | | | | | | | | | | | | |
| Plans Original | | | | | | | | | | | | | |
| Plans Copy | | | | | | | | | | | | | |
| Home Page Hosting | | | | | | | | | | | | | |
| FTP Disk Storage | | | | | | | | | | | | | |
| LAN/WAN Services | | | | | | | | | | | | | |
| Desktop Support | | | | | | | | | | | | | |
| Training Library | | | | | | | | | | | | | |
| Accumulated Totals | | | | | | | | | | | | | |

0000246

08 04 2005 09 55 FAX 505 827 3861    STATE BUDGET DIVISION

**GENERAL SERVICES DEPARTMENT**
**ISD COMPUTER CENTER SERVICE RATES**
**New FY05 and FY06**
**"Preliminary - Pending Final Approval"**

8/12/2004

| ISD COMPUTER CENTER PRODUCTS | FY04 & FY05 Existing/Released RATES & VOLUME | Pending Final NEW FY05 RATES & VOLUME | Pending Final NEW FY06 RATES & VOLUME |
|---|---|---|---|
| **Enterprise Servers** | | | |
| VM CPU - Standard | 17,800.00 /CPU/Hr | 52,692.00 /CPU/Hr | 52,692.00 /CPU/Hr |
| VM CPU - NonPrime | 8,900.00 /CPU/Hr | 35,128.00 /CPU/Hr | 35,128.00 /CPU/Hr |
| VM Start I/O | 0.10 /1000 | 1.84 /1000 | 1.84 /1000 |
| VM Print Pages | 0.02 /Page | 0.94 /Page | 0.94 /Page |
| | | | |
| MVS CPU - Standard | 850.00 /CPU/Hr | | |
| MVS CPU - Prime | 1,275.00 /CPU/Hr | 316 /CPU/Hr | 316 /CPU/Hr |
| MVS CPU - NonPrime | 425.00 /CPU/Hr | 474 /CPU/Hr | 474 /CPU/Hr |
| MVS Disk I/O | 0.10 /1000 | 158 /CPU/Hr | 158 /CPU/Hr |
| MVS Tape I/O | 0.22 /1000 | 0.03 /1000 | 0.03 /1000 |
| MVS Print Local | 0.02 /Page | 0.08 /1000 | 0.08 /1000 |
| MVS Print Remote | 0.01 /Page | 0.01 /Page | 0.01 /Page |
| | | 0.18 /Page | 0.18 /Page |
| UNIX CPU - Standard | 3,000.00 /CPU/Hr | 532.00 /CPU/Hr | 532.00 /CPU/Hr |
| UNIX CPU - NonPrime | 1,500.00 /CPU/Hr | 506.00 /CPU/Hr | 506.00 /CPU/Hr |
| UNIX EXCP | 0.10 /1000 | 0.03 /1000 | 0.03 /1000 |
| | | | |
| DB2 CPU | 900.00 /CPU/Hr | 1,039.93 /CPU/Hr | 1,039.93 /CPU/Hr |
| IDMS EXCP | 0.20 /1000 | 3.29 /1000 | 3.29 /1000 |
| ADSO CPU | 490.00 /CPU/Hr | 12,073.73 /CPU/Hr | 12,073.73 /CPU/Hr |
| ADSO EXCP | 0.10 /1000 | 5.22 /1000 | 5.22 /1000 |
| ADABAS CPU | 0.00 /CPU/Hr | 319,364.00 /LS | 319,364.00 /LS |
| ADABASE EXCP | 0.00 /1000 | 0.00 /LS | 0.00 /LS |
| TSO MVS CPU | 88.00 /CPU/Hr | 347 /CPU/Hr | 347 /CPU/Hr |
| TSO Connect | 0.52 /Hr | 0.72 /Hr | 0.72 /Hr |
| TSO Disk I/O | 0.10 /1000 | 0.16 /1000 | 0.16 /1000 |
| TSO Print Pages | 0.02 /Page | 1.00 /Page | 1.00 /Page |
| Disk Occupancy | 0.00000948 /KB-Day | 0.00000241 /KB-Day | 0.00000241 /KB-Day |
| Tape Storage | 0.30 /Mo | 0.26 /Mo | 0.26 /Mo |
| Fiche Originals | 3.25 /Ea | 10.47 /Ea | 10.47 /Ea |
| Fiche Copies | 1.00 /Ea | 8.96 /Ea | 8.96 /Ea |
| | | | |
| **LABOR** | | | |
| **Project Labor** | | | |
| Project Manager | 80.00 /Hr | 97.55 /Hr | 97.55 /Hr |
| Systems Analyst | 60.00 /Hr | | |
| Sr. Systems Analyst | 70.00 /Hr | | |
| Programmer Analyst | 50.00 /Hr | | |
| | | | |
| **Project Labor** | | | |
| Desktop Support | 100.00 /Node/Mo | 83.500 /Hr | 83.500 /Hr |
| **E-Mail Services (Groupwise)** | 10.00 /10 MB-Box/Mo | 27.57 /Box/Mo | 6.46 /Box/Mo |
| **Training Library** | 250.00 /Library | To Be Determined | To Be Determined |
| **Home Page Hosting** | 45.00 /Mo | See Open/Distributed - | See Open/Distributed - |
| **OPEN/DISTRIBUTED** | | | |
| Shared - GSD Owned & GSD Admin Servers | Quote/MOU | 176.40 /Server/Mo | 176.40 /Server/Mo |
| Web Servers | | | |
| File Servers | | | |
| Application Servers (O/S Only) | | | |
| Data Base Servers | | | |
| | | | |
| Dedicated - GSD Owned & GSD Admin Servers | Quote/MOU | 3,974.37 /Server/Mo | 3,974.37 /Server/Mo |
| Web Servers | | | |
| File Servers | | | |
| Application Servers (O/S Only) | | | |
| Data Base Servers | | | |
| | | | |
| Agency Owned & GSD Admin Servers | Quote/MOU | 877.97 /Server/Mo | 877.97 /Server/Mo |
| Web Servers | | | |
| File Servers | | | |
| Application Servers (O/S Only) | | | |
| Data Base Servers | | | |
| Agency Owned & Agency Admin Servers | Quote/MOU | 304.82 /Server/Mo | 304.82 /Server/Mo |
| Web Servers | | | |
| File Servers | | | |
| Application Servers | | | |
| Data Base Servers | | | |

0000247

## State of New Mexico
## General Services Department
### Statement of Revenues, Expenses and
### Changes in Net Assets
### Enterprise Funds
### Year Ended June 30, 2004

| | Enterprise Funds | | |
|---|---|---|---|
| | 362 Office of Information Processing | 369 ISD Office of Communication | 357 Public Liability |
| **Operating Revenue** | | | |
| Service fees/premiums | $ 21,983,295 | $ 22,890,314 | $ 14,682,872 |
| Federal funds | - | - | - |
| Interest income | - | 10,954 | 1,772,062 |
| Other revenue | 186 | 689,470 | 334,484 |
| **Total revenues** | 21,983,481 | 23,590,738 | 16,789,418 |
| **Operating Expenses** | | | |
| **Current expenses** | | | |
| Personnel services | 6,144,439 | 2,544,048 | - |
| Employee benefits | 1,867,634 | 763,107 | - |
| In-state travel | 39,420 | 109,821 | - |
| Out-of-state travel | 17,404 | 4,694 | - |
| Maintenance and repairs | 1,292,166 | 1,951,788 | - |
| Supplies | 489,998 | 200,352 | - |
| Contractual services | 7,521,491 | 363,136 | 8,393,944 |
| Depreciation | 851,288 | 3,676,173 | - |
| Operating costs | (1,572,141) | 13,425,134 | 41,740,698 |
| Other costs | 513,229 | 224,039 | 350,999 |
| Capital outlay | - | 24,354 | - |
| **Total expenses** | 17,164,928 | 23,286,646 | 50,285,641 |
| **Operating Income (Loss)** | 4,818,553 | 304,092 | (33,496,223) |
| **Nonoperating Revenue (Expense)** | | | |
| Gain (loss) on disposal | (1,919) | - | - |
| Other financing sources (uses) | | | |
| General appropriations | - | 2,659,933 | - |
| Other state agency transfers | - | - | - |
| Other state funds | - | - | - |
| **Total other financing sources (uses)** | (1,919) | 2,659,933 | - |
| **Income Before Transfers** | 4,816,634 | 2,964,025 | (33,496,223) |
| **Transfers From/(To)** | (620,454) | - | - |
| **Change in Net Assets** | 4,196,180 | 2,964,025 | (33,496,223) |
| Net Assets, Beginning of Year, as Previously Reported | 10,139,356 | 25,947,338 | 2,628,337 |
| Adjustment Applicable to Prior Year | - | - | - |
| Net Assets, Beginning of Year, as Restated | 10,139,356 | 25,947,338 | 2,628,337 |
| **Net Assets, End of Year** | $ 14,335,536 | $ 28,911,363 | $ (30,867,886) |

*See Notes to Financial Statements*

**State of New Mexico**
**General Services Department**
Statement of Net Assets
Enterprise Funds
June 30, 2004

| | Enterprise Funds | |
|---|---|---|
| | 362 Office of Information Processing | 369 ISD Office of Communication |
| **Assets** | | |
| **Current Assets** | | |
| Cash | | |
| Receivables | $ 7,454,965 | $ 6,549,422 |
| Severance tax bonds proceeds | - | - |
| Interest receivable | - | - |
| Accounts/trade receivables | 9,249,929 | 4,327,356 |
| Allowance for doubtful accounts | (2,635,703) | (741,784) |
| Due from/(to) other funds | 255,112 | (2,902) |
| Due from other agencies | - | 130,358 |
| Inventories | 325,423 | 4,037 |
| Total current assets | 14,649,726 | 10,266,487 |
| Noncurrent assets | | |
| Capital assets | 14,402,468 | 57,177,373 |
| Accumulated depreciation | (13,213,620) | (37,284,781) |
| Total noncurrent assets | 1,188,848 | 19,892,592 |
| Total assets | 15,838,574 | 30,177,079 |
| **Liabilities** | | |
| **Current Liabilities** | | |
| Claims payable | - | - |
| Accounts payable | 558,794 | 783,475 |
| Deferred revenue | - | - |
| Accrued expenses | 90,564 | 24,643 |
| Due to other agencies | - | 48,196 |
| Accrued compensated absences | 604,960 | 299,177 |
| Total current liabilities | 1,254,318 | 1,155,491 |
| **Long-term Debt** | | |
| Compensated absences payable | 248,720 | 109,225 |
| Total liabilities | 1,503,038 | 1,265,716 |
| **Net Assets** | | |
| Invested in capital assets, net of related debt | 1,188,848 | 19,892,592 |
| Restricted for | | |
| Insurance/claims | | |
| Unrestricted | 13,146,688 | 9,018,771 |
| Total net assets | $ 14,335,536 | $ 28,911,363 |

See Notes to Financial Statements.

## *** Profit / Loss Analysis By Billable Service — 2004 Fiscal Year ***

### State of New Mexico ISD Offices of: Information Processing (OIP) and Client Services (OCS)

| A<br>Billing<br>Service | B<br>Actual Cost by<br>Billing Service | C<br>Actual ISD<br>Billable Revenues | D<br>Actual<br>Profit / (Loss) by<br>Billing Service<br>(C - B) |
|---|---|---|---|
| VM CPU - Standard | $612,694 | $147,187 | ($465,507) |
| VM CPU - NonPrime | 509,508 | 61,199 | (448,309) |
| VM Start I/O | 5,259 | 10,620 | 5,361 |
| VM Print Local | 7,805 | 4,753 | (3,051) |
| | | | |
| MVS CPU - Standard | 2,284,882 | 3,961,295 | 1,676,413 |
| MVS CPU - Prime | 585,944 | 1,523,774 | 937,830 |
| MVS CPU - NonPrime | 19,320 | 16,747 | (2,572) |
| MVS Disk I/O | 394,422 | 796,519 | 402,097 |
| MVS Tape I/O | 158,385 | 816,569 | 658,184 |
| MVS Print Local | 699,634 | 426,098 | (273,536) |
| MVS Print Remote | 217,608 | 13,170 | (204,438) |
| | | | |
| CICS CPU - Standard | 786,167 | 4,124,768 | 3,338,600 |
| CICS CPU - NonPrime | 58,093 | 152,398 | 94,305 |
| CICS EXCP | 380,374 | 768,148 | 387,774 |
| DB2 CPU | 1,886,220 | 746,054 | (1,140,166) |
| IDMS EXCP | 1,000,713 | (34,596) | (1,035,309) |
| ADABAS CPU | 271,375 | 0 | (271,375) |
| ADABAS EXCP | 0 | 0 | 0 |
| ADSO CPU | 221,101 | 2,232 | (218,869) |
| ADSO EXCP | 544 | 1,099 | 555 |
| TSO MVS CPU | 34,252 | 76,154 | 41,903 |
| TSO Connect | 558,667 | 70,608 | (488,059) |
| TSO Disk I/O | 32,109 | 64,842 | 32,733 |
| TSO Print Local | 3,632 | 2,212 | (1,420) |
| | | | |
| Project Manager | 97,104 | 14,440 | (82,664) |
| Systems Analyst | 1,228,175 | 118,152 | (1,110,023) |
| Sr Systems Analyst | 380,423 | 320,634 | (59,789) |
| Programmer Analyst | 97,104 | 2,900 | (94,204) |
| | | | |
| Disk Occupancy | 706,181 | 4,212,878 | 3,506,697 |
| Tape Storage | 1,017,838 | 1,489,038 | 471,200 |
| | | | |
| Fiche Original | 159,567 | 37,216 | (122,351) |
| Fiche Copy | 159,567 | 18,353 | (141,214) |
| | | | |
| Home Page Hosting | 1,665,068 | 68,244 | (1,596,824) |
| E-Mail Boxes | 620,837 | 396,650 | (224,187) |
| LAN / WAN Mgt Servcs | 0 | 0 | 0 |
| Desktop Support | 0 | 0 | 0 |
| Training Library | 305,520 | 42,198 | (263,322) |
| | | | |
| Accumulated Totals | $17,166,091 | $20,472,554 | $3,306,463 |

**Model Assumptions:**

- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2002 through 30 June 2003.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | 2003 Ending Balance | 2004 Actual Cost by Billable Service | 2004 Actual Billed Revenue | Cost % | Rev % | 2004 Profit/Loss By Billable Service | 2004 Ending Balance | Imputed Interest | Less 2004 Final Allowed Working Cap Without Depr | Final 2004 Adjusted Billing Service Balances |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU | -2,182,689 | 1,122,202 | 208,386 | 6.54% | 1.02% | -913,816 | -3,096,505 | 0 | 177,758 | -3,274,263 |
| VM Start I/O | 12,419 | 5,259 | 10,620 | 0.03% | 0.05% | 5,361 | 17,780 | 151 | 833 | 17,098 |
| VM Print Pages | -11,082 | 7,805 | 4,753 | 0.05% | 0.02% | -3,052 | -14,134 | 0 | 1,236 | -15,370 |
| MVS CPU | 567,920 | 2,890,146 | 5,501,816 | 16.84% | 26.87% | 2,611,670 | 3,179,590 | 18,738 | 457,803 | 2,740,524 |
| MVS Disk I/O | 533,446 | 394,422 | 796,519 | 2.30% | 3.89% | 402,097 | 935,543 | 7,345 | 62,477 | 880,411 |
| MVS Tape I/O | 9,592 | 158,385 | 816,569 | 0.92% | 3.99% | 658,184 | 667,776 | 3,387 | 25,088 | 646,074 |
| MVS Print Local | -961,004 | 699,834 | 426,098 | 4.08% | 2.08% | 273,536 | -1,234,540 | 0 | 110,623 | -1,345,363 |
| MVS Print Remote | -60,844 | 217,608 | 13,170 | 1.27% | 0.06% | -204,438 | -265,282 | 0 | 34,469 | -299,751 |
| CICS CPU | 434,059 | 844,260 | 4,277,166 | 4.92% | 20.89% | 3,432,906 | 3,866,965 | 21,505 | 133,732 | 3,754,738 |
| CICS ESCP | 527,982 | 380,374 | 768,148 | 2.22% | 3.75% | 387,774 | 915,756 | 7,219 | 60,262 | 862,723 |
| DB2 CPU | -1,686,283 | 1,886,220 | 746,054 | 10.99% | 3.64% | -1,140,166 | -2,826,429 | 0 | 298,780 | -3,125,209 |
| IDMS EXCP | -2,246,268 | 1,000,713 | -34,596 | 5.83% | -0.17% | -1,035,309 | -3,281,577 | 0 | 158,514 | -3,440,091 |
| ADABAS CPU | -1,226,562 | 271,375 | 0 | 1.58% | 0.00% | -271,375 | -1,497,937 | 0 | 42,986 | -1,540,923 |
| ADSO CPU | -207,852 | 221,101 | 2,232 | 1.29% | 0.01% | -218,869 | -426,721 | 0 | 35,023 | -461,744 |
| ADSO EXCP | 4,044 | 544 | 1,099 | 0.00% | 0.01% | 555 | 4,599 | 43 | 86 | 4,556 |
| TSO MVS CPU | 172,831 | 34,252 | 76,154 | 0.20% | 0.37% | 41,902 | 214,633 | 1,939 | 5,426 | 211,346 |
| TSO Connect | -142,997 | 558,667 | 70,608 | 3.25% | 0.34% | -488,059 | -631,056 | 0 | 88,494 | -719,550 |
| TSO Disk I/O | 83,036 | 32,109 | 64,842 | 0.19% | 0.32% | 32,733 | 115,769 | 994 | 5,086 | 111,677 |
| TSO Print Pages | -11,881 | 3,632 | 2,212 | 0.02% | 0.01% | -1,420 | -13,101 | 0 | 575 | -13,676 |
| Project Manager | 153,322 | 87,104 | 14,440 | 0.57% | 0.07% | -82,664 | 70,658 | 1,120 | 15,381 | 56,396 |
| Systems Analysis | 344,764 | 1,228,175 | 118,152 | 7.15% | 0.58% | -1,110,023 | -765,259 | 0 | 194,545 | -959,804 |
| Microcomp Specialists | -85,461 | 360,423 | 320,634 | 2.22% | 1.57% | -59,789 | -125,250 | 0 | 60,260 | -185,510 |
| Programmer Analysis | 449 | 97,104 | 2,900 | 0.57% | 0.01% | -94,204 | -93,755 | 0 | 15,381 | -109,136 |
| Disk Occupancy | 185,219 | 706,181 | 4,212,678 | 4.11% | 20.58% | 3,506,697 | 3,691,916 | 19,386 | 111,860 | 3,599,442 |
| Tape Storage | -782,398 | 1,017,838 | 1,489,038 | 5.93% | 7.27% | 471,200 | -311,198 | 0 | 161,227 | -472,425 |
| Ficha Originals | -286,665 | 169,567 | 37,216 | 0.93% | 0.18% | -122,361 | -411,016 | 0 | 25,276 | -436,292 |
| Ficha Copies | -233,592 | 159,667 | 18,353 | 0.93% | 0.09% | -141,214 | -374,806 | 0 | 25,276 | -400,082 |
| Home Page Hosting | -2,154,087 | 1,665,068 | 68,244 | 9.70% | 0.33% | -1,596,824 | -3,750,911 | 0 | 263,749 | -4,014,660 |
| E-Mail Boxes | -260,198 | 620,837 | 396,650 | 3.62% | 1.94% | -224,187 | -484,385 | 0 | 98,341 | -582,726 |
| Desktop Support | -380,845 | 0 | 0 | 0.00% | 0.00% | | -380,845 | 0 | | -380,845 |
| LAN/WAN Mgt Services | -247,307 | 0 | 0 | 0.00% | 0.00% | | -247,307 | 0 | | -247,307 |
| Training Library | -220,787 | 305,520 | 42,198 | 1.78% | 0.21% | -263,322 | -484,109 | 0 | 48,395 | -532,504 |
| TOTAL | -$10,341,399 | 17,166,092 | 20,472,553 | 100.00% | 100.00% | 3,306,461 | -7,034,938 | 81,826 | 2,719,134 | -9,672,246 |
| | | | | 100.00% | 100.00% | | | | 851,288 | 12,483,912 |

2004 Depreciation

**STATE OF NEW MEXICO**
**INTERNAL SERVICE FUND**
**RECONCILIATION OF RETAINED EARNINGS BALANCE TO FEDERAL GUIDELINES**
**FOR THE YEAR ENDING JUNE 30, 2004**

## OFFICE OF INFORMATION PROCESSING

**OMB A-87 Retained Earnings Balance July 1, 2003**
Balance per prior year's Reconciliation of Fund to A-87

($11,779,988)

**2004 Retained Earnings Increase (Decrease) per CAFR**

Revenues per CAFR
Service Fees/Premiums                                    $21,983,295
Interest                                                          $0
Other Revenue                                                 $186

Total Revenues

$21,983,481

Expenditures per State's CAFR                          $17,164,928

Plus A-87 Allowable Costs:
2004 SWCAP costs based on 2002 actuals           ($278,786)
(if not allocated in Section I of SWCAP to user Depts/Programs)
Loss on disposal of assets                              $1,919

Less A-87 Unallowable Costs:
Capital Outlay-(If recorded as expense)                     $0
Bad Debt Expense                                           $0
Net adjustments to costs                                          ($276,867)

**Total adjusted A-87 Expenses**

16,888,061

Retained earnings June 30, 2004

($6,684,568)

**Imputed Interest Income (If no interest income recorded above)**
Calculated on average of beginning and ending cash balance per audit
at State Treasury Average Rate of Return          $6,223,124          0.010          $62,231

**Transfers to other funds**
Fund balance transfer to State Printing

($620,454)

**OMB A-87 Adjusted Retained Earnings at June 30, 2004**

($7,242,791)

**Excessive Fund Balance**
A) Retained earnings at June 30,2004                                        ($7,242,791)
B) 60-Day Expenditure Equivalency Amount without depreciation              $2,672,796
(total allowable expenditures less depreciation)/6

**Excessive Balance (A - B)**

($9,915,586)

**EXHIBIT 5**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
### DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

| | |
|---|---|
| **NEW MEXICO GENERAL SERVICES DEPARTMENT,** )<br>Appellant, )<br> )<br>v. )<br> )<br>**DIVISION OF COST ALLOCATION,** )<br>Appellee. )<br> ) | **DOCKET NO. A-06-105** |

---

### AFFIDAVIT OF ROBERT G. PETERS

---

I, ROBERT G. PETERS, hereby depose and state as follows:

1.      I serve as Executive Budget Analyst in the New Mexico Department of Finance and Administration. My responsibilities include preparing the Governor's budget recommendation for the Human Services Department and the General Services Department. This entails year-round oversight of these agencies.

2.      I work closely with the General Services Department ("GSD") on accounting issues concerning the Information Systems Division internal service fund ("the information services ISF"). I also participate in preparing the section of New Mexico's annual statewide cost allocation plan ("SWCAP") on billed central services, including the information services ISF. In working with GSD on these issues, I have become thoroughly familiar with the rate structure and cost allocation methodologies that GSD uses.

0000253

3.      The ISF provides computer services—hardware, software, email services, and technical support—to New Mexico state agencies ("customer agencies"). In fiscal year 2004, the fund included thirty-two categories of information services. These categories are listed, along with a glossary of terms used, in Exhibits 8.a and 8.b to the Brief, and I affirm the accuracy of these documents. GSD has since streamlined the service categories. As of fiscal year 2008, the fund will contain 24 service categories, grouped into three clusters.

4.      The fund's costs, incurred by GSD, include the direct costs of providing services, such as salary and wage costs, hardware, and software; depreciation of assets; overhead costs, such as building maintenance; and allowable indirect costs. GSD uses allocation methods to assign all costs to the thirty-two service categories.

5.      In the mid-1990s, the Division of Cost Allocation ("DCA") informed GSD that GSD needed to reform cost allocation and billing policies in the ISF in several ways. Chiefly, DCA required that GSD switch to a cost-based rate system. Previously, GSD had established rates by reference to the rates that a private provider of information services would charge. GSD therefore, in consultation with DCA, implemented a system for monitoring service usage and for allocating costs among the categories of services provided as part of the ISF.

6.      GSD policy is to calculate billing rates for each service category using estimated costs, which are based on historical usage, taking into account routine increases in fixed costs and anticipated changes in variable costs. Then, estimated cost is divided by anticipated per-unit usage in the rate year to achieve unit rates. Rates are then applied to actual reported service units to obtain the amounts billed to the customer agencies.

7.      In fiscal year 2004 and the four fiscal years preceding it, GSD calculated rates as set forth above, but did not implement them. During this period, the cost-based rates originally

calculated for fiscal year 1999 continued in use. From fiscal year 2005 forward, GSD has implemented updated cost-based rates. A GSD-audited cost reconciliation analysis shows that there was no overcharge in any ISF category in fiscal year 2005 exceeding $500,000.

8. GSD issues monthly invoices to state agencies. State customer agencies request that billing accounts be established to reflect distinct activities. GSD monitors and reflects in each account's monthly invoice the services consumed by the account. The state customer agency's payment reflects one total amount for consumption of all service categories by that agency.

9. GSD does not use "imputed" or "memo" billings: each invoice is a request for payment. The ISF relies entirely on state customer agency payments (and interest earned on those payments) in order to operate.

10. The billing account is the most specific level at which GSD bills information services usage. Therefore, even though multiple federal programs may participate in a state agency's billing account, the makeup of federal program users is identical from one service category to the next within the account. Each program participates in a fixed portion of the account's costs.

11. After the finish of each fiscal year, GSD analyzes actual costs in each service category of the ISF, applying the cost allocation model discussed above. GSD then compares actual costs with revenues: payment rates received for the service category, plus imputed interest (interest at the state treasury earning rate) on payments. GSD then takes into account the 60-day reserve for operating revenues permitted by Circular A-87, in order to obtain a final profit or loss for each service category.

12.    A variety of factors may cause actual costs to fall short of the anticipated costs on which rates were based, resulting in an overcharge: for example, staffing levels might drop; or usage levels for a service may be higher than anticipated, increasing efficiency of service delivery and creating a lower per-unit cost. Conversely, an increase in staffing or unexpectedly low usage levels might result in an undercharge for a service.

13.    GSD conducts an audit of the cost settlement information before it is finalized and submitted to DCA as part of the SWCAP. As required by Office of Management & Budget Circular A-87, Attachment C, Paragraph G.4, New Mexico's annual SWCAP includes cost reconciliation information on internal service funds, including the information services ISF.

14.    The SWCAP does not dictate the specific method for implementing the cost reconciliation in the information services ISF. GSD has developed new cost-based rates from fiscal year 2005 forward, and has implemented a year-end cost reconciliation for that year that reflects an adjustment to the fiscal year 2007 billing rates based on deficit or excess positive balance in the previous fiscal years.

15.    The SWCAP description of this internal service fund contemplates that, as well as a year-end cost reconciliation, a "mid-year rate realignment" may be performed. This realignment was not performed in fiscal year 2004.

16.    I participated in preparing and submitting to DCA the SWCAP containing cost reconciliation information for the ISF for fiscal year 2004.

17.    Normally, the deadline for preparing the plan containing the cost reconciliation for 2004 would be December 31, 2004. The State ran behind schedule because of delays in

obtaining the audit verifying the supporting cost information. The plan was submitted on October 15, 2005.

18.    In the SWCAP and through subsequent submissions to DCA, the State compiled cost reconciliation information for the information services ISF as a whole and for the federal share of amounts overcharged to three state customer agencies: the Human Services Department; the Children, Youth and Families Department; and the Department of Health. These are the three state agency customers of the ISF with more than negligible federal funding.

19.    The analysis revealed that in ten service categories, revenues in SFY 2004 exceeded allowable costs; in sixteen service categories, allowable costs exceeded revenues. (Of the thirty-two service categories, six had neither undercharges nor overcharges to HSD. In five categories, HSD had no charges in fiscal year 2004; one category had a year-end balance of zero.)

20.    The analysis that GSD submitted to DCA in the SWCAP, and modified in the course of subsequent discussions, determined the federal financial participation ("FFP") in each state agency's service-category overcharges and undercharges by applying a weighted average of federal participation in all of the agency's fiscal year 2004 payments for ISF services. The three state customer agencies provided this information. For HSD, this FFP was calculated at 62.89%.

21.    GSD summed the federal share in all service-category overcharges and undercharges to HSD (determined using the weighted average FFP) to obtain an overall overcharge for HSD. This calculation, after reflecting corrections that GSD made through dialogue with DCA in 2006, disclosed that within HSD, federal programs were overcharged by $1,716,068. This calculation is summarized in Exhibit 10.b, and I affirm the accuracy of that document.

22.    The use of a state-agency weighted average FFP to compute an overcharge or undercharge for each service category was consistent with HHS guidance, and DCA did not ask for the information to be provided in any other format.

23.    GSD had not yet taken steps to adjust future billing rates to reflect the cost reconciliation for SFY 2004 when DCA, on February 22, 2006, issued a disallowance letter seeking a refund of the federal share of certain ISF overcharges in SFY 2004. DCA's disallowance took into account only five service categories in which the ISF had overcharged federal programs, without considering the sixteen service categories with undercharges.

24.    GSD later requested that DCA amend its February 22, 2006 disallowance, for two reasons. First, GSD asserted that DCA should consider service-category undercharges in computing a refund, and that the proper amount owed was $1,716,068, which reflected all overcharges and all undercharges to federal programs. Second, GSD submitted data correcting errors in GSD's cost allocation methodology, and requested that the refund amount be modified accordingly. DCA denied the first request, but did modify the determination based on GSD's corrected data. DCA issued a revised determination on June 22, 2006, seeking a refund (including pre-disallowance interest through the date of the disallowance letter) of $4,011,031. The disallowance calculation is summarized in Exhibit 10.c, and I affirm the accuracy of this document.

25.    Between June and December 2006, GSD and DCA engaged in unsuccessful efforts to resolve the dispute through negotiation.

26.    During this period, in order to alleviate any potential concern on the part of DCA that consideration of cost-revenue variances in all service categories could result in cost-shifting, the State refined its previous analysis of cost-revenue variances by identifying all overcharges

and undercharges to federal programs. First, GSD analyzed all monthly ISF invoices to Human

Services Department billing accounts for fiscal year 2004. Exhibit 9.a to the brief summarizes

this analysis, and I affirm the accuracy of that document. The analysis first obtains an

overcharge or undercharge for each billing account by summing the service-category

overcharges and undercharges for the account. This analysis is contained in the spreadsheet at

Exhibit 9.b, and I affirm its accuracy. The data used to identify the per-unit overcharge or

undercharge for each service category are identical to the data supporting DCA's disallowance.

"Netting" of overcharges and undercharges across service categories within a billing account

does not result in the shifting of costs, because the makeup of federal-program users and the

allocation methodology used to charge those programs are identical from service to service

within the account.

27.    Next, the analysis identifies the percentage of each account's overcharge or

undercharge attributable to each federal program, and uses the FFP applicable to that program's

administrative costs to determine federal participation in the overcharge or undercharge. I

worked with Lynn Scheller of GSD and Donna Sandoval of HSD to perform this analysis. The

analysis is attached to the Brief as Exhibit 9.c, and I affirm its accuracy.

28.    The new analysis reveals that the federal share of GSD's total net overcharge to

HSD was $1,683,715. This amount is lower than the amount obtained, $1,716,068, using a

weighted-average FFP for HSD. This demonstrates that while minor cost-shifting did result

from the use of an average FFP in the Human Services Department (the method used by DCA in

calculating the disallowance), this cost-shifting actually benefited federal programs, because

billing accounts with a lower level of federal participation bore a heavier share of the

overcharges. The federal share of all costs in the ISF in 2004 was about 63%, while the federal share in overcharges was 61.7%.

29.    GSD's refined overcharge analysis not only ensures that there is no cost-shifting between federal and state funds; it also guarantees against cost-shifting among federal programs. This concern could arise only if one federal program were, on the whole, undercharged for ISF services in FY 2004. Offsetting this program's undercharge against another program's overcharge would cause the refund to be insufficient to reimburse each federal program in the amount of its overcharge. GSD identified the cost-revenue variance attributable to each federal program and found that each program, as a whole, was overcharged in SFY 2004.

30.    GSD, using the base amount of $1,683,715 obtained above, has recomputed the amount owing to the federal government. This computation takes into account the DCA findings with respect to the Children, Youth & Families Department and the Department of Health ($66,676), which the State is not contesting. The computation also incorporates pre-disallowance interest (using the interest rate determined by DCA in Attachment 3 to its disallowance letter) through the date of the disallowance letter. The final amount owing to the federal government is $1,852,193. I affirm the accuracy of this computation, attached as Exhibit 10.a to the Brief.

Robert G. Peters
Executive Budget Analyst
New Mexico Department of Finance
& Administration

Signed before me on this 16th day of January, 2007.

Notary Public

My Commission Expires:

_2- 7- 2008_

My Commission Number:

# EXHIBIT 6.a

# Summary of Human Services Department Billing Accounts

Charges from the General Services Department information services internal service fund ("ISF") are billed to the Human Services Department ("HSD") using ten billing accounts. HSD has requested that GSD establish billing accounts associated with different areas of program activity within HSD. HSD has three program divisions: Child Support Enforcement ("CSED"), Medical Assistance ("MAD"), and Income Support ("ISD"). Eight billing accounts are associated with one program division each. The two remaining billing accounts are associated with HSD's Administrative Services Division, which supports all three program divisions.

Federal programs participated in the costs of all ten accounts in state fiscal year ("SFY") 2004 as described below. Also listed below are the results of the cost reconciliation analysis that the State performed in order to determine overcharges at the federal program level. The attached flowchart, Exhibit 6.b, summarizes the movement of ISF billings through the HSD accounts to federal programs.

Once HSD pays bills for ISF services, the costs are allocated to federal programs according to each program's percentage of participation in that billing account's total costs. In a billing account in which multiple federal programs participate (see headings 3 and 4 below), each federal program participates in the costs of each ISF category in accordance with a single allocation calculation. The makeup of federal users is identical from service to service within the account. Therefore, the federal participation levels listed for each account below apply to every service category within that account.

## 1.    Account 628 - Child Support Enforcement Division

GSD account code 628 is used for the billings of system usage related to CSED. One hundred percent of this account's costs are allocated to the Child Support program. HSD made payment on the billings for these account codes using the organizational code 6102, which is the indirect cost pool for CSE. The expenditures posted to organizational code 6102 are reported on the Form OCSE-396A.

For fiscal year 2004, the Child Support program had a 66% federal financial participation ("FFP") rate for ISF expenditures. Therefore, the FFP for Account 628 is 66%.

In 2004, the overcharge to Account 628 totaled $1,177,276. The federal share of this overcharge was $777,002.

## 2.    Account 629 - Medical Assistance Division

GSD account code 629 is used for the billings of system usage related to MAD. One hundred percent of this account's costs are allocated to the Medicaid program. HSD made payment on the billings for this account code using the organizational code 8102, and these amounts are reported on the CMS-64.

For SFY 2004, the Medicaid program had a 50% FFP rate for ISF expenditures. Therefore, the FFP for Account 629 is 50%.

In 2004, Account 629 was undercharged by [$5,002]. The federal share was [$2,501].

3.    Accounts 620, 622, 625, 626, 627, 640 - Income Support Division

These six GSD accounts are used for the billings of system usage related to ISD. Unlike the other two program divisions, ISD serves multiple programs. Seven federal programs are included in ISD: Temporary Aid for Needy Families ("TANF"), Food Stamps, Food Stamps Employment and Training, Medicaid (Administration), the Low Income Home Energy Assistance Program ("LIHEAP"), Refugee Cash and Medical Assistance, and Systematic Alien Verification for Entitlements ("SAVE"). One state-only program, General Assistance, is also included in ISD. HSD made payment on these accounts using organizational code 9102.

Charges to ISD are allocated among the six federal programs and General Assistance using a Random Moment Sampling ("RMS") methodology, which is a time study used to allocate the time of eligibility workers responsible for determining eligibility for the assistance programs. In addition, time associated with overhead and time that is common to all programs are captured and allocated to programs based upon the RMS results. HSD queries a sample of eligibility workers about the programs they are working on, and the results are recorded on the random moment survey documents. Surveyed staff identify the program for which they are determining eligibility, as well as the name and number of the client being served at the randomly selected sample time. The information collected is used to distribute costs among the several programs for which eligibility determination occurs.

Based on the RMS results, the charges are allocated among programs in the ISD accounts. In all six ISD accounts, billings are allocated among federal programs in the same fashion.

For SFY 2004, each program participated in ISD billings to the extent below. Taking into account each program's RMS allocation and FFP, the level of federal participation for the ISD accounts for 2004 was 58.67%.

- **TANF:** 18.4% of ISD costs in SFY 2004 were claimed under TANF. TANF has an FFP of 100% for administrative expenses. Expenses are reported on Form ACF-196.

- **General Assistance:** 2.2% of ISD costs in SFY 2004 were allocated to General Assistance. General assistance is a state-only program.

- **Refugee Cash and Medical:** .6% of ISD costs in SFY 2004 were claimed under Refugee Cash and Medical. This program has an FFP of 100% for administrative expenses. Expenses are reported on Form Refugee Cash and Medical 296-A.

2

0000263

- **Food Stamps:** 52% of ISD costs in SFY 2004 were claimed under Food Stamps. This program has an FFP of 50% for administrative expenses. Expenses are reported on Form FNS-269.

- **Medicaid (Administration):** 25.74% of ISD costs in SFY 2004 were claimed under Medicaid. Medicaid has an FFP of 50% for ISF expenses. No enhanced MMIS matching rate applies. Expenses are reported on Form CMS-64.

- **LIHEAP:** .62% of ISD costs in SFY 2004 were claimed under LIHEAP. LIHEAP has an FFP of 100% for administrative expenses. Expenses are reported on Form LIHEAP 269A.

- **SAVE:** .04% of ISD costs in SFY 2004 were claimed under SAVE. SAVE has an FFP of 50% for administrative expenses.

- **Food Stamps Employment and Training:** .4% of ISD costs in SFY 2004 were claimed under this program, which has an FFP of 50% for administrative expenses. Expenses are reported on Form FNS-269.

In SFY 2004, the total overcharge to ISD accounts was $1,874,560, with a federal share of $1,099,878.

4.    Accounts 623 and 630 - Administrative Services Division

Accounts codes 623 and 630 are used for the billings of system usage related to the Administrative Services Division ("ASD"). HSD made payment on the billings for these account codes using the organizational code 1202, which is an indirect cost pool for ASD. During the quarterly cost allocation process, the expenditures posted to organizational code 1202 are allocated based on the number of employees in each of the three program divisions: CSED, MAD, and ISD. The number of employees calculation is taken from the quarterly payroll register and includes both paid full- and part-time employees at the end of the quarter. The percentage allocation to each of the HSD program divisions for SFY 2004 was the following: CSED 25%, MAD 10%, and ISD 65%.

The amount allocated to CSED, as described in section 1 above, is allocated fully to Child Support Enforcement, and reported on the OCSE-396A. The amount allocated to MAD, as described in section 2 above, is allocated fully to Medicaid, and reported on the CMS-64.

The amount allocated to ISD is further allocated based on the RMS results, as described in section 3 above.

Based on these allocations, the federal participation in the Administrative Services Division accounts is 59.9%.

In SFY 2004, the total undercharge to the ASD accounts was $[318,150]. The federal share was $[190,663].

3

0000264

# EXHIBIT 6.b

# How ISF Charges Reach HSD-Administered Federal Programs



0000265



0000266



**EXHIBIT 7**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

|  |  |  |
|---|---|---|
| NEW MEXICO GENERAL SERVICES DEPARTMENT, | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | DOCKET NO. A-06-105 |
| | ) | |
| DIVISION OF COST ALLOCATION, | ) | |
| Appellee. | ) | |
| | ) | |

## AFFIDAVIT OF DONNA SANDOVAL

I, DONNA SANDOVAL, hereby depose and state as follows:

1.    I serve as Bureau Chief, Grants Management, in the Administrative Services Division of New Mexico's Human Services Department ("HSD"). As Grants Management Bureau Chief I complete the Schedule of Expenditures of Federal Awards and supporting schedules, oversee the completion of the cost allocation plan, review quarterly and annual federal reports, ensure federal revenue and federal accounts receivable is reconciled, and research applicable grant requirements as necessary.

2.    HSD administers federal-state assistance programs including Medicaid, Child Support Enforcement, Food Stamps, the Low Income Home Energy Assistance Program, Refugee Cash and Medical Assistance, and Temporary Aid for Needy Families ("TANF").

0000268

3.    HSD is the dominant customer of the information services ISF. It purchases approximately half of the information services that GSD provided through the fund in fiscal year 2004. Approximately 95% of the federal funds that support the ISF's operations derive from HSD-administered programs. HSD is the customer agency with the most significant federal financial participation; in state fiscal year 2004, federal programs contributed in the aggregate approximately 63% of the total ISF costs paid by HSD.

4.    ISF charges billed by GSD to the Human Services Department for information technology services reach the federal programs that HSD administers through a two-tiered process. First, GSD bills each HSD account for services used each month. The invoice breaks down ISF services into categories.

5.    Second, HSD allocates charges from each account to federal programs as administrative expenses for each program. Service categories are not relevant in this process: HSD charges a fixed percentage of a billing account's costs to each federal program. Therefore, within each HSD account, the makeup of federal-program users is identical from one service category to the next.

6.    HSD's three program divisions—Medical Assistance ("MAD"), Child Support Enforcement ("CSED"), and Income Support ("ISD")—coincide with three principal billing account areas. The relationship between billing accounts and charges to federal programs is described in Exhibit 6.a to the brief and depicted in the flowchart attached to Exhibit 6.b, and I affirm the accuracy of these documents.

7.    Two billing accounts, MAD (Account 629) and CSED (Account 628), include charges to only one federal program each: Medicaid, for MAD; and Child Support, for CSED.

Therefore, any over- or underbilling by the ISF to those accounts is clearly traceable to one federal program.

8.    The third program division, ISD, is comprised of six GSD billing accounts (Accounts 620, 622, 625, 626, 627, and 640). The charges to the six ISD accounts reflect the information technology costs that eligibility workers incur while administering various programs. ISD services benefit seven federal programs: TANF, Medicaid (Administration), Food Stamps, Food Stamps Employment and Training, the Low Income Home Energy Assistance Program ("LIHEAP"), Refugee Cash and Medical Grant, and Systematic Alien Verification for Entitlements ("SAVE"). ISD services also benefit the state-funded General Assistance program.

9.    HSD pools the ISF charges to the six Income Support Division accounts with other administrative expenses, and then allocates these costs among benefiting federal programs and the General Assistance program using a random moment sample ("RMS"). The RMS methodology and the percentages allocated to each program in SFY 2004 are described in detail in Exhibit 6.a to the Brief.

10.    Because the same RMS results dictate the allocation of costs to federal programs in all six ISD accounts, each program bears the same share of costs in all six accounts. For example, during fiscal year 2004, Food Stamps was allocated 52% of ISF charges in all six of the ISD accounts.

11.    Finally, two billing accounts serve the Administrative Services Division ("ASD") of HSD. ASD administratively supports the three program divisions. ISF charges to this division are allocated among the three HSD program divisions (ISD, CSED, and MAD)

according to the number of employees in each division. This allocation process is described in Exhibit 6.a.

12.      For each of the HSD-administered federal programs contributing to ISF payments, HSD seeks reimbursement of ISF payments as administrative costs. HSD's quarterly claims for reimbursement from federal programs contain one line item for administrative expenses; HSD payments to GSD for ISF services are grouped with other administrative expenses on this line.

13.      For fiscal year 2004, at the request of GSD, I prepared a weighted average federal financial participation ("FFP") rate for ISF costs incurred by the Human Services Department. I provided this information to GSD to use the FFP in computing the federal share of all service-category overcharges to the Human Services Department in 2004. I obtained the average by taking into account the total amount of ISF expenses that each federal program bore in 2004, and each program's federal participation rate. This method is the most targeted average. An inexact calculation, by contrast, would use a non-weighted average of federal participation in all program and administrative expenditures of the Human Services Department.

14.      Nonetheless, the use of *any* average FFP may lead to a refund amount that does not accurately capture federal participation in overcharges and undercharges. This is because, while the weighted average captures each federal program's participation in all ISF costs, overcharges may be distributed in a way that disproportionately impacts certain programs.

15.      I worked with Bob Peters on completing the federal program-specific analysis of ISF overcharges for fiscal year 2004. I attest to the accuracy of this analysis, attached as Exhibits 9.b and 9.c to the Brief. This more sophisticated analysis responds completely to DCA's concerns about "cost-shifting." This analysis determines the units of each service

attributable to each federal program in each HSD billing account in fiscal year 2004, and applies the FFP of that program to determine its overall share in over- and undercharges.

16.    For example, as shown in Exhibit 6.a, in 2004, 18.4% of all ISF costs billed to Income Support Division accounts within the Human Services Department were allocated to the TANF program.  TANF reimburses administrative expenses at 100%.  TANF thus bore 18.4% of all service category overcharges to the Income Support accounts, and benefited from 18.4% of all service category undercharges to ISD.  Our analysis therefore applied a 100% FFP to 18.4% of the overall overcharge for each ISD account to reflect the participation of TANF in these cost-revenue variances.

17.    I declare under penalty of perjury that the foregoing is true and correct.

_____

Donna Sandoval, Bureau Chief
Grants Management
Administrative Services Division
New Mexico Human Services Department

Signed before me on this _16_th day of January, 2007.

_____
Notary Public

My Commission Expires:

_____ 9.29.07

# EXHIBIT 8.a

# GSD Information Services ISF
## Categories - Fiscal Year 2004

VM CPU

VM Start I/O

VM Print Pages

MVS CPU

MVS Disk I/O

MVS Tape I/O

MVS Print Local

MVS Print Remote

CICS CPU

CICS EXCP

DB2 CPU

IDMS EXCP

ADABAS CPU

ADSO CPU

ADSO EXCP

TSO MVS CPU

TSP Connect

TSO Disk I/O

TSO Print Pages

Project Manager

Systems Analyst

Microcomp. Specialist

Programmer Analyst

Disk Occupancy

Tape Storage

Fiche Originals

Fiche Copies

Home Page Hosting

E-Mail Boxes

LAN/WAN Mgt. Services

Desktop Support

Training Library

**EXHIBIT 8.b**

# General Services Department
# ISF SERVICE RATE TERMINOLOGY - Fiscal Year 2004

## Operating Systems

VM:    The acronym "VM" stands for Virtual Machine.

VM refers to a family of high-performance operating systems that control the resources of an Enterprise Server. VM in the Enterprise Server domain is analogous to Windows XP in the desktop/laptop world. The specific VM family member used by ISD is ZVM 5.2. VM permits the sharing of the Enterprise Server's resources so that each user is presented with the appearance of having exclusive ownership of the computer system's resources.

ISD uses VM/ESA in two ways:
- To control the multiple MVS operating systems which ISD runs;
- To serve as an application platform.

The context in which "VM" is used in ISD's Service Rate Terminology is to refer the use of VM as an application platform.

MVS:    The acronym "MVS" stands for Multiple Virtual Storage.

MVS refers to a family of operating systems which manage an Enterprise Server's resources in order to provide batch and interactive application services. MVS in the Enterprise Server domain is also somewhat analogous to Windows XP in the desktop/laptop world. The specific MVS family member used by ISD is ZOS 1.4. MVS is noted for its ability to accommodate a very high volume of work with rapid response.

The context in which the term "MVS" is used in ISD's Service Rate Terminology is to refer to resources used by "batch" processing within MVS.

Resources used by "interactive" processing within MVS are billed in different categories.

## Enterprise Server

CPU:    A measure of utilization of the central processor engines. A CPU Hour is any number of CPU seconds divided by 3,600, the number of seconds in an hour. Thus a "CPU Hour" represents the amount of work that a single processor engine can perform in one hour at maximum utilization.

This measure should not be confused with "wall clock hours." In a multi-processor environment, a dedicated CPU task can accumulate more than a single CPU Hour during a wall clock hour since multiple subtasks can be performed simultaneously. A computer job that runs over the course of several "wall clock hours" may possibly only use a few minutes of CPU time.

0000274

## Input/Output (I/O) Operations

Disk I/O in the Enterprise Server domain is analogous to opening, or saving from or to, your hard drive in the desktop/laptop world. Tape I/O in the Enterprise Server domain is somewhat analogous to retrieving, or saving from or to, your external tape drive in the desktop/laptop world.

| | |
|---|---|
| START I/O: | A transfer of a block of data between the processor and an input/output device. The amount of data involved in a single START I/O can vary, depending on the block size. A count of the START I/O's represents a count of the number of blocks of data transferred. |
| DISK I/O: | A transfer of a block of data between the processor and a disk device. The amount of data involved in a single DISK I/O can vary, depending on the block size. A count of the Disk I/O's represents a count of the number of blocks of data transferred. |
| TAPE I/O: | A transfer of a block of data between the processor and a tape device. The amount of data involved in a single TAPE I/O can vary, depending on the block size. A count of the Tape I/O's represents a count of the number of blocks of data transferred. |
| EXCP: | A transfer of a block of data between the processor and an input/output device. The amount of data involved in a single EXCP can vary, depending on the block size. A count of the EXCP's represents a count of the number of blocks of data transferred. |
| | Technically, EXCP is the shortened term for the "Execute Channel Program" macro instruction. |

CICS, DB2, IDMS, ADABAS:

DB2, ADABAS, and IDMS in the Enterprise Server domain are somewhat analogous to MS Access in the desktop/laptop world.

The context in which these terms are used in ISD's Service Rate Terminology is to refer to resources used by "interactive" application processing within MVS. Use of resources here does not appear under the "MVS" category, which, as stated above, is for "batch" resources.

| | |
|---|---|
| ADSO: | A high-level language used to develop applications for use with IDMS databases. |
| TSO: | An MVS-based interactive tool used for application development and data set management. |
| | The acronym "TSO" stands for "Time Sharing Option." |
| CONNECT: | The "wall-clock" time interval between the time a LOGON command is issued and the following LOGOFF command is issued. This measure is associated with use of TSO services. |

2

**DISK OCCUPANCY:**

Disk Occupancy in the Enterprise Server domain is analogous to the file size on your hard drive in the desktop/laptop world.

**TAPE STORAGE:**

A measure of data storage used on a tape device. The unit of measure is a "tape-month," which represents storage of (1) magnetic tape for (1) month.

**PRIME TIME:**

The hours from 8:00 a.m. to 5:00 p.m. Monday through Friday.

**NONPRIME TIME:**

The hours after 5:00 p.m. (i.e. from 5:00 p.m. to 8:00 a.m.) on Monday through Friday. This also includes all 24 hours on Saturday and Sunday. For VM and CICS services, NONPRIME TIME also includes holidays. NonPrime Time is a client cost enticement and client savings reward for good social behavior. By encouraging non-time-critical processing migration to low-load nights and weekend times, Prime Time loading is reduced and processor life is considerably extended. While Circular A-87 is essentially silent regarding this matter, federal auditors have, in the past, recognized "load leveling" as good business practice, thereby reducing costs to federal funds.

3

# EXHIBIT 9.a

# New Mexico General Services Department
## Summary of Overcharge Computation at Federal Program Level

The calculation of ISF overcharges to federal programs is based on a comparison of billed revenue to cost by Human Services Department ("HSD") billing account. GSD has used the same data to prepare this analysis that it used to prepare the fund balance analysis that formed the basis for DCA's disallowance calculation. However, rather than calculating the overcharges at the service-category level for usage by the entire Human Services Department, the State's refined analysis determines over- and undercharges at the federal program level.

Each HSD billing account represents either a single federal program or a group of federal programs. All services used by an account are charged on a single bill each month. GSD invoices monitor information services usage at the billing-account level. Therefore, where multiple federal programs participate in one account, each program participates in a fixed portion of the costs associated with that account. From service to service within an account, the makeup of federal program users is identical.

GSD has reviewed account billings to determine units of each service category consumed during state fiscal year ("SFY") 2004. GSD then obtained a service category overcharge or undercharge for each account, by applying to that account's actual usage for each service category, the per-unit overcharge or undercharge for that category reflected in the disallowance work papers. Next, GSD summed the category overcharges and undercharges to obtain a total undercharge or overcharge for each billing account. This process is reflected in the spreadsheet at Exhibit 9.b.

Next, GSD determined the federal share in each billing account's over- or undercharges. This process is reflected in the spreadsheet at Exhibit 9.c. For accounts identified with one federal program, GSD applied that program's FFP for ISF expenditures to the total overcharge or undercharge. For other billing accounts, HSD informed GSD of the percentage of the account's costs allocated to each federal program (the leftmost column in the Exhibit 9.c spreadsheet), and the FFP each program uses for ISF expenditures (the second-from-the-right column in the Exhibit 9.c spreadsheet). GSD multiplied the two percentages to obtain the percentage of each account's costs reimbursed by each federal program. For example, the TANF program participated at the level of 18.4% in the costs of each Income Support Division account in SFY 2004. TANF reimburses ISF costs at a rate of 100%. Therefore, the TANF program reimbursed 18.4% of all billings to the ISD accounts in SFY 2004, and TANF also bore an 18.4% of the overcharge to ISD accounts that year.

This calculation guarantees precision in determining the amount by which federal programs were overcharged. There is no risk of cost-shifting between federal and state programs. Moreover, there is no risk of cost-shifting among federal programs. Cost-shifting among federal programs could occur if one federal program had a net undercharge for SFY 2004. As shown in Exhibit 9.c to the Brief, this condition is not present here; each federal program had a net overcharge.

0000277

**EXHIBIT 9.b**

## Detail of Calculations in Exhibit 9.b

**Beginning fund balance totals** (Column A)

GSD used the same beginning fund balance data as were used in the DCA calculation of overcharges. The beginning fund balance has been allocated to each account on the basis of the ratio of account service utilization to total service utilization.

**Actual service costs unrolled** (Column E)

GSD calculated the actual cost of providing a unit of service multiplied by the service utilization.

**Actual billable revenues** (Column H)

GSD used actual account billings for each service category.

**Actual profit/loss** (Column I)

Actual billed revenue (Column H) less cost (Column E).

**FY 2004 ending fund balance** (Column J)

Beginning fund balance (Column A) minus actual service costs unrolled (Column E), plus actual ISD billed revenue (Column H).

**Imputed interest** (Column K)

For service categories with overcharges, GSD calculated imputed interest as follows: Beginning fund balance (A) plus ending fund balance (J) divided by two, multiplied by .01 ( New Mexico overnight average yield for SFY 2004).

**Cost Percent** (Column L)

The cost percent is the cost of the specific service as a percent of total internal service fund costs. This is used to allocate a portion of total ISD depreciation to each service.

**60 Days Working Capital** (Column M)

Sixty days working capital is calculated by subtracting the allocated portion of depreciation from the actual cost for each service, and dividing by six.

**A-87 Adjusted Fund Balance** (Column N)

The A-87 adjusted fund balance is the FY 2004 ending fund balance plus imputed interest minus sixty days working capital.

2

\*\*\*    State of New Mexico GSD / OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004    \*\*\*

Analysis: HSD Billing Account #620 (Income Support Division)

\*\*\*    Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account    \*\*\*

**Model Assumptions:**
- Costs are represented principally from a salvage document and/or a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constants:**
| | |
|---|---|
| FY04 Interest Rate: | 1.00% |
| FY04 ISD Revenue: | $17,672,380 |
| FY04 ISD Depreciation: | $851,268 |

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual ISD Prod/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A - E) + H) | K Imputed Interest ((A + J) / 2 *IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Dep)*L*/6) | N A-87 Adjusted Fund Balance ((L + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| DB2 CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| IDMS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | 0 | N/A | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Disk Occupancy | 1,493 | 12,562 | 12,562 | $33,964 | 21,402 | $22,895 | $122 | 0.0711% | $1,993 | $21,025 |
| Tape Storage | (3,895) | 7,413 | 7,413 | $7,413 | 0 | ($3,895) | $0 | 0.0419% | $1,176 | ($6,071) |
| | | | | | | | | | | |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| **Accumulated Totals** | ($2,402) | $19,975 | $19,975 | $41,377 | $21,402 | $19,001 | $122 | 0.1130% | $3,169 | $15,954 |
| Gross Totals | | | | | | | | | | |

0000279

*** State of New Mexico GSD / OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD Billing Account #622 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HBO Account ***

**FY04 Model Constants:**
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $851,286

**Model Assumptions:**
- Cost data are extracted principally from a rollup document similar to a Budget Status Report
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | i Actual ISD Profit/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A - E) + H) | K Imputed Interest ((A + J)/2 *IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Dept*L/6) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - NonPrime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| DB2 CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| IDMS EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Project Manager | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Disk Occupancy | 2 | 20 | 20 | $54 | 34 | $37 | $3 | 0.001% | $3 | $34 |
| Tape Storage | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.000% | $0 | $0 |
| | | | | | | | | | | |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| **Accumulated Totals** | $2 | $20 | $20 | $64 | $34 | $37 | $37 | 0.0001% | $3 | $34 |

0000280

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD Billing Account #623 (Administrative Services Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

**FY04 Model Constants:**
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,360
FY04 ISD Depreciation: $851,286

**Model Assumptions:**
- Cost data are extracted principally from a rolled-up document similar to a Budget Status Report
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A - E) + H) | K Imputed Interest ((A + J)/2 *IntRate) | L Cost Percent (E / ISD Rev) | M 50 Days Working Capital (E/ISD Depr*LM8) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O General | N/A | N/A | 97 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 100 | 428 | 480 | $1,024 | 596 | $697 | $4 | 0.0024% | $68 | $633 |
| CICS CPU - NonPrime | 12 | 51 | 51 | 562 | 10 | $22 | $0 | 0.0003% | $8 | $14 |
| CICS EXCP | 117 | 67 | 67 | $170 | 74 | $191 | $2 | 0.0005% | $15 | $177 |
| DB2 CPU | (238) | 263 | 263 | $34 | (186) | ($395) | $0 | 0.0015% | $42 | ($436) |
| IDMS EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Disk Occupancy | 1,053 | 8,555 | 8,555 | $23,943 | 18,087 | $16,140 | $86 | 0.0501% | $1,405 | $14,821 |
| Tape Storage | (7,620) | 14,501 | 14,501 | $14,501 | 0 | ($37,620) | $0 | 0.0821% | $2,300 | ($9,920) |
| | | | | | | | | | | |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| **Accumulated Totals** | (6,674) | $24,196 | $24,293 | $39,895 | $15,609 | $9,036 | $92 | 0.1369% | $3,838 | $8,288 |

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD Billing Account #625 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

Model Assumptions:
- Cost data are extracted primarily from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

FY04 Model Constraints:
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $951,296

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs (Unable) | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A + E) + H) | K Imputed Interest ((A + E) + J / 2 * IntRate) | L Cost Percent (E / ISD Rev) | M 50 Days Working Capital (E / ISD Depr*L/8) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O  General | N/A | N/A |  | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Standard | 8 | 33 | 40 | $79 | 46 | $54 | $0 | 0.0002% | $5 | $49 |
| CICS CPU - NonPrime | 2 | 7 | 7 | $8 | 1 | $3 | $0 | 0.0000% | $1 | $2 |
| CICS EXCP | 7 | 8 | 8 | $10 | 4 | $11 | $0 | 0.0000% | $1 | $11 |
| DB2 CPU | (1) | 1 | 1 | $0 | (0) | ($1) | $0 | 0.0000% | $0 | ($1) |
| IDMS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 3,520 | 29,810 | 29,810 | $90,056 | 60,446 | $53,966 | $287 | 0.1675% | $4,697 | $49,666 |
| Tape Storage | (49,018) | 93,290 | 93,290 | $93,290 | (549,018) | ($49,018) | $0 | 0.5279% | $14,799 | ($83,817) |
| Home Page Hosting |  |  |  | $0 | | | | | | |
| Fiche Original | (51,224) | 23,052 | 23,052 | 56,604 | (16,448) | (567,672) | $0 | 0.1304% | $3,857 | ($71,328) |
| Fiche Copy | (34,839) | 13,414 | 13,414 | $2,737 | (10,677) | (546,513) | $0 | 0.0759% | $2,128 | ($47,641) |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Accumulated Totals | ($131,543) | $169,413 | $169,419 | $193,784 | $23,372 | ($106,171) | $288 | 0.9020% | $25,269 | ($133,172) |

0000282

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT – Fiscal Year 2004 ***

Analysis: HSD Billing Account #628 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

FY04 Model Constants:
FY04 Interest Rate. 1.00%
FY04 ISD Revenue $17,572,380
FY04 ISD Depreciation. $851,289

Model Assumptions:
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable per Federal Circular OMB A-87 not cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Uncollated | F Actual Service Costs Rolled (C-D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A - E) + H) | K Imputed Interest ((A + J)/2 * In(Rate)) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Depr * L/6) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| I/O General | N/A | N/A | 329,265 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 60,083 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
|  |  |  |  |  |  |  |  |  |  |  |
| MVS CPU - Standard | 41,223 | 207,686 | 302,982 | $363,698 | 156,012 | 197,235 | $1,192 | 1.1752% | $32,047 | $166,480 |
| MVS CPU - Prime | 18,765 | 84,643 | 0 | $248,344 | 163,801 | 172,567 | $957 | 0.5550% | $14,598 | $158,926 |
| MVS CPU - NonPrime | 150 | 754 | 0 | $660 | (94) | 856 | $1 | 0.0043% | $130 | $726 |
| MVS Disk I/O | 88,641 | 75,175 | 75,175 | $132,355 | 87,179 | 145,820 | $1,172 | 0.4254% | $11,926 | $135,067 |
| MVS Tape I/O | 2,559 | 153,114 | 153,114 | $217,819 | 64,706 | $67,264 | $349 | 0.8664% | $24,290 | $43,323 |
| MVS Print Local | (76,761) | 60,060 | 60,060 | $34,044 | (26,036) | (102,817) | $0 | 0.3400% | $9,531 | ($112,348) |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Standard | 191,047 | 815,089 | 852,277 | $1,949,628 | 1,134,639 | 1,325,586 | $7,583 | 4.6122% | $129,304 | $1,203,865 |
| CICS CPU - NonPrime | 8,717 | 37,189 | 0 | $44,476 | 7,287 | 16,004 | $124 | 0.2104% | $5,900 | $10,228 |
| CICS EXCP | 305,861 | 250,350 | 250,350 | $440,770 | 190,420 | 493,380 | $3,982 | 1.4166% | $39,715 | $457,447 |
| DB2 CPU | (64,240) | 72,206 | 72,206 | $28,028 | (44,286) | (105,115) | $0 | 0.4076% | $11,428 | ($119,542) |
| IDMS EXCP | (154,240) | (61,196) | (61,196) | $3,100 | 64,286 | (376,942) | $0 | -0.4084% | ($12,879) | ($67,063) |
| ADABAS CPU | 0 | 0 | 0 | 0 | 0 | 0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | 0 | 0 | $1 | (23) | (598) | $0 | 0.0000% | $0 | ($102) |
| ADO CPU | (74) | 24 | 24 | $1 | 2,806 | 52 | $0 | 0.0001% | $4 | $92 |
| ADO EXCP | 2 | 2 | 0 | $4,511 | (6,010) | 2 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 10,257 | 2,011 | 2,011 | $6,295 | 2,844 | 12,763 | $115 | 0.0114% | $319 | $12,559 |
| TSO Command | (12,745) | 11,304 | 11,304 | $6,584 | (1) | (17,758) | $0 | 0.0640% | $0 | ($19,851) |
| TSO Disk I/O | 8,431 | 3,740 | 3,740 | $6,584 | 2,844 | 11,278 | $99 | 0.0212% | $593 | $10,784 |
| TSO Print Local | (8) | (8) | 3 | $1 | (1) | (90) | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| Disk Occupancy | 37,281 | 313,637 | 313,637 | $847,981 | 534,344 | $671,625 | $3,045 | 1.7747% | $49,765 | $624,916 |
| Tape Storage | (73,010) | 138,951 | 138,951 | $138,951 | 0 | ($73,010) | $0 | 0.7863% | $22,043 | ($95,053) |
|  |  |  |  |  |  |  |  |  |  |  |
| Fiche Original | (303) | 136 | 136 | $39 | (97) | ($400) | $0 | 0.0008% | $22 | ($421) |
| Fiche Copy | (153) | 59 | 59 | $12 | (47) | ($200) | $0 | 0.0003% | $9 | ($209) |
|  |  |  |  |  |  |  |  |  |  |  |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | (78,042) | 123,058 | 123,058 | $115,920 | (7,138) | ($83,177) | $0 | 0.6953% | $19,521 | ($102,699) |
| LAN / WAN Service | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Delivery | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| Accumulated Totals | $241,969 | $2,277,748 | $2,467,096 | $4,993,822 | $3,300,073 | $2,548,032 | $19,619 | 12.8887% | $381,338 | $2,205,312 |

0000283

\*\*\*  State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT –  Fiscal  Year  2004  \*\*\*

\*\*\*  Analysis: HSD Billing Account #627 (Income Support Division)  \*\*\*

\*\*\*  Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account  \*\*\*

**FY04 Model Constants:**
FY04 Interest Rate — 1.00%
FY04 ISD Revenue — $17,672,350
FY04 ISD Depreciation — $851,286

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report
- Costs include only those allowable per Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unabated | F Actual Service Costs Abated (C÷D) | H Actual ISD Billable Revenues | I Actual Profit/(Loss) by Billing Service (H - E) | FY2004 Ending Fund Balance ((A - E) + H) | K Imputed Interest ((A + J)/2 · IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E ÷ ISD Depr·L/4.5) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | N/A | N/A | 18,739 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 7,594 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 2,790 | 14,058 | 34,753 | $24,618 | 10,560 | $13,350 | $81 | 0.0795% | $2,230 | $11,201 |
| MVS CPU - Prime | 4,102 | 20,665 | 0 | $54,282 | 33,617 | $37,719 | $209 | 0.1169% | $3,278 | $34,650 |
| MVS CPU - NonPrime | 6 | 39 | 0 | $27 | (4) | $2 | $0 | 0.0002% | $6 | ($4) |
| VM Disk I/O | 22,095 | 18,738 | 18,738 | $32,991 | 14,253 | $36,347 | $292 | 0.1060% | $2,973 | $33,667 |
| MVS Tape I/O | 70 | 4,219 | 4,219 | $6,002 | 1,783 | $1,853 | $10 | 0.0239% | $669 | $1,194 |
| MVS Print Local | (9,833) | 7,694 | 7,694 | $4,360 | (3,334) | ($13,167) | $0 | 0.0435% | $1,221 | ($14,388) |
| MVS Print Remote | (624) | 1,639 | 1,639 | $178 | (1,461) | ($2,084) | $0 | 0.0093% | $260 | ($2,844) |
| CICS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Prime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| DB2 CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| IDMS EXCP | (729,696) | (350,796) | (350,796) | $13,394 | 384,189 | ($345,506) | $0 | -1.9850% | ($55,650) | ($289,857) |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 1 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | (6) | 0 | 0 | $3 | 0 | ($8) | ($0) | 0.0000% | $0 | ($9) |
| TSO Disk I/O | 2 | 5 | 5 | $2 | (2) | $1 | $0 | 0.0000% | $1 | $1 |
| TSO Print Local | 0 | 1 | 1 | $0 | 1 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 1,680 | 14,134 | 14,134 | $39,214 | 24,080 | $25,760 | $137 | 0.0800% | $2,242 | $23,655 |
| Tape Storage | (7,772) | 14,792 | 14,792 | $14,792 | 0 | ($7,772) | $0 | 0.0837% | $2,346 | ($10,119) |
| Fiche Original | (832) | 374 | 374 | $107 | (267) | ($1,099) | $0 | 0.0021% | $59 | ($1,180) |
| Fiche Copy | (420) | 162 | 162 | $33 | (129) | ($549) | $0 | 0.0009% | $26 | ($574) |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| **Accumulated Totals** | **(698,638)** | **(254,266)** | **(227,852)** | **$189,001** | **443,286** | **($565,349)** | **$729** | **-1.4389%** | **($40,339)** | **($214,280)** |

\*\*\*  State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004  \*\*\*

\*\*\*  Analysis: HSD Billing Account #628 (Child Support Enforcement Division)  \*\*\*

\*\*\*  Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account  \*\*\*

**Model Assumptions:**
-- Cost data are extracted principally from a roll-up document similar to a Budget Status Report
-- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004
-- This analysis is only for the purposes of Federal reporting and does not reflect actual Division profit and loss.

MVS CPU Sund:  296,765
2,569
3,090
247,485

**FY04 Model Constants:**
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,980
FY04 ISD Depreciation: $851,286

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unbilled | F Actual Service Costs Billed (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance (A - E) + H | K Imputed interest ((A + J) / 2 InrRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Dept*1/6) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| IO General | N/A | N/A | 105,553 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | 1,434 | 1,434 | | | | | | | | |
| MVS CPU - Standard | 247,490 | 1,246,889 | 1,485,542 | $2,193,544 | $28,888 | $1,184,144 | $7,158 | 7.0565% | $187,804 | $893,498 |
| MVS CPU - Prime | 46,608 | 236,315 | | $920,750 | 384,435 | $431,340 | $2,391 | 3.3372% | $37,489 | $396,243 |
| MVS CPU - NonPrime | 464 | 2,338 | 2,338 | $2,047 | (291) | $173 | $53 | 0.0152% | $371 | ($197) |
| MVS Disk I/O | 43,787 | 37,119 | 37,119 | $65,351 | 28,233 | $72,020 | $579 | 0.2100% | $5,896 | $68,502 |
| MVS Tape I/O | 2,103 | 125,840 | 125,840 | $178,019 | 53,179 | $55,282 | $287 | 0.7121% | $19,983 | $38,608 |
| MVS Print Local | (3,641) | 1,294 | 1,294 | $728 | (567) | ($82,189) | $82 | 0.0073% | $204 | ($2,492) |
| MVS Print Remote | | | | | | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Standard | 113,661 | 505,238 | 505,238 | $1,161,946 | $76,187 | $790,027 | $4,519 | 2.7489% | $77,063 | $717,484 |
| CICS CPU - NonPrime | 4,765 | 20,459 | 20,459 | $24,457 | 4,009 | $8,504 | $68 | 0.1159% | $3,245 | $8,627 |
| CICS EXCP | 150,523 | 50,095 | 50,095 | $88,199 | 38,103 | $88,726 | $797 | 0.2835% | $7,947 | $91,576 |
| DB2 CPU | (759,595) | 849,079 | 849,079 | $335,533 | (608,746) | ($1,267,132) | $0 | 4.7774% | $133,935 | ($1,401,067) |
| IDMS EXCP | (25,424) | (12,567) | (12,567) | $490 | 13,048 | ($12,077) | $0 | -0.0711% | ($1,994) | ($10,384) |
| ADABAS CPU | | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADO CPU | (8,861) | 2,884 | 2,884 | $95 | (2,789) | ($11,650) | $11 | 0.0163% | $458 | ($12,108) |
| ADSO EXCP | (3,041) | 151 | 151 | $253 | 122 | $1,163 | $11 | 0.0009% | $25 | $1,148 |
| TSO MVS CPU | 83,899 | 16,466 | 16,466 | $36,594 | 20,488 | $104,387 | $941 | 0.0931% | $2,509 | $102,889 |
| TSO Connect | (37,451) | 33,211 | 33,211 | $18,493 | (14,718) | ($52,169) | $0 | 0.1876% | $5,268 | ($67,438) |
| TSO Disk I/O | 40,985 | 18,178 | 18,178 | $32,005 | 13,827 | $54,811 | $479 | 0.1029% | $2,884 | $52,406 |
| TSO Print Local | (449) | 150 | 150 | $85 | (65) | ($513) | $0 | 0.0008% | $24 | ($537) |
| Project Manager | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | (537) | 0 | | $0 | 0 | ($970) | ($970) | 0.0000% | $0 | ($1,487) |
| Programmer Analyst | | 3,065 | 3,065 | $2,632 | (433) | $0 | $0 | 0.0173% | $466 | $0 |
| Disk Occupancy | 35,324 | 297,168 | 297,168 | $903,453 | 606,286 | $541,609 | $2,885 | 1.6815% | $47,142 | $497,351 |
| Tape Storage | (185,397) | 371,874 | 371,874 | $371,874 | 0 | ($195,397) | $0 | 2.1043% | $58,993 | ($264,391) |
| Fiche Original | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Home Page Hosting | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | (31,887) | 51,882 | 51,882 | $49,810 | (2,992) | ($34,880) | $0 | 0.2937% | $8,195 | ($43,089) |
| LAN / WAN Services | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Library | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| **Accumulated Totals** | ($375,808) | $3,632,059 | $3,939,858 | $6,576,527 | $2,143,958 | $1,785,190 | $20,118 | 21.6849% | $407,992 | $1,177,276 |

0000285

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT – Fiscal Year 2004 ***

Analysis: HSD Billing Account #629 (Medical Assistance Division)

Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account

FY04 Model Constants:
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $951,288

Model Assumptions:
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | A. FY2004 Beginning Fund Balance | E. Actual Service Costs (Unrated) | F. Actual Service Costs Rated (C*D) | H. Actual ISD Billable Revenues | I. Actual ISD Profit/(Loss) by Billing Service (H − E) | J. FY2004 Ending Fund Balance ((A − E) + H) | K. Imputed Interest ((A + J)/2 * InfRate) | L. Cost Percent (E / ISD Rev) | M. 50 Days Working Capital (E / ISD Depr*L/6) | N. A-87 Adjusted Fund Balance ((J + K) − M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O General | N/A | N/A | 2,220 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 2,346 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 495 | 2,493 | 2,686 | $4,355 | 1,872 | $2,367 | $14 | 0.0141% | $395 | $1,800 |
| MVS CPU - Prime | 38 | 190 | 0 | $498 | 308 | $346 | $0 | 0.0011% | $30 | $318 |
| MVS CPU - NonPrime | 1 | 3 | 0 | $3 | (0) | $0 | $0 | 0.0000% | $1 | $1 |
| MVS Disk I/O | 2,434 | 2,064 | 2,064 | $3,634 | 1,570 | $4,003 | $32 | 0.0117% | $327 | $3,708 |
| MVS Tape I/O | 45 | 2,740 | 2,740 | $3,897 | 1,158 | $1,204 | $6 | 0.0155% | $435 | $775 |
| MVS Print Local | (2,998) | 2,346 | 2,346 | $1,929 | (1,017) | ($4,015) | $0 | 0.0133% | $372 | ($4,347) |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 115 | 489 | 538 | $1,170 | 681 | $795 | $5 | 0.0028% | $78 | $722 |
| CICS CPU - NonPrime | 11 | 46 | 0 | $59 | 10 | $21 | $0 | 0.0003% | $8 | $13 |
| CICS EXCP | 156 | 156 | 156 | $274 | 119 | $207 | $2 | 0.0009% | $25 | $229 |
| DB2 CPU | (289) | 332 | 332 | $132 | (200) | ($498) | $0 | -0.0001% | $53 | ($560) |
| IDMS EXCP | (38) | (19) | (19) | $1 | 19 | ($19) | $0 | 0.0019% | ($3) | ($15) |
| ADABAS CPU | | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | (34) | 11 | 11 | $1 | (11) | ($44) | $0 | 0.0001% | $2 | ($46) |
| ADSO CPU | 3 | 1 | 0 | $0 | 0 | $4 | $0 | 0.0000% | $0 | $4 |
| ADSO EXCP | | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Disk Occupancy | 1,155 | 9,221 | 9,221 | $25,282 | 16,061 | $17,717 | $94 | 0.0550% | $1,542 | $15,269 |
| Tape Storage | (2,215) | 4,215 | 4,215 | $4,215 | 0 | ($2,215) | $0 | 0.0239% | $669 | ($2,884) |
| | | | | | | | | | | |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Home Page Hosting | 0 | 0 | 0 | $23,590 | (1,472) | ($17,171) | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | (15,698) | 25,403 | 25,403 | $0 | 0 | $0 | $0 | 0.1437% | $4,030 | ($21,201) |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Accumulated Totals | (15,794) | $60,192 | $54,768 | $59,789 | $19,598 | $2,804 | $164 | 0.2840% | $7,942 | ($5,002) |

0000286

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis : HSD  Billing Account #630 (Administrative Services Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs exclude only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constants:**
| | |
|---|---|
| FY04 Interest Rate | 1.00% |
| FY04 ISD Revenue | $17,672,350 |
| FY04 ISD Depreciation | $851,286 |

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrecled | F Actual Service Costs Rolled (C-D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H-E) | J FY2004 Ending Fund Balance ((A-E)+H) | K Imputed interest ((A+J)/2 * IntRate) | L Cost Percent (E/ISD Rev) | M 60 Days Working Capital (E/ISD Dept/L/8) | N A-87 Adjusted Fund Balance ((J+K)-M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | (906) | $159 | $6,176 | $112 | ($47) | ($955) | $0 | 0.0009% | $25 | ($861) |
| VM CPU - NonPrime | (34,285) | $6,017 | $6,017 | $2,115 | ($3,901) | ($38,156) | $0 | 0.0340% | $954 | ($39,111) |
| VM Start I/O | 8 | $3 | $3 | $5 | $2 | $8 | $0 | 0.0000% | $0 | $8 |
| VM Print Local | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 4,636 | 23,355 | 37,959 | $40,899 | 17,644 | $24,179 | $134 | 0.1322% | $3,705 | $18,609 |
| MVS CPU - Prime | 2,811 | 14,161 | 0 | $37,199 | 23,097 | $25,848 | $143 | 0.0801% | $2,247 | $23,745 |
| MVS CPU - NonPrime | 94 | 474 | 0 | $415 | (59) | $35 | $1 | 0.0027% | $76 | ($39) |
| MVS Disk I/O | 34,999 | 29,682 | 29,682 | $52,259 | 22,577 | $57,576 | $463 | 0.1880% | $4,709 | $63,329 |
| MVS Tape I/O | 139 | 8,300 | 8,300 | $11,808 | 3,808 | $3,646 | $19 | 0.0470% | $1,317 | $2,349 |
| MVS Print Local | (21,492) | 18,794 | 18,794 | $9,518 | (7,279) | ($23,739) | $0 | 0.0650% | $2,664 | ($31,403) |
| MVS Print Remote | (241) | 479 | 479 | $52 | (427) | ($668) | $0 | 0.0027% | $76 | ($744) |
| CICS CPU - Standard | 8,089 | 34,513 | 35,133 | $82,552 | 48,039 | $56,128 | $321 | 0.1953% | $5,475 | $60,071 |
| CICS CPU - NonPrime | 24,880 | 1,920 | 1,920 | $1,938 | 317 | $697 | $5 | 0.0092% | $257 | $444 |
| CICS EKCP | (22,504) | 20,355 | 20,355 | $35,837 | 15,482 | $40,115 | $324 | 0.1150% | $3,229 | $37,209 |
| DB2 CPU | | 25,053 | 25,053 | $9,057 | (16,096) | ($37,601) | $0 | 0.1418% | $3,974 | ($41,575) |
| IDMS EKCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EKCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EKCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 8,619 | 1,690 | 1,690 | $3,796 | 2,106 | $10,725 | $97 | 0.0099% | $288 | $10,884 |
| TSO Connect | (17,700) | 15,895 | 15,895 | $11,059 | (4,836) | ($24,656) | $0 | 0.0898% | $2,490 | ($27,146) |
| TSO Disk I/O | 6,463 | 2,867 | 2,867 | $5,047 | 2,180 | $8,644 | $78 | 0.0162% | $455 | $9,155 |
| TSO Print Local | (4,692) | 1,625 | 1,625 | $921 | (704) | ($5,566) | $0 | 0.0092% | $258 | ($5,265) |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 43,087 | 147,326 | 147,326 | $14,798 | (132,580) | ($89,473) | $0 | 0.8337% | $23,372 | ($112,840) |
| Sr Systems Analyst | (129) | 734 | 734 | $630 | (104) | ($233) | $0 | 0.0042% | $116 | ($349) |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 6,849 | 55,907 | 55,907 | $151,155 | 95,248 | $101,894 | $543 | 0.3164% | $8,866 | $93,567 |
| Tape Storage | (38,452) | 122,872 | 122,872 | $110,264 | (12,608) | ($52,120) | $0 | 0.6953% | $19,482 | ($64,328) |
| Fiche Original | (20,619) | 17,754 | 17,754 | $5,068 | (12,686) | ($33,305) | $0 | 0.1005% | $2,817 | ($36,123) |
| Fiche Copy | | 7,940 | 7,940 | $1,620 | (6,320) | ($6,320) | $0 | 0.0449% | $1,260 | ($7,580) |
| Home Page Hosting | (34,089) | 22,773 | 22,773 | $1,060 | (21,693) | ($55,782) | $0 | 0.1289% | $3,613 | ($59,395) |
| E-Mail Boxes | (28,308) | 45,806 | 45,806 | $45,150 | (656) | ($28,964) | $0 | 0.2592% | $7,267 | ($36,231) |
| LAN / WAN Services | | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | (44,547) | 53,196 | 53,196 | $8,514 | (44,682) | ($89,229) | $0 | 0.3010% | $8,459 | ($97,680) |
| Training Library | | | | | | | | | | |
| **Accumulated Totals** | **(183,032)** | **$477,148** | **$748,474** | **$652,038** | **($25,110)** | **($218,142)** | **$2,126** | **3.8317%** | **$107,422** | **($323,438)** |

0000287

*** State of New Mexico OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD Billing Account #840 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constants:**
FY04 Interest Rate: 1.0%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $851,298

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H-E) | J FY2004 Ending Fund Balance ((A-E)+H) | K Imputed Interest ((A-J)/2*IntRate) | L Cost Percent (E/ISD Rev) | M 60 Days Working Capital (E/(ISD Dep*L/6)) | N A-87 Adjusted Fund Balance ((J+K)-M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O General | N/A | N/A | 340 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 135 | 684 | 796 | $1,196 | 514 | $650 | $4 | 0.0039% | $109 | $845 |
| MVS CPU - Prime | 0 | 0 | 0 | $0 | | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 23 | 114 | 0 | $99 | (14) | $8 | $1 | 0.0006% | $18 | |
| MVS Disk I/O | 92 | 78 | 78 | $137 | 59 | $151 | $1 | 0.0004% | $12 | $141 |
| MVS Tape I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 238 | 1,018 | 1,252 | $2,431 | 1,416 | $1,653 | $9 | 0.0058% | $161 | $1,501 |
| CICS CPU - NonPrime | 545 | 236 | 236 | $282 | 46 | $102 | $1 | 0.0013% | $37 | $66 |
| CICS EXCP | 317 | 282 | 282 | $461 | 199 | $516 | $4 | 0.0016% | $42 | $478 |
| DB2 CPU | (147) | 183 | 183 | $65 | (98) | ($245) | $0 | 0.0009% | $26 | ($271) |
| IDMS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | | 0 | 0 | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | | 0 | 0 | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk IO | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Disk Occupancy | 283 | 2,381 | 2,381 | $6,498 | 4,087 | $4,340 | $23 | 0.0135% | $378 | $3,985 |
| Tape Storage | (4,395) | 8,384 | 8,384 | $8,364 | 0 | ($4,395) | $0 | 0.0473% | $1,327 | ($5,722) |
| | | | | | | | | | | |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| **Accumulated Totals** | (3,398) | 13,299 | 13,659 | $19,477 | 6,178 | $2,780 | $43 | 0.0753% | $2,110 | $713 |

0000288

*** State of New Mexico OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) All HSD Accounts -- Fiscal Year 2004 ***

*** Analysis: Totals, All HSD Billing Accounts ***

*** Reconciliation of Usage-Based Costs and Usage-Based Revenue by Billable Service for a Single HSD Account ***

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constants:**
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,872,350
FY04 ISD Depreciation: $851,286

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unbilled | F Actual Service Costs Billed (C·D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H − E) | J FY2004 Ending Fund Balance ((A − E) + H) | K Imputed Interest ((A + J)/2·IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E/ISD Dept·L/.6) | N A-87 Adjusted Fund Balance ((J + K) − M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | ($909) | $159 | $6,176 | $112 | ($47) | ($955) | $0 | 0.0009% | $25 | ($981) |
| VM CPU - NonPrime | ($34,255) | $6,017 | $0 | $2,115 | ($3,901) | ($38,156) | $0 | 0.0340% | $954 | ($39,111) |
| VM Start I/O | $6 | $0 | 3 | $0 | $0 | $8 | $0 | 0.0000% | $0 | $8 |
| VM Print Local | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | #VALUE! | N/A | 0 | N/A | N/A | N/A | $0 | N/A | N/A | N/A |
| Print General | #VALUE! | N/A | 0 | N/A | N/A | N/A | $0 | N/A | N/A | N/A |
| MVS CPU - Standard | $296,768 | 1,465,164 | 1,864,750 | $2,618,321 | 1,123,157 | $1,419,925 | $8,583 | 8.4805% | $237,190 | $1,191,318 |
| MVS CPU - Prime | $72,620 | 365,873 | | $961,073 | 695,199 | $667,820 | $3,702 | 2.0703% | $59,042 | $613,480 |
| MVS CPU - NonPrime | 3737 | 3,712 | 3,712 | $3,250 | (462) | $275 | $5 | 0.0210% | $599 | ($329) |
| MVS Disk I/O | $192,027 | 162,666 | 162,666 | $288,727 | 123,871 | $315,688 | $2,540 | 0.9215% | $26,635 | $292,603 |
| MVS Tape I/O | $43,017 | 204,212 | 204,212 | $415,845 | 124,333 | $129,250 | $871 | 1.6046% | $49,873 | $93,247 |
| MVS Print Local | ($112,715) | 88,198 | 88,198 | $49,976 | (39,221) | ($150,938) | $0 | 0.4991% | $13,982 | ($164,920) |
| MVS Print Remote | ($1,064) | 2,118 | 2,118 | $230 | (1,889) | ($2,952) | $0 | 0.0120% | $336 | ($3,288) |
| CICS CPU - Standard | $313,468 | 1,337,348 | 1,398,957 | $3,196,830 | 1,861,482 | $2,174,940 | $12,442 | 7.5674% | $212,154 | $1,975,227 |
| CICS CPU - NonPrime | $13,872 | 58,610 | | $71,281 | 11,881 | $26,653 | $199 | 0.3373% | $9,466 | $16,386 |
| CICS EXCP | $388,945 | 321,321 | 321,321 | $562,722 | 244,401 | $633,546 | $5,110 | 1.8162% | $50,974 | $487,883 |
| DB2 CPU | ($848,278) | 842,126 | 842,126 | $374,419 | (467,707) | ($1,413,966) | $0 | 5.3311% | $149,457 | ($1,563,443) |
| IDMS EXCP | $645,317 | (444,567) | (444,567) | $15,974 | 461,641 | ($407,564) | $0 | 2.5156% | ($70,525) | ($397,339) |
| ADABAS CPU | | | | | | | | | | |
| ADABAS EXCP | ($5,969) | 2,919 | 2,919 | 896 | (2,023) | ($11,792) | $0 | 0.0165% | $463 | ($12,256) |
| ADSO CPU | $1,046 | 161 | 161 | $204 | 123 | $1,169 | $11 | 0.0009% | $26 | $1,164 |
| ADSO EXCP | $102,747 | 20,147 | 20,147 | $45,247 | 25,100 | $127,847 | $1,153 | 0.1140% | $3,198 | $128,804 |
| TSO MVS CPU | ($57,924) | 60,215 | 60,215 | $33,529 | (26,686) | ($84,620) | $0 | 0.3407% | $9,552 | ($104,143) |
| TSO Connect | $55,891 | 24,785 | 24,785 | $43,637 | 18,852 | $44,733 | $653 | 0.1402% | $3,928 | $41,458 |
| TSO Disk I/O | ($5,319) | 1,777 | 1,777 | $1,007 | (770) | ($6,098) | $0 | 0.0101% | $282 | ($6,370) |
| TSO Print Local | $0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | $43,097 | 147,326 | 147,326 | $14,766 | (132,560) | ($90,473) | $0 | 0.8037% | $23,372 | ($112,844) |
| Systems Analyst | ($666) | 3,799 | 3,799 | $3,262 | (537) | ($1,203) | $11 | 0.0215% | $903 | ($1,905) |
| Sr Systems Analyst | $0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Br Systems Analyst | | | | | | | | | | |
| Programmer Analyst | $0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | $88,437 | 743,995 | 743,995 | $2,011,540 | 1,267,646 | $1,355,982 | $7,222 | 4.2096% | $119,028 | $1,244,179 |
| Tape Storage | ($407,683) | 778,272 | 778,272 | $779,272 | (17,173) | ($407,683) | $0 | 4.3926% | $123,146 | ($531,029) |
| Fiche Original | ($91,810) | 41,317 | 41,317 | $11,837 | (29,491) | ($121,291) | $0 | 0.2333% | $8,554 | ($127,845) |
| Fiche Copy | ($56,027) | 21,575 | 21,575 | $4,492 | (17,173) | ($73,200) | $0 | 0.1221% | $3,493 | ($76,623) |
| Home Page Hosting | ($34,089) | 22,773 | 22,773 | $1,060 | (21,693) | ($55,782) | $0 | 0.1296% | $3,613 | ($59,395) |
| E-Mail Boxes | ($151,933) | 245,987 | 245,987 | $231,810 | (14,267) | ($166,190) | $0 | 1.3912% | $39,034 | ($208,194) |
| LAN / WAN Services | $0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | ($44,547) | 53,196 | 53,196 | $8,514 | (44,682) | ($89,229) | $0 | 0.3010% | $8,439 | ($97,889) |
| Training Library | $0 | | | $0 | | $0 | $0 | | $0 | $0 |
| **Accumulated Totals** | $1,189,224) | $6,800,276 | $6,800,276 | $11,734,875 | $4,934,400 | $3,746,176 | $42,291 | 38.4797% | $1,076,724 | $2,726,684 |

**EXHIBIT 9.c**

***    Information Services ISF Overcharge Analysis;    ...deral Program Level For HSD -- Fiscal Year 2004    ***

This spreadsheet identifies the impact of each billing account's overcharge or undercharge on each federal program.

Federal programs:

| | |
|---|---|
| CSED | Child Support Enforcement |
| MAD | Medical Assistance Division (Medicaid) |
| TANF | Temporary Assistance for Needy Families |
| GE | General Assistance |
| Refugee FA | Refugee Financial Assistance |
| Refugee MA | Refugee Medical Assistance |
| Food Stamps | |
| MA Title 19 | Medicaid (Administration) |
| LIHEAP | Low Income Home Energy Assistance Program |
| SAVE | Systematic Alien Verification for Entitlements |
| E&T | Food Stamps Employment and Training |

In the results summary, the total net overcharge to each federal program is identified. For purposes of this summary MAD and MA Title 19 (both Medicaid) and Refugee FA and Refugee MA (also forming one assistance program) are consolidated.

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Uncoiled | Actual Billable Revenues | Actual Profit/(Loss) by Billing Service | FY2004 Ending Fund Balance | Imputed Interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY2004 HSD %FFP | Federal Over/(Under)-Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (Account 620)** | -2,401.71 | 19,874.94 | 41,377.15 | 21,402.21 | 19,000.50 | 122.00 | 3,168.79 | 15,953.71 | 58.67% | 9,360.04 |
| | *Income Support Division* | | | | | | | | | | |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00% | 0.00 |
| 0.183750445 | TANF | -441.32 | 3,670.41 | 7,603.08 | 3,932.67 | 3,491.35 | 22.42 | 582.27 | 2,931.51 | 100.00% | 2,931.51 |
| 0.022447243 | GA | -53.91 | 446.38 | 926.90 | 480.42 | 426.51 | 2.74 | 71.13 | 358.12 | 0.00% | 0.00 |
| 0.000459416 | REFUGEE FA | -1.10 | 6.16 | 19.01 | 9.83 | 8.73 | 0.06 | 1.46 | 7.33 | 100.00% | 7.33 |
| 0.003493909 | REFUGEE MA | -13.19 | 109.74 | 227.32 | 117.58 | 104.39 | 0.67 | 17.41 | 87.85 | 100.00% | 87.85 |
| 0.519986384 | FOOD STAMPS | -1,246.81 | 10,384.70 | 21,511.42 | 11,126.72 | 9,876.10 | 63.43 | 1,647.41 | 8,264.12 | 50.00% | 4,147.06 |
| 0.257360381 | MA TITLE 19 | -618.15 | 5,141.16 | 10,649.67 | 5,508.51 | 4,860.36 | 31.40 | 815.58 | 4,106.17 | 50.00% | 2,053.09 |
| 0.006221474 | LIHEAP | -14.64 | 124.27 | 257.43 | 133.16 | 118.21 | 0.76 | 19.71 | 99.26 | 100.00% | 99.26 |
| 0.000478997 | SAVE | -1.15 | 9.57 | 19.82 | 10.25 | 9.10 | 0.06 | 1.52 | 7.64 | 50.00% | 3.82 |
| 0.003881647 | E&T | -9.32 | 77.54 | 160.81 | 83.06 | 73.75 | 0.47 | 12.30 | 61.93 | 50.00% | 30.98 |
| 100.00% | TEST | -2,401.71 | 19,874.94 | 41,377.15 | 21,402.21 | 19,000.50 | 122.00 | 3,168.79 | 15,953.71 | | 9,360.67 |
| | **Accumulated Totals (Account 622)** | 2.39 | 20.14 | 54.46 | 34.31 | 36.71 | 0.00 | 3.20 | 33.51 | 58.67% | 19.68 |
| | *Income Support Division* | | | | | | | | | | |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00% | 0.00 |
| 0.183750445 | TANF | 0.44 | 3.70 | 10.01 | 6.31 | 6.75 | 0.00 | 0.59 | 8.16 | 50.00% | 5.16 |
| 0.022447243 | GA | 0.05 | 0.45 | 1.22 | 0.77 | 0.82 | 0.00 | 0.07 | 0.75 | 0.00% | 0.02 |
| 0.000459416 | REFUGEE FA | 0.00 | 0.01 | 0.03 | 0.02 | 0.02 | 0.00 | 0.00 | 0.02 | 100.00% | 0.02 |
| 0.003493909 | REFUGEE MA | 0.01 | 0.11 | 0.30 | 0.19 | 0.20 | 0.00 | 0.02 | 0.18 | 100.00% | 0.18 |
| 0.519986384 | FOOD STAMPS | 1.24 | 10.47 | 28.31 | 17.84 | 18.08 | 0.00 | 1.86 | 17.42 | 50.00% | 8.71 |
| 0.257360381 | MA TITLE 19 | 0.62 | 5.18 | 14.02 | 8.83 | 9.45 | 0.00 | 0.82 | 8.63 | 50.00% | 4.31 |
| 0.006221474 | LIHEAP | 0.01 | 0.13 | 0.34 | 0.21 | 0.23 | 0.00 | 0.02 | 0.21 | 100.00% | 0.21 |
| 0.000478997 | SAVE | 0.00 | 0.01 | 0.03 | 0.02 | 0.02 | 0.00 | 0.00 | 0.02 | 50.00% | 0.01 |
| 0.003881647 | E&T | 0.01 | 0.06 | 0.21 | 0.13 | 0.14 | 0.00 | 0.01 | 0.13 | 50.00% | 0.07 |
| 100.00% | TEST | 2.39 | 20.14 | 54.46 | 34.31 | 36.71 | 0.00 | 3.20 | 33.51 | | 19.68 |

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Unrolled | Actual Billable Revenues | ual (Loss) by Billing Service | FY2004 Ending Fund Balance | Impuded interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY2 HSD %... | Federal Over/(Under)-Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (Account 623)** | -6,573.54 | 24,198.24 | 39,804.75 | 15,606.51 | 9,034.97 | 92.00 | 3,838.45 | 5,288.52 | 59.93% | 3,169.41 |
| | **Administrative Services Division** | | | | | | | | | | |
| 0.249639798 | CSED | -1,842.33 | 6,045.18 | 9,944.81 | 3,896.63 | 2,257.29 | 22.99 | 956.00 | 1,321.28 | 66.00% | 872.05 |
| 0.097401466 | MAD | -640.29 | 2,356.82 | 3,877.16 | 1,520.34 | 880.05 | 8.96 | 373.88 | 515.13 | 50.00% | 267.56 |
| 0.12245334 | TANF | -804.95 | 2,962.89 | 4,874.19 | 1,911.30 | 1,106.35 | 11.27 | 470.03 | 647.59 | 50.00% | 647.59 |
| 0.013972405 | GA | -341.85 | 338.08 | 556.17 | 218.09 | 126.24 | 1.29 | 53.65 | 73.89 | 0.00% | 0.00 |
| 0.000681638 | REFUGEE FA | -5.34 | 19.64 | 32.31 | 12.67 | 7.33 | 0.07 | 3.12 | 4.29 | 100.00% | 4.29 |
| 0.004435536 | REFUGEE MA | -29.16 | 107.32 | 176.56 | 69.23 | 40.08 | 0.41 | 17.03 | 23.46 | 100.00% | 23.46 |
| 0.339294771 | FOOD STAMPS | -2,231.03 | 8,212.08 | 13,509.55 | 5,297.45 | 3,066.42 | 31.22 | 1,302.75 | 1,764.90 | 50.00% | 697.45 |
| 0.164494374 | MA TITLE 19 | -1,081.31 | 3,980.15 | 6,547.66 | 2,567.51 | 1,486.20 | 15.13 | 631.40 | 869.93 | 50.00% | 434.97 |
| 0.024698449 | LIHEAP | -32.20 | 118.53 | 164.99 | 78.48 | 44.26 | 0.45 | 18.60 | 25.91 | 100.00% | 25.91 |
| 0.000156022 | SAVE | -1.03 | 3.78 | 6.22 | 2.44 | 1.41 | 0.01 | 0.60 | 0.83 | 50.00% | 0.41 |
| 0.002139761 | E&T | -14.07 | 51.77 | 85.17 | 33.40 | 19.33 | 0.20 | 8.21 | 11.32 | 50.00% | 5.66 |
| 100.00% | **TEST** | -6,573.54 | 24198.24 | 39,804.75 | 15,606.51 | 9,034.97 | 92.00 | 3,838.45 | 5,288.52 | | 3,169.34 |
| | | | | | | | | | | | |
| | **Accumulated Totals (Account 625)** | -131,542.55 | 159,412.49 | 182,784.33 | 23,371.84 | -109,170.71 | 288.00 | 25,286.82 | -133,171.83 | 58.67% | -78,131.79 |
| | **Income Support Division** | | | | | | | | | | |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00% | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.183750045 | TANF | -24,171.03 | 29,292.15 | 33,586.74 | 4,294.59 | -19,876.44 # | 52.92 | 4,646.85 | -24,470.37 | 100.00% | -24,470.37 |
| 0.022447243 | GA | -2,852.77 | 3,578.37 | 4,103.00 | 524.63 | -2,428.13 # | 6.46 | 567.67 | -2,989.34 | 0.00% | 0.00 |
| 0.000459418 | REFUGEE FA | -60.43 | 873.78 | 83.67 | 10.74 | -49.70 # | 0.13 | 11.82 | -81.18 | 100.00% | -81.18 |
| 0.005493609 | REFUGEE MA | -722.67 | 875.78 | 1,004.18 | 128.40 | -594.27 # | 1.58 | 138.93 | -731.62 | 100.00% | -731.62 |
| 0.519886394 | FOOD STAMPS | -68,387.18 | 82,876.38 | 95,027.08 | 12,150.70 | -56,236.48 # | 149.73 | 13,147.36 | -69,234.12 | 50.00% | -34,617.06 |
| 0.257380381 | MA TITLE 19 | -33,856.47 | 41,029.65 | 47,045.10 | 6,015.45 | -27,841.02 # | 74.13 | 6,508.87 | -34,275.76 | 50.00% | -17,137.86 |
| 0.008221474 | LIHEAP | -991.78 | 991.78 | 1,137.19 | 145.41 | -872.08 # | 1.79 | 157.33 | -828.52 | 100.00% | -828.52 |
| 0.002401897 | SAVE | -63.01 | 76.36 | 87.55 | 11.20 | -51.81 # | 0.14 | 12.11 | -63.79 | 50.00% | -31.89 |
| 0.003861647 | E&T | -510.60 | 618.79 | 709.50 | 90.72 | -419.88 # | 1.12 | 98.16 | -516.93 | 50.00% | -258.46 |
| 100.00% | **TEST** | -131,542.55 | 159,412.49 | 182,784.33 | 23,371.84 | -109,170.71 | 288.00 | 25,289.92 | -133,171.63 | | -78,135.99 |
| | | | | | | | | | | | |
| | **Accumulated Totals (626)** | 241,958.59 | 2,277,748.47 | 4,693,821.79 | 2,306,073.32 | 2,548,031.91 | 18,618.00 | 361,338.02 | 2,205,311.90 | 58.87% | 1,283,656.49 |
| | **Income Support Division** | | | | | | | | | | |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00% | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.183750645 | TANF | 44,490.05 | 418,537.75 | 842,260.271 | 423,742.46 | 465,202.51 | 3,421.07 | 66,396.09 | 405,227.48 | 100.00% | 405,227.48 |
| 0.022447243 | GA | 5,431.30 | 51,129.17 | 102,894.16 | 51,764.99 | 57,198.29 | 417.62 | 8,111.04 | 49,503.17 | 0.00% | 0.00 |
| 0.000459418 | REFUGEE FA | 111.16 | 1,046.44 | 2,105.69 | 1,056.45 | 1,167.20 | 8.55 | 166.01 | 1,013.16 | 100.00% | 1,013.16 |
| 0.005493609 | REFUGEE MA | 1,329.27 | 12,513.52 | 25,162.64 | 12,689.13 | 13,998.40 | 102.28 | 1,985.12 | 12,115.56 | 100.00% | 12,115.56 |
| 0.519886394 | FOOD STAMPS | 125,780.08 | 1,184,170.42 | 2,383,058.54 | 1,198,896.12 | 1,324,687.19 | 9,979.24 | 187,854.72 | 1,148,511.55 | 50.00% | 573,255.81 |
| 0.257380381 | MA TITLE 19 | 62,275.39 | 569,247.77 | 1,176,785.60 | 593,538.03 | 655,813.42 | 4,761.91 | 90,001.32 | 567,804.02 | 50.00% | 283,802.01 |
| 0.008221474 | LIHEAP | 1,505.34 | 14,170.95 | 28,518.73 | 14,347.18 | 15,852.51 | 115.83 | 2,248.06 | 13,720.29 | 100.00% | 13,720.29 |
| 0.002401897 | SAVE | 115.90 | 1,091.03 | 2,195.84 | 1,104.60 | 1,220.50 | 8.92 | 173.08 | 1,056.34 | 50.00% | 528.17 |
| 0.003861647 | E&T | 939.22 | 8,841.42 | 17,782.78 | 8,961.36 | 9,880.58 | 72.27 | 1,402.59 | 8,560.24 | 50.00% | 4,280.12 |
| 100.00% | **TEST** | 241,958.59 | 2,277,748.47 | 4,583,821.79 | 2,305,073.32 | 2,548,031.91 | 18,618.00 | 361,338.02 | 2,205,311.90 | | 1,293,942.61 |

0000291

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Unrolled | Actual Billable Revenues | ...al (...ose) by Billing Service | FY2004 Ending Fund Balance | Imputed Interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY20? HSD % | Federal Over/(Under) Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (627)** | -698,634.95 | -254,284.90 | 189,001.39 | 443,286.29 | -255,348.66 | 729.00 | -40,339.31 | -214,280.35 | 58.87% | -125,718.26 |
| | **Income Support Division** | | | | | | | | | | |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00% | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.183750845 | TANF | -128,374.82 | -46,725.01 | 34,729.13 | 81,454.14 | -46,920.48 | 133.95 | -7,412.37 | -39,374.15 | 100.00% | -39,374.?? |
| 0.022447243 | GA | -15,682.43 | -5,707.99 | 4,242.56 | 9,950.56 | -5,731.87 | 16.38 | -905.51 | -4,810.00 | 0.00% | 0.00 |
| 0.000459418 | REFUGEE FA | -320.97 | -116.82 | 86.83 | 203.65 | -117.31 | 0.33 | -18.53 | -98.44 | 100.00% | -98.44 |
| 0.005493609 | REFUGEE MA | -3,838.17 | -1,396.99 | 1,038.34 | 2,435.33 | -1,402.64 | 4.00 | -221.62 | -1,177.22 | 100.00% | -1,177.22 |
| 0.519986384 | FOOD STAMPS | -363,210.80 | -132,199.28 | 98,259.25 | 230,458.51 | -132,752.29 | 379.00 | -20,971.86 | -111,401.43 | 50.00% | -55,700.72 |
| 0.257380381 | MA TITLE 19 | -179,814.93 | -65,447.94 | 48,645.25 | 114,093.19 | -85,721.73 | 187.63 | -10,382.55 | -55,151.56 | 50.00% | -27,675.93 |
| 0.006221474 | LIHEAP | -4,346.54 | -1,582.03 | 1,175.87 | 2,757.88 | -1,588.65 | 4.54 | -250.97 | -1,333.14 | 100.00% | -1,333.14 |
| 0.000478997 | SAVE | -334.64 | -121.80 | 90.53 | 212.33 | -122.31 | 0.35 | -19.32 | -102.64 | 50.00% | -51.32 |
| 0.000381647 | E&T | -2,711.85 | -987.04 | 733.64 | 1,720.68 | -991.17 | 2.83 | -156.58 | -831.76 | 50.00% | -415.85 |
| 100.00% | TEST | -698,634.95 | -254,284.90 | 189,001.39 | 443,286.29 | -255,348.66 | 729.00 | -40,339.31 | -214,280.35 | | -125,726.?? |
| | **Accumulated Totals (Account 628)** | -378,808.18 | 3,832,568.76 | 5,976,526.60 | 2,143,958.04 | 1,765,149.85 | 20,118.00 | 607,691.98 | 1,177,275.87 | 66.00% | 777,002.08 |
| | **Child Support Enforcement** | | | | | | | | | | |
| 100.00% | CSED | -378,808.18 | 3,832,568.76 | 5,976,526.80 | 2,143,959.04 | 1,765,149.85 | 20,118.00 | 607,891.98 | 1,177,275.87 | 66.00% | 777,002.08 |
| 0.00% | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | TANF | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | GA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% | 0.00 |
| 0.00% | REFUGEE FA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | REFUGEE MA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | FOOD STAMPS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | MA TITLE 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | LIHEAP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | SAVE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | E&T | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 100.00% | TEST | -378,808.18 | 3,832,568.76 | 5,976,526.80 | 2,143,958.04 | 1,765,149.85 | 20,118.00 | 607,691.98 | 1,177,275.87 | | 777,002.08 |
| | **Accumulated Totals (Account 629)** | -16,793.92 | 50,191.83 | 69,789.47 | 19,597.64 | 2,803.72 | 156.00 | 7,962.34 | -5,002.62 | 50.00% | -2,501.34 |
| | **Medical Assistance Division** | | | | | | | | | | |
| 0.00% | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00% | 0.00 |
| 100.00% | MAD | -16,793.92 | 50,191.83 | 69,789.47 | 19,597.64 | 2,803.72 | 156.00 | 7,962.34 | -5,002.62 | 50.00% | -2,501.31 |
| 0.00% | TANF | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | GA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% | 0.00 |
| 0.00% | REFUGEE FA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | REFUGEE MA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | FOOD STAMPS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | MA TITLE 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | LIHEAP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | SAVE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | E&T | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 100.00% | TEST | -16,793.92 | 50,191.83 | 69,789.47 | 19,597.64 | 2,803.72 | 156.00 | 7,962.34 | -5,002.62 | | -2,501.30 |

0000292

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Unvoiced | Actual Billable Revenues | ...oes) by Billing Service | FY2004 Ending Fund Balance | Imputed Interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY20? HSD % | Federal Over/(Under)- Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (Account 630)** | -193,032.04 | 677,146.36 | 652,038.28 | -25,110.10 | -218,142.14 | 2,125.00 | 107,421.63 | -323,438.77 | 59.93% | -193,638.86 |
| | **Administrative Services Division** | | | | | | | | | | |
| 0.24963799% | CSED | -48,227.00 | 159,178.61 | 162,905.11 | -6,273.50 | -54,500.59 | 530.91 | 28,839.20 | -80,807.88 | 66.00% | -53,333.39 |
| 0.09740446% | MAD | -18,802.18 | 65,957.28 | 63,511.44 | -2,445.84 | -21,248.02 | 206.98 | 10,463.35 | -31,504.38 | 50.00% | -15,762.19 |
| 0.12245234% | TANF | -23,637.23 | 82,918.40 | 79,843.61 | -3,074.79 | -26,712.02 | 260.21 | 13,154.03 | -39,605.83 | 100.00% | -39,605.83 |
| 0.01397240% | GA | -2,687.12 | 9,461.39 | 9,110.54 | -350.85 | -3,047.97 | 28.89 | 1,500.94 | -4,519.22 | 0.00% | 0.00 |
| 0.00061165% | REFUGEE FA | -156.68 | 529.61 | 529.23 | -20.38 | -177.06 | 1.72 | 87.19 | -262.52 | 100.00% | -262.52 |
| 0.00443558% | REFUGEE MA | -856.21 | 3,003.55 | 2,992.17 | -111.38 | -967.56 | 9.43 | 476.48 | -1,434.64 | 100.00% | -1,434.64 |
| 0.33939427% | FOOD STAMPS | -65,514.07 | 229,820.61 | 221,286.38 | -8,522.24 | -74,036.30 | 721.21 | 36,856.34 | -109,773.43 | 50.00% | -54,886.72 |
| 0.14449434% | MA TITLE 19 | -31,762.69 | 111,387.09 | 107,256.62 | -4,130.47 | -35,893.16 | 349.55 | 17,670.25 | -53,203.86 | 100.00% | -26,601.93 |
| 0.00499642% | LIHEAP | -945.59 | 3,317.11 | 3,194.10 | -123.01 | -1,068.60 | 10.41 | 528.22 | -1,584.41 | 100.00% | -1,584.41 |
| 0.00015202% | SAVE | -30.15 | 105.77 | 101.85 | -3.92 | -34.07 | 0.33 | 16.78 | -50.52 | 50.00% | -25.26 |
| 0.00213976% | E&T | -413.04 | 1,448.94 | 1,395.21 | -53.73 | -466.77 | 4.55 | 229.88 | -692.08 | 50.00% | -346.04 |
| 100.00% | **TEST** | -193,032.04 | 677,146.36 | 652,038.28 | -25,110.10 | -218,142.14 | 2,125.00 | 107,421.63 | -323,438.77 | 59.93% | -193,832.74 |
| | **Accumulated Totals (Account 640)** | -3,397.89 | 13,298.69 | 19,478.61 | 6,177.92 | 2,760.03 | 43.00 | 2,109.71 | 713.32 | 58.67% | 418.50 |
| | **Income Support Division** | | | | | | | | | | |
| 0.00000000% | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00% | 0.00 |
| 0.00000000% | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.16375045% | TANF | -624.37 | 2,443.88 | 3,578.88 | 1,135.20 | 510.83 | 7.90 | 387.86 | 131.07 | 100.00% | 131.07 |
| 0.02244724% | GA | -76.27 | 288.52 | 437.20 | 138.88 | 62.40 | 0.97 | 47.38 | 16.01 | 0.00% | 0.00 |
| 0.00045418% | REFUGEE FA | -1.58 | 6.11 | 8.95 | 2.84 | 1.28 | 0.02 | 0.87 | 0.33 | 100.00% | 0.33 |
| 0.00549309% | REFUGEE MA | -18.67 | 73.06 | 107.00 | 33.94 | 15.27 | 0.24 | 11.59 | 3.92 | 100.00% | 3.92 |
| 0.51986384% | FOOD STAMPS | -1,766.52 | 6,913.91 | 10,125.73 | 3,211.82 | 1,445.30 | 22.38 | 1,096.61 | 370.64 | 50.00% | 185.42 |
| 0.25738031% | MA TITLE 19 | -874.55 | 3,422.87 | 5,012.95 | 1,560.08 | 715.53 | 11.07 | 543.00 | 183.59 | 50.00% | 91.80 |
| 0.02622147% | LIHEAP | -21.14 | 82.74 | 121.17 | 38.44 | 17.30 | 0.27 | 13.13 | 4.44 | 100.00% | 4.44 |
| 0.00078997% | SAVE | -1.63 | 6.37 | 9.33 | 2.96 | 1.33 | 0.02 | 1.01 | 0.34 | 50.00% | 0.17 |
| 0.00361647% | E&T | -13.19 | 51.62 | 75.60 | 23.98 | 10.76 | 0.17 | 8.19 | 2.77 | 50.00% | 1.38 |
| | **TEST** | -3,397.89 | 13,298.69 | 19,478.61 | 6,177.92 | 2,760.03 | 43.00 | 2,109.71 | 713.32 | 58.67% | 418.50 |
| | **Accumulated Totals All Accounts** | -1,189,223.80 | 6,800,275.23 | 11,754,575.22 | 4,954,399.99 | 3,765,176.19 | 42,291.00 | 1,076,783.72 | 2,728,683.48 | | 1,683,637.94 |
| | CSED | -426,877.60 | 4,007,792.66 | 6,149,376.72 | 2,141,584.16 | 1,712,006.56 | 20,571.89 | 835,708.17 | 1,097,769.28 | 66.00% | 724,540.92 |
| | TANF | -133,693.01 | 493,103.86 | 1,006,505.84 | 513,401.87 | 378,808.86 | 3,908.74 | 59,546.38 | 335,493.45 | 50.00% | 305,493.45 |
| | GA | -16,122.99 | 59,546.38 | 122,273.67 | 62,727.29 | 46,604.29 | 475.43 | 9,446.33 | 37,633.39 | 100.00% | 37,633.39 |
| | REFUGEE FA & MA | -4,863.69 | 16,973.49 | 33,484.73 | 16,621.24 | 12,037.66 | 128.91 | 2,676.78 | 9,490.28 | 100.00% | 9,490.28 |
| | FOOD STAMPS | -375,655.99 | 1,390,189.32 | 2,842,626.23 | 1,452,636.92 | 1,078,070.94 | 11,046.18 | 220,537.79 | 866,579.93 | 50.00% | 433,289.97 |
| | MEDICAID | -221,958.49 | 804,271.85 | 1,542,135.13 | 737,863.28 | 615,904.79 | 5,832.76 | 127,588.27 | 384,149.28 | 50.00% | 197,074.64 |
| | LIHEAP | -4,673.46 | 17,223.48 | 34,599.22 | 17,376.74 | 12,702.28 | 134.06 | 2,732.30 | 10,104.03 | 100.00% | 10,104.03 |
| | SAVE | -315.71 | 1,171.09 | 2,510.98 | 1,339.87 | 1,024.16 | 9.93 | 186.78 | 848.21 | 50.00% | 424.11 |
| | E&T | -2,732.87 | 10,103.10 | 20,982.73 | 10,846.62 | 8,118.76 | 81.60 | 1,602.74 | 6,595.52 | 50.00% | 3,297.94 |
| | | -1,189,223.80 | 6,800,275.23 | 11,754,575.22 | 4,954,399.99 | 3,765,176.19 | 42,291.00 | 1,076,783.72 | 2,728,683.46 | | 1,683,716.00 |

# EXHIBIT 10.a

# New Mexico General Services Department
## State's Refund Calculation
## Federal Program FFP

**Principal:**

| | |
|---|---|
| Human Services Department | $1,683,715 |
| Children, Youth and Families Department and Department of Health | $66,676 |
| Total principal: | $1,750,391 |

**Pre-Disallowance Interest**
(June 30, 2004 through June 22, 2006):    $101,802

**TOTAL:**                                **$1,852,193**

**Service Categories Considered:** GSD proposes that its total debt to the federal government for overcharges to HSD be computed at $1,683,715. This reflects the sum of the federal share of over- and undercharges in all service categories.

**Federal Participation Rate:** This method considers the participation of each federal program in over- and undercharges to each billing account, and applies each federal program's FFP rate to its billing account overcharge or undercharge.

**Pre-Disallowance Interest:** Interest through June 30, 2004 is incorporated in GSD's calculation of the refund amount due, because GSD's cost reconciliation includes imputed interest on service-category overcharges. In order to bring interest up to date, GSD has computed interest from June 30, 2004 through June 22, 2006 at a rate of 2.9% per annum, on the principal. The rate used complies with DCA's finding concerning the average state treasury earning rate. (*See* Ex. 2, Attachment 3 - Interest Calculation.)

**EXHIBIT 10.b**

# New Mexico General Services Department
## State's Refund Calculation
### Average FFP

**Principal:**

| | |
|---|---|
| Human Services Department | $1,716,068 |
| Children, Youth and Families Department and Department of Health | $66,676 |
| **TOTAL:** | **$1,782,744** |

**Service Categories Considered:** In submitting cost reconciliation data to DCA before the final disallowance letter was issued, GSD proposed that its total debt to the federal government for overcharges to HSD be computed at $1,716,068. This reflects the sum of the federal shares of over- and undercharges in all service categories reflected in the disallowance work papers. *See* Ex. 2, Disallowance Letter, Att. 1.

**Federal Participation Rate:** This calculation uses an average FFP for HSD, 62.89%. It also uses an average for the other two state agencies.

**Pre-Disallowance Interest:** The base refund amount incorporates imputed interest for fiscal year 2004. The amount does not include pre-disallowance interest through the date of the June 22, 2006 disallowance letter.

**EXHIBIT 10.c**

# New Mexico General Services Department
## DCA Refund Calculation
### Average FFP

**Principal:**

| | |
|---|---|
| Human Services Department | $3,723,891 |
| Children, Youth and Families Department and Department of Health | $66,676 |
| Total principal: | $3,790,567 |

**Pre-Disallowance Interest**
(June 30, 2004 through June 22, 2006):      $220,464

**TOTAL:**      **$4,011,031**

**Service Categories Considered:** In computing the disallowance, DCA summed the federal share of only certain service-category overcharges reflected in the disallowance work papers (those categories with a total excess balance exceeding $500,000). *See* Attachment 1 to Disallowance Letter. This amount disregards two categories of cost-revenue variances: (1) undercharges in sixteen service categories, which total $2,184,963; and (2) overcharges in service-categories with excess balances less than $500,000, which total $177,140.

**Federal Participation Rate:** This calculation uses an average FFP, 62.89%, for the Human Services Department. It also uses an average for the other two state agencies.

**Interest:** The base refund amount incorporates imputed interest on service-category overcharges for fiscal year 2004, because this was included in the cost reconciliation information the State submitted. It also includes pre-disallowance interest at 2.9% through the date of the disallowance letter.

**EXHIBIT 11**



**STATE OF NEW MEXICO**
**GENERAL SERVICES DEPARTMENT**
JOHN SIMMS, JR. BUILDING
P.O. DRAWER 26110
SANTA FE, NM 87502-6110



BACKUP COPY 1

*INVOICE*
*NUMBER*    017040

04-04-630.00

*DATE:*
04/30/2004

*INVOICE TO:*    HUMAN SERVICES DEPT.
DOROTHY C. MONTOYA
AUTOMATED DATA PROC
729 ST. MICHAELS DR.
SANTA FE, NM      87503

| DESCRIPTION OF SERVICES RENDERED | SERVICE CHARGE | CHARGE TOTAL |
|---|---|---|
| ISD BILLING ACCOUNT   -   628 | | |
| MVS USE | 170,189.03 | |
| CICS USE | 110,965.10 | |
| IDMS ADSO USE | 37.72 | |
| DB2 USE | 27,915.60 | |
| IDMS USE | 45.30 | |
| LABOR | 455.00 | |
| TSO USE | 6,394.50 | |
| TAPE STORAGE | 29,023.07 | |
| DISK STORAGE | 66,812.76 | |
| DIRECT CHARGES | 4,100.00 | |
| TOTAL SERVICE CHARGES | | 415,938.08 |

```
IF TRANSFERED THROUGH DFA ACCOUNT AND LINE ITEMS:

C~FRAS ACCOUNT CODES FOR I.S.D. SERVICES ARE:
FUND: 362          AGENCY: 350        PROGRAM CODE: P605
DIV: 2000          OBJECT: 0571
REVENUE SOURCE: 2423
CONTACT MIKE FRIEL FOR BILLING QUESTIONS AT 827-2082
```

| TOTAL CHARGES, CURRENT MONTH | | 415,938.08 |
|---|---|---|

| NOTICE: PLEASE REVIEW AND REPORT ANY | TOTAL | |
|---|---|---|
| 628     DISCREPANCIES WITHIN 5 DAYS | 0000297 | 415,938.08 |

UNITED STATES OF AMERICA

DEPARTMENT OF HEALTH AND HUMAN SERVICES

*CERTIFICATION OF TRUE COPY*

Pursuant to the provisions of 42 U.S.C. 3505 and the authority vested in me by delegation from the Secretary (see attached memo), I hereby certify that the annexed is a true copy of the document on file in the Department of Health and Human Services.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Department of Health and Human Services to be affixed, on this_____ 12th _____day of _____October_____20__07____

Constance B. Tobias
Chair
Departmental Appeals Board

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

MAR - 5 1992

Washington, D C  20201

TO:        Chair, Departmental
            Appeals Board

FROM:      Terrence J. Tychan
            Acting Deputy Assistant Secretary for
            Management and Acquisition

SUBJECT:   Authority to Certify True Copies and Affix the
            Department Seal

Under the authority vested in the Deputy Assistant Secretary for
Management and Acquisition on November 14, 1991 (attached) to
certify true copies and affix the Department Seal for the Office
of the Secretary, I hereby redelegate to the Chair of the
Departmental Appeals Board:

1.   The authority to certify true copies of any books, records,
     papers, or other documents on file within the Department, or
     extracts from such, to certify that true copies are true
     copies of the entire file of the Department, to certify the
     complete original record, or to certify the nonexistence of
     records on file within the Department, and to cause the Seal
     of the Department to be affixed to such certifications.

2.   The authority to cause the Seal to be Affixed to agreements,
     awards, citations, diplomas, and similar documents.

3.   These authorities may be redelegated.

4.   This redelegation supersedes all previous redelegations of
     authorities to the Chair of the Departmental Appeals Board
     relating to this subject.  Further redelegations made under
     previous redelegations of authority shall remain in effect
     until appropriate new redelegations are made.

Attachment

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
APPELLATE DIVISION

RECEIVED

JAN 1 2 2007

DAB

NEW MEXICO GENERAL SERVICES  )
DEPARTMENT,                   )
            Appellant,     )
                            )
        v.                 )        **DOCKET NO. A-06-105**
                            )
DIVISION OF COST ALLOCATION, )
            Appellee.      )

---

### APPELLANT'S APPEAL FILE

### EXHIBIT LIST

1.    UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, A GUIDE FOR STATE, LOCAL AND INDIAN TRIBAL GOVERNMENTS (April 8, 1997) ("ASMB C-10") (Excerpt: Part 4, "Attachment C - Requirements for Cost Allocation Plans")

2.    June 22, 2006 Disallowance Letter from Henry Williams, Director, Central States Field Office, DCA, to Arturo Jaramillo, Secretary, New Mexico General Services Department

3a.   Office of Management & Budget, Final Revision to OMB Circular A-87, 60 Fed. Reg. 26,484 (May 17, 1995)

3b.   Office of Management & Budget, Proposed Revisions to OMB Circular A-87, 58 Fed. Reg. 44,212 (Aug. 19, 1993) (Excerpt: Attachment C)

4a.   New Mexico 2004 Cost Allocation Plan, Based on Costs for Fiscal Year 2002 (Excerpt: February 22, 2005 Cost Allocation Agreement)

4b.   New Mexico Proposed 2006 Cost Allocation Plan, Based on Costs for Fiscal Year 2004 (Excerpt: Description of Billed Central Services - Office of Information Processing / Information Systems Division)

5.    Affidavit of Robert G. Peters

6a.   Summary of Human Services Department Billing Accounts

6b.   Flowchart - How ISF Charges Reach HSD-Administered Federal Programs

7.    Affidavit of Donna Sandoval



8a.     GSD Information Services ISF - Categories (Fiscal Year 2004)

8b.     ISF Service Rate Terminology - Fiscal Year 2004

9a.     Summary of Overcharge Computation at Federal Program Level

9b.     Spreadsheet: Overcharge Analysis - HSD Billing Accounts

9c.     Spreadsheet: Overcharge Analysis - Federal Programs

10.a.   State's Refund Calculation - Federal Program FFP

10.b    State's Refund Calculation - HSD Average FFP

10.c    DCA Refund Calculation - HSD Average FFP

11.     April 30, 2004 GSD Invoice to HSD Billing Account 628

# EXHIBIT 1

# A GUIDE FOR

## STATE, LOCAL AND INDIAN TRIBAL

## GOVERNMENTS

---

## COST PRINCIPLES AND PROCEDURES FOR

## DEVELOPING COST ALLOCATION PLANS AND

## INDIRECT COST RATES FOR AGREEMENTS

## WITH THE FEDERAL GOVERNMENT

---

## IMPLEMENTATION GUIDE FOR

## OFFICE OF MANAGEMENT AND BUDGET

## CIRCULAR A-87

**ASMB C-10**

0000168

Cost Principles and Procedures for

Establishing Cost Allocation Plans and Indirect Cost Rates

for Agreements with the Federal Government

## A GUIDE FOR STATE, LOCAL AND INDIAN TRIBAL GOVERNMENTS

This guide is intended to assist state, local, and Indian tribal governments in applying Office of Management and Budget Circular A-87, which provides principles and standards for determining costs applicable to Federal grants and contracts performed by state, local, and Indian tribal governments.

The procedures in this guide are applicable to grants and contracts awarded by all Federal agencies and have been developed in coordination with the Office of Management and Budget.

This document replaces "A Guide for State and Local Government Agencies" (OASC-10), published December 1976

8 April 1997

U.S. Department of Health and Human Services

This document can be ordered from the U.S. Government Printing Office, Superintendent of Documents, Mail Stop: SSOP, Washington, DC 20402-9328, 202-512-1800.

April 8, 1997

**TO USERS OF OMB CIRCULAR A-87 - COST PRINCIPLES FOR STATE, LOCAL AND INDIAN TRIBAL GOVERNMENTS**

Dear Colleague:

The Office of Management and Budget, in Circular A-87, mandates that the Department of Health and Human Services issue implementing material for that document on behalf of the Federal Government. The accompanying *Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government* reflects our efforts to satisfy that mandate. This brochure, last issued in 1976 under the reference OASC-10, is being assigned the new reference number ASMB C-10.

I want to acknowledge the efforts of the Office of Audit Resolution and Cost Policy, in the Office of Grants and Acquisition Management, who had the responsibility for developing this brochure. I also wish to thank the HHS staff, those of other Federal agencies, and OMB who provided much appreciated assistance on this project. Lastly, I would like to acknowledge Management Concepts, Inc., of Vienna, Virginia, who provided advice, layout, and editorial support.

As will be noted, the C-10 is issued in loose-leaf form. Users are encouraged to maintain a subscription with the Government Printing Office in order that they can receive up-dates and changes in the future. This document can also be accessed on HHS's GrantsNet: http://www.os.dhhs.gov/progorg/GrantsNet/index.html. This document may be reproduced without permission.

We welcome your comments and inquiries. Please address them to:

> Director, Office of Audit Resolution and
> Cost Policy
> Rm. 1067 - Cohen Building
> 300 Independence Ave. S.W.
> Washington, D.C. 20201

> Sincerely,


> Terrence Tychan
> Deputy Assistant Secretary for
>     Grants and Acquisition Management

# PART 4

# Attachment C — Requirements for Cost Allocation Plans

---

**4.1    Highlights of New Section, Attachment C**

A new attachment C has been added addressing Central Service Cost Allocation Plans (commonly referred to as the state-wide cost allocation plan or SWCAP and for local governments, LOCAP). The new Attachment generally has incorporated longstanding practices and procedures contained in internal HHS implementing material as well as historical convention.

**4.2    What is a Central Service Cost Allocation Plan?**

Most governmental units provide certain services, such as motor pools, computer centers, purchasing, accounting, etc., to operating agencies on a centralized basis. Because Federally supported awards are performed within the individual operating agencies, there needs to be a process through which these central service costs can be identified and assigned to benefitted activities on a reasonable and consistent basis. The central service cost allocation plan (CSCAP) provides that process.

**4.3    Content of CSCAPs**

CSCAPs must include all central service costs that will be claimed, whether as a billed or an allocated cost, under Federal awards. Costs of central services omitted from the plan will not be reimbursed. Documentation requirements are discussed in section 4.5 below.

Plans must include a projection of the next year's allocated central services cost. This projection should be based on either actual costs for the most recently completed year or the budget projection for the coming year. Plans must also include a reconciliation of actual allocated central services costs to the estimated costs used for either the most recently completed year or the year preceding the most recently completed year.

**4.4    Requirements for Submission of Cost Allocation Plans**

**4.4.1    Role of Cognizant Agencies**

Circular A-87 provides that, for certain larger governmental units and their subdivisions, Federal cognizant agencies will be appointed to review and approve cost allocation plans on behalf of other Federal agencies. The Circular further explains these assignments and the approval process that these agencies will use.

**4.4.2    State Governments and "Major" Local Governments**

All state governments must submit statewide cost allocation plans to the Department of Health and Human Services. All local governments that OMB designates as "major" are also required to submit their plans to a designated cognizant agency unless the

0000171

cognizant agency determines otherwise. Note: Indian tribal governments should use guidelines applicable to local governments and local education agencies (LEAs) should follow the procedures established by the U.S. Department of Education.

OMB periodically publishes a listing of major local governments in the *Federal Register*. The most recently published listing is contained in Appendix 2 of this guide. In general, cognizant agencies for local governments are assigned according to the predominance of Federal funding, although other factors such as availability of resources and past history may also be considered.

### 4.4.3    Local Governments Not Considered "Major"

Local governments that are not designated as "major" are not required to submit their cost allocation plans for Federal review and approval unless specifically instructed to do so by a Federal agency. Local governments that only receive funds as a subrecipient of another government should follow instructions from their pass-through grantors concerning submission and review. However, they are expected to prepare and retain their plans for audit by independent auditors and Federal auditors. Pass-through grantors (primary recipients) are expected to review and monitor subrecipient plans to provide reasonable assurance that provisions of Circular A-87 are being followed.

### 4.5    What Are the Documentation Requirements for a CSCAP?

All costs and other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the appropriateness of the costs assigned to Federal awards.

### 4.5.1    Allocated Central Services

The allocated costs of the CSCAP are commonly referred to as "Section I" costs and are categorized as such in both the plan submission and the negotiated agreement. For each allocated central service, the proposed cost allocation plan must:

- briefly describe the service;

- identify the unit rendering the service and the operating agencies receiving the service;

- list the items of expense included in the cost of the service;

- identify the method used to distribute the cost of the service to benefitted agencies; and

- provide a summary schedule showing the allocation of each service to benefitted agencies.

In addition, all proposed cost allocation plans must be accompanied by:

- an organization chart which is sufficiently detailed to show operations, including the central service activities of the governmental unit, regardless of whether they are shown as benefitting from central service functions;

- a copy of the comprehensive annual financial report (CAFR) (or executive budget, if budgeted costs are being proposed) to support the allowable costs of each central service activity included in the plan; and

- a certification that the plan:

  — was prepared in accordance with A-87;

  — contains only allowable costs; and

  — was prepared in a manner that treated similar costs consistently among the various Federal awards and between Federal and nonfederal awards/activities.

### 4.5.2    Internal Service Funds

The internal service funds (ISFs) and other billed services in the CSCAP are commonly referred to as "Section II" costs in both the plan submission and the negotiated agreement. For each internal service fund or similar activity with an operating budget of $5 million or more, the proposed cost allocation plan must include:

- a brief description of each service;

- a balance sheet for each fund based on individual accounts contained in the governmental unit's accounting system;

- a revenue/expenses statement with revenues broken out by source;

- a list of nonoperating transfers (as defined by generally accepted accounting principles) into and out of the fund;

- a description of the methodology used to charge the costs of each service to users, including how billing rates are determined;

- a schedule of current rates; and

- a schedule comparing total revenues (including imputed revenues) generated by the service to the allowable costs of the service under Circular A-87, with an explanation of how variances will be handled.

### 4.5.3    Self-Insurance Funds

For each self-insurance fund, the proposed cost allocation plan must include:

- the fund balance sheet;

- a statement of revenue and expenses, including a summary of billings and claims paid by the agency;

- a listing of all nonoperating transfers into and out of the fund;

- the type(s) of risk(s) covered by the fund;

- an explanation of how the level of fund contributions are determined;

- a description of the procedures used to charge or allocate fund contributions to benefitted activities;

- an identification and explanation of reserve levels in excess of claims:

  — submitted and adjudicated, but not paid;

  — submitted but not adjudicated; or

  — incurred but not submitted; and

- an insurance report.

### 4.5.4    Fringe Benefits Costs

For fringe benefit costs, the proposed cost allocation plan must:

- list fringe benefits provided to covered employees and the overall annual cost of each type of benefit;

- identify current fringe benefit policies; and

- describe procedures used to charge or allocate the costs of the benefits to benefitted activities.

### 4.5.5    Pension and Postretirement Health Insurance Plans

For pension and postretirement health insurance plans, the proposed cost allocation plan must provide:

- the governmental unit's funding policies, if different from actuarially determined rates;

- the pension plan's costs accrued for the year;

- the amount funded and date(s) of funding;

- a copy of the current actuarial report, including the actuarial assumptions;

- the plan trustee's report; and

- a schedule from the activity showing the value of the interest cost associated with late funding.

### 4.5.6    Certification

CSCAPs must be accompanied by a certification, shown in Attachment C, ¶ D.4. (See also 2.9, Government Certification)

**4.6      How Should Allocated Costs Be Presented in a CSCAP?**

**4.6.1    Sample Formats for Central Service Cost Allocation Plans**
The following pages illustrate a central service cost allocation plan. They consist of:

Illustration 4-1 - Statement of Function and Benefit, Personnel Department. The personnel department has been selected as an example of a central service. This schedule is a narrative description of the activities conducted by the personnel department, their necessity (benefits) to the successful performance of Federally supported programs, a description of the base(s) selected to distribute the costs of those activities to the organizations to which services are rendered, and the rationale for the base(s) selected.

Illustration 4-2 - Costs to be Allocated, Personnel Department. This illustration shows the composition of the costs of the personnel department as contained in official financial or budget statements and a reconciliation of those costs with the amount allocated in Illustration 4-1.

Illustration 4-3 - Allocation of Costs, Personnel Department. This illustration shows those state organizations to which the personnel department provides services and the allocation of its costs to those organizations. This illustration is supported by Illustrations 4-1 and 4-2.

Illustration 4-4 - Summary of Allocated Central Service Costs. This illustration shows each central service, and the attendant costs, which benefit Federal grants and contracts and for which a state or local government wishes to make a claim. This summary must be supported by detailed schedules comparable to Illustrations 4-1 — 4-3 for each included central service. (For purposes of preparing Attachment A of the Negotiation Agreement, only those state agencies receiving Federal funds are to be individually listed. The remaining agencies are to be grouped under "other.")

Illustration 4-5 - Summary of Central Services Billed. It is common practice for central service departments to bill those organizations to which they render services for the cost of those services. This summary illustrates the services billed to organizations conducting Federal grants and contracts, the costs included in the billing, the methodology for computing the billing rate, etc.

Amounts allocated to the operating departments from the central service cost allocation plan in Illustrations 4-4 and 4-5 are carried forward to Illustrations 6-1 — 6-4, which provide various sample formats for an indirect cost rate proposal.

Only a few of the many possible central services have been shown in Illustration 4-4 and only one central service department is shown in the accompanying Illustrations 4-1 through 4-3. A central service cost allocation plan may include any other services and their attendant costs which are allowable under OMB Circular A-87 and for which documentation can be provided. Each type of cost claimed should be supported by appropriate schedules and other documentation sufficient to provide a reasonable basis for evaluation and acceptance.

**Illustration 4-1**

**Sample Central Service Cost Allocation Plan**
**Statement of Function & Benefit, Personnel Department**
**For the Fiscal Year Ended June 30, XXXX**

The personnel department is responsible for overall administration of the Civil Service program. This includes recruiting, interviewing, testing, and referring potential candidates for the more than 2,000 municipal positions.

The personnel department administers the classifications and salary programs and is responsible for recommending personnel policies and procedures to the Civil Service Commission for approval.

The department is involved in the design of the various employee benefit programs. After installation, the department reviews and maintains the records of these programs.

Active and inactive personnel records are maintained on all municipal employees.

The personnel department is responsible for maintaining the safety program (including workmen's compensation and injury level) and the city training programs.

All functions and services performed by the personnel department benefit all departments of the city. Federal programs are benefitted because city employees are hired to work in these programs. Therefore, the costs of the personnel department have been distributed to all departments of the city.

The basis for allocation is the number of employees per department. The base data is readily available and verifiable. All employees receive essentially the same type and level of services. Therefore, this base reflects that condition by distributing the total cost of providing these services to each department in proportion to its relative number of employees.

---

This is a sample. In practice, this schedule should be sufficiently detailed to provide narrative explanations of the functions and benefits associated with the costs being allocated.

---

0000176

**Illustration 4-2**

## Sample Central Service Cost Allocation Plan
## Costs to be Allocated, Personnel Department
## For the Fiscal Year Ended June 30, XXXX

| | | |
|---|---|---:|
| Salaries and Wages | | $1,088,380 |
| Fringe Benefits (19.8%) | | 215,499 |
| Supplies | | 113,600 |
| Travel | | 26,200 |
| Equipment/Capital Outlay | | 41,560 |
| Maintenance and Janitorial Services | | 26,040 |
| Miscellaneous | | 35,880 |
| Total Cost | | $1,547,159 |
| | | |
| **Adjustments** | | |
| Less: | Unallowable Costs | <40,979> |
| | Capital Outlay | <41,560> |
| | Costs Chargeable to Federal Grant *(a)* | <24,000> |
| | | |
| Add: | Use Allowance | 15,236 |
| | | |
| Subtotal Adjustments | | <91,303> |
| | | |
| Total Allowable, Allocable Costs | | $1,455,856  *(b)* |

**Notes:**

*(a)*   Represents charges to a Federal grant awarded to assist the state or local government in improving its efforts to hire and train disabled workers. If a supporting agency received an award from the Federal Government, all costs incurred in connection with the award (including any costs that are required for matching or cost sharing) must be eliminated prior to distributing the supporting agency's costs to the user departments or agencies.

*(b)*   The costs allocated must be reconciled to appropriate financial documents, either financial statements, budgets, or a combination of both. In this example, the government's base data was cost incurred for its most recent fiscal year.

> This is a sample. In practice, this schedule should be sufficiently detailed to show the costs of major activities, branches, etc. of the personnel departments in a manner permitting a reasonable assessment of the costs claimed against Federal programs.

0000177

Illustration 4-3

**Sample Central Service Cost Allocation Plan**
**Allocation of Costs, Personnel Department**
**For the Fiscal Year Ended June 30, XXXX**

| Department/Unit | Number of Employees *(b)* | Percent | Allocation *(c)* |
|---|---|---|---|
| Health | 188 | 6.61 | 96,232 |
| Environmental Services | 170 | 5.98 | 87,060 |
| Social Services | 61 | 2.14 | 31,155 |
| Highway and Public Transportation | 289 | 10.16 | 147,915 |
| Police | 570 | 20.04 | 291,754 |
| Corrections | 475 | 16.70 | 243,128 |
| Other Departments *(a)* | 1,091 | 38.37 | 558,612 |
| Total | 2,844 | 100.00 | $1,455,856 |

**Notes:**

*(a)*    Those departments that do not perform Federal programs may be grouped together. However, a one-time schedule is required, listing all agencies or functions listed under "other."

*(b)*    Allocation base must include all full- and part-time employees of all operating departments that are serviced by the personnel department.

*(c)*    Allocated amounts are carried forward to the summary schedule in Illustration 4-4. The total of $1,455,856 comes from Illustration 4-2.

> This is a sample. In practice, the type and level of service provided by the personnel department to the various organizations served may require a separate allocation for each service or to different organizations served.

0000178

**Illustration 4-4**

**Sample Central Service Cost Allocation Plan**
**Summary of Allocated Central Service Costs**
**For the Fiscal Year Ended June 30, XXXX**

| Department/Operating Unit | Central Service Organizations *(c)* | | | | Total Allocated Costs *(b)* |
|---|---|---|---|---|---|
| | Personnel *(a)* | Accounting/ Cmptr Svcs. | Purchasing | Audit | |
| Health | 96,232 | 201,450 | 34,123 | 16,753 | 348,558 |
| Environmental Services | 87,060 | 216,220 | 22,211 | 12,210 | 337,701 |
| Social Services | 31,155 | 79,841 | 8,960 | 6,452 | 126,408 |
| Highway and Public Transportation | 147,915 | 428,550 | 67,512 | 62,271 | 706,248 |
| Police | 291,754 | 519,605 | 94,751 | 114,211 | 1,020,321 |
| Corrections | 243,128 | 497,431 | 99,970 | 145,260 | 985,789 |
| Other Departments | 558,612 | 1,876,082 | 214,311 | 186,542 | 2,835,547 |
| TOTALS | $1,455,856 | $3,819,179 | $541,838 | $543,699 | $6,360,572 |

**Notes:**

*(a)* Allocated amounts shown are from Illustration 4-3. In an actual plan, the remaining service departments would also need to be supported by separate schedules showing the computation of the allocated amounts.

*(b)* These amounts are includable in the indirect cost proposals of the individual operating departments/units. See Illustrations 6-1 — 6-4.

*(c)* Suggested allocation bases can be found in Section 4.6.2.

This is a sample. In practice, a state or local government may wish to claim more or fewer activities as charges to Federally supported programs. If so, this Illustration and its supporting schedules (Illustrations 4-1 — 4-3) would need to be modified accordingly.

**Illustration 4-5**

**Sample Central Service Cost Allocation Plan**
**Summary of Central Services Billed to User Organizations**

Motor Pool

The state (or local government) operates a central motor pool which makes cars, trucks, and buses available to the user departments. User departments are billed for each mile driven: cars - 40 cents per mile; trucks - 55 cents per mile; and buses - 75 cents per mile. The basis for the charge is the most recent study of cost per mile driven, performed by the internal audit staff. Any over- or under recovery is applied to the next year's expected expenditures and is included in that year's billing rate. The costs included are salaries and wages and fringe benefits of motor pool personnel; their travel; supplies and parts; and use charges for equipment, buildings, and vehicles determined in accordance with OMB Circular A-87.

Data Processing

The state (or local government) operates a central data service center (DSC) consisting of a mainframe computer and an area network. The center provides both regular, continuing, and special job computer support to most operating and staff departments. Billings for services are made to user organizations based on a standard price schedule. The price schedule is related to, and designed to recover, the costs of various types of jobs on each system. It is revised quarterly and audited annually by the internal audit department. Profits or losses are carried forward and used to adjust price schedules of ensuing quarterly billing rates. Costs consist of salaries and wages and fringe benefits of center personnel, supplies, maintenance and utilities, and straight-line depreciation of equipment based on a fifteen-year life.

> This is a sample. In actual practice, a complete listing of all billed components of the DSC would be required: e.g., CPU, programming, microfiche, etc.

Long Distance Telephone

All long distance telephone calls are placed through a central switchboard and are billed to the organizations making the call.

**Notes:**

If a direct billing mechanism is used by the government, then all users must be billed, either through actual, memo, or imputed billings. Billing of selected departments and allocation of residual amounts through the cost allocation plan to remaining departments results in inequitable costing and is not acceptable. However, if all users are billed, residual amounts may be allocated through the allocation plan, provided they are not material and the allocation base is equitable.

A detailed breakdown of costs is not normally required as a part of this summary. However, the submitting state or local government must have and make available to the Federal cognizant agency such cost and revenue breakdowns, utilization records, and other information necessary to permit a reasonable assessment of the costs incurred and changes made.

> This is a sample. In practice, the number and types of services billed may be greater than shown here and may require more extensive description and explanation.

### 4.6.2 Suggested Bases for Cost Distribution

Listed below are suggested bases for distributing joint costs of central-type services to local government departments or agencies and to projects and programs utilizing these services. The bases are suggestions only, and should not be used if they are not suitable for the particular services involved. Any method of distribution can be used which will produce an equitable distribution of cost. In selecting one method over another, consideration should be given to the additional effort required to achieve a greater degree of accuracy.

| *Type of Service* | *Suggested Bases for Allocation* |
|---|---|
| Accounting | Number of transactions processed |
| Auditing | Direct audit hours |
| Budgeting | Direct hours of identifiable services of employees of central budget |
| Buildings lease management | Number of leases |
| Data processing | System usage |
| Disbursing service | Number of checks or warrants issued |
| Employees retirement system administration | Number of employees contributing |
| Insurance management service | Dollar value of insurance premiums |
| Legal services | Direct hours |
| Mail and messenger service | Number of documents handled or employees served |
| Motor pool costs, including automotive management | Miles driven and/or days used |
| Office machines and equipment maintenance repairs | Direct hours |
| Office space use and related costs (heat, light, janitorial services, etc.) | Square feet of space occupied |
| Organization and management services | Direct hours; Square feet |
| Payroll services | Number of employees |
| Personnel administration | Number of employees |
| Printing and reproduction | Direct hours, job basis, pages printed, etc. |
| Procurement service | Number of transactions processed |
| Local telephone | Number of telephone instruments |
| Health services | Number of employees |
| Fidelity bonding program | Employees subject to bond or penalty amounts |

0000182

### 4.7    How Should Billed Costs Be Presented in a CSCAP?

"Billed costs" include internal service funds (ISFs), self-insurance funds (SIFs), and fringe benefits funds (FBFs). Illustrations 4-6 and 4-7 show suggested formats for presenting these costs in the CSCAP proposal. While these formats are not mandated, the information they contain is required, unless the cognizant agency waives the requirement.

Specifically, for all funds, including those under $5 million, a schedule of retained earnings (see e.g., Illustration 4-7) must be submitted which shows:

- the beginning balance for the fiscal year;

- actual and imputed revenues;

- A-87 allowable costs, adjusted for:

    — capital expenditures,

    — depreciation or use allowance,

    — nonrecognized transfers,

    — bad debts,

    — CSCAP allocations,

    — actual or imputed earnings on monthly cash balances and replacement reserves;

- working capital reserve; and

- contributed capital.

Contributed capital consists of unallowable A-87 costs, such as reserves for future asset replacement and capital expenditures, and are funded by nonfederal funds.

For those funds which have operating budgets over $5 million, a schedule of billed services must be submitted. Illustration 4-6 is a suggested format for presenting billings. Again, this format is only for illustration purposes, and is not required. However, the schedule must provide, for each fund:

- billings by user;

- revenues, both actual and imputed; and

- adjustments for the pro rata share of the rate representing bad debts, reserves for replacement costs, capital expenditures, etc.

STATE OF _____ FUND

SUMMARY OF ACTUAL AND IMPUTED REVENUES
FOR THE YEAR ENDING JUNE 30, 19__

Illustration 4-6
Summary of Actual and Imputed Revenues by Fund

ATTACHMENT

| USER AGENCY/DEPARTMENT | RATIO OF FEDERAL ACTIVITY* | TOTAL BILLING | | | IMPUTED REVENUES | | | SUBTOTAL (A-87 REVENUES) | SURCHARGE*** | | TOTAL REVENUES |
| | | COLLECTED BILLINGS# | | | | | | | | | |
| | | BILLED AT FULL RATE(S | BILLED AT LESS THAN FULL RATE(S | UNCOLLECTED BILLINGS** | DIFF BETWEEN FULL-BILLED RATES) | MEMO BILLING | UNBILLED | | COLLECTED | (IMPUTED) | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.0% | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| | 0.0% | | | | | | | | | | |
| TOTALS | | $0 | $0 | $0 | $0 | $0 | $0 | **** $0 | $0 | $0 | **** $0 |

* FOR EXAMPLE, BASED ON EXPENDITURES EXCLUDING FLOW-THROUGH FUNDS.
** ACCOUNTS RECEIVABLE/BAD DEBT EXPENSE
*** FOR EXAMPLE, INCREMENT FOR UNALLOWABLE COSTS SUCH AS INTEREST, RESERVES FOR REPLACEMENT, PROJECTED COST INCREASES, ETC. BILLED TO STATE FUNDS
**** SHOW THIS FIGURE AS "ACTUAL & IMPUTED REVENUES" ON RECONCILIATION OF FUND TO FEDERAL GUIDELINES (ATTACHMENT B).
***** MUST RECONCILE TO TOTAL ACTUAL COSTS PER STATE FINANCIAL REPORT.
# MUST RECONCILE TO BILLED REVENUE PER STATE FINANCIAL REPORT.

4-18

0000184

**Illustration 4-7**
**Reconciliation of Retained Earnings**

STATE OF _____                                                              ATTACHMENT B
                                    FUND
RECONCILIATION OF RETAINED EARNINGS BALANCE TO FEDERAL GUIDELINES
FOR YEAR ENDING JUNE 30, 19 __

PART I    A-87 R.E. BALANCE                                                                        (000s)

    A-87 R.E. BALANCE JULY 1, 19__
        Balance Per Prior Year's Reconciliation of Fund to A-87                              $0
        (Initial Year, Use CAFR RE Balance at Beginning of Year Less
        Adjustments - e.g., Contrib, Capital)

    FY 19 __   RETAINED EARNINGS INCREASE (DECREASE) Per CAFR
        A-87 Revenue (Actual and Imputed)
          From Attachment A                                                      $0
          Other-                                                                     0
              Total Revenues                                                  $0

        Expenditures (Actual Costs):
          Per State's Financial Report                                           $0
          Less A-87 Unallowable Costs (e.g.)-
           Capital Outlay                                                        (0)
           Projected Cost Increases/Replacement Reserve                          (0)
           Bad Debt                                                              (0)
           Other - (e.g., Gain on Disposal of Assets)                            (0)

          Plus A-87 Allowable Costs (e.g.)-
           Indirect Costs from SWCAP                                              0
           (If Not Allocated in Section I Of SWCAP To User Depts/Programs)
           Depreciation or Use Allowance                                          0
           (If Not Included in Actual Costs Above)
           Other-                                                                 0
              OMB A-87 Allowable Expenditures                                 $0
        Adjustments:
          Imputed Interest Earnings on Monthly Average Cash Balance
          at State Treasury Avg. Rate of Return                                  0
          Other-                                                                 0
              Total Adjustments                                               $0

    A-87 R.E. BALANCE June 30, 19__                    (A)                                 $0                $0

    Allowable Reserve                                  (B)                                 $0

    Excess Balance (A)-(B)                                                                $0
    (If less than zero, the amount on (A) is the beginning A-87 R.E. balance for the next year's reconciliation.
    If there is an excess balance, than the federal share should be returned to the federal gov't and the amount
    on (B) will be the beginning A-87 R.E. balance for the next year.)

PART II   A-87 CONTRIBUTED CAPITAL BALANCE

    A-87 CONTRIBUTED CAPITAL BALANCE JULY 1, 19__                                         $0

    TRANSFERS Per CAFR (Supported By Official Accounting Records)
        Plus: Transfers in      (e.g., Contrib, Capital)                       $0
        Less: Transfers Out    (e.g., Payback of Contrib, Other Users of Fund R.E.)  (0)
            Net Transfers                                                  $0
    A-87 CONTRIBUTED CAPITAL BALANCE JUNE 30, 19__     (C)                                                  $0

PART III   A-87 ADJUSTMENTS BALANCE

    A-87 ADJUSTMENTS BALANCE JULY 1, 19__

    ADJUSTMENTS:
        Less: A-87 Unallowable Costs                                          ($0)
        Plus: A-87 Allowable Costs                                             0
        Other-                                                                 0
            Total Adjustments                                               $0

    A-87 ADJUSTMENTS BALANCE JUNE 30, 19__             (D)                                                  $0

PART IV   RECONCILIATION OF A-87 R.E., CONTRIBUTED CAPITAL AND ADJUSTMENTS BALANCES TO CAFR BALANCE

    RECONCILIATION OF A-87 R.E., CONTR. CAPITAL & ADJUST. BALANCES TO CAFR (A) + (C) + (D)                   $0
    (Should Tie to the Fund Balance in the CAFR)

## Instructions for Preparing the Reconciliation of Retained Earnings (R.E.) Balance to Federal Guidelines (Illustration 4-7)

**General.** A reconciliation schedule must be completed for all billed central services, including internal service funds (ISFs), self-insurance funds (SIFs), and fringe benefit funds (FBFs).

For those funds which utilize multiple billing rates (e.g., ADP funds), a reconciliation schedule may be required for **each** billing rate. An overall/average fund balance may not be appropriate, because excess charges may occur in one billed service but undercharges may occur in other billed services. In addition, various users do not utilize each/all billed services to the same extent.

### Part I A-87 R.E. Balance

1. **Beginning A-87 R.E. Balance.** If this is the first time the reconciliation schedule is being prepared, the beginning A-87 R.E. balance should be the R.E. balance on the state's CAFR, including allowable adjustments (e.g., transfers in/transfers out, A-87 unallowable/allowable costs, imputed interest). If the fund has been reviewed in prior years, the beginning balance will be the ending balance from the previous year's reconciliation schedule. However, if adjustments for excess reserve balances have been made, then a zero balance may be the appropriate starting balance.

2. **A-87 Revenues.** Revenues shall consist of all revenues generated by the service, including unbilled and uncollected revenues. If some users were not billed for services (or were not billed at a full rate), a schedule showing the full imputed revenues associated with these users shall be provided (see Summary of Actual and Imputed Revenues - Illustration 4-6). Revenues should also include (i) all other revenues the fund earned from its operation, and (ii) interest earned on reserves. If imputed interest/investment earnings are shown at the bottom of the schedule, these amounts should not be included in this section.

3. **A-87 Expenditures.** The initial expenditure balance should reconcile to the CAFR (or other financial records). Adjustments in accordance with A-87 are made, for example, the exclusion of bad debts and the inclusion of allocated central service costs (SWCAP Section I costs).

4. **Imputed Interest.** There are different methods to compute imputed interest earnings. Currently, one acceptable method is the application of the state's Treasury Average Rate of Return to the monthly average cash balance for the year. If actual interest earned is computed incorrectly, then additional interest may be imputed.

5. **Allowable Reserves.**

   A. **Internal Service Funds.** The allowable reserve for ISFs, which are identified in the CAFR, is equal to the ISF's billing cycle up to 60 days allowable operating expenditures. The reserve is determined by applying a percentage to the allowable operating expenditures (excludes depreciation/use allowance, start-up capital, and any reserves to fund

long-term assets). The percentage is the number of days in the billing cycle days divided by 360.

Reserves for other billed central services that are not identified as ISFs in the CAFR are unallowable.

B. **Self-Insurance Funds.** The allowable reserve for self-insurance funds is defined in Circular A-87, Attachment B, paragraph 25. d. It is normally limited to the discounted present value of claims (i) submitted and adjudicated but not paid; (ii) submitted but not adjudicated; and (iii) incurred but not submitted.

C. **Fringe Benefit Funds.**

(i) *Medical, Unemployment, and Workers' Compensation Insurance.* See self-insurance funds above.

(ii) *Pension Plan.* Actuarial determined, but limited to the amount funded in accordance with Circular A-87, Attachment B, Paragraph 11.e.

(iii) *Post-retirement Health Benefits.* Actuarial determined, but limited to the amount funded in accordance with Circular A-87, Attachment B, paragraph 11.f.

(iv) *Accrued Leave.* Accrued leave is the amount required to pay leave earned but not taken. The reserve must be a valid liability as defined by GAAP and is limited to the amount funded. It must be supported by the state's payroll records.

Note: To be considered funded, a reserve must be paid to a trustee (or insurer) who maintains a trust fund or reserve for the sole purpose of paying the specific fringe benefit for which the reserve is established. If there is no funding, costs are recognized when paid.

6. **Excess Balance.** The Federal share of the excess must be returned to the Federal Government. Exceptions are based on negotiator judgment. For example, the state could credit the appropriate Federal and state programs/agencies for the overcharged amount, or the future billing rates could be reduced.

Interest may be assessed, taking into consideration the time period required to affect the payback.

**Part II A-87 Contributed Capital Balance**

1. **Transfers In/Transfers Out.** Contributed capital represents contributions by the state to the fund to cover expenditures not allowable under A-87, capital expenditures, reserves for the acquisition of future assets, etc. Transfers in/transfers out are identified in the CAFR and are in compliance with GAAP. Examples include contributed capital to the fund by the state or the transfer out of earned capital/cash to a fund that is having cash flow problems.

**Part III   A-87 Adjustments Balance**

1.   **A-87 Adjustments.**   Adjustments specific to A-87 must be identified and recorded.  The figures should be the same as those identified in Part I above.

**Part IV   Reconciliation of R.E., Contr.  Capital & Adjustments Balances to CAFR Balance**

1.   The ending balances for Parts I, II, and III are totaled.  The total figure should reconcile to the CAFR fund balance.

Note:  If this schedule is for a billed central service that is general funded (and not identified as an ISF in the CAFR), there will be no reconciliation.

**4.8    Questions and Answers on Attachment C**

**4-1    Under what, if any, circumstances can an approved cost allocation plan be reopened by either party? [Att. C]**

With respect to the governmental unit or component, the only circumstance whereby a negotiated plan can be re-opened is noted in Question 4-2 below.  The basis for the cognizant agency to reopen the approved plan is stated in Attachment C, paragraph F.2, e.g., if there is a violation of a statute or if submitted information was materially incomplete or inaccurate.  Inclusion of unallowable or unallocable costs under Circular A-87 will not be grounds for reopening.  In such cases, a roll-forward adjustment or refund will be made at the cognizant agency's option.

**4-2    If a central service activity, either allocated (Section I) or billed (Section II), is omitted when the state/local-wide cost allocation plan (SWCAP/LOCAP) is approved, can the carry forward procedure be used to recover the cost of the omitted activity in a future plan? [Att. C, § C]**

Attachment C, Section C specifically states that costs of central services omitted from the plan will not be reimbursed.  However, OMB clarifies in the preamble to the May 17, 1995 *Federal Register* notice of the Circular's issuance that if a service **did not exist** (as opposed to being overlooked) when the plan was prepared, the approved plan can be reopened to include the new activity.  In such cases, the plan will be amended to include the nonexistent activity.  The definition of "nonexistent" does not include central services that existed when the plan was finally approved, nor those that the state should have known would exist in the future, based on budgets approved by the state legislature.

**4-3    Does Circular A-87 require primary recipients to prospectively review cost allocation plans and negotiate indirect cost rates with all organizations to which it makes cost reimbursement subawards? OMB does not impose a similar requirement on Federal agencies.  [Att. C, ¶ D.3]**

Circular A-87 does not specifically prescribe procedures to be used by primary recipients in accepting claims for indirect costs made by organizations to which they make subawards.  The Circular states: "Where a local government only

receives funds as a sub-recipient, the primary recipient will be responsible for negotiating indirect cost rates and/or monitoring the sub-recipient's plan. " (Att. C, ¶ D.3.) This would permit a primary recipient to actually engage in prospective review and negotiation. Alternatively, the primary recipient could require subrecipients to develop the necessary documentation concerning indirect charges and retain the documentation for audit and could then review audit reports to determine whether proper cost charging occurred. It would also be acceptable for primary recipients to use a combination of these methods, depending upon the relative size of the subrecipient. As accountability for the Federal funds ultimately rests with the primary recipient, the level of risk and exposure should be the determining factors in what oversight will be required.

**4-4    Attachment C, Section E provides the cognizant agency with flexibility in the types of information and documentation it can require when approving central service cost allocation plans (SWCAPs/LOCAPs). Are there limits on this authority? [Att. C, § E]**

The data and information that a cognizant agency can require is subject to reasonableness. Factors to be considered when assessing documentation needs are: (1) the overall size of the government unit; (2) the timing of previous reviews and the results of such reviews; (3) the appearance of systemic problems; (4) the reoccurrence of problems/issues; (5) the veracity of information provided in the past; and (6) the level of "good faith" exercised in the past by the government or its consultants, if applicable.

**4-5    Attachment C, paragraph E.2 requires that a summary schedule be provided showing the allocation of each service to the specific benefitted agencies. Can the allocations to small or inconsequential agencies be included in a grouping, such as "other"? [Att. C, ¶ E.2]**

Such a practice is permissible where, in fact, the agencies/activities are inconsequential and they receive no Federal awards. However, a narrative description must be provided listing all agencies/activities that have been included in the grouping, so that it can be verified that all operations of the government have been included in the base.

**4-6    Attachment C, paragraph E.3.b. identifies the requirements for the submission of information to the cognizant agency concerning internal service funds (ISFs). What is the definition of an ISF? [Att. C, ¶ E.3.b(1)]**

The definition is provided in generally accepted accounting principles, i.e., a fund used "to account for the financing of goods or services provided by one department or agency to other departments or agencies of a government or to other governments, on a cost-reimbursement basis." *(Codification of Standards of Governmental Accounting*, 1300.104. Governmental Accounting Standards Board.) Internal Service Funds (ISFs) would be separately recognized in the financial statements using the accrual basis of accounting. However, this section of A-87 covers more than ISFs for central service activities of a state or local government. It covers the submission requirements of all central service activities for which the state or local government uses a billing mechanism (formal or memo billing) to assign or allocate costs to other components of the respective government. This requirement applies whether or not the "billed" activity is established in the unit's financial statements as a true ISF under

generally accepted accounting principles.

**4-7   Under a central service cost allocation plan (SWCAP/LOCAP), is the government required to submit documentation for internal service funds (ISFs) with operating budgets under $5 million? [Att. C, ¶ E.3.b(1)]**

Attachment C, paragraph E.3.b(1) specifies documentation requirements for internal services funds (ISFs) with operating budgets of $5 million or more. It also states that the requirements may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis. At a minimum, the government or component must submit a schedule for ISFs under $5 million that reconciles the ISF Retained Earnings. Illustration 4-7 provides a sample schedule format for making such presentations. This schedule provides information that is essential for Federal review and approval of the ISFs and which is not included in the comprehensive annual financial report (CAFR) or other financial statements. In addition, the reconciliation determines an A-87 allowable balance on an on-going basis. Additional documentation may be requested on a case-by-case basis, depending, in part, on the dollar impact on Federal awards and when a detailed review of the ISF was last performed by the cognizant Federal agency.

**4-8   Attachment C, paragraph E.3.b(1) requires the governmental unit to provide a description of the procedures (methodology) used to charge the costs of each service to the user, including how the billing rates are determined. How much detail is required on how billing rates are determined? [Att. C, ¶ E.3.b(1)]**

Like any other aspect of the submission requirements, the governmental unit is required to submit sufficient documentation for the reviewer to make an informed judgement as to the acceptability of the basis used by the unit of government. Such documentation would include: (1) the items of expense making up the billed activity; (2) the specific data used to develop the billing rate(s) and how often they are updated; (3) justification as to why the method used is the most appropriate for the activity; (4) an identification of any users that are not billed, with assurance that their share of services are reflected in the base; (5) how often billings are compared to actual costs and usage; (6) how variances will be adjusted; and (7) any other information the cognizant agency requires to evaluate the reasonableness of the billing system.

**4-9   Attachment C, paragraph E.3.b(2) of the May 4, 1995 revision to Circular A-87 requires that the expenses of the billed function be broken out by object cost categories. In the past, submissions were permitted where a break-out of salaries and wages was made, but a roll-up of all other costs was presented as one amount. Can this practice continue, supported with detailed, on-site accounting records, or must the plans be modified to include the detail? [Att. C, ¶ E.3.b(2)]**

A listing of the items of expenses is required for each central service activity whether it is a billed or unbilled activity. In addition, as noted in the beginning of Attachment C, Section E, the documentation requirements can be reduced by the cognizant agency. For example, reduced documentation might be appropriate for a central service function which has little or no impact on Federal awards. Therefore, the initial plan should address the A-87 documentation requirement, unless the cognizant agency approves otherwise based on the

Federal effort, significance of "roll-up amount," and other factors.

**4-10  Under what circumstances are working capital reserves permitted for internal service funds (ISFs) and how are they to be determined? [Att. C, ¶ G.2]**

Attachment C, paragraph G.2 permits working capital reserves to allow ISFs sufficient cash to sustain operations between billing cycles. While the Circular authorizes reserves of up to 60-day cash needs, their allowability is not automatic. The following factors are to be considered when establishing reserves and determining whether they will be allowable.

(1)  Reserves are only allowable for enterprise funds and bona fide ISFs recognized in the government's comprehensive annual financial report (CAFR). Reserves are not allowable for activities funded through general revenue appropriations.

(2)  For each fund for which a reserve is determined necessary, the number of days of cash needs, up to 60 days, must be fully supported by a cash flow analysis reflecting billing cycles, revenue receipts, and allowable disbursements.

(3)  Semi-annual or annual payments are to be amortized in billing rates.

(4)  Reserves, for purposes of Federal recognition, may only include allowable cash disbursements. Depreciation, principal payments, and capital expenditures are not allowable. However, interest payments are allowable.

(5)  Self-insurance funds, including fringe benefits operating as such, are further subject to the provisions of Circular A-87, Attachment B, paragraph 25.

(6)  Pension funds are subject to Circular A-87, Attachment B, paragraph 11.

(7)  Allowability of reserves covering longer periods can be granted by the cognizant agency in extraordinary circumstances where such needs are fully documented and justified.

**4-11  Earnings on ISF cash balances are to be treated as applicable credits. If a state co-mingles its funds, how is the amount of earnings for a single fund to be determined? [Att. C, G]**

When known, actual earnings should be used. In the circumstances described above, earnings may be imputed by applying the government's, e.g., State Treasurer, Average Rate of Return on the average monthly balance for a given fund.

**4-12  Attachment C, paragraph G.4 establishes four methods for adjusting internal service funds (billed central services) for profits or losses realized from operations. Alternative (b) allows credits to amounts charged to the individual programs. This method would only cover profits. If losses occur, why can't individual programs be debited? [Att. C, ¶ G.4]**

Effectively, alternative (b) is correcting billed costs in the current year, whereas alternative (c) is carrying forward the profit/loss into the next open fiscal period. The failure of the Circular to note how losses are to be treated in alternative (b) is an editing error. For consistency purposes, both alternative (b) and (c) cover profit and loss situations. However, only one method can be used in a given fiscal year.

4-13  **Attachment C, paragraph G.4 allows adjustments to allocated, unbilled central service costs ("Section I costs") as an option for adjusting a particular billed service ("Section II costs") if the amount of the adjustment does not exceed $500,000. May this adjustment be made in the normal course of plan preparation or is prior Federal approval required? [Att. C, ¶ G.4]**

Prior Federal approval is not required by Circular A-87. It should be noted, however, that the $500,000 threshold applies to the entire billing function and not to components of that function.

> **EXAMPLE:** A data service facility typically has numerous cost centers for which it develops individual billing rates. The allocation method for adjusting over/under billings can only be used if the net, total adjustment for the data facility is less than $500,000.

4-14  **For adjustments exceeding $500,000, Attachment C, paragraph G.4 presents three options. What criteria will be used to select the method of recovery? [Att. C, ¶ G.4]**

The primary concern would be the assurance that the Federal programs charged in a given year receive an equitable and appropriate adjustment for the over/under billings. Consideration must also be given to the makeup of the user community in future periods as well as the level of support they will require.

# EXHIBIT 2



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Program Support Center
Financial Management Service
Division of Cost Allocation
Central States Field Office

1301 Young Street
Room 732
Dallas, Texas 75202
(214)-757-3261
FAX: (214)-757-3264

**CERTIFIED – RETURN RECEIPT REQUESTED**

June 22, 2006



Mr. Art Jaramillo
Cabinet Secretary
New Mexico General Services Department
P.O. Drawer 26110
Santa Fe, New Mexico 87502-0110

Dear Mr. Jaramillo:

The purpose of this letter is to replace our letter of February 22, 2006 to Mr. James C. Jimenez, Cabinet Secretary of the New Mexico Department of Finance Administration, concerning a determination involving the General Services Department – Information Systems Division (ISD) excess reserve balances as of June 30, 2004. This letter changes the amount of the determination and the date from which your deadline for appealing this determination will be determined. It also changes the date from which debt interest will be computed if you elect to not pay the debt by the due date.

To recalculate the amount of the debt we used the attached materials provided to this office subsequent to our determination letter of February 22nd. It is our understanding that you proposed that the debt be reduced from $4,620,948 to $1,716,068 (Attachment Number 1), in part, because incorrect allocation methodology was used by ISD to prepare the expenditures by billing category on which the February 22, 2006 determination was based. Your proposed debt amount of $1,716,068 was also developed based on netting billing rate categories for only the New Mexico Human Services Department. This methodology, as was explained in our telephone conference of June 20, 2006, is not acceptable.

We have recalculated the debt to be $3,790,567 as of June 30, 2004. On Attachment Number 1, we used five billing rate categories which had excess reserve balances in excess of $500,000 as of June 30, 2004. The Federal share of these five categories totaled $3,723,891 for the Human Services Department. We used Attachment Number 2 to obtain the Federal share of the excess reserve for the Children Youth and Families Department and the Department of Health. These amounts totaling $66,676 have been added to Attachment Number 1 resulting in a total debt as of June 30, 2004 of $3,790,567. Interest at the State Treasurer's Office General Fund rate of 2.9%, calculated on Attachment Number 3, from June 30, 2004 to June 22, 2006 is $220,464 (Attachment Number 4) resulting in a total debt as of June 22, 2006 of $4,011,031.

It is the responsibility of the State to operate the ISD internal service fund in compliance with *Office of Management and Budget Circular A-87 Cost Principles for State, Local and Indian Tribal Governments* (A-87), Attachment C, Section G. 4, Adjustments of billed central services which states "Billing rates used to charge Federal Awards shall be based on the estimated cost of providing the services, including an estimate of the allocable central service cost. A comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable cost of the service will be made at least annually and an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following adjustments methods:
(a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central service costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and Non-Federal) share exceeds $500,000."

This is the final decision of the Director, Division of Cost Allocation- Central States Field Office. It shall be the final decision of the Department unless, within 30 days after receiving this decision, you deliver or mail (you should use registered or certified mail to establish the date) a written notice of appeal to the Department of Health and Human Services, Departmental Appeals Board, MS 6127, Appellate Division, 330 Independence Avenue S.W., Cohen Building, - Room G-644, Washington, D.C. 20201. You should attach to the notice a copy of this decision, note that you intend to appeal, state the amount in dispute, and briefly state why you think that this decision is wrong. You will be notified of further procedures.

If you elect not to appeal this decision, please refund $4,011,031 by check made payable to the U. S. Department of Health and Human Services and send it along with a copy of this letter within 30 days of the date of this letter to the following address:

> U. S. Department of Health and Human Services
> Program Support Center – Fin. Mgmt. Svcs.
> Division of Financial Operations
> Debt Management Branch
> 5600 Fishers lane
> Parklawn Building, Room 16A-12
> Rockville, MD 20857

In addition, please submit to my office <u>copies</u> of your transmittal letter and check. If you have any questions concerning the computation of the payment amount, please call Terry Hill at (214) 767-3263.

This letter constitutes the initial notification of a claim by the United States as required by the Federal Claims Collection Standards (4 CFR 102.2). If payment is not received within 30 days from the date of this notification, interest at the current Private Consumer rate as of the date of this Notice (approximately 12 1/8%), will be assessed in accordance with Department regulations at 45 CFR Part 30.13 and calculated with the Treasury Financial Manual, I TFM Part 6, Section 8025. If your organization elects to appeal, we will suspend collection action. However, if the final decision of the appeals process is determined in favor of the Federal

Government (fully or partially), interest will be assessed on the upheld amount from the date of this notification. Questions concerning payment may be addressed to the Debt Management Branch or by calling (301) 443-3083.

Sincerely,

Henry Williams
Director
Division of Cost Allocation
Central States Field Office

Attachments

cc:    Mr. James C. Jimenez
       Cabinet Secretary
       New Mexico Department of Finance Administration
       Bataan Memorial Building, Room 180
       407 Galisteo
       Santa Fe, New Mexico 87501

0000195





Service:    MVS CPU - Prime

| Published Rate: | $1,276.00 /CPU Hr (A) | | Cost-Based Rate: | $485.383 /CPU Hr (B) | | | | | | | | **ATTACHMENT NUMBER 2** |

**8 pages**

| | Beginning 2004 Fund Balance | Service Utilization (D) | Client Revenue Analysis | | | | | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | Federal Participation | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | (E) Client Util vs Total Svc Util (D/M) | (F) Revenue Published Rates (A*D) | (G) Revenue Cost-Based Rates (B*D) | (H) Client Over/(Under) Recovery (F-G) | | | | | | | (I) % Federal Financial Participation | (J) Federal Over/(Under) Recovery (J-K) | (L) |
| Client | | | | | | | | | | | | | | | |
| DFA | $1,700 | 1.470 | 1.46% | $22,900 | $9,569 | $13,304 | | $15,934 | | $1,390 | $14,282 | | | $0 |
| OSD | $4,434 | 66.7604 | 8.59% | $85,146 | $32,414 | $52,731 | | $55,163 | | $5,142 | $54,351 | | | $0 |
| HSD | $72,620 | 763.7626 | 93.07% | $991,073 | $395,173 | $595,199 | | $637,620 | | $59,402 | | | $385,618 | $0 |
| PKG | $0 | | | | | | | $0 | | $0 | $0 | 82.5% | $0 | $0 |
| STA | $390 | 3.9474 | 0.33% | | | $3,117 | | $3,417 | | $304 | 3,213 | | | $0 |
| Other | $5,057 | 62.4671 | 4.30% | $55,921 | $20,478 | $41,445 | | $46,501 | | $4,042 | $42,716 | | | $0 |
| Totals | $116,439 | 1,195 (M) | 100.00% | 1,623,774 (N) | 980,090 (O) | 943,384 | 3.23% | 1,066,823 | 5,470 | 92,024 | 972,689 | | $386,220 | |

C:\WORK\BUDGETDETERMINATIONS\wm revised 2004 individual billing rate analysis

**Service:** MVS CPU - Standard

| Published Rate: | $860.00 /CPU Hr (A) | Cost-Based Rate: | $155.333 /CPU Hr (B) |
|---|---|---|---|

| Client | Beginning 2004 Fund Balance | (D) Service Utilization | (E) Client Util vs Total Srvc Util (D/M) | (F) Revenue: Published Rates (A*D) | (G) Revenue: Cost-Based Rates (B*D) | (H) Client Over/(Under)-Recovery (F-G) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | (I) % Federal Financial Participation | (L) Federal Over/(Under)-Recovery (J-K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $1,891 | 103 | 2.20% | $67,285 | $46,834 | $20,451 | | $47,329 | | $7,608 | $39,707 | | $0 |
| GSD | $153,611 | 140 | 3.01% | $119,201 | $68,086 | $51,132 | | $82,007 | | $10,796 | $54,235 | | $0 |
| HSD | $295,750 | 3,050 | 65.10% | $2,018,521 | $1,465,164 | $1,123,157 | | $1,410,225 | | $237,190 | $1,161,318 | 82.58% | $749,220 |
| PNC | $625 | 8 | 0.14% | $6,513 | $3,150 | $2,386 | | $2,981 | | $500 | $2,519 | | $0 |
| STR | $2,374 | 28 | 0.63% | $20,242 | $11,959 | $5,938 | | $11,057 | | $1,697 | $9,529 | | $0 |
| Other | $12,017 | 104 | 2.85% | $113,985 | $65,080 | $48,808 | | $61,806 | | $10,324 | $51,565 | | $0 |
| **Totals** | **$448,994** | **4,880 (M)** | **100.00%** | **$3,861,289 (N)** | **$2,292,046 (O)** | **$1,894,240** | **13.80%** | **$2,148,225** | **$12,988** | **$356,849** | **$1,892,362** | | **$753,341** |

CH\WORK\DETERMINATIONS\firm revised 2004 individual billing rate analysis

6/22/06

2-2

Service:   MVS CPU - NonPrime

| Published Rate: | $425.00 /CPU Hr (A) | | Cost-Based Rate: | $485.383 /CPU Hz (B) |

| Client | Beginning 2004 Fund Balance | (D) Service Utilization | (E) Client Util vs Total Serv Util (D / M) | (F) Revenue: Published Rates (A * D) | (G) Revenue: Cost-Based Rates (B * D) | (H) Client Over/(Under)-Recovery (F - G) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | (I) % Federal Financial Participation | (L) Federal Over/(Under)-Recovery (I · X) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $194 | 2.0174 | 5.12% | $857 | $979 | ($122) | | $73 | | $155 | ($81) | | $0 |
| | | | | | | | | | | | | | |
| | | 11.5333 | 29.24% | $4,897 | $5,599 | ($699) | | $114 | | $887 | ($405) | | $0 |
| HSD | $727 | 7.4462 | 19.41% | $3,250 | $3,712 | ($492) | | $273 | | $569 | ($300) | | ($184) |
| | | | | | | | | | | | | 62.59% | |
| PRC | $41 | 0.4802 | 1.0% | $183 | $209 | ($29) | | $18 | | $23 | ($77) | | $0 |
| | | | | | | | | | | | | | |
| STR | $62 | 0.5464 | 1.14% | $275 | $314 | ($39) | | $13 | | $50 | ($20) | | $0 |
| Other | $649 | 6.7027 | 14.47% | $2,424 | $2,708 | ($344) | | $205 | | $439 | ($230) | | $0 |
| **Totals** | **$3,706** | **39 (M)** | **100.00%** | **$16,747 (N)** | **$19,127 (O)** | **($2,378)** | **0.41%** | **$1,477** | **$20** | **$3,934** | **($1,581)** | | **($212)** |

C:\WORD\DETERMINATIONS\rom revised 2004 indiv\dual billing rate analysis

**Service:** MVS Disk I/O

| Published Rate: | $0.10 /1000 (A) | | Cost-Based Rate: | $0.087 /1000 (B) |
|---|---|---|---|---|

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D / M) (E) | Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (J × %J) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $60,333 | 751,630 | 9.44% | $75,153 | $62,064 | $32,487 | | $92,799 | | $8,772 | $76,683 | | $0 |
| GEO | $44,700 | 687,578 | 8.38% | $65,758 | $57,917 | $29,440 | | $79,560 | | $6,015 | $85,120 | | $0 |
| HSD | $192,027 | 2,807,288 | 38.00% | $286,727 | $182,868 | $123,871 | | $315,516 | | $23,606 | $292,602 | 62.00% | $184,018 |
| PRC | $1,860 | 21,626 | 0.35% | $2,703 | $1,599 | $1,199 | | $3,044 | | $249 | $2,819 | | $0 |
| STR | $9,030 | 90,030 | 1.13% | $9,003 | $5,159 | $3,189 | | $9,919 | | $911 | $9,199 | | $0 |
| Char | $18,450 | 230,528 | 2.00% | $23,083 | $13,111 | $9,972 | | $25,431 | | $2,060 | $23,556 | | $0 |
| **Totals** | **$533,448** | **7,894,191 (M)** | **100.00%** | **$799,916 (M)** | **$469,610** | **$344,108** | **2.86%** | **$885,853** | **$3,881** | **860,905** | **$792,733** | | **$192,893** |

C:\WORK\DETERMINATIONS\rm revised 2004 individual billing rate analysis

**Service:** CICS CPU - Standard

| Published Rate: | $3,000.00 /CPU Hr | | Cost-Based Rate: | $1,264,222 /CPU Hr | | | | | | | | | | | | | |

Client Revenue Analysis

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D/M) (E) | Revenue: Published Rates (A*D) (F) | Revenue: Cost-Based Rates (B*D) (G) | Client Over/(Under)-Recovery (F-G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (I·H) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $7,166 | 24 | 1.77% | $73,022 | $30,029 | $42,404 | | $49,849 | | $4,043 | $45,190 | | $0 |
| GSD | $4,000 | 14 | 0.99% | $40,621 | $17,086 | $23,705 | | $27,793 | | $2,707 | $25,205 | | $0 |
| HSD | $313,436 | 1,006 | 77.65% | $3,198,930 | $1,317,348 | $1,001,453 | | $2,474,940 | | $312,164 | $1,975,227 | 92.59% | $1,242,221 |
| PRC | $4,357 | 15 | 1.04% | $44,460 | $17,490 | $26,974 | | $30,331 | | $2,849 | | | $0 |
| STF | $1,024 | 3 | 0.27% | $10,484 | $4,371 | $5,304 | | $7,105 | | $903 | $6,455 | | $0 |
| Other | $25,133 | 0 | 0.99% | $287,100 | $120,020 | $167,071 | | $105,304 | | $10,041 | $177,280 | | $0 |
| **Totals** | **$404,982** | **1,375 (M)** | **100.00%** | **$4,124,708 (N)** | **$1,724,486 (C)** | **$2,400,509** | **9.76%** | **$2,729,550** | **$16,911** | **$266,166** | **$2,478,275** | | **$1,270,212** |

C:\WORK\DETERMINATION\bim revised 2004 individual billing rate analysis

NO. 4070    P. 11

GENERAL SERVICES    JUN. 26, 2006    4:19PM

Service: CICS CPU - NonPrime

Published Rate: $1,500.00 /CPU Hr (A)   Cost-Based Rate: $1,254.222 /CPU Hr (B)

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Use to Total Serve URN (D / M) (E) | Client Revenue Analysis — Revenue: Published Rates (A * D) (F) | Revenue: Cost-Based Rates (B * D) (G) | Client Over/(Under) Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | Federal Participation — % Federal Financial Participation (I) | Federal Over/(Under) Recovery (J × K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $589 | 2.0033 | 4.97% | $3,005 | $2,513 | $492 | | | | $503 | $361 | | $0 |
| GSD | $204 | 0.6065 | 0.65% | $1,043 | $872 | $171 | | $1,081 | | $158 | $260 | | $0 |
| HSD | $13,972 | 47.5274 | 45.75% | $71,291 | $59,610 | $11,681 | | $375 | | $9,450 | $18,306 | 82.85% | $10,313 |
| PRC | $1,841 | 5.528 | 6.48% | $8,874 | $7,002 | $1,872 | | $3,013 | | $1,111 | $1,029 | | $0 |
| STR | $20 | 0.0592 | 0.09% | $134 | $112 | $22 | | $46 | | $16 | $31 | | $0 |
| Other | $10,264 | 34.9137 | 34.39% | $52,371 | $43,790 | $8,581 | | $16,845 | | $6,947 | $12,044 | | $0 |
| **Totals** | **$29,967** | **102 (M)** | **100.00% (L)** | **$183,588 (N)** | **$127,427 (O)** | **$24,974** | **0.72%** | **$54,044** | **$417** | **$19,811** | **$34,820** | | **$10,681** |

C:\WORK\DETERMINATION\own revised 2004 Individual billing rate analysis

JUN. 26. 2006   4:19PM    GENERAL SERVICES    NO. 4070   P. 12

**Service:** CICS EXCP

Published Rate: $0.10 /1000 (A)

Cost-Based Rate: $0.067 /1000 (B)

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D*1/M) (E) | Revenue: Published Rates (A*D) (F) | Revenue: Cost-Based Rates (B*D) (G) | Client Over/(Under)-Recovery (F-G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (I) | Federal Over/(Under)-Recovery (J*K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | $16,682 | 271,798 | 3.64% | $27,180 | $15,432 | $11,742 | | $30,424 | | $2,449 | $28,220 | | $0 |
| OSD | | 86,316 | 1.15% | $8,631 | $5,016 | $2,416 | | | | $799 | $9,170 | | $0 |
| HBD | $398,845 | 6,657,216 | 73.65% | $508,722 | $221,321 | $244,401 | | $533,248 | | $38,874 | $3,597,383 | 62.80% | $390,405 |
| FRC | $2,780 | 40,579 | 0.53% | $4,058 | $2,305 | $1,783 | | $4,642 | | $386 | $4,419 | | $0 |
| STR | $2,722 | 38,703 | 0.52% | $3,970 | $2,255 | $1,715 | | $4,144 | | $365 | $4,122 | | $0 |
| Other | $39,000 | 800,651 | 7.65% | $58,093 | $32,879 | $25,044 | | $64,904 | | $5,332 | $60,288 | | $0 |
| **Totals** | **$527,882** | **7,881,479** | **100.0%** | **$788,148** | **$439,285** | **$331,852** | **2.47%** | **$812,064** | **38,661** | **$96,445** | **$754,140** | | **$384,578** |
| | (N) | (M) | | (N) | (C) | | | | | | | | |

C:\WORK\DETERMINATIONS\trm revised 2004 individual billing rate analysis

0000204

Service:    Disk Occupancy

| Published Rate: | $0.000009 /KB-Day (A) | | Cost-Based Rate: | $0.00000351 /KB-Day (B) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Client | Beginning 2004 Fund Balance | Service Utilization (D) | Client Util vs Total Serve Util (D / ΣD) (E) | Revenue: Published Rates (A · D) (F) | Revenue: Cost-Based Rate (B · D) (G) | Client Over/(Under)-Recovery (F - G) (H) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | % Federal Financial Participation (J) | Federal Over/(Under) Recovery (J · K) (L) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DFA | | | | | | | | | | | | | $0 |
| | $8,200 | 18,979,546,108 | 4.47% | $168,466 | $69,704 | $118,764 | | $127,040 | | $11,055 | $116,059 | | $0 |
| GSD | $5,818 | 15,479,597,966 | | $127,786 | $47,283 | $80,522 | | $28,111 | | $7,464 | $79,102 | | $0 |
| HSD | $38,437 | 212,497,761,904 | 47.77% | $2,011,540 | $743,945 | $1,207,144 | | $1,355,922 | | $118,026 | $1,204,179 | 52.99% | $783,000 |
| | $108 | 1,301,155,146 | 0.39% | $16,127 | $5,986 | $10,102 | | $10,671 | | $541 | $9,983 | | $0 |
| STR | $1,698 | 9,605,409,294 | | $99,075 | $13,349 | $22,733 | | $24,319 | | $2,117 | $22,331 | | $0 |
| Other | $14,935 | 35,834,470,477 | 8.09% | $380,711 | $128,047 | $214,064 | | $229,000 | | $18,932 | $210,297 | | $0 |
| Totals | $165,219 | 441,549,571,644 (M) | 100.00% | $4,213,878 (N) | $1,908,988 (O) | $2,094,689 | 8.82% | $2,538,028 | $18,082 | $249,164 | $2,598,924 | | $732,511 |

C:\WORK\ODETERMINATIONS\Von revised 2004 individual billing rate analysis

6-22-06
8-8

ATTACHMENT NUMBER 3

# New Mexico
## state treasury interest earning rates
## July 1, 2004 - February 2006

### AVERAGE YIELD

| Quarter | Avg. Yield Rate | | weighted |
|---|---|---|---|
| June-04 | 1.988% | | |
| September-04 | 2.180% | July - Sept | 2.180% |
| December-04 | 2.030% | | 2.030% |
| March-05 | 2.570% | | 2.570% |
| June-05 | 3.020% | | 3.020% |
| September-05 | 3.613% | | 3.613% |
| December-05 | 3.330% | | 3.330% |
| Subtotal Average | 2.677% | six quarters avg | 2.790%   18 months   0.502275 |

| Month | | | |
|---|---|---|---|
| January-06 | 3.800% | | |
| February-06 | 3.900% | 2 months | 0.078 |
| Subtotal Average | 3.900% | | |
| | | total | 0.580275 |
| Average Yield | 3.2866% | | |
| | | average | |
| | | 20 months | 2.90% |

Source: www.stonm.org/level%20/L1-treasuryreports.htm

0000906

# EXHIBIT 3.a

26484          Federal Register / Vol. 60, No. 95 / Wednesday, May 17, 1995 / Notices

# OFFICE OF MANAGEMENT AND BUDGET

## Cost Principles for State, Local and Indian Tribal Governments

**AGENCY:** Office of Management and Budget.

**ACTION:** Final Revision to OMB Circular A–87, "Cost Principles for State, Local and Indian Tribal Governments".

**SUMMARY:** An interagency task force was established to review existing cost principles for Federal awards to State and local governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from State and local governments, and compared for consistency the provisions of other Office of Management and Budget cost principles covering non-profit organizations and universities. Proposed revisions reflecting the results of those efforts were published on October 12, 1988 (53 FR 40352–40367) and August 19, 1993 (58 FR 44212–44234). The extensive comments received on these proposed revisions, discussions with interested groups, and other related developments were considered in developing this final revision.

**DATES:** Agencies shall issue codified regulations to implement the provisions of this Circular by September 1, 1995.

**ADDRESSES:** Office of Management and Budget, Office of Federal Financial Management, Financial Standards and Reporting Branch, Room 6025, New Executive Office Building, Washington, DC 20503. For a copy of the revised Circular, contact Office of Administration, Publications Office, Room 2200, New Executive Office Building, Washington, DC 20503, or telephone (202)395–7332.

**FOR FURTHER INFORMATION CONTACT:** Non-Federal organizations should contact the organization's cognizant Federal funding agency. Federal agencies should contact Gilbert H. Tran, Financial Standards and Reporting Branch, Office of Federal Financial Management, Office of Management and Budget, telephone: (202)395–3993.

**SUPPLEMENTARY INFORMATION:**

## A. Background

The Office of Management and Budget (OMB) received about 200 comments from governmental units, Federal agencies, professional organizations and others in response to the Federal Register notice of August 19, 1993 (58 FR 44212). All comments were considered in developing this final revision.

OMB also considered the National Performance Review's recommendations to reduce paperwork and red tape. Changes were made to the Circular to streamline the cost negotiation process and defer to State and local accounting procedures whenever possible. Also, the policy guides in the Circular were amended to provide that Federal agencies which work with States or localities which wish to test alternative mechanisms for paying costs for administering Federal programs.

Section B presents a summary of the major public comments grouped by subject and a response to each comment. Other changes have been made to increase clarity and readability. Section C addresses procurement issues. Section D discusses the Federal Acquisition Streamlining Act of 1994.

## B. Public Comments and Responses

### Basic Circular

*Comment:* The policy subsection states that "no provision for profit or increment above allowable cost is intended." This statement is currently contained in the Circular, but it is different from that contained in other OMB cost principles circulars and is literally incorrect. This seems to say no profit or increment above cost is permitted.

*Response:* This sentence was changed to conform with the other OMB cost principles circulars. There is no policy change intended by this change.

### General Principles for Determining Allowable Costs—Attachment A

*Comment:* The requirement in the basic guidelines that "a cost may not be assigned to a Federal award as a direct cost if any other cost incurred for the same purpose in like circumstances has been allocated to a Federal award as an indirect cost" appears to be too expansive and should be clarified.

*Response:* There is no policy change intended from that in the existing Circular. The wording in the consistency provision was changed to make it clear that all costs incurred for the same purpose in like circumstances are either direct costs only or indirect costs only with respect to final cost objectives (e.g., grants). No final cost objective shall have allocated to it as an indirect cost any cost if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective. For example, a grantee normally allocates all travel as an indirect cost. For purposes of a new grant proposal, the grantee intends to allocate the travel costs of personnel

whose time is accounted for as direct labor directly to the grant. Since travel costs of personnel whose time is accounted for as direct labor working on other grants are costs which are incurred for the same purpose, these costs may no longer be included within indirect cost pools for purposes of allocation to any other grant.

*Comment:* The Circular lists the market price of comparable goods or services as one test of reasonableness. This statement may cause problems for State agencies that are required to make purchases from State-wide contracts.

*Response:* OMB recognizes that market fluctuations may result in a State paying higher prices on State-wide contracts. However, significant differences between State prices and market prices should be analyzed. For example, Federal awards should not be paying higher prices for State awards based on geographical preferences.

*Comment:* The prohibition against shifting costs allocable to a particular Federal award or other cost objective to other Federal awards needs to be clarified. Governmental units should not be precluded from shifting allowable cost in accordance with program agreements.

*Response:* This section was expanded to recognize that there are instances when it may be appropriate for governmental units to transfer costs from one cost objective to another cost objective.

*Comment:* It is not logical to require governmental units to allocate indirect costs to all activities including donated services.

*Response:* The Circular is designed to provide that Federal awards bear their fair share of costs. If non-Federal activities use donated services that require a substantial amount of support costs, it would be inequitable to charge these costs to Federal awards.

*Comment:* The section on applicable credits needs to be clarified.

*Response:* The language in this section has been revised to remove inappropriate examples of applicable credits and references to program income which are covered by the grants management common rule.

### Selected Items of Cost—Attachment B

#### Advertising and Public Relations Costs

*Comment:* Clarify the allowability of certain public relations type costs, such as job fairs and activities to promote ridership on public transportation.

*Response:* The allowability of these types of costs depends upon the circumstances surrounding the individual case. In determining whether

HeinOnline -- 60 Fed. Reg. 26484 1995

Federal awards should participate in these types of costs, the recipient should consider how similar types of costs are charged, and whether there is a direct benefit to Federal awards resulting from these costs.

### Audit Services

*Comment:* The Circular limits the allowability of audit costs to single audits and does not provide reimbursement for audits of a less comprehensive nature.

*Response:* This section was revised to allow the costs of other audits.

### Automatic Electronic Data Processing

*Comment:* The requirement for governmental units to amortize the costs associated with the development and testing of automated systems would impose an unreasonable financial and administrative burden on the governmental units.

*Response:* OMB eliminated the requirement for governmental units to amortize the costs of developing and testing automated systems until a uniform Federal policy covering all types of recipients of Federal awards can be developed.

### Compensation for Personnel Services

*Comment:* The potential paperwork burdens associated with accounting for employee leave payments and accruals could be substantial.

*Response:* This section was simplified by modifying many of the prescriptive accounting rules for leave.

*Comment:* Interest cost associated with pension contributions should be allowed if the governmental unit's contributions are delayed.

*Response:* References to interest payments were deleted. However, language was inserted into the Circular to make it clear that Federal reimbursement of pension cost must be adjusted when the governmental unit's payments to the fund are late. The adjustment should compensate for the additional cost because of the timing of the charges to the Federal Government and the governmental unit's contribution to the pension fund.

*Comment:* Governmental units should not be required to use separate cost allocation procedures for classes of employees that experience different actuarial gains and losses (e.g., police and fire departments).

*Response:* This requirement was deleted from the Circular.

*Comment:* The requirement that a governmental unit obtain Federal approval for changing its method for determining pension and post-retirement health benefit costs should be deleted.

*Response:* This requirement was deleted. Pension costs and post-retirement health benefit costs determined in accordance with Generally Accepted Accounting Principles (GAAP) and the provisions of the Circular will be allowable. For contracts covered under Cost Accounting Standards (CAS), CAS 412 and 413 promulgated by the Cost Accounting Standards Board shall establish the allocability of pension costs.

*Comment:* The current principles applicable to support of personnel costs have worked well and require no change.

*Response:* OMB believes additional guidance is necessary. Federal agencies have found that the absence of sufficient guidance on documentation to support salaries charged to Federal awards has caused numerous audit findings and resulted in endless wasted hours of negotiation between Federal agencies and governmental units. Based on the comments received, OMB made a number of changes to the requirements in this section of the Circular to clarify and simplify Federal requirements for documenting salaries charged to Federal awards.

### Defense and Prosecution of Criminal and Civil Proceedings, and Claims

*Comment:* OMB proposed to substantially amend the provisions on the allowability of legal and related expenses. In the 1981 version of the Circular, this provision is found at Attachment B, section 16 (46 FR 9552). In the latest proposal, the proposed revisions were at Attachment B, section 14 (58 FR 44222).

State and local governments contended that the proposed revisions on the allowability of legal and related expenses would be unfair and would deny them due process.

State and local governments also objected to the specific proposed revisions dealing with legal proceedings based on the Major Fraud Act and the Federal Acquisition Regulation (48 CFR 31.205—47) in Attachment B, sections 14.a. through f. State and local governments contended that those provisions are ambiguous, inconsistent and overly broad. In addition, the commenters argued that the provisions were designed for commercial contractors and should not be applied to grants.

*Response:* After reviewing the comments on the proposed revisions, OMB decided not to amend the current provision on the allowability of legal and related expenses. In the revised Circular, this provision is now found at section 14.b.

In this revision, OMB has added a provision at section 14.a. This provision, which was in the proposal, simply restates the currently-applicable, statutory restrictions in 10 U.S.C. 2324(k).

### Depreciation and Use Allowances

*Comment:* It is unclear if a use charge can be charged while an asset is in service.

*Response:* The Circular now provides that a reasonable use allowance may be negotiated for fully depreciated assets; therefore, OMB believes a reasonable use allowance could be negotiated for an asset for as long as the asset is in service.

*Comment:* It is not clear whether accelerated depreciation is allowed.

*Response:* The preferred method of depreciation is the straight line method. However, other methods may be used when there is evidence that an asset will be used up faster in the earlier portion of its useful life.

*Comment:* The estimated useful lives of equipment and buildings used to compute use allowances should be shortened.

*Response:* No changes were made. Governmental units have the option of claiming depreciation which is usually based on the actual life of the asset.

*Comment:* It is not clear why classes of assets needed to be determined on a State-wide, local-wide, or Tribal-wide basis.

*Response:* This section was amended to say classes of assets shall be determined on the same bases used for the governmental unit's financial statements.

### Equipment and Other Capital Expenditures

*Comment:* The capitalization level for equipment seems to be arbitrarily low. The criterion of $25,000, which is recognized by the Department of Health and Human Services (HHS), might be more appropriate.

*Response:* The $5000 criterion is in line with capitalization levels used by government contractors and others. The HHS criterion is limited to equipment used on a few very large programs where equipment purchases are a very small percentage of total program costs. For CAS-covered contracts subject to "full coverage", the threshold for equipment is $1500 as established under CAS 404.

*Comment:* Clarify the term "article" as used in the definition of equipment. The Circular defines equipment "as

being an article of nonexpendable property."

*Response:* The definition of "capital expenditure" was added to further define the term "equipment." However, if further guidance is needed in this area, governmental units should follow their own accounting practices when defining equipment.

*Comment:* It is not clear what is meant by "The total acquisition costs are not allowable as indirect costs during the period acquired."

*Response:* This section was clarified. It now says that capital expenditures which are not authorized to be charged directly to an award may be recovered through use allowances or depreciation.

*Comment:* The impact of depreciation as proposed in the Circular would shift costs to the governmental unit, not make any provision for the time value of money, increase administrative costs to track resulting depreciation schedules, and erode the partner relationship between Federal agencies and governmental units.

*Response:* The accounting treatment for depreciation as prescribed by the Circular is based on GAAP. Further, the provisions ensure that the Federal Government pays its fair share of costs, including interest on financing.

**Fund Raising and Investment Management Costs**

*Comment:* It is not clear whether costs related to raising funds from employees within an organization for charitable activities, such as the United Way, would be allowable since the Circular disallows fund raising costs.

*Response:* Generally, the prohibition on fund raising activities covered by the Circular is for those activities where the governmental unit raises funds for its own use. Incidental fund raising from an organization's own employees for charitable organizations, such as the United Way, is considered part of normal operating expenses and, therefore, allowable.

**Gains and Losses on Disposition of Depreciable Property and Other Capital Assets and Substantial Relocation of Federal Programs**

*Comment:* The provisions which would require governmental units to reimburse the Federal Government when Federal awards were relocated from facilities where the Federal Government participated in the financing is inappropriate.

*Response:* This section was amended. It now requires governmental units to obtain prior approval from the cognizant agency for substantial relocations of Federal awards from buildings for

which the Federal Government participated in the financing.

**Insurance and Indemnification**

*Comment:* It is not apparent why provisions for liabilities, which do not become payable for more than one year after a self insurance provision is made, are limited to the discounted value of the liability.

*Response:* This requirement is designed to cover only those cases where the amount of the liability is firm or reasonably certain. This provision helps to avoid excessive reserve balances for the current fiscal year. It limits current year premiums to the present value of the future (known or reasonably certain) liability. When that future liability becomes due, prior years premiums plus earnings (i.e., interest or investment income) from those premiums will be available to satisfy that debt.

*Comment:* The Circular states that self-insurance reserves must be based on sound actuarial principles using the most likely assumptions. This seems to be an attempt to limit sound actuarial principles.

*Response:* This language was not intended to restrict sound actuarial principles. The language was changed to clarify that sound actuarial assumptions should recognize actual past, as well as probable future, events when determining premiums and reserve levels.

**Interest**

*Comment:* Interest expense should be allowable not only for building modifications, as provided in the 1981 revision of Circular A–87, but also for acquisitions of equipment made prior to the issuance date of the revised Circular. The proposed provision is objectionable because it would require dual records and impose an unreasonable and unnecessary administrative burden on State and local governments.

*Response:* The provision was rewritten to allow interest expense paid or incurred on or after the revised Circular's effective date to be charged to Federal awards for existing as well as newly-acquired equipment.

Historically, OMB has not allowed interest on debt issued prior to the effective date of an interest policy revision (pre-revision debt). In 1980, OMB allowed State and local governments interest on debt issued to acquire buildings, but not on pre-revision debt (45 FR 27363). In 1982, in a revision to Circular A–21, "Cost Principles for Educational Institutions," OMB allowed interest on debt issued to acquire buildings and equipment, but

not on pre-revision debt (47 FR 33658). In 1994, in a proposed revision to Circular A–122, "Cost Principles for Non-Profit Organizations," OMB proposed to allow interest debt issued to acquire buildings and equipment, but not on pre-revision debt (59 FR 49091).

In view of the fact that pre-revision debt was incurred with full knowledge of the cost policy that was in effect at that time, OMB does not believe that grantees should expect the Federal Government to allow interest on this debt without such a decision being cost-justified from the Federal Government's perspective. OMB believes the Federal Government should only allow interest on pre-revision debt when the cost of maintaining dual records on pre-revision and post-revision assets and related debt (all or a portion of these recordkeeping costs are chargeable to the Federal programs as administrative costs) is less than the interest cost on pre-revision debt.

With respect to debt incurred to purchase buildings, OMB believes that the cost of maintaining dual records is cost-justified in view of the limited number of buildings and debt issues for which separate records would have to be maintained, and the substantial interest cost associated with long term debt used to finance buildings. Thus, as OMB has previously explained, "[a]pplying the new rules to old buildings would appear to provide a windfall recovery, and might drive up overhead costs of federally assisted programs" (47 FR 33658, also see 45 FR 27363).

Equipment acquired by State and local governments (except computers), while substantial in terms of the number of pieces, is relatively nominal in cost and has a relatively short life span. As a result, the outstanding interest on debt issued to finance this equipment is relatively nominal. Moreover, State and local governments would still bear the major share of the financing costs, even if pre-revision debt were allowable. By contrast, the cost of maintaining dual records for a large number of items and related debt would likely be substantial. Given the different balance between administrative and interest costs, OMB has decided that, in this instance, the administrative costs associated with maintaining separate records to track pre-revision and post-revision debt is not cost-justifiable from the Federal Government's perspective.

The basis for the allowance of pre-revision debt for equipment of State and local governments is consistent with the basis for OMB's treatment of such debt for educational institutions (in 1982) and OMB's proposed treatment of such

0000209

debt for non-profit organizations (in 1994). The cost of equipment acquired by educational institutions and non-profit organizations through debt financing can be significant (e.g., over $650,000 for x-ray crystallography equipment, $348,000 for a vantage flow cytometer for high speed cell analysis, and $265,000 for an electron microscope). Equipment of this type and related debt has a longer life, and in turn, significantly higher interest cost. Moreover, as with buildings, there are only a limited number of pieces of such equipment, which reduces the administrative costs of dual records. Given the amount of interest involved in the financing of these assets compared with the relatively nominal administrative burden associated with maintaining dual records, OMB believes the cost of maintaining dual records is justifiable.

*Comment:* The requirement for a governmental unit to document, as part of its decisionmaking process, that capital leasing is the most economical option does not belong in Circular A-87.

*Response:* The requirement for lease analysis as part of the governmental unit's decisionmaking process and its proper documentation is addressed in the Grants Management Common Rule under Section ____.36(b)(4). This requirement is not addressed in Circular A-87.

*Comment:* Governmental units would not recover their full costs because of provisions in the Circular which provide that a credit is due the Federal Government when Federal payments for interest, depreciation, use charges and other contributions for building use exceed the interest and principal payments made by the government (positive cash flow).

*Response:* OMB deleted the provisions in the Circular which would require credits under the conditions described above. However, governmental units will be required to negotiate the amount of allowable interest whenever cash payments (interest, use allowances, depreciation and contributions) exceed governmental unit cash payments and other governmental unit contributions. OMB will study this matter further to ensure fair and equitable policies are established for the States and the Federal Government.

**Memberships, Subscriptions, and Professional Activities**

*Comment:* Membership costs in some civic and community organizations should be allowable when the purpose is to promote services provided by the Federal award.

*Response:* The language has been revised to allow memberships in civic and community organizations as a direct cost with the prior approval of the Federal awarding agency.

**Professional Service Costs**

*Comment:* Simplify the section on professional service costs by eliminating the factors to consider in determining the allowability of professional service costs.

*Response:* Eight subsections listing the factors were deleted.

**Proposal Costs**

*Comment:* It is not clear why proposal costs should normally be treated as indirect costs and allocated to all activities. Such costs should be treated as direct costs if they can be identified with a specific award.

*Response:* OMB added a provision to allow governmental units to charge proposal costs directly to a Federal award with the prior approval of the Federal awarding agency.

**Taxes**

*Comment:* If OMB adopts the proposed revision affecting sales tax reimbursement, the revision should become effective at some later date to allow time to change State and local laws.

*Response:* OMB agrees that there should be a phase-in period. The Circular allows governmental units three years to phase-in the change.

*Comment:* If the sales tax proposal were adopted, it would become a burden to separately account for State sales taxes paid on Federal grant purchases.

*Response:* The Circular allows reasonable approximations to be used where the identification of the actual amount of unallowed taxes would require an inordinate amount of effort.

*Comment:* State sales taxes should be allowable when a governmental unit is in a position that makes exclusion administratively impossible, i.e., when employees in travel status must pay sales taxes upon receipt of goods and services.

*Response:* States should attempt a reasonable approximation.

*Comment:* Some State and local governments and Indian Tribal governments would lose substantial amounts of revenue if sales taxes were not chargeable to purchases made in connection with federally-funded programs.

*Response:* The intention of the tax provision is to address State or local

government taxes, or changes in tax policy, that disproportionately affect a federally-funded program. Under the Circular, such taxes are unallowable. (As explained in the next comment-and-response, where a Federal statute prescribes a different treatment for taxes, that statute controls.)

For example, a tax would disproportionately affect a Federal program if the tax were defined or applied so that it was imposed only in connection with that program, or only in connection with Federal programs generally. Another example would be if a sales tax were imposed on a good or service that in practice is used solely or disproportionately in connection with Federal programs. These examples are for illustration, and are not meant to be exclusive. Whether a particular tax, or change in tax policy, would disproportionately affect a Federal program will have to be determined based on a review of the tax and the Federal programs in question.

When a governmental unit pays a tax to itself, that self-assessed tax is not a true cost to the governmental unit. Especially where a self-assessed tax disproportionately affects a Federal program, it is not appropriate for the governmental unit to be able to characterize that tax as a "cost" of its participation in the Federal program. If such disproportionate, self-assessed taxes were treated as allowable, even though they disproportionately affect Federal programs, governmental units could define or apply taxes in such a way that their net impact would largely be to increase the Federal Government's contribution, rather than to raise revenues from the taxpayer. To the extent that making such taxes unallowable would result in a loss of Federal assistance awards, the Circular allows three years for governmental units to phase-out any existing taxes that disproportionately affect Federal programs. (For the larger formula grant programs, the disallowance of such taxes would not result in any loss of Federal assistance awards; the funds which are now used to pay self-assessed taxes could be used to further the objectives of the Federal assistance.)

*Comment:* The proposed revision on sales taxes is directly contrary to the legislative intent of Public Law 102-234, "Medicaid Voluntary Contributions and Provider Specific Tax Amendments of 1991." The proposal should be revised to preclude its application to broad-based health care related taxes paid by public entities.

*Response:* The Circular would not take precedence over a statute. If any statute specifically prescribes policies

0000210

**26488**    **Federal Register** / Vol. 60, No. 95 / Wednesday, May 17, 1995 / Notices

and specific requirements that differ from the Circular, the statute will govern.

*Comment:* State sales taxes collected by another level of government should be exempt from the provisions of the Circular.

*Response:* As noted above, the Circular's disallowance is directed at self-assessed taxes. Thus, if a local government receives an award directly from the Federal Government, and pays a State sales tax on purchases made in connection with that award, the tax is an allowable cost. (However, as previously noted, the Circular does not restrict the authority of Federal agencies to identify taxes where Federal participation is inappropriate.)

However, if the local government does not receive the award directly from the Federal Government, but instead receives the award indirectly by virtue of a State pass-through, then the sales tax that the local government pays the State is in reality a self-assessed tax, which would be unallowable if the tax disproportionately affects a Federal program.

*Comment:* It is not clear whether the prohibition on payment of sales taxes applies to out-of-state sales tax.

*Response:* Since they are not self-assessed, taxes assessed by other States, or political subdivisions of other States, are not unallowable under the Circular. (However, as previously noted, the Circular does not restrict the authority of Federal agencies to identify taxes where Federal participation is inappropriate.)

Travel Costs

*Comment:* Airfare costs in excess of the lowest available commercial discount fare are unallowable. With today's confusing array of super savers and fare wars, the burden involved in proving the lowest airfare would be considerable.

*Response:* The travel provisions were changed to say travel costs in excess of the customary standard (coach or equivalent) airfare are unallowable.

*State/Local-Wide Central Service Cost Allocation Plans—Attachment C*

*Comment:* Working capital reserves in many cases should not be limited to 60 days cash expenses. Time consuming collections, uneven usage levels, and unanticipated demand for services are some of the reasons for authorizing a larger reserve.

*Response:* OMB believes the 60 day reserve should provide the flexibility required by most funds to operate from one billing cycle to the next. However, the Circular was amended to provide for

a larger reserve in exceptional cases when approved by the cognizant Federal agency.

*Comment:* The Circular should not restrict governmental units from engaging an accounting firm to prepare an indirect cost proposal and then engaging the same firm to make subsequent audits.

*Response:* This provision was deleted from the Circular. This issue will be addressed as part of OMB policy changes to other OMB grants management circulars.

*Comment:* What are the criteria OMB uses for making cognizant assignments and for defining "major governments"?

*Response:* OMB is in the process of reviewing the cognizant assignments for governmental units. Only governmental units receiving substantial amounts of direct Federal assistance will be assigned a Federal cognizant agency and be required to submit plans to those cognizant agencies. Because the mix of Federal awards has changed so much since the last list was issued, OMB needs to develop a new dollar criterion for defining "major."

*Comment:* States and other prime grantees should not be required to monitor subrecipient cost allocation plans and/or negotiate sub-recipient indirect costs.

*Response:* The grants management common rule requires governmental units to monitor subawards to assure compliance with applicable Federal requirements. These requirements include compliance with the cost principles. In those cases where the subrecipient does not receive any Federal awards directly from the Federal Government, Federal agencies would not have any direct responsibility for negotiating indirect costs.

*Comment:* Attachment C, Section E states that "The documentation requirements in this section may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis." This specific sentence might allow a Federal cognizant agency to unreasonably and unilaterally expand the documentation requirements.

*Response:* Federal agencies should have the flexibility to obtain additional data, when necessary. However, OMB agrees that this type of request should be the exception rather than the rule.

*Comment:* Documentation for internal service funds seems excessive since these areas are audited. This documentation is more appropriately included in a State or local government's financial statements and work papers for the fiscal year rather than in the entity's cost allocation plan.

*Response:* OMB amended this section to require only the largest funds to submit data. If the required data are included in the governmental unit's financial statements, submission of the financial statements to the Federal cognizant agency will meet the requirements of the Circular.

*Comment:* OMB proposed to add provisions requiring the certification of cost allocation plans and of indirect cost rates (see preamble (58 FR 44218); Attachment C, Section E.4 (58 FR 44229); Attachment D, Section D.3 (58 FR 44230–31); and Attachment E, Section D.3 (58 FR 44233)). States objected to the inclusion of the phrase "under penalty of perjury" in the proposed certification. They contended that the phrase is unnecessary.

*Response:* OMB has decided to amend the Circular to add the proposed certifications, but OMB has accepted the commenters' suggestion that the phrase "under penalty of perjury" not be included in the certifications. OMB believes that, when the Federal Government is dealing with State and local governments, it is unnecessary to require that the certifying government official sign a certification stating that it is made "under penalty of perjury." State and local officials should not conclude, however, that the omission of the phrase "under penalty of perjury" means that no potential legal liability is associated with a certification's submission. In this regard, note the provision in Federal law imposing criminal penalties for "false, fictitious or fraudulent statements or representations" (18 U.S.C. 1001). The Department of Justice is responsible for enforcing this provision (and other laws regarding false statements and claims). OMB expresses no opinion concerning the potential legal liabilities that are associated with making the certifications in the revised Circular.

*Comment:* Restricting the authority to reopen Central Service Plans to the Federal cognizant agency is inequitable.

*Response:* This section was changed to state that agreements may be subject to reopening only if the agreement is subsequently found to violate a statute or the information upon which the plan was negotiated is later found to be materially incomplete or inaccurate.

*Comment:* GAAP for State and local governments do not require internal service activities to be accounted for and reported in proprietary accounts.

*Response:* The requirement for internal service activities to be accounted for in proprietary accounts was deleted.

*Comment:* Remove the requirement that a carry forward adjustment is not

0000211

permitted for a central service activity that was not included in the approved plan.

*Response:* The carry forward technique was intended to permit adjustments for differences between actual and estimated costs of services included in a cost allocation plan. It was not intended to shift the entire cost of an activity excluded from the year of the plan to a future year. There may be circumstances where a change to the plan should be considered (e.g., the service did not exist when the plan was established and was initiated during the year covered by the plan). This type of amendment should modify the plan itself and would not be handled through a carry forward adjustment.

*Comment:* Adjustments of billed services do not provide a workable solution for the larger central services of the States. The dollar limitation of $50,000 for making adjustments through allocated central services is too low.

*Response:* This section was rewritten to provide governmental units more options and flexibility in making adjustments to Federal awards.

*Public Assistance Cost Allocation Plans—Attachment D*

*Comment:* The public assistance cost allocation plans are narrative descriptions of cost allocation procedures rather than allocations of actual costs. The provisions dealing with refunds or adjustments related to unallowable costs and the certification of cost allowability do not appear appropriate.

*Response:* The certification and the provisions dealing with refunds and adjustments were deleted.

*State and Local Indirect Cost Rate Proposals—Attachment E*

*Comment:* The Circular is silent on the time period for use of predetermined rates.

*Response:* The Circular was amended to encourage the use of indirect cost rates for a period of two to four years.

*Comment:* Governmental units should notify the Federal Government of any accounting changes that might make it necessary to renegotiate the predetermined rate.

*Response:* A provision was added to the certification which requires the governmental unit to notify the Federal Government of any accounting changes that would effect the application of the predetermined rate.

## C. Procurement Issues

Several procurement issues arose during the Federal Government's internal review process. This section clarifies the procurement issues.

*Effective Date for Governmental Units With Predetermined Rates Beyond September 1, 1995*

For a governmental unit that already has established indirect cost rates beyond September 1, 1995, the effective date of the revised Circular shall be at the start of the next accounting period beginning on or after September 1, 1995, for which the governmental unit has not yet established a predetermined indirect cost rate.

*Depreciation Method(s) for CAS-Covered Contracts*

CAS-covered contracts subject to "full coverage" under CASB shall follow the standards promulgated by CASB in the computation of depreciation.

*Allowability of Interest Expenses for CAS-Covered Contracts*

For contracts subject to CAS 414 (48 CFR 9903.414, cost of money as an element of the cost of capital), and CAS 417 (48 CFR 9903.417, cost of money as an element of the cost of capital assets under construction), the imputed cost of money determined allocable in accordance with CAS 414 and 417 may be claimed as an allowable cost. When cost of money is claimed, interest shall not be an allowable direct or indirect cost under such contracts.

## D. Federal Acquisition Streamline Act

The Federal Acquisition Streamlining Act (FASA) of 1994, enacted on October 13, 1994, amended Section 306(e) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 256, Public Law 103–355, Section 2151, 108 Stat. 3309–12), to specify certain items of costs as not allowable under Federal covered contracts. OMB is undertaking a review of these FASA provisions, for the purpose of determining whether the unallowable cost provisions of Circular A–87, and of OMB's other cost principles circulars, should be amended in light of the FASA provisions on unallowable costs. If OMB ultimately concludes that amendments may be appropriate, OMB will issue a proposal

seeking public comment on the proposed revisions.

John B. Arthur,
*Associate Director for Administration.*

**Executive Office of The President**

*Office of Management and Budget*
Washington, DC 20503

May 4, 1995.

Circular No. A–87 Revised

To the Heads of Executive Departments and Establishments

From: Alice M. Rivlin, Director
Subject: Cost Principles for State, Local, and Indian Tribal Governments

1. *Purpose.* This Circular establishes principles and standards for determining costs for Federal awards carried out through grants, cost reimbursement contracts, and other agreements with State and local governments and federally-recognized Indian tribal governments (governmental units).

2. *Authority.* This Circular is issued under the authority of the Budget and Accounting Act of 1921, as amended; the Budget and Accounting Procedures Act of 1950, as amended; the Chief Financial Officers Act of 1990; Reorganization Plan No. 2 of 1970; and Executive Order No. 11541 ("Prescribing the Duties of the Office of Management and Budget and the Domestic Policy Council in the Executive Office of the President").

3. *Background.* An interagency task force was established in 1987 to review existing cost principles for Federal awards to State, local, and Indian tribal governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from governmental units, and compared for consistency the provisions of other OMB cost principles circulars covering non-profit organizations and universities. A proposed revised Circular reflecting the results of those efforts was issued on October 12, 1988, and August 19, 1993. Extensive comments on the proposed revisions, discussions with interest groups, and related developments were considered in developing this revision.

4. *Rescissions.* This Circular rescinds and supersedes Circular A–87, issued January 15, 1981.

5. *Policy.* This Circular establishes principles and standards to provide a uniform approach for determining costs and to promote effective program delivery, efficiency, and better relationships between governmental units and the Federal Government. The principles are for determining allowable costs only. They are not intended to identify the circumstances or to dictate the extent of Federal and governmental unit participation in the financing of a particular Federal award. Provision for profit or other increment above cost is outside the scope of this Circular.

6. *Definitions.* Definitions of key terms used in this Circular are contained in Attachment A, Section B.

7. *Required Action.* Agencies responsible for administering programs that involve cost reimbursement contracts, grants, and other agreements with governmental units shall

0000212

issue codified regulations to implement the provisions of this Circular and its Attachments by September 1, 1995.

8. *OMB Responsibilities.* The Office of Management and Budget (OMB) will review agency regulations and implementation of this Circular, and will provide policy interpretations and assistance to insure effective and efficient implementation. Any exceptions will be subject to approval by OMB. Exceptions will only be made in particular cases where adequate justification is presented.

9. *Information Contact.* Further information concerning this Circular may be obtained by contacting the Office of Federal Financial Management, Financial Standards and Reporting Branch, Office of Management and Budget, Washington, DC 20503, telephone 202–395–3993.

10. *Policy Review Date.* OMB Circular A–87 will have a policy review three years from the date of issuance.

11. *Effective Date.* This Circular is effective as follows:

—For costs charged indirectly or otherwise covered by the cost allocation plans described in Attachments C, D and E, this revision shall be applied to cost allocation plans and indirect cost proposals submitted or prepared for a governmental unit's fiscal year that begins on or after September 1, 1995.

—For other costs, this revision shall be applied to all awards or amendments, including continuation or renewal awards, made on or after September 1, 1995.

**OMB Circular No. A–87—Cost Principles for State, Local and Indian Tribal Governments**

**Table of Contents**

Attachment A—General Principles for Determining Allowable Costs
Attachment B—Selected Items of Cost
Attachment C—State/Local-Wide Central Service Cost Allocation Plans
Attachment D—Public Assistance Cost Allocation Plans
Attachment E—State and Local Indirect Cost Rate Proposals

**Attachment A—General Principles for Determining Allowable Costs**

**Table of Contents**

A. Purpose and Scope
  1. Objectives
  2. Policy guides
  3. Application
B. Definitions
  1. Approval or authorization of the awarding or cognizant Federal agency
  2. Award
  3. Awarding agency
  4. Central service cost allocation plan
  5. Claim
  6. Cognizant agency
  7. Common rule
  8. Contract
  9. Cost
  10. Cost allocation plan
  11. Cost objective
  12. Federally-recognized Indian tribal government
  13. Governmental unit
  14. Grantee department or agency
  15. Indirect cost rate proposal
  16. Local government
  17. Public assistance cost allocation plan
  18. State
C. Basic Guidelines
  1. Factors affecting allowability of costs
  2. Reasonable costs
  3. Allowable costs
  4. Applicable credits
D. Composition of Cost
  1. Total cost
  2. Classification of costs
E. Direct Costs
  1. General
  2. Application
  3. Minor items
F. Indirect Costs
  1. General
  2. Cost allocation plans and indirect cost proposals
  3. Limitation on indirect or administrative costs
G. Interagency Services
H. Required Certifications

**A. Purpose and Scope**

1. *Objectives.* This Attachment establishes principles for determining the allowable costs incurred by State, local, and federally-recognized Indian tribal governments (governmental units) under grants, cost reimbursement contracts, and other agreements with the Federal Government (collectively referred to in this Circular as "Federal awards"). The principles are for the purpose of cost determination and are not intended to identify the circumstances or dictate the extent of Federal or governmental unit participation in the financing of a particular program or project. The principles are designed to provide that Federal awards bear their fair share of cost recognized under these principles except where restricted or prohibited by law. Provision for profit or other increment above cost is outside the scope of this Circular.

2. *Policy guides.*

a. The application of these principles is based on the fundamental premises that:

(1) Governmental units are responsible for the efficient and effective administration of Federal awards through the application of sound management practices.

(2) Governmental units assume responsibility for administering Federal funds in a manner consistent with underlying agreements, program objectives, and the terms and conditions of the Federal award.

(3) Each governmental unit, in recognition of its own unique combination of staff, facilities, and experience, will have the primary responsibility for employing whatever form of organization and management

techniques may be necessary to assure proper and efficient administration of Federal awards.

b. Federal agencies should work with States or localities which wish to test alternative mechanisms for paying costs for administering Federal programs. The Office of Management and Budget (OMB) encourages Federal agencies to test fee-for-service alternatives as a replacement for current cost-reimbursement payment methods in response to the National Performance Review's (NPR) recommendation. The NPR recommended the fee-for-service approach to reduce the burden associated with maintaining systems for charging administrative costs to Federal programs and preparing and approving cost allocation plans. This approach should also increase incentives for administrative efficiencies and improve outcomes.

3. *Application.*

a. These principles will be applied by all Federal agencies in determining costs incurred by governmental units under Federal awards (including subawards) except those with (1) Publicly-financed educational institutions subject to OMB Circular A–21, "Cost Principles for Educational Institutions," and (2) programs administered by publicly-owned hospitals and other providers of medical care that are subject to requirements promulgated by the sponsoring Federal agencies. However, this Circular does apply to all central service and department/agency costs that are allocated or billed to those educational institutions, hospitals, and other providers of medical care or services by other State and local government departments and agencies.

b. All subawards are subject to those Federal cost principles applicable to the particular organization concerned. Thus, if a subaward is to a governmental unit (other than a college, university or hospital), this Circular shall apply; if a subaward is to a commercial organization, the cost principles applicable to commercial organizations shall apply; if a subaward is to a college or university, Circular A–21 shall apply; if a subaward is to a hospital, the cost principles used by the Federal awarding agency for awards to hospitals shall apply, subject to the provisions of subsection A.3.a. of this Attachment; if a subaward is to some other non-profit organization, Circular A–122, "Cost Principles for Non-Profit Organizations," shall apply.

c. These principles shall be used as a guide in the pricing of fixed price arrangements where costs are used in determining the appropriate price.

HeinOnline -- 60 Fed. Reg. 26490 1995

0000213

d. Where a Federal contract awarded to a governmental unit incorporates a Cost Accounting Standards (CAS) clause, the requirements of that clause shall apply. In such cases, the governmental unit and the cognizant Federal agency shall establish an appropriate advance agreement on how the governmental unit will comply with applicable CAS requirements when estimating, accumulating and reporting costs under CAS-covered contracts. The agreement shall indicate that OMB Circular A-87 requirements will be applied to other Federal awards. In all cases, only one set of records needs to be maintained by the governmental unit.

**B. Definitions**

1. "Approval or authorization of the awarding or cognizant Federal agency" means documentation evidencing consent prior to incurring a specific cost. If such costs are specifically identified in a Federal award document, approval of the document constitutes approval of the costs. If the costs are covered by a State/local-wide cost allocation plan or an indirect cost proposal, approval of the plan constitutes the approval.

2. "Award" means grants, cost reimbursement contracts and other agreements between a State, local and Indian tribal government and the Federal Government.

3. "Awarding agency" means (a) with respect to a grant, cooperative agreement, or cost reimbursement contract, the Federal agency, and (b) with respect to a subaward, the party that awarded the subaward.

4. "Central service cost allocation plan" means the documentation identifying, accumulating, and allocating or developing billing rates based on the allowable costs of services provided by a governmental unit on a centralized basis to its departments and agencies. The costs of these services may be allocated or billed to users.

5. "Claim" means a written demand or written assertion by the governmental unit or grantor seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of award terms, or other relief arising under or relating to the award. A voucher, invoice or other routine request for payment that is not a dispute when submitted is not a claim. Appeals, such as those filed by a governmental unit in response to questioned audit costs, are not considered claims until a final management decision is made by the Federal awarding agency.

6. "Cognizant agency" means the Federal agency responsible for reviewing, negotiating, and approving

cost allocation plans or indirect cost proposals developed under this Circular on behalf of all Federal agencies. OMB publishes a listing of cognizant agencies.

7. "Common Rule" means the "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments; Final Rule" originally issued at 53 FR 8034-8103 (March 11, 1988). Other common rules will be referred to by their specific titles.

8. "Contract" means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. In addition to bilateral instruments, contracts include (but are not limited to): awards and notices of awards; job orders or task orders issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and, bilateral contract modifications. Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301 et seq.

9. "Cost" means an amount as determined on a cash, accrual, or other basis acceptable to the Federal awarding or cognizant agency. It does not include transfers to a general or similar fund.

10. "Cost allocation plan" means central service cost allocation plan, public assistance cost allocation plan, and indirect cost rate proposal. Each of these terms are further defined in this section.

11. "Cost objective" means a function, organizational subdivision, contract, grant, or other activity for which cost data are needed and for which costs are incurred.

12. "Federally-recognized Indian tribal government" means the governing body or a governmental agency of any Indian tribe, band, nation, or other organized group or community (including any native village as defined in Section 3 of the Alaska Native Claims Settlement Act, 85 Stat. 688) certified by the Secretary of the Interior as eligible for the special programs and services provided through the Bureau of Indian Affairs.

13. "Governmental unit" means the entire State, local, or federally-recognized Indian tribal government, including any component thereof. Components of governmental units may function independently of the

governmental unit in accordance with the term of the award.

14. "Grantee department or agency" means the component of a State, local, or federally-recognized Indian tribal government which is responsible for the performance or administration of all or some part of a Federal award.

15. "Indirect cost rate proposal" means the documentation prepared by a governmental unit or component thereof to substantiate its request for the establishment of an indirect cost rate as described in Attachment E of this Circular.

16. "Local government" means a county, municipality, city, town, township, local public authority, school district, special district, intrastate district, council of governments (whether or not incorporated as a non-profit corporation under State law), any other regional or interstate government entity, or any agency or instrumentality of a local government.

17. "Public assistance cost allocation plan" means a narrative description of the procedures that will be used in identifying, measuring and allocating all administrative costs to all of the programs administered or supervised by State public assistance agencies as described in Attachment D of this Circular.

18. "State" means any of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any agency or instrumentality of a State exclusive of local governments.

**C. Basic Guidelines**

1. *Factors affecting allowability of costs.* To be allowable under Federal awards, costs must meet the following general criteria:

a. Be necessary and reasonable for proper and efficient performance and administration of Federal awards.

b. Be allocable to Federal awards under the provisions of this Circular.

c. Be authorized or not prohibited under State or local laws or regulations.

d. Conform to any limitations or exclusions set forth in these principles, Federal laws, terms and conditions of the Federal award, or other governing regulations as to types or amounts of cost items.

e. Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit.

f. Be accorded consistent treatment. A cost may not be assigned to a Federal award as a direct cost if any other cost incurred for the same purpose in like

26492    Federal Register / Vol. 60, No. 95 / Wednesday, May 17, 1995 / Notices

circumstances has been allocated to the Federal award as an indirect cost.

g. Except as otherwise provided for in this Circular, be determined in accordance with generally accepted accounting principles.

h. Not be included as a cost or used to meet cost sharing or matching requirements of any other Federal award in either the current or a prior period, except as specifically provided by Federal law or regulation.

i. Be the net of all applicable credits.

j. Be adequately documented.

2. *Reasonable costs.* A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The question of reasonableness is particularly important when governmental units or components are predominantly federally-funded. In determining reasonableness of a given cost, consideration shall be given to:

a. Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the governmental unit or the performance of the Federal award.

b. The restraints or requirements imposed by such factors as: sound business practices; arms length bargaining; Federal, State and other laws and regulations; and, terms and conditions of the Federal award.

c. Market prices for comparable goods or services.

d. Whether the individuals concerned acted with prudence in the circumstances considering their responsibilities to the governmental unit, its employees, the public at large, and the Federal Government.

e. Significant deviations from the established practices of the governmental unit which may unjustifiably increase the Federal award's cost.

3. *Allocable costs.*

a. A cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objective in accordance with relative benefits received.

b. All activities which benefit from the governmental unit's indirect cost, including unallowable activities and services donated to the governmental unit by third parties, will receive an appropriate allocation of indirect costs.

c. Any cost allocable to a particular Federal award or cost objective under the principles provided for in this Circular may not be charged to other Federal awards to overcome fund deficiencies, to avoid restrictions imposed by law or terms of the Federal

awards, or for other reasons. However, this prohibition would not preclude governmental units from shifting costs that are allowable under two or more awards in accordance with existing program agreements.

d. Where an accumulation of indirect costs will ultimately result in charges to a Federal award, a cost allocation plan will be required as described in Attachments C, D, and E.

4. *Applicable credits.*

a. Applicable credits refer to those receipts or reduction of expenditure-type transactions that offset or reduce expense items allocable to Federal awards as direct or indirect costs. Examples of such transactions are: purchase discounts, rebates or allowances, recoveries or indemnities on losses, insurance refunds or rebates, and adjustments of overpayments or erroneous charges. To the extent that such credits accruing to or received by the governmental unit relate to allowable costs, they shall be credited to the Federal award either as a cost reduction or cash refund, as appropriate.

b. In some instances, the amounts received from the Federal Government to finance activities or service operations of the governmental unit should be treated as applicable credits. Specifically, the concept of netting such credit items (including any amounts used to meet cost sharing or matching requirements) should be recognized in determining the rates or amounts to be charged to Federal awards. (See Attachment B, item 15, "Depreciation and use allowances," for areas of potential application in the matter of Federal financing of activities.)

D. Composition of Cost

1. *Total cost.* The total cost of Federal awards is comprised of the allowable direct cost of the program, plus its allocable portion of allowable indirect costs, less applicable credits.

2. *Classification of costs.* There is no universal rule for classifying certain costs as either direct or indirect under every accounting system. A cost may be direct with respect to some specific service or function, but indirect with respect to the Federal award or other final cost objective. Therefore, it is essential that each item of cost be treated consistently in like circumstances either as a direct or an indirect cost. Guidelines for determining direct and indirect costs charged to Federal awards are provided in the sections that follow.

E. Direct Costs

1. *General.* Direct costs are those that can be identified specifically with a particular final cost objective.

2. *Application.* Typical direct costs chargeable to Federal awards are:

a. Compensation of employees for the time devoted and identified specifically to the performance of those awards.

b. Cost of materials acquired, consumed, or expended specifically for the purpose of those awards.

c. Equipment and other approved capital expenditures.

d. Travel expenses incurred specifically to carry out the award.

3. *Minor items.* Any direct cost of a minor amount may be treated as an indirect cost for reasons of practicality where such accounting treatment for that item of cost is consistently applied to all cost objectives.

F. Indirect Costs

1. *General.* Indirect costs are those: (a) incurred for a common or joint purpose benefiting more than one cost objective, and (b) not readily assignable to the cost objectives specifically benefitted, without effort disproportionate to the results achieved. The term "indirect costs," as used herein, applies to costs of this type originating in the grantee department, as well as those incurred by other departments in supplying goods, services, and facilities. To facilitate equitable distribution of indirect expenses to the cost objectives served, it may be necessary to establish a number of pools of indirect costs within a governmental unit department or in other agencies providing services to a governmental unit department. Indirect cost pools should be distributed to benefitted cost objectives on bases that will produce an equitable result in consideration of relative benefits derived.

2. *Cost allocation plans and indirect cost proposals.* Requirements for development and submission of cost allocation plans and indirect cost rate proposals are contained in Attachments C, D, and E.

3. *Limitation on indirect or administrative costs.*

a. In addition to restrictions contained in this Circular, there may be laws that further limit the amount of administrative or indirect cost allowed.

b. Amounts not recoverable as indirect costs or administrative costs under one Federal award may not be shifted to another Federal award, unless specifically authorized by Federal legislation or regulation.

0000215

## G. Interagency Services

The cost of services provided by one agency to another within the governmental unit may include allowable direct costs of the service plus a pro rata share of indirect costs. A standard indirect cost allowance equal to ten percent of the direct salary and wage cost of providing the service (excluding overtime, shift premiums, and fringe benefits) may be used in lieu of determining the actual indirect costs of the service. These services do not include centralized services included in central service cost allocation plans as described in Attachment C.

## H. Required Certifications

Each cost allocation plan or indirect cost rate proposal required by Attachments C and E must comply with the following:

1. No proposal to establish a cost allocation plan or an indirect cost rate, whether submitted to a Federal cognizant agency or maintained on file by the governmental unit, shall be acceptable unless such costs have been certified by the governmental unit using the Certificate of Cost Allocation Plan or Certificate of Indirect Costs as set forth in Attachments C and E. The certificate must be signed on behalf of the governmental unit by an individual at a level no lower than chief financial officer of the governmental unit that submits the proposal or component covered by the proposal.

2. No cost allocation plan or indirect cost rate shall be approved by the Federal Government unless the plan or rate proposal has been certified. Where it is necessary to establish a cost allocation plan or an indirect cost rate and the governmental unit has not submitted a certified proposal for establishing such a plan or rate in accordance with the requirements, the Federal Government may either disallow all indirect costs or unilaterally establish such a plan or rate. Such a plan or rate may be based upon audited historical data or such other data that have been furnished to the cognizant Federal agency and for which it can be demonstrated that all unallowable costs have been excluded. When a cost allocation plan or indirect cost rate is unilaterally established by the Federal Government because of failure of the governmental unit to submit a certified proposal, the plan or rate established will be set to ensure that potentially unallowable costs will not be reimbursed.

## Attachment B—Selected Items of Cost

### Table of Contents

1. Accounting
2. Advertising and public relations costs
3. Advisory councils
4. Alcoholic beverages
5. Audit services
6. Automatic electronic data processing
7. Bad debts
8. Bonding costs
9. Budgeting
10. Communications
11. Compensation for personnel services
    a. General
    b. Reasonableness
    c. Unallowable costs
    d. Fringe benefits
    e. Pension plan costs
    f. Post-retirement health benefits
    g. Severance pay
    h. Support of salaries and wages
    i. Donated services
12. Contingencies
13. Contributions and donations
14. Defense and prosecution of criminal and civil proceedings, and claims
15. Depreciation and use allowances
16. Disbursing service
17. Employee morale, health, and welfare costs
18. Entertainment
19. Equipment and other capital expenditures
20. Fines and penalties
21. Fund raising and investment management costs
22. Gains and losses on disposition of depreciable property and other capital assets and substantial relocation of Federal programs
23. General government expenses
24. Idle facilities and idle capacity
25. Insurance and indemnification
26. Interest
27. Lobbying
28. Maintenance, operations, and repairs
29. Materials and supplies
30. Memberships, subscriptions, and professional activities
31. Motor pools
32. Pre-award costs
33. Professional service costs
34. Proposal costs
35. Publication and printing costs
36. Rearrangements and alterations
37. Reconversion costs
38. Rental costs
39. Taxes
40. Training
41. Travel costs
42. Underrecovery of costs under Federal agreements

Sections 1 through 42 provide principles to be applied in establishing the allowability or unallowability of certain items of cost. These principles apply whether a cost is treated as direct or indirect. A cost is allowable for Federal reimbursement only to the extent of benefits received by Federal awards and its conformance with the general policies and principles stated in Attachment A to this Circular. Failure to mention a particular item of cost in these sections is not intended to imply that it is either allowable or unallowable; rather, determination of allowability in each case should be based on the treatment or standards provided for similar or related items of cost.

1. *Accounting.* The cost of establishing and maintaining accounting and other information systems is allowable.

2. *Advertising and public relations costs.*

a. The term "advertising costs" means the costs of advertising media and corollary administrative costs. Advertising media include magazines, newspapers, radio and television programs, direct mail, exhibits, and the like.

b. The term "public relations" includes community relations and means those activities dedicated to maintaining the image of the governmental unit or maintaining or promoting understanding and favorable relations with the community or public at large or any segment of the public.

c. Advertising costs are allowable only when incurred for the recruitment of personnel, the procurement of goods and services, the disposal of surplus materials, and any other specific purposes necessary to meet the requirements of the Federal award. Advertising costs associated with the disposal of surplus materials are not allowable where all disposal costs are reimbursed based on a standard rate as specified in the grants management common rule.

d. Public relations costs are allowable when:

(1) Specifically required by the Federal award and then only as a direct cost;

(2) Incurred to communicate with the public and press pertaining to specific activities or accomplishments that result from performance of the Federal award and then only as a direct cost; or

(3) Necessary to conduct general liaison with news media and government public relations officers, to the extent that such activities are limited to communication and liaison necessary to keep the public informed on matters of public concern, such as notices of Federal contract/grant awards, financial matters, etc.

e. Unallowable advertising and public relations costs include the following:

(1) All advertising and public relations costs other than as specified in subsections c. and d.;

(2) Except as otherwise permitted by these cost principles, costs of conventions, meetings, or other events

0000216

related to other activities of the governmental unit including:

(a) Costs of displays, demonstrations, and exhibits;

(b) Costs of meeting rooms, hospitality suites, and other special facilities used in conjunction with shows and other special events; and

(c) Salaries and wages of employees engaged in setting up and displaying exhibits, making demonstrations, and providing briefings;

(3) Costs of promotional items and memorabilia, including models, gifts, and souvenirs; and

(4) Costs of advertising and public relations designed solely to promote the governmental unit.

3. *Advisory councils.* Costs incurred by advisory councils or committees are allowable as a direct cost where authorized by the Federal awarding agency or as an indirect cost where allocable to Federal awards.

4. *Alcoholic beverages.* Costs of alcoholic beverages are unallowable.

5. *Audit services.* The costs of audits are allowable provided that the audits were performed in accordance with the Single Audit Act, as implemented by Circular A–128, "Audits of State and Local Governments." Generally, the percentage of costs charged to Federal awards for a single audit shall not exceed the percentage derived by dividing Federal funds expended by total funds expended by the recipient or subrecipient (including program matching funds) during the fiscal year. The percentage may be exceeded only if appropriate documentation demonstrates higher actual costs.

Other audit costs are allowable if specifically approved by the awarding or cognizant agency as a direct cost to an award or included as an indirect cost in a cost allocation plan or rate.

6. *Automatic electronic data processing.* The cost of data processing services is allowable (but see section 19, Equipment and other capital expenditures).

7. *Bad debts.* Any losses arising from uncollectible accounts and other claims, and related costs, are unallowable unless provided for in Federal program award regulations.

8. *Bonding costs.* Costs of bonding employees and officials are allowable to the extent that such bonding is in accordance with sound business practice.

9. *Budgeting.* Costs incurred for the development, preparation, presentation, and execution of budgets are allowable.

10. *Communications.* Costs of telephone, mail, messenger, and similar communication services are allowable.

11. *Compensation for personnel services.*

a. *General.* Compensation for personnel services includes all remuneration, paid currently or accrued, for services rendered during the period of performance under Federal awards, including but not necessarily limited to wages, salaries, and fringe benefits. The costs of such compensation are allowable to the extent that they satisfy the specific requirements of this Circular, and that the total compensation for individual employees:

(1) Is reasonable for the services rendered and conforms to the established policy of the governmental unit consistently applied to both Federal and non-Federal activities;

(2) Follows an appointment made in accordance with a governmental unit's laws and rules and meets merit system or other requirements required by Federal law, where applicable; and

(3) Is determined and supported as provided in subsection h.

b. *Reasonableness.* Compensation for employees engaged in work on Federal awards will be considered reasonable to the extent that it is consistent with that paid for similar work in other activities of the governmental unit. In cases where the kinds of employees required for Federal awards are not found in the other activities of the governmental unit, compensation will be considered reasonable to the extent that it is comparable to that paid for similar work in the labor market in which the employing government competes for the kind of employees involved. Compensation surveys providing data representative of the labor market involved will be an acceptable basis for evaluating reasonableness.

c. *Unallowable costs.* Costs which are unallowable under other sections of these principles shall not be allowable under this section solely on the basis that they constitute personnel compensation.

d. *Fringe benefits.*

(1) Fringe benefits are allowances and services provided by employers to their employees as compensation in addition to regular salaries and wages. Fringe benefits include, but are not limited to, the costs of leave, employee insurance, pensions, and unemployment benefit plans. Except as provided elsewhere in these principles, the costs of fringe benefits are allowable to the extent that the benefits are reasonable and are required by law, governmental unit-employee agreement, or an established policy of the governmental unit.

(2) The cost of fringe benefits in the form of regular compensation paid to

employees during periods of authorized absences from the job, such as for annual leave, sick leave, holidays, court leave, military leave, and other similar benefits, are allowable if: (a) they are provided under established written leave policies; (b) the costs are equitably allocated to all related activities, including Federal awards; and, (c) the accounting basis (cash or accrual) selected for costing each type of leave is consistently followed by the governmental unit.

(3) When a governmental unit uses the cash basis of accounting, the cost of leave is recognized in the period that the leave is taken and paid for. Payments for unused leave when an employee retires or terminates employment are allowable in the year of payment provided they are allocated as a general administrative expense to all activities of the governmental unit or component.

(4) The accrual basis may be only used for those types of leave for which a liability as defined by Generally Accepted Accounting Principles (GAAP) exists when the leave is earned. When a governmental unit uses the accrual basis of accounting, in accordance with GAAP, allowable leave costs are the lesser of the amount accrued or funded.

(5) The cost of fringe benefits in the form of employer contributions or expenses for social security; employee life, health, unemployment, and worker's compensation insurance (except as indicated in section 25, Insurance and indemnification); pension plan costs (see subsection e.); and other similar benefits are allowable, provided such benefits are granted under established written policies. Such benefits, whether treated as indirect costs or as direct costs, shall be allocated to Federal awards and all other activities in a manner consistent with the pattern of benefits attributable to the individuals or group(s) of employees whose salaries and wages are chargeable to such Federal awards and other activities.

e. *Pension plan costs.* Pension plan costs may be computed using a pay-as-you-go method or an acceptable actuarial cost method in accordance with established written policies of the governmental unit.

(1) For pension plans financed on a pay-as-you-go method, allowable costs will be limited to those representing actual payments to retirees or their beneficiaries.

(2) Pension costs calculated using an actuarial cost-based method recognized by GAAP are allowable for a given fiscal year if they are funded for that year

0000217

within six months after the end of that year. Costs funded after the six month period (or a later period agreed to by the cognizant agency) are allowable in the year funded. The cognizant agency may agree to an extension of the six month period if an appropriate adjustment is made to compensate for the timing of the charges to the Federal Government and related Federal reimbursement and the governmental unit's contribution to the pension fund. Adjustments may be made by cash refund or other equitable procedures to compensate the Federal Government for the time value of Federal reimbursements in excess of contributions to the pension fund.

(3) Amounts funded by the governmental unit in excess of the actuarially determined amount for a fiscal year may be used as the governmental unit's contribution in future periods.

(4) When a governmental unit converts to an acceptable actuarial cost method, as defined by GAAP, and funds pension costs in accordance with this method, the unfunded liability at the time of conversion shall be allowable if amortized over a period of years in accordance with GAAP.

(5) The Federal Government shall receive an equitable share of any previously allowed pension costs (including earnings thereon) which revert or inure to the governmental unit in the form of a refund, withdrawal, or other credit.

f. Post-retirement health benefits. Post-retirement health benefits (PRHB) refers to costs of health insurance or health services not included in a pension plan covered by subsection e. for retirees and their spouses, dependents, and survivors. PRHB costs may be computed using a pay-as-you-go method or an acceptable actuarial cost method in accordance with established written polices of the governmental unit.

(1) For PRHB financed on a pay as-you-go method, allowable costs will be limited to those representing actual payments to retirees or their beneficiaries.

(2) PRHB costs calculated using an actuarial cost method recognized by GAAP are allowable if they are funded for that year within six months after the end of that year. Costs funded after the six month period (or a later period agreed to by the cognizant agency) are allowable in the year funded. The cognizant agency may agree to an extension of the six month period if an appropriate adjustment is made to compensate for the timing of the charges to the Federal Government and related Federal reimbursements and the

governmental unit's contributions to the PRHB fund. Adjustments may be made by cash refund, reduction in current year's PRHB costs, or other equitable procedures to compensate the Federal Government for the time value of Federal reimbursements in excess of contributions to the PRHB fund.

(3) Amounts funded in excess of the actuarially determined amount for a fiscal year may be used as the government's contribution in a future period.

(4) When a governmental unit converts to an acceptable actuarial cost method and funds PRHB costs in accordance with this method, the initial unfunded liability attributable to prior years shall be allowable if amortized over a period of years in accordance with GAAP, or, if no such GAAP period exists, over a period negotiated with the cognizant agency.

(5) To be allowable in the current year, the PRHB costs must be paid either to:

(a) An insurer or other benefit provider as current year costs or premiums, or

(b) An insurer or trustee to maintain a trust fund or reserve for the sole purpose of providing post-retirement benefits to retirees and other beneficiaries.

(6) The Federal Government shall receive an equitable share of any amounts of previously allowed post-retirement benefit costs (including earnings thereon) which revert or inure to the governmental unit in the form of a refund, withdrawal, or other credit.

g. Severance pay.

(1) Payments in addition to regular salaries and wages made to workers whose employment is being terminated are allowable to the extent that, in each case, they are required by (a) law, (b) employer-employee agreement, or (c) established written policy.

(2) Severance payments (but not accruals) associated with normal turnover are allowable. Such payments shall be allocated to all activities of the governmental unit as an indirect cost.

(3) Abnormal or mass severance pay will be considered on a case-by-case basis and is allowable only if approved by the cognizant Federal agency.

h. Support of salaries and wages. These standards regarding time distribution are in addition to the standards for payroll documentation.

(1) Charges to Federal awards for salaries and wages, whether treated as direct or indirect costs, will be based on payrolls documented in accordance with generally accepted practice of the governmental unit and approved by a

responsible official(s) of the governmental unit.

(2) No further documentation is required for the salaries and wages of employees who work in a single indirect cost activity.

(3) Where employees are expected to work solely on a single Federal award or cost objective, charges for their salaries and wages will be supported by periodic certifications that the employees worked solely on that program for the period covered by the certification. These certifications will be prepared at least semi-annually and will be signed by the employee or supervisory official having first hand knowledge of the work performed by the employee.

(4) Where employees work on multiple activities or cost objectives, a distribution of their salaries or wages will be supported by personnel activity reports or equivalent documentation which meets the standards in subsection (5) unless a statistical sampling system (see subsection (6)) or other substitute system has been approved by the cognizant Federal agency. Such documentary support will be required where employees work on:

(a) More than one Federal award,

(b) A Federal award and a non-Federal award,

(c) An indirect cost activity and a direct cost activity,

(d) Two or more indirect activities which are allocated using different allocation bases, or

(e) An unallowable activity and a direct or indirect cost activity.

(5) Personnel activity reports or equivalent documentation must meet the following standards:

(a) They must reflect an after-the-fact distribution of the actual activity of each employee,

(b) They must account for the total activity for which each employee is compensated,

(c) They must be prepared at least monthly and must coincide with one or more pay periods, and

(d) They must be signed by the employee.

(e) Budget estimates or other distribution percentages determined before the services are performed do not qualify as support for charges to Federal awards but may be used for interim accounting purposes, provided that:

(i) The governmental unit's system for establishing the estimates produces reasonable approximations of the activity actually performed;

(ii) At least quarterly, comparisons of actual costs to budgeted distributions based on the monthly activity reports are made. Costs charged to Federal

0000218

awards to reflect adjustments made as a result of the activity actually performed may be recorded annually if the quarterly comparisons show the differences between budgeted and actual costs are less than ten percent; and

(iii) The budget estimates or other distribution percentages are revised at least quarterly, if necessary, to reflect changed circumstances.

(6) Substitute systems for allocating salaries and wages to Federal awards may be used in place of activity reports. These systems are subject to approval if required by the cognizant agency. Such systems may include, but are not limited to, random moment sampling, case counts, or other quantifiable measures of employee effort.

(a) Substitute systems which use sampling methods (primarily for Aid to Families with Dependent Children (AFDC), Medicaid, and other public assistance programs) must meet acceptable statistical sampling standards including:

(i) The sampling universe must include all of the employees whose salaries and wages are to be allocated based on sample results except as provided in subsection (c);

(ii) The entire time period involved must be covered by the sample; and

(iii) The results must be statistically valid and applied to the period being sampled.

(b) Allocating charges for the sampled employees' supervisors, clerical and support staffs, based on the results of the sampled employees, will be acceptable.

(c) Less than full compliance with the statistical sampling standards noted in subsection (a) may be accepted by the cognizant agency if it concludes that the amounts to be allocated to Federal awards will be minimal, or if it concludes that the system proposed by the governmental unit will result in lower costs to Federal awards than a system which complies with the standards.

(7) Salaries and wages of employees used in meeting cost sharing or matching requirements of Federal awards must be supported in the same manner as those claimed as allowable costs under Federal awards.

i. Donated services.

(1) Donated or volunteer services may be furnished to a governmental unit by professional and technical personnel, consultants, and other skilled and unskilled labor. The value of these services is not reimbursable either as a direct or indirect cost. However, the value of donated services may be used to meet cost sharing or matching

requirements in accordance with the provisions of the Common Rule.

(2) The value of donated services utilized in the performance of a direct cost activity shall, when material in amount, be considered in the determination of the governmental unit's indirect costs or rate(s) and, accordingly, shall be allocated a proportionate share of applicable indirect costs.

(3) To the extent feasible, donated services will be supported by the same methods used by the governmental unit to support the allocability of regular personnel services.

12. Contingencies. Contributions to a contingency reserve or any similar provision made for events the occurrence of which cannot be foretold with certainty as to time, or intensity, or with an assurance of their happening, are unallowable. The term "contingency reserve" excludes self-insurance reserves (see subsection 25.c.), pension plan reserves (see subsection 11.a.), and post-retirement health and other benefit reserves (see subsection 11.f.) computed using acceptable actuarial cost methods.

13. Contributions and donations. Contributions and donations, including cash, property, and services, by governmental units to others, regardless of the recipient, are unallowable.

14. Defense and prosecution of criminal and civil proceedings, and claims.

a. The following costs are unallowable for contracts covered by 10 U.S.C. 2324(k), "Allowable costs under defense contracts."

(1) Costs incurred in defense of any civil or criminal fraud proceeding or similar proceeding (including filing of false certification brought by the United States where the contractor is found liable or has pleaded nolo contendere to a charge of fraud or similar proceeding (including filing of a false certification).

(2) Costs incurred by a contractor in connection with any criminal, civil or administrative proceedings commenced by the United States or a State to the extent provided in 10 U.S.C. 2324(k).

b. Legal expenses required in the administration of Federal programs are allowable. Legal expenses for prosecution of claims against the Federal Government are unallowable.

15. Depreciation and use allowances.

a. Depreciation and use allowances are means of allocating the cost of fixed assets to periods benefitting from asset use. Compensation for the use of fixed assets on hand may be made through depreciation or use allowances. A combination of the two methods may not be used in connection with a single class of fixed assets (e.g., buildings,

office equipment, computer equipment, etc.) except as provided in subsection g. Except for enterprise funds and internal service funds that are included as part of a State/local cost allocation plan, classes of assets shall be determined on the same basis used for the government-wide financial statements.

b. The computation of depreciation or use allowances shall be based on the acquisition cost of the assets involved. Where actual cost records have not been maintained, a reasonable estimate of the original acquisition cost may be used. The value of an asset donated to the governmental unit by an unrelated third party shall be its fair market value at the time of donation. Governmental or quasi-governmental organizations located within the same State shall not be considered unrelated third parties for this purpose.

c. The computation of depreciation or use allowances will exclude:

(1) The cost of land;

(2) Any portion of the cost of buildings and equipment borne by or donated by the Federal Government irrespective of where title was originally vested or where it presently resides; and

(3) Any portion of the cost of buildings and equipment contributed by or for the governmental unit, or a related donor organization, in satisfaction of a matching requirement.

d. Where the use allowance method is followed, the use allowance for buildings and improvements (including land improvements, such as paved parking areas, fences, and sidewalks) will be computed at an annual rate not exceeding two percent of acquisition costs. The use allowance for equipment will be computed at an annual rate not exceeding 6⅔ percent of acquisition cost. When the use allowance method is used for buildings, the entire building must be treated as a single asset; the building's components (e.g., plumbing system, heating and air condition, etc.) cannot be segregated from the building's shell. The two percent limitation, however, need not be applied to equipment which is merely attached or fastened to the building but not permanently fixed to it and which is used as furnishings or decorations or for specialized purposes (e.g., dentist chairs and dental treatment units, counters, laboratory benches bolted to the floor, dishwashers, modular furniture, carpeting, etc.). Such equipment will be considered as not being permanently fixed to the building if it can be removed without the destruction of, or need for costly or extensive alterations or repairs, to the building or the equipment. Equipment that meets these

0000219

criteria will be subject to the 6⅔ percent equipment use allowance limitation.

e. Where the depreciation method is followed, the period of useful service (useful life) established in each case for usable capital assets must take into consideration such factors as type of construction, nature of the equipment used, historical usage patterns, technological developments, and the renewal and replacement policies of the governmental unit followed for the individual items or classes of assets involved. In the absence of clear evidence indicating that the expected consumption of the asset will be significantly greater in the early portions than in the later portions of its useful life, the straight line method of depreciation shall be used. Depreciation methods once used shall not be changed unless approved by the Federal cognizant or awarding agency. When the depreciation method is introduced for application to an asset previously subject to a use allowance, the annual depreciation charge thereon may not exceed the amount that would have resulted had the depreciation method been in effect from the date of acquisition of the asset. The combination of use allowances and depreciation applicable to the asset shall not exceed the total acquisition cost of the asset or fair market value at time of donation.

f. When the depreciation method is used for buildings, a building's shell may be segregated from the major component of the building (e.g., plumbing system, heating, and air conditioning system, etc.) and each major component depreciated over its estimated useful life, or the entire building (i.e., the shell and all components) may be treated as a single asset and depreciated over a single useful life.

g. A reasonable use allowance may be negotiated for any assets that are considered to be fully depreciated, after taking into consideration the amount of depreciation previously charged to the government, the estimated useful life remaining at the time of negotiation, the effect of any increased maintenance charges, decreased efficiency due to age, and any other factors pertinent to the utilization of the asset for the purpose contemplated.

h. Charges for use allowances or depreciation must be supported by adequate property records. Physical inventories must be taken at least once every two years (a statistical sampling approach is acceptable) to ensure that assets exist, and are in use. Governmental units will manage equipment in accordance with State laws and procedures. When the depreciation method is followed, depreciation records indicating the amount of depreciation taken each period must also be maintained.

16. *Disbursing service.* The cost of disbursing funds by the Treasurer or other designated officer is allowable.

17. *Employee morale, health, and welfare costs.* The costs of health or first-aid clinics and/or infirmaries, recreational facilities, employee counseling services, employee information publications, and any related expenses incurred in accordance with a governmental unit's policy are allowable. Income generated from any of these activities will be offset against expenses.

18. *Entertainment.* Costs of entertainment, including amusement, diversion, and social activities and any costs directly associated with such costs (such as tickets to shows or sports events, meals, lodging, rentals, transportation, and gratuities) are unallowable.

19. Equipment and other capital expenditures.

a. As used in this section the following terms have the meanings as set forth below:

(1) "Capital expenditure" means the cost of the asset including the cost to put it in place. Capital expenditure for equipment means the net invoice price of the equipment, including the cost of any modifications, attachments, accessories, or auxiliary apparatus necessary to make it usable for the purpose for which it is acquired. Ancillary charges, such as taxes, duty, protective in transit insurance, freight, and installation may be included in, or excluded from, capital expenditure cost in accordance with the governmental unit's regular accounting practices.

(2) "Equipment" means an article of nonexpendable, tangible personal property having a useful life of more than one year and an acquisition cost which equals the lesser of (a) the capitalization level established by the governmental unit for financial statement purposes, or (b) $5000.

(3) "Other capital assets" mean buildings, land, and improvements to buildings or land that materially increase their value or useful life.

b. Capital expenditures which are not charged directly to a Federal award may be recovered through use allowances or depreciation on buildings, capital improvements, and equipment (see section 15). See also section 38 for allowability of rental costs for buildings and equipment.

c. Capital expenditures for equipment, including replacement equipment, other capital assets, and improvements which materially increase the value or useful life of equipment or other capital assets are allowable as a direct cost when approved by the awarding agency. Federal awarding agencies are authorized at their option to waive or delegate this approval requirement.

d. Items of equipment with an acquisition cost of less than $5000 are considered to be supplies and are allowable as direct costs of Federal awards without specific awarding agency approval.

e. The unamortized portion of any equipment written off as a result of a change in capitalization levels may be recovered by (1) continuing to claim the otherwise allowable use allowances or depreciation charges on the equipment or by (2) amortizing the amount to be written off over a period of years negotiated with the cognizant agency.

f. When replacing equipment purchased in whole or in part with Federal funds, the governmental unit may use the equipment to be replaced as a trade-in or sell the property and use the proceeds to offset the cost of the replacement property.

20. *Fines and penalties.* Fines, penalties, damages, and other settlements resulting from violations (or alleged violations) of, or failure of the governmental unit to comply with, Federal, State, local, or Indian tribal laws and regulations are unallowable except when incurred as a result of compliance with specific provisions of the Federal award or written instructions by the awarding agency authorizing in advance such payments.

21. *Fund raising and investment management costs.*

a. Costs of organized fund raising, including financial campaigns, solicitation of gifts and bequests, and similar expenses incurred to raise capital or obtain contributions are unallowable, regardless of the purpose for which the funds will be used.

b. Costs of investment counsel and staff and similar expenses incurred to enhance income from investments are unallowable. However, such costs associated with investments covering pension, self-insurance, or other funds which include Federal participation allowed by this Circular are allowable.

c. Fund raising and investment activities shall be allocated an appropriate share of indirect costs under the conditions described in subsection C.3.b. of Attachment A.

22. *Gains and losses on disposition of depreciable property and other capital assets and substantial relocation of Federal programs.*

0000220

a. (1) Gains and losses on the sale, retirement, or other disposition of depreciable property shall be included in the year in which they occur as credits or charges to the asset cost grouping(s) in which the property was included. The amount of the gain or loss to be included as a credit or charge to the appropriate asset cost grouping(s) shall be the difference between the amount realized on the property and the undepreciated basis of the property.

(2) Gains and losses on the disposition of depreciable property shall not be recognized as a separate credit or charge under the following conditions:

(a) The gain or loss is processed through a depreciation account and is reflected in the depreciation allowable under sections 15 and 19.

(b) The property is given in exchange as part of the purchase price of a similar item and the gain or loss is taken into account in determining the depreciation cost basis of the new item.

(c) A loss results from the failure to maintain permissible insurance, except as otherwise provided in subsection 25.d.

(d) Compensation for the use of the property was provided through use allowances in lieu of depreciation.

b. Substantial relocation of Federal awards from a facility where the Federal Government participated in the financing to another facility prior to the expiration of the useful life of the financed facility requires Federal agency approval. The extent of the relocation, the amount of the Federal participation in the financing, and the depreciation charged to date may require negotiation of space charges for Federal awards.

c. Gains or losses of any nature arising from the sale or exchange of property other than the property covered in subsection a., e.g., land or included in the fair market value used in any adjustment resulting from a relocation of Federal awards covered in subsection b. shall be excluded in computing Federal award costs.

23. *General government expenses.*

a. The general costs of government are unallowable (except as provided in section 41). These include:

(1) Salaries and expenses of the Office of the Governor of a State or the chief executive of a political subdivision or the chief executives of federally-recognized Indian tribal governments;

(2) Salaries and other expenses of State legislatures, tribal councils, or similar local governmental bodies, such as county supervisors, city councils, school boards, etc., whether incurred for purposes of legislation or executive direction;

(3) Cost of the judiciary branch of a government;

(4) Cost of prosecutorial activities unless treated as a direct cost to a specific program when authorized by program regulations (however, this does not preclude the allowability of other legal activities of the Attorney General); and

(5) Other general types of government services normally provided to the general public, such as fire and police, unless provided for as a direct cost in program regulations.

b. For federally-recognized Indian tribal governments and Councils Of Governments (COGs), the portion of salaries and expenses directly attributable to managing and operating Federal programs by the chief executive and his staff is allowable.

24. *Idle facilities and idle capacity.*

a. As used in this section the following terms have the meanings set forth below:

(1) "Facilities" means land and buildings or any portion thereof, equipment individually or collectively, or any other tangible capital asset, wherever located, and whether owned or leased by the governmental unit.

(2) "Idle facilities" means completely unused facilities that are excess to the governmental unit's current needs.

(3) "Idle capacity" means the unused capacity of partially used facilities. It is the difference between (a) that which a facility could achieve under 100 percent operating time on a one-shift basis less operating interruptions resulting from time lost for repairs, setups, unsatisfactory materials, and other normal delays and (b) the extent to which the facility was actually used to meet demands during the accounting period. A multi-shift basis should be used if it can be shown that this amount of usage would normally be expected for the type of facility involved.

(4) "Cost of idle facilities or idle capacity" means costs such as maintenance, repair, housing, rent, and other related costs, e.g., insurance, interest, and depreciation or use allowances.

b. The costs of idle facilities are unallowable except to the extent that:

(1) They are necessary to meet fluctuations in workload; or

(2) Although not necessary to meet fluctuations in workload, they were necessary when acquired and are now idle because of changes in program requirements, efforts to achieve more economical operations, reorganization, termination, or other causes which could not have been reasonably foreseen. Under the exception stated in this subsection, costs of idle facilities

are allowable for a reasonable period of time, ordinarily not to exceed one year, depending on the initiative taken to use, lease, or dispose of such facilities.

c. The costs of idle capacity are normal costs of doing business and are a factor in the normal fluctuations of usage or indirect cost rates from period to period. Such costs are allowable, provided that the capacity is reasonably anticipated to be necessary or was originally reasonable and is not subject to reduction or elimination by use on other Federal awards, subletting, renting, or sale, in accordance with sound business, economic, or security practices. Widespread idle capacity throughout an entire facility or among a group of assets having substantially the same function may be considered idle facilities.

25. *Insurance and indemnification.*

a. Costs of insurance required or approved and maintained, pursuant to the Federal award, are allowable.

b. Costs of other insurance in connection with the general conduct of activities are allowable subject to the following limitations:

(1) Types and extent and cost of coverage are in accordance with the governmental unit's policy and sound business practice.

(2) Costs of insurance or of contributions to any reserve covering the risk of loss of, or damage to, Federal Government property are unallowable except to the extent that the awarding agency has specifically required or approved such costs.

c. Actual losses which could have been covered by permissible insurance (through a self-insurance program or otherwise) are unallowable, unless expressly provided for in the Federal award or as described below. However, the Federal Government will participate in actual losses of a self insurance fund that are in excess of reserves. Costs incurred because of losses not covered under nominal deductible insurance coverage provided in keeping with sound management practice, and minor losses not covered by insurance, such as spoilage, breakage, and disappearance of small hand tools, which occur in the ordinary course of operations, are allowable.

d. Contributions to a reserve for certain self-insurance programs including workers compensation, unemployment compensation, and severance pay are allowable subject to the following provisions:

(1) The type of coverage and the extent of coverage and the rates and premiums would have been allowed had insurance (including reinsurance) been purchased to cover the risks.

0000221

However, provision for known or reasonably estimated self-insured liabilities, which do not become payable for more than one year after the provision is made, shall not exceed the discounted present value of the liability. The rate used for discounting the liability must be-determined by giving consideration to such factors as the governmental unit's settlement rate for those liabilities and its investment rate of return.

(2) Earnings or investment income on reserves must be credited to those reserves.

(3) Contributions to reserves must be based on sound actuarial principles using historical experience and reasonable assumptions. Reserve levels must be analyzed and updated at least biennially for each major risk being insured and take into account any reinsurance, coinsurance, etc. Reserve levels related to employee-related coverages will normally be limited to the value of claims (a) submitted and adjudicated but not paid, (b) submitted but not adjudicated, and (c) incurred but not submitted. Reserve levels in excess of the amounts based on the above must be identified and justified in the cost allocation plan or indirect cost rate proposal.

(4) Accounting records, actuarial studies, and cost allocations (or billings) must recognize any significant differences due to types of insured risk and losses generated by the various insured activities or agencies of the governmental unit. If individual departments or agencies of the governmental unit experience significantly different levels of claims for a particular risk, those differences are to be recognized by the use of separate allocations or other techniques resulting in an equitable allocation.

(5) Whenever funds are transferred from a self-insurance reserve to other accounts (e.g., general fund), refunds shall be made to the Federal Government for its share of funds transferred, including earned or imputed interest from the date of transfer.

e. Actual claims paid to or on behalf of employees or former employees for workers' compensation, unemployment compensation, severance pay, and similar employee benefits (e.g., subsection 11.f. for post retirement health benefits), are allowable in the year of payment provided (1) the governmental unit follows a consistent costing policy and (2) they are allocated as a general administrative expense to all activities of the governmental unit.

f. Insurance refunds shall be credited against insurance costs in the year the refund is received.

g. Indemnification includes securing the governmental unit against liabilities to third persons and other losses not compensated by insurance or otherwise. The Federal Government is obligated to indemnify the governmental unit only to the extent expressly provided for in the Federal award, except as provided in subsection d.

h. Costs of commercial insurance that protects against the costs of the contractor for correction of the contractor's own defects in materials or workmanship are unallowable.

26. *Interest.*

a. Costs incurred for interest on borrowed capital or the use of a governmental unit's own funds, however represented, are unallowable except as specifically provided in subsection b. or authorized by Federal legislation.

b. Financing costs (including interest) paid or incurred on or after the effective date of this Circular associated with the otherwise allowable costs of building acquisition, construction, or fabrication, reconstruction or remodeling completed on or after October 1, 1980 is allowable, subject to the conditions in (1)–(4). Financing costs (including interest) paid or incurred on or after the effective date of this Circular associated with otherwise allowable costs of equipment is allowable, subject to the conditions in (1)–(4).

(1) The financing is provided (from other than tax or user fee sources) by a bona fide third party external to the governmental unit;

(2) The assets are used in support of Federal awards;

(3) Earnings on debt service reserve funds or interest earned on borrowed funds pending payment of the construction or acquisition costs are used to offset the current period's cost or the capitalized interest, as appropriate. Earnings subject to being reported to the Federal Internal Revenue Service under arbitrage requirements are excludable.

(4) Governmental units will negotiate the amount of allowable interest whenever cash payments (interest, depreciation, use allowances, and contributions) exceed the governmental unit's cash payments and other contributions attributable to that portion of real property used for Federal awards.

27. *Lobbying.* The cost of certain influencing activities associated with obtaining grants, contracts, cooperative agreements, or loans is an unallowable cost. Lobbying with respect to certain grants, contracts, cooperative

agreements, and loans shall be governed by the common rule, "New Restrictions on Lobbying" published at 55 FR 6736 (February 26, 1990), including definitions, and the Office of Management and Budget "Government-wide Guidance for New Restrictions on Lobbying" and notices published at 54 FR 52306 (December 20, 1989), 55 FR 24540 (June 15, 1990), and 57 FR 1772 (January 15, 1992), respectively.

28. *Maintenance, operations, and repairs.* Unless prohibited by law, the cost of utilities, insurance, security, janitorial services, elevator service, upkeep of grounds, necessary maintenance, normal repairs and alterations, and the like are allowable to the extent that they: (1) keep property (including Federal property, unless otherwise provided for) in an efficient operating condition, (2) do not add to the permanent value of property or appreciably prolong its intended life, and (3) are not otherwise included in rental or other charges for space. Costs which add to the permanent value of property or appreciably prolong its intended life shall be treated as capital expenditures (see sections 15 and 19).

29. *Materials and supplies.* The cost of materials and supplies is allowable. Purchases should be charged at their actual prices after deducting all cash discounts, trade discounts, rebates, and allowances received. Withdrawals from general stores or stockrooms should be charged at cost under any recognized method of pricing, consistently applied. Incoming transportation charges are a proper part of materials and supply costs.

30. *Memberships, subscriptions, and professional activities.*

a. Costs of the governmental unit's memberships in business, technical, and professional organizations are allowable.

b. Costs of the governmental unit's subscriptions to business, professional, and technical periodicals are allowable.

c. Costs of meetings and conferences where the primary purpose is the dissemination of technical information, including meals, transportation, rental of meeting facilities, and other incidental costs are allowable.

d. Costs of membership in civic and community, social organizations are allowable as a direct cost with the approval of the Federal awarding agency.

e. Costs of membership in organizations substantially engaged in lobbying are unallowable.

31. *Motor pools.* The costs of a service organization which provides automobiles to user governmental units at a mileage or fixed rate and/or

0000222

provides vehicle maintenance, inspection, and repair services are allowable.

32. *Pre-award costs.* Pre-award costs are those incurred prior to the effective date of the award directly pursuant to the negotiation and in anticipation of the award where such costs are necessary to comply with the proposed delivery schedule or period of performance. Such costs are allowable only to the extent that they would have been allowable if incurred after the date of the award and only with the written approval of the awarding agency.

33. *Professional service costs.*
a. Cost of professional and consultant services rendered by persons or organizations that are members of a particular profession or possess a special skill, whether or not officers or employees of the governmental unit, are allowable, subject to section 14 when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Federal Government.

b. Retainer fees supported by evidence of bona fide services available or rendered are allowable.

34. *Proposal costs.* Costs of preparing proposals for potential Federal awards are allowable. Proposal costs should normally be treated as indirect costs and should be allocated to all activities of the governmental unit utilizing the cost allocation plan and indirect cost rate proposal. However, proposal costs may be charged directly to Federal awards with the prior approval of the Federal awarding agency.

35. *Publication and printing costs.* Publication costs, including the costs of printing (including the processes of composition, plate-making, press work, and binding, and the end products produced by these processes), distribution, promotion, mailing, and general handling are allowable.

36. *Rearrangements and alterations.* Costs incurred for ordinary and normal rearrangement and alteration of facilities are allowable. Special arrangements and alterations costs incurred specifically for a Federal award are allowable with the prior approval of the Federal awarding agency.

37. *Reconversion costs.* Costs incurred in the restoration or rehabilitation of the governmental unit's facilities to approximately the same condition existing immediately prior to commencement of Federal awards, less costs related to normal wear and tear, are allowable.

38. *Rental costs.*
a. Subject to the limitations described in subsections b. through d. of this section, rental costs are allowable to the extent that the rates are reasonable in light of such factors as: rental costs of comparable property, if any; market conditions in the area; alternatives available; and, the type, life expectancy, condition, and value of the property leased.

b. Rental costs under sale and leaseback arrangements are allowable only up to the amount that would be allowed had the governmental unit continued to own the property.

c. Rental costs under less-than-arms-length leases are allowable only up to the amount that would be allowed had title to the property vested in the governmental unit. For this purpose, less-than-arms-length leases include, but are not limited to, those where:

(1) One party to the lease is able to control or substantially influence the actions of the other;

(2) Both parties are parts of the same governmental unit; or

(3) The governmental unit creates an authority or similar entity to acquire and lease the facilities to the governmental unit and other parties.

d. Rental costs under leases which are required to be treated as capital leases under GAAP are allowable only up to the amount that would be allowed had the governmental unit purchased the property on the date the lease agreement was executed. This amount would include expenses such as depreciation or use allowance, maintenance, and insurance. The provisions of Financial Accounting Standards Board Statement 13 shall be used to determine whether a lease is a capital lease. Interest costs related to capital leases are allowable to the extent they meet the criteria in section 26.

39. *Taxes.*
a. Taxes that a governmental unit is legally required to pay are allowable, except for self-assessed taxes that disproportionately affect Federal programs or changes in tax policies that disproportionately affect Federal programs. This provision becomes effective for taxes paid during the governmental unit's first fiscal year that begins on or after January 1, 1998, and applies thereafter.

b. Gasoline taxes, motor vehicle fees, and other taxes that are in effect user fees for benefits provided to the Federal Government are allowable.

c. This provision does not restrict the authority of Federal agencies to identify taxes where Federal participation is inappropriate. Where the identification of the amount of unallowable taxes would require an inordinate amount of effort, the cognizant agency may accept a reasonable approximation thereof.

40. *Training.* The cost of training provided for employee development is allowable.

41. *Travel costs.*
a. *General.* Travel costs are allowable for expenses for transportation, lodging, subsistence, and related items incurred by employees traveling on official business. Such costs may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip, and results in charges consistent with those normally allowed in like circumstances in non-federally-sponsored activities. Notwithstanding the provisions of section 23, travel costs of officials covered by that section, when specifically related to Federal awards, are allowable with the prior approval of a grantor agency.

b. *Lodging and subsistence.* Costs incurred by employees and officers for travel, including costs of lodging, other subsistence, and incidental expenses, shall be considered reasonable and allowable only to the extent such costs do not exceed charges normally allowed by the governmental unit in its regular operations as a result of the governmental unit's policy. In the absence of a written governmental unit policy regarding travel costs, the rates and amounts established under subchapter I of Chapter 57 of Title 5, United States Code "Travel and Subsistence Expenses; Mileage Allowances," or by the Administrator of General Services, or the President (or his designee) pursuant to any provisions of such subchapter shall be used as guidance for travel under Federal awards (41 U.S.C. 420, "Travel Expenses of Government Contractors").

c. *Commercial air travel.* Airfare costs in excess of the customary standard (coach or equivalent) airfare, are unallowable except when such accommodations would: require circuitous routing, require travel during unreasonable hours, excessively prolong travel, greatly increase the duration of the flight, result in increased cost that would offset transportation savings, or offer accommodations not reasonably adequate for the medical needs of the traveler. Where a governmental unit can reasonably demonstrate to the awarding agency either the nonavailability of customary standard airfare or Federal Government contract airfare for individual trips or, on an overall basis, that it is the governmental unit's practice to make routine use of such airfare, specific determinations of nonavailability will generally not be questioned by the Federal Government,

unless a pattern of avoidance is detected. However, in order for airfare costs in excess of the customary standard commercial airfare to be allowable, e.g., use of first-class airfare, the governmental unit must justify and document on a case-by-case basis the applicable condition(s) set forth above.

d. *Air travel by other than commercial carrier.* Cost of travel by governmental unit-owned, -leased, or -chartered aircraft, as used in this section, includes the cost of lease, charter, operation (including personnel costs), maintenance, depreciation, interest, insurance, and other related costs. Costs of travel via governmental unit-owned, -leased, or -chartered aircraft are unallowable to the extent they exceed the cost of allowable commercial air travel, as provided for in subsection c.

42. *Underrecovery of costs under Federal agreements.* Any excess costs over the Federal contribution under one award agreement are unallowable under other award agreements.

**Table of Contents**

A. General
B. Definitions
  1. Billed central services
  2. Allocated central services
  3. Agency or operating agency
C. Scope of the Central Service Cost Allocation Plans
D. Submission Requirements
E. Documentation Requirements for Submitted Plans
  1. General
  2. Allocated central services
  3. Billed services
    a. General
    b. Internal service funds
    c. Self-insurance funds
    d. Fringe benefits
  44. Required certification
F. Negotiation and Approval of Central Service Plans
G. Other Policies
  1. Billed central service activities
  2. Working capital reserves
  3. Carry-forward adjustments of allocated central service costs
  4. Adjustments of billed central services
  5. Records retention
  6. Appeals
  7. OMB assistance

**A. General**

1. Most governmental units provide certain services, such as motor pools, computer centers, purchasing, accounting, etc., to operating agencies on a centralized basis. Since federally-supported awards are performed within the individual operating agencies, there needs to be a process whereby these central service costs can be identified and assigned to benefitted activities on a reasonable and consistent basis. The central service cost allocation plan provides that process. All costs and other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the propriety of the costs assigned to Federal awards.

2. Guidelines and illustrations of central service cost allocation plans are provided in a brochure published by the Department of Health and Human Services entitled "A Guide for State and Local Government Agencies: Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Grants and Contracts with the Federal Government." A copy of this brochure may be obtained from the Superintendent of Documents, U.S. Government Printing Office.

**B. Definitions**

1. "Billed central services" means central services that are billed to benefitted agencies and/or programs on an individual fee-for-service or similar basis. Typical examples of billed central services include computer services, transportation services, insurance, and fringe benefits.

2. "Allocated central services" means central services that benefit operating agencies but are not billed to the agencies on a fee-for-service or similar basis. These costs are allocated to benefitted agencies on some reasonable basis. Examples of such services might include general accounting, personnel administration, purchasing, etc.

3. "Agency or operating agency" means an organizational unit or sub-division within a governmental unit that is responsible for the performance or administration of awards or activities of the governmental unit.

**C. Scope of the Central Service Cost Allocation Plans**

The central service cost allocation plan will include all central service costs that will be claimed (either as a billed or an allocated cost) under Federal awards and will be documented as described in section E. Costs of central services omitted from the plan will not be reimbursed.

**D. Submission Requirements**

1. Each State will submit a plan to the Department of Health and Human Services for each year in which it claims central service costs under Federal awards. The plan should include (a) a projection of the next year's allocated central service cost (based either on actual costs for the most recently completed year or the budget projection for the coming year), and (b) a reconciliation of actual allocated central service costs to the estimated costs used for either the most recently completed year or the year immediately preceding the most recently completed year.

2. Each local government that has been designated as a "major local government" by the Office of Management and Budget (OMB) is also required to submit a plan to its cognizant agency annually. OMB periodically lists major local governments in the Federal Register.

3. All other local governments claiming central service costs must develop a plan in accordance with the requirements described in this Circular and maintain the plan and related supporting documentation for audit. These local governments are not required to submit their plans for Federal approval unless they are specifically requested to do so by the cognizant agency. Where a local government only receives funds as a sub-recipient, the primary recipient will be responsible for negotiating indirect cost rates and/or monitoring the sub-recipient's plan.

4. All central service cost allocation plans will be prepared and, when required, submitted within six months prior to the beginning of each of the governmental unit's fiscal years in which it proposes to claim central service costs. Extensions may be granted by the cognizant agency on a case-by-case basis.

**E. Documentation Requirements for Submitted Plans**

The documentation requirements described in this section may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis. For example, the requirements may be reduced for those central services which have little or no impact on Federal awards. Conversely, if a review of a plan indicates that certain additional information is needed, and will likely be needed in future years, it may be routinely requested in future plan submissions. Items marked with an asterisk (*) should be submitted only once; subsequent plans should merely indicate any changes since the last plan.

1. *General.* All proposed plans must be accompanied by the following: an organization chart sufficiently detailed to show operations including the central service activities of the State/local government whether or not they are shown as benefiting from central service functions; a copy of the Comprehensive Annual Financial Report (or a copy of the Executive Budget if budgeted costs are being proposed) to support the allowable costs of each central service activity included in the plan; and, a

certification (see subsection 4.) that the plan was prepared in accordance with this Circular, contains only allowable costs, and was prepared in a manner that treated similar costs consistently among the various Federal awards and between Federal and non-Federal awards/activities.

2. *Allocated central services.* For each allocated central service, the plan must also include the following: a brief description of the service*, an identification of the unit rendering the service and the operating agencies receiving the service, the items of expense included in the cost of the service, the method used to distribute the cost of the service to benefitted agencies, and a summary schedule showing the allocation of each service to the specific benefitted agencies. If any self-insurance funds or fringe benefits costs are treated as allocated (rather than billed) central services, documentation discussed in subsections 3.b. and c. shall also be included.

3. *Billed services.*

a. *General.* The information described below shall be provided for all billed central services, including internal service funds, self-insurance funds, and fringe benefit funds.

b. *Internal service funds.*

(1) For each internal service fund or similar activity with an operating budget of $5 million or more, the plan shall include: a brief description of each service; a balance sheet for each fund based on individual accounts contained in the governmental unit's accounting system; a revenue/expenses statement, with revenues broken out by source, e.g., regular billings, interest earned, etc.; a listing of all non-operating transfers (as defined by Generally Accepted Accounting Principles (GAAP)) into and out of the fund; a description of the procedures (methodology) used to charge the costs of each service to users, including how billing rates are determined; and, a schedule comparing total revenues (including imputed revenues) generated by the service to the allowable costs of the service, as determined under this Circular, with an explanation of how variances will be handled.

(2) Revenues shall consist of all revenues generated by the service, including unbilled and uncollected revenues. If some users were not billed for the services (or were not billed at the full rate for that class of users), a schedule showing the full imputed revenues associated with these users shall be provided. Expenses shall be broken out by object cost categories (e.g., salaries, supplies, etc.).

c. *Self-insurance funds.* For each self-insurance fund, the plan shall include: the fund balance sheet; a statement of revenue and expenses including a summary of billings and claims paid by agency; a listing of all non-operating transfers into and out of the fund; the type(s) of risk(s) covered by the fund (e.g., automobile liability, workers' compensation, etc.); an explanation of how the level of fund contributions are determined, including a copy of the current actuarial report (with the actuarial assumptions used) if the contributions are determined on an actuarial basis; and, a description of the procedures used to charge or allocate fund contributions to benefitted activities. Reserve levels in excess of claims (1) submitted and adjudicated but not paid, (2) submitted but not adjudicated, and (3) incurred but not submitted must be identified and explained.

d. *Fringe benefits.* For fringe benefit costs, the plan shall include: a listing of fringe benefits provided to covered employees, and the overall annual cost of each type of benefit; current fringe benefit policies*; and procedures used to charge or allocate the costs of the benefits to benefitted activities. In addition, for pension and post-retirement health insurance plans, the following information shall be provided: the governmental unit's funding policies, e.g., legislative bills, trust agreements, or State-mandated contribution rules, if different from actuarially determined rates; the pension plan's costs accrued for the year; the amount funded, and date(s) of funding; a copy of the current actuarial report (including the actuarial assumptions); the plan trustee's report; and, a schedule from the activity showing the value of the interest cost associated with late funding.

4. *Required certification.* Each central service cost allocation plan will be accompanied by a certification in the following form:

**Certificate of Cost Allocation Plan**

This is to certify that I have reviewed the cost allocation plan submitted herewith and to the best of my knowledge and belief:

(1) All costs included in this proposal [identify date] to establish cost allocations or billings for [identify period covered by plan] are allowable in accordance with the requirements of OMB Circular A-87, "Cost Principles for State and Local Governments," and the Federal award(s) to which they apply. Unallowable costs have been adjusted for in allocating costs as indicated in the cost allocation plan.

(2) All costs included in this proposal are properly allocable to Federal awards on the basis of a beneficial or causal relationship between the expenses incurred and the

awards to which they are allocated in accordance with applicable requirements. Further, the same costs that have been treated as indirect costs have not been claimed as direct costs. Similar types of costs have been accounted for consistently.

I declare that the foregoing is true and correct.

Governmental Unit _____

Signature _____

Name of Official _____

Title _____

Date of Execution _____

**F. Negotiation and Approval of Central Service Plans**

1. All proposed central service cost allocation plans that are required to be submitted will be reviewed, negotiated, and approved by the Federal cognizant agency on a timely basis. The cognizant agency will review the proposal within six months of receipt of the proposal and either negotiate/approve the proposal or advise the governmental unit of the additional documentation needed to support/evaluate the proposed plan or the changes required to make the proposal acceptable. Once an agreement with the governmental unit has been reached, the agreement will be accepted and used by all Federal agencies, unless prohibited or limited by statute. Where a Federal funding agency has reason to believe that special operating factors affecting its awards necessitate special consideration, the funding agency will, prior to the time the plans are negotiated, notify the cognizant agency.

2. The results of each negotiation shall be formalized in a written agreement between the cognizant agency and the governmental unit. This agreement will be subject to re-opening if the agreement is subsequently found to violate a statute or the information upon which the plan was negotiated is later found to be materially incomplete or inaccurate. The results of the negotiation shall be made available to all Federal agencies for their use.

3. Negotiated cost allocation plans based on a proposal later found to have included costs that: (a) are unallowable (i) as specified by law or regulation, (ii) as identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal awards, or (b) are unallowable because they are clearly not allocable to Federal awards, shall be adjusted, or a refund shall be made at the option of the Federal cognizant agency. These adjustments or refunds are designed to correct the plans and do not constitute a reopening of the negotiation.

0000225

## G. Other Policies

1. *Billed central service activities.* Each billed central service activity must separately account for all revenues (including imputed revenues) generated by the service, expenses incurred to furnish the service, and profit/loss.

2. *Working capital reserves.* Internal service fund are dependent upon a reasonable level of working capital reserve to operate from one billing cycle to the next. Charges by an internal service activity to provide for the establishment and maintenance of a reasonable level of working capital reserve, in addition to the full recovery of costs, are allowable. A working capital reserve as part of retained earnings of up to 60 days cash expenses for normal operating purposes is considered reasonable. A working capital reserve exceeding 60 days may be approved by the cognizant Federal agency in exceptional cases.

3. *Carry-forward adjustments of allocated central service costs.* Allocated central service costs are usually negotiated and approved for a future fiscal year on a "fixed with carry-forward" basis. Under this procedure, the fixed amounts for the future year covered by agreement are not subject to adjustment for that year. However, when the actual costs of the year involved become known, the differences between the fixed amounts previously approved and the actual costs will be carried forward and used as an adjustment to the fixed amounts established for a later year. This "carry-forward" procedure applies to all central services whose costs were fixed in the approved plan. However, a carry-forward adjustment is not permitted, for a central service activity that was not included in the approved plan, or for unallowable costs that must be reimbursed immediately.

4. *Adjustments of billed central services.* Billing rates used to charge Federal awards shall be based on the estimated costs of providing the services, including an estimate of the allocable central service costs. A comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable costs of the service will be made at least annually, and an adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following adjustment methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c)

adjustments to future billing rates, or (d) adjustments to allocated central service costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and non-Federal share exceeds $500,000.

5. *Records retention.* All central service cost allocation plans and related documentation used as a basis for claiming costs under Federal awards must be retained for audit in accordance with the records retention requirements contained in the Common Rule.

6. *Appeals.* If a dispute arises in the negotiation of a plan between the cognizant agency and the governmental unit, the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency.

7. *OMB assistance.* To the extent that problems are encountered among the Federal agencies and/or governmental units in connection with the negotiation and approval process, OMB will lend assistance, as required, to resolve such problems in a timely manner.

## Attachment D—Public Assistance Cost Allocation Plans

Table of Contents

A. General
B. Definitions
  1. State public assistance agency
  2. State public assistance agency costs
C. Policy
D. Submission, Documentation, and Approval of Public Assistance Cost Allocation Plans
E. Review of Implementation of Approved Plans
F. Unallowable Costs

## A. General

Federally-financed programs administered by State public assistance agencies are funded predominately by the Department of Health and Human Services (HHS). In support of its stewardship requirements, HHS has published requirements for the development, documentation, submission, negotiation, and approval of public assistance cost allocation plans in Subpart E of 45 CFR Part 95. All administrative costs (direct and indirect) are normally charged to Federal awards by implementing the public assistance cost allocation plan. This Attachment extends these requirements to all Federal agencies whose programs are administered by a State public assistance agency. Major federally-financed programs typically administered by State public assistance agencies include: Aid to Families with Dependent Children, Medicaid, Food Stamps, Child Support Enforcement, Adoption Assistance and Foster Care, and Social Services Block Grant.

## B. Definitions

1. "State public assistance agency" means a State agency administering or supervising the administration of one or more public assistance programs operated by the State as identified in Subpart E of 45 CFR Part 95. For the purpose of this Attachment, these programs include all programs administered by the State public assistance agency.

2. "State public assistance agency costs" means all costs incurred by, or allocable to, the State public assistance agency, except expenditures for financial assistance, medical vendor payments, food stamps, and payments for services and goods provided directly to program recipients.

## C. Policy

State public assistance agencies will develop, document and implement, and the Federal Government will review, negotiate, and approve, public assistance cost allocation plans in accordance with Subpart E of 45 CFR Part 95. The plan will include all programs administered by the State public assistance agency. Where a letter of approval or disapproval is transmitted to a State public assistance agency in accordance with Subpart E, the letter will apply to all Federal agencies and programs. The remaining sections of this Attachment (except for the requirement for certification) summarize the provisions of Subpart E of 45 CFR Part 95.

## D. Submission, Documentation, and Approval of Public Assistance Cost Allocation Plans

1. State public assistance agencies are required to promptly submit amendments to the cost allocation plan to HHS for review and approval.

2. Under the coordination process outlined in subsection E, affected Federal agencies will review all new plans and plan amendments and provide comments, as appropriate, to HHS. The effective date of the plan or plan amendment will be the first day of the quarter following the submission of the plan or amendment, unless another date is specifically approved by HHS. HHS, as the cognizant agency acting on behalf of all affected Federal agencies, will, as necessary, conduct negotiations with the State public assistance agency and will inform the State agency of the action taken on the plan or plan amendment.

## E. Review of Implementation of Approved Plans

1. Since public assistance cost allocation plans are of a narrative

0000226

nature, the review during the plan approval process consists of evaluating the appropriateness of the proposed groupings of costs (cost centers) and the related allocation bases. As such, the Federal Government needs some assurance that the cost allocation plan has been implemented as approved. This is accomplished by reviews by the funding agencies, single audits, or audits conducted by the cognizant audit agency.

2. Where inappropriate charges affecting more than one funding agency are identified, the cognizant HHS cost negotiation office will be advised and will take the lead in resolving the issue(s) as provided for in Subpart E of 45 CFR Part 95.

3. If a dispute arises in the negotiation of a plan or from a disallowance involving two or more funding agencies, the dispute shall be resolved in accordance with the appeals procedures set out in 45 CFR Part 75. Disputes involving only one funding agency will be resolved in accordance with the funding agency's appeal process.

4. To the extent that problems are encountered among the Federal agencies and/or governmental units in connection with the negotiation and approval process, the Office of Management and Budget will lend assistance, as required, to resolve such problems in a timely manner.

## F. Unallowable Costs

Claims developed under approved cost allocation plans will be based on allowable costs as identified in this Circular. Where unallowable costs have been claimed and reimbursed, they will be refunded to the program that reimbursed the unallowable cost using one of the following methods: (a) a cash refund, (b) offset to a subsequent claim, or (c) credits to the amounts charged to individual awards.

## Attachment E—State and Local Indirect Cost Rate Proposals

### Table of Contents

A. General
B. Definitions
  1. Indirect cost rate proposal
  2. Indirect cost rate
  3. Indirect cost pool
  4. Base
  5. Predetermined rate
  6. Fixed rate
  7. Provisional rate
  8. Final rate
  9. Base period
C. Allocation of Indirect Costs and
    Determination of Indirect Cost Rates
  1. General
  2. Simplified method
  3. Multiple allocation base method
  4. Special indirect cost rates
D. Submission and Documentation of
    Proposals
  1. Submission of indirect cost rate
    proposals
  2. Documentation of proposals
  3. Required certification
E. Negotiation and Approval of Rates
F. Other Policies
  1. Fringe benefit rates
  2. Billed services provided by the grantee
    agency
  3. Indirect cost allocations not using rates
  4. Appeals
  5. Collections of unallowable costs and
    erroneous payments
  6. OMB assistance

### A. General

1. Indirect costs are those that have been incurred for common or joint purposes. These costs benefit more than one cost objective and cannot be readily identified with a particular final cost objective without effort disproportionate to the results achieved. After direct costs have been determined and assigned directly to Federal awards and other activities as appropriate, indirect costs are those remaining to be allocated to benefitted cost objectives. A cost may not be allocated to a Federal award as an indirect cost if any other cost incurred for the same purpose, in like circumstances, has been assigned to a Federal award as a direct cost.

2. Indirect costs include (a) the indirect costs originating in each department or agency of the governmental unit carrying out Federal awards and (b) the costs of central governmental services distributed through the central service cost allocation plan (as described in Attachment C) and not otherwise treated as direct costs.

3. Indirect costs are normally charged to Federal awards by the use of an indirect cost rate. A separate indirect cost rate(s) is usually necessary for each department or agency of the governmental unit claiming indirect costs under Federal awards. Guidelines and illustrations of indirect cost proposals are provided in a brochure published by the Department of Health and Human Services entitled "A Guide for State and Local Government Agencies: Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Grants and Contracts with the Federal Government." A copy of this brochure may be obtained from the Superintendent of Documents, U.S. Government Printing Office.

4. Because of the diverse characteristics and accounting practices of governmental units, the types of costs which may be classified as indirect costs cannot be specified in all situations. However, typical examples of indirect costs may include certain State/local-wide central service costs, general administration of the grantee department or agency, accounting and personnel services performed within the grantee department or agency, depreciation or use allowances on buildings and equipment, the costs of operating and maintaining facilities, etc.

5. This Attachment does not apply to State public assistance agencies. These agencies should refer instead to Attachment D.

### B. Definitions

1. "Indirect cost rate proposal" means the documentation prepared by a governmental unit or subdivision thereof to substantiate its request for the establishment of an indirect cost rate.

2. "Indirect cost rate" is a device for determining in a reasonable manner the proportion of indirect costs each program should bear. It is the ratio (expressed as a percentage) of the indirect costs to a direct cost base.

3. "Indirect cost pool" is the accumulated costs that jointly benefit two or more programs or other cost objectives.

4. "Base" means the accumulated direct costs (normally either total direct salaries and wages or total direct costs exclusive of any extraordinary or distorting expenditures) used to distribute indirect costs to individual Federal awards. The direct cost base selected should result in each award bearing a fair share of the indirect costs in reasonable relation to the benefits received from the costs.

5. "Predetermined rate" means an indirect cost rate, applicable to a specified current or future period, usually the governmental unit's fiscal year. This rate is based on an estimate of the costs to be incurred during the period. Except under very unusual circumstances, a predetermined rate is not subject to adjustment. (Because of legal constraints, predetermined rates are not permitted for Federal contracts; they may, however, be used for grants or cooperative agreements.) Predetermined rates may not be used by governmental units that have not submitted and negotiated the rate with the cognizant agency. In view of the potential advantages offered by this procedure, negotiation of predetermined rates for indirect costs for a period of two to four years should be the norm in those situations where the cost experience and other pertinent facts available are deemed sufficient to enable the parties involved to reach an informed judgment as to the probable

0000227

level of indirect costs during the ensuing accounting periods.

6. "Fixed rate" means an indirect cost rate which has the same characteristics as a predetermined rate, except that the difference between the estimated costs and the actual, allowable costs of the period covered by the rate is carried forward as an adjustment to the rate computation of a subsequent period.

7. "Provisional rate" means a temporary indirect cost rate applicable to a specified Federal which is used for funding, interim reimbursement, and reporting indirect costs on Federal awards pending the establishment of a "final" rate for that period.

8. "Final rate" means an indirect cost rate applicable to a specified past period which is based on the actual allowable costs of the period. A final audited rate is not subject to adjustment.

9. "Base period" for the allocation of indirect costs is the period in which such costs are incurred and accumulated for allocation to activities performed in that period. The base period normally should coincide with the governmental unit's fiscal year, but in any event, shall be so selected as to avoid inequities in the allocation of costs.

## C. Allocation of Indirect Costs and Determination of Indirect Cost Rates

1. *General.*

a. Where a governmental unit's department or agency has only one major function, or where all its major functions benefit from the indirect costs to approximately the same degree, the allocation of indirect costs and the computation of an indirect cost rate may be accomplished through simplified allocation procedures as described in subsection 2.

b. Where a governmental unit's department or agency has several major functions which benefit from its indirect costs in varying degrees, the allocation of indirect costs may require the accumulation of such costs into separate cost groupings which then are allocated individually to benefitted functions by means of a base which best measures the relative degree of benefit. The indirect costs allocated to each function are then distributed to individual awards and other activities included in that function by means of an indirect cost rate(s).

c. Specific methods for allocating indirect costs and computing indirect cost rates along with the conditions under which each method should be used are described in subsections 2, 3 and 4.

2. *Simplified method.*

a. Where a grantee agency's major functions benefit from its indirect costs to approximately the same degree, the allocation of indirect costs may be accomplished by (1) classifying the grantee agency's total costs for the base period as either direct or indirect, and (2) dividing the total allowable indirect costs (net of applicable credits) by an equitable distribution base. The result of this process is an indirect cost rate which is used to distribute indirect costs to individual Federal awards. The rate should be expressed as the percentage which the total amount of allowable indirect costs bears to the base selected. This method should also be used where a governmental unit's department or agency has only one major function encompassing a number of individual projects or activities, and may be used where the level of Federal awards to that department or agency is relatively small.

b. Both the direct costs and the indirect costs shall exclude capital expenditures and unallowable costs. However, unallowable costs must be included in the direct costs if they represent activities to which indirect costs are properly allocable.

c. The distribution base may be (1) total direct costs (excluding capital expenditures and other distorting items, such as pass-through funds, major subcontracts, etc.), (2) direct salaries and wages, or (3) another base which results in an equitable distribution.

3. *Multiple allocation base method.*

a. Where a grantee agency's indirect costs benefit its major functions in varying degrees, such costs shall be accumulated into separate cost groupings. Each grouping shall then be allocated individually to benefitted functions by means of a base which best measures the relative benefits.

b. The cost groupings should be established so as to permit the allocation of each grouping on the basis of benefits provided to the major functions. Each grouping should constitute a pool of expenses that are of like character in terms of the functions they benefit and in terms of the allocation base which best measures the relative benefits provided to each function. The number of separate groupings should be held within practical limits, taking into consideration the materiality of the amounts involved and the degree of precision needed.

c. Actual conditions must be taken into account in selecting the base to be used in allocating the expenses in each grouping to benefitted functions. When an allocation can be made by assignment of a cost grouping directly to the function benefitted, the allocation shall be made in that manner. When the expenses in a grouping are more general in nature, the allocation should be made through the use of a selected base which produces results that are equitable to both the Federal Government and the governmental unit. In general, any cost element or related factor associated with the governmental unit's activities is potentially adaptable for use as an allocation base provided that: (1) it can readily be expressed in terms of dollars or other quantitative measures (total direct costs, direct salaries and wages, staff hours applied, square feet used, hours of usage, number of documents processed, population served, and the like), and (2) it is common to the benefitted functions during the base period.

d. Except where a special indirect cost rate(s) is required in accordance with subsection 4, the separate groupings of indirect costs allocated to each major function shall be aggregated and treated as a common pool for that function. The costs in the common pool shall then be distributed to individual Federal awards included in that function by use of a single indirect cost rate.

e. The distribution base used in computing the indirect cost rate for each function may be (1) total direct costs (excluding capital expenditures and other distorting items such as pass-through funds, major subcontracts, etc.), (2) direct salaries and wages, or (3) another base which results in an equitable distribution. An indirect cost rate should be developed for each separate indirect cost pool developed. The rate in each case should be stated as the percentage relationship between the particular indirect cost pool and the distribution base identified with that pool.

4. *Special indirect cost rates.*

a. In some instances, a single indirect cost rate for all activities of a grantee department or agency or for each major function of the agency may not be appropriate. It may not take into account those different factors which may substantially affect the indirect costs applicable to a particular program or group of programs. The factors may include the physical location of the work, the level of administrative support required, the nature of the facilities or other resources employed, the organizational arrangements used, or any combination thereof. When a particular award is carried out in an environment which appears to generate a significantly different level of indirect costs, provisions should be made for a separate indirect cost pool applicable to that award. The separate indirect cost

0000228

pool should be developed during the course of the regular allocation process, and the separate indirect cost rate resulting therefrom should be used, provided that: (1) the rate differs significantly from the rate which would have been developed under subsections 2. and 3., and (2) the award to which the rate would apply is material in amount.

b. Although this Circular adopts the concept of the full allocation of indirect costs, there are some Federal statutes which restrict the reimbursement of certain indirect costs. Where such restrictions exist, it may be necessary to develop a special rate for the affected award. Where a "restricted rate" is required, the procedure for developing a non-restricted rate will be used except for the additional step of the elimination from the indirect cost pool those costs for which the law prohibits reimbursement.

**D. Submission and Documentation of Proposals**

1. *Submission of indirect cost rate proposals.*

a. All departments or agencies of the governmental unit desiring to claim indirect costs under Federal awards must prepare an indirect cost rate proposal and related documentation to support those costs. The proposal and related documentation must be retained for audit in accordance with the records retention requirements contained in the Common Rule.

b. A governmental unit for which a cognizant agency assignment has been specifically designated must submit its indirect cost rate proposal to its cognizant agency. The Office of Management and Budget (OMB) will periodically publish lists of governmental units identifying the appropriate Federal cognizant agencies. The cognizant agency for all governmental units or agencies not identified by OMB will be determined based on the Federal agency providing the largest amount of Federal funds. In these cases, a governmental unit must develop an indirect cost proposal in accordance with the requirements of this Circular and maintain the proposal and related supporting documentation for audit. These governmental units are not required to submit their proposals unless they are specifically requested to do so by the cognizant agency. Where a local government only receives funds as a sub-recipient, the primary recipient will be responsible for negotiating and/ or monitoring the sub-recipient's plan.

c. Each Indian tribal government desiring reimbursement of indirect costs must submit its indirect cost proposal to

the Department of the Interior (its cognizant Federal agency).

d. Indirect cost proposals must be developed (and, when required, submitted) within six months after the close of the governmental unit's fiscal year, unless an exception is approved by the cognizant Federal agency. If the proposed central service cost allocation plan for the same period has not been approved by that time, the indirect cost proposal may be prepared including an amount for central services that is based on the latest federally-approved central service cost allocation plan. The difference between these central service amounts and the amounts ultimately approved will be compensated for by an adjustment in a subsequent period.

2. *Documentation of proposals.* The following shall be included with each indirect cost proposal:

a. The rates proposed, including subsidiary work sheets and other relevant data, cross referenced and reconciled to the financial data noted in subsection b. Allocated central service costs will be supported by the summary table included in the approved central service cost allocation plan. This summary table is not required to be submitted with the indirect cost proposal if the central service cost allocation plan for the same fiscal year has been approved by the cognizant agency and is available to the funding agency.

b. A copy of the financial data (financial statements, comprehensive annual financial report, executive budgets, accounting reports, etc.) upon which the rate is based. Adjustments resulting from the use of unaudited data will be recognized, where appropriate, by the Federal cognizant agency in a subsequent proposal.

c. The approximate amount of direct base costs incurred under Federal awards. These costs should be broken out between salaries and wages and other direct costs.

d. A chart showing the organizational structure of the agency during the period for which the proposal applies, along with a functional statement(s) noting the duties and/or responsibilities of all units that comprise the agency. (Once this is submitted, only revisions need be submitted with subsequent proposals.)

3. *Required certification.* Each indirect cost rate proposal shall be accompanied by a certification in the following form:

*Certificate of Indirect Costs*

This is to certify that I have reviewed the indirect cost rate proposal submitted herewith and to the best of my knowledge and belief:

(1) All costs included in this proposal (identify date) to establish billing or final indirect costs rates for (identify period covered by rate) are allowable in accordance with the requirements of the Federal award(s) to which they apply and OMB Circular A–87, "Cost Principles for State and Local Governments." Unallowable costs have been adjusted for in allocating costs as indicated in the cost allocation plan.

(2) All costs included in this proposal are properly allocable to Federal awards on the basis of a beneficial or causal relationship between the expenses incurred and the agreements to which they are allocated in accordance with applicable requirements. Further, the same costs that have been treated as indirect costs have not been claimed as direct costs. Similar types of costs have been accounted for consistently and the Federal Government will be notified of any accounting changes that would affect the predetermined rate.

I declare that the foregoing is true and correct.

Governmental Unit _____

Signature _____

Name of Official _____

Title _____

Date of Execution: _____

**E. Negotiation and Approval of Rates**

1. Indirect cost rates will be reviewed, negotiated, and approved by the cognizant Federal agency on a timely basis. Once a rate has been agreed upon, it will be accepted and used by all Federal agencies unless prohibited or limited by statute. Where a Federal funding agency has reason to believe that special operating factors affecting its awards necessitate special indirect cost rates, the funding agency will, prior to the time the rates are negotiated, notify the cognizant Federal agency.

2. The use of predetermined rates, if allowed, is encouraged where the cognizant agency has reasonable assurance based on past experience and reliable projection of the grantee agency's costs, that the rate is not likely to exceed a rate based on actual costs. Long-term agreements utilizing predetermined rates extending over two or more years are encouraged, where appropriate.

3. The results of each negotiation shall be formalized in a written agreement between the cognizant agency and the governmental unit. This agreement will be subject to re-opening if the agreement is subsequently found to violate a statute, or the information upon which the plan was negotiated is later found to be materially incomplete or inaccurate. The agreed upon rates shall be made available to all Federal agencies for their use.

4. Refunds shall be made if proposals are later found to have included costs that (a) are unallowable (i) as specified

by law or regulation, (ii) as identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal awards, or (b) are unallowable because they are clearly not allocable to Federal awards. These adjustments or refunds will be made regardless of the type of rate negotiated (predetermined, final, fixed, or provisional).

## F. Other Policies

1. *Fringe benefit rates.* If overall fringe benefit rates are not approved for the governmental unit as part of the central service cost allocation plan, these rates will be reviewed, negotiated and approved for individual grantee agencies during the indirect cost negotiation process. In these cases, a proposed fringe benefit rate computation should accompany the indirect cost proposal. If fringe benefit rates are not used at the grantee agency level (i.e., the agency specifically identifies fringe benefit costs to individual employees), the governmental unit should so advise the cognizant agency.

2. *Billed services provided by the grantee agency.* In some cases, governmental units provide and bill for services similar to those covered by central service cost allocation plans (e.g., computer centers). Where this occurs, the governmental unit should be guided by the requirements in Attachment C relating to the development of billing rates and documentation requirements, and should advise the cognizant agency of any billed services. Reviews of these types of services (including reviews of costing/billing methodology, profits or losses, etc.) will be made on a case-by-case basis as warranted by the circumstances involved.

3. *Indirect cost allocations not using rates.* In certain situations, a governmental unit, because of the nature of its awards, may be required to develop a cost allocation plan that distributes indirect (and, in some cases, direct) costs to the specific funding sources. In these cases, a narrative cost allocation methodology should be developed, documented, maintained for audit, or submitted, as appropriate, to the cognizant agency for review, negotiation, and approval.

4. *Appeals.* If a dispute arises in a negotiation of an indirect cost rate (or other rate) between the cognizant agency and the governmental unit, the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency.

5. *Collection of unallowable costs and erroneous payments.* Costs specifically identified as unallowable and charged to Federal awards either directly or indirectly will be refunded (including interest chargeable in accordance with applicable Federal agency regulations).

6. *OMB assistance.* To the extent that problems are encountered among the Federal agencies and/or governmental units in connection with the negotiation and approval process, OMB will lend assistance, as required, to resolve such problems in a timely manner.

[FR Doc. 95–11658 Filed 5–16–95; 8:45 am]

BILLING CODE 3110-01-P

0000230

# EXHIBIT 3.b

**44212**     Federal Register / Vol. 58, No. 159 / Thursday, August 19, 1993 / Notices

## OFFICE OF MANAGEMENT AND BUDGET

### Cost Principles for State and Local Governments

**AGENCY:** Office of Management and Budget.

**ACTION:** Proposed Revisions to OMB Circular No. A-87.

**SUMMARY:** This Notice offers interested parties an opportunity to comment on proposed revisions to Office of Management and Budget (OMB) Circular No. A-87, "Cost Principles for State and Local Governments."

An interagency task force was established in 1987 to review existing cost principles for Federal awards to State and local governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from State and local governments, and compared for consistency the provisions of other OMB cost principles covering nonprofit organizations and universities. A proposed revised Circular reflecting the results of those efforts was published on October 12, 1988, at 53 FR 40352–67. The extensive comments received on the 1988 proposed revision, discussions with interest groups, recent legislation concerning lobbying, and other related developments were considered in developing this new proposed revision.

**DATES:** All comments on this proposal should be in writing and must be received by October 18, 1993. Late comments will be considered to the extent practicable.

**ADDRESSES:** Office of Management and Budget, Office of Federal Financial Management, Financial Standards and Reporting Branch, room 10235, New Executive Office Building, Washington, DC 20503. For a copy of the current Circular, contact Office of Administration, Publication Office, room 2200, New Executive Office Building, Washington, DC 20503, or telephone (202) 395–7332.

**FOR FURTHER INFORMATION CONTACT:** Palmer Marcantonio, Financial Standards and Reporting Branch, Office of Federal Financial Management, Office of Management and Budget (telephone: 202–395–3993).

**SUPPLEMENTARY INFORMATION:** The proposed changes were guided by the following criteria.

—*Fairness.* Federal cost principles will consistently guide State, local, and Indian tribal governments, within statutory limitations, in determining all the reasonable direct and indirect costs they incur in conducting Federal and the Federal portion of Federal/State programs. Federal, State, local, and Indian tribal governments will treat Federal, State, local and Indian tribal programs consistently. Due consideration will be given to public perceptions of certain costs, such as advertising, public relations, and travel. Negotiations on the extent of Federal participation will be based on consideration of all costs.

—*Effectiveness, efficiency, and accountability.* Policies, principles, and regulations will support effective, efficient delivery of program services and minimize opportunities for fraud, waste, and abuse. They will stimulate the use of efficient administrative practices and the economical use of resources. State, local and Indian tribal governments will be granted the maximum discretion for managing the activities for which reimbursable costs are incurred and the manner in which reimbursements are expended.

—*Feasibility and simplicity.* Policies, principles, and regulations will be as simple as possible to: (a) minimize time and effort required for determining reimbursable costs, consistent with the need for accountability; (b) minimize confusion and opportunity for disagreements; and, (c) minimize the need for involvement of technical and policy level officials. Changes to policies, principles, and regulations will only be made to achieve significant net benefits.

—*Conformance with generally accepted accounting principles.* Policies, principles, and regulations will be consistent with generally accepted accounting principles, subject to certain additional requirements, in order to encourage State, local, and Indian tribal governments to continue to adopt good financial management practices.

### Summary of Significant Changes

This proposal is based on the revisions proposed in 1988 but incorporates the comments, discussions, and other developments received or occurring since that time. The major areas of concern, all of which have been addressed in this proposal, are as follows:

A. Documentation and Procedures
B. Allowable Costs
C. Timing of Funding
D. Other Needed Changes

### A. Documentation and Procedures

Certain proposed revisions address the need to limit documentation and procedures to a necessary minimum, consistent with the Federal, State, local, and Indian tribal governments' need for accountability.

1. Support for Salaries and Wages

The 1988 proposed Circular tightened documentation requirements consistent with audit recommendations to prevent abuses and improve auditability.

Some comments suggested simplification of documentation requirements. This proposal provides simplification by clarifying alternative systems for personnel activity distributions and allowing salary costs to be claimed based on estimates, so long as charges to Federal programs based on such estimates are adjusted quarterly to reflect actual effort.

2. Submission of Cost Allocation Plans

The 1988 proposal reorganized the text of the current Circular (January 15, 1981) and incorporated long-standing requirements for cost allocation plans (CAPs) in attachments. Requirements for CAPs were previously issued by the Department of Health and Human Services, at OMB's direction. This proposal responded to Federal, State, and local requests that the Circular be made easier to use.

Comments were generally supportive, indicating that the new format facilitated administration. However, some comments suggested elimination of CAPs and/or further simplification. In response to these comments, this proposal makes the following changes: (i) encourages use of multi-year pre-determined rates to reduce workload, (ii) allows use of budget data as the basis for cost projections (with an after-the-fact adjustment to reflect actual costs), and (iii) allows a two year rather than one year lag for reconciliations.

3. Documentation for CAPs

The 1988 proposal required additional documentation regarding the financial condition and operations of internal service funds and self insurance funds. This was in response to audit findings that the Federal Government was inappropriately charged when governmental units accumulated excessive retained earnings or transferred excess cash balances from internal service and self insurance funds to general funds.

In response to comments, this proposal reduces part of the 1988 documentation requirements. Listings of fund transfers are no longer required for all transfers, only for non-operating transfers.

0000231

## 4. Timely Approval of CAPs

The 1988 proposal provided for timely approval of CAPs by Federal agencies, but did not impose a deadline.

Some comments suggested that a deadline be imposed. This proposal does not provide a deadline because of the nature of the approval process. Approval requires negotiation between cognizant Federal agencies and governmental units. However, this proposal does call for increased use of multi-year predetermined rates, where authorized, to reduce workload and speed the review process. OMB is also committed to work with the Department of Health and Human Services and other agencies to accelerate the approval process.

### B. Allowable Costs

Certain proposed revisions focus on the need to reimburse necessary and reasonable costs of administering Federal financial assistance programs, consistent with fairness and public policy concerns.

## 5. Interest

The 1988 proposal liberalized interest allowability as requested by State and local governments. It allowed interest paid to second parties on capital equipment acquisitions and major building renovations, including lease purchase arrangements, completed on or after the effective date of the Circular.

Some comments suggested that interest allowability also be extended to acquisitions made prior to the issue date of the final regulation. This proposal does not allow such interest because the related capital costs have already been incurred and payment of interest would in effect be retroactive. The proposal also provides for interest offsets in certain cash flow situations.

## 6. Depreciation and Use Allowances

The 1988 proposal clarified requirements for determining the useful life of assets, accounting for the cost of capital assets, determining allowable depreciation, and providing for Federal recovery on property disposal. These changes responded to reported abuses.

In response to comments, this proposal makes approval of changes in depreciation methods a part of CAP negotiation, rather than a separate process. The proposal does not adopt suggestions that reimbursements be based on replacement cost or accelerated depreciation. These suggestions would violate the basic principle of cost reimbursement by using estimates of future prices, rather than actual prices, and accelerated, rather than actual, depreciation.

## 7. State/Local Taxes

The Federal Government funds many programs and activities with State and local governments. The rates of Federal financial participation vary between programs and are generally established in law or in the agreement between the Federal Government and the governmental unit.

In September 1988, the Inspector General for the Department of Health and Human Services issued a "Report on the Effects of State Sales Tax on Federal Programs" (No. 04–87–00040). A principal question was whether there was a "need for regulatory denial of Federal financial participation (FFP) for sales tax paid by a governmental entity to itself." The report studied the effects on FFP in six States that did not exempt State agencies from the obligation to pay State sales tax. In those States during one fiscal year, sales tax paid on Federal expenditures under Federal agreements totalled approximately $54 million. Thus the "Federal Government could have saved this $54 million if sales tax generated by those States was considered unallowable for FFP." The report also studied two States that exempted State departments from sales tax, and found that "significant increases in Federal expenditures, $74.5 million, would occur if those two States were to begin taxing themselves." Based on additional analysis contained in the report, the Inspector General reached the following conclusion: "We believe that State sales tax applied to expenditures under Federal agreements is unallowable because it does not constitute actual cost to the State," but instead represents monies "paid by a governmental entity to itself."

The 1988 proposal disallowed "taxes assessed by a Governmental unit upon itself, [and] its component parts * * *" 53 FR 40361 (10/14/88). The response to this proposal did not disagree that such taxes are self-payments. Nevertheless, some comments called for continued allowability of self-assessed taxes, contending that the proposed disallowance would be intrusive and administratively burdensome. Comments stated that user charges, such as gasoline taxes, provide benefits to Federal financial assistance programs.

During our analysis, we noted that one State had passed a law which would require each contractor involved in the highway program to pay an amount equal to five percent of the gross receipts derived from the performance of federally-funded highway contracts. Under the proposed provisions of this Circular such taxes will not be allowable.

In response to comments concerning implementation problems, this proposal allows most taxes but disallows, as a matter of government-wide policy, only sales taxes and equivalent broad-based taxes that a governmental unit assesses upon itself and/or Federal programs. The current proposal is therefore narrower than the 1988 proposal, which would have disallowed all self-assessed taxes, including user charges. Federal agencies may continue to disallow other taxes on a case by case basis, if the agency determines that the tax is an inappropriate charge to the Federal financial assistance program or if it inappropriately reduces the actual contribution by the governmental unit.

This proposal responds to other comments regarding implementation concerns by allowing alternatives to actual cost records, where identification of actual costs is not administratively feasible.

## 8. Lobbying

This proposal specifies restrictions against the reimbursement of lobbying costs consistent with recent legislation.

## 9. Costs Incurred in Appeals and Claims Against Federal Agencies

This proposal disallows costs of appeals, claims, and related actions consistent with the October 3, 1991, revision to Circular A–21, "Cost Principles for Educational Institutions."

## 10. Working Capital Reserves

The 1988 proposal liberalized current policy by allowing reimbursement for an amount equivalent of up to 60 days cash expenditures in order to provide for establishment of a working capital reserve in internal service funds. This proposed change responded to suggestions by governmental units that such reserves were a necessary cost of doing business.

Some comments suggested 90 days of working capital reserve. No change was made to the 60 day proposal, since comments did not provide adequate support for a longer period.

## 11. Capital Expenditures

The 1988 proposal liberalized treatment of capital expenditures by making such expenditures under $5,000 allowable as a current expense, if permitted by the accounting policies uniformly applied at the governmental unit. This responded to suggestions that the policy be changed to facilitate acquisition of equipment and allows use of existing systems rather than requiring two different capital accounting systems. It also was consistent with the capitalization requirements in the

0000232

Common Rule, "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments; Final Rule," published at 53 FR 8034–8103 (3/11/88).

In response to comments, this proposal clarifies that only capital acquisitions of $5,000 or more treated as a direct cost to Federal programs are subject to Federal approval. This proposal provides that for indirect cost purposes the governmental unit shall use the capitalization level, up to $5,000, established by that unit. Some comments also suggested that the ceiling be raised above $5,000. This change was not made since $5,000 is consistent with other requirements, including the Common Rule.

### 12. Mass Severance and Back Pay

The 1988 proposal restricted the allowability of mass severance pay and back pay and provided for prior approval of deviations.

In response to comments, this proposal deletes pre-approval requirements regarding back pay. However, such back pay is still unallowable if it constitutes payment of fines and penalties.

### C. Timing of Funding

Certain proposed revisions are made in recognition of the importance of cash flows and the time value of money as well as the need to follow generally accepted accounting principles.

### 13. Pension Costs

The 1988 proposal clarified current policy by limiting allowability of the Federal share of pension costs to the portion currently funded by governmental units. It also defined situations in which the interest component of pension cost was not reimbursable. It also required additional information on pension fund financial condition and operations.

In response to comments, this proposal provides for Federal sharing, on an amortized basis, of the costs of unfunded liabilities, net of the increased interest cost caused by late funding of the actuarially required pension plan contributions by the governmental unit.

### 14. Retiree Health Benefits

The 1988 proposal limited allowability of retiree health benefit costs to the amount actually paid.

In response to comments, this proposal also provides for payment on the basis of accrued costs to the extent such costs are funded.

### 15. Employee Leave Earned But Not Taken

The 1988 proposal limited reimbursements to actual payments for leave taken.

In response to comments, this proposal also provides for payment on the basis of accrued costs to the extent such costs are funded.

### 16. Insurance and Indemnification Reserves

The 1988 proposal tightened standards for self insurance programs to prevent abuses identified in Federal audits. It also limited reimbursements to actual cash payments for employee benefit related programs.

In response to comments, this proposal allows costs associated with employee benefit related programs, such as worker's compensation, to be treated either on an actual cash payment basis or on the basis of accrued cost to the extent such costs are funded and satisfy the other requirements governing insurance and indemnification reserves.

### D. Other Needed Changes

Certain proposed changes were made to this Circular to reflect related changes in law, potential conflict of interest situations and to make it consistent with revisions in Circular A–21 "Cost Principles for Educational Institutions."

### 17. Certification on CAPs and Indirect Cost Proposals

This proposal adds a requirement for specific certification language in CAPs and indirect cost proposals (ICPs) to improve understanding by responsible governmental unit officials of the types of costs the Federal Government does not allow.

### 18. Additional Changes

This proposal explicitly restricts or prohibits reimbursement for alcohol, entertainment, advertising and public relations, and travel. This is consistent with law and the recent revisions in OMB Circular No. A–21, "Cost Principles for Educational Institutions."

### 19. Refunds of Unallowable Cost

This proposal requires unallowable costs to be refunded to the Federal Government.

### 20. Accounting and Consulting Services

This proposal restricts State and local governments from engaging an accounting firm to prepare indirect cost proposals and then engaging the same firm to make subsequent audits.

### Judicial Review

This Circular is intended solely to improve the internal management of the Executive Branch and is not intended to create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its officers, or any person.

### Public Comment

Suggestions received on the revisions proposed in 1988 to the Circular were accommodated to the extent appropriate. OMB encourages comments on the revisions being proposed here and on more efficient approaches to funding indirect cost. Other alternative proposals are also encouraged.

### National Performance Review

Cost principles for State and local governments are under consideration by the National Performance Review. If changes are adopted as a result of that review, this proposal will be made compatible with those changes.

John B. Arthur,

*Assistant Director for Administration.*

To the Heads of Executive Departments and Establishments

Subject: Cost principles for Federal financial assistance programs conducted by State, local, and Indian tribal governments

1. *Purpose.* This Circular establishes principles and standards for determining costs for Federal financial assistance programs carried out through grants, contracts, and other agreements with State and local governments and federally-recognized Indian tribal governments (governmental units).

2. *Authority.* This Circular is issued under the authority of 31 U.S.C. 1111, 31 U.S.C. 503, Reorganization Plan No. 2 of 1970; and Executive Order No. 11541.

3. *Background.* An interagency task force was established in 1987 to review existing cost principles for Federal awards to State and local governments. The task force studied Inspector General reports and recommendations, solicited suggestions for changes to the Circular from State and local governments, and compared for consistency the provisions of other OMB cost principles covering nonprofit organizations and universities. A proposed revised Circular reflecting the results of those efforts was issued on October 12, 1988. Extensive comments on the proposed revision, discussions with interest groups, recent legislation concerning lobbying, and related developments have been considered in this new proposed revision.

HeinOnline -- 58 Fed. Reg. 44214 1993

expectancy, condition, and value of the property leased.

b. Rental costs under sale and leaseback arrangements are allowable only up to the amount that would be allowed had the governmental unit continued to own the property.

c. Rental costs under less-than-arms-length leases are allowable only up to the amount that would be allowed had title to the property vested in the governmental unit. For this purpose, less-than-arms-length leases include, but are not limited to, those where:

(1) One party to the lease is able to control or substantially influence the actions of the other;

(2) Both parties are parts of the same governmental unit; or

(3) The governmental unit creates an authority or similar entity to acquire and lease the facilities to the governmental unit and other parties.

d. Rental costs under leases which are required to be treated as capital leases under generally accepted accounting principles are allowable only up to the amount that would be allowed had the governmental unit purchased the property on the date the lease agreement was executed; e.g., depreciation or use allowance, maintenance, taxes, insurance but excluding any unallowable costs. Wherever GAAP does not apply, the provisions of Financial Accounting Standards Board Statement 13 shall be used to determine whether a lease is a capital lease. Interest costs related to capital leases are allowable to the extent they meet the criteria in Section 26.

39. *Taxes.* Taxes which the governmental unit is legally required to pay are allowable except for general sales taxes (and equivalent broad based taxes) assessed by a governmental unit upon itself, its component parts (including State colleges, universities, and hospitals) or other political subdivisions and or Federal programs. Gasoline taxes, motor vehicle fees, and other taxes that are in effect user fees providing a benefit to the Federal Government are allowable. This does not restrict the authority of Federal agencies to identify other taxes where Federal participation is inappropriate. Where the identification of the amount of such taxes would require an inordinate amount of effort, the cognizant agency may accept a reasonable approximation thereof.

40. *Training.* The cost of training customarily provided for employee development is allowable.

41. *Travel costs.* a. *General.* Travel costs are allowable for expenses for transportation, lodging, subsistence, and related items incurred by employees who are in travel status on official business. Such costs may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip, and results in charges consistent with those normally allowed in like circumstances in non-federally sponsored activities. Notwithstanding the provisions of section 23, travel costs of officials covered by that section, when specifically related to Federal financial assistance programs, are allowable with the prior approval of a grantor agency.

b. *Lodging and subsistence.* Costs incurred by employees and officers for travel, including costs of lodging, other subsistence, and incidental expenses, shall be considered reasonable and allowable only to the extent such costs do not exceed charges normally allowed by the governmental unit in its regular operations as a result of a governmental unit policy and the amounts claimed under Federal awards represent reasonable and allocable costs. In the absence of a written governmental unit policy regarding travel costs, the rates and amounts established under subchapter I of Chapter 57 of Title 5, United States Code, or by the Administrator of General Services, or the President (or his designee) pursuant to any provisions of such subchapter shall be used as guidance for travel under Federal financial assistance programs (41 U.S.C. 420).

c. *Commercial air travel.* Airfare costs in excess of the lowest available commercial discount airfare, Federal Government contract airfare (where authorized and available), or customary standard (coach or equivalent) airfare, are unallowable except when such accommodations would: require circuitous routing; require travel during unreasonable hours; excessively prolong travel; greatly increase the duration of the flight; result in increased cost that would offset transportation savings; or offer accommodations not reasonably adequate for the medical needs of the traveler. Where a governmental unit can reasonably demonstrate to the awarding agency either the nonavailability of discount airfare or Federal Government contract airfare for individual trips or, on an overall basis, that it is the governmental unit's practice to make routine use of such airfare, specific determinations of nonavailability will generally not be questioned by the Federal Government, unless a pattern of avoidance is detected. However, in order for airfare costs in excess of the customary standard commercial airfare to be allowable, e.g., use of first-class

airfare, the governmental unit must justify and document on a case-by-case basis the applicable condition(s) set forth above.

d. *Air travel by other than commercial carrier.* Cost of travel by governmental unit-owned, -leased, or -chartered aircraft, as used in this paragraph, includes the cost of lease, charter, operation (including personnel costs), maintenance, depreciation, interest, insurance, and other related costs. Costs of travel via governmental unit-owned, -leased, or -chartered aircraft are unallowable to the extent they exceed the cost of allowable commercial air travel, as provided for in section c. above.

42. *Underrecovery of costs under Federal agreements.* Any excess costs over the Federal contribution under one award agreement are unallowable under other award agreements.

Attachment C—State/Local-Wide Central Service Cost Allocation Plans

*Table of Contents*

A. General
B. Definitions
  1. Central Service Cost Allocation Plan
  2. Billed central services
  3. Allocated central services
  4. Agency or operating agency
C. Scope of the Central Service Cost Allocation Plans
D. Submission Requirements
E. Documentation Requirements for Submitted Plans
  1. General
  2. Allocated Central Services
  3. Billed Services
    a. General
    b. Internal service Funds
    c. Self-Insurance Funds
    d. Fringe benefits
  4. Required Certification
F. Negotiation and Approval of Central Service Plans
G. Other Policies
  1. Use of Proprietary Fund Accounts for Internal Services
  2. Working Capital Reserves
  3. Carry-forward Adjustments of Allocated Central Service Costs
  4. Adjustments of Billed Central Services
  5. Records Retention
  6. Appeals
  7. Accounting/Consulting Services
  8. OMB Assistance

A. *General.* 1. Most governmental units provide certain services, such as motor pools, computer centers, purchasing, accounting, etc., to operating agencies on a centralized basis. Since federally-supported programs are performed within the individual operating agencies, there needs to be a process whereby these central service costs can be identified and assigned to benefitted activities on

0000234

a reasonable and consistent basis. The Central Service Cost Allocation Plan provides that process. All costs and other data used to distribute the costs included in the plan should be supported by formal accounting and other records that will support the propriety of the costs assigned to Federal financial assistance programs.

2. Guidelines and illustrations of central service cost allocation plans are provided in a brochure published by the Department of Health and Human Services entitled "A Guide for State and Local Government Agencies: Cost Principles and Procedures for Establishing Cost Allocation Plans and Indirect Cost Rates for Grants and Contracts with the Federal Government." A copy of this brochure may be obtained from the Superintendent of Documents, U.S. Government Printing Office.

B. *Definitions.* 1. "Central service cost allocation plan" means the documentation identifying, accumulating, and allocating, or developing billing rates based on, the allowable costs of services provided by a governmental unit on a centralized basis to its departments/agencies. The costs of these services may be either billed or allocated to users.

2. "Billed central services" means central services that are billed to benefitted agencies and/or programs on an individual fee for service or similar basis, and the billings are included in the accounting records of the benefitted agencies. Typical examples of billed central services include computer services, transportation services, insurance, and fringe benefits.

3. "Allocated central services" means central services that benefit operating agencies but are not billed to the agencies on a fee for service or similar basis. These costs are allocated to benefitted agencies on some reasonable basis. Examples of such services might include general accounting, personnel administration, purchasing, etc.

4. "Agency or operating agency" means an organizational unit or sub-division within a governmental unit that is responsible for the performance or administration of programs or activities of the governmental unit.

C. *Scope of the Central Service Cost Allocation Plans.* The central service cost allocation plan will include all central service costs that will be claimed (either as a billed or an allocated cost) under Federal financial assistance programs and will be documented as described in Section F below. Costs of central services omitted from the plan will not be reimbursed.

D. *Submission Requirements.* 1. All States will submit a plan to the Department of Health and Human Services for each year in which they claim central service costs under Federal financial assistance programs. The plan should include (i) a projection of the next year's cost (based either on actual costs for the most recently completed year or the executive budget for the coming year), and (ii) a reconciliation of actual costs to the estimated costs used for either the most recently completed year or the year immediately preceding the most recently completed year.

2. Local governments that have been designated as "major local governments" by the Office of Management and Budget are also required to submit a plan to their cognizant agency annually. OMB periodically lists major local governments in the Federal Register.

3. All other local governments claiming central service costs must develop a plan in accordance with the requirements described in this Circular and maintain the plan and related supporting documentation for audit. These local governments are not required to submit their plans for Federal approval unless they are specifically requested to do so by the cognizant agency. Where a local government only receives funds as a sub-recipient, the primary recipient will be responsible for negotiating and/or monitoring the sub-recipient's plan.

4. All central service cost allocation plans will be prepared (and when required, submitted) within six months prior to the beginning of each of the governmental unit's fiscal years in which it proposes to claim central service costs. Extensions may be granted by the cognizant agency on a case-by-case basis.

E. *Documentation Requirements for Submitted Plans.* The documentation requirements described in this section may be modified, expanded, or reduced by the cognizant agency on a case-by-case basis. For example, the requirements may be reduced for those central services which have little or no impact on Federal programs. Conversely, if a review of a plan indicates that certain additional information is needed, and will likely be needed in future years, it may be routinely requested in future plan submissions. Items marked with an asterisk (*) should be submitted only once; subsequent plans should merely indicate any changes since the last plan.

1. General. All proposed plans must be accompanied by the following: An organization chart showing all operations including the central service activities of the State/local government whether or not they are shown as benefiting from central service functions; a copy of the Comprehensive Annual Financial Report (or a copy of the Executive Budget if budgeted costs are being proposed) to support the allowable costs of each central service activity included in the plan; and a certification (see subsection E. 4) that the plan was prepared in accordance with this Circular, contains only allowable costs, and was prepared in a manner that treated similar costs consistently among the various Federal financial assistance programs and between Federal and non-Federal programs.

2. Allocated central services. For each allocated central service, the plan must also include the following: a brief description of the service*; an identification of the unit rendering the service and the operating agencies receiving the service; the items of expense included in the cost of the service; the method used to distribute the cost of the service to benefitted agencies; and a summary schedule showing the allocation of each service to the specific benefitted agencies. If any self-insurance funds or fringe benefits are treated as allocated (rather than billed) central services, documentation discussed in paragraphs 3.b. and c. below shall also be included.

3. Billed services.

a. General. The information described below shall be provided for all billed central services, including internal service funds, self-insurance funds and fringe benefit funds.

b. Internal service funds.

(1) For each internal service fund, the plan shall include: A brief description of each service; a fund balance sheet for each fund based on individual accounts contained in the governmental unit's accounting system; revenues/expenditures statement, with revenues broken out by source, e.g., regular billings, interest earned, etc.; a listing of all non-operating transfers (that is cash transfers made for purposes other than normal purchases and sales) into and out of the fund; a description of the procedures (methodology) used to charge the costs of each service to users, including how billing rates are determined; a schedule of current rates; and a schedule comparing the full revenues (including imputed revenues) generated by the service to the allowable costs of the service, as determined under this Circular, with an explanation of how variances will be handled.

(2) Revenues shall consist of all revenues generated by the service,

0000235

including unbilled and uncollected revenues. If some users were not billed for the services (or were not billed at the full rates), a schedule showing the full "imputed" revenues associated with these users shall be provided. Expenditures shall be broken out by cost category (e.g., salaries, supplies, etc.).

c. Self-insurance funds. For each self-insurance fund, the plan shall include: The fund balance sheet; a statement/ schedule showing fund income (contributions, earnings, etc.) and fund outlays including a summary of billings and claims paid by agency; a listing of all transfers into and out of the fund; the type(s) of risk(s) covered by the fund (e.g., automobile liability, worker's compensation, etc.); an explanation of how the level of fund contributions are determined, including a copy of the current actuarial report (with the actuarial assumptions used) if the contributions are determined on an actuarial basis; and a description of the procedures used to charge or allocate fund contributions to benefiting activities. Reserve levels in excess of claims (i) submitted and adjudicated but not paid, (ii) submitted but not adjudicated, and (iii) incurred but not submitted must be identified and justified.

d. Fringe benefits. For fringe benefit costs, the plan shall include: a listing of fringe benefits provided to State/local employees, and the overall annual cost of each type of benefit; current fringe benefit policies*; and procedures used to charge or allocate the costs of the benefits to benefiting activities. In addition, for pension and post retirement health insurance plans, the following information shall be provided: The governmental unit's funding policies, e.g., legislative bills, trust agreements, state-mandated contribution rules if different from actuarially determined rates; the pension plan's costs accrued for the year; the amount funded, and date(s) of funding; a copy of the current actuarial report (including the actuarial assumptions); the plan trustee's report and a schedule from the activity showing the value of the interest cost associated with late funding (see Sections 11.e. and f.).

4. Required certification. Each central service cost allocation plan will be accompanied by a certification in the following form:

Certificate of Cost Allocation Plan

This is to certify that I have reviewed the cost allocation plan submitted herewith and to the best of my knowledge and belief:

(1) All costs included in this proposal [identify date] to establish allocations or billings for [identify period covered by plan]

are allowable in accordance with the requirements of the Federal agreement(s) to which they apply and the cost principles applicable to those agreements.

(2) This proposal does not include any costs which are unallowable under applicable cost principles, such as (without limitation): advertising and public relations costs, entertainment costs, fines and penalties, lobbying costs, and defense and prosecution of criminal and civil proceedings.

(3) All costs included in this proposal are properly allocable to Federal agreements on the basis of a beneficial or causal relationship between the expenses incurred and the agreements to which they are allocated in accordance with applicable requirements. Further, the same costs that have been treated as indirect costs have not been claimed as direct costs. Similar types of costs have been accounted for consistently.

I declare under penalty of perjury that the foregoing is true and correct.

Governmental Unit: _____
Signature: _____
Name of Official: _____
Title: _____
Date of Execution: _____

F. Negotiation and Approval of Central Service Plans. 1. All proposed Central Service Cost Allocation Plans that are required to be submitted will be reviewed, negotiated, and approved by the Federal cognizant agency on a timely basis. The cognizant agency will review the proposal within six months and either negotiate/approve the proposal or advise the governmental unit of the additional documentation needed to support/evaluate the proposed plan or the changes required to make the proposal acceptable. Once an agreement with the governmental unit has been reached, the agreement will be accepted and used by all Federal agencies unless prohibited or limited by statute. Where a Federal funding agency has reason to believe that special operating factors affecting its awards necessitate special consideration, the funding agency will, prior to the time the plans are negotiated, notify the cognizant agency.

2. The results of each negotiation shall be formalized in a written agreement between the cognizant agency and the governmental unit. This agreement will be subject to re-opening only at the option of the cognizant agency, and then only if: (a) The agreement is subsequently found to violate a statute; (b) the information provided by the governmental unit upon which the cognizant agency relied during the plan review and negotiation process is later found to be materially incomplete or inaccurate; or (c) the cognizant agency was not made aware that major changes in accounting practices occurred during the effective

period of the agreement. The results of the negotiation shall be made available to all Federal agencies for their use.

3. Negotiated cost allocation plans based on a proposal later found to have included costs which are unallowable as (i) specified by law or regulation, (ii) identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal awards; or (b) are unallowable because they are clearly not allocable to Federal awards, shall be adjusted, or a refund shall be made at the option of the Federal cognizant agency. These adjustments or refunds are designed to correct the plans and do not constitute a reopening of the negotiation.

G. Other Policies. 1. Use of proprietary fund accounts for internal services. Internal service activities must be accounted for and reported in individual proprietary fund accounts in order to properly account for revenues, expenses, and profit or loss.

2. Working capital reserves. Internal service funds are dependent upon a reasonable level of working capital reserve to operate from one billing cycle to the next. Charges by an internal service activity to provide for the establishment and maintenance of a reasonable level of working capital reserve, in addition to the full recovery of costs, are allowable. A working capital reserve as part of retained earnings of up to 60 days cash expenditures for normal operating purposes is considered reasonable.

3. Carry-forward adjustments of allocated central service costs. Allocated central service costs are usually negotiated and approved for a future fiscal year on a "fixed with carry-forward" basis. Under this procedure, the fixed amounts for the future year covered by agreement are not subject to adjustment for that year. However, when the actual costs of the year involved become known, the differences between the fixed amounts previously approved and the actual costs will be carried forward and used as an adjustment to the fixed amounts established for a later year. This "carry-forward" procedure applies to all central services whose costs were fixed in the approved plan. A carry-forward adjustment is not permitted, however, for a central service activity that was not included in the approved plan, or for unallowable costs that must be reimbursed immediately.

4. Adjustments of billed central services. Billing rates used to charge Federal programs should normally reflect only allowable costs as defined by the circular, including an estimate of the allocable central service costs.

0000236

Case 1:07-cv-01603-CKK   Document 11-3   Filed 12/11/2007   Page 407 of 502

Individual billing rates will be reviewed and adjusted to actual costs at least annually. Adjustments related to the elimination of unallowable costs will be made and returned to the Federal Government immediately. Other adjustments, at the option of the cognizant agency, will be made (1) for major differences. In these cases, the State or local government and the Federal Government may agree to an immediate cash recovery or an agreed to repayment plan that includes the payment of interest, (2) adjustments to future billing rates, or (3) an adjustment through allocated central services where the total adjustment is the lesser of either $50,000 or 5% of the annual operating cost of the billing rate involved. It is the governmental units responsibility to document the amount of the adjustment. If the governmental unit does not compute the Federal share of the adjustment a ratio of total Federal revenues to the total Federal/Governmental unit revenues will be used for this purpose.

5. Records retention. All Central Service Cost Allocation Plans and related documentation used as a basis for claiming costs under Federal financial assistance programs must be retained for audit in accordance with the records retention requirements contained in the Common Rule.

6. Appeals. If a dispute arises in the negotiation of a plan between the cognizant agency and the governmental unit, the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency.

7. Accounting/consulting services. To avoid a potential conflict of interest State and local governments shall not engage the same accounting/consulting firm to prepare indirect cost proposals/cost allocation plans and to make subsequent audits in accordance with the provisions of Circular A–128, "Audits of State and Local Governments."

8. OMB assistance. To the extent that problems are encountered among the Federal agencies in connection with the negotiation and approval process, the Office of Management and Budget will lend assistance as required to resolve such problems in a timely manner.

Circular A–87 Attachment D—Public Assistance Cost Allocation Plans

Table of Contents

A. General
B. Definitions
  1. State public assistance agency
  2. Public Assistance Cost Allocation Plan
  3. State public assistance agency costs
C. Policy
D. Submission, Documentation and Approval of Public Assistance Cost Allocation Plans
E. Review of Implementation of Approved Plans

A. General. 1. Federally-financed programs administered by State public assistance agencies are funded predominately by the Department of Health and Human Services (HHS). In support of its stewardship requirements, HHS has published requirements for the development, documentation, submission, negotiation, and approval of public assistance cost allocation plans in subpart E of 45 CFR part 95. All administrative (direct and indirect) are normally charged to Federal awards by implementing the public assistance cost allocation plan. This Attachment extends these requirements to all Federal agencies whose programs are administered by a State public assistance agency. Major federally-financed programs typically administered by State public assistance agencies include: Aid for Families with Dependent Children, Medicaid, Food Stamps, Child Support Enforcement, Adoption Assistance and Foster Care, and Social Services.

2. An interim guide has also been developed by the Department of Health and Human Services entitled "A Guide for State and Local Government Public Assistance Agencies/Departments—Procedures for the Preparation and Submission of Cost Allocation Plans". A copy of this guide may be obtained from HHS.

3. Negotiated cost allocation plans based on a proposal later found to have included costs that (a) are unallowable as (i) specified by law or regulation, (ii) identified in Attachment B of this Circular, or (iii) by the terms and conditions of Federal financial assistance programs; or (b) are unallowable because they are clearly not allocable to Federal awards, shall be adjusted, or a refund shall be made at the option of the Federal cognizant agency. These adjustments or refunds are designed to correct the plans and do not constitute a reopening of the negotiation.

B. Definitions. 1. "State public assistance agency" means a State agency administering or supervising the administration of one or more public assistance programs operated by the State as identified by subpart E of 45 CFR part 95. For the purpose of this Attachment, these programs include all programs administered by that State public assistance agency.

2. "Public assistance cost allocation plan" means a narrative description of the procedures that will be used in identifying, measuring, and allocating all "State public assistance agency costs" (as defined in paragraph 3. below) to all of the programs administered or supervised by the State agency.

3. "State public assistance agency costs" mean all costs incurred by, or allocable to, the State public assistance agency, except expenditures for financial assistance, medical vendor payments, food stamps, and payments for services and goods provided directly to program recipients.

C. Policy. State public assistance agencies will develop, document and implement, and the Federal Government will review, negotiate and approve, public assistance cost allocation plans in accordance with subpart E of 45 CFR part 95. The plan will include all programs administered by the State public assistance agency. Where a letter of approval or disapproval is transmitted to a State public assistance agency in accordance with subpart E, the letter will apply to all Federal agencies and programs. The remaining sections of this Attachment (except for the requirement for certification) summarize the provisions of subpart E of 45 CFR part 95.

D. Submission, Documentation, and Approval of Public Assistance Cost Allocation Plans. 1. A currently approved public assistance cost allocation plan will continue in effect until the occurrence of an event that would make the current plan outdated. At that time, the State public assistance agency is required to promptly develop and submit an amendment to the cost allocation plan to HHS for review and approval.

2. Under the coordination process outlined in subpart E, affected Federal agencies will review all new plans and plan amendments and provide comments as appropriate to HHS. The effective date of the plan or plan amendment will be the first day of the quarter following the submission of the plan or amendment unless another date is specifically approved by HHS. HHS, as the cognizant agency acting on behalf of all affected Federal agencies, will, as necessary, conduct negotiations with the State public assistance agency and will inform the State agency of the action taken on the plan or plan amendment.

3. Each public assistance cost allocation plan or proposed amendment will be accompanied by a certification in the following form:

0000237

# EXHIBIT 4.a

## COST ALLOCATION AGREEMENT
## STATE AND LOCAL GOVERNMENTS

EIN # 1856000565A1

DATE: February 22, 2005

DEPT/AGENCY:
State of New Mexico
DFA - Budget Division
190 Bataan Memorial Building
Santa Fe, NM 87501

FILING REF: The preceding
Agreement was dated
June 30, 2003.

---

### SECTION I: ALLOCATED COSTS

The central service costs listed in Exhibit A, attached, are approved on a Fixed basis and may be included as part of the costs of the State/local departments and agencies indicated during the fiscal year ending June 30, 2004 for further allocation to Federal grants, contracts, and other agreements performed at those departments and agencies.

---

### SECTION II: BILLED COSTS

In addition to Section I, which provides for services furnished but not billed, the services listed below are furnished and billed to departments and agencies:

1. State Auditor
2. Information System Division
    Human Resource System
    Office of Information Processing
    Office of Communications
    Radio Communications Bureau
3. Transportation Services Division
4. State Printing Office
5. Risk Management Division
    Group Health & Life Insurance
    Public Liability Insurance
    Surety Bonds
    Unemployment Compensation
    Workers' Compensation
6. PERA Building
7. Public Employees Retirement Association Contributions

1

DEPT/AGENCY: State of New Mexico
DATE: February 22, 2005

## SECTION III: CONDITIONS

The amounts approved in Section I and the billings for the services listed in Section II are subject to the following conditions:

A. LIMITATIONS: (1) Charges resulting from this Agreement are subject to any statutory or administrative limitations and apply to a given grant, contract, or other agreement only to the extent that funds are available. (2)Such charges represent costs incurred by the State/locality which are legal obligations of the State/locality and are allowable under OMB Circular A-87. (3) The same costs that are treated as indirect costs are not claimed as direct costs. (4) Similar type of costs are accorded consistent accounting treatment. (5) The information provided by the State/locality which was used to establish this Agreement is not later found to be materially incomplete or inaccurate.

B. ACCOUNTING CHANGES: This Agreement is based on the accounting system purported by the State/locality to be in effect during the Agreement period. Changes to the method of accounting for costs which affect the amount of reimbursement resulting from the use of this Agreement require prior approval of the authorized representative of the Cognizant Agency. Such changes include, but are not limited to, changes in the charging of a particular type of cost from an allocated cost to a billed cost. Failure to obtain such approval may result in cost disallowances.

C. FIXED AMOUNTS: If fixed amounts are approved in Section I of this Agreement, they are based on an estimate of the costs for the period covered by the Agreement. When the actual costs for this period are determined, adjustments will be made to the amounts of a future year to compensate for the difference between the costs used to establish the fixed amounts and actual costs.

D. BILLED COSTS: Charges for the services listed in Section II will be billed in accordance with rates established by the State/locality. These rates will be based on the estimated costs of providing the services. Adjustments for variances between billed costs and the actual allowable costs of providing the services, as defined by OMB Circular A-87, will be made in accordance with procedures agreed to between the State/locality and the Cognizant Agency.

E. USE BY OTHER FEDERAL AGENCIES: This Agreement was executed in accordance with the authority in OMB Circular A-87, and should be applied to grants, contracts and other agreements covered by this Circular, subject to any limitations in Paragraph A above. The State/locality may provide copies of this Agreement to other Federal Agencies to give them early notification of the Agreement.

2

DEPT/AGENCY:
State of New Mexico
DATE: February 22, 2005

F.  SPECIAL REMARKS:

Equipment Definition - Equipment means an article of nonexpendable, tangible personal property having a useful
life of more than one year and an acquisition cost of $500 or more unit.


## ACCEPTANCE

BY THE DEPT/AGENCY:
State of New Mexico

*State Budget Division*
(DEPT/AGENCY)

*Dannette K Burch*
(SIGNATURE)

*Dannette K Burch*
(NAME)

*Director, State Budget Division*
(TITLE)

*6/1/2005*
DATE)

BY THE COGNIZANT AGENCY ON
BEHALF OF THE FEDERAL GOVERNMENT
DEPARTMENT OF HEALTH AND HUMAN SERVICES
(AGENCY)

(SIGNATURE)

Henry Williams
(NAME)

Director, Division of Cost Allocation
(TITLE)

February 22, 2005
(DATE)0244

Pamela Page

HHS REPRESENTATIVE

(214) 767-6505
Telephone

3

# EXHIBIT 4.b

# The State of New Mexico

## OMB A-87 Cost Allocation Plan
## Volume I



## Based on Fiscal Year Ending June 30, 2004

October 15, 2005



Innovative
Costing
Solutions LLC

# State of New Mexico

## Cost Allocation Plan based on FYE 2004

October 15, 2005

## State of New Mexico
### Description of Billed Central Services

Central Service Function:   Office of Information Processing/Information Systems
Division

1.   Brief Description of Function:

The Information Services Division (ISD) provides automated data
processing services for State departments/agencies and other local
and federal governmental units.  In addition, ISD develops and
promotes new technology applications and provides data processing
training.

2.   Financial Information – Reference is made to extracted pages from the
CAFR - Attached

A.   Balance Sheet - Since this account (Office of Information
Processing) also includes State Printing and the Equipment
Replacement Fund a supplemental schedule is needed to be
developed to identify the costs related to each component.

B.   Profit and Loss - Since this account (Office of Information
Processing) also includes State Printing and the Equipment
Replacement Fund a supplemental schedule is needed to be
developed to identify the costs related to each component.

C.   OMB Reconciliation

3.   Transfers

4.   Billing Rate Methodology

All costs, including an allocation from the State-wide cost allocation
plan, an assessment from the GSD Office of the Secretary, the GSD
Administrative Support Division and the Information Systems Division
are initially identified and entered into a double step down cost
allocation model.  This model assigns costs of the various functions
within ISD to the various billing centers (rates).

ISD provides in excess of 30 different services, none of which exceed
the $5M special data needs requirement contained in OMB Circular A-
87, to the State's operating departments/agencies and other entities.
At the beginning of the year, data from the cost allocation step down
model is entered into another model that analyzes historical utilization

Innovative Costing Solutions LLC

April 11, 2004

0000243

**State of New Mexico**
Description of Billed Central Services

data by billing service and anticipated usage based on the customers needs and a billing rate by service is computed.

The State's departments/agencies are requested to provide information on the billing accounts they want established to accumulate the cost of the services provided by ISD related to these accounts. As services are requested by the departments/agencies throughout the year, they also identify the billing account to be billed that is associated with the request. As ISD generates the data in response to each request, all resources used by service (units of service by billing rate) are identified and charged to the specific account identified on the request.

In March/April of each year, a "mid-year realignment" is performed to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87. The billing rates are adjusted to reflect actual usage and costs to that point in time plus the expected usage and costs to the end of the year. Based on the new billing rates by service, any over/under recovery associated with each account is adjusted to reflect the new billing rates and the actual usage by that account. An adjusted bill by account is sent to the respective departments/agencies. In this manner, each account receives an adjustment proportional to its actual usage. This same process is also performed at the end of the year

5.  Schedule of Current Rates –

    Attached

6.  Treatment of variances

    See item 4 above.

7.  Actuarial Reports

    Not applicable

8.  Explanation of Insurance Fund Contributions Are Determined

    Not applicable

9.  Explanation of Pension Fund Contributions and Dates

    Not applicable

---

**FISCAL YEAR 2004 OFFICE OF INFORMATION PROCESSING RECONCILIATION OF REVENUES AND EXPENDITURES**

## REVENUE

| | Reference | Usage Base Internal Revenue | Audited Statements | General Ledger Trial Balance | Difference between Profit/Audit |
|---|---|---|---|---|---|
| | | 20,472,554 | 21,983,481 | 21,983,481 | |
| ...s Through charges (S.W, Gartner, Xerox, Team Tack) | Model/Various | | | | |
| ...balance Account Adjustment control for in prior year from Reconciliation | Revenue Recon | | (748,631) | (748,631) | |
| ...for the Future Household Policy from Reconciliation | Revenue Recon | | 213,247 | 213,247 | |
| ...Miscellaneous Revenue from Trial | Trial | | 339 | 339 | |
| ...Accessory Assessments (by & Dep Dir Assessments) from Trial | Trial | | (186) | (186) | |
| ...actual less actual utilization times rate versus Yvonne's caculation | Adj util sheet | | (972,824) | (972,824) | |
| INTERNAL REVENUE (only rev associated to rates) | | | (2,872) | (2,872) | |
| | | 20,472,554 | 20,472,554 | 20,472,554 | 0 |

## EXPENDITURES

| | Cost Centers | Usage Base Internal COSTS | Audited Statements | Trial Balance OIP/ERF | Difference between Profit/Audit |
|---|---|---|---|---|---|
| | | 17,166,091 | 17,164,928 | 20,114,129 | |
| ...ate Printing | 8413001 | | 1,230,084 | | |
| HRS | 8414010 | | 1,850,812 | | |
| Adj Entry (Audited Statement needs to reduce expense/included St.Printing) | Various | | 1,919 | | |
| Adj Entry (Audited Statement needs to increase expense from HRS?) | 2061045 | | (180,383) | | |
| | | | 46,769 | | |
| SUB RECONCILIATION | | | | | |
| | | | 20,114,129 | 20,114,129 | |
| ...apital Outlay ?(Non-budgeted) should have been reversed out of expense | Various | | | | |
| ...loss on Disposal (Non-budgeted) | 8420005 | | (1,871) | (1,871) | |
| ...other Finance uses (Non-budgeted) | Various | | 2,653,870 | 2,653,870 | |
| ...tate Printing (Budgeted and Non-Budgeted) | 02060005/08420005 | | (1,919) | (1,919) | |
| HRS (Budgeted and Non-Budgeted) | 02061045/08413001 | | (16) | (16) | |
| Flow Through Charges (S/W, Gartner, Xerox, Team Tack) | 8414010 | | (1,230,084) | (1,230,084) | |
| Non Allocated/Management/Application Support Services (Dorenda)55% HRS | Model/Various | | (1,850,812) | (1,850,812) | |
| Non-Allocated/Management Computer Operation (Millie) 42% Printing | Model/8411005 | | (728,572) | (728,572) | |
| Non-Allocated/Administrative Support (Diana S.) 51% CD, HRS, Printing | Model/8414005 | | (47,276) | (47,276) | |
| Non-Allocated/Customer Serv Management (Karen B.) 51% CD,HRS, Printing | Model/8420010 | | (88,322) | (88,322) | |
| Non-Allocated/Account Manager (Karen B.) 51% CD,HRS, Printing | Model/8421005 | | (282,631) | (282,631) | |
| Non-Allocated/Despatch 100% | Model/8421030 | | (118,037) | (118,037) | |
| Non-Allocated In House Training | Model/8421040 | | (206,804) | (206,804) | |
| Other Financing Sources(Division Assessments) | Model/8414030 | | (361,376) | (361,376) | |
| | Model/Various | | (4,613) | (4,613) | |
| | | | (677,923) | (677,923) | |
| EXPENSE (only expense associated to rates) | | | | | |
| | | $17,166,091 | $17,165,743 | $17,165,743 | $349 |

0000245

State of New Mexico ISD/DP and ISD/CCS Profit/Loss Analysis by Billable Service

Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service

Model Assumptions:
- Detail files are extracted principally from a well-set document under a Budget Status Report.
- Costs include only those allowances by Federal Circular OMB a-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of expense reporting and does not reflect actual Division profit and loss.

| Billing Service | A Total Actual Cost by Billing Service | B Actual Billable Utilizations | C Billable Utilizations, Rated | D Service Rates Based On Actual Service Costs (A/C) | E Actual Service Costs Unrated (B*D) | F Actual Service Costs Rated (C*D) | G ISD Published Service Rates | H Actual ISD Billing Revenue (B*G) | I Actual ISD Profit/Loss vs Billable Revenue (H-E) | Profit/(Loss) Margin by Billing Service (I/E) | 90 Days Working Capital (E045/90) | Acct + "D" Profit + "Loss" Billing Service Adj for Working Capital (H-E+K) | Acct + "D" Profit + Loss Billing Service % (I/E+K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

## GENERAL SERVICES DEPARTMENT
### ISD COMPUTER CENTER SERVICE RATES
### New FY05 and FY06
## "Preliminary - Pending Final Approval"

8/12/2004

| ISD COMPUTER CENTER PRODUCTS | FY04 & FY05 Pending Final Approval RATES & VOLUME | | Pending Final Approval NEW FY05 RATES & VOLUME | | Pending Final Approval NEW FY06 RATES & VOLUME | |
|---|---|---|---|---|---|---|
| **Enterprise Servers** | | | | | | |
| VM CPU - Standard | 17,800.00 | /CPU/Hr | 52,692.00 | /CPU/Hr | 52,692.00 | /CPU/Hr |
| VM CPU - NonPrime | 8,900.00 | /CPU/Hr | 35,128.00 | /CPU/Hr | 35,128.00 | /CPU/Hr |
| VM Start I/O | 0.10 | /1000 | 1.84 | /1000 | 1.84 | /1000 |
| VM Print Pages | 0.02 | /Page | 0.94 | /Page | 0.94 | /Page |
| | | | | | | |
| MVS CPU - Standard | 850.00 | /CPU/Hr | 316 | /CPU/Hr | 316 | /CPU/Hr |
| MVS CPU - Prime | 1,275.00 | /CPU/Hr | 474 | /CPU/Hr | 474 | /CPU/Hr |
| MVS CPU - NonPrime | 425.00 | /CPU/Hr | 158 | /CPU/Hr | 158 | /CPU/Hr |
| MVS Disk I/O | 0.10 | /1000 | 0.03 | /1000 | 0.03 | /1000 |
| MVS Tape I/O | 0.22 | /1000 | 0.08 | /1000 | 0.08 | /1000 |
| MVS Print Local | 0.02 | /Page | 0.01 | /Page | 0.01 | /Page |
| MVS Print Remote | 0.01 | /Page | 0.18 | /Page | 0.18 | /Page |
| | | | | | | |
| UNIX CPU - Standard | 3,000.00 | /CPU/Hr | 532.00 | /CPU/Hr | 532.00 | /CPU/Hr |
| UNIX CPU - NonPrime | 1,500.00 | /CPU/Hr | 506.00 | /CPU/Hr | 506.00 | /CPU/Hr |
| UNIX EXCP | 0.10 | /1000 | 0.03 | /1000 | 0.03 | /1000 |
| | | | | | | |
| DB2 CPU | 900.00 | /CPU/Hr | 1,039.93 | /CPU/Hr | 1,039.93 | /CPU/Hr |
| IDMS EXCP | 0.20 | /1000 | 3.29 | /1000 | 3.29 | /1000 |
| ADABK CPU | 490.00 | /CPU/Hr | 12,073.73 | /CPU/Hr | 12,073.73 | /CPU/Hr |
| ADSO EXCP | 0.10 | /1000 | 5.22 | /1000 | 5.22 | /1000 |
| ADABAS CPU | 0.00 | /CPU/Hr | 319,364.00 | /LS | 319,364.00 | /LS |
| ADABASE EXCP | 0.00 | /1000 | 0.00 | /LS | 0.00 | /LS |
| TSO MVS CPU | 88.00 | /CPU/Hr | 347 | /CPU/Hr | 347 | /CPU/Hr |
| TSO Connect | 0.52 | /Hr | 0.72 | /Hr | 0.72 | /Hr |
| TSO Disk I/O | 0.10 | /1000 | 0.16 | /1000 | 0.16 | /1000 |
| TSO Print Pages | 0.02 | /Page | 1.08 | /Page | 1.08 | /Page |
| Disk Occupancy | 0.00000948 | /KB-Day | 0.00000241 | /KB-Day | 0.00000241 | /KB-Day |
| Tape Storage | 0.30 | /Mo | 0.26 | /Mo | 0.26 | /Mo |
| Fiche Originals | 3.25 | /Ea | 10.47 | /Ea | 10.47 | /Ea |
| Fiche Copies | 1.00 | /Ea | 5.95 | /Ea | 5.95 | /Ea |
| | | | | | | |
| **LABOR** | | | | | | |
| **Project Labor** | | | | | | |
| Project Manager | 80.00 | /Hr | 97.55 | /Hr | 97.55 | /Hr |
| Systems Analyst | 60.00 | /Hr | | | | |
| Sr. Systems Analyst | 70.00 | /Hr | | | | |
| Programmer Analyst | 50.00 | /Hr | | | | |
| | | | | | | |
| **Project Labor** | | | | | | |
| Desktop Support | 100.00 | /Node/Mo | 83.500 | /Hr | 83.500 | /Hr |
| **E-Mail Services (Groupwise)** | 10.00 | /10 MB-Box/Mo | 27.57 | /Box/Mo | 6.48 | /Box/Mo |
| **Training Library** | 250.00 | /Library | To Be Determined | | To Be Determined | |
| **Home Page Hosting** | 45.00 | /Mo | See Open/Distributed - | | See Open/Distributed - | |
| **OPEN/DISTRIBUTED** | | | | | | |
| Shared - GSD Owned & GSD Admin Servers | Quote/MOU | | | | | |
| Web Servers | | | 178.40 | /Server/Mo | 178.40 | /Server/Mo |
| File Servers | | | | | | |
| Application Servers (O/S Only) | | | | | | |
| Data Base Servers | | | | | | |
| | | | | | | |
| Dedicated - GSD Owned & GSD Admin Servers | Quote/MOU | | | | | |
| Web Servers | | | 3,974.37 | /Server/Mo | 3,974.37 | /Server/Mo |
| File Servers | | | | | | |
| Application Servers (O/S Only) | | | | | | |
| Data Base Servers | | | | | | |
| | | | | | | |
| Agency Owned & GSD Admin Servers | Quote/MOU | | | | | |
| Web Servers | | | 877.97 | /Server/Mo | 877.97 | /Server/Mo |
| File Servers | | | | | | |
| Application Servers (O/S Only) | | | | | | |
| Data Base Servers | | | | | | |
| Agency Owned & Agency Admin Servers | Quote/MOU | | | | | |
| Web Servers | | | 304.82 | /Server/Mo | 304.82 | /Server/Mo |
| File Servers | | | | | | |
| Application Servers | | | | | | |
| Data Base Servers | | | | | | |

# State of New Mexico
# General Services Department
## Statement of Revenues, Expenses and
## Changes in Net Assets
## Enterprise Funds
## Year Ended June 30, 2004

| | Enterprise Funds | | |
| --- | --- | --- | --- |
| | 362 Office of Information Processing | 369 ISD Office of Communication | 357 Public Liability |
| **Operating Revenue** | | | |
| Service fees/premiums | $ 21,983,295 | $ 22,890,314 $ | 14,682,872 |
| Federal funds | - | - | - |
| Interest income | - | 10,954 | 1,772,062 |
| Other revenue | 186 | 689,470 | 334,484 |
| Total revenues | 21,983,481 | 23,590,738 | 16,789,418 |
| **Operating Expenses** | | | |
| Current expenses | | | |
| Personnel services | 6,144,439 | 2,544,048 | - |
| Employee benefits | 1,867,634 | 763,107 | - |
| In-state travel | 39,420 | 109,821 | - |
| Out-of-state travel | 17,404 | 4,694 | - |
| Maintenance and repairs | 1,292,166 | 1,951,788 | - |
| Supplies | 489,998 | 200,352 | - |
| Contractual services | 7,521,491 | 363,136 | 8,393,944 |
| Depreciation | 851,288 | 3,676,173 | - |
| Operating costs | (1,572,141) | 13,425,134 | 41,740,698 |
| Other costs | 513,229 | 224,039 | 350,999 |
| Capital outlay | - | 24,354 | - |
| Total expenses | 17,164,928 | 23,286,646 | 50,285,641 |
| **Operating Income (Loss)** | 4,818,553 | 304,092 | (33,496,223) |
| **Nonoperating Revenue (Expense)** | | | |
| Gain (loss) on disposal | (1,919) | - | - |
| Other financing sources (uses) | | | |
| General appropriations | - | - | - |
| Other state agency transfers | - | 2,659,933 | - |
| Other state funds | - | - | - |
| Total other financing sources (uses) | (1,919) | 2,659,933 | - |
| **Income Before Transfers** | 4,816,634 | 2,964,025 | (33,496,223) |
| **Transfers From/(To)** | (620,454) | - | - |
| **Change in Net Assets** | 4,196,180 | 2,964,025 | (33,496,223) |
| Net Assets, Beginning of Year, as Previously Reported | 10,139,356 | 25,947,338 | 2,628,337 |
| Adjustment Applicable to Prior Year | - | - | - |
| Net Assets, Beginning of Year, as Restated | 10,139,356 | 25,947,338 | 2,628,337 |
| Net Assets, End of Year | $ 14,335,536 $ | 28,911,363 $ | (30,867,886) |

*See Notes to Financial Statements*

# State of New Mexico
## General Services Department
### Statement of Net Assets
### Enterprise Funds
### June 30, 2004

| | | Enterprise Funds | |
| --- | --- | --- | --- |
| | | 362 Office of Information Processing | 369 ISD Office of Communication |
| **Assets** | | | |
| **Current Assets** | | | |
| Cash | $ | 7,454,965 $ | 6,509,422 |
| Receivables | | | |
| Severance tax bonds proceeds | | - | - |
| Interest receivable | | - | - |
| Accounts/trade receivables | | 9,249,929 | 4,327,356 |
| Allowance for doubtful accounts | | (2,635,703) | (741,784) |
| Due from/(to) other funds | | 255,112 | (7,902) |
| Due from other agencies | | - | 150,358 |
| Inventories | | 325,423 | 4,037 |
| Total current assets | | 14,649,726 | 10,284,487 |
| **Noncurrent assets** | | | |
| Capital assets | | 14,402,468 | 57,177,373 |
| Accumulated depreciation | | (13,213,620) | (37,284,781) |
| Total noncurrent assets | | 1,188,848 | 19,892,592 |
| Total assets | | 15,838,574 | 30,177,079 |
| **Liabilities** | | | |
| **Current Liabilities** | | | |
| Claims payable | | - | - |
| Accounts payable | | 558,794 | 783,875 |
| Deferred revenue | | - | - |
| Accrued expenses | | 90,564 | 24,643 |
| Due to other agencies | | - | 48,196 |
| Accrued compensated absences | | 604,960 | 299,877 |
| Total current liabilities | | 1,254,318 | 1,156,591 |
| **Long-term Debt** | | | |
| Compensated absences payable | | 248,720 | 109,225 |
| Total liabilities | | 1,503,038 | 1,265,716 |
| **Net Assets** | | | |
| Invested in capital assets, net of related debt | | 1,188,848 | 19,892,592 |
| Restricted for | | | |
| Insurance/claims | | - | - |
| Unrestricted | | 13,146,688 | 9,018,771 |
| Total net assets | $ | 14,335,536 $ | 28,911,363 |

See Notes to Financial Statements.

0000249

### *** Profit / Loss Analysis By Billable Service — 2004 Fiscal Year ***

### State of New Mexico ISD Offices of: Information Processing (OIP) and Client Services (OCS)

| | A | B | C | D |
|---|---|---|---|---|
| | Billing Service | Actual Cost by Billing Service | Actual ISD Billable Revenues | Actual Profit / (Loss) by Billing Service (C - B) |
| **VM CPU - Standard** | $612,694 | $147,187 | ($465,507) |
| **VM CPU - NonPrime** | 509,508 | 61,199 | (448,309) |
| **VM Start I/O** | 5,259 | 10,620 | 5,361 |
| **VM Print Local** | 7,805 | 4,753 | (3,051) |
| | | | | |
| **MVS CPU - Standard** | 2,284,882 | 3,961,295 | 1,676,413 |
| **MVS CPU - Prime** | 585,944 | 1,523,774 | 937,830 |
| **MVS CPU - NonPrime** | 19,320 | 16,747 | (2,572) |
| **MVS Disk I/O** | 394,422 | 796,519 | 402,097 |
| **MVS Tape I/O** | 158,385 | 816,569 | 658,184 |
| **MVS Print Local** | 699,634 | 426,098 | (273,536) |
| **MVS Print Remote** | 217,608 | 13,170 | (204,438) |
| | | | | |
| **CICS CPU - Standard** | 786,167 | 4,124,768 | 3,338,600 |
| **CICS CPU - NonPrime** | 58,093 | 152,398 | 94,305 |
| **CICS EXCP** | 380,374 | 768,148 | 387,774 |
| **DB2 CPU** | 1,886,220 | 746,054 | (1,140,166) |
| **IDMS EXCP** | 1,000,713 | (34,596) | (1,035,309) |
| **ADABAS CPU** | 271,375 | 0 | (271,375) |
| **ADABAS EXCP** | 0 | 0 | 0 |
| **ADSO CPU** | 221,101 | 2,232 | (218,869) |
| **ADSO EXCP** | 544 | 1,099 | 555 |
| **TSO MVS CPU** | 34,252 | 76,154 | 41,903 |
| **TSO Connect** | 558,667 | 70,608 | (488,059) |
| **TSO Disk I/O** | 32,109 | 64,842 | 32,733 |
| **TSO Print Local** | 3,632 | 2,212 | (1,420) |
| | | | | |
| **Project Manager** | 97,104 | 14,440 | (82,664) |
| **Systems Analyst** | 1,228,175 | 118,152 | (1,110,023) |
| **Sr Systems Analyst** | 380,423 | 320,634 | (59,789) |
| **Programmer Analyst** | 97,104 | 2,900 | (94,204) |
| | | | | |
| **Disk Occupancy** | 706,181 | 4,212,878 | 3,506,697 |
| **Tape Storage** | 1,017,838 | 1,489,038 | 471,200 |
| | | | | |
| **Fiche Original** | 159,567 | 37,216 | (122,351) |
| **Fiche Copy** | 159,567 | 18,353 | (141,214) |
| | | | | |
| **Home Page Hosting** | 1,665,068 | 68,244 | (1,596,824) |
| **E-Mail Boxes** | 620,837 | 396,650 | (224,187) |
| **LAN / WAN Mgt Servcs** | 0 | 0 | 0 |
| **Desktop Support** | 0 | 0 | 0 |
| **Training Library** | 305,520 | 42,198 | (263,322) |
| | | | | |
| **Accumulated Totals** | $17,166,091 | $20,472,554 | $3,306,463 |

**Model Assumptions:**

- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2002 through 30 June 2003.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | 2003 Ending Balance | 2004 Actual Cost by Billable Service | 2004 Actual Billed Revenue | Cost % | Rev % | 2004 Profit/Loss By Billable Service | 2004 Ending Balance | Imputed Interest | Less 2004 Final Allowed Working Cap Without Depr | Final 2004 Adjusted Billing Service Balances |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU | -2,182,689 | 1,122,202 | 208,386 | 6.54% | 1.02% | -913,816 | -3,096,505 | 0 | 177,758 | -3,274,263 |
| VM Start I/O | 12,419 | 5,259 | 10,620 | 0.03% | 0.05% | 5,361 | 5,361 | 151 | 833 | 17,098 |
| VM Print Pages | -11,082 | 7,805 | 4,753 | 0.05% | 0.02% | -3,052 | -14,134 | 0 | 1,236 | -15,370 |
| MVS CPU | 567,920 | 2,890,146 | 5,501,816 | 16.84% | 26.87% | 2,611,670 | 3,179,590 | 18,738 | 457,803 | 2,740,524 |
| MVS Disk I/O | 533,446 | 394,422 | 796,519 | 2.30% | 3.89% | 402,097 | 935,543 | 7,345 | 62,477 | 880,411 |
| MVS Tape I/O | 9,592 | 158,385 | 816,569 | 0.92% | 3.99% | 658,184 | 667,776 | 3,387 | 25,088 | 646,074 |
| MVS Print Local | -961,004 | 699,834 | 426,098 | 4.08% | 2.08% | 273,536 | -1,234,540 | 0 | 110,623 | -1,345,363 |
| MVS Print Remote | -60,844 | 217,808 | 13,170 | 1.27% | 0.06% | -204,438 | -265,282 | 0 | 34,469 | -299,751 |
| CICS CPU | 434,059 | 844,260 | 4,277,166 | 4.92% | 20.89% | 3,432,906 | 3,866,965 | 21,505 | 133,732 | 3,754,738 |
| CICS ESCP | 527,982 | 380,374 | 768,148 | 2.22% | 3.75% | 387,774 | 915,756 | 7,219 | 60,252 | 862,723 |
| DB2 CPU | -1,686,283 | 1,886,220 | 746,054 | 10.99% | 3.64% | -1,140,166 | -2,826,429 | 0 | 298,780 | -3,125,209 |
| IDMS EXCP | -2,246,268 | 1,000,713 | -34,596 | 5.83% | -0.17% | -1,035,309 | -3,281,577 | 0 | 158,514 | -3,440,091 |
| ADABAS CPU | -1,226,562 | 271,375 | 0 | 1.58% | 0.00% | -271,375 | -1,497,937 | 0 | 42,986 | -1,540,923 |
| ADSO CPU | -207,852 | 221,101 | 2,232 | 1.29% | 0.01% | -218,869 | -426,721 | 0 | 35,023 | -461,744 |
| ADSO EXCP | 4,044 | 544 | 1,099 | 0.00% | 0.01% | 555 | 4,599 | 43 | 86 | 4,556 |
| TSO MVS CPU | 172,831 | 34,252 | 76,154 | 0.20% | 0.37% | 41,902 | 214,633 | 1,939 | 5,426 | 211,346 |
| TSO Connect | -142,997 | 558,667 | 70,608 | 3.25% | 0.34% | -488,059 | -631,056 | 0 | 88,494 | -719,550 |
| TSO Disk I/O | 83,036 | 32,109 | 64,842 | 0.19% | 0.32% | 32,733 | 115,769 | 994 | 5,086 | 111,677 |
| TSO Print Pages | -11,881 | 3,632 | 2,212 | 0.02% | 0.01% | -1,420 | -13,101 | 0 | 575 | -13,676 |
| Project Manager | 153,322 | 87,104 | 14,440 | 0.57% | 0.07% | -82,664 | 70,658 | 1,120 | 15,381 | 56,396 |
| Systems Analysis | 344,764 | 1,228,175 | 118,152 | 7.15% | 0.58% | -1,110,023 | -765,259 | 0 | 194,545 | -959,804 |
| Microcomp Specialists | -85,461 | 360,423 | 320,634 | 2.22% | 1.57% | -59,789 | -125,250 | 0 | 60,260 | -185,510 |
| Programmer Analysis | 449 | 97,104 | 2,900 | 0.57% | 0.01% | -94,204 | -93,755 | 0 | 15,381 | -109,136 |
| Disk Occupancy | 185,219 | 706,181 | 4,212,678 | 4.11% | 20.58% | 3,506,697 | 3,691,916 | 19,386 | 111,860 | 3,599,442 |
| Tape Storage | -782,398 | 1,017,838 | 1,489,038 | 5.93% | 7.27% | 471,200 | -311,198 | 0 | 161,227 | -472,425 |
| Ficha Originals | -286,665 | 159,567 | 37,216 | 0.93% | 0.18% | -122,361 | -411,016 | 0 | 25,276 | -436,292 |
| Ficha Copies | -233,592 | 159,567 | 18,353 | 0.93% | 0.09% | -141,214 | -374,806 | 0 | 25,276 | -400,082 |
| Home Page Hosting | -2,154,087 | 1,665,068 | 68,244 | 9.70% | 0.33% | -1,596,824 | -3,750,911 | 0 | 263,749 | -4,014,660 |
| E-Mail Boxes | -260,198 | 620,837 | 396,650 | 3.62% | 1.94% | -224,187 | -484,385 | 0 | 98,341 | -582,726 |
| LAN/WAN Mgt Services | -380,845 | 0 | 0 | 0.00% | 0.00% | 0 | -380,845 | 0 | 0 | -380,845 |
| Desktop Support | -247,307 | 0 | 0 | 0.00% | 0.00% | 0 | -247,307 | 0 | 0 | -247,307 |
| Training Library | -220,787 | 305,520 | 42,198 | 1.78% | 0.21% | -263,322 | -484,109 | 81,826 | 48,395 | -532,504 |
| TOTAL | -$10,341,399 | 17,166,092 | 20,472,553 | 100.00% | 100.00% | 3,306,461 | -7,034,938 | 81,826 | 2,719,134 | 12,483,912 |

100.00%    100.00%

851,288

2004 Depreciation

**STATE OF NEW MEXICO**
**INTERNAL SERVICE FUND**
**RECONCILIATION OF RETAINED EARNINGS BALANCE TO FEDERAL GUIDELINES**
**FOR THE YEAR ENDING JUNE 30, 2004**

## OFFICE OF INFORMATION PROCESSING

**OMB A-87 Retained Earnings Balance July 1, 2003**
  Balance per prior year's Reconciliation of Fund to A-87                              ($11,779,988)

**2004 Retained Earnings Increase (Decrease) per CAFR**

  Revenues per CAFR
    Service Fees/Premiums                          $21,983,295
    Interest                                                $0
    Other Revenue                                         $186
      Total Revenues                                                    $21,983,481

  Expenditures per State's CAFR                     $17,164,928
    Plus A-87 Allowable Costs:
      2004 SWCAP costs based on 2002 actuals         ($278,786)
      (if not allocated in Section I of SWCAP to user Depts/Programs)
      Loss on disposal of assets                       $1,919
    Less A-87 Unallowable Costs:
      Capital Outlay-(If recorded as expense)              $0
      Bad Debt Expense                                     $0
    Net adjustments to costs                                           ($276,867)

**Total adjusted A-87 Expenses**
    Retained earnings June 30, 2004                                     16,888,061
                                                                       ($6,684,568)

**Imputed Interest Income (If no interest income recorded above)**
  Calculated on average of beginning and ending cash balance per audit
    at State Treasury Average Rate of Return         $6,223,124    0.010    $62,231

**Transfers to other funds**
  Fund balance transfer to State Printing                              ($620,454)

**OMB A-87 Adjusted Retained Earnings at June 30, 2004**              ($7,242,791)

**Excessive Fund Balance**
  A)  Retained earnings at June 30,2004                               ($7,242,791)
  B)  60-Day Expenditure Equivalency Amount without depreciation       $2,672,796
        (total allowable expenditures less depreciation)/6

    **Excessive Balance (A - B)**                                     ($9,915,586)

**EXHIBIT 5**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
### APPELLATE DIVISION

| | |
|---|---|
| **NEW MEXICO GENERAL SERVICES DEPARTMENT,** <br>       Appellant, <br><br>    v. <br><br> **DIVISION OF COST ALLOCATION,** <br>       Appellee. | ) ) ) ) ) ) ) ) ) ) <br><br> **DOCKET NO. A-06-105** |

## AFFIDAVIT OF ROBERT G. PETERS

I, ROBERT G. PETERS, hereby depose and state as follows:

  1.   I serve as Executive Budget Analyst in the New Mexico Department of Finance and Administration. My responsibilities include preparing the Governor's budget recommendation for the Human Services Department and the General Services Department. This entails year-round oversight of these agencies.

  2.   I work closely with the General Services Department ("GSD") on accounting issues concerning the Information Systems Division internal service fund ("the information services ISF"). I also participate in preparing the section of New Mexico's annual statewide cost allocation plan ("SWCAP") on billed central services, including the information services ISF. In working with GSD on these issues, I have become thoroughly familiar with the rate structure and cost allocation methodologies that GSD uses.

3.      The ISF provides computer services—hardware, software, email services, and technical support—to New Mexico state agencies ("customer agencies"). In fiscal year 2004, the fund included thirty-two categories of information services. These categories are listed, along with a glossary of terms used, in Exhibits 8.a and 8.b to the Brief, and I affirm the accuracy of these documents. GSD has since streamlined the service categories. As of fiscal year 2008, the fund will contain 24 service categories, grouped into three clusters.

4.      The fund's costs, incurred by GSD, include the direct costs of providing services, such as salary and wage costs, hardware, and software; depreciation of assets; overhead costs, such as building maintenance; and allowable indirect costs. GSD uses allocation methods to assign all costs to the thirty-two service categories.

5.      In the mid-1990s, the Division of Cost Allocation ("DCA") informed GSD that GSD needed to reform cost allocation and billing policies in the ISF in several ways. Chiefly, DCA required that GSD switch to a cost-based rate system. Previously, GSD had established rates by reference to the rates that a private provider of information services would charge. GSD therefore, in consultation with DCA, implemented a system for monitoring service usage and for allocating costs among the categories of services provided as part of the ISF.

6.      GSD policy is to calculate billing rates for each service category using estimated costs, which are based on historical usage, taking into account routine increases in fixed costs and anticipated changes in variable costs. Then, estimated cost is divided by anticipated per-unit usage in the rate year to achieve unit rates. Rates are then applied to actual reported service units to obtain the amounts billed to the customer agencies.

7.      In fiscal year 2004 and the four fiscal years preceding it, GSD calculated rates as set forth above, but did not implement them. During this period, the cost-based rates originally

calculated for fiscal year 1999 continued in use. From fiscal year 2005 forward, GSD has implemented updated cost-based rates. A GSD-audited cost reconciliation analysis shows that there was no overcharge in any ISF category in fiscal year 2005 exceeding $500,000.

8.    GSD issues monthly invoices to state agencies. State customer agencies request that billing accounts be established to reflect distinct activities. GSD monitors and reflects in each account's monthly invoice the services consumed by the account. The state customer agency's payment reflects one total amount for consumption of all service categories by that agency.

9.    GSD does not use "imputed" or "memo" billings: each invoice is a request for payment. The ISF relies entirely on state customer agency payments (and interest earned on those payments) in order to operate.

10.    The billing account is the most specific level at which GSD bills information services usage. Therefore, even though multiple federal programs may participate in a state agency's billing account, the makeup of federal program users is identical from one service category to the next within the account. Each program participates in a fixed portion of the account's costs.

11.    After the finish of each fiscal year, GSD analyzes actual costs in each service category of the ISF, applying the cost allocation model discussed above. GSD then compares actual costs with revenues: payment rates received for the service category, plus imputed interest (interest at the state treasury earning rate) on payments. GSD then takes into account the 60-day reserve for operating revenues permitted by Circular A-87, in order to obtain a final profit or loss for each service category.

12.    A variety of factors may cause actual costs to fall short of the anticipated costs on which rates were based, resulting in an overcharge: for example, staffing levels might drop; or usage levels for a service may be higher than anticipated, increasing efficiency of service delivery and creating a lower per-unit cost. Conversely, an increase in staffing or unexpectedly low usage levels might result in an undercharge for a service.

13.    GSD conducts an audit of the cost settlement information before it is finalized and submitted to DCA as part of the SWCAP. As required by Office of Management & Budget Circular A-87, Attachment C, Paragraph G.4, New Mexico's annual SWCAP includes cost reconciliation information on internal service funds, including the information services ISF.

14.    The SWCAP does not dictate the specific method for implementing the cost reconciliation in the information services ISF. GSD has developed new cost-based rates from fiscal year 2005 forward, and has implemented a year-end cost reconciliation for that year that reflects an adjustment to the fiscal year 2007 billing rates based on deficit or excess positive balance in the previous fiscal years.

15.    The SWCAP description of this internal service fund contemplates that, as well as a year-end cost reconciliation, a "mid-year rate realignment" may be performed. This realignment was not performed in fiscal year 2004.

16.    I participated in preparing and submitting to DCA the SWCAP containing cost reconciliation information for the ISF for fiscal year 2004.

17.    Normally, the deadline for preparing the plan containing the cost reconciliation for 2004 would be December 31, 2004. The State ran behind schedule because of delays in

obtaining the audit verifying the supporting cost information. The plan was submitted on October 15, 2005.

18.    In the SWCAP and through subsequent submissions to DCA, the State compiled cost reconciliation information for the information services ISF as a whole and for the federal share of amounts overcharged to three state customer agencies: the Human Services Department; the Children, Youth and Families Department; and the Department of Health. These are the three state agency customers of the ISF with more than negligible federal funding.

19.    The analysis revealed that in ten service categories, revenues in SFY 2004 exceeded allowable costs; in sixteen service categories, allowable costs exceeded revenues. (Of the thirty-two service categories, six had neither undercharges nor overcharges to HSD. In five categories, HSD had no charges in fiscal year 2004; one category had a year-end balance of zero.)

20.    The analysis that GSD submitted to DCA in the SWCAP, and modified in the course of subsequent discussions, determined the federal financial participation ("FFP") in each state agency's service-category overcharges and undercharges by applying a weighted average of federal participation in all of the agency's fiscal year 2004 payments for ISF services. The three state customer agencies provided this information. For HSD, this FFP was calculated at 62.89%.

21.    GSD summed the federal share in all service-category overcharges and undercharges to HSD (determined using the weighted average FFP) to obtain an overall overcharge for HSD. This calculation, after reflecting corrections that GSD made through dialogue with DCA in 2006, disclosed that within HSD, federal programs were overcharged by $1,716,068. This calculation is summarized in Exhibit 10.b, and I affirm the accuracy of that document.

22.     The use of a state-agency weighted average FFP to compute an overcharge or undercharge for each service category was consistent with HHS guidance, and DCA did not ask for the information to be provided in any other format.

23.     GSD had not yet taken steps to adjust future billing rates to reflect the cost reconciliation for SFY 2004 when DCA, on February 22, 2006, issued a disallowance letter seeking a refund of the federal share of certain ISF overcharges in SFY 2004. DCA's disallowance took into account only five service categories in which the ISF had overcharged federal programs, without considering the sixteen service categories with undercharges.

24.     GSD later requested that DCA amend its February 22, 2006 disallowance, for two reasons. First, GSD asserted that DCA should consider service-category undercharges in computing a refund, and that the proper amount owed was $1,716,068, which reflected all overcharges and all undercharges to federal programs. Second, GSD submitted data correcting errors in GSD's cost allocation methodology, and requested that the refund amount be modified accordingly. DCA denied the first request, but did modify the determination based on GSD's corrected data. DCA issued a revised determination on June 22, 2006, seeking a refund (including pre-disallowance interest through the date of the disallowance letter) of $4,011,031. The disallowance calculation is summarized in Exhibit 10.c, and I affirm the accuracy of this document.

25.     Between June and December 2006, GSD and DCA engaged in unsuccessful efforts to resolve the dispute through negotiation.

26.     During this period, in order to alleviate any potential concern on the part of DCA that consideration of cost-revenue variances in all service categories could result in cost-shifting, the State refined its previous analysis of cost-revenue variances by identifying all overcharges

and undercharges to federal programs. First, GSD analyzed all monthly ISF invoices to Human

Services Department billing accounts for fiscal year 2004. Exhibit 9.a to the brief summarizes

this analysis, and I affirm the accuracy of that document. The analysis first obtains an

overcharge or undercharge for each billing account by summing the service-category

overcharges and undercharges for the account. This analysis is contained in the spreadsheet at

Exhibit 9.b, and I affirm its accuracy. The data used to identify the per-unit overcharge or

undercharge for each service category are identical to the data supporting DCA's disallowance.

"Netting" of overcharges and undercharges across service categories within a billing account

does not result in the shifting of costs, because the makeup of federal-program users and the

allocation methodology used to charge those programs are identical from service to service

within the account.

     27.    Next, the analysis identifies the percentage of each account's overcharge or

undercharge attributable to each federal program, and uses the FFP applicable to that program's

administrative costs to determine federal participation in the overcharge or undercharge. I

worked with Lynn Scheller of GSD and Donna Sandoval of HSD to perform this analysis. The

analysis is attached to the Brief as Exhibit 9.c, and I affirm its accuracy.

     28.    The new analysis reveals that the federal share of GSD's total net overcharge to

HSD was $1,683,715. This amount is lower than the amount obtained, $1,716,068, using a

weighted-average FFP for HSD. This demonstrates that while minor cost-shifting did result

from the use of an average FFP in the Human Services Department (the method used by DCA in

calculating the disallowance), this cost-shifting actually benefited federal programs, because

billing accounts with a lower level of federal participation bore a heavier share of the

overcharges. The federal share of all costs in the ISF in 2004 was about 63%, while the federal share in overcharges was 61.7%.

29.    GSD's refined overcharge analysis not only ensures that there is no cost-shifting between federal and state funds; it also guarantees against cost-shifting among federal programs. This concern could arise only if one federal program were, on the whole, undercharged for ISF services in FY 2004. Offsetting this program's undercharge against another program's overcharge would cause the refund to be insufficient to reimburse each federal program in the amount of its overcharge. GSD identified the cost-revenue variance attributable to each federal program and found that each program, as a whole, was overcharged in SFY 2004.

30.    GSD, using the base amount of $1,683,715 obtained above, has recomputed the amount owing to the federal government. This computation takes into account the DCA findings with respect to the Children, Youth & Families Department and the Department of Health ($66,676), which the State is not contesting. The computation also incorporates pre-disallowance interest (using the interest rate determined by DCA in Attachment 3 to its disallowance letter) through the date of the disallowance letter. The final amount owing to the federal government is $1,852,193. I affirm the accuracy of this computation, attached as Exhibit 10.a to the Brief.



Robert G. Peters
Executive Budget Analyst
New Mexico Department of Finance
& Administration

Signed before me on this 16th day of January, 2007.

Notary Public

My Commission Expires:

_2- 7- 2008_

My Commission Number:

_____

# EXHIBIT 6.a

# Summary of Human Services Department Billing Accounts

Charges from the General Services Department information services internal service fund ("ISF") are billed to the Human Services Department ("HSD") using ten billing accounts. HSD has requested that GSD establish billing accounts associated with different areas of program activity within HSD. HSD has three program divisions: Child Support Enforcement ("CSED"), Medical Assistance ("MAD"), and Income Support ("ISD"). Eight billing accounts are associated with one program division each. The two remaining billing accounts are associated with HSD's Administrative Services Division, which supports all three program divisions.

Federal programs participated in the costs of all ten accounts in state fiscal year ("SFY") 2004 as described below. Also listed below are the results of the cost reconciliation analysis that the State performed in order to determine overcharges at the federal program level. The attached flowchart, Exhibit 6.b, summarizes the movement of ISF billings through the HSD accounts to federal programs.

Once HSD pays bills for ISF services, the costs are allocated to federal programs according to each program's percentage of participation in that billing account's total costs. In a billing account in which multiple federal programs participate (see headings 3 and 4 below), each federal program participates in the costs of each ISF category in accordance with a single allocation calculation. The makeup of federal users is identical from service to service within the account. Therefore, the federal participation levels listed for each account below apply to every service category within that account.

## 1.    Account 628 - Child Support Enforcement Division

GSD account code 628 is used for the billings of system usage related to CSED. One hundred percent of this account's costs are allocated to the Child Support program. HSD made payment on the billings for these account codes using the organizational code 6102, which is the indirect cost pool for CSE. The expenditures posted to organizational code 6102 are reported on the Form OCSE-396A.

For fiscal year 2004, the Child Support program had a 66% federal financial participation ("FFP") rate for ISF expenditures. Therefore, the FFP for Account 628 is 66%.

In 2004, the overcharge to Account 628 totaled $1,177,276. The federal share of this overcharge was $777,002.

## 2.    Account 629 - Medical Assistance Division

GSD account code 629 is used for the billings of system usage related to MAD. One hundred percent of this account's costs are allocated to the Medicaid program. HSD made payment on the billings for this account code using the organizational code 8102, and these amounts are reported on the CMS-64.

For SFY 2004, the Medicaid program had a 50% FFP rate for ISF expenditures. Therefore, the FFP for Account 629 is 50%.

In 2004, Account 629 was undercharged by [$5,002]. The federal share was [$2,501].

3.    Accounts 620, 622, 625, 626, 627, 640 - Income Support Division

These six GSD accounts are used for the billings of system usage related to ISD. Unlike the other two program divisions, ISD serves multiple programs. Seven federal programs are included in ISD: Temporary Aid for Needy Families ("TANF"), Food Stamps, Food Stamps Employment and Training, Medicaid (Administration), the Low Income Home Energy Assistance Program ("LIHEAP"), Refugee Cash and Medical Assistance, and Systematic Alien Verification for Entitlements ("SAVE"). One state-only program, General Assistance, is also included in ISD. HSD made payment on these accounts using organizational code 9102.

Charges to ISD are allocated among the six federal programs and General Assistance using a Random Moment Sampling ("RMS") methodology, which is a time study used to allocate the time of eligibility workers responsible for determining eligibility for the assistance programs. In addition, time associated with overhead and time that is common to all programs are captured and allocated to programs based upon the RMS results. HSD queries a sample of eligibility workers about the programs they are working on, and the results are recorded on the random moment survey documents. Surveyed staff identify the program for which they are determining eligibility, as well as the name and number of the client being served at the randomly selected sample time. The information collected is used to distribute costs among the several programs for which eligibility determination occurs.

Based on the RMS results, the charges are allocated among programs in the ISD accounts. In all six ISD accounts, billings are allocated among federal programs in the same fashion.

For SFY 2004, each program participated in ISD billings to the extent below. Taking into account each program's RMS allocation and FFP, the level of federal participation for the ISD accounts for 2004 was 58.67%.

- **TANF:** 18.4% of ISD costs in SFY 2004 were claimed under TANF. TANF has an FFP of 100% for administrative expenses. Expenses are reported on Form ACF-196.

- **General Assistance:** 2.2% of ISD costs in SFY 2004 were allocated to General Assistance. General assistance is a state-only program.

- **Refugee Cash and Medical:** .6% of ISD costs in SFY 2004 were claimed under Refugee Cash and Medical. This program has an FFP of 100% for administrative expenses. Expenses are reported on Form Refugee Cash and Medical 296-A.

2

- **Food Stamps:** 52% of ISD costs in SFY 2004 were claimed under Food Stamps. This program has an FFP of 50% for administrative expenses. Expenses are reported on Form FNS-269.

- **Medicaid (Administration):** 25.74% of ISD costs in SFY 2004 were claimed under Medicaid. Medicaid has an FFP of 50% for ISF expenses. No enhanced MMIS matching rate applies. Expenses are reported on Form CMS-64.

- **LIHEAP:** .62% of ISD costs in SFY 2004 were claimed under LIHEAP. LIHEAP has an FFP of 100% for administrative expenses. Expenses are reported on Form LIHEAP 269A.

- **SAVE:** .04% of ISD costs in SFY 2004 were claimed under SAVE. SAVE has an FFP of 50% for administrative expenses.

- **Food Stamps Employment and Training:** .4% of ISD costs in SFY 2004 were claimed under this program, which has an FFP of 50% for administrative expenses. Expenses are reported on Form FNS-269.

In SFY 2004, the total overcharge to ISD accounts was $1,874,560, with a federal share of $1,099,878.

4.    Accounts 623 and 630 - Administrative Services Division

Accounts codes 623 and 630 are used for the billings of system usage related to the Administrative Services Division ("ASD"). HSD made payment on the billings for these account codes using the organizational code 1202, which is an indirect cost pool for ASD. During the quarterly cost allocation process, the expenditures posted to organizational code 1202 are allocated based on the number of employees in each of the three program divisions: CSED, MAD, and ISD. The number of employees calculation is taken from the quarterly payroll register and includes both paid full- and part-time employees at the end of the quarter. The percentage allocation to each of the HSD program divisions for SFY 2004 was the following: CSED 25%, MAD 10%, and ISD 65%.

The amount allocated to CSED, as described in section 1 above, is allocated fully to Child Support Enforcement, and reported on the OCSE-396A. The amount allocated to MAD, as described in section 2 above, is allocated fully to Medicaid, and reported on the CMS-64.

The amount allocated to ISD is further allocated based on the RMS results, as described in section 3 above.

Based on these allocations, the federal participation in the Administrative Services Division accounts is 59.9%.

In SFY 2004, the total undercharge to the ASD accounts was $[318,150]. The federal share was $[190,663].

3

# EXHIBIT 6.b

# How ISF Charges Reach HSD-Administered Federal Programs







0000267

**EXHIBIT 7**

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**DEPARTMENTAL APPEALS BOARD**
**APPELLATE DIVISION**

| | |
|---|---|
| **NEW MEXICO GENERAL SERVICES DEPARTMENT,** )<br>)<br>) | |
| Appellant, ) | |
| ) | |
| v.  ) | **DOCKET NO. A-06-105** |
| ) | |
| **DIVISION OF COST ALLOCATION,** ) | |
| Appellee. )<br>) | |

**AFFIDAVIT OF DONNA SANDOVAL**

I, DONNA SANDOVAL, hereby depose and state as follows:

1.      I serve as Bureau Chief, Grants Management, in the Administrative Services Division of New Mexico's Human Services Department ("HSD").  As Grants Management Bureau Chief I complete the Schedule of Expenditures of Federal Awards and supporting schedules, oversee the completion of the cost allocation plan, review quarterly and annual federal reports, ensure federal revenue and federal accounts receivable is reconciled, and research applicable grant requirements as necessary.

2.      HSD administers federal-state assistance programs including Medicaid, Child Support Enforcement, Food Stamps, the Low Income Home Energy Assistance Program, Refugee Cash and Medical Assistance, and Temporary Aid for Needy Families ("TANF").

0000268

3.    HSD is the dominant customer of the information services ISF. It purchases approximately half of the information services that GSD provided through the fund in fiscal year 2004. Approximately 95% of the federal funds that support the ISF's operations derive from HSD-administered programs. HSD is the customer agency with the most significant federal financial participation; in state fiscal year 2004, federal programs contributed in the aggregate approximately 63% of the total ISF costs paid by HSD.

4.    ISF charges billed by GSD to the Human Services Department for information technology services reach the federal programs that HSD administers through a two-tiered process. First, GSD bills each HSD account for services used each month. The invoice breaks down ISF services into categories.

5.    Second, HSD allocates charges from each account to federal programs as administrative expenses for each program. Service categories are not relevant in this process: HSD charges a fixed percentage of a billing account's costs to each federal program. Therefore, within each HSD account, the makeup of federal-program users is identical from one service category to the next.

6.    HSD's three program divisions—Medical Assistance ("MAD"), Child Support Enforcement ("CSED"), and Income Support ("ISD")—coincide with three principal billing account areas. The relationship between billing accounts and charges to federal programs is described in Exhibit 6.a to the brief and depicted in the flowchart attached to Exhibit 6.b, and I affirm the accuracy of these documents.

7.    Two billing accounts, MAD (Account 629) and CSED (Account 628), include charges to only one federal program each: Medicaid, for MAD; and Child Support, for CSED.

Therefore, any over- or underbilling by the ISF to those accounts is clearly traceable to one federal program.

8.    The third program division, ISD, is comprised of six GSD billing accounts (Accounts 620, 622, 625, 626, 627, and 640). The charges to the six ISD accounts reflect the information technology costs that eligibility workers incur while administering various programs. ISD services benefit seven federal programs: TANF, Medicaid (Administration), Food Stamps, Food Stamps Employment and Training, the Low Income Home Energy Assistance Program ("LIHEAP"), Refugee Cash and Medical Grant, and Systematic Alien Verification for Entitlements ("SAVE"). ISD services also benefit the state-funded General Assistance program.

9.    HSD pools the ISF charges to the six Income Support Division accounts with other administrative expenses, and then allocates these costs among benefiting federal programs and the General Assistance program using a random moment sample ("RMS"). The RMS methodology and the percentages allocated to each program in SFY 2004 are described in detail in Exhibit 6.a to the Brief.

10.    Because the same RMS results dictate the allocation of costs to federal programs in all six ISD accounts, each program bears the same share of costs in all six accounts. For example, during fiscal year 2004, Food Stamps was allocated 52% of ISF charges in all six of the ISD accounts.

11.    Finally, two billing accounts serve the Administrative Services Division ("ASD") of HSD. ASD administratively supports the three program divisions. ISF charges to this division are allocated among the three HSD program divisions (ISD, CSED, and MAD)

according to the number of employees in each division. This allocation process is described in Exhibit 6.a.

12.    For each of the HSD-administered federal programs contributing to ISF payments, HSD seeks reimbursement of ISF payments as administrative costs. HSD's quarterly claims for reimbursement from federal programs contain one line item for administrative expenses; HSD payments to GSD for ISF services are grouped with other administrative expenses on this line.

13.    For fiscal year 2004, at the request of GSD, I prepared a weighted average federal financial participation ("FFP") rate for ISF costs incurred by the Human Services Department. I provided this information to GSD to use the FFP in computing the federal share of all service-category overcharges to the Human Services Department in 2004. I obtained the average by taking into account the total amount of ISF expenses that each federal program bore in 2004, and each program's federal participation rate. This method is the most targeted average. An inexact calculation, by contrast, would use a non-weighted average of federal participation in all program and administrative expenditures of the Human Services Department.

14.    Nonetheless, the use of *any* average FFP may lead to a refund amount that does not accurately capture federal participation in overcharges and undercharges. This is because, while the weighted average captures each federal program's participation in all ISF costs, overcharges may be distributed in a way that disproportionately impacts certain programs.

15.    I worked with Bob Peters on completing the federal program-specific analysis of ISF overcharges for fiscal year 2004. I attest to the accuracy of this analysis, attached as Exhibits 9.b and 9.c to the Brief. This more sophisticated analysis responds completely to DCA's concerns about "cost-shifting." This analysis determines the units of each service

attributable to each federal program in each HSD billing account in fiscal year 2004, and applies the FFP of that program to determine its overall share in over- and undercharges.

16.    For example, as shown in Exhibit 6.a, in 2004, 18.4% of all ISF costs billed to Income Support Division accounts within the Human Services Department were allocated to the TANF program.  TANF reimburses administrative expenses at 100%.  TANF thus bore 18.4% of all service category overcharges to the Income Support accounts, and benefited from 18.4% of all service category undercharges to ISD.   Our analysis therefore applied a 100% FFP to 18.4% of the overall overcharge for each ISD account to reflect the participation of TANF in these cost-revenue variances.

17.    I declare under penalty of perjury that the foregoing is true and correct.

_____

Donna Sandoval, Bureau Chief
Grants Management
Administrative Services Division
New Mexico Human Services Department


Signed before me on this _16_th day of January, 2007.

_____
Notary Public


My Commission Expires:

_____ 9.29.07

# EXHIBIT 8.a

# GSD Information Services ISF
## Categories - Fiscal Year 2004

VM CPU

VM Start I/O

VM Print Pages

MVS CPU

MVS Disk I/O

MVS Tape I/O

MVS Print Local

MVS Print Remote

CICS CPU

CICS EXCP

DB2 CPU

IDMS EXCP

ADABAS CPU

ADSO CPU

ADSO EXCP

TSO MVS CPU

TSP Connect

TSO Disk I/O

TSO Print Pages

Project Manager

Systems Analyst

Microcomp. Specialist

Programmer Analyst

Disk Occupancy

Tape Storage

Fiche Originals

Fiche Copies

Home Page Hosting

E-Mail Boxes

LAN/WAN Mgt. Services

Desktop Support

Training Library

**EXHIBIT 8.b**

# General Services Department
# ISF SERVICE RATE TERMINOLOGY - Fiscal Year 2004

## Operating Systems

VM:          The acronym "VM" stands for Virtual Machine.

VM refers to a family of high-performance operating systems that control the resources of an Enterprise Server. VM in the Enterprise Server domain is analogous to Windows XP in the desktop/laptop world. The specific VM family member used by ISD is ZVM 5.2. VM permits the sharing of the Enterprise Server's resources so that each user is presented with the appearance of having exclusive ownership of the computer system's resources.

ISD uses VM/ESA in two ways:
- To control the multiple MVS operating systems which ISD runs;
- To serve as an application platform.

The context in which "VM" is used in ISD's Service Rate Terminology is to refer the use of VM as an application platform.

MVS:         The acronym "MVS" stands for Multiple Virtual Storage.

MVS refers to a family of operating systems which manage an Enterprise Server's resources in order to provide batch and interactive application services. MVS in the Enterprise Server domain is also somewhat analogous to Windows XP in the desktop/laptop world. The specific MVS family member used by ISD is ZOS 1.4. MVS is noted for its ability to accommodate a very high volume of work with rapid response.

The context in which the term "MVS" is used in ISD's Service Rate Terminology is to refer to resources used by "batch" processing within MVS.

Resources used by "interactive" processing within MVS are billed in different categories.

## Enterprise Server

CPU:   A measure of utilization of the central processor engines. A CPU Hour is any number of CPU seconds divided by 3,600, the number of seconds in an hour. Thus a "CPU Hour" represents the amount of work that a single processor engine can perform in one hour at maximum utilization.

This measure should not be confused with "wall clock hours." In a multi-processor environment, a dedicated CPU task can accumulate more than a single CPU Hour during a wall clock hour since multiple subtasks can be performed simultaneously. A computer job that runs over the course of several "wall clock hours" may possibly only use a few minutes of CPU time.

## Input/Output (I/O) Operations

Disk I/O in the Enterprise Server domain is analogous to opening, or saving from or to, your hard drive in the desktop/laptop world. Tape I/O in the Enterprise Server domain is somewhat analogous to retrieving, or saving from or to, your external tape drive in the desktop/laptop world.

START I/O: A transfer of a block of data between the processor and an input/output device. The amount of data involved in a single START I/O can vary, depending on the block size. A count of the START I/O's represents a count of the number of blocks of data transferred.

DISK I/O: A transfer of a block of data between the processor and a disk device. The amount of data involved in a single DISK I/O can vary, depending on the block size. A count of the Disk I/O's represents a count of the number of blocks of data transferred.

TAPE I/O: A transfer of a block of data between the processor and a tape device. The amount of data involved in a single TAPE I/O can vary, depending on the block size. A count of the Tape I/O's represents a count of the number of blocks of data transferred.

EXCP: A transfer of a block of data between the processor and an input/output device. The amount of data involved in a single EXCP can vary, depending on the block size. A count of the EXCP's represents a count of the number of blocks of data transferred.

Technically, EXCP is the shortened term for the "Execute Channel Program" macro instruction.

CICS, DB2, IDMS, ADABAS:

DB2, ADABAS, and IDMS in the Enterprise Server domain are somewhat analogous to MS Access in the desktop/laptop world.

The context in which these terms are used in ISD's Service Rate Terminology is to refer to resources used by "interactive" application processing within MVS. Use of resources here does not appear under the "MVS" category, which, as stated above, is for "batch" resources.

ADSO: A high-level language used to develop applications for use with IDMS databases.

TSO: An MVS-based interactive tool used for application development and data set management.

The acronym "TSO" stands for "Time Sharing Option."

CONNECT: The "wall-clock" time interval between the time a LOGON command is issued and the following LOGOFF command is issued. This measure is associated with use of TSO services.

2

0000275

**DISK OCCUPANCY:**

> Disk Occupancy in the Enterprise Server domain is analogous to the file size on your hard drive in the desktop/laptop world.

**TAPE STORAGE:**

> A measure of data storage used on a tape device. The unit of measure is a "tape-month," which represents storage of (1) magnetic tape for (1) month.

**PRIME TIME:**

> The hours from 8:00 a.m. to 5:00 p.m. Monday through Friday.

**NONPRIME TIME:**

> The hours after 5:00 p.m. (i.e. from 5:00 p.m. to 8:00 a.m.) on Monday through Friday. This also includes all 24 hours on Saturday and Sunday. For VM and CICS services, NONPRIME TIME also includes holidays. NonPrime Time is a client cost enticement and client savings reward for good social behavior. By encouraging non-time-critical processing migration to low-load nights and weekend times, Prime Time loading is reduced and processor life is considerably extended. While Circular A-87 is essentially silent regarding this matter, federal auditors have, in the past, recognized "load leveling" as good business practice, thereby reducing costs to federal funds.

3

# EXHIBIT 9.a

# New Mexico General Services Department
## Summary of Overcharge Computation at Federal Program Level

The calculation of ISF overcharges to federal programs is based on a comparison of billed revenue to cost by Human Services Department ("HSD") billing account. GSD has used the same data to prepare this analysis that it used to prepare the fund balance analysis that formed the basis for DCA's disallowance calculation. However, rather than calculating the overcharges at the service-category level for usage by the entire Human Services Department, the State's refined analysis determines over- and undercharges at the federal program level.

Each HSD billing account represents either a single federal program or a group of federal programs. All services used by an account are charged on a single bill each month. GSD invoices monitor information services usage at the billing-account level. Therefore, where multiple federal programs participate in one account, each program participates in a fixed portion of the costs associated with that account. From service to service within an account, the makeup of federal program users is identical.

GSD has reviewed account billings to determine units of each service category consumed during state fiscal year ("SFY") 2004. GSD then obtained a service category overcharge or undercharge for each account, by applying to that account's actual usage for each service category, the per-unit overcharge or undercharge for that category reflected in the disallowance work papers. Next, GSD summed the category overcharges and undercharges to obtain a total undercharge or overcharge for each billing account. This process is reflected in the spreadsheet at Exhibit 9.b.

Next, GSD determined the federal share in each billing account's over- or undercharges. This process is reflected in the spreadsheet at Exhibit 9.c. For accounts identified with one federal program, GSD applied that program's FFP for ISF expenditures to the total overcharge or undercharge. For other billing accounts, HSD informed GSD of the percentage of the account's costs allocated to each federal program (the leftmost column in the Exhibit 9.c spreadsheet), and the FFP each program uses for ISF expenditures (the second-from-the-right column in the Exhibit 9.c spreadsheet). GSD multiplied the two percentages to obtain the percentage of each account's costs reimbursed by each federal program. For example, the TANF program participated at the level of 18.4% in the costs of each Income Support Division account in SFY 2004. TANF reimburses ISF costs at a rate of 100%. Therefore, the TANF program reimbursed 18.4% of all billings to the ISD accounts in SFY 2004, and TANF also bore an 18.4% of the overcharge to ISD accounts that year.

This calculation guarantees precision in determining the amount by which federal programs were overcharged. There is no risk of cost-shifting between federal and state programs. Moreover, there is no risk of cost-shifting among federal programs. Cost-shifting among federal programs could occur if one federal program had a net undercharge for SFY 2004. As shown in Exhibit 9.c to the Brief, this condition is not present here; each federal program had a net overcharge.

# EXHIBIT 9.b

## Detail of Calculations in Exhibit 9.b

**Beginning fund balance totals** (Column A)

GSD used the same beginning fund balance data as were used in the DCA calculation of overcharges. The beginning fund balance has been allocated to each account on the basis of the ratio of account service utilization to total service utilization.

**Actual service costs unrolled** (Column E)

GSD calculated the actual cost of providing a unit of service multiplied by the service utilization.

**Actual billable revenues** (Column H)

GSD used actual account billings for each service category.

**Actual profit/loss** (Column I)

Actual billed revenue (Column H) less cost (Column E).

**FY 2004 ending fund balance** (Column J)

Beginning fund balance (Column A) minus actual service costs unrolled (Column E), plus actual ISD billed revenue (Column H).

**Imputed interest** (Column K)

For service categories with overcharges, GSD calculated imputed interest as follows: Beginning fund balance (A) plus ending fund balance (J) divided by two, multiplied by .01 ( New Mexico overnight average yield for SFY 2004).

**Cost Percent** (Column L)

The cost percent is the cost of the specific service as a percent of total internal service fund costs. This is used to allocate a portion of total ISD depreciation to each service.

**60 Days Working Capital** (Column M)

Sixty days working capital is calculated by subtracting the allocated portion of depreciation from the actual cost for each service, and dividing by six.

**A-87 Adjusted Fund Balance** (Column N)

The A-87 adjusted fund balance is the FY 2004 ending fund balance plus imputed interest minus sixty days working capital.

0000278

*** State of New Mexico GSD / OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD Billing Account #620 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

FY04 Model Constants:
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $851,288

Model Assumptions:
- Costs are allocated principally from a salvage document and/or by a Budget Status Report.
- Costs include only those allowable by Federal OMB Circular A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C+D) | H Actual ISD Billable Revenues | I Actual ISD Profit(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A - E) + H) | K Imputed Interest ((A - E) / 2 * IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Dep*L/6) | N A-87 Adjusted Fund Balance ((L + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| DB2 CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| IDMS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | 0 | N/A | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 1,493 | 12,562 | 12,562 | $33,964 | 21,402 | $22,895 | $122 | 0.0711% | $1,893 | $21,025 |
| Tape Storage | (3,985) | 7,413 | 7,413 | $7,413 | 0 | ($3,985) | $0 | 0.0419% | $1,176 | ($5,071) |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Accumulated Totals | ($2,492) | $19,975 | $19,975 | $41,377 | $21,492 | $19,001 | $122 | 0.1130% | $3,169 | $15,954 |

0000279

*** State of New Mexico GSD / OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD Billing Account #622 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

**FY04 Model Constraints:**
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $851,286

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C×D) | H Actual ISD Billable Revenues | i Actual ISD Profit/(Loss) by Billing Service (H − E) | J FY2004 Ending Fund Balance ((A − E) + H) | K Imputed Interest ((A + J)/2 × IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Dept × L/6) | N A-87 Adjusted Fund Balance ((J + K) − M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| I/O General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
|  |  |  |  |  |  |  |  |  |  |  |
| MVS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| CICS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| DB2 CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| IDMS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| Disk Occupancy | 2 | 20 | 20 | $54 | 34 | $37 | $0 | 0.001% | $3 | $34 |
| Tape Storage | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |
| **Accumulated Totals** | $2 | $20 | $20 | $54 | $34 | $37 | $0 | 0.0001% | $3 | $34 |

Model Assumptions:
- Cost data are extracted principally from a rollup document similar to a Budget Status Report
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD  Billing Account  #623 (Administrative Services Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

Model Assumptions:
- Cost data are extracted principally from a rolled-up document similar to a Budget Status Report
- Costs indicate only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss

FYDM Model Constants:
FY04 Interest Rate:           1.00%
FY04 ISD Revenue:      $17,672,360
FY04 ISD Depreciation:    $651,288

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H-E) | J FY2004 Ending Fund Balance ((A-E)+H) | K Imputed Interest ((A+J)/2 *Int Rate) | L Cost Percent (E/ISD Rev) | M 50 Days Working Capital (E/ISD Dep*L/M) | N A-87 Adjusted Fund Balance ((J+K)-M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | N/A | N/A | 97 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Standard | 100 | 428 | 480 | $1,024 | 596 | $697 | $4 | 0.0024% | $68 | $633 |
| CICS CPU - NonPrime | 12 | 51 | 57 | 562 | 10 | $22 | $0 | 0.0033% | $8 | $14 |
| CICS EXCP | 117 | 87 | 97 | $170 | 74 | $191 | $2 | 0.0005% | $15 | $177 |
| DB2 CPU | (236) | 263 | 263 | $24 | (166) | ($395) | $0 | 0.0015% | $42 | ($436) |
| IDMS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADO CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | $0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 1,053 | 8,555 | 8,555 | $23,943 | 18,087 | $16,140 | $86 | 0.0501% | $1,405 | $14,821 |
| Tape Storage | (7,620) | 14,501 | 14,501 | $14,501 | 0 | ($7,620) | $0 | 0.0821% | $2,300 | ($9,920) |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Accumulated Totals | ($6,574) | $24,196 | $24,293 | $39,895 | $15,601 | $9,036 | $92 | 0.1365% | $3,838 | $5,286 |

0000281

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004    ***

Analysis: HSD Billing Account #625 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constraints:**
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $951,298

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs (Unable) | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A + E) + H) | K Imputed Interest ((A + J) / 2 *IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Depr*L/LB) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 5 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - Prime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Tape I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Standard | 6 | 33 | 46 | $79 | 46 | $54 | $0 | 0.0002% | $5 | $49 |
| CICS CPU - NonPrime | 2 | 7 | 7 | $8 | 1 | $3 | $0 | 0.0000% | $1 | $2 |
| CICS EXCP | 7 | 6 | 6 | $10 | 4 | $11 | $0 | 0.0000% | $1 | $11 |
| DB2 CPU | (1) | 1 | 1 | $0 | (0) | $(1) | $0 | 0.0000% | $0 | $(1) |
| IDMS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 3,520 | 29,810 | 29,810 | $90,058 | 60,448 | $53,966 | $287 | 0.1675% | $4,697 | $49,644 |
| Tape Storage | (49,018) | 93,290 | 93,290 | $93,290 | 0 | $(49,018) | $0 | 0.5279% | $14,799 | $(83,817) |
| Home Page Hosting | | | | $0 | | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Original | (51,224) | 23,052 | 23,052 | 56,604 | (16,448) | (367,672) | $0 | 0.1304% | $3,857 | (571,329) |
| Fiche Copy | (34,836) | 13,414 | 13,414 | $2,737 | (10,877) | (545,513) | $0 | 0.0759% | $2,128 | (547,641) |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| **Accumulated Totals** | **($131,543)** | **$159,413** | **$159,419** | **$192,784** | **$33,372** | **($105,171)** | **$288** | **0.9020%** | **$25,269** | **($533,172)** |

0000282

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT – Fiscal Year 2004 ***

Analysis: HSD Billing Account #628 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

**FY04 Model Constants:**
FY04 Interest Rate.    1.00%
FY04 ISD Revenue    $17,572,380
FY04 ISD Depreciation.    $851,289

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable for Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

| Billing Service | A — FY2004 Beginning Fund Balance | E — Actual Service Costs Unrolled | F — Actual Service Costs Rolled (C-D) | H — Actual ISD Billable Revenues | I — Actual ISD Profit/(Loss) by Billing Service (H - E) | J — FY2004 Ending Fund Balance ((A - E) + H) | K — Imputed Interest ((A + J) / 2 *In/Rate) | L — Cost Percent (E / ISD Rev) | M — 60 Days Working Capital (E / ISD Dep*L/6) | N — A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O  General | N/A | N/A | 329,265 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 60,083 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 41,223 | 207,686 | 302,982 | $363,698 | 156,012 | $197,235 | $1,192 | 1.1752% | $32,047 | $165,480 |
| MVS CPU - Prime | 19,785 | 84,643 | 94,643 | $248,344 | 163,801 | $172,567 | $957 | 0.5550% | $14,598 | $166,526 |
| MVS CPU - NonPrime | 150 | 754 | 754 | $660 | (94) | $956 | $1 | 0.0043% | $120 | $920 |
| MVS Disk I/O | 68,541 | 75,175 | 75,175 | $132,355 | 57,179 | $145,609 | $1,172 | 0.4254% | $11,926 | $134,097 |
| MVS Tape I/O | 2,559 | 153,114 | 153,114 | $217,819 | 64,706 | $67,264 | $349 | 0.8664% | $24,290 | $43,323 |
| MVS Print Local | (76,761) | 60,080 | 60,080 | $34,044 | (26,036) | $(102,817) | $0 | 0.3400% | $9,531 | $(112,348) |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 191,047 | 815,089 | 852,277 | $1,949,628 | 1,134,539 | $1,325,586 | $7,583 | 4.6122% | $129,304 | $1,203,865 |
| CICS CPU - NonPrime | 8,717 | 37,189 | | $44,476 | 7,287 | $16,004 | $124 | 0.2104% | $5,900 | $10,228 |
| CICS EXCP | 302,561 | 250,350 | 250,350 | $440,770 | 190,420 | $493,380 | $3,982 | 1.4166% | $39,715 | $457,447 |
| DB2 CPU | (64,207) | 72,206 | 72,206 | $28,628 | (43,407) | $(105,115) | $0 | 0.4076% | $11,428 | $(119,542) |
| IDMS EXCP | (164,248) | (81,186) | (81,186) | $3,100 | 84,286 | $(376,492) | $0 | -0.4594% | $(12,879) | $(367,083) |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | (74) | 24 | 24 | $1 | (23) | $(98) | $0 | 0.0001% | $4 | $(102) |
| AD80 CPU | 2 | | | $1 | 1 | $2 | $0 | 0.0000% | $0 | $2 |
| AD80 EXCP | 10,257 | 2,011 | 2,011 | $4,517 | 2,606 | $12,763 | $115 | 0.0114% | $319 | $12,559 |
| TSO MVS CPU | (12,745) | 11,304 | 11,304 | $6,295 | (6,010) | $(17,756) | $0 | 0.0640% | $1,793 | $(19,551) |
| TSO Command | 8,431 | 3,740 | 3,740 | $6,584 | 2,844 | $11,279 | $99 | 0.0212% | $593 | $10,785 |
| TSO Disk I/O | (8) | (8) | 3 | $1 | (1) | $(9) | $0 | 0.0000% | $0 | $(9) |
| TSO Print Local | | | | | | | | | | |
| | | | | | | | | | | |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Disk Occupancy | 37,281 | 313,637 | 313,637 | $847,681 | 534,344 | $671,625 | $3,045 | 1.7747% | $49,765 | $624,916 |
| Tape Storage | (73,010) | 135,951 | 135,951 | $138,951 | (97) | $(73,010) | $0 | 0.7663% | $22,043 | $(95,053) |
| | | | | | | | | | | |
| Fiche Original | (303) | 136 | 136 | $39 | (97) | $(400) | $0 | 0.0003% | $22 | $(421) |
| Fiche Copy | (153) | 59 | 59 | $12 | (47) | $(200) | $0 | 0.0003% | $9 | $(209) |
| | | | | | | | | | | |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | (78,042) | 123,056 | 123,056 | $115,920 | (7,136) | $(83,177) | $0 | 0.6653% | $18,521 | $(102,699) |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Accumulated Totals | $241,989 | $2,277,748 | $2,667,096 | $4,983,822 | $3,300,073 | $2,548,032 | $19,616 | 12.8887% | $381,330 | $2,205,312 |

0000283

\*\*\*    State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT – Fiscal Year 2004    \*\*\*

\*\*\*    Analysis: HSD Billing Account #627 (Income Support Division)

\*\*\*    Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account    \*\*\*

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constants:**

| | |
|---|---|
| FY04 Interest Rate | 1.00% |
| FY04 ISD Revenue | $17,672,350 |
| FY04 ISD Depreciation | $851,266 |

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unrolled | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual/(Loss) Profit/(Loss) by Billing Service (H - F) | FY2004 Ending Fund Balance ((A - E) + H) | K Imputed Interest ((A + J)/2 IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Depr*L)/6 | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | N/A | N/A | 18,739 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 7,594 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 2,790 | 14,058 | 34,753 | $24,618 | 10,660 | $13,350 | $81 | 0.0765% | $2,230 | $11,201 |
| MVS CPU - Prime | 4,102 | 20,665 | 0 | $54,282 | 33,617 | $37,719 | $209 | 0.1159% | $3,278 | $34,650 |
| MVS CPU - NonPrime | 6 | 30 | 0 | $27 | (4) | $2 | $0 | 0.0002% | $5 | $0 |
| MVS Disk I/O | 22,095 | 18,738 | 18,738 | $32,991 | 14,263 | $38,347 | $282 | 0.1060% | $2,973 | $33,697 |
| MVS Tape I/O | 70 | 4,219 | 4,219 | $6,002 | 1,783 | $1,853 | $10 | 0.0238% | $669 | $1,194 |
| MVS Print Local | (9,833) | 7,694 | 7,694 | $4,360 | (3,334) | ($13,167) | $0 | 0.0436% | $1,221 | ($14,389) |
| MVS Print Remote | (624) | 1,639 | 1,639 | $178 | (1,461) | ($2,284) | $0 | 0.0093% | $280 | ($2,564) |
| CICS CPU - Standard | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Prime | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| DB2 CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| IDMS EXCP | (709,696) | (350,796) | (350,796) | $13,394 | 384,189 | ($345,508) | $0 | -1.9863% | ($55,650) | ($289,857) |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 1 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | (6) | 5 | 5 | $1 | 0 | $2 | $0 | 0.0000% | $0 | $2 |
| TSO Connect | (3) | 2 | 2 | $3 | (2) | ($8) | $0 | 0.0000% | $0 | ($9) |
| TSO Disk I/O | 2 | 1 | 1 | $2 | 1 | $3 | $1 | 0.0000% | $0 | $3 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 1,660 | 14,134 | 14,134 | $39,214 | 24,080 | $25,760 | $137 | 0.0800% | $2,242 | $23,655 |
| Tape Storage | (7,772) | 14,792 | 14,792 | $14,792 | 0 | ($7,772) | $0 | 0.0937% | $2,346 | ($10,119) |
| Fiche Original | (832) | 374 | 374 | $107 | (267) | ($1,099) | $0 | 0.0021% | $59 | ($1,160) |
| Fiche Copy | (420) | 162 | 162 | $33 | (129) | ($549) | $0 | 0.0009% | $26 | ($574) |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| **Accumulated Totals** | **($698,636)** | **($254,266)** | **($227,852)** | **$189,001** | **$443,286** | **($365,349)** | **$729** | **-1.4399%** | **($40,339)** | **($214,280)** |

0000284

**\*\*\* State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 \*\*\***

\*\*\* Analysis: HSD Billing Account #628 (Child Support Enforcement Division) \*\*\*

\*\*\* Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account \*\*\*

Model Assumptions:
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004
- This analysis is only for the purposes of Federal reporting and does not reflect actual Division profit and loss.

FY04 Model Constants:
FY04 Interest Rate — 1.00%
FY04 ISD Revenue: $17,672,980
FY04 ISD Depreciation: $651,285

MVS CPU Sand — 296,765 / 2,569 / 3,090 / 247,485

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unalled | F Actual Service Costs Rolled (C+D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H−E) | J FY2004 Ending Fund Balance (A−E)+H | K Imputed interest ((A+J)/2 IntRate) | L Cost Percent (E/ISD Rev) | M 60 Days Working Capital (E/ISD Dept*1/6) | N A-87 Adjusted Fund Balance ((J+K)−M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O General | N/A | N/A | 105,553 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | 1,434 | 1,434 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 247,489 | 1,246,889 | 1,495,542 | $2,183,544 | $936,688 | $1,184,144 | $7,158 | 7.0566% | $167,804 | $893,498 |
| MVS CPU - Prime | 46,608 | 236,315 | | $620,750 | 384,435 | $431,340 | $2,391 | 3.3372% | $37,489 | $360,243 |
| MVS CPU - NonPrime | 464 | 2,338 | 2,338 | $2,047 | (291) | $173 | $3 | 0.0152% | $371 | ($141) |
| MVS Disk I/O | 43,767 | 37,119 | 37,119 | $65,351 | 28,233 | $72,000 | $579 | 0.2100% | $5,898 | $66,680 |
| MVS Tape I/O | 2,103 | 125,840 | 125,840 | $178,019 | 53,179 | $55,282 | $287 | 0.7121% | $19,983 | $35,606 |
| MVS Print Local | (1,841) | 1,294 | 1,294 | $728 | (557) | ($2,189) | $8 | 0.0073% | $204 | ($2,402) |
| MVS Print Remote | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 113,661 | 485,779 | 508,238 | $1,161,946 | $676,187 | $790,027 | $4,519 | 2.7488% | $77,063 | $717,484 |
| CICS CPU - NonPrime | 4,765 | 20,459 | 24,457 | $24,457 | 4,009 | $8,604 | $58 | 0.1159% | $3,245 | $6,627 |
| CICS EXCP | (759,085) | 50,095 | 50,095 | $88,199 | 38,103 | $99,726 | $797 | 0.2635% | $7,947 | $91,576 |
| DB2 CPU | (25,424) | (12,567) | (12,567) | $335,633 | (698,746) | ($1,267,132) | $0 | 4.7774% | $133,935 | ($1,401,067) |
| IDMS EXCP | 0 | $490 | $490 | $490 | 13,046 | $0 | $0 | 0.0011% | $0 | ($10,384) |
| ADABAS CPU | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADO CPU | (8,851) | 2,884 | 2,884 | $95 | (2,789) | ($11,650) | $0 | 0.0163% | $458 | ($12,108) |
| ADSO CPU | 1,641 | 161 | 161 | $283 | 122 | $1,163 | $11 | 0.0093% | $525 | $1,148 |
| TSO MVS CPU | 83,809 | 16,456 | 16,456 | $35,094 | 20,488 | $104,263 | $941 | 0.0931% | $2,609 | $102,889 |
| TSO Connect | (37,451) | 33,211 | 33,211 | $18,493 | (14,718) | ($52,169) | $0 | 0.1674% | $5,268 | ($57,438) |
| TSO Disk I/O | 40,985 | 18,178 | 18,178 | $32,005 | 13,827 | $54,811 | $479 | 0.1029% | $2,884 | $52,406 |
| TSO Print Local | (449) | 150 | 150 | $85 | (65) | ($513) | $0 | 0.0008% | $24 | ($537) |
| | | | | | | | | | | |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | (537) | 0 | 0 | $0 | 0 | ($970) | $0 | 0.0000% | $0 | ($1,467) |
| Programmer Analyst | 0 | 3,065 | 3,065 | $2,632 | (453) | | $0 | 0.0173% | $466 | |
| | | | | | | | | | | |
| Disk Occupancy | 38,324 | 297,168 | 297,168 | $903,453 | 806,285 | $541,609 | $2,865 | 1.6815% | $47,142 | $497,351 |
| Tape Storage | (185,397) | 371,874 | 371,874 | $371,874 | 0 | ($195,397) | $0 | 2.1043% | $58,993 | ($264,391) |
| | | | | | | | | | | |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Home Page Hosting | (31,897) | 51,802 | 51,802 | $48,810 | (2,992) | ($34,880) | $0 | 0.2929% | $8,195 | ($43,069) |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Delivery | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| **Accumulated Totals** | **($379,808)** | **$3,832,849** | **$3,939,868** | **$6,576,527** | **$2,143,858** | **$1,785,199** | **$20,118** | **21.5849%** | **$407,992** | **$1,177,278** |

0000285

*** State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT – Fiscal Year 2004 ***

Analysis: HSD Billing Account #629 (Medical Assistance Division)

Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account

**Model Assumptions:**
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constants:**
| | |
|---|---|
| FY04 Interest Rate: | 1.00% |
| FY04 ISD Revenue: | $17,672,380 |
| FY04 ISD Depreciation: | $951,288 |

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs (Unrated) | F Actual Service Costs Rated (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H − E) | J FY2004 Ending Fund Balance ((A − E) + H) | K Imputed Interest ((A + J) / 2 * InfRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E / ISD Depr*L/6) | N A-87 Adjusted Fund Balance ((J + K) − M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Start I/O | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| VM Print Local | 0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| I/O General | N/A | N/A | 2,220 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 2,346 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | | | | | | | | |
| MVS CPU - Standard | 495 | 2,493 | 2,666 | $4,355 | 1,872 | $2,367 | $14 | 0.0141% | $395 | $1,800 |
| MVS CPU - Prime | 39 | 190 | 0 | $498 | 308 | $346 | $0 | 0.0011% | $30 | $318 |
| MVS CPU - NonPrime | 3 | 3 | 0 | $3 | (0) | $0 | $0 | 0.0000% | $1 | $1 |
| MVS Disk I/O | 2,434 | 2,064 | 2,064 | $3,634 | 1,570 | $4,003 | $32 | 0.0117% | $327 | $3,708 |
| MVS Tape I/O | 45 | 2,740 | 2,740 | $3,897 | 1,158 | $1,204 | $6 | 0.0155% | $435 | $775 |
| MVS Print Local | (2,998) | 2,346 | 2,346 | $1,929 | (1,017) | ($4,015) | $0 | 0.0133% | $372 | ($4,347) |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| CICS CPU - Standard | 115 | 489 | 538 | $1,170 | 681 | $795 | $5 | 0.0028% | $78 | $722 |
| CICS CPU - NonPrime | 11 | 48 | 0 | $59 | 10 | $21 | $0 | 0.0003% | $8 | $13 |
| CICS EXCP | 156 | 158 | 156 | $274 | 118 | $207 | $2 | 0.0009% | $25 | $289 |
| DB2 CPU | (289) | 332 | 332 | $132 | (200) | ($496) | $0 | 0.0019% | $53 | ($600) |
| IDMS EXCP | (36) | (19) | (19) | $1 | 19 | ($18) | $0 | -0.0001% | ($3) | ($15) |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | (34) | 11 | 11 | $0 | (11) | ($44) | $0 | 0.0001% | $2 | ($46) |
| ADSO CPU | 3 | 1 | 0 | $1 | 0 | $4 | $0 | 0.0000% | $0 | $4 |
| ADSO EXCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Disk Occupancy | 1,155 | 9,221 | 9,221 | $25,282 | 16,061 | $17,717 | $94 | 0.0550% | $1,542 | $15,269 |
| Tape Storage | (2,215) | 4,215 | 4,215 | $4,215 | 0 | ($2,215) | $0 | 0.0239% | $669 | ($2,884) |
| | | | | | | | | | | |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | (16,698) | 25,403 | 25,403 | $23,930 | (1,472) | ($17,171) | $0 | 0.1437% | $4,030 | ($21,201) |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| | | | | | | | | | | |
| Accumulated Totals | ($16,794) | $60,192 | $54,768 | $59,789 | $19,598 | $2,804 | $168 | 0.2840% | $7,942 | ($5,002) |

0000286

**\*\*\* State of New Mexico GSD OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 \*\*\***

Analysis: HSD Billing Account #630 (Administrative Services Division)

\*\*\* Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account \*\*\*

Model Assumptions:
- Cost data are extracted principally from a roll-up document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of federal reporting and does not reflect actual Division profit and loss.

FY04 Model Constants:
FY04 Interest Ratio: 1.00%
FY04 ISD Revenue: $17,672,350
FY04 Depreciation: $651,286

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs Unedited | F Actual Service Costs Rolled (C - D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H - E) | J FY2004 Ending Fund Balance ((A - E) + H) | K Imputed interest ((A + J) / 2 *IntRate) | L Cost Percent (E / ISD Rev) | M 60 Days Working Capital (E÷(ISD Dept/L/8) | N A-87 Adjusted Fund Balance ((J + K) - M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VN CPU - Standard | (906) | $159 | $6,176 | $112 | ($47) | ($955) | $0 | 0.0009% | $25 | ($885) |
| VN CPU - NonPrime | (34,285) | $6,817 | 0 | $2,115 | ($3,901) | ($38,154) | $0 | 0.0340% | $954 | ($39,111) |
| VN Print I/O | 8 | $3 | 3 | $5 | $2 | $6 | $0 | 0.0000% | $0 | $8 |
| VN Print Local | 0 | $0 | 0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | 52,907 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| | | | 18,418 | | | | | | | |
| MVS CPU - Standard | 4,636 | 23,355 | 37,999 | $40,899 | 17,544 | $24,179 | $134 | 0.1322% | $3,705 | $18,609 |
| MVS CPU - Prime | 2,811 | 14,161 | 0 | $37,199 | 23,037 | $25,848 | $143 | 0.0801% | $2,247 | $23,745 |
| MVS CPU - NonPrime | 94 | 474 | 0 | $415 | (59) | $35 | $1 | 0.0027% | $76 | ($39) |
| MVS Disk I/O | 34,999 | 29,682 | 29,682 | $52,259 | 22,577 | $57,576 | $463 | 0.1880% | $4,709 | $53,330 |
| MVS Tape I/O | 139 | 8,300 | 8,300 | $11,808 | 3,508 | $3,646 | $19 | 0.0470% | $1,317 | $2,349 |
| MVS Print Local | (21,492) | 19,794 | 19,794 | $9,516 | (7,278) | ($23,739) | $0 | 0.0650% | $2,664 | ($31,403) |
| MVS Print Remote | (241) | 479 | 479 | $52 | (427) | ($668) | $0 | 0.0027% | $76 | ($744) |
| CICS CPU - Standard | 8,089 | 34,513 | 36,133 | $82,552 | 48,039 | $56,128 | $321 | 0.1953% | $5,475 | $50,974 |
| CICS CPU - NonPrime | 2,380 | 1,920 | 1,920 | $1,538 | 317 | $697 | $5 | 0.0092% | $257 | $444 |
| CICS EKCP | 24,882 | 20,355 | 20,355 | $36,837 | 16,482 | $40,115 | $324 | 0.1150% | $3,229 | $37,209 |
| CICS EKCP | (22,504) | 25,053 | 25,053 | $9,957 | (15,096) | ($37,601) | $0 | 0.1418% | $3,974 | ($41,575) |
| IDMS EKCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EKCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EKCP | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 8,619 | 1,690 | 1,690 | $3,796 | 2,106 | $10,725 | $97 | 0.0096% | $268 | $10,664 |
| TSO Connect | (17,700) | 15,695 | 15,695 | $5,740 | (9,946) | ($24,656) | $0 | 0.0988% | $2,490 | ($27,146) |
| TSO Disk I/O | 6,483 | 2,867 | 2,867 | $5,047 | 2,180 | $9,644 | $78 | 0.0162% | $455 | $9,266 |
| TSO Print Local | (4,992) | 1,625 | 1,625 | $921 | (704) | ($5,566) | $0 | 0.0092% | $258 | ($5,822) |
| Project Manager | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 43,087 | 147,326 | 147,326 | $14,798 | (132,636) | ($89,473) | $0 | 0.8337% | $23,372 | ($112,840) |
| Sr Systems Analyst | (129) | 734 | 734 | $630 | (104) | ($232) | $0 | 0.0042% | $118 | ($349) |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 6,848 | 55,907 | 55,907 | $151,155 | $6,248 | $101,894 | $543 | 0.3164% | $8,868 | $93,567 |
| Tape Storage | (84,561) | 122,872 | 122,872 | $122,872 | 0 | ($84,561) | $0 | 0.6963% | $19,492 | ($94,054) |
| Fiche Original | (38,452) | 17,754 | 17,754 | $5,068 | (12,808) | ($52,120) | $0 | 0.1005% | $2,817 | ($54,935) |
| Fiche Copy | (20,619) | 7,940 | 7,940 | $1,620 | (6,330) | ($26,939) | $0 | 0.0449% | $1,250 | ($28,189) |
| Home Page Hosting | (34,099) | 22,773 | 22,773 | $1,060 | (21,693) | ($55,782) | $0 | 0.1269% | $3,613 | ($59,399) |
| E-Mail Boxes | (26,308) | 45,808 | 45,808 | $45,150 | (2,896) | ($30,962) | $0 | 0.2592% | $7,267 | ($38,229) |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | (44,547) | 53,196 | 53,196 | $8,514 | (44,682) | ($89,229) | $0 | 0.3010% | $8,439 | ($97,668) |
| **Accumulated Totals** | **($183,032)** | **$677,148** | **$748,474** | **$652,038** | **($25,110)** | **($218,142)** | **$2,126** | **3.8317%** | **$107,422** | **($323,438)** |

0000287

Case 1:07-cv-01603-... Document ... 0000288

*** State of New Mexico OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) BY HSD BILLING ACCOUNT -- Fiscal Year 2004 ***

Analysis: HSD Billing Account #840 (Income Support Division)

*** Reconciliation of Usage-Based Costs and Usage-Based Revenues by Billable Service for a Single HSD Account ***

**Model Assumptions:**
- Cost data are extracted principally from a roll-up Document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

**FY04 Model Constants:**
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,672,380
FY04 ISD Depreciation: $851,298

| Billing Service | A FY2004 Beginning Fund Balance | E Actual Service Costs (Unrolled) | F Actual Service Costs Rolled (C*D) | H Actual ISD Billable Revenues | I Actual ISD Profit/(Loss) by Billing Service (H-E) | J FY2004 Ending Fund Balance ((A-E)+H) | K Imputed Interest ((A-J)/2*IntRate) | L Cost Percent (E/ISD Rev) | M 90 Days Working Capital (E/(ISD Depr*L/6)) | N A-87 Adjusted Fund Balance ((J+K)-M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | 0 | $0 | 0 | $0 | N/A | $0 | $0 | N/A | $0 | $0 |
| VM CPU - NonPrime | 0 | $0 | 0 | $0 | N/A | $0 | $0 | N/A | $0 | $0 |
| VM Start I/O | 0 | $0 | 0 | $0 | N/A | $0 | $0 | N/A | $0 | $0 |
| VM Print Local | 0 | $0 | 0 | $0 | N/A | $0 | $0 | N/A | $0 | $0 |
| I/O General | N/A | N/A | 340 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | N/A | N/A | | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | 135 | 684 | 796 | $1,198 | 514 | $650 | $4 | 0.0039% | $109 | $545 |
| MVS CPU - Prime | 0 | 0 | 0 | $0 | | $0 | $0 | 0.0000% | $0 | $0 |
| MVS CPU - NonPrime | 23 | 114 | 78 | $999 | (14) | $8 | $0 | 0.0006% | $18 | |
| MVS Disk I/O | 92 | 78 | 78 | $137 | 59 | $151 | $1 | 0.0004% | $12 | $141 |
| MVS Tape I/O | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Local | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| MVS Print Remote | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| CICS CPU - Standard | 238 | 1,016 | 1,252 | $2,431 | 1,416 | $1,653 | $9 | 0.0058% | $161 | $1,501 |
| CICS CPU - NonPrime | 545 | 236 | 282 | $282 | 46 | $102 | $1 | 0.0013% | $37 | $66 |
| CICS EXCP | 317 | 282 | 163 | $461 | 199 | $516 | $4 | 0.0016% | $42 | $478 |
| DB2 CPU | (147) | 163 | | $65 | (98) | ($245) | $0 | 0.0009% | $26 | ($271) |
| IDMS EXCP | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS CPU | | 0 | 0 | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADABAS EXCP | | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO CPU | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| ADSO EXCP | 0 | 0 | | 0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO MVS CPU | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Connect | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Disk I/O | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| TSO Print Local | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Project Manager | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Systems Analyst | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Sr Systems Analyst | 0 | 0 | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Disk Occupancy | 283 | 2,381 | 2,381 | $6,408 | 4,087 | $4,340 | $23 | 0.0135% | $378 | $3,984 |
| Tape Storage | (4,395) | 8,364 | 8,364 | $8,364 | 0 | ($4,395) | $0 | 0.0473% | $1,327 | ($5,722) |
| Fiche Original | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Fiche Copy | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Home Page Hosting | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| E-Mail Boxes | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| LAN / WAN Services | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Training Library | 0 | 0 | 0 | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| **Accumulated Totals** | (3,398) | $13,299 | $13,659 | $19,477 | 6,178 | $2,780 | $443 | 0.0753% | $2,110 | $713 |

### State of New Mexico OVERCHARGE ANALYSIS (FEDERAL AND STATE SHARES) All HSD Accounts -- Fiscal Year 2004 ***

*** Analysis: Totals, All HSD Billing Accounts ***

*** Reconciliation of Usage-Based Costs and Usage-Based Revenue by Billable Service for a Single HSD Account ***

Model Assumptions:
- Cost data are extracted principally from a not-so document similar to a Budget Status Report.
- Costs include only those allowable by Federal Circular OMB A-87 and cover the period 1 July 2003 through 30 June 2004.
- This analysis is only for the purpose of Federal reporting and does not reflect actual Division profit and loss.

FY04 Model Constants:
FY04 Interest Rate: 1.00%
FY04 ISD Revenue: $17,872,350
FY04 ISD Depreciation: $851,286

| Billing Service | A — FY2004 Beginning Fund Balance | E — Actual Service Costs Unabated | F — Actual Service Costs Abated (C*D) | H — Actual ISD Billable Revenues | I — Actual ISD Profit/(Loss) by Billing Service (H−E) | J — FY2004 Ending Fund Balance ((A+E)+H) | K — Imputed Interest ((A+J)/2 *IntRate) | L — Cost Percent (E/ISD Rev) | M — 60 Days Working Capital (E/ISD Days*L/6) | N — A-87 Adjusted Fund Balance ((J+K)−M) |
|---|---|---|---|---|---|---|---|---|---|---|
| VM CPU - Standard | ($909) | $159 | $6,176 | $112 | ($47) | ($955) | $0 | 0.0009% | $25 | ($981) |
| VM CPU - NonPrime | ($34,255) | $6,017 | $0 | $2,115 | ($3,901) | ($38,156) | $0 | 0.0340% | $954 | ($39,111) |
| VM Start I/O | $6 | $0 | 3 | $0 | $0 | $8 | $0 | 0.0000% | $0 | $8 |
| VM Print Local | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| I/O Connect | #VALUE! | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| Print General | #VALUE! | N/A | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| MVS CPU - Standard | $296,768 | 1,465,164 | 1,864,750 | $2,618,321 | 1,123,157 | $1,419,925 | $8,583 | 8.4850% | $237,190 | $1,191,318 |
| MVS CPU - NonPrime | $72,620 | 365,873 | | $961,073 | 895,199 | $667,820 | $3,592 | 2.0733% | $58,042 | $613,480 |
| MVS Disk I/O | $3737 | 3,712 | 3,712 | $3,250 | (462) | $275 | $5 | 0.0210% | $589 | ($309) |
| MVS Tape I/O | $192,027 | 162,666 | 162,666 | $286,727 | 123,871 | $315,888 | $2,540 | 0.9215% | $25,835 | $292,802 |
| MVS Print Local | $43,317 | 204,212 | 204,212 | $416,545 | 124,333 | $129,250 | $871 | 1.6646% | $46,673 | $93,247 |
| MVS Print Remote | ($112,715) | 88,198 | 88,198 | $40,976 | (39,221) | ($150,938) | $0 | 0.4991% | $13,992 | ($164,929) |
| MVS Print Remote | ($1,064) | 2,118 | 2,118 | $230 | (1,888) | ($2,952) | $0 | 0.0120% | $336 | ($3,288) |
| CICS CPU - Standard | $313,468 | 1,337,348 | 1,398,957 | $3,196,830 | 1,861,482 | $2,174,940 | $12,442 | 7.5674% | $212,154 | $1,975,227 |
| CICS CPU - NonPrime | $13,872 | 58,610 | | $71,281 | 11,881 | $25,653 | $199 | 0.3373% | $9,456 | $16,396 |
| CICS EXCP | $388,945 | 332,321 | 321,321 | $562,722 | 244,401 | $653,246 | $5,110 | 1.8162% | $50,974 | $607,339 |
| DB2 CPU | ($846,278) | 842,126 | 842,126 | $374,419 | (467,707) | ($1,413,986) | $0 | 5.5311% | $149,457 | ($1,563,443) |
| IDMS EXCP | ($899,406) | (444,567) | (444,567) | $15,974 | 491,641 | ($407,936) | $0 | 2.5156% | ($70,525) | ($397,339) |
| ADABAS CPU | | | | | | | | | | |
| ADABAS EXCP | | | | | | | | | | |
| ADSO CPU | ($5,969) | 2,919 | 2,919 | 996 | (2,623) | ($11,792) | $0 | 0.0165% | $463 | ($12,256) |
| ADSO EXCP | $1,046 | 161 | 161 | $294 | 153 | $1,169 | $11 | 0.0009% | $26 | $1,164 |
| TSO MVS CPU | $102,747 | 20,147 | 20,147 | $45,247 | 25,100 | $0 | $11 | 0.1140% | $3,198 | $128,804 |
| TSO Connect | ($67,904) | 60,215 | 60,215 | $33,529 | (26,686) | ($94,590) | $1,153 | 0.3407% | $9,552 | $120,804 |
| TSO Disk I/O | $55,891 | 24,785 | 24,785 | $43,637 | 18,802 | $74,733 | $653 | 0.1402% | $3,931 | $104,143 |
| TSO Print Local | ($5,319) | 1,777 | 1,777 | $1,007 | (770) | ($6,098) | $0 | 0.0101% | $282 | ($6,370) |
| Project Manager | $43,097 | 147,328 | 147,328 | $14,786 | (132,680) | ($80,478) | $0 | 0.8937% | $23,372 | ($112,844) |
| Systems Analyst | ($866) | 3,799 | 3,789 | $3,262 | (837) | ($1,203) | $11 | 0.0218% | $903 | ($1,900) |
| Br Systems Analyst | $0 | | | $0 | 0 | $0 | $0 | 0.0000% | $0 | $0 |
| Programmer Analyst | $0 | | | $0 | | | | | | |
| Disk Occupancy | $88,437 | 745,985 | 743,995 | $2,011,540 | 1,287,646 | $1,355,982 | $7,222 | 4.2096% | $119,026 | $1,244,179 |
| Tape Storage | ($407,663) | 778,272 | 776,272 | $778,272 | 0 | ($407,663) | $0 | 4.3926% | $123,146 | ($531,029) |
| Fiche Original | ($91,810) | 41,317 | 41,317 | $11,837 | (29,491) | ($121,291) | $0 | 0.2338% | $8,554 | ($127,846) |
| Fiche Copy | ($56,027) | 21,575 | 21,575 | $4,402 | (17,173) | ($73,200) | $0 | 0.1221% | $3,423 | ($76,623) |
| Home Page Hosting | ($34,089) | 22,773 | 22,773 | $1,060 | (21,693) | ($55,782) | $0 | 0.1289% | $3,613 | ($59,395) |
| E-Mail Boxes | ($151,933) | 245,987 | 245,987 | $231,610 | (14,287) | ($166,190) | $0 | 1.3912% | $39,004 | ($205,194) |
| LAN / WAN Services | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.0000% | $0 | $0 |
| Desktop Support | ($44,547) | 53,196 | 53,196 | $8,514 | (44,682) | ($89,229) | $0 | 0.3010% | $8,439 | ($97,669) |
| Training Library | $0 | | | | | | | 0.0000% | | $0 |
| Accumulated Totals | $1,189,224 | $6,800,276 | $6,800,276 | $11,734,875 | $4,934,400 | $3,746,176 | $42,291 | 38.4797% | $1,076,724 | $2,728,684 |

**EXHIBIT 9.c**

*** Information Services ISF Overcharge Analysis ...deral Program Level For HSD -- Fiscal Year 2004 ***

This spreadsheet identifies the impact of each billing account's overcharge or undercharge on each federal program.

Federal programs:

CSED — Child Support Enforcement
MAD — Medical Assistance Division (Medicaid)
TANF — Temporary Assistance for Needy Families
GE — General Assistance
Refugee FA — Refugee Financial Assistance
Refugee MA — Refugee Medical Assistance
Food Stamps
MA Title 19 — Medicaid (Administration)
LIHEAP — Low Income Home Energy Assistance Program
SAVE — Systematic Alien Verification for Entitlements
E&T — Food Stamps Employment and Training

In the results summary, the total net overcharge to each federal program is identified. For purposes of this summary MAD and MA Title 19 (both Medicaid) and Refugee FA and Refugee MA (also forming one assistance program) are consolidated.

**Accumulated Totals (Account 620) — Income Support Division**

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Uncoiled | Actual Billable Revenues | Actual Profit/(Loss) by Billing Service | FY2004 Ending Fund Balance | Imputed Interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY2004 HSD %FFP | Federal Over/(Under)-Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (Account 620)** | -2,401.71 | 19,874.94 | 41,377.15 | 21,402.21 | 19,000.50 | 122.00 | 3,168.79 | 15,953.71 | 58.67% | 9,360.04 |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00% | 0.00 |
| 0.183750445 | TANF | -441.32 | 3,670.41 | 7,603.08 | 3,932.67 | 3,491.35 | 22.42 | 582.27 | 2,931.51 | 50.00% | 0.00 |
| 0.022447243 | GA | -53.91 | 446.38 | 928.90 | 480.42 | 426.51 | 2.74 | 71.13 | 358.12 | 100.00% | 2,931.51 |
| 0.000459418 | REFUGEE FA | -1.10 | 6.16 | 19.01 | 9.83 | 8.73 | 0.06 | 1.46 | 7.33 | 0.00% | 0.00 |
| 0.005493809 | REFUGEE MA | -13.19 | 109.74 | 227.32 | 117.58 | 104.39 | 0.67 | 17.41 | 87.85 | 100.00% | 7.33 |
| 0.519986384 | FOOD STAMPS | -1,246.81 | 10,384.70 | 21,511.40 | 11,126.72 | 9,878.10 | 63.43 | 1,647.41 | 8,204.12 | 100.00% | 87.85 |
| 0.257360381 | MA TITLE 19 | -618.15 | 5,141.16 | 10,649.67 | 5,508.51 | 4,860.36 | 31.40 | 815.58 | 4,106.17 | 50.00% | 4,147.06 |
| 0.006221474 | LIHEAP | -14.04 | 124.27 | 257.43 | 133.16 | 118.21 | 0.76 | 19.71 | 99.26 | 50.00% | 2,053.09 |
| 0.000478957 | SAVE | -1.15 | 9.57 | 19.82 | 10.25 | 9.10 | 0.06 | 1.52 | 7.64 | 100.00% | 99.26 |
| 0.003881647 | E&T | -9.32 | 77.54 | 160.61 | 83.06 | 73.75 | 0.47 | 12.30 | 61.93 | 50.00% | 30.96 |
| 100.00% | TEST | -2,401.71 | 19,874.94 | 41,377.15 | 21,402.21 | 19,000.50 | 122.00 | 3,168.79 | 15,953.71 | | 9,360.04 |

**Accumulated Totals (Account 622) — Income Support Division**

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Uncoiled | Actual Billable Revenues | Actual Profit/(Loss) by Billing Service | FY2004 Ending Fund Balance | Imputed Interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY2004 HSD %FFP | Federal Over/(Under)-Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (Account 622)** | 2.39 | 20.14 | 54.46 | 34.31 | 36.71 | 0.00 | 3.20 | 33.51 | 58.67% | 19.68 |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00% | 0.00 |
| 0.183750445 | TANF | 0.44 | 3.70 | 10.01 | 6.31 | 6.75 | 0.00 | 0.59 | 8.16 | 50.00% | 0.00 |
| 0.022447243 | GA | 0.05 | 0.45 | 1.22 | 0.77 | 0.82 | 0.00 | 0.07 | 0.75 | 100.00% | 6.16 |
| 0.000459418 | REFUGEE FA | 0.00 | 0.01 | 0.02 | 0.02 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00% | 0.00 |
| 0.005493809 | REFUGEE MA | 0.01 | 0.11 | 0.30 | 0.19 | 0.20 | 0.00 | 0.02 | 0.18 | 100.00% | 0.02 |
| 0.519986384 | FOOD STAMPS | 1.24 | 10.47 | 28.31 | 17.84 | 18.08 | 0.00 | 1.86 | 17.42 | 100.00% | 0.18 |
| 0.257360381 | MA TITLE 19 | 0.62 | 5.18 | 14.02 | 8.83 | 9.45 | 0.00 | 0.82 | 8.63 | 50.00% | 8.71 |
| 0.006221474 | LIHEAP | 0.01 | 0.13 | 0.34 | 0.21 | 0.23 | 0.00 | 0.02 | 0.21 | 50.00% | 4.31 |
| 0.000478957 | SAVE | 0.00 | 0.01 | 0.03 | 0.02 | 0.02 | 0.00 | 0.00 | 0.02 | 100.00% | 0.21 |
| 0.003881647 | E&T | 0.01 | 0.06 | 0.21 | 0.13 | 0.14 | 0.00 | 0.01 | 0.13 | 50.00% | 0.07 |
| 100.00% | TEST | 2.39 | 20.14 | 54.46 | 34.31 | 36.71 | 0.00 | 3.20 | 33.51 | | 19.68 |

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Uncoiled | Actual Billable Revenues | ual (Loss) by Billing Service | FY2004 Ending Fund Balance | Imputed Interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY2 HSD %... | Federal Over/(Under)- Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.24963979% | **Administrative Services Division** | -4,673.54 | 24,198.24 | 39,804.75 | 15,606.51 | 9,034.97 | 92.00 | 3,838.45 | 5,286.52 | 59.93% | 3,169.41 |
| 0.09740440468 | CSED | -1,842.33 | 6,045.18 | 9,944.81 | 3,896.63 | 2,257.29 | 22.99 | 959.00 | 1,321.28 | 66.00% | 872.05 |
| 0.12245334 | MAD | -640.29 | 2,356.82 | 3,877.16 | 1,520.34 | 880.05 | 8.96 | 373.88 | 515.13 | 50.00% | 267.56 |
| 0.01397240% | TANF | -804.95 | 2,962.89 | 4,874.19 | 1,911.30 | 1,106.35 | 11.27 | 470.03 | 647.59 | 50.00% | 647.59 |
| 0.000981λ538 | GA | -391.85 | 338.08 | 556.17 | 218.09 | 126.24 | 1.29 | 53.65 | 73.89 | 0.00% | 0.00 |
| 0.0μ43553% | REFUGE FA | -5.34 | 19.64 | 32.31 | 12.67 | 7.33 | 0.07 | 3.12 | 4.29 | 100.00% | 4.29 |
| 0.33929477% | REFUGEE MA | -29.16 | 107.32 | 176.56 | 69.23 | 40.06 | 0.41 | 17.03 | 23.46 | 100.00% | 23.46 |
| 0.1444㎡374 | FOOD STAMPS | -2,231.03 | 8,212.08 | 13,509.53 | 5,297.45 | 3,066.42 | 31.22 | 1,302.75 | 1,764.90 | 50.00% | 697.45 |
| 0.02469842% | MA TITLE 19 | -1,061.31 | 3,080.15 | 6,547.66 | 2,567.51 | 1,486.20 | 15.13 | 631.40 | 869.93 | 50.00% | 434.97 |
| 0.00015022% | LIHEAP | -32.20 | 118.53 | 164.99 | 78.46 | 44.26 | 0.45 | 18.60 | 25.91 | 100.00% | 25.91 |
| 0.02213976% | SAVE | -1.03 | 3.78 | 6.22 | 2.44 | 1.41 | 0.01 | 0.60 | 0.83 | 50.00% | 0.41 |
| | E&T | -14.07 | 51.77 | 85.17 | 33.40 | 19.33 | 0.20 | 8.21 | 11.32 | 50.00% | 5.66 |
| 100.00% | **TEST** | -4,673.54 | 24,198.24 | 39,804.75 | 15,606.51 | 9,034.97 | 92.00 | 3,838.45 | 5,286.52 | | 3,169.41 |
| | **Accumulated Totals (Account 625)** | -131,542.55 | 159,412.49 | 182,784.33 | 23,371.84 | -109,170.71 | 288.00 | 25,288.92 | -133,171.63 | 58.87% | -78,131.79 |
| | **Income Support Division** | | | | | | | | | | |
| 0.0000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 # | 0.00 | 0.00 | 0.00 | 66.00% | 0.00 |
| 0.0000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 # | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.18379045% | TANF | -24,171.03 | 29,292.15 | 33,586.74 | 4,294.59 | -19,876.44 # | 52.92 | 4,846.85 | -24,470.37 | 100.00% | -24,470.37 |
| 0.02244724% | GA | -2,852.77 | 3,578.37 | 4,103.00 | 524.63 | -2,428.13 # | 6.46 | 567.67 | -2,989.34 | 0.00% | 0.00 |
| 0.000459418 | REFUGE FA | -60.43 | 873.78 | 83.67 | 10.74 | -49.70 # | 0.13 | 11.62 | -81.18 | 100.00% | -81.18 |
| 0.0054㎡3809 | REFUGEE MA | -722.67 | 875.78 | 1,004.18 | 128.40 | -594.27 # | 1.58 | 138.93 | -731.62 | 100.00% | -731.62 |
| 0.51988λ384 | FOOD STAMPS | -86,387.118 | 82,870.38 | 95,027.08 | 12,150.70 | -56,236.48 # | 149.73 | 13,147.36 | -69,234.12 | 50.00% | -34,617.06 |
| 0.25738038% | MA TITLE 19 | -33,856.47 | 41,020.85 | 47,045.10 | 6,015.45 | -27,841.02 # | 74.13 | 6,508.87 | -34,275.76 | 50.00% | -17,137.86 |
| 0.00622147% | LIHEAP | -818.39 | 991.78 | 1,137.19 | 145.41 | -672.98 # | 1.79 | 157.33 | -828.52 | 100.00% | -828.52 |
| 0.00308㎡647 | SAVE | -63.01 | 76.36 | 87.55 | 11.20 | -51.81 # | 0.14 | 12.11 | -63.79 | 50.00% | -31.89 |
| | E&T | -510.60 | 618.79 | 709.50 | 90.72 | -419.88 # | 1.12 | 98.16 | -516.93 | 50.00% | -258.46 |
| 100.00% | **TEST** | -131,542.55 | 159,412.49 | 182,784.33 | 23,371.84 | -109,170.71 | 288.00 | 25,288.92 | -133,171.63 | | -78,138.99 |
| | **Accumulated Totals (626)** | 241,958.59 | 2,277,748.47 | 4,593,821.79 | 2,306,073.32 | 2,548,031.91 | 18,618.00 | 381,338.02 | 2,205,311.90 | 58.87% | 1,283,858.49 |
| | **Income Support Division** | | | | | | | | | | |
| 0.0000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00% | 0.00 |
| 0.0000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.18379045% | TANF | 44,490.05 | 418,537.75 | 842,280.271 | 423,742.49 | 465,202.51 | 3,421.07 | 86,396.09 | 405,227.48 | 100.00% | 405,227.48 |
| 0.02244743 | GA | 5,431.30 | 51,129.17 | 102,894.16 | 51,764.99 | 57,198.29 | 417.62 | 8,111.04 | 49,503.17 | 0.00% | 0.00 |
| 0.000459418 | REFUGE FA | 111.16 | 1,046.44 | 2,105.69 | 1,056.45 | 1,170.61 | 8.55 | 166.01 | 1,013.16 | 100.00% | 1,013.16 |
| 0.005493809 | REFUGEE MA | 1,329.27 | 12,513.52 | 25,182.64 | 12,689.13 | 13,998.40 | 102.28 | 1,985.12 | 12,115.56 | 100.00% | 12,115.56 |
| 0.51988λ384 | FOOD STAMPS | 125,760.08 | 1,184,170.42 | 2,383,068.54 | 1,198,896.12 | 1,324,687.10 | 9,979.24 | 187,854.72 | 1,148,511.55 | 50.00% | 573,255.81 |
| 0.25738038% | MA TITLE 19 | 62,275.39 | 589,247.77 | 1,176,765.60 | 593,538.03 | 655,813.42 | 4,761.91 | 93,007.32 | 567,804.02 | 50.00% | 283,802.01 |
| 0.00622147% | LIHEAP | 1,505.34 | 14,710.95 | 28,518.13 | 14,347.18 | 15,852.52 | 115.83 | 2,246.06 | 13,720.29 | 100.00% | 13,720.29 |
| 0.00478997% | SAVE | 115.90 | 1,091.03 | 2,195.64 | 1,104.60 | 1,220.50 | 8.92 | 173.08 | 1,056.34 | 50.00% | 528.17 |
| | E&T | 939.22 | 8,841.42 | 17,782.78 | 8,961.36 | 9,880.58 | 72.27 | 1,402.59 | 8,560.24 | 50.00% | 4,280.12 |
| 100.00% | **TEST** | 241,958.59 | 2,277,748.47 | 4,593,821.79 | 2,305,073.32 | 2,548,031.91 | 18,618.00 | 381,338.02 | 2,205,311.90 | | 1,283,858.49 |

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Unrolled | Actual Billable Revenues | ...(loss) by Billing Service | FY2004 Ending Fund Balance | Imputed Interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY20 HSD % | Federal Over/(Under) Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (627)** | -699,634.95 | -254,284.90 | 189,001.39 | 443,286.29 | -255,348.66 | 729.00 | -40,339.31 | -214,280.35 | 58.87% | -125,718.26 |
| | **Income Support Division** | | | | | | | | | | |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00% | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.183750845 | TANF | -128,374.82 | -46,725.01 | 34,729.13 | 81,454.14 | -46,920.48 | 133.95 | -7,412.37 | -39,374.15 | 100.00% | -39,374.35 |
| 0.022447243 | GA | -15,682.43 | -5,707.99 | 4,242.56 | 9,950.56 | -5,731.87 | 16.38 | -905.51 | -4,810.00 | 0.00% | 0.00 |
| 0.000459418 | REFUGEE FA | -320.97 | -116.82 | 86.83 | 203.65 | -117.31 | 0.33 | -18.53 | -98.44 | 100.00% | -98.44 |
| 0.005493609 | REFUGEE MA | -3,838.17 | -1,396.99 | 1,038.34 | 2,435.33 | -1,402.64 | 4.00 | -221.62 | -1,177.22 | 100.00% | -1,177.22 |
| 0.519986384 | FOOD STAMPS | -363,210.80 | -132,199.28 | 98,259.25 | 230,458.51 | -132,752.29 | 379.00 | -20,971.86 | -111,401.43 | 50.00% | -55,700.72 |
| 0.257360381 | MA TITLE 19 | -179,814.93 | -65,447.94 | 48,645.25 | 114,093.19 | -85,721.73 | 187.63 | -10,382.55 | -55,151.56 | 50.00% | -27,575.93 |
| 0.006221474 | LIHEAP | -4,346.54 | -1,582.03 | 1,775.87 | 2,767.86 | -1,588.65 | 4.54 | -250.97 | -1,333.14 | 100.00% | -1,333.14 |
| 0.000479997 | SAVE | -334.84 | -121.90 | 90.53 | 212.33 | -122.31 | 0.35 | -19.32 | -102.64 | 50.00% | -51.32 |
| 0.000388647 | E&T | -2,711.85 | -987.04 | 733.64 | 1,720.68 | -991.17 | 2.83 | -156.58 | -831.76 | 50.00% | -415.85 |
| 100.00% | TEST | -699,634.95 | -254,284.90 | 189,001.39 | 443,286.29 | -255,348.66 | 729.00 | -40,339.31 | -214,280.35 | | -125,726.03 |
| | **Accumulated Totals (Account 628)** | -378,808.18 | 3,832,568.76 | 5,976,526.60 | 2,143,958.04 | 1,765,149.85 | 20,118.00 | 607,891.98 | 1,177,275.87 | 66.00% | 777,002.09 |
| | **Child Support Enforcement** | | | | | | | | | | |
| 100.00% | CSED | -378,808.18 | 3,832,568.76 | 5,976,526.60 | 2,143,959.04 | 1,765,149.85 | 20,118.00 | 607,891.98 | 1,177,275.87 | 66.00% | 777,002.09 |
| 0.00% | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | TANF | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | GA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% | 0.00 |
| 0.00% | REFUGEE FA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | REFUGEE MA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | FOOD STAMPS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | MA TITLE 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | LIHEAP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | SAVE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | E&T | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 100.00% | TEST | -378,808.18 | 3,832,568.76 | 5,976,526.60 | 2,143,958.04 | 1,765,149.85 | 20,118.00 | 607,891.98 | 1,177,275.87 | | 777,002.09 |
| | **Accumulated Totals (Account 629)** | -16,793.92 | 50,191.83 | 69,789.47 | 19,597.64 | 2,803.72 | 156.00 | 7,962.34 | -5,002.62 | 50.00% | -2,501.31 |
| | **Medical Assistance Division** | | | | | | | | | | |
| 0.00% | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00% | 0.00 |
| 100.00% | MAD | -16,793.92 | 50,191.83 | 69,789.47 | 19,597.64 | 2,803.72 | 156.00 | 7,962.34 | -5,002.62 | 50.00% | -2,501.31 |
| 0.00% | TANF | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | GA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% | 0.00 |
| 0.00% | REFUGEE FA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | REFUGEE MA | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | FOOD STAMPS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | MA TITLE 19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | LIHEAP | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00% | 0.00 |
| 0.00% | SAVE | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.00% | E&T | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 100.00% | TEST | -16,793.92 | 50,191.83 | 69,789.47 | 19,597.64 | 2,803.72 | 156.00 | 7,962.34 | -5,002.62 | | -2,501.31 |

| Program % | HSD BILLING ACCOUNTS | FY2004 Beginning Fund Balance | Actual Service Costs Unvoiled | Actual Billable Revenues | Variance (Gain/Loss) by Billing Service | FY2004 Ending Fund Balance | Imputed interest | 60 Days Working Capital | A-87 Adjusted Fund Balance | FY20 HSD % | Federal Over/(Under)-Recovery |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Accumulated Totals (Account 630)** | -193,032.04 | 677,146.36 | 652,038.28 | -25,110.10 | -218,142.14 | 2,125.00 | 107,421.63 | -323,438.77 | 59.93% | -193,638.66 |
| | **Administrative Services Division** | | | | | | | | | | |
| 0.249637996 | CSED | -48,227.09 | 159,178.61 | 162,905.11 | -6,273.50 | -54,500.59 | 530.91 | 28,838.20 | -80,807.88 | 66.00% | -53,333.20 |
| 0.097404466 | MAD | -18,802.18 | 65,957.28 | 63,511.44 | -2,445.84 | -21,248.02 | 206.98 | 10,463.35 | -31,504.38 | 50.00% | -15,762.19 |
| 0.12245234 | TANF | -23,637.23 | 82,918.40 | 79,843.61 | -3,074.79 | -26,712.02 | 260.21 | 13,154.03 | -39,605.83 | 100.00% | -39,605.83 |
| 0.013972405 | GA | -2,687.12 | 9,461.39 | 9,110.54 | -350.85 | -3,047.97 | 28.89 | 1,500.94 | -4,519.22 | 0.00% | 0.00 |
| 0.000681658 | REFUGEE FA | -156.68 | 529.61 | 529.23 | -20.38 | -177.06 | 1.72 | 87.19 | -262.52 | 100.00% | -262.52 |
| 0.00443558 | REFUGEE MA | -856.21 | 3,003.55 | 2,892.17 | -111.38 | -967.59 | 9.43 | 476.48 | -1,434.64 | 100.00% | -1,434.64 |
| 0.339394771 | FOOD STAMPS | -65,514.07 | 229,820.61 | 221,286.38 | -8,522.24 | -74,036.30 | 721.21 | 36,458.34 | -109,773.43 | 50.00% | -54,886.72 |
| 0.144494134 | MA TITLE 19 | -31,762.69 | 111,387.09 | 107,256.62 | -4,130.47 | -35,883.16 | 349.55 | 17,670.25 | -53,203.86 | 100.00% | -28,601.93 |
| 0.004499647 | LIHEAP | -945.59 | 3,317.11 | 3,194.10 | -123.01 | -1,068.60 | 10.41 | 528.22 | -1,584.41 | 100.00% | -1,584.44 |
| 0.000156202 | SAVE | -30.15 | 105.77 | 101.85 | -3.92 | -34.07 | 0.33 | 16.78 | -50.52 | 50.00% | -25.26 |
| 0.000213976 | E&T | -413.04 | 1,448.94 | 1,395.21 | -53.73 | -466.77 | 4.55 | 226.88 | -692.08 | 50.00% | -346.04 |
| 100.00% | **TEST** | -193,032.04 | 677,146.36 | 652,038.28 | -25,110.10 | -218,142.14 | 2,125.00 | 107,421.63 | -323,438.77 | 59.87% | -193,832.74 |
| | **Accumulated Totals (Account 640)** | -3,397.89 | 13,298.69 | 19,476.61 | 6,177.92 | 2,760.03 | 43.00 | 2,109.71 | 713.32 | 58.87% | 418.50 |
| | **Income Support Division** | | | | | | | | | | |
| 0.000000000 | CSED | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00% | 0.00 |
| 0.000000000 | MAD | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00% | 0.00 |
| 0.16375045 | TANF | -524.37 | 2,443.86 | 3,578.86 | 1,135.20 | 510.83 | 7.90 | 387.66 | 131.01 | 100.00% | 131.01 |
| 0.02244724 | GA | -76.27 | 288.52 | 437.20 | 138.88 | 62.40 | 0.97 | 47.38 | 16.01 | 0.00% | 0.00 |
| 0.000045416 | REFUGEE FA | -1.58 | 6.11 | 8.95 | 2.84 | 1.28 | 0.02 | 0.67 | 0.33 | 100.00% | 0.33 |
| 0.005439609 | REFUGEE MA | -18.87 | 73.06 | 107.00 | 33.94 | 15.27 | 0.24 | 11.59 | 3.92 | 100.00% | 3.92 |
| 0.519863841 | FOOD STAMPS | -1,786.52 | 6,913.91 | 10,125.73 | 3,211.82 | 1,445.30 | 22.38 | 1,096.81 | 370.84 | 50.00% | 185.42 |
| 0.25738031 | MA TITLE 19 | -874.55 | 3,422.67 | 5,012.86 | 1,590.06 | 716.53 | 11.07 | 543.00 | 183.59 | 50.00% | 91.80 |
| 0.02622474 | LIHEAP | -21.14 | 62.74 | 121.17 | 38.44 | 17.30 | 0.27 | 13.13 | 4.44 | 100.00% | 4.44 |
| 0.000278997 | SAVE | -1.63 | 6.37 | 9.33 | 2.96 | 1.33 | 0.02 | 1.01 | 0.34 | 50.00% | 0.17 |
| 0.000361647 | E&T | -13.19 | 51.62 | 75.60 | 23.88 | 10.76 | 0.17 | 8.19 | 2.77 | 50.00% | 1.38 |
| | **TEST** | -3,397.89 | 13,298.69 | 19,476.61 | 6,177.92 | 2,760.03 | 43.00 | 2,109.71 | 713.32 | 58.87% | 418.50 |
| | **Accumulated Totals All Accounts** | -1,189,223.80 | 6,800,275.23 | 11,754,575.22 | 4,954,399.99 | 3,765,176.19 | 42,291.00 | 1,076,783.72 | 2,728,683.48 | | 1,683,637.04 |
| | CSED | -426,877.60 | 4,007,793.66 | 6,149,378.72 | 2,141,584.16 | 1,712,906.56 | 20,571.89 | 835,708.17 | 1,097,769.28 | | 724,540.82 |
| | TANF | -133,693.01 | 493,103.86 | 1,006,505.84 | 513,401.87 | 378,808.85 | 3,905.74 | 93,446.33 | 305,483.45 | | 305,483.45 |
| | GA | -16,122.99 | 59,546.38 | 122,273.67 | 62,727.29 | 46,604.29 | 475.43 | 37,433.39 | | | |
| | REFUGEE FA & MA | -4,863.69 | 16,973.49 | 33,484.73 | 16,621.24 | 12,037.66 | 128.91 | 2,676.78 | 9,490.28 | | 9,490.28 |
| | FOOD STAMPS | -375,636.99 | 1,390,189.12 | 2,842,626.23 | 1,452,636.92 | 1,078,070.94 | 11,046.19 | 220,537.19 | 868,579.93 | | 433,289.97 |
| | MEDICAID | -221,958.49 | 804,271.85 | 1,542,135.13 | 737,863.28 | 615,904.79 | 5,832.76 | 12,588.27 | 384,149.28 | | 197,074.64 |
| | LIHEAP | -4,673.46 | 17,223.48 | 34,599.22 | 17,376.74 | 12,702.28 | 134.06 | 2,732.30 | 10,104.03 | | 10,104.03 |
| | SAVE | -315.71 | 1,171.09 | 2,510.99 | 1,339.87 | 1,024.16 | 9.83 | 186.78 | 848.21 | | 424.11 |
| | E&T | -2,732.87 | 10,103.10 | 20,952.73 | 10,849.62 | 8,116.76 | 81.60 | 1,602.74 | 6,595.52 | | 3,297.64 |
| | | -1,189,223.80 | 6,800,275.23 | 11,754,575.22 | 4,954,399.99 | 3,765,176.19 | 42,291.00 | 1,076,783.72 | 2,728,683.46 | | 1,683,716.50 |

0000293

**EXHIBIT 10.a**

# New Mexico General Services Department
## State's Refund Calculation
## Federal Program FFP

**Principal:**

| | |
|---|---|
| Human Services Department | $1,683,715 |
| Children, Youth and Families Department and Department of Health | $66,676 |
| Total principal: | $1,750,391 |

**Pre-Disallowance Interest**
(June 30, 2004 through June 22, 2006): $101,802

**TOTAL:** **$1,852,193**

**Service Categories Considered:** GSD proposes that its total debt to the federal government for overcharges to HSD be computed at $1,683,715. This reflects the sum of the federal share of over- and undercharges in all service categories.

**Federal Participation Rate:** This method considers the participation of each federal program in over- and undercharges to each billing account, and applies each federal program's FFP rate to its billing account overcharge or undercharge.

**Pre-Disallowance Interest:** Interest through June 30, 2004 is incorporated in GSD's calculation of the refund amount due, because GSD's cost reconciliation includes imputed interest on service-category overcharges. In order to bring interest up to date, GSD has computed interest from June 30, 2004 through June 22, 2006 at a rate of 2.9% per annum, on the principal. The rate used complies with DCA's finding concerning the average state treasury earning rate. (*See* Ex. 2, Attachment 3 - Interest Calculation.)

**EXHIBIT 10.b**

# New Mexico General Services Department
## State's Refund Calculation
## Average FFP

**Principal:**

| | |
|---|---|
| Human Services Department | $1,716,068 |
| Children, Youth and Families Department and Department of Health | $66,676 |
| **TOTAL:** | **$1,782,744** |

**Service Categories Considered:** In submitting cost reconciliation data to DCA before the final disallowance letter was issued, GSD proposed that its total debt to the federal government for overcharges to HSD be computed at $1,716,068. This reflects the sum of the federal shares of over- and undercharges in all service categories reflected in the disallowance work papers. *See* Ex. 2, Disallowance Letter, Att. 1.

**Federal Participation Rate:** This calculation uses an average FFP for HSD, 62.89%. It also uses an average for the other two state agencies.

**Pre-Disallowance Interest:** The base refund amount incorporates imputed interest for fiscal year 2004. The amount does not include pre-disallowance interest through the date of the June 22, 2006 disallowance letter.

**EXHIBIT 10.c**

# New Mexico General Services Department
## DCA Refund Calculation
### Average FFP

**Principal:**

| | |
|---|---|
| Human Services Department | $3,723,891 |
| Children, Youth and Families Department and Department of Health | $66,676 |
| Total principal: | $3,790,567 |

**Pre-Disallowance Interest**
   (June 30, 2004 through June 22, 2006):     $220,464

**TOTAL:**     **$4,011,031**

**Service Categories Considered:** In computing the disallowance, DCA summed the federal share of only certain service-category overcharges reflected in the disallowance work papers (those categories with a total excess balance exceeding $500,000). *See* Attachment 1 to Disallowance Letter. This amount disregards two categories of cost-revenue variances: (1) undercharges in sixteen service categories, which total $2,184,963; and (2) overcharges in service-categories with excess balances less than $500,000, which total $177,140.

**Federal Participation Rate:** This calculation uses an average FFP, 62.89%, for the Human Services Department. It also uses an average for the other two state agencies.

**Interest:** The base refund amount incorporates imputed interest on service-category overcharges for fiscal year 2004, because this was included in the cost reconciliation information the State submitted. It also includes pre-disallowance interest at 2.9% through the date of the disallowance letter.

# EXHIBIT 11



# STATE OF NEW MEXICO
# GENERAL SERVICES DEPARTMENT
JOHN SIMMS, JR. BUILDING
P.O. DRAWER 26110
SANTA FE, NM 87502-6110



BACKUP COPY 1

*INVOICE*
*NUMBER*   017040

04-04-630.00

*DATE:*
04/30/2004

*INVOICE TO:*   HUMAN SERVICES DEPT.
DOROTHY C. MONTOYA
AUTOMATED DATA PROC
729 ST. MICHAELS DR.
SANTA FE, NM     87503

| DESCRIPTION OF SERVICES RENDERED | SERVICE CHARGE | CHARGE TOTAL |
|---|---|---|
| ISD BILLING ACCOUNT   -   628 | | |
| MVS USE | 170,189.03 | |
| CICS USE | 110,965.10 | |
| IDMS ADSO USE | 37.72 | |
| DB2 USE | 27,915.60 | |
| IDMS USE | 45.30 | |
| LABOR | 455.00 | |
| TSO USE | 6,394.50 | |
| TAPE STORAGE | 29,023.07 | |
| DISK STORAGE | 66,812.76 | |
| DIRECT CHARGES | 4,100.00 | |
| TOTAL SERVICE CHARGES | | 415,938.08 |

```
IF TRANSFERED THROUGH DFA ACCOUNT AND LINE ITEMS:


C-FRAS ACCOUNT CODES FOR I.S.D. SERVICES ARE:
FUND: 362          AGENCY: 350          PROGRAM CODE: P605
DIV:  2000         OBJECT: 0571
REVENUE SOURCE: 2423
CONTACT MIKE FRIEL FOR BILLING QUESTIONS AT 827-2082
```

| TOTAL CHARGES, CURRENT MONTH | | 415,938.08 |
|---|---|---|

| NOTICE: PLEASE REVIEW AND REPORT ANY | TOTAL | |
|---|---|---|
| 628       DISCREPANCIES WITHIN 5 DAYS | 0000297 | 415,938.08 |

UNITED STATES OF AMERICA

DEPARTMENT OF HEALTH AND HUMAN SERVICES

## CERTIFICATION OF TRUE COPY

Pursuant to the provisions of 42 U.S.C. 3505 and the authority vested in me by delegation from the Secretary (see attached memo), I hereby certify that the annexed is a true copy of the document on file in the Department of Health and Human Services.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the Department of Health and Human Services to be affixed, on this_____12th_____day of _____October_____20__07_____

Constance B. Tobias
Chair
Departmental Appeals Board

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Office of the Secretary

MAR - 5 1992

Washington, D.C. 20201

TO:    Chair, Departmental
        Appeals Board

FROM:   Terrence J. Tychan
       Acting Deputy Assistant Secretary for
       Management and Acquisition

SUBJECT: Authority to Certify True Copies and Affix the
        Department Seal

Under the authority vested in the Deputy Assistant Secretary for
Management and Acquisition on November 14, 1991 (attached) to
certify true copies and affix the Department Seal for the Office
of the Secretary, I hereby redelegate to the Chair of the
Departmental Appeals Board:

1.   The authority to certify true copies of any books, records,
    papers, or other documents on file within the Department, or
    extracts from such, to certify that true copies are true
    copies of the entire file of the Department, to certify the
    complete original record, or to certify the nonexistence of
    records on file within the Department, and to cause the Seal
    of the Department to be affixed to such certifications.

2.   The authority to cause the Seal to be Affixed to agreements,
    awards, citations, diplomas, and similar documents.

3.   These authorities may be redelegated.

4.   This redelegation supersedes all previous redelegations of
    authorities to the Chair of the Departmental Appeals Board
    relating to this subject.  Further redelegations made under
    previous redelegations of authority shall remain in effect
    until appropriate new redelegations are made.

Attachment

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
## DEPARTMENTAL APPEALS BOARD
## APPELLATE DIVISION

| | | |
|---|---|---|
| NEW MEXICO GENERAL SERVICES DEPARTMENT,<br>     Appellant, | §<br>§<br>§<br>§<br>§<br>§ | |
| vs. | § | **Docket No.   A-06-105** |
| DIVISION OF COST ALLOCATION,<br>     Appellee. | §<br>§<br>§<br>§ | |

### APPELLEE'S APPEAL FILE INDEX

**Exhibit Number**

1.    Declaration of Terry Hill, Division of Cost Allocation, and Attachment.

2.    Excerpt from New Mexico State-Wide Cost Allocation Plan (FYE 2004)

3.    Email from Robert Peters, Executive Budget Analyst in the New Mexico Department of Finance and Administration.

4.    Reprint of Excerpt from NMGSD Exhibit 2 Reflecting Federal Financial Participation Rates of Three State Agencies.

5.    Notice Letter Dated February 4, 2005.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES
DEPARTMENTAL APPEALS BOARD
APPELLATE DIVISION

| | | |
|---|---|---|
| New Mexico General Services Department | § | |
| | § | Board Docket No. A-06-105 |
| Appellant. | § | |

## DECLARATION OF TERRY D. HILL

I, Terry D. Hill, Branch Chief, State and Local Governments, Division of Cost Allocation (DCA), Program Support Center, U.S. Department of Health and Human Services (HHS), hereby state as follows:

1.  I have held my present position since January 1997. My previous jobs include five years with the U.S. Department of Labor in grants accounting and indirect cost rate proposal review. Prior to that, I served 18 years with the Arkansas Employment Security Department, first as an accountant and then as an accounting manager. I graduated from the University of Arkansas, where I majored in accounting. I am a licensed C.P.A. in the State of Arkansas.

2.  As Branch Chief, State and Local Governments, I supervise the review, negotiation and approval of State-Wide Cost Allocation Plans (SWCAPs), Public Assistance Cost Allocation Plans (PACAPs), cost allocation related audit resolutions, and indirect cost rate proposals of state government grantees in Regions V, VI and VII of the U.S. Department of Health and Human Services. My staff consists of seven employees.

3.  As Branch Chief, I have been involved in the review of the State of New Mexico SWCAP for fiscal years ending (FYE) June 30, 1995 through 2004. I was involved in the determination involving the General Services Department-Office of Information Processing (GSD-OIP) for FYEs 1995-1999 which was ultimately upheld by the Departmental Appeals Board (DAB). I was involved in the determination for FYEs 2000 through 2003 which was not appealed to the DAB. I was also involved in two other determinations with basically the same issues involving the Arkansas Department of Information Systems for FYEs 1997 through 2001, which were ultimately upheld by the DAB.

4.  On August 8, 2003, I participated in a meeting with Edward J. Lopez, Jr., Cabinet Secretary for New Mexico General Services Department; Wanda J. Carrillo, Deputy Cabinet Secretary for New Mexico General Services Department; and James C. Jimenez, Cabinet Secretary for New Mexico Department of Finance and Administration. We discussed how to bring the required reporting back into compliance with the terms of OMB Circular A-87 in response to the 2003 decision.

1

5. On June 22, 2004, I participated in another meeting with Wanda J. Carrillo, Deputy Cabinet Secretary of New Mexico General Services Department and Michael S. Friel, the Budget Director of the New Mexico General Services Department. The topic for the meeting was a briefing and discussion relating to New Mexico's rate restructuring project.

6. DCA received the New Mexico 2004 SWCAP on October 14, 2005. The normal due date was December 31, 2004.

7. We reviewed the GSD-OIP SWCAP information for 2004 and using billing rates for 2004, 2005, and 2006, estimated ending fund balances for the three heavily overcharged billing rates (MVS-CPU, CICS-CPU, and Disk Occupancy). We estimated that even with rate adjustments excess fund balances would still exist at June 30, 2007 unless other actions was taken. We provided this information to Bob Peters, Executive Budget Analyst at the New Mexico Department of Finance and Administration, in mid-December 2005 and requested that they review our estimates.

8. Bob Peters responded by email on February 6, 2006 that "I basically agree. I mentioned there were a few very minor differences, but I haven't had a chance to figure out what they are. If I can't be (sic) the end of this week, lets just go with your numbers."

9. We issued a determination on February 22, 2006 (mislabeled 2005) to request a refund totaling $4,702,071, consisting of principal of $4,620,948 and imputed interest of $81,123.

10. GSD-OIP informed us verbally of its intention to appeal on March 17, 2006, and requested that they be allowed to provide additional information. Over the next several months, we received additional information from GSD-OIP and had several conference calls. The reason given for the need to provide additional information was that the GSD-OIP accountants had used incorrect cost allocation methodologies for 2004 in the SWCAP received by DCA on October 14, 2005. In the interest of reaching a settlement without going through the formal appeal process, we accepted GSD-OIP's explanation. We had our last conference call, prior to issuing the revised determination, with GSD-OIP on June 21, 2006. GSD-OIP's position was that no repayment to the Federal government should be required.

11. We reviewed the material provided and issued a revised determination letter on June 22, 2006 seeking a total repayment to the Federal government of $4,011,031 consisting of principal of $3,790,567 and imputed interest of $220,464.

12. GSD-OIP appealed our determination on July 24, 2006.

13. Prior to GSD-OIP's submission of its brief to the DAB, we received correspondence

2

from New Mexico, had settlement discussions/negotiations in an attempt to resolve the issues without briefing the case. We were unsuccessful in these attempts.

14. I have had an opportunity to review GSD-OIP's brief that was submitted to the DAB on January 16, 2007. The brief proposes a debt to the Federal government as of June 22, 2006 of $1,852,193 consisting of principal of $1,750,391 and imputed interest of $101,802.

15. Upon review of GSD-OIP's brief and exhibits, I noted their repeated emphasis that the manner in which they operated was not like Arkansas and that no cost shifting had occurred. Our previous determinations for 1995 – 2003 were calculated using billing rates with excess fund balances and a Federal Financial Participation (FFP) percentage at either the statewide level or a composite by a limited number of state departments. Because the *Office of Management and Budget Circular A-87 Cost Principles for State, Local and Indian Tribal Governments* (A-87) methodologies for rate adjustment do not include customer by customer analysis we use it only to develop composite FFP rates. While we have received information at the department level from the GSD-OIP, in the past it was generally too voluminous to analyze for inconsistent cost treatment and cost shifting. DCA does not generally perform an analysis of information at the customer department level because it is not within the scope of DCA's role as defined by A-87.

16. In the past I had generally agreed with GSD-OIP that the problem was limited to simply over and undercharging of various rate categories. GSD-OIP's protests that it was not like Arkansas piqued my curiosity about whether or not their assertions were factually based. In my memory, I do not recall receiving a worksheet that was so easy to analyze as Attachment Number 1 in GSD-OIP's Exhibit 2. At issue is how Federally funded programs are ultimately treated in relation to state funded programs.

17. I reviewed the various exhibits. I prepared Attachment Number 1 to verify that the document I used from GSD-OIP's Exhibit 2 in our June 22, 2006 determination reconciles to the New Mexico Exhibits used to calculate their proposed debt of $1,852,193. Attachment Number 1 in GSD-OIP Exhibit 2 which I used in my subsequent analysis does tie to GSD-OIP Exhibits 9.b. and 9.c. The result of this verification is that the data I used to prepare my analysis described below is the same data prepared and used by GSD-OIP to calculate the proposed debt of $1,683,715 for the New Mexico Human Services Department (NMHSD) in GSD-OIP's Exhibit 10.a.

18. Using Attachment Number 1 of GSD-OIP's Exhibit 2, I added a "DCA ANALYSIS" section to create Attachment Number 2 to this Declaration. I subtotaled the line by line detail information for five of the columns into two categories – "HSD ONLY" and "ALL OTHER/ NOT IDENTIFIED". For each of these two categories I also subtotaled the information in the five columns to create three subcategories – "OVER CHARGES", "UNDER CHARGES" and "ZERO – OVER/UNDER". The

3

subcategory "ZERO – OVER/UNDER" is for those items for which Revenue matched Cost.

19. This categorization of the detail data shows that despite GSD-OIP's protests to the contrary, during 2004 the NMHSD was overcharged in total for services while all other departments were undercharged in total. In addition, this worksheet also shows on page 3, column D that the cumulative effect of prior fiscal years 2000-2003 was that the NMHSD was undercharged $1,189,224 while "All Others" were undercharged $9,152,175. This is the cumulative result for Fiscal Years 2000 – 2003 after refunding overcharges of $3,016,928 to the Federal government.

20. I have calculated various percentages in the DCA ANALYSIS section of Attachment Number 2 which highlight how the NMHSD is charged in relation to "All Others". I have bolded and placed the percentages in boxes which I bring to attention in this declaration. NMHSD was allocated 38% of GSD-OIP's cost but charged 173% of costs while "All Others" were charged only 80% of costs. NMHSD was charged 64% of the overcharges while "All Others" were only charged 36% of the overcharges. NMHSD was charged only 14% of the undercharges while "All Others" received 86% of the undercharges. Of the total profit of $2,800,173 calculated by GSD-OIP, NMHSD was the source of $4,954,399 while "All Others" provided $2,154,226 less revenue that the cost of services provided to them. The 2003 Ending Balance of a negative $10.3 million, after adjustments for a refund to the federal government as of June 30, 2003, was caused by undercharges to HSD of $1,189,224 and $9,152,175 for "All Other".

21. The end result is that the methods used by GSD-OIP have resulted in an inconsistent treatment of charges among customer departments and subsequently state and federally funded programs operated by those departments. This inconsistent treatment violates A-87 Attachment A Section C 1. which states "To be allowable under Federal awards, cost must meet the following general criteria:... e. Be consistent with policies, regulations, and procedures that apply uniformly to both Federal awards and other activities of the governmental unit." Inconsistent treatment of costs can also result in shifting of costs from one Federally funded program to another and is also prohibited by A-87 in Attachment A, Section C 3.c.

22. Bob Peters in his Affidavit item 26 states that ""Netting" of overcharges and undercharges across service categories within a billing account does not result in the shifting of costs". The analysis on which this statement is based only considers one customer department, the NMHSD. When all customer departments are considered as I have put forth, it becomes very apparent that inconsistent treatment of costs has occurred and costs have been shifted between customer departments and ultimately their programs.

0000302

Docket No. A-06-105
DCA Exhibit # 1
Page 4 of 10

23. This case clearly illustrates that an Internal Service Fund such as the GSD-OIP with multiple rates cannot meet the A-87 requirement of consistent treatment unless it consistently uses the methods described in A-87 Attachment C Section G.4. and the *Implementation Guide for Office and Budget Circular A*-87 (ASMB C-10). It also supports, with the detail by customer department, the DAB's previous decision in which they conclude that "netting" is prohibited. To have achieved true "consistent treatment" in 2004 and prior years the GSD-OIP would have had to (1) adjusted individual rates to have eliminated over/under recoveries for 2000 in 2001, for 2001 in 2002 and so forth or (2) provided rebates or additional charges to customer departments during 2000 through 2004 in each of those years. While refunds to the Federal government do reduce the overcharges to Federally funded programs, they do not achieve true compliance with the A-87 consistency requirement.

24. To achieve true consistency, the GSD-OIP would have to refund charges to the Federal government to the point that Federally funded state departments such as NMHSD are undercharged to the same degree that "All Others" are, OR all undercharges are billed and collected from all customers. Our preference is that GSD-OIP operate its billing system so that all customers pay the cost of the services that they receive. Unfortunately, we do not have the authority to enforce such action. We can only take limited action that is intended to protect the interest of Federally funded programs. We do not advocate that the Federal government pay less than the costs that are specifically allocable to and billed to Federally funded state departments for further allocation to the programs they operate.

25. GSD-OIPs proposal to refund $1,683,715 of overcharges to the NMHSD that have been "netted" against "undercharges" which were never billed to NMHSD would only be a partial fix of a problem focused on that single department. This proposal, however, does not address the reality of the larger inconsistent treatment of costs among customer departments and subsequently state and federally funded programs. It stops short of collecting the underbillings of $5.5mil in 2004 and $9.1 mil from prior years from the "All Other" state departments (Attachment Number 2).

26. Repaying the federal government for the full amount of the determination does not correct the overall inconsistent treatment of customer departments and programs. Settling with the Federal government but not collecting adequate revenue from all customers would be expected to leave the ISF in a poor financial condition. Per item number 9 of Bob Peter's Affidavit "The ISF relies entirely on state customer department payments (and interest earned on those payments) in order to operate." Considering this and the undercharging situation, two questions come to mind. They are: (1) How can the ISF continue in business and provide quality service to all customers if it does not charge enough to cover its costs? and (2) Are the costs assigned to Federally funded state departments such as the NMHSD properly allocated? It is not the responsibility of the DCA to analyze financial solvency and its effects.

5

27. To my recollection, Fiscal Year 2004 is the first time that New Mexico's SWCAP has stated that "In March/April of each year, a "mid-year realignment" is performed to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87." It goes on to describe the process and to state that "This same process is also performed at the end of the year." Bob Peters, in item number 15 of his Affidavit, now states that this was not done for fiscal year 2004. To my knowledge, he did not inform DCA of New Mexico's failure to complete the realignment process, which the SWCAP inaccurately documented as completed.

28. Thus, as we have now demonstrated, the central focus here should not be just "netting" but also the failure to follow the specific requirements of A-87 Attachment C, Section G.4 and ASMB C-10 Question and Answer 4-12 as well as the broader A-87 "consistent treatment" requirement.

I declare that the foregoing is true and correct.

Executed this __8th__ day of March 2007.

Terry D. Hill, Branch Chief
State and Local Governments
Central States Field Office
Division of Cost Allocation
Program Support Center
U.S. Department of Health and
Human Services

6

0000304

Docket No. A-06-105
DCA Exhibit # 1
Page 6 of 10

# NEW MEXICO GENERAL SERVICES DEPARTMENT - OFFICE OF INFORMATION PROCESSING
## RECONCILIATION OF SELECTED GSD-OIP EXHIBITS
### FYE 8/30/2004

ATTACHMENT NUMBER 1

EXHIBIT 2, ATTACHMENT NUMBER 1 - worksheet provided by NM used by DCA for 6/22/2006 determination:

| | Beginning Fund Balance | Costs | Revenue | P/L / Ending Fund Balance | Ending Fund Balance | Imputed Interest | 60 day working Fund cap balance | Adjusted Fund Balance |
|---|---|---|---|---|---|---|---|---|
| Grand Total | -$10,341,399 | $17,672,380 | $20,472,553 | $2,800,173 | -$7,541,226 | $70,319 | $2,803,515 | -$10,274,423 |
| broken into customer categories: | | | | | | | | |
| All other | -$7,286,379 | $10,697,998 | $8,713,127 | -$1,984,871 | -$9,271,250 | $28,028 | $1,697,112 | -$10,940,334 |
| Not Identified | -$1,865,796 | $174,108 | $4,753 | -$169,355 | -$2,035,151 | $0 | $27,620 | -$2,062,771 |
| | | | | | | | | |
| HSD only | -$1,189,224 | $6,800,274 | $11,754,673 | $4,954,400 | $3,765,175 | $42,291 | $1,078,784 | $2,728,682 |
| | | | | | | | | |
| | | | | | | | | |
| EXHIBIT 9.b HSD total by billing rate categories | -$1,189,224 | $6,800,275 | $11,754,675 | $4,954,400 | $3,765,176 | $42,291 | $1,078,784 | $2,728,684 |
| | | | | | | | | |
| EXHIBIT 9.c HSD total of internal org units by program | -$1,189,224 | $6,800,275 | $11,754,675 | $4,954,400 | $3,765,176 | $42,291 | $1,078,784 | $2,728,683 |
| | | | | | | | | |
| | | | | | | | | |
| NOTE: LINES 15, 18, AND 20 HAVE THE SAME AMOUNTS IN EACH COLUMN. | | | | | | | | |

F:\NEW MEXICO GSD-OIP 2004 APPEAL\HILL - ATTACHMENT NUMBER 1 - NM GSD-OIP EXHIBIT RECON.xls

0000305

Docket No. A-06-105
DCA Exhibit # 1
Page 8 of 10

| | | 2003 Ending Balance | 2004 Actual Cost By Billable Service | 2004 Actual Billed Revenue | Cost % | Profit/Loss By Billable Service | 2004 Ending Balance | Imputed Interest | Less 2004 First Allowed Working Cap | Adjusted First Allowed Working Cap Without Depr | ATTACHMENT NUMBER 2 Billing Service Balances | FFP | FED $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | |
| 2 | NEW MEXICO | | | | | | | | | | | | |
| 3 | GSD-DP | | | | | | | | | | | | |
| 4 | FYE 6/30/2004 | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | |
| 6 | Billing Service | | | | | | | | | | | | |
| 7 | VM CPU | -$35,583 | $9,178 | $2,227 | 0.03% | -$6,948 | -$38,112 | $980 | $980 | $40,092 | -$2,378,408 | 62.89% | -$25,814 |
| 8 | HSD | -$2,147,528 | $377,500 | $206,159 | 2.13% | -$171,041 | -$2,318,567 | $0 | $59,838 | -$2,378,408 | | 62.89% | |
| 9 | ALL OTHER | | | | | | | | | | | | |
| 10 | VM Start I/O | $0 | $3 | $2 | 0.00% | -$2 | | | | | | | |
| 11 | HSD | | | | | | | | | | | | |
| 12 | OTHER | $12,413 | $6,029 | $10,615 | 0.03% | $4,586 | $16,999 | $147 | $956 | $181,100 | $5 | 62.89% | $5 |
| 13 | VM Print Pages | -$11,082 | $8,389 | $4,753 | 0.05% | -$3,636 | -$14,718 | $0 | $0 | -$16,048 | | 62.89% | |
| 14 | MVS CPU | | | | | | | | | | | | |
| 15 | HSD | $370,123 | $1,864,749 | $1,711,698 | 10.85% | -$922,869 | $2,096,020 | $17,291 | $245,887 | $1,804,490 | $1,134,844 | 62.89% | $1,134,844 |
| 16 | ALL OTHER | $197,795 | $956,523 | $1,919,172 | 5.64% | | $1,120,444 | 96,581 | $150,087 | $998,949 | | 62.89% | |
| 17 | MVS Disk I/O | | | | | | | | | | | | |
| 18 | HSD | $192,027 | $182,850 | $123,571 | 0.93% | $315,808 | $2,540 | $23,835 | $292,602 | | 62.89% | |
| 19 | ALL OTHER | $341,419 | $289,554 | $509,792 | 1.64% | $220,238 | $561,657 | $4,515 | $55,934 | $620,238 | $164,018 | 62.89% | $164,018 |
| 20 | MVS Tape I/O | | | | | | | | | | | | |
| 21 | HSD | $4,917 | $284,312 | $415,545 | 1.86% | $124,333 | $129,250 | $971 | $46,673 | $5,248 | $52,354 | 62.89% | $52,354 |
| 22 | MVS Print Local | $4,675 | $279,787 | $389,024 | 1.58% | $118,237 | $122,912 | $938 | $44,365 | $79,165 | | 62.89% | |
| 23 | HSD | | | | 0.00% | $0 | | | | | | | |
| 24 | OTHER | -$112,715 | $8,180 | $43,976 | 0.10% | $38,236 | $150,987 | $0 | $0 | -$164,929 | -$103,724 | 62.89% | -$103,724 |
| 25 | MVS Print Remote | -$548,289 | $663,774 | $378,127 | 3.76% | -$287,652 | $11,135,941 | $147 | $105,300 | -$1,234,241 | | 62.89% | |
| 26 | HSD | | $2,118 | $230 | 0.01% | -$1,888 | $0 | | | | | | |
| 27 | OTHER | -$7,084 | $118,885 | $12,940 | 0.67% | -$105,945 | $32,842 | $0 | $0 | -$3,264 | -$2,009 | 62.89% | -$2,009 |
| 28 | ALL OTHER | -$359,790 | | | 0.00% | | $165,829 | $0 | $18,876 | -$194,701 | | 62.89% | |
| 29 | DB2 CPU | | | | | | | | | | | | |
| 30 | CICS CPU | $327,430 | $396,697 | $3,270,121 | 7.90% | $1,873,184 | $2,200,664 | $0 | $221,611 | $1,991,623 | $1,253,852 | 62.89% | $1,253,852 |
| 31 | HSD | $106,829 | $954,328 | $1,001,045 | 2.57% | $552,117 | $658,746 | $3,827 | $73,198 | $590,404 | | 62.89% | |
| 32 | CICS ESCP | | | | | | | | | | | | |
| 33 | HSD | $398,848 | $321,321 | $565,722 | 1.87% | $244,401 | $633,249 | $5,110 | $50,974 | $587,393 | $370,353 | 62.89% | $370,353 |
| 34 | ALL OTHER | $139,137 | $114,874 | $202,428 | 0.65% | $87,452 | $226,589 | $1,829 | $18,239 | $210,176 | | 62.89% | |
| 35 | DB2 CPU | | | | | | | | | | | | |
| 36 | OTHER | -$7,084 | $2,118 | $230 | 0.01% | -$1,888 | $30 | $0 | $330 | -$3,264 | | 62.89% | |
| 37 | HSD | | | | | | | | | | | | |
| 38 | IDMS EXCP | -$846,278 | $842,126 | $57,419 | 8.33% | -$567,707 | -$1,413,985 | $0 | $149,467 | -$1,593,442 | -$993,249 | 62.89% | -$993,249 |
| 39 | HSD | -$359,965 | $955,720 | $371,635 | 5.29% | -$583,485 | -$1,403,470 | $0 | $148,348 | -$1,551,816 | | 62.89% | |
| 40 | OTHER | -$444,587 | $15,674 | 2.82% | -$437,468 | $0 | $70,835 | -$367,340 | -$231,020 | 62.89% | -$231,020 |
| 41 | ADABAS CPU | -$1,348,882 | -$1,350,653 | $5,570 | 7.64% | -$1,402,233 | -$2,749,083 | $0 | $214,267 | -$2,963,362 | | 62.89% | |
| 42 | ADSO CPU | -$1,223,562 | $165,719 | $0 | 0.94% | -$165,719 | -$1,982,261 | $0 | $25,269 | -$1,408,570 | | 62.89% | |
| 43 | HSD | -$4,989 | $2,919 | $738 | 0.02% | -$82,823 | -$11,792 | $0 | $449 | -$12,285 | -$7,707 | 62.89% | -$7,707 |
| 44 | OTHER | -$188,893 | $54,739 | $96 | 0.37% | -$62,603 | -$251,486 | $0 | $10,270 | -$271,756 | | 62.89% | |
| 45 | ADSO EXCP | | | | | | | | | | | | |
| 46 | HSD | $1,046 | $161 | $284 | 0.00% | $123 | $1,169 | $11 | $26 | $1,195 | $726 | 62.89% | $726 |
| 47 | OTHER | $2,908 | $483 | $815 | 0.00% | $352 | $3,350 | $32 | $73 | $3,308 | | 62.89% | |
| 48 | TSO MVS CPU | | | | | | | | | | | | |
| 49 | HSD | $102,747 | $15,762 | $45,247 | 0.11% | $17,145 | $127,846 | $1,153 | $3,196 | $123,603 | $78,117 | 62.89% | $78,117 |
| 50 | OTHER | $70,184 | $13,762 | $30,907 | 0.08% | $23,099 | $87,329 | $788 | $2,189 | $55,933 | | 62.89% | |

0000306

| | B | D | F | H | J | N | O | Q | S | U | W | Y |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | NEW MEXICO GSD-OIP FYE 6/30/2004 | 2003 Ending Balance | 2004 Actual Cost by Billable Service | 2004 Actual Billed Revenue | Cost % | 2004 Profit/Loss By Billable Service | 2004 Ending Balance | Imputed Interest | Less 2004 Final Allowed Working Cap Without Dep'r | Final 2004 Adjusted Billing Service Balances | FFP | FED $ |
| 51 | Billing Service TBO Connect | | | | | | | | | | | |
| 52 | HSD | -$67,064 | $80,216 | $53,529 | 0.34% | -$26,688 | -$94,590 | $0 | $9,582 | -$104,142 | 62.89% | -$65,495 |
| 53 | OTHER | -$75,093 | $66,590 | $37,079 | 0.36% | -$29,511 | -$104,604 | $0 | $10,564 | -$115,168 | | |
| 54 | TBO Disk I/O | | | | | | | | | | | |
| 55 | HSD | $65,981 | $24,785 | $43,637 | 0.14% | $18,852 | $74,733 | $683 | $3,932 | $71,484 | 62.89% | $44,938 |
| 56 | OTHER | $27,155 | $12,044 | $21,205 | 0.07% | $9,161 | $38,316 | $317 | $1,911 | $34,723 | | |
| 57 | TBO Print Pages | | | | | | | | | | | |
| 58 | HSD | -$5,318 | $1,777 | $1,007 | 0.01% | -$770 | -$6,088 | $0 | $282 | -$6,370 | 62.89% | -$4,006 |
| 59 | OTHER | -$6,363 | $2,127 | $1,205 | 0.01% | -$922 | -$7,285 | $0 | $337 | -$7,622 | | |
| 60 | Project Manager | | | | | | | | | | | |
| 61 | HSD | $0 | $0 | $0 | 0.00% | $0 | $0 | $0 | $0 | $0 | 62.89% | $0 |
| 62 | OTHER | $153,322 | $32,887 | $14,440 | 0.19% | -$18,547 | $134,775 | $1,440 | $5,233 | $130,982 | | |
| 63 | Systems Analyst | | | | | | | | | | | |
| 64 | HSD | $43,087 | $147,327 | $14,766 | 0.83% | -$132,561 | -$89,474 | $0 | $23,372 | -$112,846 | 62.89% | -$70,988 |
| 65 | OTHER | $301,677 | $1,031,519 | $103,386 | 5.84% | -$928,133 | -$626,456 | $0 | $163,638 | -$790,094 | | |
| 66 | Microcomp Specialists | | | | | | | | | | | |
| 67 | HSD | -$986 | $3,790 | $3,242 | 0.02% | -$637 | -$1,203 | $0 | $803 | -$1,906 | 62.89% | -$1,136 |
| 68 | OTHER | -$64,785 | $369,578 | $317,372 | 2.09% | -$52,206 | -$117,001 | $0 | $58,629 | -$175,630 | | |
| 69 | Programmer Analysis | | | | | | | | | | | |
| 70 | HSD | $449 | $30,842 | $2,900 | 0.17% | -$27,942 | -$27,493 | $0 | $4,893 | -$32,386 | | |
| 71 | OTHER | | | | | | | | | | | |
| 72 | Disk Occupancy | | | | | | | | | | | |
| 73 | HSD | $88,437 | $743,996 | $2,011,540 | 4.21% | $1,267,545 | $1,355,982 | $7,222 | $118,026 | $1,245,176 | 62.89% | $783,092 |
| 74 | OTHER | $86,782 | $814,194 | $2,201,338 | 4.61% | $1,387,144 | $1,483,926 | $7,904 | $129,162 | $1,362,667 | | |
| 75 | Tape Storage | | | | | | | | | | | |
| 76 | HSD | -$407,883 | $778,272 | $776,272 | 4.39% | $0 | -$407,883 | $0 | $123,146 | -$531,029 | 62.89% | -$333,944 |
| 77 | OTHER | -$374,515 | $712,766 | $712,766 | 4.03% | $0 | -$374,515 | $0 | $113,072 | -$487,587 | | |
| 78 | Fiche Originals | | | | | | | | | | | |
| 79 | HSD | -$81,810 | $41,317 | $11,837 | 0.23% | -$29,480 | -$121,290 | $0 | $8,564 | -$127,844 | 62.89% | -$80,401 |
| 80 | OTHER | -$196,855 | $98,590 | $25,379 | 0.56% | -$63,211 | -$260,066 | $0 | $14,054 | -$274,120 | | |
| 81 | Fiche Copies | | | | | | | | | | | |
| 82 | HSD | -$56,027 | $21,575 | $4,402 | 0.12% | -$17,173 | -$73,200 | $0 | $3,423 | -$76,623 | 62.89% | -$48,168 |
| 83 | OTHER | -$177,586 | $68,375 | $13,951 | 0.39% | -$54,424 | -$223,989 | $0 | $10,847 | -$242,836 | | |
| 84 | Home Page Hosting | | | | | | | | | | | |
| 85 | HSD | -$34,089 | $22,773 | $1,080 | 0.13% | -$21,693 | -$55,782 | $0 | $3,613 | -$59,395 | 62.89% | -$37,353 |
| 86 | OTHER | -$2,119,866 | $1,416,226 | $67,164 | 8.01% | -$1,349,061 | -$3,469,059 | $0 | $224,667 | -$3,693,726 | | |
| 87 | E-Mail Boxes | | | | | | | | | | | |
| 88 | HSD | -$151,923 | $245,866 | $231,610 | 1.39% | -$14,266 | -$166,189 | $0 | $39,004 | -$205,193 | 62.89% | -$129,046 |
| 89 | OTHER | -$108,265 | $175,200 | $165,040 | 0.99% | -$10,160 | -$118,425 | $0 | $27,793 | -$146,218 | | |
| 90 | LANWAN Mgt Svcs | -$380,845 | $380,845 | $0 | 0.00% | -$380,845 | -$380,845 | $0 | $0 | -$380,845 | | |
| 91 | Desktop Support | -$247,307 | $247,307 | $0 | 0.00% | -$247,307 | -$247,307 | $0 | $0 | -$247,307 | | |
| 92 | Training Library | | | | 0.00% | | | | | | | |
| 93 | HSD | -$44,547 | $53,196 | $8,514 | 0.30% | -$44,682 | -$89,229 | $0 | $8,439 | -$97,668 | 62.89% | -$61,423 |
| 94 | OTHER | -$176,240 | $210,460 | $33,684 | 1.16% | -$176,776 | -$353,018 | $0 | $33,387 | -$386,403 | | |
| 95 | TOTAL | -$10,341,399 | $17,872,360 | $20,472,653 | 100.00% | $2,800,173 | -$7,541,226 | $70,319 | $2,803,615 | -$10,274,423 | | $1,716,008 |
| 96 | | | | | 100.00% | 2004 Depreciation | | | $651,286 | | | $0 |
| 97 | | | | | | | | | | | | |

Docket No. A-06-105
DCA Exhibit # 1
Page 9 of 10

F:\NEW MEXICO GSD-OIP 2004 APPEAL\HILL ATTACHMENT NUMBER 2 - NMGSD-OIP-INCONSISTENT ANALYSIS.xls

Page 10 of 10
DKA Exhibit # 1
Docket No. A-06-105

| # | | 2003 Ending Balance | 2004 Actual Cost by Billable Service | 2004 Actual Billed Revenue | ALL OTHERS | 2004 Profit/Loss By Billable Service | ATTACHMENT NUMBER 2 — 2004 Ending Balance | P/L - OVER / UNDER CHARGES AS % OF REVENUE | P/L - OVER / UNDER CHARGES AS % OF COST |
|---|---|---|---|---|---|---|---|---|---|
| 105 | NEW MEXICO GSD | | | | | | | | |
| 106 | DCA ANALYSIS | | | | | | | | |
| 107 | SUMMARY SUBTOTALS BY HSD AND "ALL OTHER": | | | | | | | | |
| 114 | HSD ONLY: | | | | | | | | |
| 115 | OVER CHARGES | $632,055 | $4,384,620 | $10,241,446 | | $5,856,826 | $6,488,881 | 57% | 134% |
| 116 | UNDER CHARGES | -$1,413,396 | -$1,639,382 | $736,955 | | -$902,427 | -$2,315,823 | -122% | -55% |
| 117 | ZERO - OVER / UNDER | -$407,883 | $776,272 | $776,272 | | $0 | -$407,883 | | |
| 119 | NET HSD | -$1,189,224 | $6,800,274 | $11,754,673 | | $4,954,399 | $3,785,175 | 42% | 73% |
| 121 | ALL OTHER / NOT IDENTIFIED: | | | | | | | | |
| 122 | OVER CHARGES | $999,187 | $2,982,258 | $6,301,339 | | $3,319,081 | $4,318,268 | 53% | 111% |
| 123 | UNDER CHARGES | -$9,148,695 | $7,177,082 | $1,703,775 | | -$5,473,307 | -$14,622,002 | -321% | -76% |
| 124 | ZERO - OVER / UNDER | -$1,002,667 | $712,766 | $712,766 | | $0 | -$1,002,667 | | |
| 126 | NET "ALL OTHER" | -$9,152,175 | $10,872,106 | $8,717,880 | | -$2,154,226 | -$11,306,401 | -25% | -20% |
| 128 | TOTAL | | | | | | | | |
| 129 | OVER CHARGES | $1,631,242 | $7,366,878 | $16,542,785 | | $9,175,907 | $10,807,149 | 55% | 125% |
| 130 | UNDER CHARGES | -$10,562,091 | $8,816,464 | $2,440,730 | | -$6,375,734 | -$16,937,825 | -261% | -72% |
| 131 | ZERO - OVER / UNDER | -$1,410,550 | $1,489,038 | $1,489,038 | | $0 | -$1,410,550 | | |
| 133 | GRAND TOTAL | -$10,341,399 | $17,672,360 | $20,472,553 | | $2,800,173 | -$7,541,226 | 14% | 16% |
| 135 | % OF TOTAL REVENUE: | | | | | | | | |
| 137 | OVERCHARGES | | | 45% | | | | | |
| 138 | UNDERCHARGES | | | -31% | | | | | |
| 140 | % OF TOTAL COST: | | | | | | | | |
| 142 | OVERCHARGES | | 52% | | | | | | |
| 143 | UNDERCHARGES | | -36% | | | | | | |
| 145 | OTHER PERCENTAGES: | | | | | | | | |
| 146 | | | HSD | | ALL OTHERS | | | | |
| 147 | PERCENT OF TOTAL REVENUE: | | 57% | | 43% | | | | |
| 149 | **PERCENT OF TOTAL COST:** | | **38%** | | **62%** | | | | |
| 151 | REV % OF ASSIGNED COSTS: | | **173%** | | **80%** | | | | |
| 153 | **PERCENT OF OVERCHARGES:** | | **64%** | | **36%** | | | | |
| 155 | **PERCENT OF UNDERCHARGES:** | | **14%** | | **86%** | | | | |

# State of New Mexico
## Description of Billed Central Services

data by billing service and anticipated usage based on the customers needs and a billing rate by service is computed.

The State's departments/agencies are requested to provide information on the billing accounts they want established to accumulate the cost of the services provided by ISD related to these accounts. As services are requested by the departments/agencies throughout the year, they also identify the billing account to be billed that is associated with the request. As ISD generates the data in response to each request, all resources used by service (units of service by billing rate) are identified and charged to the specific account identified on the request.

In March/April of each year, a "mid-year realignment" is performed to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87. The billing rates are adjusted to reflect actual usage and costs to that point in time plus the expected usage and costs to the end of the year. Based on the new billing rates by service, any over/under recovery associated with each account is adjusted to reflect the new billing rates and the actual usage by that account. An adjusted bill by account is sent to the respective departments/agencies. In this manner, each account receives an adjustment proportional to its actual usage. This same process is also performed at the end of the year

5. Schedule of Current Rates –

    Attached

6. Treatment of variances

    See item 4 above.

7. Actuarial Reports

    Not applicable

8. Explanation of Insurance Fund Contributions Are Determined

    Not applicable

9. Explanation of Pension Fund Contributions and Dates

    Not applicable

Innovative Costing Solutions LLC

April 11, 2004

0000309

## Hill, Terry (PSC)

om:     Lauritsen, Lyle (PSC)
Sent:   Tuesday, January 30, 2007 1:51 PM
To:     Hill, Terry (PSC)
Subject:  FW: status of FY 05 SWCAP

NM response on submitting the FY 05 & 06 SWCAPs.

Lyle Lauritsen
Division of Cost Allocation
(913) 724-3920


In an effort to evaluate customer service, the staff of the PSC would appreciate your taking a few moments to complete our Customer Comment Card by clicking on the link below. Your time and effort in providing this valuable feedback pertaining to products and services you received is greatly appreciated.

http://www.psc.gov/survey/Customer1/customer_1.htm


From: Peters, Bob G., DFA
 nt: Tue 1/30/2007 11:29 AM
    Lauritsen, Lyle (PSC)
Subject: RE: status of FY 05 SWCAP

Lyle,

I'm sorry for not responding sooner. I've been out sick for three days with the flu. Our legislative session has begun so things are somewhat crazy around here. GSD still has not completed their audited financial statements for FY05, which is the reason for the delay in submitting the 2005 SWCAP. The audit should have been completed a year ago. The previous management of the General Services Department was removed by the Governor and new management has been in place for about nine month. What the new management found was a financial nightmare, and they are working hard to clean it up. The delay in the FY 05 SWCAP has also pushed back the 2006 plan. GSD has not yet begun their 2006 audit. I have no good news on the matter. It's an embarrassing situation for the state, but it is not the fault of the current management at GSD. I have a draft of the 2005 audit and from what I understand, the remaining parts of the audit that need to be completed should not affect the numbers for any of the internal service funds contained in Section II of the plan. If you would be willing to accept a Section II from the draft audit I can try to complete it as soon as possible. I will check with Ted to see what if any additional information he needs to complete Section I

The complete picture of New Mexico's efforts to put together the SWCAP must also include a comment on the resources we dedicate to the preparation of the plan. As you know, the state has been delinquent in submitting the plan on a timely basis since the Stone Age. And even though we have had disagreements with DCA in Dallas on other matters such as how to calculate overcharges to federal programs, they have been more than patient with the state on the submission of the plan. We have also made life difficult for the consultants we hire because we don't furnish them on a timely basis the information they need to submit the plan. Part of the problem is that agencies contained in the plan (not just GSD) can't get their audits completed in time for us to get the plan submitted by December 31st. That is not likely to change until the state has successfully implemented its new accounting system.

^-d part of the problem lies with me. I have a very demanding full time job in addition to the responsibility to oversee the
    aration of the plan including the preparation of Section II. Until, the plan is assigned to someone else or my work load is reduced, I will continue to struggle to do what is necessary to get the plan in on time.

0000310

Docket No. A-06-105
DCA Exhibit # 3
Page 1 of 2

1/31/2007

ob

Lauritsen, Lyle (PSC) [mailto:Lyle.Lauritsen@psc.hhs.gov]
**ent:** Friday, January 26, 2007 7:52 AM
**To:** Peters, Bob G., DFA
**Subject:** status of FY 05 SWCAP

Bob, are you going to soon submit both Sections I & II of the FY 05 SWCAP?  since the FY 06 was due 12-31-06, did you request
an extension to submit that one too?

not, you will probably be getting a delinquency letter sometime in February. Those are generated by our automated tracking
stem.
THANKS!
le Lauritsen
vision of Cost Allocation
13) 724-3920

an effort to evaluate customer service, the staff of the PSC would appreciate your taking a few moments to complete our
Customer Comment Card by clicking on the link below. Your time and effort in providing this valuable feedback pertaining to
oducts and services you received is greatly appreciated.

http://www.psc.gov/survey/Customer1/customer_1.htm

entiality Notice: This e-mail, including all attachments is for the sole use of the intended recipient(s) and may
contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited
less specifically provided under the New Mexico Inspection of Public Records Act. If you are not the intended
recipient, please contact the sender and destroy all copies of this message. -- This email has been scanned by the Sybari
Antigen Email System.

0000311

Docket No. A-06-105
DCA Exhibit # 3
Page 2 of 2

| Published Rate: | $3,000.00 /CPU Hr (A) | Service: | CICS CPU - ...ndard | Cost-Based Rate: | $1,254.222 /CPU Hr (B) |
|---|---|---|---|---|---|



| Client | Beginning 2004 Fund Balance | (D) Service Utilization | (E) Client Util vs Total Servc Util (D/M) | (F) Revenue Published Rates (A*D) | (G) Revenue Cost-Based Rates (B*D) | (H) Client Over/(Under)-Recovery (F-G) | Cost Percent | Ending Fund Balance | Imputed Interest | Allowable Reserve | Excess Fund Balance | (I) % Federal Financial Participation | (L) Federal Over/(Under)-Recovery (J-K) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CYFD | | | | | | | | | | | | 33.00% | $0 |
| DFA | $7,156 | 24 | 1.77% | $73,022 | $30,529 | $42,494 | | $49,649 | $294 | $4,843 | $45,090 | | $0 |
| DOH | | | | | | | | | | | | 18.00% | $0 |
| GSD | $4,000 | 14 | 0.99% | $40,821 | $17,066 | $23,755 | | $27,755 | $198 | $2,707 | $25,206 | | $0 |
| HRS | | 7 | | | | | | | | | | | |
| HSD | $313,458 | 1,066 | 77.55% | $3,198,830 | $1,337,348 | $1,861,482 | | $2,174,940 | | $212,154 | $1,975,227 | 62.89% | $1,242,221 |
| ONG | | | | | | | | | | | | | $0 |
| PRC | $4,367 | 15 | 1.06% | $44,463 | $18,599 | $25,874 | | $30,231 | | $2,849 | $27,455 | | $0 |
| SHD | | | | | | | | | | | | | $0 |
| STR | $1,024 | 3 | 0.25% | $10,454 | $4,371 | $6,084 | | $7,108 | | $693 | $6,455 | | $0 |
| TRD | | | | | | | | | | | | | $0 |
| Other | $28,133 | 96 | 6.96% | $287,100 | $120,029 | $167,071 | | $185,204 | | $19,041 | $177,280 | | $0 |
| **Totals** | **$404,192** | **1,375** (M) | **100.00%** | **$4,124,768** (N) | **$1,724,458** (O) | **$2,400,309** | **9.76%** | **$2,728,850** | **$15,811** | **$286,186** | **$2,478,275** | | **$1,270,212** |



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Program Support Center
Financial Management Service
Division of Cost Allocation
Central States Field Office

1201 Young Street
Room 732
Dallas, TX 75202
(214) 767-3261
(214) 767-3264 FAX

CERTIFIED – RETURN RECIEPT REQUESTED

February 4, 2005

Ms. Dona Wilpolt-Cook, Director
State Budget Division
State of New Mexico
DFA – Budget Division
Suite 190 Bataan Memorial Building
Santa Fe, NM 87501

Dear Ms. Wilpolt-Cook:

The purpose of this letter is to issue a determination concerning the federal share of billings in excess of cost for computer services by the General Services Department - Information Systems Division (ISD), (formerly the Office of Information Processing - OIP) from July 1, 1999 through June 30, 2003. We have determined that ISD has excess reserve balances as of June 30, 2003 for which a repayment to the Federal Government is needed.

We have prepared the attached Revenue, Expenditures and Fund Balance worksheets for each of Fiscal Years Ending (FYE) June 30, 2000, 2001, 2002 and 2003. Beginning fund balances for FYE June 20, 2000 were calculated as agreed to in the Stipulation and Agreement signed by David J. Davis, Cabinet Secretary, State of New Mexico General Services Department on December 31, 2002, related to the Departmental Appeals Board Docket A-01-58 and A-01-65. Calculations by billing rate category for each of the four fiscal years (2000 -2003) have been made consistent with the Departmental Appeals Board Decision Number 1876.

It is the responsibility of the State to operate the ISD internal service fund in compliance with *Office of Management and Budget Circular A-87 Cost Principles for State, Local and Indian Tribal Government* (A-87), Attachment C, Section G. 4, Adjustments of billed central services which states "Billing rates used to charge Federal awards shall be based on the estimated cost of providing the services, including an estimate of the allocable central service cost. A comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable costs of the service will be made at least annually, and an

0000313

adjustment will be made for the difference between the revenue and the allowable costs. These adjustments will be made through one of the following adjustments methods: (a) a cash refund to the Federal Government for the Federal share of the adjustment, (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central service costs. Adjustments to allocated central services will not be permitted where the total amount of the adjustment for a particular service (Federal share and Non-Federal) share exceeds $500,000." Cumulatively for the period July 1, 1999 through June 30, 2003, three billing rate categories, MVS CPU, CICS CPU and Disk Occupancy, have excess reserves in excess of $500,000 each as of June 30, 2003. The total Federal share for the three as of June 30, 2003 is $3,016,928.

Interest at 5% from June 30, 2003 to March 6, 2005 is $257,696 (worksheet attached) resulting in a total debt as of March 6, 2005 of $3,274,624. If the State provides treasury interest earning rates for the periods from June 30, 2003 to the present, we will adjust the determination accordingly. Otherwise, pay the Federal Government $3,274,624 as described below.

This is the final decision of the Director, Division of Cost Allocation-Central States Field Office. It shall be the final decision of the Department unless, within 30 days after receiving this decision, you deliver or mail (you should use registered or certified mail to establish the date) a written notice of appeal to the Department of Health and Human Services, Departmental Appeals Board, MS 6127, Appellate Division, 330 Independence Avenue, S.W., Cohen Building - Room G-644, Washington, D.C. 20201. You should attach to the notice a copy of this decision, note that you intend to appeal, state the amount in dispute, and briefly state why you think that this decision is wrong. You will be notified of further procedures.

If you elect not to appeal this decision and/or provide additional information described above, please refund $3,274,624 by check made payable to the Department of Health and Human Services, and send it along with a copy of this letter within 30 days of the date of this letter to the following address:

> Department of Health and Human Services
> Program Support Center - Fin. Mgmt. Svcs.
> Division of Financial Operations
> Debt Management Branch
> 5600 Fishers Lane
> Parklawn Building, Room 16A-12
> Rockville, MD 20857

In addition, please submit to my office copies of your transmittal letter and check. If you have questions concerning the computation of the payment amount, please call Pamela Page at (214) 767-6505.

This letter constitutes the initial notification of a claim by the United States as required by the Federal Claims Collection Standards (4 CFR 102.2). If payment is not received within 30 days from the date of this notification, interest at the current Private Consumer rate as of the date of this notice ( approximately 12%), will be assessed in accordance with Department regulations at 45 CFR Part 30.13 and calculated in accordance with the Treasury Financial Manual, 1 TFM Part 6, Section 8025. If your organization elects to appeal, we will suspend collection action. However, if the final decision of the appeals process is determined in favor of the Federal Government (fully or partially), interest will be assessed on the upheld amount from the date of

this notification. Questions concerning payment may be addressed to the Debt Management Branch or by calling (301) 443-3083.

Sincerely,

Henry Williams
Director
Division of Cost Allocation
Central States Field Office

Attachments

0000315

Docket No. A-06-105
DCA Exhibit # 5
Page 3 of 3