# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
NEW MEXICO                                        )
DEPARTMENT OF INFORMATION        )
TECHNOLOGY,                                    )
                                                          )
                                                          )
                *Plaintiff*,                      )
                                                          )
      v.                                        )          Case No. 1:07-cv-01603-CKK
                                                          )          Judge Kollar-Kotelly
U.S. DEPARTMENT OF HEALTH            )          Administrative Agency Review
AND HUMAN SERVICES,                       )
                                                          )
      and                                       )
                                                          )
MICHAEL O. LEAVITT                          )
Secretary of the Department of Health      )
  and Human Services,                          )
                                                          )
               *Defendants*.                  )
_____)

## MOTION FOR SUMMARY JUDGMENT

        Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1,

Plaintiff New Mexico Department of Information Technology moves for summary judgment.

For the reasons set forth in the accompanying Statement of Material Facts Not in Dispute and

Memorandum of Points and Authorities, there is no genuine issue of material fact, and Plaintiff

is entitled to judgment as a matter of law.  Plaintiff therefore asks this Court to enter judgment in

its favor.

        Plaintiff believes that this case involves a subject – federal cost allocation

principles – that is not often before this Court.  Plaintiff submits that this Court's understanding

of this subject, which is an important one for all State administration of federal programs, would

be enhanced by oral presentations by the attorneys.  Therefore, in accordance with Local Rule

7(f), Plaintiff requests a hearing at which the attorneys for each side could present oral argument

(but no new evidence).

Respectfully submitted,


__/s/__ Charles A. Miller _____
Charles A. Miller (D.C. Bar No. 8904)
Susannah Vance (D.C. Bar No. 496163)
Leah Pogoriler (D.C. Bar No. 973827)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
(202) 662-6000

*Attorneys for New Mexico Department of
Information Technology*

December 21, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of December, 2007, I caused the foregoing

Motion for Summary Judgment and the attached Statement of Material Facts Not in Dispute,

Memorandum of Points and Authorities, and Proposed Order to be served on Mercedeh Momeni,

counsel for Defendants, via the Court's Electronic Case Filing system.


          /s/   Leah Pogoriler         
Leah Pogoriler
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
(202) 662-6000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
NEW MEXICO                                            )
DEPARTMENT OF INFORMATION          )
TECHNOLOGY,                                          )
                                                               )
                                                               )
                           *Plaintiff*,                    )
                                                               )
            v.                                              )            Case No. 1:07-cv-01603-CKK
                                                               )            Judge Kollar-Kotelly
U.S. DEPARTMENT OF HEALTH           )            Administrative Agency Review
AND HUMAN SERVICES,                     )
                                                               )
            and                                             )
                                                               )
MICHAEL O. LEAVITT                          )
Secretary of the Department of Health    )
   and Human Services,                         )
                                                               )
                           *Defendants*.               )
_____)


**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

        In accordance with Local Rule 56.1, Plaintiff New Mexico Department of

Information Technology ("New Mexico" or "the State") submits the following statement of

material facts as to which there is no genuine dispute among the parties:

        1.        Office of Management and Budget (OMB) Circular A-87 establishes

principles for determining the costs that States may charge to federal awards.  AR 2,[1] 212; OMB,

Final Revision to OMB Circular A-87, ¶ 1, 60 Fed. Reg. 26,484, 26,489 (May 17, 1995)

("Circular A-87").  The principles of Circular A-87 must be applied by all federal agencies in

---

[1] Throughout this statement, citations to "AR __" refer to the administrative record of the appeal
filed by the New Mexico General Services Department before the Departmental Appeals Board
(DAB) of the United States Department of Health and Human Services (HHS).

determining costs incurred by States and other governmental units under federal awards and agreements.  AR 2, 213; Circular A-87, Att. A, ¶¶ A.1, A.3.a.

2.    States often provide services, such as computer services, on a centralized basis to numerous State agencies and departments that operate federal and other programs within the State.  Central service cost allocation plans (CAPs) provide the process for allocating central service costs from the central service provider to the activities that benefit from the service.  AR 3, 224; Circular A-87, Att. C, ¶ A.1.

3.    The CAP for central services provided on a statewide basis is known as the statewide cost allocation plan (SWCAP).  AR 8, 171.  For each year in which the State claims central service costs under federal awards, the State must submit a SWCAP for review and approval by the cognizant federal agency.  AR 3, 224; Circular A-87, Att. C, ¶¶ C, D.

4.    The cognizant agency responsible for reviewing and approving SWCAPs for States that administer federal-state programs is the Division of Cost Allocation (DCA) of the United States Department of Health and Human Services (HHS).  AR 3-4.

5.    Central service costs that have been assigned to a customer State agency or department are charged by that agency to the various programs that it administers, which in turn pass some of these costs through to the federal government.  AR 3, 224; Circular A-87, Att. C, ¶¶ C, D.1.

6.    Billed central services are central services that are billed to benefiting agencies or programs on a fee-for-service basis.  AR 4, 224; Circular A-87, Att. C, ¶ B.1.

7.    Billed central services may be provided through a financing mechanism known as an internal service fund (ISF).  AR 4, 225; Circular A-87, Att. C, ¶¶ E.3.a, b.

8.     The central services at issue in this action are information services that were administered during SFY 2004 by what was then the Information Systems Division (ISD) of the New Mexico General Services Department (GSD).  Plaintiff New Mexico Department of Information Technology was subsequently formed by combining ISD and the former Communications Division of GSD with the Office of the Chief Information Officer, an oversight agency.  AR 1, 69, 253-54; Complaint ¶ 10.

9.     The information services at issue include hardware, software, email, and technical support services provided to customer agencies.  AR 1, 6, 254.

10.     The services in question are billed central services provided through an ISF.  AR 1, 6.  During SFY 2004, the information services provided through the ISF were divided into thirty-two categories.  AR 6, 69.

11.     The ISF incurs various costs in providing information services to customer agencies.  These costs include direct costs of providing services (such as the costs of salaries, hardware, and software) and other costs (such as depreciation, overhead, and indirect costs).  AR 6-7, 105.  The State uses an allocation methodology developed in consultation with DCA that assigns these costs to each of the categories of service functions provided by the ISF.  AR 69, 254.

12.     A unit of service is defined with reference to each service function; for instance, central processing unit (CPU) services are provided by the hour, while printing is provided by the page.  AR 70, 247.

13.     Each service function was billed at a per-unit rate that was established before the beginning of SFY 2004 and that reflected the estimated cost of providing the service, as originally calculated for SFY 1999.  AR 70, 254-55.

14.    The Human Services Department (HSD), the Children, Youth, and Families Department (CYF), and the Department of Health (DOH) are the three State agency customers of the ISF with more than negligible federal funding.  AR 257.  HSD, which administers Medicaid and other federally funded programs in partnership with HHS, is the primary customer agency of the ISF.  AR 71, 269.

15.    Customer agencies are issued monthly invoices that break down ISF charges by billing accounts.  A customer agency may have multiple billing accounts, each of which corresponds to one or more of its major activities or program divisions.  AR 70, 255, 262.

16.    When HSD receives an invoice for any of its billing accounts, it applies cost allocation methodologies approved by DCA to charge the expenses for that account to the programs that participate in that account, including one or more federal programs (depending on the account).  Some billing accounts include charges to only one federal program, and others benefit numerous federal and State programs.  AR 71-72, 262-64.

17.    It is possible to trace the amounts of any ISF over- or under-billings to the federal program that benefited from and was charged with the service.  AR 70-73, 255, 277.

18.    New Mexico's SWCAP for SFY 2004 provided that "[a]djustments for variances between billed costs and the actual allowable costs of providing the services, as defined by OMB Circular A-87, will be made in accordance with procedures agreed to between the State/locality and the Cognizant Agency."  AR 239.  The SWCAP does not establish a specific method for making adjustments for SFY 2004.  AR 238-52.

19.    After each fiscal year, the State analyzes the actual costs for that year attributable to each service category within the information services ISF.  The State then compares these costs with the revenues for each service category (revenues include payments

received, plus imputed interest on payments).  After taking into account the sixty-day working capital reserve permitted by Circular A-87, the State calculates a final profit or loss for each service category for the year.  AR 74, 255.

20.    For any given year, there may be an overcharge or an undercharge for a particular category of service, depending upon whether costs were lower or higher than expected. AR 74, 256.

21.    The State conducts an audit of the relevant cost settlement information before it is finalized and submitted to DCA as part of a SWCAP.  AR 256.

22.    On October 15, 2005, the State submitted to DCA a proposed SWCAP containing a cost settlement and a reconciliation of profits and losses for the ISF as a whole for SFY 2004.  AR 241-52, 257.  In subsequent correspondence with DCA, the State provided cost reconciliations for HSD, CYF, and DOH.  AR 75, 257.

23.    The State's analysis revealed that out of the thirty-two functional categories, ten had overcharges (revenues exceeded allowable costs), sixteen had undercharges (allowable costs exceeded revenues), and six had no charges.  AR 75, 257.  The State determined the amount of federal participation in each customer agency's service category overcharges and undercharges by applying a weighted average of federal participation in the agency's SFY 2004 payments for ISF services  AR 76, 257.  These amounts were aggregated to compute a total overcharge for each State agency; this calculation took into account all cost-revenue variances, whether overcharges or undercharges, in the thirty-two service categories.  *Id.*  As corrected during subsequent discussions with DCA, these computations calculated an ISF overcharge to federal programs of $1,782,744 in SFY 2004, of which $1,716,068 was attributable to federal programs administered by HSD.  AR 76, 257, 295.

24.    On June 22, 2006, DCA issued a letter announcing DCA's determination to disallow $4,011,031 in claims for federal funds.  This letter replaced a February 22, 2006 letter in which DCA had originally issued its disallowance; in the June 22, 2006 letter, DCA accepted corrected data from the State but refused to take into account undercharges, as requested by the State.  AR 76, 193-95, 258.  In its June 22, 2006 disallowance letter, DCA concluded that five of the service categories in the ISF had excess balances totaling more than $500,000.  DCA computed the base disallowance amount by totaling the federal share of overcharges in these five service categories to HSD, CYF, and DOH, using the weighted average federal participation rate for each State agency.  The base disallowance amount in DCA's calculation was $3,790,567, of which $3,723,891 was attributable to HSD and $66,676 to the other two agencies.  With respect to HSD, DCA disregarded sixteen service categories in which the costs of providing service exceeded the revenues collected; the federal share of these undercharges was $2.18 million.  DCA also disregarded service categories in which revenues exceeded costs by less than $500,000.  The total disallowance amount of $4,011,031 incorporates $220,464 in pre-disallowance interest, at the rate of 2.9%, from the end of SFY 2004 until the date of the disallowance letter.  AR 76-77, 193-95, 296.

25.    Between June and December 2006, in connection with attempts to reach a negotiated resolution, the State conducted a more refined analysis, using data identical to the data DCA used to calculate the disallowance.  The analysis, which applied the federal participation rate for each federal program in each HSD billing account to that program's share of overcharges or undercharges for that account, showed that the federal share of the State's total overcharge to HSD was $1,683,715; this amount is $32,353 less than the total overcharge to HSD-administered

6

federal programs obtained using a weighted average federal participation rate.  AR 77-78, 258-60, 271-72, 277.

26.    The State's refined analysis does not result in cost-shifting among federal programs or between federal and State programs.  AR 260, 277.

27.    Each federal program as a whole was overcharged in SFY 2004.  AR 260, 277.

28.    The State has calculated a total overcharge amount of $1,683,715 for HSD (calculated as described above at ¶ 25) plus $66,676 for CYF and DOH (as calculated by DCA and not contested by the State), for a total principal amount of $1,750,391.  Pre-disallowance interest on this amount (from June 30, 2004, the end of SFY 2004, to June 22, 2006, the date of the disallowance letter), at the rate of 2.9%, is $101,802.  The total correct base disallowance amount is thus $1,852,193.  AR 77, 260, 294.  Post-disallowance interest on this base amount accrues at the annual rate of 12.125%, without compounding.  AR 194, 294; 45 C.F.R. Part 30.

29.    The State appealed DCA's disallowance to the Departmental Appeals Board (DAB) of HHS.  The State's primary argument was that in calculating total overcharges, DCA should have taken into account service categories in which there were undercharges.  The State proposed to refund to the federal government $1,852,193, representing the sum of (a) the net overcharges to federal programs administered by HSD during SFY 2004 ($1,683,715), (b) the overcharges as calculated by DCA for CYF and DOH ($66,676), and (c) pre-disallowance interest ($101,802).  AR 148-162, 60-103.

30.    The DAB upheld the disallowance in full, holding that DCA's method of calculating the disallowance was reasonable.  AR 1-26.

Respectfully submitted,


___/s/___Charles A. Miller_____
Charles A. Miller (D.C. Bar No. 8904)
Susannah Vance (D.C. Bar No. 496163)
Leah Pogoriler (D.C. Bar No. 973827)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
(202) 662-6000

*Attorneys for New Mexico Department of
Information Technology*


December 21, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| NEW MEXICO | ) | |
| DEPARTMENT OF INFORMATION | ) | |
| TECHNOLOGY, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01603-CKK |
| | ) | Judge Kollar-Kotelly |
| U.S. DEPARTMENT OF HEALTH | ) | Administrative Agency Review |
| AND HUMAN SERVICES, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MICHAEL O. LEAVITT | ) | |
| Secretary of the Department of Health | ) | |
| and Human Services, | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Charles A. Miller
Susannah Vance
Leah Pogoriler
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
(202) 662-6000

*Attorneys for New Mexico Department of*
*Information Technology*

December 21, 2007

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

I.     Legal Framework ............................................................................................ 2

II.    Factual Background ........................................................................................ 5

        A.     The Information Services ISF and how its Costs Reach Federal Programs ........... 5
        B.     The Adjustment Reconciling Revenues with Allowable Costs ............................ 7
        C.     The Disallowance ............................................................................................ 9

III.    Proceedings Before the DAB ...................................................................... 10

STANDARD OF REVIEW ........................................................................................ 12

ARGUMENT ............................................................................................................. 13

I.     The Refund Calculated by DCA Improperly Disregards Undercharges and
      Is More than Double the State's Total Obligation to the Federal Government. .............. 13

        A.     Federal Cost Principles Call for Adjustments That Take Into Account
              Both Overcharges and Undercharges. .................................................. 13

            1.     The Refund Method Is Designed to Take Undercharges into Account. ..... 13

            2.     Circular A-87 Does Not Authorize a Punitive Time Limit. ...................... 16

        B.     The Adjustment Calculated by the State Accurately and Reliably Measures and
              Reimburses for the Impact on Federal Programs, While the Adjustment
              Calculated by DCA Does Not. ............................................................. 18

            1.     The State's Methodology ...................................................................... 18

            2.     DCA's Methodology Compared to the State's Methodology ................... 20

II.    Other Grounds Advanced by the DAB Do Not Support Its Decision. ............................ 21

CONCLUSION .......................................................................................................... 23

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ....................12, 13

*Fund for Animals v. Babbitt*, 903 F. Supp. 96 (D.D.C. 1995) ...........................12

### DEPARTMENTAL APPEALS BOARD CASES

*Arkansas Department of Information Systems*, DAB No. 2010, 2006 WL 321179
    (2006)...................................................................................................18

*New Mexico General Services Department*, DAB No. 1876, 2003 WL 21043171
    (2003)...................................................................................................11

*Texas Office of the Governor*, DAB No. 1608, 1997 WL 72177 (1997)..........................21

### FEDERAL STATUTES

Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*...........................................12

### FEDERAL REGISTER

Office of Management and Budget, Proposed Revisions to OMB Circular No. A-
    87, 58 Fed. Reg. 44,212 (Aug. 19, 1993)......................................................17

* Office of Management and Budget, Final Revision to OMB Circular A-87, 60
    Fed. Reg. 26,484 (May 17, 1995) ............................................... 2-3, 5, 7, 11-19, 21-22

Office of Management and Budget, Final Revision of OMB Circulars A-21, A-
    87, A-102, A-110, and A-122 and Interim Final Revision of OMB Circular A-
    110, 62 Fed. Reg. 45,934 (Aug. 29, 1997).....................................................2

Office of Management and Budget, Revisions to OMB Circulars A-21, A-87 and
    A-122, 69 Fed. Reg. 25,970 (May 10, 2004).................................................2

Office of Management and Budget, Relocation of Policy Guidance to 2 C.F.R.
    Chapter II, Code of Federal Regulations, 70 Fed. Reg. 51,910 (Aug. 31, 2005) ..........2

### FEDERAL POLICY GUIDANCE

* United States Department of Health and Human Services, A Guide for State,
    Local and Indian Tribal Governments, ASMB C-10 (April 8, 1997) ("ASMB
    C-10") ...............................................................................11-15, 17-18, 22

## <u>INTRODUCTION</u>

In this action, Plaintiff New Mexico Department of Information Technology ("New Mexico" or "the State") seeks judicial review of a decision of the Departmental Appeals Board (DAB) of the United States Department of Health and Human Services (HHS).  In Decision No. 2083, dated May 17, 2007, the DAB upheld a $4,011,031 disallowance imposed by HHS's Division of Cost Allocation (DCA) against the State.  Although the stated purpose of this disallowance was to recover for State "overcharges" to federal programs, the actual amount of overcharges (including pre-disallowance interest) was only $1,852,193.  DCA improperly calculated the disallowance amount by summing certain overcharges by the State for central services provided by the State and ultimately charged in part to federal programs, while disregarding undercharges that also must be taken into account.

Controlling cost principles make clear that the federal government is obligated to bear its fair share of costs incurred by States in the administration of federal programs.  Here, though, HHS has avoided that obligation by imposing over two million dollars worth of federal costs on the State.  None of the reasons cited by DCA or by the DAB supports this inequity.  HHS's objections to equal treatment of over- and under-charges in this case do not stand up even to deferential review.

In disregarding the undercharges and demanding a refund of more than double the actual amount of overcharges to federal programs, HHS has acted arbitrarily, capriciously, and in violation of controlling legal principles.  Therefore, Plaintiff is entitled to summary judgment invalidating HHS's disallowance and related actions and ordering HHS to adjust the disallowance amount to $1,852,193.

## BACKGROUND

### I.    Legal Framework

Every State operates a variety of programs that are funded in whole or in part by the federal government.  Examples include public assistance programs, such as Medicaid, Child Support Enforcement, and Food Stamps, as well as education, work training, and other activities.  When State agencies incur costs as part of these programs, they claim reimbursement for these costs as allowed by federal law.

These federally supported programs are administered by departments or agencies of the States.  In addition, there are support functions for these and other State activities that are provided by other arms of State governments that are also eligible for federal reimbursement.  As a general proposition, the extent of available federal reimbursement for federally supported programs is governed not just by rules specific to individual federal programs, but also by a set of rules of general applicability contained in Office of Management and Budget (OMB) Circular A-87.  This circular, titled "Cost Principles for State, Local and Indian Tribal Governments," establishes generally applicable principles for determining the costs that States may charge to federal awards.[1]  OMB, Final Revision to OMB Circular A-87, ¶ 1, 60 Fed. Reg. 26,484, 26,489 (May 17, 1995) ("Circular A-87").  The principles of Circular A-87 must be applied by all federal agencies in determining costs incurred by States under federal awards and agreements.  Circular A-87, Att. A, ¶¶ A.1, A.3.a.

---

[1] The version of Circular A-87 applicable to this case was promulgated in 1995.  60 Fed. Reg. 26,484 (May 17, 1995).  Limited revisions in 1997, *see* OMB, Final Revision of OMB Circulars A-21, A-87, A-102, A-110, and A-122 and Interim Final Revision of OMB Circular A-110, 62 Fed. Reg. 45,934 (Aug. 29, 1997), did not affect the provisions at issue here.  The circular was later revised effective June 9, 2004, in respects not applicable here, *see* OMB, Revisions to OMB Circulars A-21, A-87 and A-122, 69 Fed. Reg. 25,970 (May 10, 2004), and then relocated to the Code of Federal Regulations, *see* OMB, Relocation of Policy Guidance to 2 C.F.R. Chapter II, 70 Fed. Reg. 51,910 (Aug. 31, 2005).  The Federal Register publications containing the proposed and final 1995 versions are in the Administrative Record at AR 207-37.

2

The provisions of Circular A-87 that are at the heart of this case are set forth in Attachment C of the circular.  Attachment C is concerned with central services – services such as accounting, motor pools, or computer services that a State provides on a centralized basis to some or all of the individual State agencies that administer federally supported and other programs within the State, instead of requiring each individual agency to provide these services for itself.  *Id.* Att. C, ¶ A.1.  When a State provides central services to several of its agencies or departments, each of which in turn may administer one or more separate programs, the costs of the services must be assigned to the individual benefiting programs on a reasonable and consistent basis.  *Id.*  Central service cost allocation plans (CAPs) provide the process for allocating central service costs from the central service provider to the activities that benefit from the services.  *Id.*

The CAP for central services provided on a statewide basis, as distinct from those provided on a local government or other basis, is known as the statewide cost allocation plan (SWCAP).  AR 8,[2] 171.  For each year in which the State claims central service costs under federal awards, the State must submit a SWCAP to the cognizant agency, that is, to the federal agency charged with reviewing and approving the SWCAP.  Circular A-87, Att. C, ¶¶ C, D. DCA is the cognizant agency for States that administer federal-state public assistance programs. SWCAPs generally should be submitted within six months prior to the beginning of the State fiscal year (SFY) in which the State proposes to claim central service costs.  Circular A-87, Att. C, ¶ D.4.

Central service costs may be assigned to customer State agencies either by billing each benefiting agency or program on a fee-for-service basis (in which case the services are

---

[2] Throughout this memorandum, citations to "AR __" refer to the administrative record of the appeal filed by the New Mexico General Services Department before the DAB.

known as billed central services) or by allocating the costs on some other reasonable basis (in which case the services are known as allocated central services). *Id.* Att. C, ¶¶ B.1-2. This case involves billed services. Where central services are charged in part to federal awards, the billing rates for these services must be based on the estimated costs of providing the services. *Id.* Att. C, ¶ G.4.

Billed central services may be provided through a financing mechanism known as an internal service fund (ISF). *Id.*, Att. C, ¶¶ E.3.a, b. Although ISFs generally should not profit at the expense of their customers (including, indirectly, the federal government), they may charge rates that provide for the full recovery of the costs of providing services plus an additional margin, in order to establish and maintain a reasonable level of working capital reserves. A working capital reserve of up to sixty days' worth of cash expenses for normal operating purposes is considered reasonable. *Id.* Att. C, ¶ G.2.

Once billed central services have been provided to and paid for by a customer State agency, that customer agency allocates its expenditures to the various programs that it administers consistently with its federally approved cost allocation plan. Thus, if a customer State agency administers one or more federally funded programs, some central service costs will ultimately be passed through to the federal government.[3] *Id.* Att. C, ¶¶ C, D.1.

Because there is almost invariably some difference between the estimated costs on which an ISF's billing rates are based and the actual costs as determined after the fact, Circular A-87 establishes a two-step reconciliation process for billed central services. First, "[a]

---

[3] The rate at which a particular federal program reimburses the State agency for the expenditures claimed by the agency under the given program is known as the federal financial participation (FFP) rate. The FFP rate is generally expressed as a percentage; for example, many federal programs reimburse State agencies for 50 percent of the costs of administering the programs.

comparison of the revenue generated[4] by each billed service . . . to the actual allowable costs of the service will be made at least annually." *Id.* Att. C, ¶ G.4.  Second, "an adjustment will be made for the difference between the revenue and the allowable costs." *Id.*  There are four "adjustment methods" outlined in the circular: (a) a cash refund to the federal government for the federal share of the adjustment (if revenue from the billing rate exceeded costs), (b) credits to the amounts charged to the individual programs, (c) adjustments to future billing rates, or (d) adjustments to allocated central service costs.[5] *Id.*

## II.    Factual Background

### A.    The Information Services ISF and how its Costs Reach Federal Programs

The disallowance that Plaintiff is challenging relates to billed central services that were provided during SFY 2004 by what was then the Information Services Division (ISD) of the New Mexico General Services Department (GSD).  Plaintiff New Mexico Department of Information Technology was subsequently formed by combining ISD and the former Communications Division of GSD with the Office of the Chief Information Officer, an oversight agency.

The services ISD provided were electronic information services, including hardware, software, email, and technical support services.  AR 1, 6, 254.  ISD provided these services through an ISF.  AR 1, 6.  During SFY 2004, the ISF services were divided into thirty-two service functions, or categories of information services.  AR 6, 69.  Each service function has its own definition of what constitutes a unit of service.  For instance, central processing unit (CPU) services are provided by the hour, while printing is provided by the page.  AR 70, 247.

---

[4] "Revenue generated" refers to the amounts paid by the agencies billed for the particular central service.
[5] Method (d) is not permitted if the total amount of the adjustment for any given service exceeds $500,000.  Circular A-87, Att. C, ¶ G.4.

The ISF incurs various costs in providing information services to its customer State agencies. These costs include the direct costs of providing services (such as salaries, hardware, and software) and other costs (such as depreciation, overhead, and indirect costs). AR 6-7, 69. Using an allocation methodology developed in consultation with DCA, the State assigns these costs to each of the service functions provided by the ISF. AR 69, 254.

To recover these costs during SFY 2004, the ISF billed each customer agency for its usage of each service function, using a per-unit rate that had been established before the beginning of SFY 2004 and that reflected the estimated cost of providing each service, as originally calculated for SFY 1999. AR 70, 254-55.

The three State agency customers of the ISF with more than negligible federal funding are the Human Services Department (HSD), the Children, Youth, and Families Department (CYF), and the Department of Health (DOH). AR 257. HSD, which administers Medicaid and other federally funded programs in partnership with HHS, is the primary customer agency of the ISF. AR 71, 269.

Customer agencies are issued monthly invoices that break down ISF charges by billing accounts. A customer agency may have multiple billing accounts, each of which corresponds to one or more major activities of the agency or program divisions within the agency. AR 70, 255, 262. When HSD receives an invoice for any of its billing accounts, it applies cost allocation methodologies approved by DCA to charge the expenses for that account to the programs that participate in that account, including one or more federal programs (depending on the account). Some of HSD's billing accounts include charges to only one federal program, such as Medicaid or Child Support Enforcement, and others benefit and are charged to numerous federal and State programs. AR 71-72, 262-64.

The billing account is the most specific level at which information services are billed. Within any given billing account, there is no differentiation based on the ISF's service categories; each program, including those that are federally supported, participates in a specified percentage of all of the account's costs. AR 72-73, 255, 262-67, 277. As a result of the way HSD structures its billing accounts and allocates the costs of these accounts to federal and State programs, it is possible to trace the amounts of any ISF over- or under-billings to the federal program that benefited from and was charged with the service. AR 70-73, 255, 277. The Addendum to this memorandum contains a diagram outlining the manner in which ISF billed charges reach federal programs.

  B. The Adjustment Reconciling Revenues with Allowable Costs

New Mexico's SWCAP for SFY 2004 provided for a post-year-end reconciliation of estimated and actual costs and for "[a]djustments for variances between billed costs and the actual allowable costs of providing the services, as defined by OMB Circular A-87, [to] be made in accordance with procedures agreed to between the State/locality and the Cognizant Agency." AR 239. The SWCAP does not establish a specific method for making adjustments for SFY 2004 based on the post-year-end review. AR 238-52.

After each fiscal year, the State analyzes the actual costs for that year attributable to each service category within the information services ISF. The State then compares these costs with the revenues for each service category (including payments received and imputed interest on payments). After taking into account the sixty-day working capital reserve, the State calculates a final profit or loss for each service category for the year. AR 74, 255. For any given year, there may be an overcharge (profit) or an undercharge (loss) for a particular category of service. An overcharge would arise if actual costs were lower than expected because of reduced staffing, higher-than-anticipated usage levels, or other reasons; an undercharge would arise if

actual costs were higher than expected because of increased staffing or unexpectedly low usage levels. AR 74, 256. The State conducts an audit of the relevant cost settlement information before it is finalized and submitted to DCA as part of a SWCAP. AR 256.

On October 15, 2005, the State submitted to DCA a proposed SWCAP containing a cost settlement and a reconciliation of profits and losses for the ISF as a whole for SFY 2004. AR 241-52, 257. In the SWCAP and subsequent correspondence with DCA, the State provided cost reconciliations for the three departments with significant federal participation – HSD, CYF, and DOH. AR 75, 257. The State's analysis revealed that out of the ISF's thirty-two functional categories, ten had overcharges (revenues exceeded allowable costs), sixteen had undercharges (allowable costs exceeded revenues), and six had no charges during the year. *Id.* In order to identify the total overcharge to the federal government, the State applied a methodology employing the weighted average of federal participation in each customer agency's SFY 2004 payments for ISF services. First, the State determined the total overcharge or undercharge to each State agency for each service category. Next, for each agency, the State applied that agency's average FFP rate to determine the federal share of each service-category overcharge or undercharge to that agency as a whole. AR 76, 87-88, 257. The State aggregated these amounts to compute a total overcharge for each State agency; this calculation took into account all cost/revenue variances, whether overcharges or undercharges, in the thirty-two service categories. *Id.* This calculation, as corrected during subsequent discussions with DCA, concluded that the ISF overcharged federal programs by a total of $1,782,744 in SFY 2004, of which $1,716,068 was attributable to federal programs administered by HSD. AR 76, 257, 295. Pre-disallowance interest increased the total sum calculated by the State to approximately $1.89 million.

C.     The Disallowance

On February 22, 2006, DCA informed the State of DCA's intent to impose a disallowance on the State.  On June 22, 2006, after the State submitted corrected data and urged DCA to recalculate the disallowance by taking into account undercharges for HSD, DCA issued a revised disallowance of $4,011,031.  In issuing the revised disallowance, DCA accepted the State's corrected data and computation methodology for purposes of calculating overcharges, but refused to take into account the undercharges revealed by the same data and methodology.  AR 76, 193-95, 258.

In its revised disallowance letter, DCA concluded that five of the service categories in the ISF had excess balances totaling more than $500,000.  DCA computed the base disallowance amount by totaling the federal share of overcharges in these five service categories to HSD, CYF, and DOH, using the weighted average FFP rate for each State agency.  The base disallowance amount in DCA's calculation was $3,790,567, of which $3,723,891 was attributable to HSD and $66,676 to CYF and DOH.  With respect to HSD, DCA disregarded sixteen service categories in which the costs of providing service exceeded the revenues collected; the federal share of these undercharges was $2,184,963.  DCA also disregarded service categories in which revenues exceeded costs by less than $500,000.  The total disallowance amount of $4,011,031 incorporates $220,464 in pre-disallowance interest, at the rate of 2.9%, from the end of SFY 2004 until the date of the disallowance letter.  AR 76-77, 193-95, 296.

The State appealed this disallowance to the DAB.  While the appeal was pending, in connection with attempts to reach a negotiated resolution, the State conducted a refined, federal-program-specific analysis designed to alleviate any potential concern on DCA's part that consideration of cost/revenue variances in all service categories could result in the shifting of costs from State to federal programs or among federal programs.  The data used in the State's

9

refined analysis were identical to the data DCA used to calculate the disallowance.  The analysis

determined the ISF charges claimed under each federal program in each HSD billing account in

SFY 2004 pursuant to HSD's approved cost allocation plan, and then applied the FFP rate for

each federal program to that program's share of overcharges or undercharges for that account.[6]

AR 77, 88-89, 258-60, 271-72, 277.  This federal-program-specific analysis showed that the

federal share of the State's total overcharge to HSD was $1,683,715.  Because the State did not

(and still does not) contest DCA's calculation of a $66,676 refund for overcharges to CYF and

DOH, the State calculated the total principal amount of its debt as $1,750,391, plus $101,802 in

pre-disallowance interest, for a total correct base disallowance amount of $1,852,193.[7]  AR 77,

260, 294.

### III.    Proceedings Before the DAB

After its efforts to reach a negotiated resolution with DCA proved unsuccessful,

the State proceeded with its appeal to the DAB.  The State asked the DAB to correct the amount

of DCA's disallowance with respect to HSD or to remand the matter to DCA for correct

computation of the disallowance.  AR 66.  The State did not contest (and does not now contest)

the amount of the disallowance relating to CYF and DOH.  The State's position was that the total

refund owed to the federal government, including pre-disallowance interest, was $1,852,193.

_____

[6] The refined analysis identified the overcharge or undercharge to each billing account for each
service category, added these service category amounts to determine the total overcharge or
undercharge for each billing account (including both federal and State shares), identified the
overcharge or undercharge attributable to each federal program within each billing account
(according to the percentage at which each federal program participated in all the services within
the billing account), and multiplied this amount by the FFP rate at which each federal program
reimbursed ISF expenses.  Having obtained the federal share of each program's overcharge or
undercharge in each billing account, the State was able to aggregate these sums to determine the
overall overcharge to each federal program; all federal programs were overcharged.  AR 88-89.
[7] The State's proposed refund amount takes into account service categories disregarded by DCA
in which the total excess balances fell below $500,000.  AR 81.

Before the DAB, the State's primary argument was that DCA, by disregarding the undercharges, had overstated by more than double the amount actually owed to federal programs. Pointing to the language and history of Circular A-87, to HHS's implementation guide for Circular A-87, HHS, *A Guide for State, Local and Indian Tribal Governments*, ASMB C-10 (April 8, 1997) ("ASMB C-10"),[8] and to other authorities, the State stressed that all of the adjustment mechanisms in Circular A-87 are intended to take into account all aspects of the retrospective cost settlement – both profit and loss; that there is no basis for interpreting the "refund" mechanism, as distinct from all the other adjustment methods, as designed to impose a forfeiture on the State by taking into account only overcharges; that there is no deadline for the State to pursue an equitable adjustment; that the overcharges and undercharges were determined through the same process and were equally reliable; that the State was not time-barred from pursuing the adjustment method it sought; and that the State's total obligation to the federal government was $1.85 million. AR 60, 64-66, 78, 80-90.

In response, DCA moved for a summary decision on the basis of earlier DAB decisions, including a case involving New Mexico,[9] upholding overcharge-only disallowances. AR 113-14, 121-26. DCA also argued that its disallowance should be upheld on the merits, on the grounds that the undercharges identified by the State were not allowable and allocable and that DCA's own calculation was reasonable and in accord with Circular A-87. AR 113-14, 126-42.

The DAB declined to issue a summary decision as urged by DCA, but it ultimately upheld the disallowance as calculated by DCA. The DAB agreed with DCA that the State had not adequately addressed the concerns that led the DAB to uphold DCA in the prior

---

[8] A copy of ASMB C-10 is included in the Administrative Record at AR 168-92.
[9] *New Mexico Gen. Servs. Dep't.*, DAB No. 1876, 2003 WL 21043171 (2003).

decisions, and that DCA had used a refund calculation method that was reasonable under the circumstances.  AR 2.  The DAB stated that the State had failed to follow the adjustment methodology adopted in its SWCAP for SFY 2004.  AR 2, 8-9.  The DAB held that DCA's determination and its own precedent were consistent with the intent of Circular A-87's requirements and with ASMB C-10.  AR 11-16.  The DAB agreed with the State that the instant case was distinguishable from earlier cases in some respects, but it held that those earlier cases nevertheless controlled.  AR 16-20.  Finally, raising new issues not previously discussed by DCA, the DAB concluded that the State was improperly attempting to offset undercharges from prior years against overcharges for SFY 2004 and was relying on calculations that were otherwise flawed, with the result that the State had failed to show that the refund as calculated by DCA was inequitable.  AR 2, 20-26.  The State now seeks judicial review of this decision.

## STANDARD OF REVIEW

This is an action for judicial review of a final agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*  Under the APA, the reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  This standard of review, though deferential, "is not to shield [the agency's] action from a thorough, probing, in-depth review."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).  "In thoroughly reviewing the agency's actions, the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors."  *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995).  The Court must consider "whether there has been a clear error of judgment," and although the Court should not "substitute its judgment for that of

the agency," its "inquiry into the facts is to be searching and careful." *Citizens to Preserve Overton Park,* 401 U.S. at 416.

## ARGUMENT

HHS has imposed (through DCA) and upheld (through the DAB) a disallowance that vastly overstates the amount to which the federal government is entitled. The State, applying controlling cost principles according to their plain language and intent, has calculated a refund owed to the federal government, and it does not object to paying that amount. But the State does object to paying more than $2 million in excess of that amount, for no reason other than HHS's arbitrary refusal to take into account undercharges to federal programs. That refusal is inconsistent with the federal cost principles that must be applied, is without any legitimate justification, results in a State subsidy of federal programs, and is an abuse of discretion.

The State asks this Court to hold that the DAB's decision cannot survive even deferential review, because only the refund calculated by the State, and not the refund calculated by DCA, complies with applicable cost principles and equitably determines the amount owed by the State to the federal government.

**I.    The Refund Calculated by DCA Improperly Disregards Undercharges and Is More than Double the State's Total Obligation to the Federal Government.**

    A.    <u>Federal Cost Principles Call for Adjustments That Take Into Account Both Overcharges and Undercharges.</u>

        1.    <u>The Refund Method Is Designed to Take Undercharges into Account.</u>

DCA's calculation of the disallowance and the DAB's decision upholding that calculation cannot be reconciled with the clear language and intent of the applicable cost principles, as those principles are set forth in Circular A-87 and interpreted in ASMB C-10. The main error made by DCA and the DAB is their failure to acknowledge that the adjustments required by Circular A-87 are designed to account for both profit and loss from the provision of

central services and that, in this case, only a refund that takes account of service category

overcharges and undercharges gives full effect to the language and intent of Circular A-87.

Circular A-87 speaks very clearly in terms of adjusting for the difference between

revenue and cost: "an *adjustment* will be made for *the difference* between the revenue and the

allowable costs."  Circular A-87, Att. C, ¶ G.4 (emphasis added).  The circular then goes on to

provide that "[t]hese adjustments will be made through one of [four] adjustment methods," one

of which is the refund method.[10]  *Id.*  It is clear that each of the four adjustment methods,

including the refund method, is intended to be an adjustment for the difference between revenue

and cost.  "Adjustment" and "difference" are neutral terms, designed to capture both profit

(revenue in excess of cost) and loss (cost in excess of revenue).

In policy guidance interpreting Circular A-87, HHS has confirmed that

adjustments are to be made neutrally and evenhandedly, taking into account all aspects of the

retrospective cost settlement performed by the State, whether the "difference" to be adjusted for

arises from an overcharge or an undercharge.  Thus, in a set of questions and answers in a

document issued to explain Attachment C to Circular A-87, HHS stated that "Attachment C,

paragraph G.4 establishes *four methods* for adjusting internal service funds (billed central

services) *for profits or losses* realized from operations."  ASMB C-10 ¶ 4-12 (emphasis added).

Moreover, HHS has specifically confirmed that both method (b), credits to the amounts charged

to individual programs, and method (c), adjustments to future billing rates, "cover profit and loss

situations," and that the circular's failure to make this clear with respect to method (b) was

simply "an editing error."  *Id.*

---

[10] The disallowance in this case is a cash refund to the federal government.

In ASMB C-10, HHS did not specifically address method (a), making a cash refund to the federal government for the federal share of an adjustment, but that is because there was no confusion to be resolved. Because method (b) refers only to "credits," its wording raises a question as to the permissibility of debits (relating to undercharges) to federal programs. The clarification confirmed that debits were also contemplated. Because method (a) is worded simply to provide for a cash refund to the federal government, without any suggestion that the refund cannot take into account loss arising from undercharges, there was no need to clarify that it, like the other methods, contemplates consideration of undercharges.

Nothing in either Circular A-87 or ASMB C-10 suggests that the refund method, as distinct from all the others, must be calculated only by summing overcharges to federal programs, without taking into account undercharges in the same ISF reconciliation. On the contrary, as HHS itself has acknowledged, "[t]he primary concern" in "select[ing] the method of recovery" is "the assurance that the Federal programs charged in a given year receive an *equitable and appropriate* adjustment for the *over/under billings*." *Id.* ¶ 4-14 (emphasis added). In this language, ASMB-C10 clearly acknowledges that the various adjustment methods, including the refund method, are primarily concerned with equitably and appropriately adjusting for overbillings *and* underbillings.[11]

If Circular A-87's language left any doubt about the manner in which particular adjustment methods were meant to be implemented (and the State believes it does not) then the intent of Circular A-87 should control the interpretation. That intent is to establish cost principles "designed to provide that Federal awards bear their fair share of cost recognized under

---

[11] If the undercharges in the aggregate exceed the overcharges to a particular program, no refund adjustment would be taken for that program, although the billing agency would presumably bill for the undercharges, which would result in a claim for the federal share of that undercharge.

these principles except where restricted or prohibited by law." Circular A-87, Att. A, ¶ A.1; *see also id.* Att. A, ¶ C.1.a. (cost is allowable if "necessary and reasonable for proper and efficient performance and administration of Federal awards"); *id.* Att. C, ¶ A.1 (CAP process is designed to ensure that "central service costs can be identified and assigned to benefited activities on a reasonable and consistent basis"). Federal awards are not bearing their fair share of the costs of central services if the State is forced to pay the federal government more than double the amount by which federal programs were actually overcharged for those services.

Moreover, in the 1995 preamble to the final revision to Circular A-87, OMB clarified that it had "rewritten" the section on adjustments of billed central services in order to provide States and units of local government with "more options and flexibility in making adjustments to Federal awards." 60 Fed. Reg. at 26,489. The rigid and punitive approach taken by DCA and ratified by the DAB is inconsistent with this intent to provide States with more flexibility, not less, in making adjustments. Hence, to the extent that Circular A-87's directives are at all unclear on their face, they permit but one interpretation when read in light of Circular A-87's history and purpose: that the State is entitled to have undercharges appropriately taken into account, not ignored, in the calculation of the refund due to the federal government.

2.     Circular A-87 Does Not Authorize a Punitive Time Limit.

Both DCA and the DAB have effectively taken the position that, because of the amount of time it took the State to complete its audited cost settlement in preparation for implementing an adjustment, the State is time-barred from insisting on an equitable adjustment that takes account of the undercharges. *See, e.g.*, AR 12-13. That position is inconsistent with Circular A-87 in several respects.

First, the circular imposes no time limit for making an adjustment based on the annual reconciliation of revenues and costs. It provides that "[a] *comparison* of the revenue

generated by each billed service . . . to the actual allowable costs of the service will be made at least annually, and an *adjustment* will be made for the difference between the revenue and the allowable costs." Circular A-87, Att. C, ¶ G.4 (emphasis added). The "at least annually" language appears in connection with the comparison requirement, but not the adjustment requirement.[12] The language was drafted this way quite deliberately: OMB's original proposal would have provided that "[i]ndividual billing rates will be reviewed and *adjusted to actual costs at least annually*." OMB, Proposed Revisions to OMB Circular No. A-87, 58 Fed. Reg. 44,212, 44,230 (Aug. 19, 1993) (emphasis added). As noted above, OMB revised the final version of the circular to give States more flexibility. It is wholly inconsistent with OMB's rejection of a time constraint on adjustments, and expressed desire to give States more flexibility, for HHS to purport to implement a version of Circular A-87 that was not in fact promulgated.

Just as the adjustment generally required by Circular A-87 is not subject to a deadline, so the individual adjustment methods are not subject to any specific deadlines. They are defined simply in terms of their structure, not their timing. *See* Circular A-87, Att. C., ¶ G.4; *see also* ASMB C-10, ¶ 4-12 (describing the fiscal year for which certain adjustment methods are effective, though not when they are or must be implemented).

Even if some adjustment methods were no longer available to the State, and even if only the refund option remained, there is no support for HHS's position that the State must forfeit its entitlement to an equitable adjustment based on the total federal share of cost/revenue variances in the ISF. At most, the effect of any time constraints on adjustment methods would

---

[12] The State complies with the annual comparison requirement by submitting a SWCAP for each SFY containing cost reconciliation data for the information services ISF. The State has acknowledged that its SWCAP containing SFY 2004 costs was submitted late (on October 15, 2005), but notes that the circular imposes no penalty for this type of lateness. *See* Circular A-87, Att. C., ¶ D.4.

be that only the refund option (as implemented via a disallowance) remains available to the State. That proposition, even if true, does not support HHS's quite separate conclusion that the refund option can take into account only overcharges, even though all the other methods take into account undercharges as well. That position amounts in this case to imposing a $2 million forfeiture for an asserted delay in submitting the cost reconciliation. Circular A-87 imposes no penalties for late submission of the cost reconciliation, and there is no justification for DCA to impose the particularly harsh penalty that was imposed in this case.

In fact, Circular A-87 separately addresses the consequences to a State of delay in implementing adjustments: interest accrues on excess funds held in an ISF, and the State must pay the federal government interest for the federal share of the excess balances. Circular A-87, Att. C, ¶ E.3.b.1; ASMB C-10, Instructions on Illus. 4-7, ¶ 4, AR 186. As the DAB has noted, this framework "remove[s] any incentive to states to accumulate and retain excess federal funds." *Arkansas Dep't of Info. Sys.*, DAB No. 2010, 2006 WL 321179 at n.27 (2006). States have an adequate incentive to promptly reconcile costs and revenues and implement adjustments, and the circular does not provide for any forfeitures to supplement that incentive.

B.    The Adjustment Calculated by the State Accurately and Reliably Measures and Reimburses for the Impact on Federal Programs, While the Adjustment Calculated by DCA Does Not.

1.    The State's Methodology

The State has proffered two calculations of its obligation to the federal government. The first employed an average FFP rate for each customer agency. *See* p. 8 *supra*. This methodology complied with HHS's own guidance in ASMB C-10 to use an average FFP rate for each customer agency, *see* ASMB C-10, Illus. 4-6 (asking for "ratio of federal activity" for each "user agency/department"); it complied with all other federal cost principles, including

18

Circular A-87's directive to adjust for all cost/revenue differences; and it should have been accepted by DCA.

The second calculation proffered by the State improved on the first by focusing on individual federal programs administered by HSD, since there are different matching rates used in the federal programs administered by HSD. *See* pp. 9-10 & nn.6-7 *supra*. This methodology eliminated any possibility of cost-shifting from one federal program to another, a hypothetical risk that might arise from the use of an agency-wide average FFP rate. The refined methodology eliminates this risk by determining each individual program's actual stake in overcharges and undercharges pursuant to the cost allocation methodology approved by DCA. It precisely calculates exactly how much each federal program overpaid for central services that turned out to cost less than expected. The DAB provided no meaningful response to this showing by the State.

In calculating the correct adjustment, the State took into account a crucial fact now ignored by DCA: that within any particular billing account, one dollar of undercharge in a service category benefits a federal program exactly as much as one dollar of overcharge in another service category harms that federal program. This fact arises from the DCA-approved methodology in which billing accounts are established and billed and in which State customer agencies pay their bills and allocate their costs to participating federal programs. AR 80, 243-44, 269, 277. And this fact means that, through the billing account(s) in which each federal program participated, the State was able to measure the precise impact on *each* federal program of any amount by which the actual costs of providing the *specific* services consumed by that program and charged to that program differed from the revenues received from that program. *Id.* The total variance between costs and revenues – the difference for which an adjustment must be

19

made – is simply the sum of all federal programs' individual shares in the total overcharges or undercharges to each account, and that refund amount is precisely what the State calculated.[13]

The total net overcharge to HSD-administered federal programs in the State's federal-program-specific calculation is $32,353 *less* than the total overcharge obtained under the DCA method using an average FFP rate, taking into account both overcharges and undercharges.

2.    DCA's Methodology Compared to the State's Methodology

The State calculated the actual financial impact on federal programs of all cost/revenue variances, while DCA focused on a much less meaningful – and legally indefensible – number: the sum of overcharges to federal programs for some service categories, calculated without regard to over $2 million in undercharges for different service categories that benefited the same federal programs.  DCA's refusal to measure correctly the impact of cost/revenue variances on the federal government stems from this artificial distinction based on service categories rather than federal programs.  That distinction is unnecessary and improper, and it results in the assessment of a disallowance more than double the correct amount.

The precision and reliability of the State's refined methodology mean that the way in which DCA calculated the disallowance is not justified by any need to avoid cost-shifting among federal programs or from State to federal programs.  In fact, the disallowance imposed by DCA results in major cost-shifting.  In disregarding the federal share of undercharges, DCA seeks a "refund" amount that exceeds by more than $2 million the amount by which federal programs were actually overcharged – a massive and improper cost-shifting from the federal government to the State.  *See Texas Office of the Governor*, DAB No. 1608, 1997 WL 72177

---

[13] Every federal program had a net overcharge.  AR 90, 260, 277.  Thus, there is no occasion to deal with the hypothetical concern that offsetting overcharges to one federal program against undercharges to another could lead to cost-shifting because of differences in matching rates among federal programs.

(1997) (characterizing DCA's attempt to impose excessive disallowance as an improper "remedy [that] results in the same sort of shifting of costs and benefits that led DCA to take the disallowance in the first place").[14]

In sum, the State's adjustment methodology, but not DCA's, complied with federal cost principles. The State made an adjustment for "the difference" between allowable costs and revenue, as required by Circular A-87, while DCA imposed an adjustment only for a selective set of differences – those arising from profit to the ISF, but not loss. The State's adjustment accurately traces overcharges and undercharges to individual federal programs, and it reimburses the federal government for the exact amount by which the federal government was overcharged, while DCA's adjustment greatly overstates the total overcharge and results in cost-shifting.

## II.     Other Grounds Advanced by the DAB Do Not Support Its Decision.

Other grounds advanced by the DAB to support the agency's position were not meritorious, and do not justify the agency's refusal to consider the undercharges as well as the overcharges to federal programs.

- The DAB contended that the State did not show that it had submitted claims for the undercharge amounts that were timely and within the overall limits applicable to the types of administrative costs being claimed. AR 15-17.

*Response*: The DAB failed to realize that no new claims were necessary. The State's claims to every federal program were greater than the amount due from that program, even after taking all the undercharges into account. The federal agencies that reviewed the

---

[14] As shown above, even when undercharges are considered, DCA's method, which uses average FFP rates, rather than the program-specific FFP rates used in the State's more refined analysis, results in some cost-shifting, albeit minor, that benefited the federal government. AR 77-78, 90, 258-60.

claims have already determined that they met all programmatic requirements.  The only issue is how much the State should refund to these programs.

- The DAB on its own raised a concern that the undercharges included, in certain service categories, amounts that had carried over from previous years, and that there was a potential for cost-shifting if federal program usage changed over time.  AR 20-24.

*Response*: The method of calculating the undercharges (as well as the overcharges) was that specified in the governing federal guidance, Circular A-87 and ASMB C-10, which is no doubt why DCA never raised the issue advanced by the DAB.  In any case, the State's method of calculating the overcharge on a federal program by federal program basis eliminated any possibility of cost-shifting among programs.

- The DAB pointed to alleged flaws in the State's method of calculating the undercharges, including the determination of imputed interest, and the failure to use a methodology specified in the State's SWCAP for SFY 2004.  AR 2, 8-9, 12-14, 24-25.

*Response*: There were no flaws in the State's calculations, but at best the DAB's points amount to quibbles that would, even if valid, have no material impact on the outcome of the case.  The State did not understate imputed interest; it calculated imputed interest only for service categories with overcharges, all of which had positive beginning balances.  As for the SWCAP, it did not specify any particular methodology for calculating overcharges and undercharges; the DAB's finding on this point reflected a mistaken reading of the SWCAP. (DCA did not advance any of these grounds in support of its refusal to consider the undercharges.)

- The DAB treated as significant the State's failure to make a mid-year adjustment as allegedly contemplated by the State's SWCAP.  AR 8-9, 14.

22

*Response*: Whether or not the mid-year adjustment should or could have been made provides no basis for the federal government not to calculate the amount owed to it in accordance with the governing federal policy issuances, and certainly cannot justify imposition on the State of a forfeiture of over $2 million.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully asks this Court to grant its Motion for Summary Judgment.

Respectfully submitted,

    /s/    Charles A. Miller_____
Charles A. Miller (D.C. Bar No. 8904)
Susannah Vance (D.C. Bar No. 496163)
Leah Pogoriler (D.C. Bar No. 973827)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
(202) 662-6000

*Attorneys for New Mexico Department of*
*Information Technology*

December 21, 2007

**ADDENDUM**

1. The Information Services ISF provides services in 32 service categories.  For each, the estimated cost per unit of service times the number of reported units consumed by each billing account during the month is calculated, and the totals are summed to produce an aggregate (consolidated) amount to be billed to each account.



2. Bills are sent to the billing accounts in each department.

3. Billed costs are allocated to each program or activity included in the billing account.

4. Costs allocated to federal programs are included on claims to federal agencies for reimbursement at the applicable FFP rate.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| NEW MEXICO DEPARTMENT OF INFORMATION TECHNOLOGY, | ) ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-01603-CKK Judge Kollar-Kotelly |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | Administrative Agency Review |
| and | ) ) | |
| MICHAEL O. LEAVITT Secretary of the Department of Health and Human Services, | ) ) ) ) | |
| *Defendants*. | ) ) | |

---

## <u>ORDER</u>

Having considered Plaintiff's Motion for Summary Judgment, documents submitted in support thereof, and any opposition and replies thereto; and Defendants' Motion for Summary Judgment, documents submitted in support thereof, and any opposition and replies thereto, the Court hereby finds, based on the undisputed facts, that Decision No. 2083 (May 17, 2007) of the Departmental Appeals Board (DAB) of the United States Department of Health and Human Services (HHS) and the underlying disallowance assessed by the Division of Cost Allocation (DCA) of HHS were arbitrary and capricious, an abuse of discretion, and contrary to the requirements of federal law.

It is hereby ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED and that Defendants' Motion for Summary Judgment is DENIED.

It is further ORDERED that judgment declaring that DAB Decision  No. 2083 was arbitrary and capricious, an abuse of discretion, contrary to the requirements of federal law, unlawful, null, void, and of no legal effect, shall be entered.

It is further ORDERED that a permanent injunction requiring Defendants to modify the amount of the disallowance against Plaintiff from $4,011,031 to $1,852,193, shall be issued.


It is so ORDERED this _____ day of _____, 2008.


_____

Judge Kollar-Kotelly
United States District Judge


The following attorneys are entitled to be notified of the entry of the foregoing Order:

Charles A. Miller
Susannah Vance
Leah Pogoriler
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004


Mercedeh Momeni
Assistant United States Attorney
555 4th Street, NW
Washington, DC  20530