## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————— )
                                                             )
New Mexico Department of Information        )
Technology,                                                )
                                                             )
                        Plaintiff,            ) Civ. Action No. 07-1603 (CKK)
                                                             )
            v.                                         )            ECF
                                                             )
U.S. Department of Health and                  )
Human Services, and                              )
Michael O. Leavitt, Secretary of               )
the Department of Health and                   )
Human Services,                                    )
                        Defendants.         )
————————————————————)

## REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendants respectfully submit this Reply in Support of their Motion to Dismiss and for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment. In this Administrative Procedures Act ("APA") case, Plaintiff seeks review and reversal of the decision of U.S. Department of Health and Human Services' ("HHS") Departmental Appeals Board ("DAB"), finding that Plaintiff overcharged the federal government approximately $4,000,000. Plaintiff seeks a declaration from the Court that the Defendants' determination was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law, as well as an injunction restraining HHS from enforcing the portion of the disallowance in excess of $1,852,193.

Plaintiff has now provided the Court with its reasons, in detail, why it believes that it is entitled to the relief it seeks. *See* USDC Pacer Doc. Nos. 14 and 16, respectively, Plaintiff's Motion for Summary Judgment ("XMSJ") and Opposition to Defendants' Motions for Summary

Judgment ("Opp."). Despite Plaintiff's assertions, it is clear that Defendants are entitled to judgment as a matter of law because the Departmental Appeals Board's ("DAB" or "the Board") decision was not arbitrary, capricious, an abuse of discretion, or contrary to law. Accordingly, Defendants respectfully urge the Court to grant their motion for summary judgment, thereby upholding the DAB's decision, ordering Plaintiff to repay the amounts overcharged to the federal government.

ARGUMENT

**I.      Plaintiff is Not Entitled to Injunctive Relief.**

Plaintiff contends that the Court in this case does not need to follow the language set forth by the Supreme Court in *Florida Power & Light v. NRC*, 470 U.S. 729, 744 (1985). Opp., pp. 1-3. The Supreme Court instructed that "If the record before the agency does not support the agency action . . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* While previous Supreme Court decisions have stated that an APA case need not be remanded where "remand would be an idle and useless formality," *see NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6 (1969), there is no indication here that a remand would be an idle and useless formality. Plaintiff's principle contention in this case is that the overcharges should be reduced by the amount of the unsubstantiated undercharges identified by Plaintiff.

In the event that this Court were to determine that the DAB's decision regarding this issue was arbitrary and capricious, the proper course of action would be for the Court to remand the case to the DAB to allow the DAB to make findings consistent with the Court's ruling. Nothing in this scenario requires the DAB to adopt the alternative methodology devised by

Plaintiff. *See* Opp., pp. 1-3. In fact, the DAB has already identified flaws in Plaintiff's alternative calculations, including the inclusion of over and undercharges from state fiscal years 2000 through 2003. AR 21. Additionally, the DAB raised concerns about New Mexico's allocation methods and the possibility that allocation percentages and federal financial participation ("FFP") rates might have changed since the prior fiscal years. *Id.* The DAB identified a concern about shifting state programs costs to federal program payers. AR 22, fn.10. Furthermore, the DAB issued concerns about allowing New Mexico to reopen already settled cost allocation issues from fiscal years 2000 through 2003. AR 22. The DAB also raised further questions about New Mexico's treatment of the working capital reserve and whether or not the figures presented were accurate. AR 24-25. Finally, the DAB noted that New Mexico did not have approval to carry forward profits and losses from 2000 through 2003 into 2004. AR 25.

At a minimum, the DAB notes that "adjustments would have to be made to New Mexico's calculations to back out the prior years' profits or losses and to correct . . . the other identified flaws and any further problems that more complete information might reveal." AR 26. Were this Court to rule that the Division of Cost Allocation's ("DCA") calculation of the amount to refund to the federal government was arbitrary and capricious, remand would be far from "an idle and useless formality" as suggested by Plaintiff. *See* Opp., p. 2. Serious questions, as suggested by the DAB, would remain to be answered, and this task would not be accomplished simply by utilizing Plaintiff's alternative methodology without careful examination of the issues identified above.

II.    **Plaintiff's Arguments Regarding Forfeiture Are Untenable.**

In an ostensible attempt to win the Court's sympathy, Plaintiff here presents the argument that DCA's issuance of a disallowance constitutes a "forfeiture". *See* Opp. 4-14. This argument is a red herring and cannot stand for two reasons. First, Plaintiff misuses the term "forfeiture" and the decision at issue has not resulted in New Mexico forfeiting any property or rights. Second, even if Plaintiff was employing the term correctly, it did not raise the issue below and may not do so now, for the first time, before this Court.

A.    **The Disallowance at Issue Here Has Not Resulted in a Forfeiture of New Mexico's Property or Rights.**

Plaintiff incorrectly characterizes the determination issued by DCA as a "forfeiture." "Forfeiture" is a legal term of art which refers to the divestiture of specific property without compensation– it imposes a loss by the taking away of some preexisting valid right without compensation. *Black's Legal Dictionary,* 449 *(6th ed. 1991).* Plaintiff misuses this term here.

The DAB has been clear that disallowances are not forfeitures. In a prior DAB case, *New York State Department of Social Services*, DAB 1358, 1992 WL 685440 (1992), New York likewise improperly used the term "forfeiture" in reference to a disallowance. The Board plainly addressed the issue, finding that "[t]he State is entitled to FFP only as authorized by Congress; thus, requiring the State to repay funds it claimed improperly cannot fairly be characterized as either a 'penalty' or a 'forfeiture'. . . .." *Id.* Supreme Court case law supports the DAB's conclusion in that case. *See Bennett v. Kentucky Department of Education*, 470 U.S. 656, 662-63 (1984) (a demand for repayment is more an effort to collect a debt than a penal sanction.).

Contrary to Plaintiff's contentions (*see* Opp., p. 5), Plaintiff has not forfeited any of its established legal rights. Plaintiff does not have any right to the federal funds that were paid to

4

the state through overcharging the federal government.  With regard to the undercharges, Plaintiff continues to have the right, as it has always had, to seek the processing of its claims for payment pursuant to the terms of OMB Circular A-87 and the appropriate claims processing regulations for the grant under which payment is sought.  *Id*.  Plaintiff never had any right to have the DCA process claims on its behalf, as indeed DCA does not process claims.[1]  The only right Plaintiff had with regard to the funds at issue is to receive reimbursement for costs that are allowable and allocable, per the terms of OMB Circular A-87, as explained fully in USDC Pacer Doc. No. 11, Defendant's Opening Brief ("MSJ"), pp. 14-15.  Under its proposed methodology, Plaintiff seeks nothing more than a short cut, so that these claims will bypass the normal process used for evaluating claims.  Because Plaintiff has, to date, apparently refused to subject these claims for normal reimbursement processing, one is left to presume that these claims are either defective in some term under the grant or untimely.  DCA's refusal to allow Plaintiff to circumvent the reimbursement process does not convert the disallowance issued into a forfeiture.

In short, applying the legal term of art "forfeiture", New Mexico has not forfeited any rights to its property here and there is no evidence that the DAB acted arbitrarily and capriciously with regard to this unraised legal issue.  Thus, Plaintiff's argument should be disregarded.

**B.    Plaintiff Improperly Introduces a New Legal Theory Not Presented to the Administrative Agency During the Administrative Process.**

In its Opposition to Defendants' Motion for Summary Judgment, Plaintiff presents a new legal theory, contending that the disallowance issued by DCA constitutes a "forfeiture," arguing

---

[1]  DCA's function is to examine compliance with State Wide Cost Allocation Programs ("SWCAP").  Processing of claims is left to the individual agency with the grant authority.

5

that forfeitures are disfavored under the law. *See* Opp., pp. 4-14. Plaintiff errs in bringing this argument forward at this time, having failed to raise it during the administrative process.

"Under ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency." *Sims v. Apfel*, 530 U.S. 103, 114, 120 S.Ct. 2080, 2087 (2000) (Breyer, J., dissenting); *accord Woodford v. Ngo*, 126 S.Ct. 2378, 2385-86 (2006); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37, 73 S.Ct. 67, 68-69 (1952); *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 249-51 (1946). The Supreme Court has held that "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Sims*, 530 U.S. at 109. Accordingly, where the parties are expected to fully develop the issues during the course of an adversarial administrative proceeding, the rationale for requiring issue exhaustion are at its strongest. *Id.* at 110, 120 S.Ct. at 2085; *Mahon v. U.S. Dept. of Agriculture*, 485 F.3d 1247, 1254-55 (11th Cir. 2007). "Where the parties must present and develop issues, the adjudicative model is apt and issue exhaustion is appropriate." *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety*, 429 F.3d 1136, 1149 (D.C. Cir. 2005).

"Issue exhaustion" and "issue waiver" appear in the case law as interchangeable terms, sometimes treated as synonymous. *Id. Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 204) (*per curiam*) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review."). *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1169 (D.C. Cir. 1994).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers of U.S., Inc. v. State Farm Mutual Auto. Ins. Inc., et al.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866 (1983). The D.C. Circuit has noted that it is therefore unsurprising that parties rarely are allowed to seek "review" of a substantive claim that has never even been presented to the agency for its consideration. *Advocates for Highway and Auto Safety*, 429 F.3d at 1150. "Simple fairness . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body . . . has erred . . .." *L.A. Trucker Truck Lines*, 344 U.S. at 37.

In light of Plaintiff's failure to raise before the DAB its argument that this disallowance constitutes a "forfeiture," Plaintiff cannot now raise new legal theories to challenge the disallowance.  Simply put, Plaintiff failed to raise or exhaust the issue of "forfeiture" at any time during the administrative process. It should be noted that the administrative proceedings before the DAB were fully adversarial; both Plaintiff and Defendant were represented by counsel (unlike Social Security hearings, as noted in *Sims v. Apfel*, where the Social Security Administration is not represented by counsel).  Additionally, Plaintiff had every opportunity to raise every basis for challenging the overpayment determined in this case.  The parties briefed the case without limitation.  *See* AR 46-47, 58-164 .  Plaintiff was permitted to raise any issue it desired in defense of its actions or inactions, and was permitted to raise any legal theory it desired in challenging DCA's determination.  Therefore, Plaintiff's failure to raise this issue before the DAB should foreclose Plaintiff's ability to raise the issue before this Court.[2]

---

[2]  The only time at which Plaintiff used the term "forfeit" in its case before the DAB was when it referenced its perception of the disallowance as "punitive."  AR 86-87 (Plaintiff's Brief before DAB).  The term was used in passing without invoking case law or argument that the

7

### III.    OMB Circular A-87 and ASMB C-10 Place
Time Limitations on Adjustments of Billing Rates.

Plaintiff argues that there is "no punitive time limit on the making of equitable adjustments."  Plaintiff's Opposition, p. 8.  This statement mis-characterizes DCA's determination.

First and foremost, it is well established that the overcharge determined here is not punitive in nature.  The DAB addressed and rejected this argument in the 2003 case that New Mexico brought contesting the overcharges determined at that time, stating:  "Nor does it appear that DCA is seeking to impose any penalty on New Mexico.  New Mexico is simply required to repay what it overcharged.  This obligation implies no misconduct."  *New Mexico General Services Department*, DAB No. 1876, at section 5, 2003 WL 21053171 (H.H.S.).[3]

In the present case, the Board clearly rejected the concept that the disallowance at issue involves a penalty.  "To determine that a state has lost an opportunity to recover federal funds that it could have recovered had it timely followed federal requirements is not tantamount to imposing a penalty."  AR 16.  Plaintiff cites to no authority that suggests that disallowances are penalties.

---

actions taken by the federal government here should constitute a "forfeiture."  There is a significant difference between reference to forfeiting an opportunity to file a claim and that an action taken by the government constitutes a forfeiture under the law.  Plaintiff's colloquial use of the term "forfeit" in its brief does not invoke the legal term of art involving the federal forfeiture process.  Even if the Court views the forgoing as an argument made in passing, it still could not be acceptable for review now.  *See City of Waukesha, et al. v. Environmental Protection Agency*, 320 F.3d 228 (D.C. Cir. 2003) (Arguments raised only in passing and not developed are waived.)

[3]  A copy of the decision, involving the same parties and same issues, albeit for a different time period, is attached for the Court's ease of reference as Exhibit A.

Likewise, Plaintiff incorrectly proposes that adjustments can be made at any time without regard to the passage of time. This attitude of nonchalance towards the passage of time may, in fact, be reflective of the manner in which New Mexico addresses its financial and reporting obligations (*see* AR 256-57, 310-11). However, New Mexico's argument ignores the fact that the adjustment options set forth in Circular A-87 are options for cost allocation plan methodologies to adjust for variances between billing rates and actual costs of a service *for a particular fiscal year*. *See* OMB Circular A-87, Attach. C, para. G.4. In its approved SWCAP for the fiscal year at issue, New Mexico adopted a method involving issuance of credits in the current year and adjustment of the billing rates to eliminate further overcharges and undercharges. AR 309. The proposed methodology is in compliance with the options provided in OMB Circular A-87, Attach. C, para. G.4. The problem for New Mexico arises where New Mexico committed to undertaking these "realignments" of the billing rates twice per year (*see* AR 309), and then failed to actually perform, or performed but did not implement the realignments at all, resulting in the overcharges at issue in this case. *See* AR 254, para. 7; AR 256, para. 15; AR 304, para. 28.

New Mexico continues to ignore the interpretative guidelines presented in *Cost Principles and Procedures for Developing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government*: *Implementation Guide for Office of Management and Budget Circular A-87* (ASMB C-10). In that guidance at Question 4-12, the issue raised by New Mexico is clearly addressed:

> **Attachment C, paragraph G.4 establishes four methods for adjusting internal service funds (billed central services) for profits or losses realized from operations. Alternative (b) allows credits to amounts charged to the individual programs. This method would only cover**

9

**profits.  If losses occur, why can't individual programs be debited?**

> Effectively, alternative (b) is correcting billing costs in the *current* year, whereas alternative (c) is carrying forward the profit/loss into the *next open fiscal period.*

> The failure of the Circular to note how losses are to be treated in alternative (b) is an editing error.  For consistency purposes, both alternative (b) and (c) cover profit and loss situations.  However, only one method can be used in a given fiscal year.

ASMB C-10, Part 4, §4.8, Question 4-12 at page 4-27 (bold in original, italicization added); AR

191-92.  The Board also noted that the ASMB C-10 interpretation of Circular A-87, Attach. C,

paragraph G.4 is reasonable since the adjustment methods follow the requirement for a

comparison to actual costs for each service "at least annually."  *See* OMB Circular A-87, Attach.

C, para. G.4; AR 226.  It should also be noted that OMB Circular A-87 does not allow a state to

adopt one methodology for addressing variances in its SWCAP, fail to apply that methodology in

a timely manner, then seek to have the benefit of an alternative type of adjustment that was not

presented in its SWCAP.  New Mexico has been on notice to the time sensitive nature of

alternatives (b) and (c) (current credits or debits or future rate changes) for several years, at a

minimum, since this issue was addressed in New Mexico's 2003 Board decision, discussed in

footnote 3, *supra*.[4]

Plaintiff has not established in its Motion for Summary Judgment that the decision of the

DAB to abide by OMB Circular A-87 and the interpretive guidelines issued in ASMB C-10 was

---

[4]  There is some flexibility built into the cost allocation process and New Mexico's SWCAP, but such flexibility needs to be invoked by the State in a proactive and timely way. *See, e.g.,* ASMB C-10, Part 4, §4.8, Question 4-12, pp. 4-27.  The record clearly establishes that DCA has been amenable to working with New Mexico's staff to bring its adjustment process into compliance with OMB Circular A-87.  AR 299-300.  However, Plaintiff did not seek this sort of assistance during SFY 2004 or at any time during the appropriate times set forth in ASMB C-10.  Instead, Plaintiff did not take a realistic approach to addressing its shortcomings.

*arbitrary and capricious.  See* XMSJ, generally.  In fact, the record clearly reflects that Plaintiff

here was aware that its actions were contrary to the requirements of OMB Circular A-87, the

state's own SWCAP, and the prior Board decision involving this same Plaintiff.

### IV.     Defendants' Position is Consistent with the Terms of OMB Circular A-87.

As discussed previously, the scope of review under the "arbitrary and capricious"

standard is narrow and a court is not to substitute its judgment for that of the agency.  *Motor*

*Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Auto. Ins., Inc., et al.*, 463

U.S. 29, 43, 103 S.Ct. 2856, 2866 (1983); *see also Center for Auto Safety v. Peck*, 751 F.2d

1336, 1342 (D.C. Cir. 1985);  *Office of Communication of the United Church of Christ v. FCC,*

707 F.2d 1413, 1440 (D.C.Cir.1983); *National Resources Defense Council, Inc. v. Morton*, 337

F.Supp. 170, 172 (D.D.C. 1972) (the viability of alternatives is not before the court nor may the

court substitute its judgment for that of the executive agency involved.).  The Court's role here is

to determine "whether the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." *State Farm,* 103 S.Ct. at 2867 (*quoting*

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28

L.Ed.2d 136 (1971)).

Here, Plaintiff would have this Court reject the DAB's findings accepting the

determination issued by DCA in favor of an overpayment calculation methodology set forth by

Plaintiff New Mexico.  *See* Plaintiff's XMSJ, pp. 18-21.  Plaintiff, however, has been unable to

establish that the methodology that has historically been used by DCA is arbitrary or capricious.

Under the standard of review in APA cases, this Court may not select another methodology for

making the determination at issue here without a finding that the DAB's findings accepting the

DCA determination were arbitrary and capricious.  *See supra,* p. 3.  In the absence of clear error of judgment, this Court may not adopt an alternative proposed by Plaintiff.

Plaintiff contends that the determination at issue here is not consistent with the terms of OMB Circular A-87.  Plaintiff's XMSJ, pp. 13-18.  However, Plaintiff is unable to point to any provision of OMB Circular A-87 that was violated by DCA's determination.  Plaintiff's attempt to suggest that DCA violated the obligation to "bear their fair share of cost" (*see* Circular A-87, Attach. A, para. 1; AR 213) is simply an attempt to obfuscate the true nature of this proceeding.  *See* Plaintiff's XMSJ, pp. 15-16.  Circular A-87 contemplates that the state will document in its SWCAP its planned methodology for addressing variances.  The Board stressed the importance of meeting the federal requirements in its decision:  ". . . meeting federal requirements is a prerequisite for billing central services to federal funds.  New Mexico had been failing for many years to comply with federal ISF requirements for billing central services and failed to make adjustments to the billed amounts using the methodology in its approved SWCAP for SFY 2004."  AR 11.  Plaintiff is silent in this case as to these failures except to the extent that it argues that it should not be "punished" for its failure to comply with the requirements.  DCA has not, and does not now contend that Plaintiff should be "punished."  Instead, it simply maintains that Plaintiff should repay the amounts overpaid instead of allowing Plaintiff to devise a new strategy to avoid the requirements and restrictions involved in the normal processing of its costs so that it will not have to refund the overpayment to the federal government.[5]

---

[5]  It should be noted that the overpayment in this case took into account the permissible reserves established by OMB Circular A-87.  According to OMB Circular A-87, the state is permitted to retain 60 days worth of operating funds as a working capital reserve.  OMB Circular A-87, Attach. C, para. G.2.  Here, the overpayment was calculated as the amount overpaid in excess of the 60 day working capital reserve.  AR 11, 305-08.

In Plaintiff's efforts to argue that costs should be allocated in accordance with the benefits received, Plaintiff takes the Court in the wrong direction. Plaintiff's XMSJ, pp. 18-21. The allocation of costs is performed through the use of the rate setting and billing process prescribed by A-87. Plaintiff described an acceptable process in its 2004 SWCAP, (*see* AR 309), but did not adhere to its plan as set forth and subsequently filed this Complaint. The Board acknowledged the role of the SWCAP in the decision. "Following the approved methodology [set forth in the SWCAP] provides an assurance that the adjustment of any over or under billing will be equitable and appropriate. That assurance simply is not there when a state deviates from that methodology, as New Mexico has done over a period of years." AR 15. Therefore, the assurance that costs are allocated in accordance with the benefits received is achieved through the adherence to the terms of the approved SWCAP, not through performing post-hoc analyses to mitigate harm.

Plaintiff now seeks to provide a post-hoc alternative to the SWCAP. *See* Plaintiff's XMSJ, pp. 18-21. However, OMB Circular A-87 simply does not provide for the creation of such an alternative scheme. Plaintiff provides no basis for allowing Plaintiff to perform this alternative analysis that was never part of its SWCAP as an acceptable form for addressing the overpayments. In contrast, DCA used the same methodology it has used in other cases, including in prior cases with New Mexico, to reach a reasonable conclusion regarding overpayment. *See* MSJ § II.B. The fact that DCA did not include undercharges (or costs that had not been shown to be allowable or allocable under OMB Circular A-87) does not make DCA's determination improper. As discussed in the Defendants' Opening Brief (pp. 14-15), New Mexico has no right to reimbursements for costs that have not been shown by New Mexico

13

to be allowable or allocable pursuant to the terms of OMB Circular A-87.

In sum, Plaintiff's motion for summary judgment should fail because Plaintiff has been unable to show that the DAB's decision was arbitrary, capricious, an abuse of discretion, or contrary to law. While Plaintiff proposes an alternative methodology for calculating the amount due to the federal government, the case law is clear that the existence of an alternative is not evidence that the DAB's decision was arbitrary and capricious.

## V.     Authority Cited in Defendants' Opening Brief Support Their Position.

Plaintiff attempts to divert the Court's attention from the importance of a body of case law cited by Defendants addressing certain aspects of this case. *See* Opp., pp. 15-17. Specifically, Plaintiff attempts to discredit the important legal principles embodied in these cases by noting factual differences that do not affect the legal principles for which these cases were cited. For example, Plaintiff draws this Court's attention to several cases that concern retroactive claiming. An example is *Colorado Department of Social Services v. Shalala*, 29 F.3d 519 (10th Cir. 1994). While Plaintiff attempts to distract this Court by a discussion of retroactivity and "backcasting," the bottom line is that this case was cited to reflect the strict proof required for considering retroactive claims under federal entitlement programs. *See* MSJ, p. 17. In this case, retroactivity is implicated where undercharges are involved, because the case includes offsetting the undercharges that were not collected by the State. Plaintiff does not address this important legal point. Similarly, Defendants cited several other cases to note that the deciding courts had considered the state's role in creating situations that resulted in undercharges. *See, e.g.*, *State of Kansas v. Shalala*, 859 F.Supp. 484 (D. Kan. 1994); *State of Kansas ex rel. Secretary of Social and Rehabilitation Services v. Shalala*, 884 F.Supp. 413, 416

14

(D. Kan. 1995).

Plaintiff also takes issue with Defendants' citation of *Maine v. Shalala*, 81 F.Supp.2d 91 (D. ME 1999), which was cited for the principle that Maine failed to affirmatively show that underpayments resulted in allowable charges to federal grant programs at issue.  *See* MSJ, p. 17. Plaintiff never addresses this important legal issue but simply states that this citation is inexplicably "afield." *See* Opp., p. 16.  This case is indeed applicable here, as it is a cost allocation decision in which the Court affirmed the DAB's decision not to allow offset of overcharges against undercharges.  *Maine*, 81 F.Supp.2d at 101.  Plaintiff attempts to focus the Court on the *Maine* decision's discussion of cost shifting. *See* Opp., p. 16.  While the instant case did not address in depth the possibility of cost-shifting, *see* AR 22, n. 10, the issue was raised by the DAB along with other significant concerns about New Mexico's proposed methodology. The principle for which Defendants cited the case still stands undisputed, that courts have consistently rejected the use of undercharges for payment or offset of overcharges.[6]

---

[6]  Plaintiff also makes much ado about Defendants' citation to *Illinois Department of Administrative Services*, DAB 271 (1982).  It appears, however, that Plaintiff concedes that this case represents improper use of federal funds and improper billing practices.  *See* Opp., p. 13. Plaintiff suggests that Defendants cited this case "for the proposition that New Mexico should have known that it could not expect undercharges to be taken into account as part of the adjustment made in connection with the cost/revenue reconciliation it performed."  *Id*.  While Plaintiff cites to Defendants' Motion, this language appears no where on the cited page.  Instead, Defendants' cited this case as an example of a less specific proposition, that "the DAB itself has addressed a number of cases in which states have sought to utilize unclaimed costs in manners that the Board deemed inconsistent with OMB Circular A-87 requirements."  *See* MSJ, p. 17.

## CONCLUSION

For the foregoing reasons and the reasons stated in Defendants' Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, Defendants' Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment should be denied.

Respectfully submitted,

/s/
_____

JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

/s/
_____

RUDOLPH CONTRERAS, D.C. Bar #434122
Assistant United States Attorney

/s/
_____

MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, D.C.  20530
202-305-4851

*Of Counsel:*
Katherine W. Brown
Assistant Regional Counsel
Office of the General Counsel, Region VI
1301 Young Street, Suite 1138
Dallas, TX 75202

CERTIFICATE OF SERVICE

I certify that on February 5, 2008, I filed the forgoing Reply in Support of Defendants'

Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment

with the Clerk of the Court, and served all parties of record via the Court's ECF system.


_____/s/_____
MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, D.C. 20530
202-305-4851

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| New Mexico Department of Information Technology, | ) ) ) |
| | ) |
| Plaintiff, | )    Civ. Action No. 07-1603 (CKK) |
| | ) |
| v. | )    ECF |
| | ) |
| U.S. Department of Health and Human Services, and Michael O. Leavitt, Secretary of the Department of Health and Human Services, | ) ) ) ) ) |
| Defendants. | ) |

_____)

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Defendants, U.S. Department of Health and Human Services and the Secretary of the Department of Health and Human Services, respectfully submit this response to Plaintiff's statement of material facts not in dispute.

1-7.  Defendants agree with these paragraphs.

8.  This statement is not a material fact in that it does not "affect the outcome of the case under governing law." *Nails v. England*, 311 F. Supp.2d 116, 121 (D.D.C. 2004).  Defendants are without sufficient knowledge and information, as to the timing and the exact nature of the reorganization of New Mexico's governmental agencies, to respond to this paragraph.

9-16.  Defendants agree with these paragraphs.

17.  This statement is not a material fact in that it does not "affect the outcome of the case under governing law." *Nails v. England*, 311 F. Supp.2d 116, 121 (D.D.C. 2004). Defendants also note that DCA is without authorization to engage in tracing ISF over- or under-

billings.

18.  Defendants agree with the first sentence.  With regard to the second sentence, Defendants agree that the SWCAP does not provide step-by-step procedures of how New Mexico will undertake adjustments, but also add that the SWCAP does provide expressly that "[i]n March/April of each year, [New Mexico would undertake] a 'mid-year realignment' . . . to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87."  AR 244. At the relevant time, New Mexico stated that it would adjust the billing rates "reflect actual usage and costs to that point in time plus the expected usage and costs to the end of the year." *Id*.  New Mexico further set out that it would adjust each account to reflect the new billing rates and actual usage by that account.  *Id*.  "An adjusted bill by account is sent to the respective departments/ agencies.  In this manner, each account receives an adjustment proportional to its actual usage."  *Id*.  New Mexico also stated that this process would be repeated at the end of the year.  *Id.*  According to New Mexico's staff, it did not perform these rate adjustments at any time during SFY 2004.  AR 256.

19-22.  Defendants agree with these paragraphs.

23.  Defendant agrees that New Mexico performed the analysis outlined in paragraph 23, but notes that DCA rejected this form of calculation for the reasons set forth in DCA's administrative brief.  AR 112-44.

24.  Defendants agree with this paragraph.

25.  Defendants agree that New Mexico performed the analysis described in paragraph 25, but disagrees with Plaintiff's characterization that this analysis is "more refined."  DCA submits that New Mexico employed an alternative methodology that is not mandated by OMB

Circular A-87.

26.  Defendants disagree with the characterization of New Mexico's analysis as "refined" and New Mexico's blanket statement that its analysis does not result in cost-shifting.  While the Departmental Appeals Board did not directly state that cost-shifting was a result of New Mexico's alternative analysis, it left the possibility open, stating that using New Mexico's analysis "would raise the possibility of cost-shifting . . .."  AR 21.

27.  Defendants agree with paragraph 27.

28.  Defendants disagree with Plaintiff's characterization of its calculation of the disallowance amount as "correct" to the extent that it suggests that the final determination at issue here is incorrect.

29-30.  Defendants agree with these paragraphs.

Respectfully submitted,

/s/

_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

/s/

_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

/s/

_____
MERCEDEH MOMENI
Assistant United States Attorney
555 4th Street, N.W.
Civil Division
Washington, D.C.  20530

*Of Counsel*:
Katherine Brown
Assistant Regional Counsel
Office of the General Counsel, Region VI
U.S. Department of Health and Human Services

3

Westlaw.

DAB 1876 (2003), 2003 WL 21043171 (H.H.S.)                                    Page 1


DAB 1876 (2003), 2003 WL 21043171 (H.H.S.)


Department of Health and Human Services (H.H.S.)


Departmental Appeals Board


Appellate Division

NEW MEXICO GENERAL SERVICES DEPARTMENT

Docket No. A-01-58 and A-01-65
Decision No. 1876


April 30, 2003


DECISION


By letter dated April 13, 2001, the **New Mexico General Services Department** (New Mexico, GSD) appealed the March 13, 2001 determination of Merle M. Schmidt, Central States Field Office Director of the Division of Cost Allocation (DCA), disallowing $5,239,972 in federal funds for billings in excess of costs for central computer services provided in fiscal years (FYs) 1995, 1996, and 1997. By letter dated May 4, 2001, New Mexico also appealed a further disallowance determination covering $3,135,133 in federal funds for FYs 1998 and 1999. After lengthy proceedings, including settlement efforts and a scheduled hearing, the amount in dispute under both docket numbers was reduced by agreement of the parties to $1 million. The parties agreed that the only remaining issue was whether that amount must be refunded to the federal government or whether it could be satisfied by offsetting or netting alleged undercharges in some internal services accounts against the overcharge amount deriving from other such accounts. The parties also agreed that no hearing should be held. Based on the record before us and for the reasons explained below, we conclude that the "netting" sought by New Mexico is not permissible under the circumstances here. New Mexico's position would improperly permit costs that were never billed to state agencies or claimed from federal programs to be used to offset the debt incurred as a result of admitted overbilling of costs. Such an approach would result in costs being charged against funds due to the federal government while evading required tests for reasonableness, allowability, allocability and timeliness which would normally apply during the claims process. In the present posture of this matter, the only option for New Mexico to discharge the overpayment is through cash repayment. We therefore sustain the disallowance of the remaining $1 million.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DAB 1876 (2003), 2003 WL 21043171 (H.H.S.)                                    Page 2


## Factual and procedural background[FN1]

DCA disallowed the federal share of billings in excess of costs for computer services provided to federal programs by the State's central GSD. As noted, the two disallowances at issue between them included overcharges for FYs 1995 through 1999. DCA Exs. 1 and 2. New Mexico did not dispute the existence of overcharges, but initially challenged the basis for DCA's calculations of the amounts, the proper allowance for permissible reserves, and the interest rate used. The interest rate is no longer at issue. Joint Motion to Vacate Hearing and To Submit Case for Decision Without Further Pleadings, December 30, 2002 (Joint Motion). Disputes about the amount of the overcharges and the reserves have also been resolved by agreement of the parties. Id.

New Mexico contended, however, that, rather than repay directly the amount by which it now admits it overcharged the federal government, it should be permitted to use as offsets against that debt certain undercharges it alleges occurred during the same period. The undercharges at issue involved GSD information technology (IT) services as did the overcharges, but arose from different funding categories in which the costs of providing services exceeded the revenues. The computer services provided by GSD are divided into more than 30 "rate services" categories which are set out as part of the approved statewide cost allocation plan.[FN2] Affidavit of E. Foster Dowell (Director of the Information Services Division -- ISD), New Mexico Ex. 4, ¶¶ 6, 7.

The parties dispute whether the undercharges are "substantiated" and whether the use of such undercharges to "offset" a debt based on overcharges in other categories is allowed under applicable grant law provisions. The parties' joint motion of December 30, 2002, sought to vacate the hearing which had been scheduled for February 2003 and to submit the case "for a decision based upon the present record without any additional pleadings." Joint Motion at 1. That motion is hereby granted, except to the extent that the Board requested and received some additional information after December 30, 2002 which will also be considered part of the record for decision.

## Applicable legal standards

The allowability of costs claimed by state governments under federal grants is governed by Office of Management and Budget (OMB) Circular A-87. 45 C.F.R. §§ 74.27(a) and 92.22(b). In order to be allowable, a cost must be necessary and reasonable for proper and efficient performance and administration of a federal award and allocable to the award. OMB Circular A-87, Attachment (Att.) A, ¶ C.1. A cost is allocable to a particular cost objective if the goods or services involved are chargeable or assignable to such cost objective in accordance with relative benefits received. OMB Circular A-87, Att. A, ¶ C.3.a.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The funds at issue here related to New Mexico's central services costs, which were distributed among state and federal programs under New Mexico's CAP. The moneys that a state collects from its agencies through billings for centralized services and goods pursuant to its CAP are typically deposited into an "internal service fund" (ISF), which the state uses to finance those services and goods. Because ISFs are typically funded through periodic billing cycles, the cost principles permit them to maintain a working capital reserve to enable payment of expenses as they arise. OMB Circular A-87 permits an ISF to maintain a working capital reserve as part of its retained earnings sufficient to cover up to 60 days cash expenses for normal operating purposes. OMB Circular A-87, Att. C, ¶ G.2.

When the revenue collected for billed central service costs exceeds the allowable costs of providing the services and goods (including an amount sufficient to maintain an ICF reserve of up to 60 days cash expenses for normal operating purposes), an adjustment must be made for the difference, so that federally-funded programs are not overcharged. OMB Circular A-87, Att. C., ¶ G.4. The allowance for a working capital reserve, and its recognition of reserve contributions as allowable costs, is a deliberate exception to the general policy that federal grantees are not allowed to make a profit by charging the federal grant more than the cost of the services. Id.; ASMB C-10, ¶ 1.6, Question 1-4.[FN3] As part of the CAP, a state government must provide specific documentation about ISFs, including a fiscal year-end reconciliation schedule showing the revenues, costs, and year-end balance. OMB Circular A-87, Att. C, ¶¶ E.3.b(1), G.4; ASMB C-10, ¶ 4.8, Question 4-7.[FN4]

The parties relied on different general provisions of OMB Circular A-87 as support for their positions on netting or offsetting. New Mexico emphasized that the Circular states that its "principles are designed to provide that Federal awards bear their fair share of costs recognized under these principles except where restricted or prohibited by law." OMB Circular A-87, Att. A, ¶ A.1; see New Mexico Br. at 2, 8. DCA referred to Att. A, ¶ C.3.a:

Any cost allocable to a particular grant or cost objective under the principles provided for in this Circular may not be shifted to other federal grant programs to overcome fund deficiencies, avoid restrictions imposed by law, or grant agreements, or for other reasons.

DCA Reply Br. at 3. Both parties argued about the proper interpretation of the more specific provision in the Circular on alternative methods of recovery of overcharges, which we quote in full in the analysis section of this decision.

## Issue Presented

As noted, the parties represented that the dollar amount in dispute was narrowed by agreement to $1 million, but they made no representation as to how that amount was derived or how the parties allocated it across the disallowed amounts. The parties further agreed that "the sole legal issue to be determined . . . is that of netting as set forth in the parties' briefs." Id.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

New Mexico framed the "netting" issue in its brief as "whether OMB Circular A-87 does or does not allow for netting or offset when federal programs are both unintentionally overcharged some rates for computer and information technology services and undercharged on others." New Mexico Br. at 2.

DCA framed the issue as whether "the 'netting' of unsubstantiated undercharges against established overcharges by State customer agency is a valid method of calculating the amount owed to the federal government." DCA Br. at 2.

## Analysis

### 1. It is appropriate for us to resolve the legal issue given the factual context and based on the record before us.

We accept for purposes of this decision the parties' implicit agreement as to the dollar amount that depends on our resolution of the question of whether, under the circumstances here, undercharges in some categories can be offset against overcharges in others. Therefore, we do not reach the question of the precise amount of alleged undercharges in particular categories but assume that, were we to find the proposed offsetting or "netting" permissible in the circumstances here, this would fully account for the $1 million disallowance. The remaining issue before us, then, is essentially a legal one.[FN5] To some extent, the correct application of the law here is tied to an understanding of the circumstances presented. Hence, we first set out what the record shows as to the factual context in which this dispute arose.

According to New Mexico, specific services in each of the 30 rate services categories were charged to the client agencies in different ways, such as an hourly rate for data processing or a per-page rate for printing.[FN6] Dowell Affidavit at ¶ 6. It appears, based on all the affidavits and the other evidence in the record, that some significant changes occurred that affected New Mexico's internal services claiming in FYs 1993-1994. Mr. Dowell explained that these charges had been arrived at by looking at historical usage, agency need projections, and other information. Mr. Dowell asserted that "in the past up until fiscal year 1994," the state had netted services that under-recovered their costs against those that over-recovered. Id. at ¶ 5. Specifically, he explained that GSD took "those thirty different items and netted either a plus or a minus figure." Id. at ¶ 6. ISD projected rates for these services for budget purposes two years ahead of actual usage and then evaluated historical data to determine actual usage. Id. This description implied, though it did not clearly explain, that such internal inter-rate netting to balance under-and over-recovered rate categories ceased after 1994. Changes in New Mexico's billing system were evidently triggered in part by the return of the largest State user of information systems (and the largest State recipient of federal grant funds), which had used other mechanisms for obtaining such services for a time. Affidavit of Bob Peters (Executive Budget Analyst, New Mexico Dept. of Finance and Administration), New Mexico Ex. 6, at ¶5. In response to this and other developments, a meeting was held with DCA staff and New Mexico hired a consultant, David M. Griffith, to begin a gradual process of "setting and monitoring cost based

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

rates." Id. at ¶¶5,8.


The resulting system has not been fully developed on the record before us. Mr.
Dowell described the rate-setting process as follows:
> We have the utilization process, where we take historical information and send it
> to our customers. We ask them to project what they will do for the next budget
> year. . . . Then we take a look at what was projected which always means the rate
> services are set to zero. Then we take the actuals and see how far off they are
> because that is going to be plus or minus on any specific services. Then we
> realign the rates based on that. That is what we did last fiscal year. Customers
> were not thrilled about it, but it gives us reliable information for that fiscal
> year. In seven years we have reduced the rate structure on an average of 81%.
> From 1998, we had 24% reduction, in 1999 we had 27% reduction, in 2000 we had a
> 29% reduction.

New Mexico Ex. 4, at ¶8; see also New Mexico Ex. 14. It is clear that the change to
a cost-based system in which "profit and loss" are analyzed "by service during and
at the end of a fiscal year" has been gradual, with the consultant projecting in
1994 that the transition would take five years. Peters Affidavit at ¶8.


At any rate, it is undisputed that during the fiscal years at issue, some of the
billing rates resulted in net profits and others in net losses.


2. The asserted undercharges were not properly substantiated and claimed.


New Mexico strongly disputed DCA's position that the undercharges were
"unsubstantiated." According to New Mexico, the same data and methods DCA used to
calculate the overcharges would also provide the amount of the undercharges. New
Mexico Reply Br. at 2. New Mexico stressed the parallel between how DCA determined
the overcharge amounts and how New Mexico would identify undercharge amounts in
other categories, arguing that if the overcharges are substantiated then the
undercharges must also be. We find that DCA is correct that, while superficially
appealing, the attempted parallel does not hold.


DCA conceded that the charges which New Mexico would like to use as offsetting were
included in the same worksheets and calculated in the same way as the overcharges.
DCA Supplemental Br. at 5. However, as DCA argued, the submission of these
worksheets to DCA as part of its review of central services billing rates is not
equivalent to the submission of claims to the federal grantor agencies. The internal
services costs at issue here were not claimed directly by GSD under any federal
grant, but instead were billed to various state agencies that receive federal
grants. The amounts now asserted to be undercharges were amounts that were not
billed to the state agencies but which New Mexico now calculates could have been so
billed. Only belatedly when DCA questioned the admitted excess profits in some areas
did GSD re-evaluate its billing and assert that other areas could legitimately have
been billed at a higher rate.[FN7]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Such a re-evaluation may sometimes be appropriate, depending on the circumstances and the terms of the state's CAP, but the disallowance now before us is not the right place to determine that. If GSD billed inadequately for some of its services, its remedy would be to adjust its billing to the state agencies for the past periods. Those agencies could then verify whether the bills reflect necessary costs for services actually ordered and delivered and allocate the correct amounts to any participating federal programs in accordance with the CAP and the rules applicable to those program grants. See generally DAB No. 1822, at 9-10 (CAP review process provides important scrutiny). Those agencies might be able to file claims for reimbursement to the appropriate federal programs if the claim adjustments were still timely under the applicable regulations.[FN8] The federal programs would then be in a position to review the claims for allocability and allowability, including timeliness and grant-specific requirements.[FN9] None of these processes are part of the evaluation normally done by DCA in its review of the bases for the internal service fund amounts. Yet, New Mexico expressly stated that it did not propose "to go back into prior years and charge federal programs that were undercharged." New Mexico Br. at 8.

The difference between offsetting unbilled costs in different internal services rate categories against overcharges actually billed to federal programs in prior fiscal years, as opposed to filing timely claims for federal grant funds in the first instance, is clearly not one of mere form. To allow the former maneuver would be to open a back door to claims evading timely filing requirements which would leave federal budget outlays uncertain indefinitely. What is more, to use the unbilled undercharges to offset repayment of improperly claimed federal funds would mean the additional charges would never pass through the normal claiming process at all. The normal claiming processes at the grantor federal agencies are critical mechanisms that assure that expenditures are proper under the particular federal grants involved. We therefore decline to allow these late and speculative undercharge amounts to offset the documented, and uncontested, overcharges.

3. The issue is not whether GSD could have handled its rate-setting among categories differently but whether it can now offset potential claims against the present disallowance.

The disallowance does not find that any amounts were improperly netted by GSD in setting its prospective rates during the period at issue.[FN10] What New Mexico now seeks to do is essentially adopt retrospectively the concept of balancing profit and loss across the various rate categories to counter the admitted overcharges in the actual billing rates applied. We find no justification for this approach as a defense to paying the disallowance now due.

New Mexico pointed out that it could have had different numbers of rate categories and that no federal requirement specified that internal services must be broken out in any particular way. See Peters Affidavit at ¶¶ 6,7. Other states, according to Mr. Peters, may have ten rates, while New Mexico happens to have used greater detail yielding more than 30. Id. New Mexico would have us infer that what it could have done prospectively, it should be allowed to do in effect by recalculating the

disallowed overcharges.

It is not relevant now, however, that GSD could have made different choices in how it structured its service rate categories. Certainly, if GSD had grouped services in different ways, the profit and loss resulting in the categories from that grouping relative to each other would have been different. A different amount of claims to various federal programs might have been supported by such a different billing category structure. Individual ISFs are dedicated to specific services functions and identified and approved that way as part of a CAP. See DAB No. 1822, at 10. New Mexico had the flexibility prospectively in setting up its internal services system, designing its billing rate mechanisms, and developing its CAP to select among many permissible alternatives. New Mexico pointed to no provision in any of its approved CAPs during the relevant period that established any methodology to handle overcharges by netting across ISFs as it now seeks to do. See DCA Exs. 24-30. Having made its elections, New Mexico may not now complain that it might have chosen a different way that hindsight suggests could have increased its federal funding.

Furthermore, as Mr. Peters acknowledged, the rate structure chosen must be approved by the federal government, precisely because the states' flexibility is limited by the need to comply with requirements of OMB Circular A-87 restricting charges to federal programs to the benefits received. Peters Affidavit at ¶ 7. The obvious concern would be exactly that identified by Mr. Peters, that is, "if you have too few rates they [federal officials] may see it as a way for states to shift costs between federal programs or to under-recover in non federal programs while over-recovering in federal programs." Id. New Mexico denied that the mechanism it argued for would actually shift costs between federal programs, on the grounds that the different services rates are charged to state agencies which then pass on costs indirectly to various federal programs under their approved CAP methodologies. New Mexico Br. at 6. It is impossible to determine from the information provided by New Mexico whether this representation would in fact prove true since it cannot be ascertained what costs would actually be reassigned from the $1 million, or how that would play out in practice.

We need not make this determination, in any case, because we find it impermissible for New Mexico to use the amounts it describes as undercharges in the manner it suggested. First, we have concluded that the undercharges are unsubstantiated, were never charged to any federal programs, and cannot now be claimed through contesting the DCA disallowance. Second, we found that all alternatives to cash repayment of the overcharges have become unavailable, either due to the amount at issue, the passage of time, and/or the present status of the undercharges. We address the second point next.

4. New Mexico must make repayment in cash.

DCA argued that the only option presently available to New Mexico to account for the sums by which federal programs were overcharged for the profit-making services is cash repayment. DCA cited the following provision of OMB Circular A-87 relating to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alternatives for dealing with federal overcharges, for the proposition that New
Mexico could not use the alleged undercharges as a means of adjusting for the
admitted overcharges:

> 4. Adjustments of billed central services. Billing rates used to charge Federal
> awards shall be based on the estimated costs of providing the services, including
> an estimate of the allocable central service costs. A comparison of the revenue
> generated by each billed service (including total revenues whether or not billed
> or collected) to the actual allowable costs of the service will be made at least
> annually, and an adjustment will be made for the difference between the revenue
> and the allowable costs. **These adjustments will be made through one of the
> following adjustment methods: (a) a cash refund to the Federal Government for the
> Federal share of the adjustment, (b) credits to the amounts charged to the
> individual programs, (c) adjustments to future billing rates, or (d) adjustments
> to allocated central service costs.** Adjustments to allocated central services
> will not be permitted where the total amount of the adjustment for a particular
> service (Federal share and non-Federal) share exceeds $500,000.

OMB Circular A-87, Att. C, ¶G.4 (emphasis added); see DCA Supp. Submission at 9-12.
DCA argued that nothing in this section allowed overcharges for one service to be
offset by undercharges in another service and that the time for adjustments by means
other than cash repayment ended long ago. Id.


It is not contested that New Mexico could have adjusted its billing rates itself to
correct for over- and under-billing using the alternatives set out above. DCA Branch
Chief Terry D. Hill, who supervised the review of New Mexico's billing rates,
provided an affidavit stating that one goal was to "determine which rates could be
considered as having been adjusted during the five year period so that revenue in
excess of costs in one year were eliminated by cost in excess of revenue in
subsequent years or vice versa." DCA Ex. 5, at 2. He viewed these adjustments as the
responsibility of New Mexico to have made on its own, but found that rates "needing
significant adjustments for 1995 went unadjusted for most, if not all, of the
five-year period." Id., at 4; see also DCA Exs. 11, 12. Mr. Hill concluded that New
Mexico had not taken appropriate adjustments despite having received correspondence
from DCA in 1993 that should have clarified that such adjustments are to be made by
the state by individual billing rate. DCA Ex. 5, at 1, 3; see also DCA Exs. 17, 18.
Having determined that New Mexico had failed to make the requisite adjustments, Mr.
Hill indicated that DCA next considered the alternatives for making the appropriate
adjustments for the years involved. DCA Ex. 5, at 1-3. Given the time that had
passed, DCA concluded that the only viable option remaining was a cash repayment.


In reaching this conclusion, DCA also pointed to ASMB C-10, which provides
additional discussion of the Circular provision at issue in a question-and-answer
format.

> **4-12 Attachment C, paragraph G.4 establishes four methods for adjusting internal
> service funds (billed central services) for profits or losses realized from
> operations. Alternative (b) allows credits to amounts charged to the individual
> programs. This method would only cover profits. If losses occur, why can't
> individual programs be debited? [Att. C, ¶ G.4]**
> Effectively, alternative (b) is correcting billed costs in the current year,
> whereas alternative (c) is carrying forward the profit/loss into the next open

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fiscal period.
The failure of the Circular to note how losses are to be treated in alternative (b) is an editing error. For consistency purposes, both alternative (b) and (c) cover profit and loss situations. However, only one method can be used in a given fiscal year.
ASMB C-10, Part 4, § 4.8, Question 4-27 (emphasis in original); see DCA Supp. Submission at 12-15. While this response does show that a state could make timely adjustments in either direction in billing rates, it also highlights the time-sensitive nature of the alternatives. Thus, had New Mexico been reconciling each billing rate category annually as required, the alternatives open to it for making adjustments to reflect excess profits and losses in each would have been the same. It did not do so. The alternatives available to correct for the over-billed amounts have been narrowed now, because alternatives (b) and (c) (current credits or future rate changes) are time-limited. The first action would have had to be taken effective the fiscal year in which the revenues exceeded costs and the second would have had to be taken the next open fiscal period. New Mexico did not dispute that those time frames have long passed. Since the amounts involved make alternative (d) unavailable, it follows that the only option remaining is a cash repayment. In any case, the Board has recognized in prior cases that DCA has discretion in determining to seek a cash refund rather than allow one of the alternative methods of adjustment. Colorado Dept. of Personnel and Admin., DAB No. 1872, at n.3 (2003); Michigan Dept. of Management and Budget, DAB No. 1811 (2002).


New Mexico argued that the options set out at OMB Circular A-87, Attachment C, ¶ G.4.a-d, address only ways to "handle" billing rates when over-or undercharges have occurred but that the Circular does not deal with "how to calculate" such over- or undercharges in the first place. New Mexico Reply Br. at 1. On this point, according to New Mexico, OMB Circular A-87 is silent. This argument misses the point. The provision addresses ways for the grantee to correct billing rates to avoid accruing overcharges and undercharges as New Mexico did here. Had the overcharges come to light earlier, New Mexico might have had additional alternatives to make the needed corrections. But there is no question of calculation before us. The amounts involved are settled by agreement of the parties. The undercharge amounts are not part of "calculating" the overcharges. For the reasons we have discussed above, neither can they serve the role of retrospectively reducing the overcharges.


5. New Mexico's equitable arguments cannot entitle it to federal funds.


Much of New Mexico's argument depended on a general position that some unfairness inhered in disallowing the overcharges in billing rate service categories with excess revenues when New Mexico cannot somehow go back and retrospectively recover additional funds in categories with excess costs. See, e.g., New Mexico Submission in Response to July 3rd Teleconference at 3-4. New Mexico contended that the effect is to force it to "subsidize federal programs by millions of dollars," when New Mexico has "aggressively reduced rates and increased CPU utilization." New Mexico Br. at 8-9. New Mexico argued that this result violated its understanding of the intent of OMB Circular A-87 that "federal programs should bear their fair share of costs." Id. at 8.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DAB 1876 (2003), 2003 WL 21043171 (H.H.S.)                                      Page 10

New Mexico's fairness argument overlooks several important points. First, the reason that New Mexico may be unable to recover undercharges in some rate categories is that it did not take timely steps to reconcile and adjust those billing rates. Second, the costs of which OMB Circular A-87 speaks in saying that the federal programs should bear a fair share are expressly limited to those "recognized under these principles." The undercharges New Mexico seeks to substitute for amounts admittedly overbilled to federal programs do not meet the requirements to be recognized as allowable and allocable claims.

New Mexico also suggested that, though DCA asserted that it had not authorized any other state to offset overcharges as New Mexico sought to do here, such "netting" may have been "passively allowed" by DCA's "failing to issue determinations against other states engaged in the same practice." New Mexico Reply Br. at 2. It is not entirely clear what New Mexico seeks to establish by this point. We find no relevance in it to the single question before us. Other states may have grouped their internal services in a wide variety of ways, as noted elsewhere, and may have made timely adjustments to their rates in various permissible ways. New Mexico has proffered nothing to demonstrate that any other state is in a position analogous to that presented here. Even if it had, DCA's inaction against another state that made improper claims could do nothing to establish the propriety of New Mexico's claims.[FN11]

Finally, New Mexico interpreted DCA's actions and comments as treating it "like it was some deadbeat parent failing to pay child support or a tax evader," when New Mexico insisted it "behaved in good faith." New Mexico Br. at 9. We make no finding that New Mexico acted in anything other than good faith. Nor does it appear that DCA is seeking to impose any penalty on New Mexico. New Mexico is simply required to repay what it overcharged. This obligation implies no misconduct.

**Conclusion**

For the reasons set out in detail above, we sustain DCA's determination and uphold the disallowance in full.

Donald F. Garrett

Cecilia Sparks Ford

Marc R. Hillson
Presiding Board Member

FN1. This section provides an overview of the posture of the matter as it now stands. We provide more discussion of the factual details in the analysis section.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. A central service (or statewide) cost allocation plan (CAP) is a method of identifying central service costs and assigning them to benefitting federal and state programs and activities on a reasonable and consistent basis. OMB Circular A-87, Att. C, ¶¶ A.1, B.4; see Idaho Division of Financial Management, DAB No. 1822 (2002). "In essence, the CAP identifies the central support services that qualify for federal financial participation and describes how central support agencies allocate the costs." Alabama v. Shalala, 124 F. Supp. 2d 1250, at 1253 (M.D. Ala. 2000).

FN3. The Implementation Guide for OMB Circular A-87 for State, Local and Indian Tribal Governments, ASMB C-10, entitled "Cost Principles and Procedures for Developing Cost Allocation Plans and Indirect Cost Rates for Agreements with the Federal Government," replaced "A Guide for State and Local Government Agencies," OASC-10 (Dec. 1976), effective April 8, 1997. Hence, each applied during part of the time at issue. We cite to ASMB C-10 since neither party identified any significant difference.

FN4. For more general discussion of internal service funds, see Idaho Division of Financial Management, DAB No. 1822 (2002).

FN5. We do not view our decision as advisory since the disposition of a concrete sum depends directly on the resolution of the remaining issue. To the extent the parties sought to have the Board resolve some more generalized conceptual question of when "netting" is permissible, rather than whether the asserted undercharges here may be offset against the payment due from New Mexico as a result of the documented overcharges, we decline the invitation. The Board's regulations limit Board review to final written decisions in disputes, including those involving cost allocation plans and disallowance decisions denying payment of an amount claimed under an award, or requiring return or set-off of funds already received. 45 C.F.R. Part 16, App. A, ¶¶ B, C.a.1, D; OMB Circular A-87, Att. C., ¶¶ D.1, F.1. General and prospective guidance, such as the scope of "netting" in principle or the permissible structuring of future claims, do not involve such final determinations.

FN6. The actual number of specific rate categories is not entirely clear on the record before us. Other affidavits refer to 36 cost centers, for example. See New Mexico Ex. 17 (Peters Supp. Affidavit); compare New Mexico Ex. 8. The number and nature of categories used in any particular years is not relevant to the analysis here, so we need not sort out these specifics.

FN7. Mr. Peters admitted as much when he stated:
    If the state had made the billing adjustments to the billable services with
    losses during the fiscal years covered by this claim, those adjustments would
    have been allowed by OMB Circular A-87. It is those very same adjustments that
    the state is now asking to be considered in any calculation of overcharges to
    federal programs.
Peters Supplemental Affidavit, New Mexico Ex. 17, at ¶ 5. The fact remains, thus, that the state did not make any timely billing adjustments.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DAB 1876 (2003), 2003 WL 21043171 (H.H.S.)                                Page 12


FN8. For discussion of the kinds of timely claims issues that might be implicated, see generally New York State Department of Health, DAB No. 1867 (2003) (Medicaid); Minnesota Department of Human Services, DAB No. 1791 (2001)(Medicaid); Florida Department of Children and Families, DAB No. 1777 (2001) (foster care).


FN9. The various steps in this cycle are graphically illustrated at DCA Ex. 21.


FN10. Much of the documentation submitted by New Mexico seems to address whether it was permissible for New Mexico to adjust its billing rates in the different categories prospectively to correct for experience. See, e.g., Affidavit of Lynn Scheller, New Mexico Ex. 5, at ¶¶7, 8; Dowell Affidavit at ¶9. As explained in the text, the methods of setting billing rates and adjusting them to avoid excess profit or loss are not in dispute.


FN11. Generally, the Board has held that an agency's alleged inaction or tolerance in other situations cannot be used as a defense to an otherwise supported finding of impropriety in the case at bar. See Edison Medical Laboratories, Inc., DAB No. 1713 (1999); Beverly Health and Rehabilitation-- Spring Hill, DAB No. 1696 (1999); Rural Day Care Ass'n, DAB No. 1489, at 94-115 (1994), aff'd Rural Day Care Ass'n v. Shalala, Civ. No. 2:94-CV-40-BO (E.D.N.C.1995).


 DAB 1876 (2003), 2003 WL 21043171 (H.H.S.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.