## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEW MEXICO DEPARTMENT OF INFORMATION TECHNOLOGY, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Civil Action No. 07-1603 (CKK) |

## MEMORANDUM OPINION
(September 22, 2008)

New Mexico and other states receive federal funds for costs that are incurred in the administration of federal programs, but only to the extent that the costs are allowable (i.e., necessary and reasonable for the proper and efficient performance of a federal award) or allocable (i.e., assignable to a cost objective in accordance with the relative benefits received). Federal funds that are improperly awarded may be subject to a disallowance determination and a refund by the state. In this Administrative Procedure Act ("APA") case, the New Mexico Department of Information Technology ("New Mexico") has brought suit against the United States Department of Health and Human Services and Michael O. Leavitt, in his official capacity as Secretary of the Department of Health and Human Services (collectively, "HHS"), arguing that HHS's Division of Cost Allocation improperly calculated a disallowance amount by failing to offset overcharges associated with certain fiscal year 2004 services with undercharges occurring during the same period. The disallowance determination was upheld by HHS's Departmental Appeals Board ("DAB") on May 17, 2007, resulting in a decision that New Mexico challenges in this case as

arbitrary and capricious.  After a searching review of the parties' submissions, applicable case

law, statutory authority, regulations, and the administrative record, the Court finds that the DAB's

decision was not arbitrary and capricious, and quite to the contrary, was consistent with all

applicable regulations and with a prior decision issued by the DAB against New Mexico that

rejected the same arguments that New Mexico has once again raised before the DAB and before

this Court.  Accordingly, the Court shall GRANT Defendant's [11] Motion for Summary

Judgment and DENY Plaintiff's [14] Motion for Summary Judgment, for the reasons that follow.

## I.  BACKGROUND

*A.     Regulatory Framework*

The procedures governing the receipt and payment of federal funds to states for the

administration of federal programs are contained in the Office of Management and Budget

Circular A-87, located at 60 Fed. Reg. 26,484 - 26,507 (May 17, 1995) ("Circular A-87").[1]  This

case concerns the disposition of federal funds that New Mexico claimed for "central service

costs," which are "the costs of services provided by a state on a centralized basis to its various

departments and agencies . . ."  Circular A-87, Attach. A, ¶ B.4.  A state receives funds for

central service costs pursuant to a negotiated Cost Allocation Plan (a "CAP," or on a statewide

basis, an "SWCAP").  *Id.*, Attach. C, ¶ A.1.  An SWCAP has numerous requirements that a state

must follow in order to receive federal funds.  For example, an SWCAP must identify,

accumulate, and allocate allowable costs of services and include a formal accounting and other

---

[1] A copy of Circular A-87 is included in the Administrative Record ("A.R.") at 207-237, and both parties cite directly to the Circular throughout their pleadings.  For ease of reference and consistency, the Court shall cite directly to the provisions of Circular A-87 throughout this Memorandum Opinion.

records that support the propriety of the costs assigned to the federal funds. *Id.*, ¶¶ A.1, D.4. An SWCAP must include a projection of the central service costs for the following year, and a reconciliation of actual allocated central service costs with the estimated costs for the year most recently completed or the year preceding the year that was most recently completed. *Id.* ¶ D.1. All SWCAPs must be submitted to the cognizant agency[2] within six months prior to the beginning of each of the governmental unit's fiscal year, *id.* ¶ D.4, and must include a certification that the costs are allowable and properly allocable for federal funds in accordance with federal requirements. *Id.* ¶ E.4. A state must comply with its SWCAP that has been approved by the cognizant agency. *See* Circular A-87, Attach. A, ¶ C.1.d (explaining that costs are only allowable when they "[c]onform to any limitations or exclusions set forth in [Circular A-87], Federal laws, terms and conditions of the Federal award, or other governing regulations . . ."); *id.*, Attach. C, ¶ A (explaining that states must adopt and conform to CAPs that support claimed central service costs); *id.*, ¶ C (explaining that "[c]osts of central services omitted from the plan will not be reimbursed").

In the present case, the cognizant agency responsible for reviewing and approving New Mexico's fiscal year 2004 SWCAP was HHS's Division of Cost Allocation ("DCA"). A.R. 3-4 (5/17/07 DAB Decision). DCA disallowed overcharges for central service costs involving New Mexico's Internal Service Fund ("ISF"), a financing mechanism that allows a state to charge rates to recover the costs of services, and an additional margin permitting a reasonable level of working capital reserves. Circular A-87, Attach. C, ¶¶ E.3.b, G.2. Just as a state must produce

---

[2] A cognizant agency is the federal agency responsible for reviewing, negotiating, and approving an SWCAP. Circular A-87, Attach. A, ¶ B.6.

certain information related to an SWCAP, a state must also provide the cognizant agency with certain information related to an ISF.  For example, a state must provide a fiscal year-end reconciliation and an explanation as to how variances will be handled.  *Id.* ¶ E.3.b.1.  Although an ISF may cover more than one category of service provided by a central services agency, "[e]ach billed central service activity must separately account for all revenues . . .  generated by the service, expenses incurred to furnish the service, and profit/loss."  *Id.* ¶ G.1.

Of particular significance to the present litigation, Circular A-87 provides that revenues resulting from these billed central services must be compared to the actual allowable costs *at least annually* so that adjustments can be made:

> Billing rates used to charge Federal awards shall be based on the estimated costs of providing the services, including an estimate of the allowable central service costs.  A comparison of the revenue generated by each billed service (including total revenues whether or not billed or collected) to the actual allowable costs of the service will be made at least annually, and an adjustment will be made for the difference between the revenue and the allowable costs.

*Id.* ¶ G.4.  Circular A-87 identifies four possible "Adjustment Methods":

> (a) a cash refund to the Federal Government for the Federal share of the adjustment,
> (b) credits to the amounts charged to the individual programs,
> (c) adjustments to future billing rates, or
> (d) adjustments to the allocated central services costs.

*Id.*[3]

HHS's interpretation of Circular A-87, including its interpretation of the Adjustment Methods quoted immediately above, is embodied in an implementation guide titled "ASMB C-10."  A.R. 168-192.  ASMB C-10 explains (through a question and answer format) that

---

[3] Adjustment Method (d) is unavailable where "the total amount of the adjustment for a particular service . . . exceeds $500,000."  Circular A-87, Attach. C, ¶ G.4.

4

Adjustment Method (b) may only be used for billed costs within a fiscal year:

> Attachment C, paragraph G.4 establishes four methods for adjusting internal
> service funds (billed central services) for profits or losses realized from
> operations.  Alternative (b) allows credits to amounts charged to the individual
> programs.  This method would only cover profits.  If losses occur, why can't
> individual programs be debited?

> Effectively, *alternative (b) is correcting billed costs in the current year*, whereas
> alternative (c) is carrying forward the profit/loss into the next open fiscal period.

> The failure of the Circular to note how losses are to be treated in alternative (b) is
> an editing error.  For consistency purposes, both alternative (b) and (c) cover
> profit and loss situations.  However, only one method can be used in a given fiscal
> year.

A.R. 191-92 (ASMB C-10, Part 4, § 4.8, Question 4-12) (emphasis added).

DCA may initiate a disallowance action if costs are not claimed in accordance with a

state's approved SWCAP.  45 C.F.R. § 92.51; Circular A-87, Attach. C, ¶ F.3.  The state may

request reconsideration of a disallowance determination, and may file an appeal with the

Department of Appeals Board ("DAB").  45 C.F.R. Part 16, App'x A, ¶ D.  A final disallowance

determination is subject to judicial review as a final agency action under 5 U.S.C. § 704.

B.    *Factual Background*

This case is best understood against the background of New Mexico's repeated failures to

comply with its SWCAP requirements and with Circular A-87.  In March and April 2001, DCA

issued determinations for fiscal years 1995 through 1999 that disallowed more than $8,000,000

in federal funds for costs associated with central computer services billed by New Mexico.  *See*

*New Mexico Gen'l Svcs. Dep't*, DAB 1876 at 1, 2003 WL 21043171 (H.H.S. Apr. 30, 2002).

New Mexico appealed this disallowance determination, arguing that the amount should be offset

with costs that were never billed to state agencies for federal programs but that, according to

New Mexico, *could have* been billed.  *Id.* at 1, 5.  The DAB found that, although it might

sometimes be appropriate to reevaluate prior costs that were never billed, a disallowance action is

"not the right place to determine that."  *Id.* at 6.  Instead, if New Mexico believed that it billed

inadequately for some of its services:

> its remedy would be to adjust its billing to the state agencies for the past periods.
> Those agencies could then verify whether the bills reflect necessary costs for
> services actually ordered and delivered and allocate the correct amounts to any
> participating federal programs in accordance with the CAP and the rules
> applicable to those program grants.

*Id.*  The disallowance action was the improper place to raise New Mexico's offset arguments

because "[n]one of these processes are part of the evaluation normally done by DCA in its review

of the bases for the internal service funds amounts."  *Id.*  The DAB concluded that New Mexico's

position, if accepted, would allow the circumvention of regulations implemented by Circular A-

87:

> To allow [New Mexico to offset these unbilled costs in its disallowance review]
> would be to open a back door to claims evading timely filing requirements which
> would leave federal budget outlays uncertain indefinitely.  What is more, to use
> the unbilled undercharges to offset repayment of improperly claimed federal funds
> would mean the additional charges would never pass through the normal claiming
> process at all . . . We therefore decline to allow these late and speculative
> undercharge amounts to offset the documented, and uncontested, overcharges.

*Id.* at 6.

New Mexico argued that it should be allowed to offset these costs because it *could have*

balanced the profit and loss across various rate categories to counter the admitted overcharges in

the actual billing rates applied.  *Id.*  The DAB rejected this argument, holding that "New Mexico

would have [the DAB] infer that what it could have done prospectively, it should be allowed to

do in effect by recalculating the disallowed overcharges," but that "[h]aving made its elections,

6

New Mexico may not now complain that it might have chosen a different way that hindsight

suggests could have increased its federal funding." *Id.* at 6-7.

In terms of repayment, the DAB found that the only option remaining for New Mexico

was a cash repayment for the full amount of the overcharges:

> had New Mexico been reconciling each billing rate category annually as required,
> the alternative open to it for making adjustments to reflect excess profits and
> losses in each would have been the same.  It did not do so.  The alternatives
> available to correct for the over-billed amounts have been narrowed now, because
> alternatives (b) and (c) . . . are time-limited.  The first action would have had to be
> taken effective the fiscal year in which the revenues exceeded costs and the
> second would have had to be taken the next open fiscal period.

*Id.* at 9.  Finally, New Mexico argued that it would be unfair to disallow overcharges in billing

rate service categories without allowing New Mexico to go back and retrospectively recover

funds in categories with excess costs.  *Id.*  The DAB rejected this argument because "the reason

that New Mexico may be unable to recover undercharges in some rate categories is that it did not

take timely steps to reconcile and adjust those billing rates."  *Id.* at 10.  New Mexico did not

appeal this decision.

The disallowance discussed above concerned fiscal years 1995 through 1999.  New

Mexico reportedly calculated new adjusted rates for these services but, inexplicably, failed to

implement them for fiscal years 2000 through 2004.  A.R. 254-261 ¶ 7 (Affidavit of Robert G.

Peters).  For this reason, New Mexico continued to use the cost-based rates originally calculated

for fiscal year 1999.  *Id.*  On August 8, 2003, members of DCA met with various individuals

representing New Mexico to discuss how to bring New Mexico's reporting back into compliance

with Circular A-87.  A.R. 299-304 ¶ 4 (Declaration of Terry D. Hill).  A second meeting was

held on June 22, 2004.  *Id.* ¶ 5.  Nevertheless, on February 4, 2005, DCA issued a disallowance

of approximately $3,000,000 in costs for computer services because (like the earlier disallowance) New Mexico had failed to adjust its billing rates in order to eliminate reserves in excess of the amount permitted by Circular A-87.  A.R. 313-15 (2/4/05 Letter from H. Williams to D. Wilpolt-Cook); A.R. 7 (5/17/07 DAB Opinion).  New Mexico did not appeal this decision and reimbursed the federal government in full.  A.R. 7 (5/17/07 DAB Opinion).

The deadline for New Mexico to submit its fiscal year 2004 SWCAP, which would have included fiscal year cost reconciliations in accordance with Circular A-87, was December 31, 2004.  A.R. 253-61 ¶ 17 (Affidavit of Robert G. Peters).  New Mexico missed that deadline and submitted its plan on October 15, 2005 (i.e., approximately 10 months late).  *Id.*  Robert Peters, the Executive Budget Analyst in New Mexico's Department of Finance and Administration, explained that New Mexico chronically failed to devote the resources necessary to timely submit its SWCAPs:

> The complete picture of New Mexico's effort to put together the SWCAP must also include a comment on the resources we dedicate to the preparation of the plan.  As you know, the state has been delinquent in submitting the plan on a timely basis since the Stone Age.  And even though we have had disagreements with DCA in Dallas on other matters such as how to calculate overcharges to federal programs, they have been more than patient with the state on the submission of the plan . . . Part of the problem is that agencies contained in the plan . . . can't get their audits completed in time for us to get the plan submitted by December 31st.  That is not likely to change until the state has successfully implemented its new accounting system.

*Id.* ¶ 1; A.R. 310 (1/30/07 Email from R. Peters to L. Lauritsen).

Once New Mexico submitted its fiscal year 2004 SWCAP, it stated that New Mexico would reconcile revenues with actual allowable costs through two reconciliations per year to adjust billing rates (i.e. Adjustment Method (b)):

> In March/April of each year, a 'mid-year realignment' is performed to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87.  The billing rates are adjusted to reflect actual usage and costs to that point in time plus the expected usage and costs to the end of the year.  Based on the new billing rates by service, any over/under recovery associated with each account is adjusted to reflect the new billing rates and the actual usage by that account . . . This same process is also performed at the end of the year.

A.R. 244 (10/15/05 Cost Allocation Plan Based on FYE 2004).

New Mexico failed to undertake the mid-year realignment described in its SWCAP and continued to use its fiscal year 1999 rates.  *See* A.R. 253-61 ¶¶ 7, 17 (Affidavit of Robert G. Peters).  Not surprisingly, on February 22, 2006, DCA issued a disallowance determination for fiscal year 2004, disallowing $4,620,948 in costs for computer services.  A.R. 29-31 (6/22/06 Letter from H. Williams to A. Jaramillo).  New Mexico submitted clarifying information to DCA which resulted in a revised determination in the amount of $3,790,567, or $4,011,031 with interest.  *Id.*  New Mexico filed a notice of appeal with the DAB on July 24, 2006, arguing (again) that it should be allowed to offset overpayments associated with costs for services using undercharges for other services.  A.R. 27-28 (7/24/06 Letter from C. Miller to HHS Appellate Division).  The DAB (again) rejected New Mexico's arguments in an opinion that is now the subject of the instant suit.

The DAB first recounted the history of New Mexico's repeated inability to comply with Circular A-87, including its failure to implement new cost-based rates each fiscal year, failure to perform the mid-year realignment contained in its SWCAP, failure to timely submit its 2004 SWCAP to DCA, and failure to adjust its bills for fiscal year 2004 pursuant to its SWCAP methodology.  A.R. 6-9 (5/17/07 DAB Opinion).  Notwithstanding these deficiencies, New Mexico argued that Circular A-87 allows central service costs to be adjusted to cover the cost-

neutral "difference between [ISF] revenue and the allowable costs," A.R. 81 (1/16/07 Appellant's Brief), and that ASMB C-10 instructs that "[t]he primary concern would be that the Federal programs charged in a given year receive an equitable and appropriate adjustment for the over/under billings." *Id.* at 82. Consistent with that view, New Mexico argued that HHS's interpretation of Circular A-87 was incorrect because the Adjustment Methods contained in Circular A-87 are not time-limited and allow New Mexico's proposed offsets. *Id.* at 84.

The DAB rejected these arguments because they ignored the fact that the Adjustment Methods "adjust for any variance between a billing rate and the actual costs of a service *for a fiscal year* and that the methodology New Mexico adopted in its approved SWCAP for SFY 2004 was alternative (b)." (emphasis in original). A.R. 12 (5/17/07 DAB Opinion). New Mexico admittedly failed to make timely adjustments for any credits or debits to individual programs using that methodology and within the fiscal year. *Id.* at 14. The so-called undercharges could not, therefore, be offset because "[f]ollowing ISF requirements and submitting claims are "prerequisites for charging ISF services to federal programs." *Id.* at 14.

The DAB then confronted New Mexico's arguments related to a post-hoc audit of the ISF conducted by New Mexico to include undercharges for other categories of services that results in a disallowance amount of $1.85 Million (as opposed to the approximate $4 Million disallowance determination that had been issued by DCA). A.R. 83 (1/16/07 Appellant's Brief). The DAB found that New Mexico's audit missed the essential issue on appeal – "whether undercharges not timely billed or adjusted pursuant to the approved methodology (and consequently never claimed for federal programs) should be considered allowable and allocable charges to federal funds that may be offset against admitted overcharges." A.R. 15 (5/17/07 DAB Opinion). The DAB

rejected the use of New Mexico's belated analysis because "there are requirements in particular programs, such as requirements for timely submission of claims or caps on administrative costs, that affect allowability of such charges at the program level . . . [and] the methods of adjustment in the Circular presume timely calculation of billing rates and timely adjustments to billing, consistent with the approved methodology in the SWCAP." *Id.* at 15.  The DAB also rejected New Mexico's audit because it took into account overcharges and undercharges for services occurring between fiscal years 2000 and 2003, even though New Mexico had no authorization to carry forward such costs.  *Id.* at 20-24.  The DAB concluded that "New Mexico understood this and deliberately sought to obfuscate exactly what its analysis did."  *Id.* at 26.

   C.      *Procedural Background*

   New Mexico filed the instant Complaint on September 10, 2007.  HHS filed a Motion for Summary Judgment ("Defs.' Mot.") on December 11, 2007, and New Mexico filed a Cross-Motion for Summary Judgment ("Pl.'s Mot.") on December 21, 2007.  New Mexico filed an Opposition to HHS's Motion ("Pl.'s Opp'n") on January 10, 2008.  Defendant thereafter filed a consolidated Reply in support of its Motion and Opposition to New Mexico's Motion for Summary Judgment ("Defs.' Opp'n") on February 5, 2008.  New Mexico filed a Reply in support of its Motion ("Pl.'s Reply") on February 22, 2008.  On February 25, 2008, the Court granted New Mexico leave to supplement the record with an additional exhibit.[4]  Accordingly, the parties' cross-motions are fully briefed and are ripe for decision.

---

   [4] The exhibit reflects New Mexico's payment to the federal government of the undisputed amount of the overpayment ($1.85 Million), plus interest.  *See* Pl.'s Consent Mot. to Suppl. the Record at 1, Docket No. [20] (2/22/08).

## II.  LEGAL STANDARDS

*A.      Summary Judgment*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C. Cir.1992).  Furthermore, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975); *Long v. Gaines,* 167 F. Supp. 2d 75, 85 (D.D.C. 2001).  Each moving party discharges its burden to support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)  (quoting Fed. R. Civ. P. 56(c)).  In opposing a motion for summary judgment, a party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.

*B.      Administrative Procedure Act*

Under the APA, the Court is to set aside an agency action that is "arbitrary and

capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §

706(2). "'The party challenging an agency's action as arbitrary and capricious bears the burden

of proof.'" *City of Olmsted Falls v. F.A.A.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quoting *Lomak*

*Petroleum, Inc. v. FERC,* 206 F.3d 1193, 1198 (D.C. Cir. 2000)). To survive the "arbitrary and

capricious" standard, an agency must "'examine the relevant data and articulate a satisfactory

explanation for its action, including a rational connection between the facts found and the choice

made." *PPL Wallingford Energy LLC v. Federal Energy Regulatory Comm'n*, 419 F.3d 1194,

1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Asso'n of the United states, Inc. v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal punctuation omitted). This standard

of review is highly deferential to the agency, so that a Court need not find that the agency's

decision is "the only reasonable one, or even that it is the result [the Court] would have reached

had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am.*

*Elec. Paper Serv. Corp.*, 461 U.S. 402, 422 (1983). The Court is not entitled to substitute its

judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402,

416 (1971). Finally, an agency decision must generally be affirmed on the grounds stated

therein, and a reviewing court may not attempt to supply "a reasoned basis for the agency's

action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Consistent with this review standard, judicial review is confined to the full administrative record

before the agency at the time the decision was made. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d

275, 284 (D.C. Cir. 1981).

## III.  DISCUSSION

Based on the facts contained in the record, the Court finds that the DAB's decision was

not arbitrary or capricious.  The DAB correctly found that New Mexico had failed to comply

with its fiscal year 2004 SWCAP, which required New Mexico to undertake mid-year and end-

of-year cost reconciliations and to implement billing adjustments to account for any variances.

Instead, New Mexico waited until a disallowance determination had been issued, and then

undertook a post-hoc review of its ISF in an attempt to offset undercharges against the

disallowed amount, even though it knew from prior experience that such a course of action was

unauthorized by the applicable regulations in Circular A-87.  Accordingly, the DAB correctly

concluded that the disallowance amount properly excluded New Mexico's proffered offsets.

New Mexico first argues that the "main error" made by DCA and the DAB is that they

None of the arguments raised by New Mexico demonstrate that the DAB acted arbitrarily

or capriciously when reaching this decision.  New Mexico's Motion argues that it is entitled to

offsets because all four Adjustment Methods in Circular A-87 must take into account

overcharges and undercharges, *see* Pl.'s Mot. at 13-16, the Adjustment Methods are *not* time-

limited, *id.* at 16-18, and New Mexico's method of calculating the overcharge amount is more

accurate and reliable than the amount calculated by DCA, *id.* at 18-21.  New Mexico's

Opposition adds a final argument that the overcharge amount, as calculated by DCA, constitutes

an unlawful forfeiture.  *See* Pl.'s Opp'n at 4-13.  The Court shall address each of these arguments

in turn.

New Mexico first argues that the "main error" made by DCA and the DAB is that they

fail to acknowledge that all four Adjustment Methods permit a balancing of overcharges and

undercharges.  *See* Pl.'s Mot. at 13-14.  The DAB correctly found that New Mexico's arguments

in this respect were misguided because New Mexico's SWCAP incorporated Adjustment Method

(b):

14

> In March/April of each year, a 'mid-year realignment' is performed to adjust the billed costs to the actual, allowable costs as defined by OMB Circular A-87.  The billing rates are adjusted to reflect actual usage and costs to that point in time plus the expected usage and costs to the end of the year.  Based on the new billing rates by service, any over/under recovery associated with each account is adjusted to reflect the new billing rates and the actual usage by that account . . . This same process is also performed at the end of the year.

A.R. 224 (10/15/05 Cost Allocation Plan for fiscal year 2004).  There is no dispute that

Adjustment Method (b) allows a balancing of overcharges and undercharges, provided the

adjustments occur within a given fiscal year.  A.R. 191-92 (ASMB C-10, Part 4, § 4.8, Question

4-12).

Seeking to avoid Adjustment Method (b) and its time limitation, New Mexico denies that

its SWCAP incorporated Adjustment Method (b) and dismisses the above-quoted language as

"directed only toward the billing process."  Pl.'s Opp'n at 11.  New Mexico argues that its

SWCAP expressly incorporated none of the Adjustment Methods, relying on the following

language: "[a]djustments for variances between billed costs and the actual allowable costs of

providing the services, as defined by OMB Circular A-87, [are to] be made in accordance with

procedures agreed to between the State/locality and the Cognizant agency."  Pl.'s Mot. at 7

(quoting A.R. 239 (2/22/05 Cost Allocation Agreement)).  The DAB rejected New Mexico's

argument that this general provision could reasonably be read as allowing New Mexico to

disregard the more specific adjustment procedures set out in its SWCAP.  A.R. 9.  The Court

agrees.  In no sense could the specific provision quoted above be read to refer simply to the

"billing process," as it specifically states that "a 'mid-year realignment' is performed to adjust the

billed costs to the actual, allowable costs as defined by OMB Circular A-87," and that "any

over/under recovery associated with each account is adjusted to reflect the new billing rates and

the actual usage by that account."  A.R. 224 (10/15/05 Cost Allocation Plan for fiscal year 2004).

This is precisely what is contemplated by Adjustment Method (b).  *See* A.R. 191-92 (ASMB C-

10, Part 4, § 4.8, Question 4-12) ("alternative (b) is correcting billed costs in [a] current year").

Nor does the language of the general provision require a different method to be used, as it only

suggests that New Mexico intended to comply with Circular A-87 and its SWCAP.[5]

Accordingly, the DAB was correct to find that New Mexico's SWCAP adopted Adjustment

Method (b), and that "the issue of whether offset is permitted if the adjustment method selected

in a CAP is the refund alternative in [Adjustment Method] (a)" is not the relevant inquiry in this

case.  A.R. 14 (5/17/07 DAB Opinion).

New Mexico next argues that Circular A-87 "imposes no time limit for making an

adjustment based on the annual reconciliation of revenues and costs."  Pl.'s Mot. at 16.  This

argument is grounded in the language of Circular A-87 and a prior version of the same provision.

Circular A-87 provides:

> Billing rates used to charge Federal awards shall be based on the estimated costs
> of providing the services, including an estimate of the allocable central service
> costs.  *A comparison of the revenue generated by each billed service (including
> total revenues whether or not billed or collected) to the actual allowable costs of
> the service will be made at least annually, and an adjustment will be made for the
> difference between the revenue and the allowable costs.*  These adjustments will
> be made through one of the following adjustment methods: (a) a cash refund to
> the Federal Government for the Federal share of the adjustment, (b) credits to the
> amounts charged to the individual programs, (c) adjustments to future billing
> rates, or (d) adjustments to allocated central service costs.

---

[5] Even if the language in the specific and general provisions did conflict, the D.C. Circuit
has recognized as a canon of construction that a specific provision controls the meaning of a
more general provision.  *See, e.g.*, *Gandal v. Telemundo Grp., Inc.*, 23 F.3d 539, 546 (D.C. Cir.
1994) ("[t]he specific provision . . . therefore supersedes the language of the general clause")
(citing *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (stating that in statutory interpretation a
specific statute will not be controlled by a more general statute)).

Circular A-87, Attach. C., ¶ G.4 (emphasis added).  New Mexico interprets this language to distinguish between reconciliations (which must occur annually) and adjustments (which may occur at any time).  *See* Pl.'s Mot. at 17.  Plaintiff further supports its interpretation by referencing a proposed prior version of this provision, which specified that "[i]ndividual billing rates will be reviewed and *adjusted to actual costs at least annually*."  *Id.* (quoting OMB Proposed Revisions to Circular A-87, 58 Fed. Reg. 44,212, 44,230 (Aug. 19, 1993) (emphasis in original)).  Based on a comparison of the proposed language and the promulgated version, New Mexico concludes that the OMB rejected a time constraint on adjustments.  *Id.*

The DAB rejected New Mexico's arguments because ASMB C-10 explains that Adjustment Method (b) may only be used in a given fiscal year:

> Attachment C, paragraph G.4 establishes four methods for adjusting internal service funds (billed central services) for profits or losses realized from operations.  Alternative (b) allows credits to amounts charged to the individual programs.  This method would only cover profits.  If losses occur, why can't individual programs be debited?
>
> Effectively, *alternative (b) is correcting billed costs in the current year*, whereas alternative (c) is carrying forward the profit/loss into the next open fiscal period.
>
> The failure of the Circular to note how losses are to be treated in alternative (b) is an editing error.  For consistency purposes, both alternative (b) and (c) cover profit and loss situations.  However, only one method can be used in a given fiscal year.

A.R. 191-92 (ASMB C-10, Part 4, § 4.8, Question 4-12) (emphasis added).  The DAB further explained that this interpretation of Circular A-87 is reasonable because the four Adjustment Methods "follow the requirement for a comparison of revenue to actual costs for each service 'at least annually.'" A.R. 13 (5/17/07 DAB Opinion) (quoting Circular A-87, Attach. C, ¶ G.4).  The

DAB concluded that such a time limitation was also reasonable because Circular A-87 "does not permit a state to adopt one methodology in its SWCAP, fail to apply that methodology in a timely manner, and then seek to have the benefit of an alternative type of adjustment, no matter what the consequences of the delay." *Id.*

The Court finds that the DAB's interpretation of Circular A-87 is entirely reasonable and cannot be characterized as arbitrary or capricious.  Interpreting Circular A-87 to require adjustments to be made in the same fiscal year as the reconciliations undertaken by the state is a logical reading of the provision because the reconciliations identify the areas where adjustments are necessary.  This interpretation is consistent with New Mexico's SWCAP, which required reconciliations to occur twice each year so that corresponding adjustments to the billing rates could be made. A.R. 224 (10/15/05 Cost Allocation Plan for fiscal year 2004).  This interpretation is also consistent with the other provisions of Circular A-87, which require annual negotiations and approval of SWCAPs, *see* Circular A-87, Attach. C, ¶ D, and that allow costs to be allocable only where they are incurred in the context of an annually-negotiated SWCAP, *see e.g.*, Circular A-87, Attach. A, ¶ C.3.d.  The reasonableness of the DAB's interpretation is unaffected by New Mexico's cursory analysis of a previous draft of the Circular's language.  Far from rejecting time limitations, the proposed language is not inconsistent with the promulgated version, which indicates that reconciliations must occur annually and corresponding adjustments "will be made for the difference between the revenue and the allowable costs."  Circular A-87, Attach. C., ¶ G.4.  New Mexico offers no support for its position that the language was re-written to remove time limitations, and an equally plausible reading is that the language was re-written to further elucidate the adjustments to which the OMB was referring.  The DAB's interpretation of

this provision is therefore not arbitrary or capricious.[6]

A further difficulty for New Mexico's argument is that New Mexico failed to comply

with the terms of its SWCAP with respect to these unbilled costs.  *See* Pl.'s Mot. at 11 n.5

("DCA could easily ascertain that the State was not conducting [mid-year] adjustments from the

materials that the State shared for the SWCAP fo each fiscal year").  The DAB found that

> the methods of adjustment in the Circular presume timely calculation of billing
> rates and timely adjustments to billing, consistent with the approved methodology
> in the SWCAP.  Following the approved methodology provides an assurance that
> the adjustment of any over or under billing will be equitable and appropriate.
> That assurance simply is not there when a state deviates from that methodology,
> as New Mexico has done over a period of many years.

A.R. 15 (5/17/07 DAB Opinion).  The Fourth Circuit has acknowledged the same concerns in a

similar context:

> Maryland has asserted that denying retroactive approval of its CAP will result in
> its receiving less than full reimbursement for the expenses it incurred that could
> have been eligible for Title IV-E reimbursement.  Approval of a plan and
> compliance with the plan approved are two different things . . . a state that
> administered a program substantively complying with Title IV-E but did not
> submit a plan would be entitled to no funds at all.

*Colvin v. Sullivan*, 939 F.2d 153, 156 (4th Cir. 1991).  *Cf.  Idaho Div. of Fin. Mgmt.*, DAB 1822

at 5, 2002 WL 464464 (H.H.S. Mar. 21, 2002) ("it is important that [costs of central services] be

---

[6] The Court must similarly reject New Mexico's argument, contained in a footnote in
Opposition to HHS's Motion, that an adjustment could "never be implemented during the same
year in which the cost/revenue difference arose, because cost/revenue settlements are not even
completed until after the end of the year."  Pl.'s Opp'n at 9 n.3.  This argument is unpersuasive
because New Mexico's SWCAP expressly required mid-year reconciliations and adjustments,
and as the DAB recognized, this argument does not "explain why New Mexico never made the
mid-year 'realignment' pursuant to its SWCAP or seek to credit/debit the billing accounts . . .
once it had the information to compare the revenues to expenses for each service category.  Nor
does New Mexico explain why it continued to bill at the 1999 rates, which could no longer be
considered to be a reasonable estimate of 2004 costs."  A.R. 14 (5/17/07 DAB Opinion).

claimed only under an approved CAP methodology subject to DCA's scrutiny.  By that scrutiny,

DCA may assure that costs claimed through an ISF are allowable types of costs . . . and that any

excess reserves resulting from billing rates that were set too high are identified, so that they may

be returned to the federal programs though one of the permitted methods").  The Court agrees

with the DAB that Circular A-87 is appropriately interpreted to prevent a state from avoiding the

requirements of the adjustment methodology incorporated into its SWCAP and then later

claiming those same costs.  A.R. 13 (5/17/07 DAB Opinion).

New Mexico also makes the argument that, notwithstanding its failure to comply with its

SWCAP, it should be permitted to offset costs under Adjustment Method (a) because the

government is seeking a cash repayment.  *See* Pl.'s Opp'n at 10 & n.4 ("there is no authority that

would suggest that a refund implemented via a disallowance may be calculated without regard to

the principles that generally apply to the calculation of a refund under Paragraph G.4").  New

Mexico's argument ignores the actual facts in this case and conflicts with Circular A-87.  A state

that adopts Adjustment Method (a) in its SWCAP and complies with the same is not similarly

situated to New Mexico, which selected Adjustment Method (b) in its SWCAP and then

subsequently failed to comply with the same.  As the DAB has repeatedly informed New Mexico,

billing these costs as part of an approved Adjustment Method is *different* from arguing to the

DCA that the costs should be part of its review:

> Such a re-evaluation may sometimes be appropriate, depending on the
> circumstances and the terms of the state's CAP, but [a disallowance
> determination] is not the right place to determine that.  If [New Mexico] billed
> inadequately for some of its services, its remedy would be to adjust its billing to
> the state agencies for the past periods.  Those agencies could then verify whether
> the bills reflect necessary costs for services actually ordered and delivered and
> allocate the correct amounts to any participating federal programs in accordance

with the CAP and the rules applicable to those program grants.

*New Mexico*, DAB 1876 at 6, 2003 WL 21043171 (HHS).  Second, it would be anomalous to

allow a state to recover unbilled costs years after the fact because the state also erred by

overcharging the federal government as to other services.  *See Maine v. Shalala*, 81 F. Supp. 2d

91, 97 n.7 (D. Me. 1999) ("merely because the federal government is entitled to recover its

overpayments resulting from an error by the State of Maine, it does not follow that the State is

entitled to recover federal 'underpayments' resulting from another error by the State of Maine").

*Cf. Arkansas Dep't of Info. Sys.*, DAB 2010, 2006 WL 321179 (H.H.S. Jan. 26, 2006) ("here the

issue is whether, in the absence of Arkansas having timely adjusted its rates, Arkansas should be

permitted in effect to recover federal funds for amounts it has not claimed from specific

programs though the proper channels, merely because Arkansas overcharged federal funds for

some services," and rejecting such an offset)*; W. Va. Dep't of Admin.*, DAB 1465, 1994 WL

321796 (H.H.S. Feb. 25, 1994) ("Since West Virginia has never filed a proper claim for these

costs, the federal government has not had the opportunity to make any determination regarding

[their] allowability . . . To allow West Virginia to offset any unclaimed costs against the

disallowance here would allow it to circumvent these time limits and recover costs which it

would otherwise not be entitled to receive").  Finally, New Mexico's argument, if accepted,

would eviscerate any incentive for states to comply with their SWCAPs and Circular A-87,

particularly where a state has demonstrated no intention of complying with its SWCAP and

Circular A-87 over an extended period of time.  Accordingly, the Court finds that the DAB's

decision was not arbitrary or capricious.

New Mexico's final two arguments do not require extended discussion.  New Mexico

21

argues that it has conducted a post-hoc evaluation (which it calls a "refined analysis") that it claims is more accurate that the analysis applied by DCA, mainly because it takes into account undercharges instead of focusing solely on overcharges. Pl.'s Mot. at 14, 18-21. This argument misses the mark completely because, as discussed above, the applicable regulations in Circular A-87 and New Mexico's SWCAP do not permit New Mexico to offset these unbilled costs against DCA's disallowance determination. Moreover, this Court's review is limited to determining whether the DAB reached a decision that was arbitrary or capricious, not whether the Court believes New Mexico's post-hoc calculations apply a better methodology. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (explaining that a court is not entitled to substitute its own judgment for that of the agency). If New Mexico believes that its methodology is superior, the proper course of action would be to incorporate it into its fiscal year SWCAP for purposes of making adjustments to its billing rates.[7] *See* Circular A-87, Attach. C, ¶ A.

Finally, New Mexico argues that the DAB's decision that prevents New Mexico from belatedly offsetting unbilled costs against the disallowed amount constitutes a "major forfeiture" that is disfavored in the law. Pl.'s Opp'n at 4-7. The Court agrees with the DAB that "determin[ing] that a state has lost an opportunity to recover federal funds that it could have recovered had it timely followed federal requirements is not tantamount to imposing a penalty." A.R. 16. As explained above, New Mexico improperly received federal funds because it failed to follow its SWCAP and adjust its billing rates. New Mexico therefore has no right to these funds,

---

[7] New Mexico does not allege that its post-hoc analysis was contemplated as part of its adjustment methodology in its approved fiscal year 2004 SWCAP.

and pursuant to Circular A-87, must repay them.  Circular A-87, Attach. C, ¶ F.3 (explaining that

federal funds that are not allowable shall be adjusted or "a refund shall be made at the option of

the Federal cognizant agency").  *Cf. Maine*, 81 F. Supp. 2d at 96 n.4 (rejecting the plaintiff's

appeal to "fairness" in support of its efforts to offset overpayments because the language [of

Circular A-87] makes clear that provisions of law supercede such principles").

## IV.  CONCLUSION

For the reasons set forth above, the Court shall GRANT Defendant's [11] Motion for

Summary Judgment and DENY Plaintiff's [14] Motion for Summary Judgment.  This case shall

be dismissed in its entirety.  An appropriate Order accompanies this Memorandum Opinion


Date:   September 22, 2008


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge